**Westlaw Delivery Summary Report for SINN,NATE R 6026349**

| | |
|---|---|
| Date/Time of Request: | Tuesday, February 5, 2008 15:56 Central |
| Client Identifier: | 0126/01 |
| Database: | LH |
| Citation Text: | S. REP. 100-19 |
| Lines: | 4835 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.



S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)

**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

**\*\*489** P.L. 100-86, COMPETITIVE EQUALITY BANKING ACT OF 1987
DATES OF CONSIDERATION AND PASSAGE
House May 5, August 3, 1987
Senate March 27, May 14, August 4, 1987
House Report (Banking, Finance and Urban Affairs Committee)
No. 100-62, Apr. 22, 1987 [To accompany H.R. 27]
Senate Report (Banking, Housing, and Urban Affairs Committee)
No. 100-19, Mar. 19, 1987 [To accompany S. 790]
House Conference Report No. 100-261, July 31, 1987
[To accompany H.R. 27]
Cong. Record Vol. 133 (1987)
The House bill was passed in lieu of the Senate bill after amending its
language to contain much of the text of the Senate bill. The Senate Report is
set out below and the House Conference Report and the Signing Statement of the
President follow.

SENATE REPORT NO. 100-19
March 19, 1987

CONTENTS
Page
Introduction ................................................................. 1
Purpose of the legislation ................................................... 1
FSLIC recapitalization ....................................................... 2
Nonbank banks and related issues ............................................. 2
History of the legislation ................................................... 4
Title I.--Financial institutions competitive equality ....................... 5
  Closing the nonbank bank loophole ......................................... 5
  Exclusions from the definition of 'bank' ................................. 11
  Restrictions on grandfathered companies that control nonbank banks ....... 11
  Restrictions on bank holding companies that control nonbank banks ........ 13
  Loans to insiders ........................................................ 13
  Anti-tying restrictions .................................................. 13
  Closing the nonthrift loophole ........................................... 13
  Qualified thrift lender test ............................................. 15
  Joint marketing restrictions on thrift institutions ...................... 15
  Security activities of FSLIC-insured thrift institutions ................. 15
Title II.--Mortatorium on certain nonbanking activities ..................... 15
  Securities ............................................................... 15
  Insurance ................................................................ 16
  Real estate .............................................................. 17
Title III.--Federal Savings and Loan Insurance Corporation Act of 1987 ..... 17
  Borrowing limit and congressional review ................................. 18
  Funding framework ........................................................ 19

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)

Title IV.--Emergency acquisitions ........................................ 21
    Failed and failing banks ............................................ 22
    Bridge banks ........................................................ 22
    State considerations ................................................ 22
    Sequestration and apportionment ..................................... 23
Title V.--Amendments to the Federal Credit Union Act .................... 23
Title VI.--Fair deposit availability ................................... 25
Section-by-section summary ............................................. 29
    Title I.--Financial institutions competitive equality .............. 29
        Section 101(a): Definition of 'bank' and other terms .......... 29
            Trust company exclusion ..................................... 29
            Credit card exclusion ....................................... 29
            Industrial loan companies and industrial banks ............. 30
            Anti-tying provisions ....................................... 30
            Edge Act and agreement corporations ......................... 30
            Other terms ................................................. 31
        Section 101(b): Immediate divestiture requirement ............. 31
        Section 101(c): Grandfather provisions ........................ 31
            Joint marketing restrictions ................................ 33
            Overdrafts .................................................. 34
            Notice of grandfathered affiliations and enforcement ....... 34
            Anti-tying restrictions ..................................... 35
            Nonbank banks owned by bank holding companies .............. 35
        Section 101(d): State-authorized activities of savings banks ... 35
        Section 101(e): Savings bank holding company defined .......... 36
        Section 101(f): Thrift institution defined .................... 36
        Section 101(g): Exemption for certain banks and trust companies ........ 36
    Amendments to the Federal Reserve Act:
        Section 102(a): Restrictions on transactions with affiliates ........... 36
        Section 102(b): Applicability of section 23B to insured banks .......... 37
        Section 102(c): Edge Act and agreement corporations ................... 37
    Amendments to the Federal Deposit Insurance Act:
        Section 103: Securities affiliations of nonmember insured banks ........ 37
        Section 104(a): Savings and Loan Holding Company Act definitions ....... 38
        Section 104(b): Savings and loan holding company activity and
        grandfather provisions ............................................... 38
            Qualified thrift lender test ................................ 39
        Section 104(c): Affiliate transaction and marketing restrictions ....... 40
        Section 104(d): Tie-in restrictions ................................. 41
        Section 104(e): Savings banks as insured institutions ............... 41
        Section 104(f): Emergency acquisitions ............................. 41
        Section 105: Advances ............................................. 42
        Section 106: Securities affiliates ................................ 42
        Section 107(a): Mutual savings bank holding company ............... 42
        Section 107(b): Stock savings bank holding company ............... 43
        Section 108: Leasing authority of national banks ................. 43

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

Title II.--Moratorium on certain nonbanking activities ................... 43
  Section 201: Moratorium on Certain Securities and Insurance
Activities ............................................................. 43
    Section 201(a)(1): Securities Underwriting ........................... 43
    Section 201(a)(2)-(4): Insurance .................................... 44
    Section 201(a)(5): Real Estate ...................................... 45
Title III.--Recapitalization of FSLIC ................................... 45
    Section 301: Short title ............................................ 45
    Section 302: Financing corporation established ...................... 45
    Section 303: Mixed ownership government corporation ................. 52
    Section 304: Recapitalizaton of FSLIC ............................... 52
    Section 305: FSLIC authority to charge premiums reduced by amount of
financing corporation assessments ...................................... 53
    Section 306: Miscellaneous provisions ............................... 54
    Section 307: Thrift accounting standards ............................ 54
    Section 308: Audit of FADA .......................................... 55
    Section 309: Thrift industry recovery guidelines ................... 55
    Section 310: Application of GAAP .................................... 56
    Section 311: Report on prevention of insolvencies .................. 56
Title IV.--Emergency acquisitions ...................................... 56
    Section 401: Short title ............................................ 56
    Section 402: Extension of Garn-St Germain Act ...................... 56
    Section 403: Assisted extraordinary acquisitions .................. 56
Amendments to the Bank Holding Act:
    Section 404: Bridge banks .......................................... 60
    Section 405: Conversion from FDIC insurance to FSLIC insurance ...... 61
    Section 406: Sequestration ......................................... 61
    Section 407: Apportionment ......................................... 62
Title V.--Credit Union amendments ...................................... 62
    Section 501: Permanent Merger and Conservatorship Authority ......... 62
    Section 502: Second Mortgage and Home Improvement Loans ............ 62
    Section 503: Ownership Interest .................................... 62
    Section 504: Technical Amendments .................................. 62
    Section 505: Faithful Performance .................................. 62
    Section 506: Membership Officers ................................... 62
    Section 507: Nonparticipation ...................................... 62
    Section 508: Property Acquisition Flexibility ...................... 63
    Section 509: Treatment of NCUAB Funds .............................. 63
    Section 510: Technical and Clarifying Amendments; Removal and
Prohibition Authority .................................................. 63
    Section 511: Effect of Removal or Suspension ...................... 63
    Section 512: Imposition of Conservatorship ........................ 63
    Section 513: Reduction in State Comment Waiting Period ............. 63
    Section 514: Authority as Conservator .............................. 63
    Section 515: Liquidation Proceedings ............................... 64
Title VI.--Deposit availability ........................................ 64

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

    Section 601: Short title ............................................... 64
    Section 602: Definitions .............................................. 64
    Section 603: Disclosure of funds availability policies ................ 64
    Section 604: Interest on deposits ..................................... 65
    Section 605: Interim expedited funds availability regulation .......... 65
    Section 606: Expedited funds availability regulation ................. 67
    Section 607: Availability of Government checks ....................... 70
    Section 608: Administrative enforcement .............................. 70
    Section 609: Civil liability ......................................... 70
    Section 610: Miscellaneous ........................................... 70
    Section 611: Effect on check acceptance policies and other laws ....... 71
    Section 612: Regulations ............................................. 71
    Section 613: Improving payment mechanisms ............................ 71
    Section 614: Parity in clearing ...................................... 71
    Section 615: Effective date .......................................... 71
Regulatory impact statement .............................................. 71
Changes in existing law .................................................. 71
Cost of legislation ...................................................... 71
Supplemental views of Senators Proxmire, Cranston, Riegle, Dodd, Dixon,
  Sanford, Graham, and Heinz ............................................ 75
Additional views of Senator Sasser ...................................... 77
Additional views of Senators Garn, Hecht, Gramm, Bond, and Chafee ........ 79
Additional views of Senator Armstrong ................................... 97

### *1 **491 INTRODUCTION

  On March 10, 1987, the Senate Banking Committee marked up and ordered to be re-
ported a bill, the Competitive Equality Banking Act of 1987, to close the nonbank
bank loophole and provide a framework for congressional reconsideration of the
Bank Holding Company Act, recapitalize the Federal Savings and Loan Insurance Cor-
poration, authorize emergency interstate bank acquisitions and the operation of
failed banks by the Federal Deposit Insurance Corporation (FDIC), streamline cred-
it union regulation, and end excessive holds on customer deposits by depository
institutions.

  The Competitive Equality Banking Act reflects many years of effort, on the part
of both majority and minority Members of the Senate Banking Committee, to deal
with growing problems among thrift institutions and the enormous stresses on the
existing statutory structure governing the ownership and management of federally
insured depository institutions.  The Committee vote was 12 ayes and 6 nays to ad-
opt the bill and report it to the Senate for consideration as promptly as circum-
stances permit.

### **492 PURPOSE OF THE LEGISLATION

  The Competitive Equality Banking Act is carefully structured to address two
critical needs.  The first is to halt the aggressive exploitation **2 of loopholes

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

in our banking laws.  The bill does this by closing nonbank bank loopholes as of
March 5, 1987, while providing Congress with time for a careful consideration of
the need for new financial services legislation, and encourages financial service
industry groups to participate constructively in the Committee's efforts to recon-
sider the laws governing the ownership of federally insured depository institu-
tions.

   The second need is to recapitalize the Federal Savings and Loan Insurance Cor-
poration (FSLIC), and to make that recapitalization as effective and economical as
possible.

                          FSLIC RECAPITALIZATION

   Although the vast majority of thrift institutions are profitable, several hun-
dred thrift institutions generate losses so large they cannot be accommodated with
the resources available to the FSLIC within its existing statutory framework.
This legislation amends the FSLIC's governing statutes to enable the resources of
the FSLIC to be augmented by a combination of capital market borrowings and thrift
industry contributions.  The legislation provides $7.5 billion in borrowing au-
thority for two years and requires congressional review and approval before addi-
tional funds could be borrowed.  Although the time limit on the borrowing author-
ity is less than that sought by the Treasury Department, the amount of permissible
annual borrowing is in the range indicated by Treasury and the General Accounting
Office as essential.  The recapitalization provided for is, in the Committee's
judgment, fully sufficient to enable the FSLIC to meet its obligations and can be
implemented with no government funds.

                     NONBANK BANKS AND RELATED ISSUES

   At the foundation of American financial law is a longstanding tradition of sep-
arating banking and commerce.  This separation has served to preserve the equal
availability of credit in the United States and minimize the concentration of fin-
ancial and economic power.  An unintended loophole in the Bank Holding Company Act
has resulted in a situation in which any company can own a bank--a so-called non-
bank bank--thus breaking down the banking/commerce separation that has served our
nation so well.

   The Committee is aware of and sympathetic to the need to review and possibly re-
structure the existing laws governing who can own a federally insured bank or
thrift institution.  Such a review and possible restructuring would be an appro-
priate part of a comprehensive evaluation of how to obtain for businesses and
households the benefits that are said to be arising from rapid technological and
organizational changes in all sectors of the financial services industry.

   The 'revolution' in the financial services has led to major innovations that
test the structure of basic financial law.  Those innovations hold great promise
and some significant longer-term risks.  **493 The Committee, under the leadership
of its distinguished former chairman, Senator Garn of Utah, repeatedly attempted
to obtain the benefits and address the risks of the profound changes underway in
financial service industries.  However, because of a few key *3 interest groups,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

each insisting on its own agenda and preferring deadlock to compromise, no compre-
hensive legislation has been passed by Congress since 1982.

The Competitive Equality Banking Act of 1987 would break the deadlock by giving
all of the major industry participants an interest in participating constructively
in the development of comprehensive legislation.

The proposed legislation would do the following:

1.  The nonbank bank loophole is closed, as of March 5, 1987, by redefining a
bank as an institution that has FDIC insurance or that takes demand deposits and
makes commercial loans.  Companies that acquired nonbank banks on or before March
5, 1987, would be grandfathered and could continue to own and operate those banks.
The grandfather rights could not be transferred to a new parent company.

2.  Restrictions are placed on companies controlling grandfathered nonbank banks
to prevent unfair competition with regulated bank holding companies. Nonbank banks
can continue doing everything they were doing as of March 5, 1987, and can jointly
sell new products permissible for bank holding companies.  There are, however,
prohibitions on acquiring additional banks or thrifts, on allowing affiliates to
overdraw their accounts, and on expanding into new activities.  A 7 percent asset-
growth limit on grandfathered nonbank banks becomes effective one year after en-
actment.

The desire by the owners of nonbank banks to acquire additional banks or
thrifts, to commence new activities, to engage in new joint marketing, and to
achieve higher growth will give those firms a stake in the development of new le-
gislation.

3.  The one-year moratorium on certain securities activities will prevent the
Federal Reserve Board from approving the pending applications to underwrite and
deal in securities pursuant to the 'principally engaged' loophole in the Glass-
Steagall Act and thereby narrowing the scope of that Act without congressional ap-
proval.  The Congress will thus have an additional year in which to consider, in
the context of a comprehensive review of the financial services industry, the is-
sues raised by the proposed new securities powers. But because the moratorium is
not permanent, the securities industry will have a strong incentive to participate
constructively in the development of new legislation.

4.  The one-year moratorium on regulatory approval of new insurance and real es-
tate powers will help preserve the status quo while the Congress considers compre-
hensive reform.  Because the moratorium is not permanent, the insurance and real
estate industries will have a stake in new legislation.  (By contrast, if those
industries obtained the permanent bans they are seeking, they would have no in-
centive to cooperate in framing new legislation.)

5.  Banking groups will likewise have a strong interest in new legislation,
since the bill does not give them new securities powers, nor does it loosen the
Bank Holding Company Act's restrictions on nonbanking activities.

By encouraging all the major participants to come back to the bargaining table,
the Committee intends to greatly enhance the **494 prospects for constructive
hearings and legislation. The Committee will promptly review and, if needed, pro-
pose major revisions of the *4 laws governing the activities of companies that own
federally insured depository institutions.  The Committee's distinguished current

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

chairman, Senator Proxmire of Wisconsin, has stated on several occasions that if
the Competitive Equality Banking Act is enacted, he will immediately schedule
hearings on a broad range of fundamental issues confronting the financial services
industry, with his goal being to bring the Committee together to make permanent
decisions by October 1987.

### HISTORY OF THE LEGISLATION

The issues addressed in the Competitive Equality Banking Act have been debated
by the Congress for several years. A similar FSLIC recapitalization plan was ap-
proved separately by both chambers late in the 99th Congress, but for lack of time
failed to win enactment. A ban on nonbanks cleared the Senate in the 98th Con-
gress, and failed for lack of House action. The House Banking Committee approved
a ban on nonbank banks in the 99th Congress, but this failed to win consideration
by the Full House. Other provisions of the present legislation have also pro-
gressed far in previous Congresses.

At the beginning of the 100th Congress, the Senate Banking Committee held a
series of three hearings to review the evidence for needed action on the FSLIC re-
capitalization, nonbank bank loophole closure and related matters. On February 5,
the Subcommittee on Consumer Affairs held a hearing exclusively on check holds.

The first Full Committee hearing, held January 21, 1987, focused on regulatory
concerns. Federal Reserve Chairman Paul Volcker, Treasury Under Secretary George
Gould, FDIC Chairman L. William Seidman, Comptroller of the Currency Robert L.
Clarke, and Federal Home Loan Bank Board Chairman Edwin Gray testified. Messrs.
Volcker, Seidman, and Gray all stressed the importance of closing the nonbank
loophole and recapitalizing the FSLIC. Moreover, they emphasized that closing the
nonbank loophole would reduce the cost of the FSLIC recapitalization because it
would increase the number of bidders for failed thrifts that otherwise might have
expanded through the nonbank loophole.

On January 22, trade association leaders addressed the panel including Gerald J.
Levy, of the U.S. League of Savings Institutions; Robert S. Gaiswinkler of the Na-
tional Council of Savings Institutions; Irving Stolberg of the National Council of
State Legislatures; Eugene W. Kuthy of the Conference of State Bank Supervisors;
William S. Edgerly of the Association of Reserve City Bankers; Charles Doyle of
the Independent Bankers Association of America; Charles E. Rice of the Coalition
for Regional Banking and Economic Development; Dennis Kelleher of the dealer Bank
Association; John P. La Ware of the Association of Bank Holding Companies; and
Mark Olson of the American Bankers Association.

On January 23, additional trade association representatives testified, including
Robert B. Evans of the American Financial Services Association; Alan J. Heuer of
the Consumer Bankers Association; John Motley of the National Federation of Inde-
pendent Business; Robert Gerard of the Securities Industry Association; David Sil-
ver **495 *5 of the Investment Company Institute; William V. Irons of the National
Association of Life Underwriters Financial Institutions Task Force; and Gary
Hughes of the American Council of Life Insurance.

In addition, consumer group representatives stressed the need for legislation
restricting check holds. The Federal Reserve checkclearing system enables speedy

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

availability of check deposits for banks, yet many banks place holds on those
checks for consumers beyond that clearing time.

   The Subcommittee on Consumer Affairs pursued the issue on February 5.  Michele
Meier of the Consumers Union, Franci Livingston of Congress Watch, and Alan Fox of
the Consumer Federation of America, who appeared at the January 23 hearing, re-
turned for the subcommittee hearing as well.  Joining them were Gov. Wayne Angell
of the Federal Reserve Board; Gayle K. Lawrence of the American Association of Re-
tired Persons; Robert Hewell and Fred Redeker representing the Houston Clearing
House Association; Gregory Wilhelm of the Consumers Bankers Association; Donald R.
Monks of the American Bankers Association; and Terence Kehoe of the National Fin-
ancial Automation Corp.

   The Federal Reserve is attempting to speed the check clearing process, and bank-
ing group representatives stressed that they would voluntarily conform to new
timetables.  But consumer groups urged that new timetables be codified.

   On the basis of this testimony and discussions in the hearings, the Competitive
Equality Banking Act was drafted.  On February 17, Sen. William Proxmire presented
the first of several committee prints of the a six-title bill, which the Committee
adopted with amendments on March 10, 1987, by a vote of 12 ayes to 6 nays.

            TITLE I.--FINANCIAL INSTITUTIONS COMPETITIVE EQUALITY

                     CLOSING THE NONBANK BANK LOOPHOLE

   The nonbank bank loophole arises from the definition of a bank in the Bank Hold-
ing Company Act.  Under that Act, a bank is defined as an institution that accepts
demand deposits and makes commercial loans.  A bank that refrains from one of
those two activities is not considered a bank for purposes of the Bank Holding
Company Act; hence the term nonbank bank.

   The Bank Holding Company Act of 1956 originally defined a bank as an entity
chartered as a bank under the National Banking Act or under State law. In 1966,
Congress changed the definition to denote any institution that accepted demand de-
posits.  The definition was further changed in 1970 to refer to any institution
accepting demand deposits and making commercial loans.  The purpose of the 1970
change was to accommodate the unique case of a trust company which did not make
commercial loans and which, without the definitional change, would have come under
the provisions of the Bank Holding Company Act. It is clear, however, from the le-
gislative history of the 1970 amendments, that the new two-part functional defini-
tion of a bank was intended not as a major policy change but rather as a limited
exemption for a single institution.

   The 1970 definition of a bank operated as intended for more than a decade.
However, beginning in the early 1980's, lawyers looking **\*\*496 \*6** for a way around
the Bank Holding Company Act seized upon the 1970 redefinition.  They advised
their clients that the Act could be circumvented if the bank gave up either its
demand deposits or commercial lending.

   To avoid regulation under the Bank Holding Company Act a bank need not make
drastic changes in its operations.  For example, a nonbank bank can offer in-
terest-bearing NOW accounts rather than demand deposits and still escape regula-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

tion.  Under current court rulings, it can also engage in a wide variety of busi-
ness lending activities--including making broker call loans, issuing bankers ac-
ceptances, and investing in commercial paper or certificates of deposit--without
being considered to be in the business of making commercial loans.

Although nonbank banks continue to be regulated as banks--by the Comptroller of
the Currency in the case of national banks and by the State bank supervisors in
the case of State-chartered banks--they are exempt from two key provisions of the
Bank Holding Company Act. Those are the interstate banking restrictions in section
3 and the activity restrictions in section 4.

Under section 3 of the Bank Holding Company Act, a bank holding company cannot
buy a bank in another State unless specifically permitted to do so by the law of
that State.  The purpose of that restriction is to protect the right of each State
to determine its own banking policies.  However, the restrictions of section 3 do
not prevent a bank holding company from buying a nonbank bank in another State.

Section 4 of the Bank Holding Company Act requires that all of the activities of
a bank holding company be closely related to banking.  Section 4 prevents a bank
from engaging in activities far removed from banking by forming a parent holding
company and conducting the impermissible activities through separate subsidiaries
of the holding company.  In fact, one of the major purposes of the Bank Holding
Company Act of 1956 was to prevent just such a sham.

The activity restrictions of section 4 also effectively prevent a commercial or
industrial firm from acquiring a bank.  If it did, it would become a bank holding
company and would then be required to divest itself of its nonbanking activities.
However, there is nothing to prevent a commercial or industrial firm from acquir-
ing a nonbank bank.  Thus any company in any line of business can acquire a bank
simply by changing the bank's activities enough to avoid its being classified as a
bank under the Bank Holding Company Act.

The impetus for nonbank banks stems primarily from large diversified companies
wanting to invade the banking business while avoiding the regulatory restraints of
the Bank Holding Company Act. Thus some of the nation's largest retailing, secur-
ities, and insurance companies have been able to enter the banking business
through the nonbank loophole while banks are prevented from entering those busi-
nesses by the Bank Holding Company Act.

The Senate acted, by a vote of 89 to 5, to close the nonbank bank loophole in
1984.  Unfortunately, the House failed to take action on the bill in the closing
days of the 98th Congress.  The House Banking Committee did report legislation
early in 1985 to close the nonbank **7 **497** bank loophole, but that legislation
became embroiled in other controversies and did not clear the House Rules Commit-
tee.

The continued failure of the Congress to close the nonbank bank loophole will
cause a number of problems in our banking system.  It will subvert the right of
the States to determine their own banking structure; needlessly increase the cost
of recapitalizing the FSLIC; erode the policy of separating banking from commerce;
create new competitive inequities in our financial system; undermine the ability
of the bank regulators to maintain a safe banking system; and jeopardize the pay-
ments system.  As Chairman Volcker testified before the Committee, closing the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

nonbank bank loophole is just as important and urgent as recapitalizing the FSLIC.

Subverting the Rights of the States

   Under the Bank Holding Company Act, a bank holding company cannot buy a bank in another State unless the law of that State specifically permits it to do so.   The Congress deliberately enacted that policy in 1956 in order to preserve a decent- ralized banking system and to maintain local control over local credit resources. The policy has resulted in the United States having the least concentrated banking system among the major industrial nations of the world. While the ten largest banks control upwards of 90 percent of banking assets in most European countries, in the United States, the top ten control less than 30 percent of banking assets.
   To be sure, a number of States have recently modified their banking laws to per- mit interstate banking, at least on a regional level.   But most of those laws have been carefully drafted to permit regional banks to grow in size before taking on the full competitive onslaught of the major money center banks.   These carefully designed regional timetables can be easily circumvented if the major money center banks are free to penetrate regional banking markets through nonbank banks irre- spective of State law.
   The need for prompt congressional action to close the nonbank bank loophole has been greatly enhanced by recent developments in the courts.   Last October, the Court of Appeals for the Eleventh Circuit allowed a bank holding company to open a nonbank bank in Florida.   Moreover, the Comptroller of the Currency has moved to vacate the district court injunction that prevents him from chartering new nonbank banks.   Thus there is an imminent risk that money center bank holding companies will be able to establish or acquire nonbank banks in any State without regard to the law of that State.

Increasing the Cost of Recapitalizing the FSLIC

   If the nonbank bank loophole remains open, it will increase the cost of recapit- alizing the FSLIC.   The main reason for purchasing a troubled thrift institution is to enter a market from which the acquiring company would otherwise be legally foreclosed.   The FSLIC can reduce its losses by, in effect, selling the franchise of that thrift to the highest bidder.   But if companies are free to acquire non- bank banks, they will have little incentive to take on the heavy capital and man- agement burden of acquiring a failed or failing thrift institution, and the cost of resolving problem cases will greatly increase.   As Chairman Gray of the Federal Home Loan Bank Board **498 *8 testified before the Committee, 'it is important to the health of the FSLIC to enact legislation to close the nonbank bank loophole, once and for all.   At a time when the FSLIC funds is dangerously low, the FSLIC needs the unhampered ability to offer valuable non-cash incentives [i.e., a coveted franchise] to potential acquirers.'   Thus it would be imprudent to embark upon a multi-billion-dollar recapitalization without closing the nonbank bank loophole.

Eroding the Separation of Banking and Commerce

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19                                                                                              Page 11
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)

   Nonbank banks undermine the principle of separating banking and commerce, a
policy that has long been the keystone of our banking system.  Most corporations
are free to engage in any lawful business; banks, by contrast, are limited to the
business of banking.

   Our free-enterprise economy relies on banks to allocate credit to its most pro-
ductive use.  When bankers make good credit decisions, the entire economy bene-
fits; when bankers make poor credit decisions, economic growth is impaired.  The
separation of banking from commerce helps ensure that banks allocate credit impar-
tially, and without conflicts of interest.  The nonbank bank loophole erodes that
separation by allowing commercial companies to control banks.  It raises the risk
that banks' credit decisions will be based not on economic merit but on the busi-
ness strategies of their corporate parents.

   Chairman Volcker put the point bluntly:  'Suppose the local appliance dealer
comes in to ask for loans from a bank run by a large retail chain.  I suspect the
branch manager isn't going to be very happy to provide the money . . . .  If he
does [make the loans], I suspect he is going to find himself selling shoes . . .
before long.'  A bank should always deal at arm's length with its customers--both
in the interest of fairness to prospective borrowers and in the interest of maximi-
izing economic growth.

Creating New Competitive Inequities

   The nonbank bank loophole allows commercial firms that own nonbanks to gain an
unfair competitive advantage over bank holding companies and over commercial firms
that do not have captive nonbank banks.  The key to success in today's highly com-
petitive financial services business is cross-selling. Companies seek first to se-
cure a stable account relationship with a family and then to use that relationship
to cross-sell a wide variety of financial services. One of the most stable account
relationships involves checking (or NOW) accounts.  Thus insurance companies, se-
curities firms, credit card companies, and even retailers endeavor to use such ac-
counts as the anchor for their other products and services.  This strategy puts
bank holding companies at a competitive disadvantage because, by law, their activ-
ities must be closely related to banking.  By contrast, the large diversified com-
panies that own nonbank banks are free to combine banking with a wide variety of
financial or other services.  Thus the insurance and securities activities of bank
holding companies are strictly limited, yet insurance and securities firms are
free to offer banking services through nonbank banks.  As Chairman Seidman of the
FDIC testified, the nonbank bank loophole 'is highly inequitable and detrimental.
Allowed to **499 *9 grow, nonbank banks can weaken the real banks by competing in
an unfair contest in the market place.'

   The nonbank bank loophole also promotes unfair competition between those commer-
cial firms that own nonbank banks and those that do not.  This Committee observed
in 1970:

    If a holding company combines a bank with a typical business firm, there is a
strong possibility that the bank's credit will be more readily available to the
customers of the affiliated business than to customers of other businesses not so
affiliated.  Since credit has become increasingly essential to merchandising, the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

business firm that can offer an assured line of credit to finance its sales has a
very real competitive advantage over one that cannot.  In addition to favoring the
business firm's customers, the bank might deny credit to competing firms or grant
credit to other borrowers only on condition that they agree to do business with
the affiliated firm.

Undermining Bank Supervision

   Nonbank banks could threaten the safety and soundness of our financial system.
There is no practical way to separate a nonbank bank from its parent and affili-
ates, either operationally or in the public mind.  Chairman Volcker has testified:

   [T]he practical realities of the market place and the internal dynamics of a
business organization under central direction drive bank holding companies to act
. . . as one business entity, with the component parts drawing on each other for
marketing and financial strength.  Certainly the market conceives of a bank hold-
ing company and its components in that way.  And if market participants tend to
consider the bank holding company as an integrated entity, problems in one part of
the system will inevitably be transmitted to other parts.

   As Mr. Walter Wriston, the former chairman of Citicorp, declared, 'it is uncon-
ceivable that any major bank would walk away from any subsidiary of its holding
company.  If your name is on the door, all of your capital and assets are going to
be behind it in the real world.  Lawyers can say you have separation, but the mar-
ketplace . . . would not see it that way.'

   Thus, if a nonbank bank's parent or affiliates encounter financial difficulties,
the public will, rightly or wrongly, tend to perceive the bank as suffering from
the same difficulties.  That loss of public confidence may force the bank to bor-
row from the Federal Reserve discount window or even to seek financial assistance
from the FDIC.  Thus the nonbank bank loophole greatly increases the risks to
which those agencies are exposed.  They must be concerned about mismanagement not
only by the bank but by its parent and affiliates.  Yet they lack both the re-
sources and the legal authority to supervise the activities of the parent and af-
filiate.

**\*\*500 \*10** Jeopardizing the Payments System

   The nonbank bank loophole threatens our nation's payments system by giving large
diversified firms direct access to that system.  The payments system (which in-
volves wire transfers, book-entry securities transfers, automated clearing house
services, and check-collection services, among other things) is highly complex and
interdependent, and its effective functioning requires a high degree of trust
among the participants.  The Fedwire, for example, handles some 196,000 large-
dollar payments every day, with a total daily value of more than $490 billion.
Likewise, the Federal Reserve handles over $230 billion in book-entry securities
transfers every day; most such transfers are immediate and final, and are made
from computer terminals on banks' premises.  These cash and securities transfers
can rapidly create multi-billion-dollar overdrafts (which, so long as they are
settled before the end of the day, are known as 'daylight overdrafts').  The main

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

safeguards against the rippling effects of a default are the creditworthiness of the bank making the transfer and its willingness to make an independent credit judgment about its customers.

A nonbank bank cannot, as a practical matter, independently evaluate the credit of a parent or affiliate and resist that company's orders to make payments that would create overdrafts. Without an independent credit evaluation, which traditional banks perform routinely, there is a clear danger that a nonbank bank's affiliates will incur excessive overdrafts at the nonbank bank, and that the nonbank bank could overdraw its account at a Federal Reserve bank. A financially troubled affiliate of a nonbank bank could, for example, direct the nonbank bank to make irrevocable wire transfers far exceeding the balance in the affiliate's account at the nonbank bank. Such transfers could precipitate the failure of the nonbank bank, resulting in loss to the FDIC, the Federal Reserve System, and the nonbank bank's depositors and creditors. The failure of the nonbank bank could, in turn, create chaos in the payments system.

'The risks inherent in parents-affiliate relationships would,' as Chairman Volcker has observed, 'be exacerbated by the financial formula likely to be followed by a commercial parent seeking access to the payments system through ownership of a nonbank bank; token capitalization of the bank relative to both the size of the parent and to the very high dollar volume of transactions [funneled] through the bank.'

Congressional Determination

Closing the nonbank bank loophole while placing restrictions on existing nonbank banks does not mean the Committee has necessarily concluded that the current boundary line between banking and nonbanking activities is optimal. Given the pace of technological change in the delivery of financial services, it may be that banks need to engage in a broader range of financial services, while other financial services firms may need greater entry into banking. But the Committee believes any redrawing of the boundary lines must come about as the result of deliberate congressional decision and not through the exploitation of loopholes.

**501 *11** The major purpose of the regulatory moratorium on new bank powers is to give the Committee and the Congress an opportunity to reconsider the division between banking and other activities. To the extent that the Congress becomes willing to broaden the powers of bank and bank holding companies, some of the restrictions on nonbank banks may be lifted. Similarly, to the extent that Congress opts for a narrower definition of banking-related activities, the restrictions on nonbank banks can be continued and possible tightened. In either case, the Committee strongly believes the pace of financial deregulation should be determined by the Congress and not by the loophole lawyers or bank regulators.

Committee Action on Nonbank Banks

To close the loophole, the bill provides that the term 'bank' includes any bank whose deposits are insured by the FDIC, as well as any institution that both (1) accepts demand deposits or deposits that the depositor may withdraw by check or

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

similar means for payment to third parties, and (2) engages in the business of
making commercial loans.

## EXCLUSIONS FROM THE DEFINITION OF 'BANK'

  The bill excludes from the definition of a 'bank': (1) a foreign bank that has
no branches in the United States; (2) an FSLIC-insured thrift institution; (3) an
organization that does not do business in the United States except as an incident
to its activities outside the United States; (4) a trust company that acts solely
as a fiduciary; (5) a credit union; (6) a credit card bank; (7) an Edge Act or
Agreement corporation; and (8) an industrial loan company.

## RESTRICTIONS ON GRANDFATHERED COMPANIES THAT CONTROL NONBANK BANKS

  By expanding the definition of a 'bank', the bill will cause many nonbank banks
to become 'banks' for purposes of the Bank Holding Company Act. That Act normally
limits the nonbanking activities of any company that controls a 'bank'. Under the
bill, however, those limitations will not apply to a company that controlled a
nonbank bank on March 5, 1987, as long as the company and its subsidiary bank com-
ply with certain restrictions.

  The parent company must not (1) obtain control of an additional bank or a thrift
institution; or (2) acquire more than 5 percent of the shares or assets of such a
bank or thrift institution (not counting shares held as a fiduciary, underwriter,
or trader, or loans acquired in the ordinary course of business). These restric-
tions prevent a grandfathered company from expanding its banking activities by ac-
quiring an additional bank or a thrift institution, or by having its subsidiary
bank merge with or acquire the assets of a bank or thrift.

  The subsidiary bank must not (1) engage in any activity in which it was not en-
gaged as of March 5, 1987; (2) engage in any joint marketing with an affiliate in
which it was not engaged as of March 5, 1987, unless that joint marketing involves
services that a bank holding company could lawfully provide; (3) permit any over-
draft on behalf of an affiliate, or overdraw its own account at a Federal **502
*12** Reserve bank on behalf of an affiliate, unless the overdraft results from an
inadvertent computer or accounting error that is beyond the control of the bank
and the affiliate; or (4) increase its assets at an annual rate of more than 7
percent, beginning one year after the bill becomes law. These restrictions allow
the subsidiary bank to continue to do everything that it was doing as of March 5,
1987.

No New Activities

  The restriction on new activities--like the restrictions on joint marketing and
asset growth--will help prevent existing nonbank banks from changing their basic
character while the Congress considers proposals for comprehensive legislation;
from drastically eroding the separation of banking and commerce; and from increas-
ing the potential for unfair competition, conflicts of interest, undue concentra-
tion of resources, and other adverse effects. Those restrictions will also give

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)

**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

the owners of nonbank banks an incentive to support, rather than obstruct, additional legislation.

No New Joint Marketing

   Under the restrictions on joint marketing, a nonbank bank may not (1) offer or market its services together with products or services of an affiliate that a bank holding company could not lawfully provide, or (2) allow its services to be offered or marketed by an affiliate (other than an affiliate engaged only in activities permissible for a bank holding company), except to the extent that the bank and its affiliates were engaged in such joint marketing as of March 5, 1987.

Limitations on Asset Growth

   In according grandfather privileges to companies that controlled nonbank banks as of March 5, 1987, the Committee placed considerable weight on the fact that the nonbank banks involved are generally quite small.  The Committee seeks to prevent the abuse of grandfather privileges that would occur if grandfathered companies changed the character of the institutions involved through aggressive asset growth.  On the other hand, some growth should be allowed to give the institutions involved flexibility to deal with changing economic and financial conditions, so long as the institutions' basic character is not altered.
   A bank can control the growth of its total assets by, among other things, selling portions of its asset portfolio.  If, for example, a bank's credit card accounts receivable grow at a 10 percent rate, the bank can remain in compliance with the 7 percent limitation by selling other assets and distributing the proceeds as a dividend.
   By making the 7 percent restriction become operative one year after the bill becomes law, the Committee allows time for the Congress to consider additional legislation and gives companies that control nonbank banks an additional incentive to support such legislation.

Overdrafts by an Affiliate

   The prohibition on overdrafts, including intra-day (or 'daylight') overdrafts, by or on behalf of an affiliate is intended to reduce the **503 *13 risks (discussed above) that arise from a nonbank bank's access to the payment system.

                RESTRICTIONS ON BANK HOLDING COMPANIES THAT CONTROL NONBANK BANKS

   A bank holding company is already subject to the Bank Holding Company Act's restrictions on nonbanking activities; thus its control of a nonbank bank does not raise the same concerns as would control by a commercial firm.  But bank holding companies have used nonbank banks to evade the Douglas Amendment, which prohibits a bank holding company from acquiring a 'bank' outside of the holding company's home State unless the acquisition is expressly authorized by the State where the bank is located.
   The grandfather restrictions imposed on bank holding companies are intended to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

prevent such evasions.  The nonbank bank must not (1) both accept deposits that
the depositor has a legal right to withdraw on demand, and engage in the business
of making commercial loans (which would make it a 'bank' under current law); or
(2) expand to new locations.  The restrictions will be lifted once the acquisition
of the bank by the bank holding company would be permissible under the Douglas
Amendment.

### LOANS TO INSIDERS

   Credit card banks, trust companies, Edge Act and Agreement corporations, and in-
dustrial loan companies are made subject to the Federal Reserve Act's limitations
on loans by a member bank to officers, directors, and principal shareholders of
the bank or its parent.

### ANTI-TYING RESTRICTIONS

   Those institutions are also made subject to the anti-tying provisions of the
Bank Holding Company Act Amendments of 1970, which prohibit a bank from insisting
that a customer who seeks a loan or other service from the bank purchase some ad-
ditional product or service from the bank's parent or affiliates.  The anti-tying
restrictions are also extended to all thrift institutions that are subsidiaries of
savings and loan holding companies.

### CLOSING THE NONTHRIFT THRIFT LOOPHOLE

   The Savings and Loan Holding Company Act (SLHCA) classifies thrift holding com-
panies based on the number of thrift institutions they control:  a multiple com-
pany controls more than one institution, whereas a unitary company controls a
single institution.  The Act restricts the activities of multiple thrift holding
companies, but not of unitary thrift holding companies.  Thus a commercial company
is free to own a single thrift institution.
   The special rule for unitary thrift holding companies was created in 1968, when
the powers and activities of thrift institutions themselves remained narrowly cir-
cumscribed.  Thrifts did not, for example, make commercial loans or offer access
to the payments system.  Now, however, many thrift institutions are much like
banks, and the ownership of such institutions by commercial companies raises es-
sentially the same concerns as do nonbank banks.
   **\*\*504 \*14** The closing of the nonbank bank loophole, unless accompanied by appro-
priate restrictions on thrift institutions, will merely transform the nonbank bank
problem into a 'nonthrift thrift' problem.  That would be undesirable in itself,
and would also undercut the very reason for having a separate thrift industry:
the commitment of thrift institutions to residential mortgage lending.
   Accordingly, the bill provides that the unitary thrift holding company exemption
is not available to a holding company formed after March 5, 1987, unless the com-
pany's subsidiary thrift institution meets a 'qualified thrift lender' (or QTL)
test, under which the thrift must devote at least 60 percent of its assets to
housing and related activities.  A holding company formed before March 5, 1987,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

will not be subject to those restrictions as long as it complies with grandfather
restrictions similar to those applicable to nonbank banks.

In addition, the bill prohibits a diversified unitary savings and loan holding
company from using its thrift institution to jointly market products or services
not otherwise available to a bank holding company in a manner similar to the re-
strictions applied to a grandfathered nonbank bank. This provision is intended to
discourage a diversified company from circumventing the restrictions on nonbank
banks by purchasing a thrift. A diversified unitary savings and loan holding com-
pany is defined under existing law as a company whose subsidiary thrift and re-
lated activities represent less than half of the company's consolidated net worth
and account for less than half of the company's consolidated earnings.

A unitary savings and loan holding company is currently exempt from the nonbank-
ing activity restrictions of the Savings and Loan Holding Company Act. The bill
provides that that exemption does not apply to a holding company formed after
March 5, 1987, unless the company's subsidiary thrift institution meets the 'quali-
fied thrift lender' (or QTL) test, under which the thrift must devote at least 60
percent of its assets to housing and related activities.

A holding company formed before March 5, 1987, need not comply with the SLHCA's
nonbanking restrictions--even if its subsidiary thrift does not meet the QTL test-
-so long as it complies with grandfather restrictions similar to those applicable
to companies owning nonbank banks. The company must not (1) obtain control of a
bank or an additional insured thrift, or (2) engage in an activity of a financial
nature in which it did not engage as of March 5, 1987, and which is not permiss-
ible for savings and loan holding companies that do not meet the QTL test. The
subsidiary thrift (1) must continue to meet the thrift asset test in the Internal
Revenue Code; (2) must not increase the number of locations from which it does
business; and (3) must not permit an overdraft on behalf of an affiliate, or over-
draw its own account at a Federal Reserve bank on behalf of an affiliate, unless
the overdraft results from an inadvertent computer or accounting error that is
beyond the control of the thrift and the affiliate.

A thrift institution will not be eligible for advances from a Federal Home Loan
bank unless it meet the QTL test.

### **505 *15 QUALIFIED THRIFT LENDER TEST

A 'qualified thrift' thrift is defined as an institution that maintains 60 per-
cent of its assets in housing-related investments. Companies that owned a thrift
before March 5, 1987, would be allowd to keep their thrift, regardless of the com-
pany's activities.

The Committee considers thrifts a vital conduit of financing for housing. Con-
sequently, the special benefits that accrue to thrifts should be restricted to
those that play an active role in housing finance.

### JOINT MARKETING RESTRICTIONS ON THRIFT INSTITUTIONS

The bill would impose on diversified unitary savings and loan holding companies
joint marketing restrictions similar to those applied to nonbank banks. Joint

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

marketing activities engaged in as of March 5, 1987, would be grandfathered.

### SECURITIES ACTIVITIES OF FSLIC-INSURED THRIFT INSTITUTIONS

This title extends to federally insured thrift institutions the Glass-Steagall
Act's prohibitions against underwriting and distributing securities.

### TITLE II.--MORATORIUM ON CERTAIN NONBANKING ACTIVITIES

Title II imposes a temporary moratorium on approval of certain nonbanking activi-
ties by Federal banking agencies.  The moratorium begins March 6, 1987, and ends
one year after the bill becomes law.

### SECURITIES

Section 20 of the Banking Act of 1933 prohibits a bank that is a member of the
Federal Reserve System from being affiliated with a company or other entity that
is 'engaged principally in the issue, flotation, underwriting, public sale, or
distribution' of securities.  Several bank holding companies have applied to the
Federal Reserve Board under section 4(c)(8) of the Bank Holding Company Act for
authority to underwrite and deal in securities that member banks lack authority to
underwrite--activities that would otherwise be prohibited under section 20.  Each
applicant proposes to conduct the activities in question through a nonbank subsi-
diary the bulk of whose activities would (according to the applicant) be permiss-
ible under section 20.  The applicants accordingly contend that the subsidiary
would not be 'engaged principally' in underwriting or dealing for purposes of sec-
tion 20.
  During the moratorium period, the bill would prohibit any Federal banking agency
from approving an application by a bank holding company or insured bank to acquire
any entity engaged to any extent whatever in the flotation, underwriting, public
sale, or distribution of securities.
  The moratorium should not be construed as effecting any permanent change in the
law, or as a congressional judgment on whether existing law does or does not per-
mit a bank or its affiliates to engage in particular securities activities, or on
whether a Federal banking agency does or does not have authority to approve an ap-
plication **16 **506 to engage in such an activity when the moratorium expires.
  Similarly, in extending sections 20 and 32 of the Glass-Steagall Act to nonmem-
ber insured banks for a period ending one year after the date of enactment, sec-
tion 103 is intended to give the Congress time to determine the public interest in
this field.

### INSURANCE

No Federal Regulatory Approval of New Insurance Powers

During the moratorium period, the bill bars a Federal banking agency from issu-
ing any rule, regulation, or order that would increase the insurance powers of
banks, bank holding companies, or their subsidiaries beyond those permissible un-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

der section 4(c)(8) of the Bank Holding Company Act.

Restrictions on Acquisitions by Bank Holding Companies

   Section 4(c)(8), as amended in 1982 by the Garn-St Germain Act, limits the in-
surance activities of bank holding companies.  The scope of those limitations is
in dispute.  All parties agree that the limitations apply to a bank holding com-
pany and its nonbank subsidiaries.  Insurance industry groups contend that the
limitations also apply to every bank controlled by a bank holding company, whereas
bank holding companies contend that the limitations do not apply to banks.  Pursu-
ant to the latter argument, a major bank holding company sought to conduct insur-
ance activities beyond those permissible under section 4(c)(8) through a State-
chartered bank in South Dakota.  Although that application as denied, the so-
called 'South Dakota loophole' remains a source of controversy.
   To prevent bank holding companies from using the South Dakota loophole during
the moratorium period, the bill prohibits the Federal Reserve Board from permit-
ting a bank holding company to acquire any company (including a State-chartered
bank) unless the bank holding company agrees to limit the company's insurance
activities to those permissible under section 4(c)(8).  There are, however, two
limited exceptions to that prohibition.  The Federal Reserve Board may permit a
bank holding company to acquire a State-chartered bank (1) if the bank holding
company is not a subsidiary of any other company, and the acquisition is part of a
reorganization in which the bank's stockholders exchange their shares for shares
of the holding company; or (2) if on March 6, 1987, the bank holding company con-
trolled at least one State-chartered bank engaged in insurance activities identic-
al to those of the bank to be acquired-- even if the bank holding company does not
agree to limit the bank's insurance activities to those permissible under section
4(c)(8).  But neither exception is available unless the bank holding company
agrees to divest or terminate the bank's impermissible insurance activities within
two years after acquiring the bank, and to limit the bank's insurance activities
during that two-year period to the renewal of existing policies.
   The bill in no way restricts a bank holding company from engaging in insurance
activities that are permissible under section 4(c)(8), such as agency activities
in a place of 5,000 or fewer people **507 *17 or agency activities by a bank hold-
ing company with total assets of $50 million or less.

Restrictions on Expansion of National Banks' Agency Activities

   Existing law authorizes a national bank 'located and doing business in any place
the population of which does not exceed five thousand inhabitants' to act as an
insurance agent.  The scope of that authority is currently in dispute.  The Comp-
troller of the Currency has permitted at least one national bank to sell insurance
Nationwide from an office located in a place of less than 5,000.  Insurance in-
dustry groups have challenged that decision in court, contending that a national
bank located in a place of less than 5,000 must confine its insurance activities
to that place.
   During the moratorium period, the bill prohibits a national bank for expanding

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

its insurance agency activities into places where it was not conducting such activities as of March 5, 1987. Thus a national bank operating an insurance agency in a place of 5,000 or fewer people may not expand its activities beyond that place. And a national bank engaged in activities beyond the place of 5,000 may not expand its insurance activities into places where it was not engaged in insurance activities as of March 5, 1987. The moratorium is not intended to resolve the issue of the Comptroller's authority, which is a matter for the courts.

In any event, the moratorium does not bar a national bank from beginning to sell insurance in a place with a population of 5,000 or less in which the bank is located, so long as the insurance activities remain confined to that place.

In General

The insurance moratorium provisions are intended to give the Congress time to consider the issues in dispute.

Neither the moratorium nor its lapse would increase or decrease the insurance authority of banks, bank holding companies, or their subsidiaries.

### REAL ESTATE

During the moratorium period, the bill prohibits a Federal banking agency from issuing any rule, regulation or development powers of banks, bank holding companies, or their subsidiaries.

### TITLE III.--FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION RECAPITALIZATION ACT OF 1987

Title III of the Competitive Equality Banking Act addesses major problems in the thrift industry in three important ways. First, it provides for a substantial recapitalization of the FSLIC. Second, it establishes the use of generally accepted thrift institution regulation. And third, it initiates a new approach for handling problem thrift institutions.

FSLIC Recapitalization

Despite the profitability of most thrift institutions in our nation, a small sector of that industry, roughly one-fifth, suffered losses in the first three quarters of 1986 totaling $5 billion, an increase from **508 *18 $3.6 billion in 1985. The 270 problem thrifts on the Federal Home Loan Bank Board's list of significant supervisory cases are currently losing $4.8 billion annually. Resolving known cases requiring FSLIC assistance will cost $23.5 billion, according to the FHLBB. The operating losses accruing in the most serious cases exceeds the annual income of the FSLIC, and the estimated case resolution costs exceed the available assets of the FSLIC by at least tenfold.

The Committee considered a variety proposals to recapitalize the FSLIC. Two proposals received most of the Committee's attention. One was a plan presented by the thrift industry itself as represented by the United States League of Savings Institutions. The second was a proposal developed by the Department of the Treas-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

ury and the FHLBB, and considered in both houses of Congress in the last Session. The strengths of the two plans differed.  The U.S. League plan entailed borrowing a smaller amount of funds; the Treasury/FHLBB plan, however, contained a more efficient way to borrow the funds.  The Committee sought to obtain the benefits of both approaches and at the same time to assure close congressional monitoring and evaluation of how the borrowed funds are spent.

The FSLIC recapitalization plan adopted by the Committee consists of the Treasury/FHLBB funding framework and a borrowing limitation closer to that suggested by the U.S. League.  In addition, and most importantly, the Committee plan involves no government funding--the FSLIC recapitalization would be financed entirely from the resources of FSLIC-insured institutions.

BORROWING LIMIT AND CONGRESSIONAL REVIEW

Resolving some $20 billion to $25 billion in problem thrift institution cases is expected to take many years.  The funds to resolve the problem cases will come from several sources:

(a)  capital market borrowings (because of the limited capacity of financial markets to absorb debt, the Treasury Department estimates that funds from market borrowings would be limited to about $2.5 billion per year);

(b)  income on FSLIC investments (estimated for 1987 to be about $275 million);

(c)  income from the FSLIC regular premium (estimated for 1987 to be about  $800);

(d)  income from the FSLIC special assessment (estimated for 1987 to be about $1.1 billion); and

(e)  proceeds from the sale of problem institution assets (at year-end 1986, the FSLIC held about $12 billion in receivership assets on which the GAO estimates about 42 percent will be collected over a period of several years, meaning that perhaps as much as $1 billion could be expected from assets sales).

Summing the amounts above yields an estimate of the resources available to the FSLIC in 1987 to about $5.625 billion about $5.425 billion--an amount about $2.425 billion or 80 percent.  Subtracting interest on the market borrowings and some amount for operating costs, the resulting estimate of available funds is more than was spent in 1986 by the FSLIC for problem case resolution.

The Treasury/FHLBB plan called for a borrowing authority of $15 billion with no near-term limit on when that authority could **509 *19 be exercised despite the Treasury's own statements that probably no more than $2.5 billion could be borrowed in any one year.  In considering the Treasury/FHLBB plan, the Committee was persuaded, however, that a borrowing limit is needed. The Committee reached that conclusion after weighing its longer-term congressional oversight responsibilities in view of thrift industry testimony on the impact of large borrowings on industry earnings, and recent evidence of significant deficiencies in the management of the FHLBB and its liquidation efforts.

The Committee was mindful, however, of the enormity of the FSLIC problem, of recent enhancements in FHLBB case resolution and asset liquidation capabilities and of the possibility that the Treasury's estimate of the market's ability to absorb

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

the borrowings by its own admission is a conservative one.  Desiring to provide
the FSLIC with ample recapitalization funds to enable it to meet its responsibil-
ities, the Committee determined that an annual borrowing limit of $3.75 billion
per year would be appropriate.  This amount of borrowing coupled with premium, as-
sessment, investment, and asset sale income, would result in FSLIC resources of
$6.925 billion per year for the next two years--and amount well above that contem-
plated in the Treasury/FHLBB plan.  The contribution of nearly $7 billion in re-
sources per year constitutes in the Committee's judgment a fully appropriate re-
sponse to the FSLIC's funding problems.

To assure full congressional involvement in the long-term funding and case res-
olution process, the Committee determined that after two years, additional FC bor-
rowings should have to be approved by Congress.

### FUNDING FRAMEWORK

The plan for recapitalizing the FSLIC contained in Title III amends the Federal
Home Loan Bank Act to create a new entity, the Financing Corporation. The Finan-
cing Corporation (FC) is a limited-purpose corporation, chartered by the FHLBB,
and run by a three person board consisting of two Federal Home Loan Bank presid-
ents and the FHLBB's Director of the Office of Finance.  The FC would be a shell
corporation with no employees--its activities would be carried out employing the
staff of the FHLBB and the Federal Home Loan district banks. The FC would borrow
in the capital markets by issuing long-term bonds to the public.  The bonds would
contain a statement on their face that they are not obligations of the U.S. gov-
ernment.

The FHLBanks would invest up to $3 billion in the FC from their retained earn-
ings in accordance with a formula reflecting each FHLBank's share of total FHLBank
retained earnings and the share of of FSLIC-insured deposits held by each Bank's
member institutions. Of the $3 billion FHLBank investment, $200 million would be
set aside for later use if needed, to meet interest expenses on the FC's outstand-
ing bonds.  It is expected that the FHLBanks will make investments in the FC only
in amounts sufficient to enable the FC to secure its bonds as described below.

To secure the FC's bonds so that they can be sold at the most favorable interest
rates, the FC would use up to $2.2 billion of the **510 *20** FHLBanks' investment
to provide zero-coupon U.S. government bonds of roughly the same maturity and
value at maturity as the FC's outstanding obligations.  Zero-coupon bonds are ob-
ligations that pay interest in the form of market appreciation. For example, in
twenty-five years, $2.2 billion of such bonds purchased now at 8 percent would be
worth $15 billion. When the FC's bonds mature and become due, the zero coupon
bonds would also be maturing, thus assuring adequate funds to retire the FC's
debt.

The funds raised by the FC's bond sales would be used to purchase non-voting
capital stock and non-redeemable capital certificates of the FSLIC.  The FSLIC
would eventually repurchase all or a portion of the stock depending on the level
of the FSLIC's insurance reserve to deposits ratio.  The capital certificates
would be extinguished with no repayment when the FC pays off the last of its out-
standing obligations.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19                                                                                    Page 23
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

The FSLIC would use the money obtained from selling the capital stock and certificates to the FC to resolve problem thrift institution cases.

Title III requires the FSLIC to provide Congress with a variety of reports explaining its financial and case resolution activities. Oversight by the thrift industry itself is provided for through establishment of a Federal Savings and Loan Insurance Corporation Industry Advisory committee made up of thrift industry representatives.

Thrift Industry Accounting Standards

The Federal Home Loan Bank Board has permitted or even required accounting standards inconsistent with generally Accepted Accounting Principles (GAAP). A number of those provisions were adopted during the period from 1980 to 1982, when interest rates were extraordinarily high. Now, with interest rates receding, the Committee feels that it is time that the FHLBB and the FSLIC use GAAP to assess compliance with their regulatory requirements to the same degree that GAAP is used by the bank regulatory agencies to determine compliance with their rules and regulations.

Specifically, Title III requires the FSLIC to promulgate uniform accounting standards consistent with GAAP which are to be used to assess regulatory compliance to the same degree such standards are used by the Federal bank regulatory agencies for banks. The standards may be suspended by the FSLIC for transactions that were consistent with GAAP when they were completed, and if the effect of applying the standards would treat thrifts and thrift holding companies differently than banks and bank holding companies. The promulgated standards are to go into effect on December 31, 1987, with respect to each FSLIC-insured institution except for an institution that files a plan acceptable to the FSLIC for achieving compliance at the earliest possible date, but not later than December 31, 1993. Nothing in this section is intended to eliminate the flexibility of the Bank Board and of the FSLIC in determining the includibility of subordinated debt instruments as regulatory capital or to require the deduction of goodwill or other GAAP-consistent intangibles from regulatory capital.

In addition, the Committee intends that the FHLBB and FSLIC adhere to standards no more stringent than GAAP when requiring FSLIC-insured institutions to write down or establish reserves **511 *21** against problem assets. Under current regulatory accounting practices, the FSLIC and the FHLBB are mandating write-downs of assets in economically depressed areas on a significantly harsher basis than would be required by GAAP, the accounting standard followed by virtually every other business entity in the nation. That practice may have needlessly forced institutions into insolvency, artificially exacerbated the perception of the FSLIC's problems, and in turn, aggravated the economic problems of the communities served by those institutions by forcing liquidations of real estate at unrealistically low prices.

Industry Forbearance

The large number and severity of thrift institution problems and managerial and

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

personnel deficiencies within the FHLBB may have resulted in situations in which
FHLBB actions with respect to some thrift institutions are not appropriate.  Con-
cerned that some congressional response is needed, the Committee included in Title
III a requirement that the FHLBB provide Congress with guidelines for dealing with
troubled but well-managed and viable thrift institutions in a manner with will
maximize the long-term viability of the thrift industry at the lowest cost to the
FSLIC.  The Committee specified that the guidelines address as wide variety of is-
sue areas relating to problem thrift institutions including asset classifications
and appraisal methodologies, enhanced supervisory flexibility in dealing with re-
course and renegotiated loans, appeals of supervisory agent decisions, appraisal
review, and the need for a new Capital Certificate program to assist problem in-
stitutions meet regulatory capital requirements.  The FHLBB is further required to
report to the Congress not later than January 31, 1989 on the effectiveness of the
guidelines.

In addition, the Committee, concerned about the general handling of thrift in-
stitution insolvencies, included a provision that requires the FHLBB to report to
Congress within six months after enactment of the legislation on the steps the
agency has taken and will take administratively to prevent additional FSLIC-in-
sured institution insolvencies.  The report is also to include legislative recom-
mendations to improve the FHLBB's ability to prevent thrift insolvencies.

TITLE IV.--EMERGENCY ACQUISITIONS

Title IV expands the authority for Federal regulators to arrange the sale of
failed and failing banks to interstate buyers.  It also enables regulators to op-
erate failed banks for up to three years in an effort to search for a permanent
operator of the bank.  Behind these new powers is an attempt to keep banks open in
troubled areas of the nation, such as the farm belt and energy-producing states.

Under the Garn-St Germain Act of 1982, Federal bank regulators were empowered to
invite out-of-state banks to purchase failed banks with at least $500 million in
assets.  The purpose of this legislation was to ease the drain on the Federal De-
posit Insurance Corporation when large banks fail.  Because of the general defer-
ence to states to control which banks operate within their borders, however, **22
**512 Congress chose not to permit acquisitions of banks or bank holding companies
with less than $500 million.

Since passage of that law, bank failures have continued to surge.  Each year, a
new post-Depression record for failures is set.  FDIC chairman L. William Seidman
testified that his agency expects a sizeable increase in the number of bank fail-
ures in 1987--up from 138 in 1986--which no relief yet in sight.  The increased
numbers of bank failures, the geographic concentration of banking problems, and
the relatively large size of some troubled banks are making it increasingly diffi-
cult to find purchasers for all failed banks. Though 37 states have enacted legis-
lation providing for some form of regional or national full-service interstate
banking, the FDIC continues to seek enactment of emergency interstate acquisition
authority to enhance its ability to handle failed and failing banks with minimum
disruption to local economies and minimum cost to the insurance fund.

To improve those emergency tools, the FDIC sought several new powers.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)

Page 25

### FAILED AND FAILING BANKS

Under present law, regulators must wait until a bank has already failed before it can be closed. In testimony, the FDIC stressed that by the time a bank has actually been closed, the value of its franchise may have been dissipated if not entirely eliminated. In addition, the process of decline into insolvency can create trauma in the financial community. But permitting an interstate acquisition of a commercial bank in danger of closing--but before it is actually closed--the FDIC expects to improve the chance of finding a buyer, and thereby relieve the FDIC fund.

### BRIDGE BANKS

The FDIC specifically is seeking enactment of authorities to arrange for emergency interstate acquisitions and to operate a failed bank as a 'bridge bank' for up to three years.

A bridge bank is a new national bank established by the FDIC to take over the assets and liabilities of a failed bank. A bridge bank can be established only: if it is less expensive than liquidating the failed bank; if it is essential to the community; or if it is in the best interest to the failed bank's customers and the public.

### STATE CONSIDERATIONS

To preserve the right of each state to control which banks operate within its borders, the bill requires that the appropriate state banking official must approve any emergency interstate takeover of a failing bank.

Under the Garn-St Germain Act, regulators were required to consider a set of geographic and structural priorities in arranging an emergency interstate takeover. Among these was the priority of an in-state buyer of the same type over other buyers. The Garn-St Germain Act also provided a priority for adjoining states over other states. The Committee agreed that in considering out-of-state buyers, states whose banks are already permitted to own banks in the state of the troubled bank should be preferred over other **513 *23 states. Also, in the case of a minority-controlled bank, the FDIC must first seek an offer from another minority-controlled bank before seeking other offers.

Bank holding companies that own several banks are particularly common in states that prevent branch banking. When one or more of those banks fail, however, the FDIC testified that it is difficult to find a buyer. Potential bidders are deterred because they are limited to a single location, which by nature is the most troubled part of the banking organization. And even if a buyer can be found for this bank, since it is generally a large institution given the size threshold required for an interstate bid, its loss may threaten the viability of other banks in the system. As a remedy, the Committee agreed to permit the out-of-state purchaser of a failed bank the privilege of purchasing other healthy banks in the failed bank's holding company.

The regional interstate banking laws of some states require that all banking

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

holding company subsidiary banks be located within a defined region.  Under the
Garn-St Germain Act, this would require buyers from within the compact region to
divest many of their own banks should they participate in an emergency takeover of
a bank outside the region.  The Committee agreed to override state law and permit
emergency interstate buyers to retain all their subsidiary banks.  The FDIC's an-
nual report to Congress must include an examination of all the transactions util-
izing this new law.

  The Committee emphasized that states' rights to control what banks operate with-
in their borders should not be violated by this Federal law.  At the same time,
the Committee accepted those new powers as useful in promoting the availability of
credit and the safety of the financial system.

  The Committee also extended the first title of the Garn-St Germain Act of 1982
providing for continuation of the authority for emergency interstate acquisitions
of thrift institutions and banks provided for in that statute.


                     SEQUESTRATION AND APPORTIONMENT


  To preserve the ability of the Federal Deposit Insurance Corporation, Federal
Home Loan Bank Board and Federal Savings and Loan Insurance Corporation, the Comp-
troller of the Currency, and the National Credit Union Administration, to deal
with problem institutions and meet deposit insurance responsibilities, the Commit-
tee bill exempts these agencies from the sequestration process under the Gramm-
Rudman Act and the apportionment requirements of the Anti-Deficiency Act.


             TITLE V.--AMENDMENTS TO THE FEDERAL CREDIT UNION ACT


  The purpose of Title V is to make technical and clarifying amendments to the
Federal Credit Union Act.  Generally, those changes provide the National Credit
Union Administration with flexibility in its supervision of credit unions, includ-
ing the strengthening of NCUA's conservatorship authority.

  NCUA's conservatorship authority, originally granted in the Garn-St Germain Act
of 1982, has proven to be an effective administrative tool in ensuring the safety
and soundness of credit unions.  **514 *24 It permits the agency to freeze an in-
stitution's activities and thereby prevents a dissipation of assets.  Conservator-
ship is particularly valuable where publicity may trigger substantial withdrawals
and thus endanger the soundness of the credit union.  In some cases obtaining con-
trol of a credit union's operations and assets has precluded criminal officials,
from tampering with or destroying records of their activities.  It is also benefi-
cial where the true causes of a credit union's problems are not easily learned.
By taking control of the credit union to examine the nature of the credit union's
problems, the Committee expects that the interests of all concerned will be best
protected. If problems are not sufficient to warrant liquidation, it allows the
NCUA Board the flexibility to work with credit union personnel to reopen the in-
stitution while at the same time preserving its integrity.

  Conservatorship is also a valuable tool in the case of federally insured state-
chartered credit unions that fail.  But here, the NCUA Board's ability to act is
somewhat restricted.  Normally, the NCUA Board must wait for a state agency to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

place a credit union into liquidation.  Several months may elapse due to state
procedural requirements.  Delays lead to dissipation of assets.

Title V strengthens the conservatorship option by adding new grounds for its im-
position, clarifying NCUA's full authority when acting as conservator, and provid-
ing for a shorter waiting period for a state regulator to comment on a conservat-
orship action.

Title V also clarifies the power of the NCUA to define the risk that credit uni-
ons must insure against through their fidelity bonds for officers and employees.
The present statute requires 'faithful performance' bonds for financial officers.
Officers and employees must be covered for fraud and dishonesty.  Case law shows
this is a different standard from similar bond requirements for other financial
institutions.  For example, credit union bonds must cover acts of simple negli-
gence, while bonds for other financial institutions are required only to insure
against fraud and dishonesty by officers and employees.  Such a high standard for
credit unions could lead to such bonds becoming prohibitively expensive for credit
unions.  The legislation brings the bond standards for credit unions in line with
standards for other financial institutions.

The title also provides NCUA with needed flexibility to procure office space and
equipment.  Unlike the majority of other Federal agencies, NCUA is not financially
supported by the general public. Rather, it is funded by the credit unions it reg-
ulates.  The Committee recognizes that NCUA should be provided the necessary dis-
cretion to utilize its resources.  The title accomplishes that objective by ex-
empting NCUA from any laws that would otherwise restrict the agency in its selec-
tion and acquisition of office space and equipment.  The Committee expects the
NCUA Board to exercise this authority in a prudent and cautious manner and stands
ready to review the Board's actions in this regard.

Title V also clarifies the NCUA's authority to remove credit union employees
from office.  This authority extends to any person, whether or not formally asso-
ciated with a credit union, who is in a position to do injury to a credit union.
This brings the agencies powers in line with its jurisdiction in cease-and-desist
actions, and reverses the effect of an overly-restrictive reading of the agency's
**515 *25 authority by a U.S. district court in First Empire Funding Corp. v. Na-
tional Credit Union Administration, No. 84-2391 (D.D.C., filed October 17, 1984).

The title also provides that if a person is removed, suspended, or prohibited
from participation in the conduct of the affairs of an insured credit union, he
will also be removed, suspended or prohibited from dealing with all federally in-
sured credit unions and depository institutions, all bank holding companies and
all institutions chartered by the Farm Credit Administration (unless allowed back
in by the appropriate Federal regulatory agency).  This eliminates the need for
the OCC, FDIC, FSLIC, Federal Reserve or the Farm Credit Administration to take
separate enforcement action against a person removed from a federally insured
credit union.

The 'Liquidation Proceedings' provision clarifies the Board's authority to act
ex parte without notice in situations when the credit union is determined to be
insolvent or bankrupt.  The credit union has the ability to challenge the action
within 10 days at a hearing in district court.  At such a hearing the NCUA must

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

establish that the statutory grounds for liquidation, (e.g., bankruptcy or insolv-
ency) were present when it acted.

The Committee expects that liquidations conducted under this section shall be
accomplished as expeditiously as possible in order to achieve minimal disruption
to the financial system.  Creditor, member and other claimants must be dealt with
in a fair manner. These amendments clarify the NCUA's authority to adjudicate li-
quidation claims.  Upon final agency action, a claimant may seek recourse in court
under the provisions of the Administrative Procedure Act.

Finally, the bill gives the NCUA Board discretion to permit home improvement and
second mortgage loans for terms longer than 15 years.  This provides credit unions
with flexibility comparable to other financial institutions in extending real es-
tate related loans.  The provisions would, for example, permit a credit union mak-
ing a variable rate loan to offer an extended period of repayment as an alternat-
ive to a balloon payment or higher monthly payments.  The bill also provides other
minor and technical revisions to current credit union statutes.

### TITLE VI.--FAIR DEPOSIT AVAILABILITY

Title VI of the bill is the 'Fair Deposit Availability Act of 1987.'  The provi-
sions set forth in this title represent the culmination of several years of study
and hearings before the Committee starting in 1982 concerning the practice of de-
pository institutions delaying the availability of funds deposited by checks.

The typical situation that brought this issue to the Committee's attention oc-
curs when a person deposits a check, waits a few days, and then writes several
checks to pay some bills--only to have those checks returned as unpayable because
of 'uncollected funds.'  The person immediately calls the bank to find out why the
checks have bounced and is told that the check that was deposited to cover those
amounts--sometimes a paycheck or a Social Security check--has not cleared yet.
Often the depositor is shocked to discover that the bank routinely takes a week to
clear a check drawn on a bank **516 *26 located in the same state and two weeks to
clear a check drawn on an out-of-state bank.

Then, the person has to suffer the embarrassment of explaining the problem to
the merchants and reissuing new checks, after waiting the required amount of time.
Finally, to add injury to insult, the person receives notices from both the bank
and the merchants that there will be penalty charges for the bounced checks.

The Committee found this experience to be a common one.  A February, 1979 Amer-
ican Bankers Association/Federal Reserve Board Task Force found that 'delayed
funds is a widely employed and common banking practice.'  More specifically, sur-
veys conducted by the University of Michigan's Survey Research Center on behalf of
the Federal Reserve found that 12% of consumers with checking accounts experienced
problems with check holds in 1977; 20% experienced problems in 1981; 11% in 1983;
and 15% in 1985.  Based on the number of families with checking accounts, those
percentages translate roughly into between 5.5 million and 12 million families who
have experienced problems with check holds.

In addition, the United States Public Interest Research Group conducted two ex-
tensive studies in 1985 and 1986 and found that lengthy holds are still pervasive.
The May, 1986 survey of 458 depository institutions in 11 states found that 53% of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)

**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

the banks had hold policies for local checks of 3 to 5 business days, while 76%
had hold policies of more than 6 business days for out-of-state checks, with 20%
calling for holds of between 11 and 15 business days.

Even cashier's and government checks are not exempt from long holds.  Thirty-sev-
en percent of the institutions in the U.S. PIRG study said they hold out-of-state
cashier's checks for over a week and eight percent hold those checks over two
weeks.  Seventeen percent say they hold government checks over three business
days.

But all of those statistics understate the problem.  A person who plans his or
her check cashing practices in light of a bank's hold policies will not experience
a problem that will show up on any survey.  However, that person may have other
problems--from having to pay bills out of other, higher interest bearing accounts
to paying late charges or interest because of an untimely payment.

Historically, some have argued that long hold periods are needed to protect
banks against losses on bad checks, pointing out that a bank does not know for
sure that a check is good until the time has passed for a bad check to be re-
turned.  In the case of an out-of-state check, that can mean several weeks.

At the same time, banks are able to invest the deposited funds within one to two
days in most cases; fewer than 1% of all checks are returned and, according to a
study by the Bank Administration Institute in 1974, such checks resulted in total
losses for banks of $5 million in 1973.  Furthermore, the holds placed by banks,
while long for their customers, are not long enough to protect banks against
fraudulent schemes (the average length of time an out-of-state check is held by
banks with holds policies is 10 to 12 business days, far short of the several
weeks the return of a bad check actually can take).  Moreover, some banks, such as
the Bank of America, place holds on fewer than 1% of all their checks.  The most
common situations where the Bank of America places holds on check deposits occur
'where the depositor is a new customer without **27 **517 an established relation-
ship with the bank, in nonrecurring events such as a large dollar deposit on the
sale of a home, or where the account has developed a pattern of bad checks in the
past.'

Thus the ABA-Federal Reserve Task Force Report itself recommended that banks
'retain the flexibility to provide established, financially responsible customers
with funds availability on a schedule at least equal to the receipt of 'provision-
al credit."  For practicable purposes, this would mean access to one's funds,
within one to three days in almost all cases.  Unfortunately, the bank regulators
never took action on this advisory report.

In sum, the Committee seemed to be faced with diametrically opposed solutions to
the problem:  1., expedite the system for returning bad checks so banks will know,
if fact, if a check is bad in a shorter period of time, or 2, require banks to
make funds available in shorter time periods without speeding up the return sys-
tem, protecting against fraud by permitting exceptions for the kinds of checks
that most frequently cause problems.

In the 100th Congress, the Consumer Affairs Subcommittee addressed the subject
of delayed funds within the context of S. 344, legislation introduced by Senators
Dodd, Proxmire, D'Amato, Cranston, and Kerry, that requires both disclosure of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)

**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

hold policies by banks and promulgation within four years of a regulation by the
Federal Reserve Board to assure bank customers speedier access to their check de-
posits.  The bill specifically provides the Federal Reserve with the necessary
flexibility to solve the problems by either of the approaches mentioned in the
above paragraph.

On February 5, 1987, the Subcommittee held a hearing, at which the following
witnesses testified:  Wayne D. Angell, Governor, the Federal Reserve Board; rep-
resentatives from the American Association of Retired Persons, the U.S. Public In-
terest Research Group, Public Citizens's Congress Watch and Consumers Union; rep-
resentatives from the American Bankers Association and the Consumer Banker Associ-
ation; a representative of the Houston Clearing House; and Terrence Kehoe of Na-
tional Financial Automation Corporation.

The consumer witnesses cited the problems that check holds cause for people,
particularly those on Social Security, and provided greater detail about the U.S.
PIRG studies about the frequency of check holds.  They also noted that there has
been no evidence of increased check losses in the states that have enacted laws
shortening check hold times, without making any improvements in the check return
system.  Specifically, they cited the absence of any check fraud based on the new
law in Massachusetts where funds must be made available in 2 intervening business
days for checks drawn on banks in New England and 4 intervening business days for
checks drawn on banks outside the region. Finally, the consumer witnesses ex-
pressed concern that consumers would not see shorter holds under the bill for 4
years.

Governor Angell testified that 'the Federal Reserve is considering this a prior-
ity item to improve the check collection system, particularly the speed of the re-
turn system.'  He said that the Federal Reserve could live with the time periods
contained in the bill, so long as there were adequate exceptions, citing a suc-
cessful Federal Reserve pilot project, and stated that the Federal Reserve could
**518 *28 clean up the system in less than 48 months.  He added that steps could
be taken to improve the return system in the interim: '(t)here are some who are
optimistic who think that maybe in nine months or a year we can get it done.'

Among the banking witnesses, the Consumer Bankers Association called for a broad
Federal preemption of state laws to avoid contradictory requirements, called for
exceptions even in a system based upon expedited returns and opposed entirely the
second option of very short holds with broad exceptions.  The American Bankers As-
sociation testified that 'we view the approach taken in S. 344 (tying availability
schedules to an improved return system) as a conceptual breakthrough in the logjam
of debate which has existed with regard to the issue of funds availability.'

Finally, the Houston Clearing House emphasized the need to preserve private com-
petition with the Federal Reserve in the return item business and Terrence Kehoe
gave the Committee a look into the future of an electronic solution to the prob-
lem.

As a result of the hearings, the bill was revised and then included in the Com-
mittee Print.

Title VI has three main parts:  First, it requires depository institutions to
disclose their policies relating to delaying availability of customers' funds de-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

posited by check. Second, it requires the Federal Reserve within 12 months to ad-
opt an interim regulation, based on improvements in the check clearing system,
that requires availability according to a tiered schedule with an outside limit of
6 intervening business days (with shorter time periods for local checks) and a fi-
nal regulation within 36 months that gives the Federal Reserve two options:
either improve the check clearing system and require availability according to a
tiered schedule with an outside limit of 4 intervening business days (with shorter
time periods for local checks); or require availability within 3 business days,
without necessarily making changes in the return system but giving the Federal Re-
serve Board discretion to define categories of exceptions to protect against
fraud. Third, it requires banks to provide one day availability on U.S., state
and local government checks.

The Committee believes that either of the approaches to shorten hold periods
will be a dramatic improvement over the present system and will provide a fairer
balance between the banks' interest in avoiding fraud and consumers' interests in
having speedy access to their funds. The disclosure provisions will have an imme-
diate impact by making sure that bank customers know when they can use the funds
from their check deposits. The interim regulation will, in 12 month's time, elim-
inate the most egregious present hold practices. The final regulation will, of
course, provide even faster availability for consumers.

**\*\*519 \*29** COMPETITIVE EQUALITY BANKING ACT OF 1987

SECTION-BY-SECTION SUMMARY

TITLE I.--FINANCIAL INSTITUTIONS COMPETITIVE EQUALITY

Amendments to the Bank Holding Company Act

Section 101(a). Definition of 'Bank' and Other Terms

This section closes the nonbank bank loophole in the Bank Holding Company Act by
redefining the term 'bank'. The Act currently defines a bank as an institution
that meets a two-part test: it must both accept deposits that the despositor has
a legal right to withdraw on demand and be engaged in the business of making com-
mercial loans. This section redefines the term 'bank' to include an FDIC-insured
institution whether or not it accepts demand deposits or makes commercial loans.
The new definition also includes non-FDIC insured institutions that both accept
demand deposits or transaction accounts and are engaged in the business of making
commercial loans. Thus the bill would not cover as a bank an uninsured institu-
tion that did not, for example, offer demand deposit or transaction accounts, or
one that offered such accounts but did not engage in the business of making com-
mercial loans.

This section maintains the express exclusions from the bank definition found in
current law for FSLIC-insured or federally chartered thrift institutions and cer-
tain institutions operating outside of the United States. In addition, the section
provides further limited companies, and certain industrial banks, industrial loan

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

companies and other similar institutions.

Trust Company Exclusion

   In order to qualify for exclusion from the bank definition, a trust company must
function solely in a bona fide trust or fiduciary capacity.  The bill goes on to
clarify that a trust company acting in such a bona fide trust or fiduciary capa-
city must comply with the following restrictions:
   (1)  it must receive all or substantially all of its deposits as trust funds;
   (2)  it may not permit its insured deposits to be offered or marketed by or
through an affiliate;
   (3)  it may not accept demand deposits or transaction accounts or make commer-
cial loans; and
   (4)  it may not obtain payment or payment-related services from the Federal
Reserve or exercise discount or borrowing privileges with the Federal Reserve.

Credit Card Exclusion

   In order to quality for the exclusion from the bank definition, a credit card
bank may engage only in credit card operations, and may not accept demand deposits
or transaction accounts, accept time deposits in amounts less than $100,000, en-
gage in the business of making commercial loans, or maintain more than one banking
office. The term 'engage only in credit card operations' means that the institu-
tion may engage only in the business of issuing and **520 *30 processing credit
cards for individuals and in transactions that are a necessary incident to that
business.  In accordance with the common understanding of the term, a credit card
bank may make loans only through such credit cards.  It may not engage in other
business activity, such as processing payments or effecting wire transfers for
others, including affiliates.
   Loans make to individuals through credit cards are not commercial loans.
   The prohibition against commercial loans in no way limits a credit card bank
from purchasing credit card receivables directly from establishments where such
credit cards are accepted.

Industrial Loan Companies and Industrial Banks

   This section excludes from the bank definition industrial loan companies, indus-
trial banks, and other similar institutions that were required to obtain FDIC in-
surance as a condition of accepting deposits or issuing thrift certificates to the
public, pursuant to a law enacted before March 5, 1987, by the State in which the
industrial loan company or industrial bank was chartered.

Anti-Tying Provisions

   Although trust companies, credit card banks, and industrial loan companies that
meet the above criteria are not treated as banks under the Bank Holding Company
Act, they are made subject to the anti-tying provisions of the Bank Holding Com-
pany Act Amendments of 1970 and to the insider and preferential lending prohibi-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19                                                                                              Page 33
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

tions of section 22(h) of the Federal Reserve Act. Thus those institutions--like
other banks--may not require their customers to purchase or use the products or
services of an affiliated company as a condition for obtaining a service or re-
ceiving a product at a favorable price from the institutions. In addition, com-
panies that control those exempted institutions are also made subject to the anti-
tying restrictions, but only in connection with transactions involving the
products and services of the exempt financial institution. Thus the parent com-
panies of such exempted institutions and other affiliates cannot provide their
products or services on condition that the customer obtain a product or service
from the exempted institution. The anti-tying provisions of the Bank Holding Com-
pany Act Amendments of 1970 are not made applicable to marketing practices of the
parent holding company, or its affiliates, that do not involve the products or
services of the exempted financial institution.

Edge Act and Agreement Corporations

Edge Act and Agreement corporations, which operate or are organized under sec-
tion 25 or 25(a) or the Federal Reserve Act, are currently excluded from the
definition of bank. The exemption for those institutions is continued for all ex-
isting affiliations. As discussed below, however, section 102(c) of the bill
would modify the exemption so that companies (other than banks) that acquire such
institutions after March 5, 1987, would be subject to certain provisions of sec-
tion 4 of the Act. This amendment would not in any way affect existing affili-
ations or future acquisitions of such institutions by banks or bank holding com-
panies. As in the case of nonbank *31 **521 banks, Edge Act and Agreement corpor-
ations are treated as banks for purposes of the anti-tying restrictions of the
Bank Holding Company Act Amendments of 1970 and the insider leading limitations of
section 22(h) of the Federal Reserve Act.

Other terms

Section 101(a) gives the term 'insured institution' the same meaning as in the
Savings and Loan Holding Company Act: that is, an institution that is chartered
by the Federal Home Loan Bank Board or whose deposits are insured by the FSLIC.
Such institutions are not treated as banks under the Bank Holding Company Act be-
cause of the exclusion for an 'insured institution'.

The term 'affiliate', which is used throughout the amendments, is defined as any
company that controls, is controlled by, or is under common control with another
company.

The term 'demand deposits' is intended to encompass all types of deposits that
can be withdrawn on demand, regardless of the means of withdrawal. Any deposit
account from which funds are transferred automatically pursuant to the depositor's
instructions (e.g., a sweep account) is also a 'demand deposit'.

'[D]eposits that the depositor may withdraw by check or similar means for pay-
ment to third parties' includes accounts from which funds may be transferred to
third parties by negotiable order of withdrawal (NOW), share draft, wire, computer
order, or other electronic means, regardless of whether the depository institution

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

has the right to require notice before permitting such withdrawals.

A 'commercial loan' includes any extension of credit by a bank to a person for business purposes.  Thus, for example, broker call loans, the purchase of retail installment paper, and loans to dealers in government or other securities are commercial loans because they are loans made for a business purpose in which the creditworthiness of the borrower is an important factor in determining whether to grant the extension of credit.  Likewise, an overdraft in an account of a business customer or for business purposes at the bank, including an intra-day overdraft, is a commercial loan.  Overdrafts in business accounts are commercial loans because they provide financing for the customer's business operations.  Even intra-day overdrafts permit business customers to avoid more formal extensions of credit to meet their payment obligations.

Section 101(b).  Immediate Divestiture Requirement

This section provides that a company which acquired a nonbank bank after March 5, 1987, must comply immediately with the Bank Holding Company Act or divest its bank subsidiary.  Such a company would not be permitted to utilize the two-year period currently provided in the law for newly formed bank holding companies to conform to the requirements of the Bank Holding Company Act.

Section 101(c).  Grandfather Provisions

This section permits companies that acquired nonbank banks on or before March 5, 1987, to retain the bank and not be regarded as a bank holding company so long as the company does not directly or indirectly either (1) acquire control of an additional bank or thrift institution; or (2) acquire more than 5 percent of the shares **522 *32 or assets of another bank or a thrift institution, except for loans or other accounts receivable acquired in the ordinary course of business and for shares acquired in a bona fide fiduciary capacity or held temporarily pursuant to an underwriting commitment in the ordinary course of business or in an account established solely for trading purposes.  A company does not hold shares in the normal course of an underwriting business if it attempts to exercise any control over the management or policies of the bank or thrift through its ownership of those shares.  The prohibition on acquiring the shares or assets of a bank or thrift prevents a grandfathered nonbank bank from expanding through acquisition of, or merger with, banks or thrifts.

In addition, in view of the potential for the ownership of nonbank banks by commercial firms to result in conflicts of interest, concentration of resources, or other effects adverse to bank safety and soundness, and to avoid the potential for unfair competition with regulated bank holding companies, the section provides that the company will lose its grandfather rights and thereby become subject to the Bank Holding Company Act if the nonbank bank:

(1) engages in any activity in which it was not lawfully engaged as of March 5, 1987 (thus preventing the nonbank bank from, for example, both offering demand deposits and engaging in the business of making commercial loans);

(2) offers or markets products or services of an affiliate that are not per-

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)

missible for bank holding companies or permits its products or services to be mar-
keted by or through an affiliate engaged in impermissible nonbanking activities
unless the products and services in question were being offered or marketed by the
bank or affiliate, as the case may be, as of March 5, 1987, and then only in the
same manner as they were offered as of that date;

   (3)  permits any overdraft, including an intra-day overdraft, on behalf of an
affiliate, or incurs any such overdraft in its account at a Federal Reserve bank,
unless such an overdraft results from an inadvertent computer or accounting error
that is beyond the control of the bank affiliate; or

   (4)  increases its assets by more than 7 percent per year on or after one year
from the date of enactment of the Competitive Equality Banking Act of 1987.

  In addition, under this grandfather provision, a company that controls an insti-
tution on March 5, 1987, that becomes a bank at any time (either before or after
enactment of the Competitive Equality Banking Act) because it is required by a
State statute or regulation to obtain Federal deposit insurance will not be
treated as a bank holding company so long as the grandfather restrictions dis-
cussed above are adhered to.

  A company that fails to comply with the grandfather restrictions is given 180
days to comply with the Bank Holding Company Act by divesting the bank or by re-
gistering as a bank holding company and conforming its activities to those permit-
ted under the Bank Holding Company Act for bank holding companies.  The Committee
expects the Federal Reserve Board, in administering those restrictions, to issue
cease-and-desist orders or take other administrative **523 *33 action to bring
about compliance before issuing a final order to divest or register as a bank
holding company.

  In order not to disrupt established business affiliations in existence prior to
March 5, 1987, and in conformity with the other grandfather provisions found in
the Bank Holding Company Act, grandfather rights under this section are granted
only for affiliations in existence on March 5, 1987.  Therefore, these grandfather
privileges may not be transferred to another organization, and will terminate if
another company acquires, directly or indirectly, the bank involved.

Joint Marketing Restrictions

  As described in paragraph 3 above, the bill imposes certain restrictions on
joint marketing between a grandfathered company and its nonbank bank affiliate.
The joint marketing of products and services between an insured depository insti-
tution and a company engaged in general commerce presents a significant risk to
the public in the form of potential conflicts of interest, unsound banking prac-
tices, unfair competition, and lack of impartiality in the credit granting pro-
cess.  The Bank Holding Company Act addresses those concerns by requiring the sep-
aration of banking and commerce. If, however, affiliations between banks and com-
mercial enterprises are allowed to continue, as under the grandfather provision,
those concerns must be addressed through restrictions designed to ensure objectiv-
ity in the credit granting process and the avoidance of other adverse effects.
The joint marketing restrictions are designed to achieve this objectivity and to
lessen the risks of conflicts of interest and other adverse effects the Act was

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19                                                                                                                    Page 36
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

designed to prevent by limiting transactions between the bank and its affiliates
that raise a significant potential for those abuses.  The joint marketing restric-
tions would also minimize the unfair competitive advantage that grandfathered com-
mercial companies owning nonbank banks might otherwise enjoy vis a vis regulated
bank holding companies and commercial enterprises competing with the grandfathered
companies that do not have subsidiary banks.

   The joint marketing restrictions apply only to products or services of an affil-
iate that are not permissible under section 4 of the Bank Holding Company Act for
a bank holding company.  Thus a company in this situation could not market life
insurance or automotive supplies through its bank subsidiary, since those products
are not permitted for bank holding companies generally under section 4(c) of the
Act.  Likewise, the bank in this situation may not permit its products or services
to be offered or marketed through an affiliate that engages in nonbanking activit-
ies that are prohibited for bank holding companies generally under section 4 of
the Bank Holding Company Act.  Thus the life insurance affiliate or the automobile
parts retailer could not market the bank's insured deposits or trust accounts.  On
the other hand, the nonbank bank could offer its customers loans from an affili-
ated mortgage banking or consumer finance company, and such an affiliate could of-
fer its customers the products or srvices of the bank.

   The joint marketing restrictions do not apply in the case of specific products
or services that were being jointly marketed by the affiliates as of March 5,
1987.  The exemption from the joint marketing**34 **524 restrictions applies only
to a specific company that was engaged in the activity as of March 5, 1987.  An
affiliate that was not engaged in a given joint marketing activity as of March 5,
1987, may not commence that activity even if it was being conducted by another af-
filiate as of March 5, 1987.


Overdrafts

   The restrictions on overdrafts described in paragraph 3 above are designed to
reduce the risk to the Federal Reserve System, the depositors and creditors of
nonbank banks, and the Federal Deposit Insurance Corporation presented by nonbank
banks' access to Federal Reserve payment services.  Where nonbank banks provide
payment services, including funds transfer, book-entry securities transfer, auto-
mated clearing house, and check-collection services to their affiliates, the non-
bank bank will, as a practical matter, be unable to independently evaluate the
creditworthiness of its affiliate using the service.

   Without the independent credit evaluation that banking institutions routinely
perform on their unaffiliated customers, there is a clear danger that affiliates
of nonbank banks could incur excessive overdrafts on the books of the nonbank
bank, which in turn may cause the nonbank bank to overdraw its account at the Fed-
eral Reserve bank.

   For example, a troubled affiliate of a nonbank bank could direct the nonbank
bank to make final, irrevocable funds transfers to pay its creditors far in excess
of the balance in the affiliate's account at the nonbank bank or even the nonbank
bank's account at the Federal Reserve.  Those transfers could precipitate the
failure of the nonbank bank, causing loss to the depositors, creditors, and the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

Federal Deposit Insurance Corporation.

Paragraph (3) reduces those risks by providing that grandfathered nonbank banks lose their grandfathered status if they permit affiliates to incur overdrafts at the nonbank bank. Overdrafts in an affiliate's accounts at a nonbank bank are difficult to police, particularly in times of financial difficulty of the affiliate, when the potential for overdrafts resulting in losses is highest. Paragraph (3) accordingly provides that nonbank banks lose their grandfathered status if they incur overdrafts at Federal Reserve banks. Federal Reserve banks are in a position to monitor such overdrafts on a real time basis.

Paragraph (3) excludes inadvertent overdrafts that are beyond the control of the nonbank bank and its affiliate.

Notice of Grandfathered Affiliations and Enforcement

A company qualifying for 'grandfather' treatment must provide the Federal Reserve Board, within 60 days of the date of enactment of the bill, with its name and address, the name and address of each bank it controls, and a description of the bank's activities. The Board is given authority to examine and require reports from the company or the bank, but only in order to monitor and enforce compliance with the grandfather provisions. The Board may not examine those institutions for safety or soundness or for compliance with any laws other than the grandfather provisions of the Act. In addition, the Board is given the authority to use civil enforcement **\*525 \*35** powers, such as cease-and-desist orders, to assure compliance with the grandfather provisions. This authority may not be used for any other purpose and does not limit the authority of the Comptroller of the Currency or the FDIC over national banks and nonmember insured banks, respectively.

Anti-Tying Restrictions

Although a company controlling a bank under the grandfather privilege is not treated as a bank holding company under the Bank Holding Comany Act, it is made subject to the anti-tying restrictions of the Bank, Holding Company Act Amendments of 1970 and the insider and preferential lending restrictions of section 22(h) of the Federal Reserve Act as if it were a bank holding company. Therefore, the subsidiary bank of such a grandfathered company may not condition the grant of credit or the provision of any other service or product on the purchase of a product or service from the parent company or one of its affiliates. Further, the grandfathered company and its nonbanking affiliates are also subject to those anti-tying provisions, but only with respect to transactions involving the bank affiliates. Therefore, the company could not condition the grant of its products or services on a requirement that the customer purchase a product or service from its affiliate bank.

A company eligible for the grandfather privilege may give up the privilege at any time by registering as a bank holding company and complying with all of the provisions of the Bank Holding Company Act.

Nonbank banks owned by bank holding companies

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

Finally, this section imposes restrictions on a bank holding company that con-
trols a nonbank bank similar to those imposed on nonbanking companies that control
nonbank banks.  The bank holding company may retain the bank provided that the in-
stitution does not both accept demand deposits and engage in the business of mak-
ing commercial loans and does not increase the number of locations from which it
conducts its business after the date it becomes a bank. Those restrictions would
no longer apply once the bank holding company could obtain approval under the
Douglas Amendment to acquire the bank in question. Under the Douglas Amendment,
this would occur when the State in which the bank is located authorizes its ac-
quisition by the out-of-State bank holding company.

Section 101(d).  State-Authorized Activities of Savings Banks

This section establishes a special rule for State-chartered, FDIC-insured sav-
ings banks that are owned by bank holding companies.  Under this section, a State
savings bank owned by a bank holding company may engage in any nonbanking activ-
ity, either directly or through a subsidiary, in which it was authorized by State
law, even if the activity is not permissible for bank holding companies and even
if the activity is conducted outside of the bank's home State. Those activities
must, however, be terminated within 2 years if the savings bank in question is ac-
quired by a company which does not qualify as a 'savings bank holding company' un-
less the activities are permissible for bank holding companies generally under the
**526 *36 Act. The Board would, however, be authorized under its general supervis-
ory authority over bank holding companies and their subsidiaries to prevent unsafe
or unsound activities; or to require the holding company to maintain higher level
of capital to support such activities.

Section 101(e).  Savings Bank Holding Company Defined

A 'savings bank holding company' is a company at least 70 percent of whose as-
sets are represented by savings banks chartered by a State as a savings bank on or
before October 15, 1982, and any other bank affiliated with the savings bank be-
fore the date of enactment of the Competitive Equality Banking Act.  In calculat-
ing compliance with the 70 percent test, assets acquired by such other bank by
merger after the date of enactment of the Competitive Equality Banking Act are not
included.

Thus a savings bank may continue to engage in State-authorized nonbanking activ-
ities under this section only so long as it is held by a holding company at least
70 percent of whose assets are invested in the savings bank industry (or banks
that were affiliated with the savings bank on the date of enactment).

Section 101(f).  Thrift Institution Defined

The term 'thrift institution' is currently defined as a building and loan or
savings and loan association, a cooperative bank, a Federal savings bank, or a mu-
tual savings bank.  This section would amend the definition to include any State-
chartered savings bank whose holding company is registered as a savings and loan
holding company under the Savings and Loan Holding Company Act.  This amendment

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19                                                                                  Page 39
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

reflects the provision, discussed in section 104(e) below, which allows a company that owns only savings banks to elect to be regulated under the Savings and Loan Holding Company Act rather than as a bank holding company under the Bank Holding Company Act.

Section 101(g).  Exemption for Certain Banks and Trust Companies

Current law exempts from the Bank Holding Company Act companies that control a State bank or trust company which is wholly owned by thrift institutions and which restricts itself to performing certain limited services for thrift institutions. This section allows savings banks to participate in the ownership of such banks or trust companies and allows the bank or trust company to provide its limited services to savings banks as well as to thrift institutions.

Amendments to the Federal Reserve Act

Section 102(a).  Restrictions on Transactions With Affiliates

Section 102(a) amends the Federal Reserve Act (12 U.S.C. 371(c)) to add a new section 23B, restricting the range of permissible transactions between a member bank and an affiliated company. Although section 23B applies to transactions between a member bank and all of its affiliates, the Federal Reserve Board is authorized to exempt certain affiliates from the provisions of section 23B.  As with section 23A, new section 23b applies to federally insured nonmember banks through section 18(j) of the Federal Deposit Insurence **37 **527** Act. Furthermore, as provided in section 104(c) of this bill, the provisions of sections 23A and 23B apply to transactions between a federally insured thrift and its savings and loan holding company affiliates engaged in the newly authorized nonbanking activities.

New section 23B provides that a member bank and its subsidiaries may engage in certain transactions (including loans and purchases of assets) with any affiliate only if the terms and conditions of the transaction, including credit standards, are substantially the same as, or at least as favorable to the bank as, those prevailing at the time for comparable transactions with nonaffiliated companies.  If there are no comparable transactions, the terms and conditions of the transaction must be the same as those that, in good faith, would be offered to or would apply to nonaffiliated companies.

Section 102(b).  Applicability of Section 23B to Insured Banks

This section amends the Federal Deposit Insurance Act to make the restrictions of section 23B of the Federal Reserve Act applicable to FDIC-insured nonmember banks.

Section 102(c).  Edge Act and Agreement Corporations

Edge Act and Agreement corporations, which are organized to engage primarily in international banking and finance, are currently excluded from the definition of bank in the Bank Holding Company Act.  They have all the powers of a commercial

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19                                                              Page 40
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

bank and may conduct substantial banking operations in the United States.

This section provides that any company, other than a bank, which directly or in-directly acquires an Edge Act or Agreement corporation after March 5, 1987, is to be considered a bank holding company for all purposes of the Bank Holding Company Act except section 3, which relates to the acquisition of additional banks.  Thus, if a company acquires as Edge Act or Agreement corporation, either directly or through a subsidiary (including a bank), the company will be required to conform its activities to those permissible for bank holding companies under section 4 of the Bank Holding Company Act.

This section does not in any way affect companies that currently own Edge Act or Agreement corporations or the ability of banks or bank holding companies to ac-quire additional Edge Act or Agreement corporations.

Amendments to the Federal Deposit Insurance Act

Section 103.  Securities Affiliations of Nonmember Insured Banks

Section 20 of the Banking Act of 1933 prohibits a member bank from affiliating with a company principally engaged in underwriting securities. Section 32 of the Banking Act prohibits an officer; director, or employee of a member bank from serving as an officer, director, or employee of a company primarily engaged in un-derwriting securities.  Those restrictions do not under current law apply to non-member banks.

This section of the bill would apply those restrictions, and any regulations promulgated, by the Board, thereunder, to FDIC-insured nonmember banks for a one year period following the date of **\*528 \*38** enactment of the Competitive Equality Banking Act of 1987.  Affiliations or relationships which commenced before March 5, 1987, are not affected and may continue. Further, those restrictions are not applicable to a foreign bank solely because it has an insured branch in the U.S. However, the provisions of section 32 would apply to the insured branch in the U.S., as if it were an insured bank.

Section 104(a).  Savings and Loan Holding Company Act Definitions

This section amends the definition section of the Savings and Loan Holding Com-pany Act (SLHCA) by adding definitions for the terms 'bank holding company' and 'bank'.  Those terms are defined in the SLHCA to have the same meaning as in the Bank Holding Company Act.

Section 104(b).  Savings and Loan Holding Company Activity and Grandfather Provi-sions

This section of the bill provides that the current exemption from the nonbanking activity restrictions in the SLHCA for unitary savings and loan holding companies (companies that control only a single insured thrift institution) will not apply unless the subsidiary thrift institution meets the 'qualified thrift lender' ('QTL') test.  The QTL test requires the thrift to devote at least 60 percent of its assets to housing and related activities.  If the subsidiary thrift meets the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

QTL test, its parent unitary savings and loan holding company would remain, as it is now, with no limits on its direct or indirect nonbanking activities.  This section provides grandfather rights for unitary savings and loan holding companies formed before March 5, 1987, which would allow such companies to continue to engage in nonbanking activities engaged in on the grandfather date even if their subsidiary thrifts fail to meet the QTL test.

Section 104(b) amends the Savings and Loan Holding Company Act to provide that no savings and loan holding company may commence, or continue for more than 2 years after the date it becomes a holding company or the date of enactment of the Competitive Equality Banking Act (whichever is later), any activity other than those now permissible for a multiple savings and loan holding company as well as additional activities determined by the Federal Reserve Board to be permissible for bank holding companies under section 4(c)(8) of the Bank Holding Company Act (but subject to any FSLIC limitations and restrictions).

This restriction does not apply to a unitary savings and loan holding company whose subsidiary thrift meets the QTL test described in new section 408(c)(4)(B). Thus such a unitary savings and loan holding company may engage in any nonbanking activity without regard to the nonbanking restrictions of the SLHCA.  Moreover, even if a unitary savings and loan holding comapny formed before March 5, 1987, does not meet the QTL test, it is exempt from the nonbanking restrictions of the SLCHA so long as:

    (1)  the company does not acquire a bank or an additional insured thrift;

    (2)  its existing subsidiary thrift continues to meet the asset test found in section 7701(a)(19) of the Internal Revenue Code **529 *39 and does not increase the number of locations from which it conducts its business after the grandfather date;

    (3)  the unitary savings and loan holding company does not engage in an activity of a financial nature in which it did not engage on the grandfather date and which is not permissible for savings and loan holding companies whose thrifts do not meet the QTL test;

    (4)  the subsidiary increases the number of locations from which it does business; and

    (5)  the insured institution does not permit any overdraft, including an intra-day overdraft, on behalf of an affiliate, or incur any such overdraft in its account at a Federal Reserve bank, unless such an overdraft results from an inadvertent computer or accounting error that is beyond the control of the insured institution and the affiliate.

The FSLIC may eliminate or modify grandfather rights under this provision and require a unitary savings and loan holding company to terminate any of its nonbanking activities, after giving the parties an opportunity for a hearing, if it determines that such action is necessary to prevent conflicts of interest, unsound banking practices, or is in the public interest.

This section also provides that no savings and loan holding company may engage in a nonthrift or securities underwriting activity without the prior approval of the FSLIC.  The FSLIC must consider, in approving such an application, the same factors as the Federal Reserve Board considers when approving an application under

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

section 4(c)(8) of the Bank Holding Company Act. The prior approval requirement
does not apply to a unitary savings and loan holding company whose subsidiary
thrift meets the QTL test.

Qualified Thrift Lender Test

   As noted, under this section, a unitary savings and loan holding company may
continue to engage in any activity, without the prior approval of the FSLIC, if
its sole insured institution subsidiary meets the QTL test. This test requires
that the thrift have at least 60 percent of its assets, including investments made
by any subsidiary of such institution, invested in loans, equity positions, or se-
curities related to domestic residential real estate or manufactured housing and
property used by the institution in the conduct of its business. This test must
be met on an average basis in 3 out of every 4 calendar quarters and 2 out of
every 3 years. In addition, in meeting the 60 percent requirement, cash and other
liquid assets specified in section 5A of the Federal Home Loan Bank Act, and one-
half of the dollar value of mortgages originated and sold within 90 days, may be
included, up to 10 percent of the thrift's assets.

   In general, the QTL test must be met within 2 years after the thrift is acquired
by a savings and loan holding company, or 2 years after the date of enactment of
the Competitive Equality Banking Act of 1987, whichever is later. However, in the
case of an insured thrift institution that was chartered as a State savings bank
before October 15, 1982, a 10-year period is given to qualify. During the 10-year
period, the institution must not decrease the percentage of qualifying assets be-
low the percentage it held on the **530 *40 date of enactment, and must increase
its percentage of assets devoted to housing pursuant to a prescribed formula.

   The FSLIC may grant temporary exceptions from the QTL test when extraordinary
circumstances exist, such as when high interest rates reduce mortgage demand to
such a degree that an insured institution lacks sufficient opportunity to meet the
asset requirements.

   Once an institution fails to maintain its status as a qualified thrift lender,
it cannot qualify again for that status for a period of 5 years. For good cause,
the FSLIC may grant the holding company of such an insured institution up to 3
years to comply with the activity restrictions that would automatically be imposed
on the company.

   Any savings, and loan holding company organized under foreign law as of June 1,
1984, which controls a single insured institution on the date of enactment of the
Competitive Equality Banking Act, is not subject to the activity restrictions with
respect to activities conducted exclusively in a foreign country.

   The FSLIC is empowered to issue rules and regulations, and to conduct examina-
tions, as may be necessary to enforce those provisions with respect to a qualified
thrift lender. With respect to a stock savings bank insured by the FIC, and FSLIC
shall rely to the maximum extent possible on examinations conducted by the FDIC.

Section 104(c). Affiliate Transaction and Marketing Restrictions

   This section provides that prohibitions on inter-affiliate transactions cur-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

rently applicable to savings and loan holding companies shall not apply to trans-
actions between a subsidiary thrift institution and affiliates engaged in activit-
ies permissible for a bank holding company under the Bank Holding Company Act.
Those transactions will, instead, be subject to the restrictions of sections 23A
and 23B of the Federal Reserve Act.  This has the effect of providing parity
between a bank and a thrift holding company with respect to dealings between the
depository institution and affiliates engaged in activities permitted under sec-
tion 4(c)(8).

This section also amends the SLHCA to prohibit diversified savings and loan
holding companies and their subsidiary thrift institutions from engaging in joint
marketing activities of the type prohibited for grandfathered companies and their
nonbank bank subsidiaries under section 101(c) of this bill.  Thus, under this
provision, a thrift institution owned by a diversified savings and loan holding
company may not offer or market products or services of an affiliate that are not
permissible for a bank holding company under section 4(c) of the Bank Holding Com-
pany Act, or permit its products or services to be offered or marketed by or
through such an affiliate, unless the bank or affiliate in question was offering
or marketing the particular product or service as of March 5, 1987. Thus, for ex-
ample, a diversified holding company that owns an insured institution and an auto-
mobile company, could not market the loans of its insured institution through its
car dealerships, and its thrift subsidiary could not take orders for cars produced
or sold by the parent company unelss such activities were being conducted **531
*41 as of March 5, 1987. If so, the activity may be continued but only in the same
manner as conducted as of March 5, 1987.

A diversified savings and loan holding company is currently defined as a savings
and loan holding company whose subsidiary insured institution and related activit-
ies as permitted for a multiple savings and loan holding company represented, on
either an actual or pro forma basis, less than 50 percent of its consolidated net
worth at the close of its preceding fiscal year and of its consolidated net earn-
ings for such fiscal year, as determined in accordance with regulations issued by
the FSLIC.

The section provides an exception for a diversified savings and loan holding
that is a reciprocal interinsurance exchange and that acquired its subsidiary in-
sured institution before January 1, 1984. The company covered by this exception
provides its services almost entirely to active or former officers of the United
States military services and their current and former dependents.

Section 104(d).  Tie-In Restrictions

This section provides that the anti-tying provisions currently applicable to
Federal thrift institutions and their affiliates shall also apply to any insured
thrift institution which is a subsidiary of a savings and loan holding company and
to the parent savings and loan holding company, and its nonbanking affiliates,
with respect to products and services offered by the thrift subsidiary.  Thus a
State-chartered thrift subsidiary could not condition the provision of its
products or services on the purchase or use by the customer of a product sold by
the parent holding company or one of its affiliates. Likewise, the parent holding

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

company, or one of its affiliates, could not condition the provision of its
products or services on the customer's obtaining a product or service from the af-
filiated thrift.  The bill does not restrict the conditioning of products and ser-
vices by a savings and loan holding company and its nonbanking affiliates when a
thrift product or service is not involved.

Section 104(e).  Savings Banks as Insured Institutions

   This section establishes a procedure under which companies that own only State-
chartered savings banks, which are normally treated as 'banks' under the Bank
Holding Company Act, may be regulated as savings and loan holding companies rather
than as bank holding companies under the Bank Holding Company Act.  Under this
provision, a savings bank that is either uninsured or insured by the FDIC, and
that meets the QTL test, may apply to the FSLIC to be treated as an 'insured in-
stitution' for purposes of the Savings and Loan Holding Company Act.  Upon submit-
ting such an application, the institution will be considered to be an insured in-
stitution, and the holding company would thereafter be regulated as a savings and
loan holding company rather than as a bank holding company under the Bank Holding
Company Act.

Section 104(f).  Emergency Acquisitions

   This section makes clear that the FSLIC may not waive compliance with the non-
banking activity restrictions of the SHLCA if the thrift subsidiary acquired by a
unitary savings and loan holding **532 *42 company under the emergency provisions
of subsection (m) of the SHLCA fails to meet the QTL test.

Section 105.  Advances

   This section provides that no member of a Federal Home Loan Bank is eligible for
advances from that bank unless the member meets the qualified thrift lender test.

Section 106.  Securities Affiliates

   Section 20 of the Banking Act of 1933 and section 32 of the Banking Act of 1933
are made applicable to insured thrift institutions in the same manner as if the
insured institution were a member bank.  The amendment does not affect affili-
ations or officer, director, or employe relationships established before March 5,
1987.  Moreover, the amendment and section 18(j)(3) of the Federal Deposit Insur-
ance Act do not prohibit affiliation--or officer, director, or employee inter-
locks--between an insured institution or an institution eligible to become a mem-
ber of a Federal Home Loan Bank, and a company principally engaged in the issu-
ance, sale, underwriting, or distribution of securities representing or secured by
interests in real estate or pools of real estate loans, interests in partnership
formed to own, operate or manage real estate, insurance products deemed to be se-
curities, securities of an investment company, and any securities that a national
bank may underwrite.

Section 107(a).  Mutual Savings Bank Holding Company

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

To afford all FSLIC or FDIC-insured mutual thrifts the opportunity to obtain new powers while remaining mutual institutions, this provision authorizes the establishment of holding companies for such institutions under the Savings and Loan Holding Company Act. The powers of such a parent include those of a multiple savings and loan holding company (except insurance activities) and of a bank holding company.

Under this section, an organization operating in mutual form may reorganize into a holding company by forming an interim stock savings bank to be wholly owned by the mutual, and transferring the assets and liabilities of the mutual to the stock. An insured mutual seeking to reorganize in this manner must provide the Federal Home Loan Bank Board 60 days prior written notice. Unless the Bank Board disapproves within the 60-day period, or extends the time, the application shall be deem approved.

A corporation organized as a holding company under this subsection will be regulated as a savings and loan holding company, except that it may engage only in the activities permitted a savings and loan holding company (other than acquiring an insurance agency or escrow business). It may also invest in the stock of an insured institution, acquire a mutual institution through merger, merge with or acquire another savings and loan holding company (except that the resulting company will be subject to the activity restrictions of this section), and invest in a corporation whose stock is available for purchase by an insured institution pursuant to Federal or State law.

**\*\*533 \*43** Section 107(b). Stock Savings Bank Holding Company

This section amends section 3 of the Bank Holding Company Act to provide that a FDIC-insured mutual savings bank may reorganize to form a mutual bank holding company pursuant to the provisions available for the FSLIC-insured mutual association. The resulting mutual savings bank holding company will be regulated on the same basis as a stock savings bank holding company.

Section 108. Leasing Authority or National Banks

At present there is no specific statutory authority for a national bank to engage in leasing. This section provides such authority for leasing transactions involving only the financing of property acquisition by lessees on a 'net lease' basis as now defined in the regulations of the Comptroller of the Currency (cf. 12 C.F.R. 7.3400). The National Bank Act has been construed as allowing national banks to lease personal property to others only if the lease is strictly equivalent to a secured loan or is otherwise incidental to a traditional banking activity. See M. & M. Leasing Corporation v. Seattle First National Bank, 563 F.2d 1377 (9th Cir. 1977), cert. denied, 436 U.S. 956 (1978). [FN1] Based on that court decision, the Comptroller of the Currency has imposed a strict 'residual value' limitation on national banks in 12 C.F.R. 7.3400.

Relief form the residual value restriction is necessary to enable national banks to respond to customer demand for a broader range of lease financing transactions and to compete with thrift and other nonbank lessors, particularly in the market

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

for high-grade commercial equipment leases.  It is the Committee's expectation
that the Comptroller will relax or eliminate the residual value limitation in the
Comptroller's regulation in a manner consistent with sound banking practices.

TITLE II.--MORATORIUM ON CERTAIN NONBANKING ACTIVITIES

Section 201.  Moratorium on Certain Securities and Insurance Activities

   This section imposes a moratorium on certain securities, insurance, and real es-
tate activities.  The moratorium will begin March 6, 1987, and end one year after
the bill becomes law.  Any rule, regulation, or order issued between March 6,
1987, and the date of enactment will be void if it contravenes the moratorium, and
any shares or assets acquired pursuant to such an order will be subject to immedi-
ate divestiture.

Section 201(a)(1).  Securities Underwriting

   Section 20 of the Banking Act of 1933 prohibits a bank that is a member of the
Federal Reserve System from being affiliated with a company or other entity that
is 'engaged principally in the issue flotation, underwriting, public sale, or dis-
tribution' of securities.  12 U.S.C. 377.  Several bank holding companies have ap-
plied to the Federal Reserve Board under section 4(c)(8) of the Bank Holding Com-
pany Act for authority to underwrite and deal in securities that member banks lack
authority to underwrite--activities that would otherwise be prohibited under sec-
tion 20.  Each applicant proposes to conduct the activities in question through a
nonbank **534 *44 subsidiary the bulk of whose activities would (according to the
applicant) be permissible under section 20.  The applicants accordingly contend
that the subsidiary would not be 'engaged principally' in underwriting or dealing
for purposes of section 20.  See, e.g., Bankers Trust New York Corporation, 73
Federal Reserve Bulletin 138, 140 (1987).
   During the moratorium period, this paragraph would prohibit any Federal banking
agency from taking final action to approve an application by a bank holding com-
pany or insured bank to acquire any entity engaged to any extent whatever in the
flotation, underwriting, public sale, or distribution of securities.  The 'engaged
principally' standard would continue to apply to the 'issue' of securities, lest
there be any doubt that a company acquired by a bank holding company or insured
bank may continue to issue its own securities.
   The moratorium should not be construed as effecting any permanent change in the
law, or as a congressional judgment on whether existing law does or does not per-
mit a bank or its affiliates to engage in particular securities activities, or on
whether a Federal banking agency does or does not have authority to approve an ap-
plication to engage in such an activity when the moratorium expires.

Section 201(a)(2)-4.  Insurance

   During the moratorium period, the bill bars a Federal banking agency from taking
any final action to issue any rule, regulation, or order that would have the ef-
fect of increasing the insurance powers of banks, bank holding companies, or their

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)

**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

subsidiaries beyond those expressly authorized under section 4(c)(8)(A)-(G) of the
Bank Holding Company Act.

Section 201(a)(3) specifically prohibits the Federal Reserve Board from approv-
ing the acquisition by a bank holding company of any company, including a State-
chartered bank, unless the bank holding company agrees to limit the company's in-
surance activities to those permissible under section 4(c)(8).  The prohibition is
intended to ensure that a bank holding company cannot take advantage of the 'South
Dakota loophole' during the moratorium by contending that the insurance restric-
tions in section 4(c)(8) do not apply to the activities of the holding company's
subsidiary banks.  The prohibition is fully applicable to State-chartered savings
banks.

There are two limited exceptions to the general prohibition of section
201(a)(3).  The Federal Reserve Board may (1) permit a State-chartered bank, in-
cluding a State-chartered savings bank, to be acquired by a bank holding company
that is not a subsidiary of any other company, pursuant to a reorganization plan
under which the bank's stockholders exchange their shares for shares of the bank
holding company; and (2) permit a State-chartered bank to be acquired by a bank
holding company that on March 6, 1987, controlled one or more State-chartered
banks that have engaged in insurance activities identical to those of the newly
acquired bank, even if the acquiring bank holding company does not agree to limit
the bank's insurance activities to those permissible under section 4(c)(8).  But
neither of the exceptions is available unless the bank holding company agrees (A)
to divest or terminate the banks impermissible **45 **535 insurance activities
within two years after acquiring the bank, and (B) to limit the bank's insurance
activities during that two-year period to the renewal of existing policies.

Section 201(a)(3) would not affect the authority of a bank holding company to
engage in insurance activities permissible under section 4(c)(8), such as agency
activities in a place of 5,000 or fewer people or bu a bank holding company with
total assets of $50 million or less.

Section 201(a)(4) provides that, during the moratorium period, a national bank
may not expand its insurance agency activities into places where it was not con-
ducting such activities as of March 5, 1987.  Thus a national bank now operating
an insurance agency in a place of 5,000 or fewer people may not expand its activ-
ities beyond that place.  And a national bank engaged in activities beyond the
place of 5,000 may not expand its insurance activities into places where it was
not engaged in insurance activities as of March 5, 1987.  The Committee recognizes
that there is a court challenge to the Comptroller's authority to permit national
banks in places of 5,000 or fewer to sell insurance outside that place.  The
moratorium is not intended to resolve the issue of the Comptroller's authority,
which is a matter for the courts. That section does not, however, bar a national
bank from establishing, for the first time, an insurance subsidiary in a place
with a population of 5,000 or less, so long as the insurance activities of that
subsidiary remain confined to that place.

The purpose of the moratorium provisions on insurance activities is to give the
Federal banking agencies a respite while the Congress considers several issues
that are now in dispute.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19                                                                                   Page 48
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

Section 201(c) provides that the moratorium is not intended to resolve substant-
ive issues involving the insurance powers of banks, bank holding companies, and
their subsidiaries.  Thus the expiration of the moratorium will not alter existing
law regarding insurance powers, and no inference about existing powers should be
drawn from the expiration.

Section 201(a)(5).  Real Estate

   During the moratorium period, section 201(a)(5) prohibits a Federal banking
agency from taking any final action to approve any rule, regulation, or other that
would have the effect of increasing the real estate brokerage or development
powers of banks, bank holding companies, or their subsidiaries.

                     TITLE III.--RECAPITALIZATION OF FSLIC

Section 301.  Short Title

   This section designates this title of the Act as the 'Federal Savings and Loan
Insurance Corporation Recapitalization Act of 1987.'

Section 302.  Financing Corporation Established

   Section 302 amends the Federal Home Loan Bank Act to add a new section 21 that
will require the Federal Home Loan Banks ('FHLBanks' or 'Banks') to invest in the
newly created 'Financing Corporation,' which in turn, will be required to invest
in the Federal Savings and Loan Insurance Corporation ('FSLIC').  The **536 *46
Banks' investment will be lawful, notwithstanding limitations found elsewhere in
the Federal Home Loan Bank Act.
   Under new section 21(b)(1), the Financing Corporation will be under the manage-
ment of a Directorate, composed of three members one of whom will be the Director
of the Office of Finance of the Federal Home Loan Banks ('FHLBanks' or 'Banks') or
his successor, and two of whom will be selected by the Chairman of the Federal
Home Loan Bank Board from among the presidents of the FHLBanks. Each of the two
FHLBanks presidents selected to serve as members will be appointed for a term of
one year.  If any member leaves office, the member's service will terminate on the
date such member leaves office and the successor to such member will serve the re-
mainder of the member's term.  The president of any FHLBank can not be appointed
to serve an additional term on the Directorate until the presidents of each of the
other FHLBanks had already served as many terms as the president being selected to
serve the additional term.  The Chairman of the Federal Home Loan Bank Board will
select the chairperson of the Directorate from among the three members.
   The Financing Corporation will have no paid employees, and the Directorate can,
with the approval of the Board, authorize the officers, employees, or agents of
the FHLBanks to act on behalf of the Financing Corporation to performs the Finan-
cing Corporation's functions.  Members of the Directorate will not receive any
compensation from the Financing Corporation for their service on the Directorate.
   All administrative expenses of the Financing Corporation will be paid by the
FHLBanks.  The amount each FHLBank will pay will be determined by the Board with

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19                                                                    Page 49
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)

**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

each bank paying a prorata amount based upon its required stock investment in the Financing Corporation. Administrative expenses of the Financing Corporation will not include its issuance costs in connection with the interests on its obligations, and also will not include custodian fees in connection with its segregated account maintained to assure repayment of principal.

The Directorate will be subject to the Board's regulations, orders, and directions.

Under section 21(c), the Financing Corporation, subject to other provisions of this section and to the regulations, orders and directions prescribed by the Board, will be provided with corporate powers necessary and appropriate for its operation as a specialized corporate entity. Such corporate powers will include the power to issue obligations in the form of nonvoting capital stock to the FHL-Banks; to invest in any securities issued by the FSLIC; to borrow from the capital markets by issuing debt and to pay interest thereon and give security therefore; to impose assessments pursuant to subsection (f); and to exercise incidental powers necessary or appropriate to carry out the provisions of this section.

Under section 21(d), each FHLBank will be required, as prescribed by the Board, to invest in nonvoting capital stock of the Financing Corporation. Stock issued by the Financing Corporation to the FHLBanks will have par value determined by the Board and will be transferable only among the FHLBanks as prescribed by the Board at not less than par. The cumulative amount of the **537 *47 Banks' investment in the Financing Corporation will be limited to $3 billion.

Section 21(d)(3) will limit the cumulative investment in the Financing Corporation by each Bank to the aggregate of its legal reserve plus 'undivided profits.' This limitation will be calculated by adding each Bank's legal reserves on December 31, 1985, 'undivided profits' on December 31, 1985, legal reserves after December 31, 1985, and 'undivided profits' after December 31, 1985. Thus 'legal reserves' and 'undivided profits' for purposes of this calculation will include all retained earnings of the FHLBanks minus those amounts held in the divided stabilization reserve as of December 31, 1985.

Under section 21(d)(4), each FHLBank will be required to purchase a specified percentage of the first $1 billion of stock in the Financing Corporation. The percentage of the first $1 billion that each Bank is required to invest in nonvoting capital stock of the Financing Corporation is derived from a formula taking into account each Bank's individual share of total FHLBank System retained earnings (minus their 'dividend stabilization reserves') and the share of FSLIC-insured deposits held by each Bank's member institutions. By taking into account the shares of FSLIC-insured deposits held by Bank's member institutions, the formula accommodates Banks' member institutions that are insured by the Federal Deposit Insurance Corporation.

Allocation of the remaining stock purchases is based on the percentage of total assets of FSLIC-insured members represented at each bank under section 21(d)(5); however, no Bank will be required to exceed the limitation set forth in paragraph (d)(3). The aggregate amount of Financing Corporation stock that must be purchased by all of the FHLBanks is not reduced because of the limitation in that paragraph. Section 21(d)(6), described below, provides for a reallocation of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)

**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

stock purchases among Banks that have not reached their limits.

Section 21(d)(6) provides that if a FHLBank can not purchase the full amount of stock in the Financing Corporation because that amount exceed its legal reserve plus undivided profits, the amount that the bank can not purchase will be prorated for investment among the remaining Banks based upon their stock holding in the Finance Corporation, as long as the cumulative amount of funds required to be invested by the remaining Banks did not exceed their legal reserves and undivided profits.

Any FHLBank that did not purchase the full amount of Financing Corporation stock as required under the formula in section 21(d)(5) will be required to purchase, annually at the issuance price, from those Banks to which such stock was reallocated, the stock that will have originally been allocated to it. The amount of such stock repurchases will be determined by the Board by prorating among the FHL-Banks, based upon the amount reallocated to and purchased and held by such Banks, the amount available for such purchases. The 'amount available' will include all retained earnings of the Bank on whose behalf an investment has been made under subparagraph (A)(i), less certain amounts. The 'amount available' will not include the Bank's special dividend stabilization reserve (as of December 31, 1985) listed under subparagraph **538 *48 (d)(7)(B), nor an amount of retained earnings equal to the amount of Financing Corporation capital stock already purchased by the Bank. Until the restricted Bank has fulfilled this repurchase obligation, it will be prohibited from paying dividends in excess of one-half of its 'net earnings available for dividends'. Such funds not paid out in dividends will be placed in a reserve account required by the Board.

For purposes of subparagraph (F), 'net earnings available for dividends' means net earnings after computing transfers to legal reserves. 'Undivided profits' means retained earnings minus legal reserves and amounts held in the dividend stabilization reserve as of December 31, 1985. The dividend stabilization reserve is excluded from investment in the Financing Corporation because it include funds, above the legal reserves, that had been determined not to be distributed in the year earned, so as to create a possible supplement to further years' dividends. This special dividends reserve will, however, have to be used completely before a FHLBank, subject to Board approval, can ever draw on its legal reserves until the circumstances outlined under section 206 of this Act. To ensure that only the amount held in the dividend stabilization reserve as of December 31, 1985, is excluded from the amounts that may be invested in the Financing Corporation, the legislation specifically lists the amounts held by each FHLBank in its dividend stabilization reserve as of December 31, 1985. n. hearn march 20, 1987 70-613 118% A613P1.025 79/81

Under section 21(e)(1), the aggregate outstanding amount of obligations issued by the Financing Corporation, as determined by the Board, will not be permitted to exceed $7.5 billion or the greater of (1) five times the Financing Corporation's outstanding nonvoting capital stock, or (2) the sum of the face amounts (which for zero-coupon instruments will be the principal payable at maturity) of obligations invested by the Financing Corporation and held in a segregated account pursuant to subsection (g)(2) whichever is less. The second restriction will permit the Finan-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

cing Corporation to exceed a five-to-one leverage only if it purchased and held
securities whose face amounts or amounts payable at maturity will at least equal
the principal amount payable on all the outstanding Financing Corporation's debt,
thereby ensuring that the debt principal will be repaid. In addition, under sec-
tion 21(e)(1) the amount of obligation issued by the Financing Corporation in any
year will be limited to $3.75 billion, and authority to issue new obligations will
end on June 30, 1987.

Under section 21(e)(2), the net proceeds of obligations issued by the Financing
Corporation will be required, subject to terms and conditions approved by the
Board, to be used to purchase capital certificates or capital stock issued by the
FSLIC or to refund any previously issued obligations whose net proceeds were in-
vested in capital certificates or capital stock of the FSLIC.

Under section 21(e)(3), no obligation of the Financing Corporation can be issued
which will mature more than 30 years after the date of issue or after December 31,
2026.

Pursuant to section 21(e)(4), obligations of the Financing Corporation (which
will be issued only with the approval of the Board), like FHLBank obligations,
will be lawful investments and can be accepted **\*49 \*\*539** as security for all fidu-
ciary, trust, and public funds, whose investment or deposit will be under the au-
thority or control of the United States or any offices thereof.

Under section 21(e)(5), all persons having authority to invest, sell, under-
write, purchase, use as collateral, or deal in FHLBank obligations will have the
same authorities with respect to Financing Corporation obligations. For example,
such authority is given to commercial banks pursuant to 12 U.S.C. 24, paragraph 7,
to State member banks pursuant to 12 U.S.C. 335, to federally-chartered thrift in-
stitutions pursuant to 12 U.S.C. 1464(c)(1)(D), and to Federal credit unions pur-
suant to 12 U.S.C. 1757(7). This amendment will give these financial institutions
the same authorities with respect to obligations of the Financing Corporation as
they have with respect to obligations of the FHLBanks.

Under section 21(e)(6), the Financing Corporation will bear exclusive liability
for its obligations and interest thereon. The Financing Corporation's obligations
and interest thereon will not be obligation's of or guaranteed by the FHLBanks,
the United States, or the Federal Savings and Loan Insurance Corporation.

Under section 21(e)(7), obligations of the Financing Corporation will have the
same tax status as obligations of the FHLBanks. Thus interest earned on those ob-
ligations will be taxable as income at the Federal, but not the State level.

Under section 21(e)(8), instruments issued by the Financing Corporation will be
exempt securities under the provisions of the Federal securities laws administered
by the Securities and Exchange Commission. This exemption is the same as that en-
joyed by obligations of the FHLBanks.

Section 21(f) authorizes the Financing Corporation to impose assessments on each
FSLIC-insured institution. The Financing Corporation will be authorized to assess
each institution insured by the FSLIC an amount for each semiannual period equal
to one-half of an amount not to exceed one-twelfth of 1 per centum of the total
amount of all accounts of the insured members of such institution on an annual
basis. The Financing Corporation is provided with additional exceptional author-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

ity to assess against each insured institution an additional amount for such semi-
annual period to one-half of an amount not to exceed one-eighth of 1 per centum of
the total amount of all accounts of the insured members of such institution on an
annual basis. This exceptional authority may be exercised only with Board approv-
al and a vote by all the members of the Directorate of the Financing Corporation
confirming that such assessments are necessary in order for the Financing Corpora-
tion to meet its interest payment obligations because no other sources of income
are available.

On an annual basis, the maximum assessment rate is one-twelfth of 1 per centum
plus one-eighth of 1 per centum, or 5/24 of 1 per centum of all accounts of the
insured members of an institution. However, the assessment authority is further
limited as directed in the paragraph below.

The Financing Corporation may not collect assessments, whether regular or excep-
tional, in excess of the amount necessary to pay the interest on and issuance of
its obligations, and custodian fees for the segregated account described in sub-
section (g). While the **540 *50 assessment rates are calculated on an annual
basis, the assessments are authorized to be collected on a semiannual basis.

Section 21(g) sets forth the use and disposition of assets of the Financing Cor-
poration not invested in FSLIC. Paragraph (1) authorizes the Financing Corpora-
tion to invest such assets in the same set of obligations and under the same con-
ditions as FHLBanks are permitted to invest their reserves under the current Sec-
tion 16 of the Federal Home Loan Bank Act. These investments include: (1) in-
vestments in zero-coupon instruments held in a segregated account as described be-
low; and (2) short-term investments of the net proceeds of debt issued by the Fin-
ancing Corporation prior to the purchase of FSLIC capital stock and certificates.

Under section 21(g)(2), the Financing Corporation will be required to invest in
and hold in a segregated account, Treasury STRIPS or other noninterest bearing se-
curities as described above, of which the total principal payable at maturity is
approximately equal to the aggregate amount of principal on the Financing Corpora-
tion's obligations. The purpose of this segregated account is to assure the re-
payment of principal on the Financing Corporation's obligations. Finally, para-
graph (3) of this subsection limits the aggregate amount invested by the Financing
Corporation under paragraph (2) and held in the segregated account to $2.2 bil-
lion.

For purposes of section 21, 'issuance costs' means issuance fees and commissions
incurred by the Financing Corporation in connection with the issuance or servicing
of any of the Financing Corporation's obligations, and, includes legal and ac-
counting expenses, trustee and fiscal and paying-agent charges, costs incurred in
connection with preparing and printing offering materials, and advertising ex-
penses. Each of these costs must be incurred in connection with issuing any ob-
ligation.

For purposes of section 21, 'custodian fees' means any fee incurred by the Fin-
ancing Corporation in connection with the transfer of or maintenance of any secur-
ity in the segregated account established under paragraph (2), and any other ex-
pense incurred in connection with the establishment and maintenance of the segreg-
ated account.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)

**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

Under section 21(h)(1), the Financing Corporation will have the same tax status as the FHLBbanks. The Secretary of the Treasury will be authorized to prepare the necessary forms of stock, debentures, bonds, as approved by the Board, pursuant to section 23 of the Federal Home Loan Bank Act, for obligations of the Financing Corporation, as the Secretary of the Treasury is alos so authorized for obligations of the FHLBanks.

Under section 21(h)(2), the Financing Corporation will be prohibited from making any net new borrowings after December 31, 1996, although the Financing Corporation will be permitted to refinance previously issued debt after December 31, 1996. Refinancings of previously issued debt can not mature later than December 31, 2026.

Under section 21(h)(3), the Federal Reserve Banks will be authorized to act as depositories, custodians, and fiscal agents for the Financing Corporation in the general performance of its powers under this Act.

**\*\*541 \*51** Section 21(h)(4) will accord the Financing Corporation the same coverage under the Government Corporations Control Act as the FHLBanks are accorded under that Act pursuant to Section 11(j) of the Federal Home Loan Bank Act (12 U.S.C. 1431(j)). Thus audits of the Financing Corporation by the General Accounting Office can be conducted although the Financing Corporation will have no Government capital invested in it. In addition, the Secretary of the Treasury, a Federal Reserve bank, or a bank designated as a depository or fiscal agent of the United States Government will have the authority to keep the Financing Corporation's accounts (although the Secretary of the Treasury can waive this provision regarding accounts). In addition, before the Financing Corporation can issue obligations and offer them to the public, the Secretary of the Treasury will prescribe the various conditions to which the obligations will be subject (including the form, denomination, maturity, and interest rate), the way and time the obligations will be issued, and the price for which the obligations will be sold. This procedure is currently in place for the issuers who are subject to Section 9108(a) of title 31, United States Code (part of the Government Corporations Control Act) and in practice the Treasury generally approves the terms and conditions on obligations as proposed by these issuers. Finally, before the Financing Corporation can buy or sell a direct obligation of the United States Government, or an obligation on which the principal, interest, or both, is guaranteed, of more than $100,000, the Secretary of the Treasury will have to approve the purchase or sale, although the Secretary can waive this requirement. All of these authorities also pertain to the FHLBanks' issuance of debt.

The Federal Asset Disposition Association will also be treated as a mixed ownership government corporation thereby permitting the General Accounting Office of audit its operations and accounts.

Pursuant to section 21(i), a Federal Savings and Loan Insurance Corporation Industry Advisory Committee will be created to review and make recommendations concerning the Board's activities, expenditures and receipts. Creation of the Committee will offer FSLIC-insured institutions a means of contributing input, in a constructive and responsible manner, to the FSLIC. To enable the Committee to perform this function, it will have access to the new quarterly reports that the FSLIC will be required to prepare pursuant to section 402(k) of the National Hous-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

ing Act (see section 206(d)).

The Committee, which will be exempt from Federal Advisory Committee Act coverage, will consist of 13 members, one from each FHLBank District (to be elected annually by the selected members of each Bank's directorate), plus the Chairman, who will be appointed each year by the chairman of the Board.  All members will have to be officers of FSLIC-insured institutions.  Expenses incurred by members in connection with attending Committee meetings will be paid for by the FHLBanks, as specified by regulations issued by the Board.  The Board also will be empowered to prescribe regulations to guard against possible conflicts of interest that might arise from providing sensitive FSLIC data to industry representatives.

**\*\*542 \*52** The Committee will be required to report annually to Congress, and will cease to exist upon the dissolution of the Financing Corporation.

Section 21(j) will require dissolution of the Financing Corporation no later than the earlier of:  (1) the date by which all stock purchased by the Financing Corporation in FSLIC has been retired; or (2) December 31, 2026.  The Board, on behalf of the FHLBanks, will be the successor to the powers of the Financing Corporation deemed necessary to settle and conclude the affairs of the Financing Corporations.

Section 303.  Mixed Ownership Government Corporation

Section 303 will establish the status of the Financing Corporation as a  'mixed ownership' government corporation, which is the same status accorded to FHLBanks, under the Government Corporations Control Act.  Although there will be no government capital invested in the Financing Corporation, this category of 'mixed ownership' has been accorded to the Financing Corporation to provide it with parallel legal status to that of the FHLBanks as described in the paragraph above analyzing section 21(h)(4).

Section 304.  Recapitalization of FSLIC

Section 304 will empower the FSLIC to issue equity in the forms of redeemable non-voting capital stock and non-redeemable capital certificates.  The non-voting capital stock will be issued in an amount equal to the aggregate investment by the FHLBanks in the Financing Corporation.  The Financing Corporation will be the sole purchaser of both the capital certificates and the capital stock issued by the FSLIC, and proceeds paid to the FSLIC from that purchase will be included as part of the primary reserve of the FSLIC.  The FSLIC will be prohibited from paying any dividends to the Financing Corporation on the capital certificates and stock.

This section also will authorize the FSLIC to pay off and retire its capital stock upon maturity of all the obligations issued by the Financing Corporation. Since the FSLIC's capital certificates will be non-redeemable, the FSLIC will extinguish them with no payoff at the time the FSLIC retired the capital stock. FSLIC will be authorized to make such payoff on the retired capital stock solely with its contributions accumulated in its 'equity return account,' an account created under this Act that can include annual contributions made by the FSLIC according to statutorily prescribed formulae. Any such contributions will be made at

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

the end of each year beginning in 1997 and ending in the year during which the
last obligation of the Financing Corporation matures. Contribution amounts made
to the equity return account will not be included as FSLIC reserves. Such contri-
bution amounts will be the only monies included in the equity return account. Any
interest earned on the funds in the equity return account will be for the account
of the FSLIC and will not be included as part of the equity return account, but
will be added to the reserves of the FSLIC. While the contributions to the equity
return account will be made annually as prescribed above, no payoff and retirement
of FSLIC stock will be authorized to be made until the maturity of all Financing
Corporation obligations.

 **\*\*543 \*53** The formulae for the annual contributions are described below. No an-
nual contributions can be required to be made if the FSLIC's reserves are less
than 0.5 percent of all accounts of all insured members (as of December 31 of the
preceding year). In any year in which the FSLIC's reserves are equal to 0.5 per-
cent of all accounts of all insured members or greater (as of December 31 of the
previous year), the contribution will be the amount invested by the Financing Cor-
poration in FSLIC capital stock, divided by the number of years from the first
year after 1996 that the reserves to accounts ratio reached 0.5 percent to the
year in which the last obligation of the Financing Corporation matures (which can
be no later than 2026).

 Under certain circumstances, the legislation also provides for additional con-
tributions as determined by the Board. In any year in which the FSLIC's reserves
are equal to 1.0 percent of all accounts of all insured members or greater up to
and including 1.25 percent of all such accounts (as of December 31 of the preced-
ing year), the additional contribution as determined by the Board can be a maximum
of 6 percent per year compounded on the amount invested by the Financing Corpora-
tion in FSLIC capital stock computed from the year the investment was made to the
year in which the last obligation of the Financing Corporation matures (not later
than 2026), divided by the number of years from the first year after 1996 that the
reserves to accounts ratio reached 1.0 percent to the year in which the last ob-
ligation of the Financing Corporation matures. The legislation sets forth two
other formulae for possible additional contributions if the reserves to accounts
ratio of FSLIC were to increase, raising the percentage compounded and subtracting
from these in the numerator of the fraction, the amounts already paid out in addi-
tional contributions. All these additional contributions, which will be above the
repayment of the amount invested by the Financing Corporation in FSLIC capital
stock will be subject to the discretion of the Board.

 This legislation is structured carefully to create, in a fair and appropriate
manner, budgetary collections from the equity investments in FSLIC that will off-
set budgetary outlays resulting from FSLIC's case resolution costs. The CBO, OMB,
and GAO are in agreement on this point. Section 304 also makes clear that the
term 'Financing Corporation' refers to the corporation chartered pursuant to sec-
tion 302 of this legislation, new section 21 of the Federal Home Loan Bank Act.

 Finally, section 304 makes clear that certain statutorily prescribed actions re-
garding the FSLIC's primary and secondary reserves can not be triggered as long as
shares of the capital stock of the FSLIC are outstanding.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

Section 305. FSLIC Authority to Charge Premiums Reduced by Amount of Financing
Corporation Assessments

   This section limits the FSLIC's authority to collect premiums and assess addi-
tional premiums by reducing it by the amount the Financing Corporation assesses.
Thus no institution can be required to pay on an annual basis more than one-
twelfth premium plus the additional one-eighth premium, whether the premiums are
paid to the FSLIC, the Financing Corporation, or a combination of **544 *54 both.
As under current law, the imposition of the one-eighth of one percent assessment
will be limited to special circumstances.

Section 306.  Miscellaneous Provisions

   Section 306 will amend Section 16 of the Federal Home Loan Bank Act to allow the
Board, under certain circumstances, to authorize a FHLBank to declare and pay di-
vidends out of its undivided profits or legal reserves, but only after such Bank
has reduced all other eserves (e.g., the dividend stabilization reserve) to zero.
Such an extraordinary divided may be permitted where (1) a FHLBank incurs a charge
off related to its investment in the Financing Corporation and (2) the Board de-
termines there is an extraordinary need for payment of such dividends.  Any such
use of undivided profits or legal reserves will not affect the requirements for
FHLBanks' investments in Financing Corporation stock.
   Section 306(b) is meant to clarify that the sentences referring to the retire-
ment of capital stock in subsection 402(h) of the National Housing Act do not cov-
er either FSLIC stock of FSLIC certificates issued pursuant to this Act.
   Section 306(c) recognizes the special position of the FHLBank as a lender of
last resort and grants the FHLBank a priority lien position, unless another cred-
itor has obtained a perfected security interest in the property.
   Section 306(d) will create a new section 402(k) of the National Housing Act.
Section 402(k) will require the FSLIC to prepare two sets of quarterly reports and
budgets--one projecting its activities, receipts and expenditures for the next
quarter, and the other describing such matters with regard to the quarter immedi-
ately past.  These reports and budgets will impose additional discipline on the
FSLIC operation, and will serve as the basic oversight mechanism available to the
FSLIC Industry Advisory Committee.

Section 307.  Thrift Accounting Standards

   This section requires the FSLIC to promulgate uniform accounting standards con-
sistent with Generally Accepted Accounting Principles (GAAP) which are to be used
to assess regulatory compliance with accounting and public reporting requirements
to the same degree such standards are used by the Federal bank regulatory agencies
for banks.  The standards may be suspended by the FSLIC for transactions that were
consistent with GAAP when they were completed, and if the effect of applying the
standards will treat thrifts and thrift holding companies differently than banks
and bank holding companies. The promulgated standards shall go into effect on
December 31, 1987 with respect to each FSLIC-insured institution except for an in-
stitution that files a plan acceptable to the FSLIC for achieving compliance at

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

the earliest possible date, but not later than December 31, 1993.

The purpose of this section is two-fold: first to achieve uniformity among the
federal bank and thrift regulatory agencies in the accounting standards they use
to assess regulatory compliance with accounting and public reporting requirements;
and second, to base such accounting standards on GAAP.

The committee is aware that the FHLBB and FSLIC currently require all public re-
ports by FSLIC insured institutions to be prepared **55 **545** in accordance with
GAAP and with SEC Rule SX. The committee strongly supports that requirement. This
section is not intended to change that requirement. The federal banking regulat-
ory agencies accounting regulations substantially comply with GAAP. FSLIC and
FHLBB accounting regulations allow more deviations from GAAP for non-public re-
porting obligations. The Committee recognizes the benefit of uniformity in re-
porting requirements among financial institutions and believes that GAAP should be
embraced as this uniform standard. The Committee encourages the banking regulat-
ory agencies and the FSLIC to work together to adopt standardized GAAP reporting
requirements. To the extent that banking regulatory agencies deviate from GAAP in
their accounting and reporting regulations, it is the intent of this section to
allow FHLBB and FSLIC to choose whether to adopt the same deviations or adopt
GAAP.

It is not the interest of this section to require the federal thrift and banking
agencies to adopt identical regulatory frameworks such as might apply to capital
adequacy. It is expected that the FHLBB will retain its own authority to determ-
ine, for example, the components and level of capital to be required of FSLIC-
insured institutions. It is also expected that the FHLBB and FSLIC will retain
their own authority to determine that a particular capital framework--for example,
tangible capital--would be used to determine how large an amount of assets and
FSLIC-insured institution could place in direct investments.

The intent of this section is to require the FSLIC to establish uniform thrift
accounting standards consistent with GAAP. These standards are then to be used to
assess compliance with FHLBB and FSLIC accounting and public reporting regula-
tions, to the same degree such standards are used by the federal banking agencies
to assess FDIC-insured institution compliance with analogous federal banking
agency regulations.

Section 308. Audit of FADA

This section authorizes the General Accounting Office to conduct audits of the
Federal Asset Disposition Associations.

Section 309. Thrift Industry Recovery Guidelines

This section requires the FHLBB to provide Congress with guidelines for dealing
with troubled but well-managed and viable thrift institutions in a manner with
will maximize the long-term viability of the thrift industry at the lowest cost to
the FSLIC. The Committee specifies that the guidelines address a wide variety of
issue areas relating to problem thrift institutions including asset classifica-
tions and appraisal methodologies, enhanced supervisory flexibility in dealing

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

with recourse and renegotiated loans, appeals of supervisory agent decisions, ap-
praisal review, and the need for a new Capital Certificate program to assist prob-
lem institutions meet regulatory capital requirements.  The FHLBB is further re-
quired to report to the Congress not later than January 31, 1989 on the effective-
ness of the guidelines.

**\*\*546 \*56** Section 310. Application of GAAP

   This section amends Section 407 of the National Housing Act to ensure that the
Federal Savings and Loan Insurance Corporation and the Federal Home Loan Bank
Board adhere to standards no more stringent than Generally Accepted Accounting
Principles (GAAP) when requiring FSLIC-insured institutions to write down or es-
tablish specific reserves against problem assets.  This section is not intended to
benefit institutions who have suffered losses as a result of fraud, violations of
law or regulation, or unsafe and unsound practices that could constitute grounds
for a cease and desist order.

Section 311.  Report on Prevention of Insolvencies

   This section requires the FHLBB to report to Congress not later than six months
after enactment detailing the steps that agency has taken and will take adminis-
tratively to prevent additional FSLIC-insured institution insolvencies, and spe-
cifying any legislation needed to prevent additional thrift insolvencies.

                   TITLE IV.--EMERGENCY ACQUISITIONS

Section 401.  Short Title

   This section designates this title of the Act as the 'Financial Institutions
Emergency Acquisitions Amendments of 1987.'

Section 402.  Extension of the Garn-St Germain Act

   This section reinstates the provisions of the Garn-St Germain Depository Insti-
tutions Act of 1982 that expired in 1986, including the extraordinary acquisition
authority of that Act, and extends them until March 1990.

Section 403.  Assisted Extraordinary Acquisitions

   Section 13(f) of the Federal Deposit Insurance Act, which was enacted in 1982 as
part of Title I of the Garn-St Germain Act and would be reinstated by section 402,
permitted interstate acquisitions of banks with assets of $500 million or more-
-but only under limited conditions.  Stock institutions, including all eligible
commercial banks, could be acquired only if they were closed.  An eligible mutual
savings bank could be acquired prior to closing-- but only if its board of trust-
ees and chartering authority specified in writing that it was in danger of closing
and requested the FDIC to assist an acquisition or merger.  If a bank was acquired
by an out-of-state bank holding company the bank could branch throughout the State
to the same extent as an in-state national bank.  Absent specific State authoriz-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

ing legislation, however, bank holding companies could not be acquired by out-of-state holding companies and an out-of-state holding company that acquired a bank under section 13(f) could not expand in the State other than by branching of the newly acquired bank. This meant in unit banking States, the out-of-state bank holding company's entry was limited to the existing office site of the bank it acquired.

Section 403 amends section 13(f) to change the 1982 legislation in three crucial areas. First, the amendments will permit qualified stock institutions, as well as mutual savings banks, to be acquired **547 *57 by out-of-state holding companies before they fail. Second, the amendments permit a holding company to be sold, in whole or in part, to an out-of-state holding company if the instate holding company has a bank subsidiary or subsidiaries with aggregate banking assets of $500 million or more in danger of closing and such bank or banks represents 33% of more of the holding company's banking assets. Finally, they allow an acquiring out-of-state bank holding company expansion rights in the State of acquisition through the bank holding company structure and they prevent regional compact restrictions from applying to a holding company that makes an acquisition under the emergency authority. More specifically, section 13(f) would be amended by section 403 as follows:

Paragraph (1).--Paragraph (1) of section 13(f) is amended to provide that the provisions of the section shall be used only where the FDIC provides financial assistance for an out-of-state acquisition or merger: otherwise the section is not applicable. As an alternative to section 13(f), however, the FDIC may, in its sole discretion, choose to follow State law, where available, to assist an out-of-state acquisition (see paragraph 9).

Paragraph (2).--Paragraph 2 is unchanged. It provides that whenever an insured bank with assets of $500 million or more is closed it may be sold interstate. It also provides, among other things, that in any interstate transaction involving a closed bank meeting the size requirement: (i) all other applicable approvals must be obtained; (ii) there shall be notice to and an opportunity for objection by the State bank supervisor (whether the closed bank has a State or Federal charter); and (iii) if the State bank supervisor objects, the FDIC's Board of Directors may exercise its authority only by unanimous vote.

Paragraph (3).--Subparagraph (A)(i) is amended to extend the emergency interstate acquisition provisions to all banks with assets of $500 million or more that, although not closed, have been determined by their Federal or State chartering authority to be in danger of closing. This subsection parallels subparagraph (2)(A), by allowing out-of-state banks and holding companies to establish a new bank to acquire the bank in danger of closing. It also allows an acquisition to be done directly.

The 1982 law contained a comparable provision for mutual savings banks, but not for other FDIC-insured banks. Experience has demonstrated that by the time a bank has actually been closed, the value of its franchise may have been dissipated if not eliminated. In addition, the process of decline into insolvency can create an adverse effect in the financial community. By permitting an interstate acquisition of a commercial bank in danger of closing, but before it is actually closed,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

the potential for finding a private solution will a lesser commitment of FDIC funds is substantially improved.  Such a process also would help maintain the stability of and confidence in the banking system as a whole.

Subparagraph 3(A)(ii) extends the emergency interstate acquisition provisions to holding companies that have a subsidiary bank or banks with aggregate assets of $500 million or more in danger of closing and such bank or banks represent 33% or more of the total assets of the holding company's banking subsidiaries.  If the Federal or State chartering authority has determined that such a bank or **548 *58 banks are in danger of closing, an out-of-state bank or holding company may (a) purchase the stock of or otherwise acquire the holding company that controls such bank(s) as well as all of such holding company's other subsidiary banks or (b) acquire the bank or banks in danger of closing.  Before the FDIC can assist a merger or acquisition, the board of directors of the bank in danger of closing must request in writing that the FDIC assist a merger or purchase.

An out-of-state bank or holding company that purchases from another holding company a bank or banks in danger of failing with aggregate assets of $500 million or more under clause (b) would be permitted to acquire other bank subsidiaries of the holding company.  Under this subparagraph, more than one out-of-state holding company may acquire portions of a single holding company, so long as the out-of-state holding companies combined purchase subsidiary banks, each of which is in danger of closing, that have total assets of $500 million or more, and provided that those subsidiary banks account for at least 33% of the assets of all bank subsidiaries of the holding company.

There is no comparable provision in the 1982 law.  This provision is, however, essential if the Garn-St Germain extraordinary acquisition provisions are to be effective in States which permit multi-bank holding companies, but do not permit statewide branching.  A number of states presently have such a banking structure.

The 1982 provisions do not work effectively in such States, particularly where it is the lead bank in the holding company system that is in danger of closing.  Potential bidders are deterred because they are limited to a single location and the most troubled part of the banking organization.  Even if a bidder can be found for the lead bank, the continued viability of the banks in the holding company system may be threatened by the loss of the lead bank.

This is particularly the case where there are substantial financial relationships between the lead bank and the other banks in the holding company system.  Thus, the adoption of this provision could substantially reduce the financial demands on the FDIC, as well as the adverse effects on the community served.

Subparagraph (B) provides that if a bank holding company is eligible to be acquired by an out-of-state bank or holding company under subparagraph (A) but the FDIC provides financial assistance after the date or enactment of the Emergency Acquisition Amendments of 1987 to prevent the closing, so long as FDIC assistance remains outstanding, the bank, its holding company, and its bank affiliates can be sold to an out-of-state bank or holding company to the same extent it could have been when assistance was given.  Such acquisitions would require the consent of the FDIC.

Subparagraph (C) is essentially unchanged from current law.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)

**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

Subparagraph (D) provides that the FDIC may not authorize a merger or acquisition of a failing bank or its holding company without the concurrence of the State bank supervisor of the State in which the bank in danger of closing is chartered.

Paragraph (4).--Subparagraph (A) has been changed to confirm that a multiple savings and loan holding company can acquire an FDIC-insured Federal savings bank across State lines.  Subparagraph (B) and (C) are unchanged.

**\*\*549 \*59** New subparagraph (D) provides that an out-of-state holding company that acquires a bank or holding company under section 13(f) may, two years after the acquisition or any earlier time that may be allowed by State law for out-of-state holding companies that have acquired in-State banks, acquire additional banks and establish branches in the State to the same extent that a holding company located in each of those States may expand.  This amendment complements the flexibility provided under subparagraph 3(A) and is supported by the same policy considerations.  It is particularly essential in unit banking States where bidders from troubled institutions are deterred by the lack of further expansion possibilities.

Subparagraph (E) provides that an out-of-state bank or holding company that acquires and retains control, directly or indirectly, of a bank under this subsection shall not be required under State law, as a result of such acquisition, to divest any other bank or be prevented from acquiring any other bank in a different State.  This paragraph does not prevent requiring divestiture to comply with competitive, antitrust, and similar standards imposed under Federal law.

This provision, which was not contained in the 1982 law, is in response to State law developments after passage of Garn-St Germain, and is necessary to enable a number of banks to make acquisitions under Garn-St Germain.  The regional interstate banking laws of several States require that all of the bank holding company's subsidiary banks be located within a defined region. Accordingly, an out-of-state holding company which has acquired a bank in such a State would be required to divest that bank if it made an acquisition under Garn-St Germain outside the region or prevented from further expansion within the region.  This provision would preempt such State laws only with respect to interstate acquisitions under section 13(f).

Paragraph (5).--This paragraph contains provisions relating to the solicitation of offers by the FDIC, and is essentially unchanged from the 1982 law.

Paragraph (6).--This paragraph contained priorities that were to be considered, in certain circumstances, before assisting an interstate merger. Among these were geographic and structural considerations.  In general, those priorities were as follows:

    (i)  institutions of the same type within the same State;
    (ii)  institutions of the same type in different States;
    (iii)  institutions of different types in the same State; and
    (iv)  institutions of different types in different States.

Also, in considering offers from different States the FDIC was to give a priority to offers from adjoining States.

Section 403 modifies this by providing that in considering the various specified priorities, the order of geographic priorities is changed to prefer institutions

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19                                                                                                 Page 62
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

from States with laws that specifically authorize interstate acquisitions (or, in
the absence of such laws, institutions in contiguous States) over institutions
from other States.  Also, section 403 provides that, in the case of minority-
controlled banks, the FDIC must seek an offer from another minority-controlled
bank before applying the geographic priorities.

Paragraph (7).--This paragraph contains applicable antitrust standards and is
unchanged from the 1982 law.

**\*\*550 \*60** Paragraph (8).--New subparagraph (B) prescribes when a bank is 'in
danger of closing' and new subparagraph (C) defines when banks are affiliated for
purposes of holding company acquisitions under paragraph (3).

Paragraph (9).--This paragraph permits the FDIC, in its sole discretion, to as-
sist an interstate transaction under the authority of State law rather than under
this subsection.  This provision affords the FDIC additional flexibility where a
State has enacted its own interstate acquisition authority, but does not in any
way limit the FDIC's authority under section 13(f).

Paragraph (10).--This paragraph confirms that FDIC assistance in a transaction
authorized under section 13(f) shall not be provided to any subsidiary of a hold-
ing company which is not an insured bank.  This paragraph is not, however, inten-
ded to prevent an intermediate holding company from being a conduit for FDIC as-
sistance ultimately intended for an insured bank.

Paragraph (11).--This paragraph requires that the FDIC's annual report to the
congressional banking committees includes a report on transactions that have taken
place under section 13(f) during the prior year.

Amendments to the Bank Holding Company Act

Section 403 also authorizes the Federal Reserve Board to waive the requirements
of notice of the appropriate chartering authority and opportunity for hearing or-
dinarily applicable to the acquisition by a bank holding company of a bank under
section 3 of the Bank Holding Company Act for an acquisition authorized under the
emergency provisions of section 13(f) of the Federal Deposit Insurance Act.  This
would enable the Federal Reserve to waive the notice and hearing requirements of
the Bank Holding Company Act in the event an out-of-state bank holding company has
acquired not only the failing bank but also the parent holding company and its
other subsidiary banks.  In addition the Federal Reserve is authorized to shorten
the post-approval waiting period required under section 11 of the Bank Holding
Company Act for an acquisition pursuant to section 13(f) and to waive that period
entirely to permit immediate acquisition of any or all of the banks to be acquired
where the Federal Reserve, with the concurrence of the Attorney General, finds
that immediate action is necessary to prevent the probable failure of any of the
banks acquired under section 13(f).

Finally, section 403 permits the Federal Reserve Board to waive the provisions
of section 4(c)(8) of the Bank Holding Company Act that require notice and oppor-
tunity for hearing prior to the acquisition by a bank holding company of a non-
banking company where the proposed acquisition is in connection with an applica-
tion by a bank holding company to acquire a bank in danger of closing.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

Section 404.   Bridge Banks

   This section creates a new vehicle, called a 'bridge bank', for dealing with
bank failures.  This vehicle enables the FDIC to 'bridge' the gap between the
failed bank and a satisfactory purchase-and-assumption or other transaction that
cannot be accomplished at the time of failure.

   **\*\*551 \*61** A 'bridge bank' is a new national bank established by the FDIC to take
over the assets and liabilities of a failed bank and to carry on its business for
a limited time. The FDIC may establish a bridge bank only if it finds that:

   (1)  the net cost of reorganizing and operating a bridge bank (taking into ac-
count that any net profits from the bridge bank must be returned to the sharehold-
ers of the failed bank) will not exceed the cost of liquidating the failed bank,
including paying its insured accounts; or

   (2)  the continued operation of the failed banks is essential to provide ad-
equate banking services in its community; or

   (3)  the continued operation of the failed bank is in the best interest of the
depositors of the closed bank and the public.

   Although bridge banks have all the powers of other national banks, they do not
always have capital.  Accordingly, they are excepted from various statutory limits
based on bank capital, and instead the Comptroller of the Currency is empowered to
set appropriate limits.

   The FDIC must dispose of the stock of a bridge bank with two years.  The FDIC
may, after consulting with the Comptroller of the Currency, extend that deadline
for up to one year.

   The FDIC may assist the sale or merger of a bridge bank in the same way as any
other bank.  In addition, the FDIC is specifically authorized to provide assist-
ance to a bridge bank or to any company that will acquire control of a bridge
bank.

   When a bridge bank has taken over a bank that was eligible for an interstate ac-
quisition pursuant to section 13(f) of the Federal Deposit Insurance Act, the
bridge bank remains eligible for an interstate acquisition under the provisions of
section 13(f).

Section 405.   Conversion from FDIC Insurance to FSLIC Insurance

   This section provides that when an FDIC-insured bank converts into an institu-
tion that is eligible for FSLIC insurance and applies to the FSLIC for such insur-
ance, the bank's FDIC insurance terminates automatically when the FSLIC insurance
begins.  The FDIC's existing authority to review and prohibit such conversions is
terminated.  Under the amendment, however, the FSLIC must notify the FDIC when a
bank files an application of that kind, must consult with the FDIC about the ap-
plication, and must notify the FDIC of the result.

   Likewise, when an FDIC-insured bank is acquired by a FSLIC-insured institution,
the Federal Home Loan Bank Board and the FSLIC are given sole authority to review
and approve the merger; the FDIC's current authority to review and prohibit such
mergers is extinguished.  Again, the FHLBB or the FSLIC must notify the FDIC when
it receives any applications of that kind, must consult with the FDIC about those

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

applications, and must notify the FDIC of the result.

Section 406.  Sequestration

   This section exempts the FDIC, FHLBB and FSLIC, Comptroller of the Currency, and
NCUA from the sequestration requirements of the Gramm-Rudman Act.

**\*\*552 \*62** Section 407. Apportionment

   This section exempts the FDIC, FHLBB and FSLIC, Comptroller of the Currency, and
NCUA from the apportionment requirements of the Anti-Deficiency Act.

                    TITLE V.--CREDIT UNION AMENDMENTS

Section 501.  Permanent Merger and Conservationship Authority

   This section eliminates the sunset provisions from the National Credit Union Ad-
ministration's (NCUA's) conservatorship and emergency merger authority. During its
four year trial period, conservatorship has proven to be an effective supervisory
tool for the NCUA.  Through the prudent exercise of conservatorship authority,
more than $43 million in potential losses to the National Credit Union Share In-
surance Fund (NCUSIF) have been avoided.  This section removes the sunset provi-
sion, rendering the conservatorship authority permanent.

Section 502.  Second Mortgage and Home Improvement Loans

   This section is intended to help consumer/members with a dilemma sometimes oc-
curring at the term completion of an adjustable-rate second mortgage or home im-
provement loan.  Because of market interest rate fluctuations near the end of the
loan, members are currently confronted with either a ballon payment or higher
monthly payments in order to pay off the loan by the end of the current 15 year
term.  This section authorizes the NCUA to adjust the term of such loans to permit
more leveling of the loan payout.

Section 503.  Ownership Interest

   This section clarifies that funds in shares, share certificates, and share drft
accounts constitute a member's ownership interest in the credit union.

Section 504.  Technical Amendments

   Technical change necessary due to recodification of Title 31.

Section 505.  Faithful Performance

   This section would eliminate the existing requirement that Federal credit unions
obtain 'faithful performance' coverage for financial officers.  Basic fidelity
coverages (e.g., fraud, dishonesty, embezzlement) would continue to be required
for all officials and employees.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

Section 506.  Membership Officers

  This section provides that membership officers may be selected from the credit
union's membership, rather than having only members of the board of directors eli-
gible to be membership officers.

Section 507.  Nonparticipation

  This section contains a technical amendment to clarify that paragraphs (a) and
(b) of Section 118 of the Federal Credit Union Act are alternative methods of ex-
pelling a member of a credit union.  There has been confusion as to whether (a)
and (b) were alternatives **\*63 \*\*553** or linked. A credit union may either adopt its
own policy for expulsion, as set forth in paragraph (b), or it may simply expel a
member under paragraph (a).

Section 508.  Property Acquisition Flexibility

  This section is intended to provide the NCUA Board with needed flexibility to
obtain office space and equipment so as to respond more precisely to the nature
and location of the agency's needs at substantial cost savings.

Section 509.  Treatment of NCUAB Funds

  This section clarifies the status of the NCUA's funds, thus negating the trans-
fer of any such funds to OMB.  This section would be effective for fiscal year
1986 and each fiscal year thereafter.

Section 510.  Technical and Clarifying Amendments; Removal and Prohibition Author-
ity

  This section clarifies that the NCUA's prohibition authority extends to both em-
ployees and agents of federally insured credit unions, and conforms the NCUA's
jurisdiction in prohibition actions to its jurisdiction in cease-and-desist ac-
tions.

Section 511.  Effect of Removal or Suspension

  This section provides that if a person is removed, suspended or prohibited from
participating in the conduct of the affairs of an insured credit union, he is also
removed, suspended, or prohibited from all federally insured depository institu-
tions, all bank holding companies, and all institutions chartered by the Farm
Credit Administration.  This would eliminate the need for the Federal Reserve
Board, OCC, FDIC, or FSLIC to take separate enforcement actions against a person
removed from a federally insured credit union.

Section 512.  Imposition of Conservatorship

  This section allows the NCUA to impose conservatorship:  when there is a willful
violation of a cease-and-desist order which has become final; and, when there is a

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

concealment of or refusal to submit documents or other records of a credit union
to an NCUA examiner or other lawful agent of the NCUA Board.

Section 513.  Reduction in State Comment Waiting Period

  This section reduces from 90 days to 30 days the period the NCUA must allow
State regulators to respond to the NCUA's proposed imposition of conservatorship
in the case of a State-chartered, NCUA-insured credit union. Events today often
compel quicker and more decisive action by regulators such as the NCUA than the
90-day consultation period allows.

Section 514.  Authority as Conservator

  This section declares that the NCUA, in exercising its conservatorship author-
ity, has the power of the credit union members, directors, officers, and commit-
tees.

**\*\*554 \*64** Section 515. Liquidation Proceedings

  This section clarifies the Board's authority to act ex parte without notice when
a credit union is determined to be insolvent or bankrupt.  As in Section 206 of
the Federal Credit Union Act, the credit union can challenge the action within 10
days at a show-cause hearing in district court.  At such a hearing the Board would
be required to establish that the statutory grounds for liquidation (e.g., bank-
ruptcy or insolvency) were present when it acted.

                    TITLE VI.--DEPOSIT AVAILABILITY

Section 601.  Short Title

  This section designates this title as the 'Fair Deposit Availability Act of
1987.'

Section 602.  Definitions

  This section sets forth definitions applicable to this title.

Section 603.  Disclosure of Funds Availability Policies

  This section sets forth the circumstances under which depository institutions
must disclose their holds policies and the nature of the disclosures they must
provide.
  Subsection (a)(1) provides that before opening a consumer account, a depository
institution shall provide written disclosure to the potential customer of its spe-
cific policy with respect to when a customer may withdraw funds.
  Section 603(a)(2) requires a depository institution, in the case of a consumer
account opened prior to the section's effective date, to provide the account hold-
er with a written disclosure of the institution's specific policy with respect to
when a customer may withdraw funds deposited into the account by check.  This dis-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

closure must be provided with the first regularly scheduled mailing pertaining to
the account which occurs after the effective date, such as a monthly statement,
but must occur within 90 days after the effective date.

This section provides that a depository institution that has already provided a
disclosure meeting the requirements of the section need not send another disclos-
ure.  The Committee's intent is that a prior disclosure would meet the require-
ments of the section if (1) it included substantially the same detail about the
institution's policy as is required of institutions making the disclosure for the
first time under this section; (2) the policy at the time of the prior disclosure
was identical to the policy at the time the section takes effect; and (3) the de-
pository institution took reasonable steps to ensure that substantially all ac-
count holders received the prior disclosure.

Subsection (b) requires each depository institution to post a notice of its gen-
eral policy at all its deposit taking locations. In addition, each depository in-
stitution shall mail at least annually a brief reminder with respect to consumer
accounts that deposits by checks may not be available for immediate withdrawal.

Subsection (c) provides that each owner of an automatic terminal shall provide
at each terminal location a similar brief reminder.

**555 *65 Subsection (d) requires a depository institution to give customers
prior notice before making any changes in its funds availability policies, except
that changes that expedite availability may be disclosed after implementation.

Disclosure after implementation should occur as soon as practicable and no later
than the first regularly scheduled mailing pertaining to the account that occurs
after the change takes effect.

Subsection (e) requires depository institutions to provide written disclosures
of their specific policy with respect to when a customer may withdraw funds depos-
ited by check to any person who requests such information.

Subsection (f) provides that if a depository institution does not begin to com-
pute interest on check deposits by the time that the institution receives provi-
sional credit, the institution shall inform its customer in writing of when it be-
gins to compute interest.  This subsection addresses the fact that some credit
unions follow the policy of crediting interest for an entire month on deposits
that are received before the middle of the month but do not credit any interest on
deposits received after the middle of the month.

Subsection (g) requires the Board to publish model disclosure forms and states
that a depository institution that uses any appropriate model form shall be deemed
in compliance with the provisions of this section.

Section 604.   Interest on Deposits

Section 604(a) says that depository institutions may not delay beginning to com-
pute interest on funds deposited by check beyond the date on which the institu-
tions receive provisional credit for the check, i.e., the time when the institu-
tions may invest the funds.

Section 604(b) provides a limited exception to the interest computation require-
ment of section 604(a).  It permits computation to begin a date later than the
date provisional credit is received if (1) such a policy applies to all deposits,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19     Page 68
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

including cash deposits; and (2) a specific notice requirement contained in sec-
tion 603(f) is met.

This provision is intended to accommodate small institutions that credit all de-
posits on only the first day of each month.  If deposits are received by the 10th
or the 15th of the month, they are credited as if received on the first of the
month, and interest accrues accordingly.  If deposits are received in the later
portion of the month, crediting and accrual of interest begin on the first day of
the following month.

The subsection is intended to include only such accounts, most of which are
credit union accounts, and is not intended to be used to otherwise evade compli-
ance with section 604(a).

Section 605.   Interim Expedited Funds Availability Regulation

This section requires the Board to place in effect within 12 months interim reg-
ulations to expedite customer access to funds deposited by checks by expediting
the process for returning all categories of unpaid items or by other means such as
those listed in Section 606(b)(2) and by establishing time periods within which
depository institutions must make funds deposited by check available to customers.

**\*\*556 \*66** The time periods for check categories are to be tiered by the Board
according to the time needed under an improved return system for depository insti-
tution reasonably to be expected to learn of nonpayment for each such category.
For example, availability requirements might reflect the time ordinarily required
for an item to travel from the depository institution to the payor institution and
back, as expedited by the Board's regulation.  The time periods under this example
would be varied by the Board to reflect different processing methods and interme-
diate steps.  In general this should mean one intervening business day on local
items and 2 to 6 intervening business days on other items.  The bill sets an out-
side limit of six intervening days for availability, but authorizes the Federal
Reserve to add one additional day if necessary.  It is expected that the Federal
Reserve would only authorize this seventh day for situations where processing of
the check necessarily takes a longer time because there are an unusual number of
intermediate parties between the bank of deposit and the payor bank or because a
bank is located at a place that is remote from a Federal Reserve office.

The requirement that times be established 'based on the time necessary for a de-
pository institution reasonably to expect to learn' of nonpayment does not require
that the institution will in every instance be able to learn of nonpayment within
that time, but that the institution can expect to learn of nonpayment in the pre-
scribed time in the vast majority of cases.  Since no one will be able to predict
which specific checks might not be returned within the time periods (for such
reasons as late planes or communications breakdowns), a person will not be able to
consummate a fraudulent scheme based on an awareness of the availability times
prescribed by the bill.  At no point is it assumed that the Board can or will be
able to guarantee that depository institutions will have more than a reasonable
expectation that they may learn of nonpayment in the time prescribed.  The specif-
ic exceptions in the bill are intended to protect depository institutions from
checks that may involve potential risk in light of the fact that most but not all

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)

**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

checks will return within the time periods.

Subsection (c) permits the Board to establish limited exceptions to the general
policy for check deposits in excess of $5,000 in any one day (either by an indi-
vidual check or by the aggregation of checks); for checks that have been returned
unpaid and redeposited; and for deposit accounts that have been overdrawn re-
peatedly. In such circumstances, the Federal Reserve may authorize an additional
two business days beyond the schedule that would otherwise apply to that category
of check under the tiered schedule. For example, if the Federal Reserve required
depository institutions to provide 1 intervening business day availability on loc-
al checks, then the Board may also require up to three intervening business day
availability for local checks that fall under the three exceptions in this sec-
tion. The Board may, however, set a different reasonable period of time for
checks over $5,000 that are deposited into business accounts.

In the case of the exception for accounts that are overdrawn repeatedly, under
this section and sections 606(b)(4) and 606(c)(2)(D), the Committee intends the
exception to apply to accounts that **557 *67 have been repeatedly overdrawn on
separate and distinct occasions. For example, the situation where an account is
overdrawn and, as a result, several checks are returned due to insufficient funds
would count as one occasion in which the account was overdrawn for purposes for
the exception. Additionally, the Committee intends that this exception would last
only for a limited period of time for any account holder who came under the excep-
tion and that the Board should establish a reasonable time period.

Section 605 also authorizes exceptions where a depository institution has reas-
onable suspicion to believe that the funds for the check are uncollectible or re-
ceives a notice of a diversion or other delay in transit or where there has been
an interruption of communication facilities, a suspension of payments by another
depository institution, a war, or an emergency condition beyond the control of the
receiving institution.

In the case of the 'reasonable suspicion' exception, both for purposes of this
section and section 606, the standard of 'reasonable suspicion' is intended to be
narrowly interpreted. A depository institution may not exercise this exception
based on the physical appearance of the customer, or discriminate on the basis of
race, age, sex, economic status, account balance or any similar factor. A depos-
itory institution may not use the exception to evade compliance with a general re-
quirement of the law or regulations, for example by invoking the exception with
respect to all out-of-state checks. The reasonable suspicion should be grounded
on facts, for example, about the check itself or upon unusual activity in the cus-
tomer's account which lead to the conclusion that the check may be uncollectible.

Section 606. Expedited Funds Availability Regulation

Subsection (a) provides that the Board shall within 36 months after enactment,
promulgate regulations to expedite customer access to their funds deposited by
check. The Board is authorized to adopt either of two systems-- one that involves
improvements in the return system or one that is based upon the nature of the
check and the account holder.

Subsection (b)(1) sets our option 1: This option requires the Federal Reserve

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

Board to improve the check clearing system by expediting the process for returning all categories of unpaid items or other means so that depository institutions can reasonably expect to learn of the nonpayment of items within the time periods established under subsection (b)(3). Subsection (b)(3) sets an outside limit of four intervening business days for availability. The Board is expected to tier the time periods and to provide shorter time periods, for example, for checks that take less time to travel from the bank of deposit to the payor institution and back under the expedited system such as checks deposited in banks in the same Federal Reserve territory as the banks on which they are drawn. The Board may extend the outer time limit by one business day where necessary. It is expected that the Federal Reserve would add this fifth day only for situations where processing of the check necessarily takes a longer time because there are an unusual number of intermediate parties between the bank of deposits and the payor bank **558 *68 or because a bank is located at a place that is remote from a Federal Reserve office.

  The Commission expects that the Federal Reserve, in choosing to proceed under option one, would develop an expedited return system that is both cost-effective and results in the shortest possible hold periods.

  The requirement that times be established 'based on the time necessary for a depository institution reasonably to expect to learn' of nonpayment does not require that the institution will in every instance be able to learn of nonpayment within that time, but that the institution can expect to learn of nonpayment in the prescribed time in the vast majority of cases. Since no one will be able to predict which specific checks might not be returned within the time periods (for such reasons as late planes or communications breakdowns), a person will not be able to plan a fraudulent sheme based on an awareness of the availability times prescribed by the bill. At no point is it assumed that the Board can or will be able to guarantee that depository institutions will have more than a reasonable expectation that they may learn of nonpayment in the times prescribed. The specific exceptions in the bill are intended to protect banks from checks that may involve potential risk in light of the fact that not all checks will return within the time periods.

  In requiring the Board to promulgate regulations for expediting the process for returning unpaid items, section 606(b)(1) provides that new requirements for banks and/or improvements must apply to 'all categories of unpaid items.' Thus, for example, the Board could not focus only on improving the check return system for long distance items and then imposing a system that permits four intervening business day holds on all checks, including local ones. The Committee expects the Board to impose shorter hold times on checks other than long distance checks. The requirements and/or improvements are to apply to all categories of checks and the time limits within which depository institutions must make funds deposited by check available to customers must be tiered based on the time needed under an improved returned system for depository institutions reasonably to be expected to learn of nonpayment for each category.

  As with the interim schedule, the Fed is authorized to establish exceptions for deposits by check of more than $5,000 in any one day; for checks that have been returned unpaid and redeposited; and for accounts that have been overdrawn re-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

peatedly. The maximum hold time for such checks would be two business days beyond the schedule that would otherwise apply to that category of check under the tiered schedule, except for checks deposited into business accounts that exceed $5,000. The Fed would establish reasonable times for such checks.

Subsection (c) sets forth option 2. Under this option, the Board is required to promulgate regulations establishing the time limits within which despository institutions must make funds deposited by checks available to customers as the number of days necessary for depository institutions to receive provisional credit for checks. The Board is expected to establish a tiered schedule based upon when depository institutions receive provisional credit, considering **\*\*559 \*69** the type of instrument, the type of institution and geographic location. As a general rule, banks receive provisional credit for local checks in one day and for all other checks in 2 days.

In order to protect against fraud, the Board is authorized to establish exceptions for new accounts, large dollar deposits, checks that have been returned unpaid and redeposited, and accounts that have been overdrawn repeatedly. It is expected that the Board, in establishing these exceptions, will look for guidance to the specifics of the exceptions in state funds availability laws.

In addition, the Board may establish exceptions for any other class of checks if the Board finds that such class poses a serious risk of loss to depository institutions and an exception would substantially reduce such risk. The Committee intends that this authority may be exercised only in response to a serious risk of loss that is the direct result of the availability schedule. In addition, an exception to the availability schedule must be a remedy that would substantially reduce such risk and must be no broader than necessary to accomplish this purpose. By 'serious risk of loss', the Committee means serious in comparison to the level of losses experienced prior to the implementation of the Act.

Section 606 also authorizes exceptions where the depository institution has reasonable suspicion to believe that the funds for the check are uncollectible or receives a notice of a diversion or other delay in transit. The maximum hold time for a check that falls under these exceptions would be two business days beyond the schedule that would otherwise apply to that check under the tiered schedule. In addition, Section 606 authorizes exceptions where there has been an interruption of communications facilities, a suspension of payments by another depository institution, a war, or an emergency condition beyond the control of the receiving institution.

The Board also may by regulation suspend the applicability of this section and section 605, which sets up an interim regulation, if depository institutions are experiencing an unacceptable level of losses due to check-related fraud and suspension is necessary to diminish the volume of that fraud. Any such regulation shall remain in effect no more than 45 days (excluding weekend, legal holidays or any day either House of Congress is not in session) and shall require that funds be made available within a reasonable time.

The Committee intends that this authority may be exercised only in response to fraud that is solely the result of the terms of the funds availability schedule and arises from causes outside the control of affected depository institutions.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19                                                                                    Page 72
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

It is intended that the authority may not be utilized in situations in which the
increase in check fraud losses is the result of sloppy management, poor employee
training, inadequate internal controls, or illegal activity within the affected
depository institutions.  In such instances, the Federal regulatory agencies are
expected to use their existing supervisory powers, including criminal referrals.

By the phrase 'unacceptable level of losses', the Committee means a substantial
and identifiable increase in losses compared with levels of losses experienced
prior to the implementation of the Act.  Regarding the report to Congress on any
schedule suspension, **560 *70 the Committee expects thorough documentation of the
need for the decision.

This section further provides that where the bank utilizes an exception, it must
notify the customer as to the day the funds will be available for withdrawal and
the reason the exception was invoked.  This notification system is similar to the
one in place in the State of California.

Section 606(f)(2) allows the Board to further expedite the availability of funds
and to further limit the time periods within which depository institutions must
make funds deposited by checks available to customers after the regulation under
606(b) or 606(c) takes effect.

The Committee intends that the Board have continuing authority to expedite the
availability of funds after the initial issuance of regulations under this sec-
tion.  To that end, the Board continues to have all the authority granted to it
under the section after its responsibility to issue the regulations under section
606(b) or (c) is fulfilled.  The Board is required in section 606(a) to choose one
of two systems for implementing the Act.  Under this authority, the Board could,
for example, switch its choice after promulgation of the regulations under this
section.

Section 607.  Availability of Government Checks

This section provides that the Board shall promulgate regulations within 12
months to give people access to funds based on U.S. Treasury and state and local
government checks not later than the date when the institution is given provision-
al credit for that check.  Because state and local checks generally do not have
unique routing numbers that would identify them as government checks, the availa-
bility schedule would apply only to such checks if they are presented to a deposit-
ory institution in the same state and are deposited with special deposit slips
that indicate they are checks drawn on the treasury of that state.

Section 608.  Administrative Enforcement

This section establishes an administrative enforcement system that parallels the
regulatory enforcement system for banks, savings institutions and credit unions.
A violation of any requirement imposed under the title is deemed to be a violation
of a requirement imposed under the relevant regulatory statute.

Section 609.  Civil Liability

This section establishes penalties for failing to comply with the requirements

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

imposed under sections 603, 604, 605, 606, and 607.  The penalties and exceptions
to them are drawn from the Truth in Lending Act.

Section 610.  Miscellaneous

  This section states that any deposit made on a Saturday, Sunday, legal holiday,
or after the close of business on any business day shall be deemed to have been
made on the next business day.  It also provides that when the Title requires
funds to be available for withdrawal on a business day, such funds are available
two hours after the bank opens for business.  The two hour delay in availability
**71 **561 is designed to reflect the fact that some checks do not get back to the
bank of first deposit until after the bank opens for business.

Section 611.  Effect on Check Acceptance Policies and Other Laws

  Subsection (a) provides that nothing in this Title prevents a depository insti-
tution from making funds available for withdrawal sooner than the Title requires
nor does it affect an institution's right to accept or reject a check for deposit
or to reverse to provisional credit if the check turns out not to be good.
  Subsection (b) permits state laws with shorter hold times to apply if the Board
adopts an option 2-type approach and the State law or regulation has taken effect
prior to the date of enactment of this Act.  Otherwise, regulations established by
the Fed would supercede the provisions of any State law, including the Uniform
Commercial Code, which the board determines to be inconsistent with the provisions
of this title or any regulation, but only to the extent of the inconsistency.

Section 612.  Regulations

  This section authorizes the Board to prescribe regulations after notice and the
opportunity for public comment.

Section 613.  Improving Payment Mechanisms

  This section requires the Fed to prepare a study within one year after imple-
menting the final regulations converning how the system is working and how it can
be improved.  The study must be submitted to the Congress.

Section 614.  Parity in Clearing

  This section is designed to assure parity in clearing among all institutions
that receive deposits.

Section 615.  Effective Date

  Except as otherwise provided in sections 605, 606, 607, and 612, this Title
takes effect 12 months after its enactment.

REGULATORY IMPACT STATEMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

 

 

    In compliance with paragraph 11(b) of Rule XXVI of the Standing Rules of the
Senate, the Committee makes the following statement regarding the regulatory im-
pact of the bill.  This bill represents a significant increase in the ability of
the Federal banking agencies to handle problem institutions with no increase in
regulatory burden.

* * * * *

COST OF LEGISLATION

    The Committee has requested a cost estimate of this legislation under the provi-
sions of Section 403 of the Congressional Budget **562 *72 Act of 1974. The cost
estimate of the Congressional Budget Office appears below:

    U.S. CONGRESS,

    CONGRESSIONAL BUDGET OFFICE,

    Washington, DC, March 1, 1987

Hon. WILLIAM PROXMIRE,
Chairman, Committee on Banking, Housing and Urban Affairs, U.S. Senate, Dirksen
Senate Office Building, Washington, DC.
    DEAR MR. CHAIRMAN:  The Congressional Budget Office has reviewed the Committee
Equality Banking Act of 1987, as ordered reported by the Senate Committee on Bank-
ing, Housing and Urban Affairs on March 10, 1987.
    We expect that this bill would result in a reduction in federal insurance costs
to assist failing banks, savings and loans, and credit unions, with savings estim-
ated to be between $200 million and $400 million annually over the next three
years.  In addition, the recapitalization of the Federal Savings and Loan Insur-
ance Corporation (FSLIC) would result in a cash infusion of an estimated $7.5 bil-
lion over the next two years, to be used for assisting troubled savings and loans.
Although funds received by the FSLIC would be offset over time by increased dis-
bursements, the lag between obligations and disbursements would result in receipts
exceeding outlays in 1988, causing an estimated net outlay reduction of $150 mil-
lion to $350 million in 1988. Correspondingly, net FSLIC outlays in 1990 would in-
crease by $150 million to $350 million. Other provisions of the bill are not ex-
pected to have a significant net budget impact.

Expanded Powers for Regulatory Agencies

    The bill would extend and expand certain emergency provisions of the Garn-St
Germain Depository Institutions Act of 1982 until March 1, 1990.  These and other
provisions of the bill would give the Federal Deposit Insurance Corporation
(FDIC), the FSLIC, and the National Credit Union Share Insurance Fund additional
alternatives for assisting failing and failed institutions, helping to reduce in-
surance costs to the agencies.  Because of the great uncertainty regarding the
level and cost of possible financial institution failure, and because the author-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19                                                                                    Page 75
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

ity provided in those provisions is discretionary, it is difficult to estimate
precisely the budget impact of the expanded authority for the regulatory agencies.
Nevertheless, we expect that outlay savings could be $200 million, to $400 million
annually over the next several years, because the bill would provide additional
flexibility and options for resolving problem cases.  The provisions likely to
have the greatest budgetary effects include additional authority to approve inter-
state acquisitions, to assist failing institutions and certain bank holding com-
panies, to create bridge banks, and to make permanent the conservatorship author-
ity of the National Credit Union Administration (NCUA).  The largest savings are
expected to accrue to the FDIC.

FSLIC's Recapitalization

   The bill would establish a new government-sponsored enterprise, a financing cor-
poration that would invest in the FSLIC.  The financing corporation would be cap-
italized by the Federal Home **563 *73 Loan Banks (FHLBanks), which would provide
up to $3 billion to the corporation over the next two years.  The financing cor-
poration would issue debt securities in the private market that would raise up to
$7.5 billion for investment in FSLIC non-voting common stock and non-redeemable
capital certificates.  As specified in the committee report, borrowings could not
exceed $3.75 billion annually.  To service the debt, the financing corporation
could assess a premium on all insured institutions equal to the current regular
assessment, and, if necessary, the special assessment paid by members to the
FSLIC.  To the extent that the financing corporation levies an assessment, FSLIC
assessments would be correspondingly reduced.  In addition, a minimum of $800 mil-
lion of the FHLBanks' investment in the financing corporation would be allocated
to interest payments and insurance costs on the financing corporation's bonds.
   We expect that the cash infusion in the FSLIC would allow the agency to assist a
large number of problem institutions that are currently insolvent. Thus, while the
proposed capitalization would increase offsetting collections to the FSLIC, these
collections would be used to increase FSLIC outlays for problem institutions, res-
ulting in no net budget impact over time.  Based on the information from the Fed-
eral Home Loan Bank Board (FHLBB) about the expected sale of stock, CBO expects
that initially receipts will exceed disbursements, resulting in a net outlay re-
duction in 1988 of approximately $150 million to $350 million.  In 1990, we expect
that the FSLIC would incur net additional outlays of the same amount.
   The CBO scoring of this proposal is based on the assumption that the financing
corporation would be off-budget.  This assumption, however, is a close call.  On
the one hand, it could be argued that on-budget treatment is appropriate, because
by authorizing the financing corporation to levy and collect fees from insured in-
stitutions, the proposed statute would confer powers on a privately-capitalized
entity identical to those of a government agency, the FSLIC.  Indeed, having ob-
tained assessment power from the FSLIC, the financing corporation would have more
quasi-governmental power than most federally-sponsored, wholesale, financial in-
termediaries.  On the other hand, the financing corporation would not have a dir-
ect line of credit with the Treasury, as do most existing off-budget government-
sponsored enterprises, and would be established and administered by the FHLBanks,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)

**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

which are off-budget. In the end, CBO based its assumption on the criterion adop-
ted by the President's Commission on Budget Concepts in 1967, that 'privately-
owned' entities should be off-budget.

Budgetary Control Over Regulatory Agencies

   The bill would prohibit the Office of Management and Budget (OMB) from appor-
tioning funds of the FDIC, FSLIC, the FHLBB, the Office of the Comptroller of the
Currency (OCC), or the NCUA.  It is possible that absent OMB control over spending
by these agencies, federal outlays for these agencies would be greater than they
would be without this provision.  We have no way of knowing this with any cer-
tainty, and because these agencies are funded with assessments from member insti-
tutions, any additional expenses would be largely offset by increased income.

**\*\*564 \*74** Exemption from Sequestion

   As amended, this bill would exempt the FSLIC, FHLBB, NCUA, FDIC and OCC from se-
questration of funds resulting from the Balanced Budget and Emergency Deficit Con-
trol Act of 1985 (Public Law 99-177).  The exemption from sequestration would have
no net effect on the deficit, because any savings that would be lost from the ex-
empted agencies would be made up by applying a higher sequestration percentage to
the rest of the budget accounts.  In addition, the bill would classify the NCUA
funds as trust funds for purposes of sequester under this act, thereby making $1.5
million that was sequestered in 1985 available for use by the agency.  Based on
information from NCUA, we expect that the funds would not be spent in 1987 but
rather would increase the equity balance of the agency, resulting in reduced fees
charged to member institutions next year. Thus, offsetting collections, in 1988
would be about $1.5 million lower, and net outlays $1.5 million higher, than under
current law.

Check Processing

   Title VI would limit the time a depository institution could hold a deposited
check without making the funds available for withdrawal and without paying in-
terest on those funds.  The Federal Reserve would be responsible for issuing and
enforcing the regulations to comply with the bill's guidelines for check availab-
ility.  In addition, Title VI requires depository institutions to disclose their
funds availability schedule to depositors.
   While the Federal Reserve is currently planning to spend about $10 million annu-
ally to expedite the check clearing process, enactment of this bill would require
additional expenses for this purpose.  Since the Federal Reserve has not fully
analyzed its options in complying with the legislation, a precise cost estimate is
not possible.  Preliminary analysis, however, suggests that the Federal Reserve
may incur additional expenses of about $30 million to enhance check processing.
These added costs, however, would be paid by financial institutions as higher
check clearing fees. Certain other additional costs would not be recoverable, such
as for issuing and enforcing the regulations.  These costs, however, are insigni-
ficant.  Therefore, profits of the Federal Reserve, which are returned to the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**


Treasury and classified as tax revenues, will be little affected by Title VI.

  Enactment of this bill would not significantly affect the budgets of state or
local governments.

  If you wish further details on this estimate, we will be pleased to provide
them.

  With best wishes,

Sincerely,

    EDWARD M. GRAMLICH, Acting Director.

    **565 *75 SUPPLEMENTAL VIEWS OF SENATORS PROXMIRE, CRANSTON, RIEGLE, DODD,
                DIXON, SANFORD, GRAHAM, AND HEINZ

  These supplemental views are addressed particularly to those individuals and in-
stitutions advocating what they believe to be necessary and progressive moderniza-
tion of the statutory framework governing the U.S. banking and financial system.

  We understand that the provisions of Title I and Title II of the Committee's
bill have created genuine skepticism--even cynicism--regarding the commitment of
the Senate Banking Committee to reexamine and update our Federal banking and fin-
ancial statutes. These Titles were included in the legislation because the commit-
tee recognized that, without Congressional action, state and federal financial
regulators, the judiciary and others have been making and will continue to make
policy choices that are appropriately in the province of the Congress.  Changes in
financial regulation have occurred without a broad statement by the Congress on
what the goals of financial regulation should be and how our system should be mod-
ified in order to meet those goals in a marketplace that has changed dramatically
in recent years.

  We intend that Title I and Title II will generally serve to hold in place major
changes in the marketplace while the Congress has the opportunity to conduct hear-
ings and the kind of review we believe is necessary and critical if we are to
define those goals and provide a regulatory framework for our financial markets
for future years.  We are committed to conducting that review, because it is clear
to us that changes in technology and innovation, as well as changes in the economy
and in the global, competitive marketplace, have outpaced the current regulatory
framework that has served us for many years. Title I and Title II do not represent
permanent policy statements by the Committee as to what the ultimate framework for
financial regulation should be.  We will oppose any effort to extend the moritoria
and restrictions provided in these Titles.

  We do not underestimate the difficulty of the task before us; however, we be-
lieve that in a period of 12 months, we can conduct the kind of review we believe
necessary to formulate further legislation.  We represent a variety of views on
the underlying issues but we are united in our determination to resolve these is-
sues before the moratorium period expires.  Our objective must be to create a fin-
ancial regulatory policy for today's market and economic environment which:  as-
sures the continued soundness and stability of our overall financial system; as-
sures access to capital and optimal service benefits for consumers, corporations
and other users **566 *76 of capital; provides fair treatment of all institutional

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19                                                                                              Page 78
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

participants in our financial markets; and enhances the competitiveness of our in-
stitutions domestically, as well as in the international marketplace.

WILLIAM PROXMIRE.

ALAN CRANSTON.

DON RIEGLE.

CHRISTOPHER J. DODD.

ALAN J. DIXON.

TERRY SANFORD.

ROBERT GRAHAM.

JOHN HEINZ.

## *77 ADDITIONAL VIEWS OF SENATOR JIM SASSER

The Committee, by a unanimous vote, adopted my amendment to prevent the Federal
Home Loan Bank Board and the FSLIC from requiring instructions to write down or
establish reserves against assets in amounts in excess of what would be required
under generally accepted accounting principles.  This amendment is presently in-
cluded in Part II of the Competitive Equality Banking Act of 1987.

The Committee acted on this amendment and others offered by Senator Gramm and
Senator Graham Because of its belief that the Federal Home Loan Bank Board and the
FSLIC should adopt appropriate accounting practices and related procedures that
will guard against unrealistic write downs of assets and the establishment of re-
serves against problem assets in economically depressed areas.

There are a number of well managed thrift institutions in economically depressed
areas that could be forced into premature insolvency as a result of the current
use of regulatory accounting practices that, in conjunction with appraisals per-
formed under the guidelines of Memorandum R41C, can result in deep discounting of
properties and assets held by thrift institutions in economically depressed areas.

My amendment simply curbs the regulators' authority to use regulatory accounting
practices (RAP) to require a thrift to obtain a 'current market' appraisal on a
property, adjust the loan value to the new appraisal and establish a loan loss re-
serve against that new appraisal.  Instead, by amendment directs the Board and the
FSLIC to refrain from requiring a thrift to establish reserves against or write
down the asset in an amount in excess of that which would result from the evalu-
ation of an asset consistent with generally accounted accounting principles.  This
prevents a premature and unfounded devaluation of the assets of a thrift institu-
tion in an area suffering from a temporary economic downturn.  It also has the ef-
fect, thereby, of preventing artifical liabilities based on transitory economic
conditions against the FSLIC.

Speaking of the need for revised accounting and appraisal practices by the FSLIC
and the FHLB, Jim Fischer, President of the National Association of Homebuilders,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

stated, '* * * recapitalization of the FSLIC, however, will not be enough to re-store investor **\*\*567** confidence in some areas of the country.  * * * There is le-gitimate concern that inflexibility of regulatory and accounting procedures is contributing to the instability of financial institutions in these areas.  * * * Specifically our concerns include the reclassification of assets where collateral is being revalued in accordance with new and controversial appraisal requirements, and where overall values are already depressed by economical conditions.  Such ac-tion will ultimately cause a tailspin in overall market values.  It is counterpro-ductive **\*78** in this situation to encourage further defaults, particulary where the possibility of a loan modification and work-out may exist either in the present or at a reasonable future date.'

In the same vein the U.S. League of Savings Institution in testimony before the Committee has strongly recommended that the Federal Home Loan Bank Board should require savings institutions to account for problem loans according to generally accepted accounted principles.  They advocate this approach as opposed to thie use of regulatory accounting practices in valuing problem assets since in their words, '* * * what is eliminated in the methods allowed under GAAP (generally accepted accounting principles) is the upfront hit to income and net worth which occurs un-der regulatory accounting requirements.  Under GAAP, the loss is spread more evenly and the institution's books reflect asset carrying values in a manner con-sistent with the practice of commercial banks and other business organizations.'

I would note that the use of generally accepted accounting principles in the valuation of problem assets is consistent with the rules that are applied to com-mercial banks by their regulators and that are followed by all other business en-terprises in the country.

Finally, the Board, in a related vein, is to be commended for their recent issu-ance of a forbearance program for troubled savings and loans institutions. This program, announced by Chairman Gray on February 26, 1987 is certainly a step in the right direction.  My amendment should certainly help in the Board's efforts to sustain well-managed but troubled thrift institutions in economically depressed areas.  Finally, as I noted when I offered my amendment, it is not intended to curb any of the existing powers of the Federal Home Loan Bank Board or the Federal Savings and Loan Corporation in curbing fraud and mismanagement in thrift institu-tions that are not well managed and whose operations should be subject to close scrutiny by the Board and FSLIC.

JIM SASSER.

**\*\*568 \*79** ADDITIONAL VIEWS OF SENATORS GARN, HECHT, GRAMM, BOND, AND
CHAFEE

These dissenting views to the bill reported by the Senate Banking Committee on March 10, 1987, exress four fundamental points:

I.  FSLIC recapitalization and other emergency issues should be dealt with on a stand-alone basis;

II.  The legislation is not 'temporary' despite its rhetoric and moratoriums, and it does not make comprehensive legislation more likely;

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)

**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

    III.  Many of the non-emergency positions are inconsistent with FSLIC recap
are grossly anti-competitive; and
    IV.  These extraneous items are inconsistent with a need to modernize our sys-
tem to stay competitive in the face of the increasing internationalization of cap-
ital markets.
  We strongly believe that FSLIC recapitalization and the other safety and sound-
ness packages should be handled separately.  Then, we should move expeditiously to
debate the structural issues and act on them early in 1987.

### I.--FSLIC RECAPITALIZATION

  The FSLIC recapitalization plan was conceived by the Congress and the Adminis-
tration to be a response to an emergency situation confronting the FSLIC fund and
the thrift industry.  The FSLIC recapitalization plan adopted by the Committee is
objectionable because:  (1) only a 'clean' FSLIC plan and the regulators' safety
and soundness package provide an adequate response to emergency situation and (2)
the plan is fiscally unsound in its present form.
  The FSLIC recapitalization plan contained in the legislation reported by the
Committee is encumbered by provisions that are either unwise, unsound, unworkable
or unnecessary.  The successful and prompt enactment of a FSLIC recapitalization
plan will be jeopardized by these extraneous provisions because they leave the en-
tire bill open for attack and delay on the Senate Floor.  Further, a 'clean' FSLIC
recapitalization plan satisfies the needs of our colleagues who characterized as
urgent the replenishment of the FSLIC fund but who wished to postpone until a
later date the consideration of other issues pending before the Committee.  Their
purposes would have been better served by enactment of a 'clean' FSLIC recapital-
ization plan rather than one complicated by moratoriums and other ill-considered
provisions contained in the Committee's current work product.
  Perhaps even more objectionable than the inclusion of the FSLIC plan in the
present package is the inadequacy of the funding level permitted under the Commit-
tee's recapitalization plan.  The Committee's failure to pass a FSLIC recapitaliz-
ation plan that provides more funding than the $7.5 billion presently allowed by
the legislation **80 **569 may prove to be a profound error in judgment.  The fail-
ure to provide more than $7.5 billion flies in the face of the overwhelming amount
of testimony received by this Committee supporting a recapitalization plan that
requires more funding.  The support of a partial recapitalization plan demon-
strates the Committee's failure to comprehend the size and nature of the problem
confronting FSLIC as well as a lack of resolve to address such a problem.  The
bill's plan sends the wrong message to the public, FSLIC insured institutions, and
the investors who will be asked to purchase the securities that must be sold to
recapitalize the FSLIC fund.
  The support of an underfunded FSLIC recapitalization plan requires the total
disregard of the Comptroller General's latest audit of FSLIC.  The report of the
Comptroller leads to the inevitable conclusion that the FSLIC fund is operating at
a deficit and is, as of the end of 1986, technically insolvent. The General Ac-
counting Office's (GAO) preliminary results of its 1986 audit of FSLIC contained
in a March 3, 1987 report entitled Thrift Industry:  The Treasury/Federal Home

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

Loan Bank Board Plan for FSLIC Recapitalization, 'suggest [s] that after necessary additions to the insurance fund's reserve for contingent liabilities, FSLIC may have a negative net worth of more than $3 billion.' The GAO report also noted that as of the third quarter of 1986, 445 operating thrift institutions were insolvent under generally accepted accounting principles (GAAP). According to the GAO these insolvent institutions held $112.7 billion in assets and were losing money at the rate of over $5 billion per year. The FHLBB has estimated that the current cost to FSLIC of resolving already recognized troubled institutions could be as high as $23.5 billion.

These figures demonstrate the need for an adequately funded recapitalization plan. While proponents of the FSLIC recapitalization plans and the variations on those plans which were considered by the Committee quibble about the precise deficit for 1986, or the ultimate costs of sick thrift resolution, the FSLIC fund is in need of a near term capital infusion in excess of $7.5 billion. The failure to provide FSLIC adequate funding will turn the short-term liquidity crisis presently confronting FSLIC into a crisis of confidence adversely affecting both healthy and distressed thrifts and eventually the safety and soundness of our entire financial system.

The impact of the GAO's finding that the FSLIC fund was insolvent at the end of 1986 has dramatic consequences that were not addressed during the Committee's hearings but presently merit attention. The insolvency of the FSLIC has negative implications for the calculation of assets by insured institutions that have contributed to the secondary reserves of the FSLIC fund. The secondary reserves of the FSLIC fund are currently counted as assets by the insured institutions which provided these reserves. The Securities and Exchange Commission and the accounting profession may well require that these reserves be written off because of FSLIC's insolvency. Such a write-off would result in an $817.4 million reduction in the industry's net worth. After this write-down, four additional institutions would become insolvent and 24 would fail their minimum net worth requirements.

Those institutions which have Federal Home Loan Bank (FHLBank) advances (83 institutions totaling $3,499,872,000) that **570 *81 are guaranteed by FSLIC are also affected by FSLIC's insolvency. The FHLBank advances to those institutions were premised upon the FSLIC guarantee as a source of prompt, full repayment of advances. There can be no assurance that the FHLBanks could continue to make advances to troubled thrifts on the strength of a guarantee from an insolvent FSLIC. Further, some FHLBanks face an even greater dilemma. If they made further advances, and if FSLIC were not able to honor its guarantees, the solvency of the entire FHLBank would be at risk. If the FHLBank were to discontinue the practice of making advances, it might be unable to stem a liquidity crisis.

The accountants who audit FHLBank financial statements will face the issue of whether uncollateralized advances require establishment of loss reserves. If loss reserves were required, the capital of the affected banks would fall, and the net worth of insured institutions that are members of such banks would also be reduced. The total potential write-off would be slightly over $1 billion.

An immediate problem may also arise with respect to FSLIC's notes. FSLIC has approximately $4.5 billion in notes outstanding payable to troubled thrifts and de

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

novo federal mutual associations chartered as part of asset-backed transfers.
Once again, accountants will face the question of whether the notes of an insolv-
ent corporation (FSLIC) can continue to be treated as assets by these associations
of whether substantial loss reserves are required. Any write-off required could
force some already troubled thrifts into insolvency. Write-offs could also cause a
crisis of confidence in other thrifts holding FSLIC notes.

Finally, net operating losses (this does not include any losses from write-
downs) at institutions in our significant supervisory caseload are running at over
$6 million a day, more than $2 billion a year (FHLBB estimate). That number is
greater than FSLIC's entire annual operating income. FSLIC will have to pay these
net operating losses. Due to the weakness of the FSLIC fund, thrifts have to pay
higher interest rates to attract depositors than paid by their FDIC-insured com-
petitors. Industry wide, this extra cost to FSLIC insured institutions is at
least $4 billion per year. FSLIC's GAAP insolvency is likely to increase that
cost. Every day of delay raises the present value cost to the FSLIC--and to the
thrift industry.

The Administration's position is also instructive on the issue of the appropri-
ate amount of funding for an adequate FSLIC recapitalization. The Administration
has recommended a $15 billion recapitalization plan. The Committee has provided
half of this amount. If some members of the Committee consider the Administra-
tion's request extravagant and unwarranted, then they are left to ponder this
question: How many times has this Administration asked for funding that exceeded
the funding levels that a majority of the Committee members deemed appropriate?
The short answer is: not very often, if ever.

The need for an adequate recapitalization of FSLIC was articulated by Treasury
Undersecretary George D. Gould in his January 21, 1987, testimony before the Com-
mittee.

**571 *82 [The $15 billion recapitalization plan was devised to increase] the
FSLIC's resources so that it could handle a greater number of insolvent institu-
tions in the next several years. The time to act is now. The low interest rate
environment has enabled most of the industry to have high earnings. Every day we
wait, FSLIC estimates its costs increase by $6 million.

In devising our plan to recapitalize the FSLIC, two simple requirements were
uppermost in our minds.

First, the time-tested notion of self-help was vital. The taxpayer must not
be called upon to bail out an industry that with some measure of sacrifice over
time can help itself. After all, many thrifts have profited greatly from their
franchise and they probably were paying too small an insurance premium in the
past.

Second, the recapitalization plan must have enough resources available up
front to meet the real problems we all recognize today. To this end the FHLBB,
the Federal Home Loan Bank System, and the Treasury devised a unique industry-
based plan that would enable the FSLIC to devote about $25 to $30 billion over 5
years to handling its sizeable load of problem cases, while in all likelihood be-
ing able to phase-out the special premium assessment over the same period.

During the 99th Congress and the 100th Congress the Committee has heard all of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

the arguments in favor of and in opposition to a full $15 billion recapitalization
of the FSLIC fund.  Rather than recite a litany of the 'perceived problems' of
those who have sought to delay the enactment of a recapitalization plan, three ar-
guments have been offered that merit rebuttal.

The first argument is that the FSLIC does not need $15 billion to resolve anti-
cipated losses.  As noted above, the GAO strongly disagrees with that argument.
The GAO's concern is that FSLIC's losses could ultimately exceed the current es-
timates of the Federal Home Loan Bank Board.

The adoption of plans involving lesser recapitalization resources (i.e. $5-$7
billion) would be tantamount to the adoption of a continuous crisis resolution.
No one has demonstrated that such sums are even remotely adequate to meet the full
magnitude of the FSLIC's problems.  All such plans would leave the FSLIC fund
deeply insolvent, using generally accepted accounting principles. Investment
bankers that have appeared before Congressional Committees and that have written
to the Treasury Department have expressed concerns that investors will view such
plans as risky, because they are clearly inadequate.

The second argument derives from the first.  Critics of the $15 billion plan
contend that it could be excessive, and that Congress should not 'lock' itself in-
to a $15 billion/5-year plan.  The $15 billion/5 year plan does not lock the FSLIC
into spending the full $15 billion.  Even if the problems facing the FSLIC were to
diminish dramatically, the Administration plan does not lock into place a $15 bil-
lion financing.  The markets will not accept, at reasonable interest rates, more
than an estimated $3 billion a year in bond issuances. **83 **572 Bonds will be is-
sued only to the extent the funds are necessary.  The GAO will review periodically
the issue of what funds are necessary.  Congress will have ample opportunity and
means to ensure that excessive bonds are not issued under the $15 billion recapit-
alization plan. Further, Senator Gramm's amendment that was adopted by the Commit-
tee provides for Congressional hearings and reports within two years of the enact-
ment to further assure that Congress would have a formal means of reexamining the
plan.

The third argument advanced to thwart the passage of the $15 billion recapital-
ization plan has been forbearance for economically distressed areas. In a March 9,
1987 letter to Senator Garn, Federal Home Loan Bank Chairman Edwin J. Gray noted
that the Bank Board has been following a policy of forbearance.  In that letter he
stated that statements that the FHLBB was not practicing a policy of forbearance
similar to those practiced by the FDIC and the Comptroller of the Currency were
incorrect.  To support this statement Chairman Gray noted:

The commercial banking regulators do not permit banks to operate with negative
primary capital.  As a general rule, bank regulators take action to merge or re-
move FDIC insurance of accounts to a bank with 3% or less primary capit-
al.  Tangible net worth is the closest equivalent to primary capital in the com-
mercial banking system.  If we followed the practices of the federal commercial
banking regulatory agencies, roughly 106 thrift institutions in Texas (38 percent
of the total number of Texas thrifts) would be closed immediately and we would
take action such that an additional 66 institutions (24 percent) would be merged
out of existence.  Exhibit 5 demonstrates that the Bank Board was following and

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19                                                                                                Page 84
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

has followed a practice of extraordinary forbearance, well before the current fo-
cus on the issue.

The Bank Board's policy statement on forbearance is far more liberal than the
Comptroller's.  First, to qualify for the Comptroller's program, a commercial bank
must have generally 4 percent primary capital.  The analogous threshold under our
forbearance policy is 0.5 percent regulatory capital. Thus, our policy is 8 times
more liberal on its face.  In fact, because less than one dollar in three of
thrift regulatory capital would qualify as primary capital for banks, our policy
is really about 24 times as liberal.

Our program is also more liberal in defining the other key aspect of eligibil-
ity for forbearance.  The Comptroller's policy generally restricts eligibility to
those banks that have more than 25% of their loans in energy or agricultural sec-
tors.  Very few Texas banks have qualified for forbearance.  Our policy gives much
broader forbearance to thrifts with loans in depressed regions.  . . .

At the same time that we adopted our formal capital forbearance policy state-
ment, we also took action on the subject of real estate appraisals.  The staff is-
sued clarifications of the existing appraisal standards that addressed the reason-
able concerns which had been raised by some in the industry.  I announced my in-
tention of bringing a proposal to **573 *84 the Bank Board to request public com-
ment on what appraisal standards the Board shall follow.  . . .

In short, we have taken, reaffirmed, or committed ourselves to rational
devices of forbearance.  We have gone well beyond the commercial banking regulat-
ors.  We have shown very significant forbearance and discretion in dealing with
institutions in states with depressed economies.  Indeed, other regions of the
country could complain vigorously about the degree of forbearance we have shown in
some states.  Exhibit 6 lists all recent FSLIC takeovers. It is apparent even from
a cursory review that there have been disproportionately few FSLIC takeovers in
Texas particularly when contrasted to the number of insolvencies in Texas.  The
contrast to a state such as California is startling.

The inadequate funding level of $7.5 billion is not the only shortcoming of the
FSLIC recapitalization plan approved by a majority of the Committee members.  The
success of the recapitalization plan in its present form is jeopardized by the two
year sunset provision and the arbitrary limitation on the Financing Corporation's
ability to issue $3.75 billion in a given year.

FHLBB Chairman Gray and securities industry professionals have stated in corres-
pondence to the Committee (See FHLBB Chairman Gray's March 12, 1987 letter to Sen-
ator Proxmire) and in Congressional hearings that the two year life of the borrow-
ing program will raise considerable doubts among investors regarding the perceived
market liquidity of the bonds.  Potential investors will be concerned that the
size of the authorized recapitalization program will not satisfy the identified
problem.  Investor concerns will be heightened by the knowledge that the present
recapitalization plan will require further, undefined action.

In its current form, the recapitalization plan would force investors to rely
upon the hope that a future Congress would take timely and affirmative action two
years from now to pass legislation allowing FSLIC to raise enough funds to recap-
italize itself.  After more than a year of discussion, Congress has not yet shown

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)

its willingness to pass recapitalization legislation, even where confronted by a near crisis situation.  The very act of Congress' passing a deficient recapitalization alternative would convince investors of the added seriousness of the risk two years hence. Investors will surely demand higher interest rates under alternative plans involving lessor recapitalization resources.  This higher interest expense would be wasteful, would harm the FSLIC (in the form of lower net proceeds from the financing corporation), and would be borne eventually by the thrifts, and ultimately by their customers.

Related to this uncertainty of what will happen after two years is the potential that no new borrowings would be permitted.  This would seriously impair the marketability of any issue as investors become concerned that they would not have a market of sufficient liquidity to sell these bonds after two years.  This would necessitate offering generous up-front liquidity premiums to adjust for this factor and could severely reduce the pool of eligible investors, who will simply not accept such liquidity risk.  The latter difficulty becomes **85 **574 even more pertinent when one considers that it requires many months of governmental or corporate review before new issues are authorized for investment.  The elapsed time could be six months or more for approval, leaving only a six month or less time available for bond issuances that could take advantage of the first $3.75 billion in authority. This compression of borrowings will force the bonds to carry a higher interest rate.

Any suggestion that Congress must revisit the FSLIC problem in the near term because legislation's sunset provision suggests the prospect of future, superseding federal legislation that increases the likelihood of an interruption in or a default on the repayment of principal and interest by the Financing Corporation. Whether created by doubts as to the adequacy of the funding level or the lack of political commitment to a recapitalization program beyond two years, the uncertainty created in investor's minds will cause the cost of the recapitalization program to escalate unnecessarily. The recapitalization plan adopted by the Committee which provides insufficient funding to FSLIC and which has a short sunset period will significantly increase the Financing Corporation's costs of raising funds.  The FHLBB estimates that the liquidity risk and marketing compression created by the legislation's plan will result in the Financing Corporation having to service a debt in excess of 50-75 basis points higher than under the Administration's plan. Therefore, under the plan approved by the Committee, the Financing Corporation may pay an additional $2.25 billion or more in excess interest expenses over the 30-year repayment period.

These facts demonstrate the true nature of the financial crisis facing the entire FHLBank system if the FSLIC fund is not adequately recapitalized. To date, reports of the potential impact of the FSLIC's growing GAAP insolvency have not greatly shaken public confidence.  However, a failure to acknowledge the extent of the problem confronting FSLIC and to resolve it with an adequate recapitalization plan could precipitate such a dramatic loss in public confidence that it would require a government bailout paid for by the taxpayers.

No matter how well intentioned the Committee was in approving the recapitalization plan contained in the legislation, the plan contains two major flaws.  First,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19
Page 86
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

the FSLIC recapitalization plan was designed to respond to an emergency situation. The legislation reported by the Committee was not crafted to respond to an emergency situation. Only a 'clean' FSLIC recapitalization plan containing adequate funding provides the best legislation solution to a problem demanding immediate attention. The only acceptable additions to a 'clean' FSLIC recapitalization plan wouild be the inclusion of other emergency-type provisions such as: the FDIC emergency acquisition and bridge bank authority (Title IV) and the NCUA conservatorship authority (Title V). Second, although the Committee has identified the need to enact a recapitalization plan, it has demonstrated a certain amount of temerity in adopting a plan unlikely to succeed. Admittedly, none of us can be certain of the precise amount that the FSLIC fund will require over the next five years. However, it is certain that a recapitalization plan limited by the Congressional strictures of a $7.5 billion borrowing limitation over a two year period will prove inadequate. Those lacking the desire **575 *86 to do more today should be prepared to address the same situation, and perhaps a deteriorating situation, during the very early days of the 101st Congress.

## II.--TITLES I AND II ARE NOT 'TEMPORARY'

We have already mentioned that besides the emergency elements of this legislation, this bill--especially Titles I and II--is extremely controversial. But this bill adopts a novel approach in an effort to sidestep all the arguments and infighting: it purports to be only 'temporary'; it seems to 'freeze' the situation only until Congress resolves the issues later in the year; it uses 'moratoriums' that appear carefully timed to expire; and its proponents claim that it will temporarily 'hold the interest groups' feet to the fire' to help forge a new consensus for a comprehensive bill.

All of these claims are outrageous, even in this era of 'spin control.' First and foremost, virtually all the provisions in Title I effect changes that are both substantial and permanent. The nonbank bank loophole is closed permanently. Current nonbank banks are grandfathered permanently with permanent restrictions. A new qualified thrift lender test is imposed on thrifts permanently. Certain unitary thrift holding companies are grandfathered permanently with permanent restrictions. Diversified thrift holding companies receive permanent cross-marketing restrictions. The Committee Report goes on for 24 pages about how Title I has permanently altered the financial industry landscape. And so on. The point is that no one should be deceived that this bill 'merely preserves the status quo' when it includes so many permanent substantive changes.

Likewise, no one should be deceived by window dressing. Take, for example, the closing of the nonbank bank loophole. The bill purports to 'temporarily restrict[ ] the activities' of nonbank banks 'until such time as the Congress has enacted proposals to allow . . . all banks or bank holding companies to compete on a more equal basis' with nonbank banks, 'or, alternatively, proposals to permanently restrict the activities' of nonbank banks. This appears to say that at least the grandfather restrictions on nonbank banks are merely temporary. But what the bill says and what it does are two very different things--in fact, the restrictions are permanent.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19   Page 87
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

    The grandfather restrictions are also referred to as 'freeze rights' that are put in place until Congress finally resolves the controversy.  We respectfully suggest that this legislation itself 'finally resolves' the issue, or at least tries to, by making the restrictions permanent.  The bill is not a 'temporary freeze'; it is a deep freeze that is unlikely to thaw soon.  To characterize it any other way would be simply inaccurate.

    Perhaps the most alluring effort to make the bill appear temporary is the use of 'moratoriums.'  Title II, the moratorium section, includes five provisions that penalize banks alone among all the warring segments of the financial services industry.  (It is more than ironic that Title I of the bill proclaims its only Congressional 'finding' that banks may be disadvantaged by competition--without reference to any particular hearings or evidence--while Title II **576 *87 solves the problem by forbidding banks to compete.)  As will be set forth in more detail below, we strongly oppose these provisions as obvious restraints on competition.  But the point here is that the bill attempts to avoid the maelstrom of infighting, by insisting that its restrictions are only 'temporary moratoriums.'

    Are they only temporary? How much easier politically is it to vote for temporary rather than permanent pain?  When the moratorium is scheduled to expire, will that calculus change?  How difficult is it to imagine that a year from the date this bill is enacted into law--which could easily be as late as the summer of 1988--that Congress could vote to extend the moratoriums rather than resolve a contentious political issue at the height of both the Presidential and Congressional election seasons?

    The answers to these questions are obvious.  The Congressional penchant of merely 'rolling over' issues rather than deciding them has been poignantly demonstrated by the infamous 'Regulation Q,' which placed a ceiling on interest rates extended twelve times.  For 14 years consumers suffered unfair interest rates on their savings because of a 'temporary' government action.  But even this pales in comparison with the 'temporary' legislation produced in 1916 pending the end of World War I:  the income tax.

    Our point is simple.  If Congress has not had the will to address these issues before and resolve them, there is certainly no likelihood that they will acquire that will in the next year.  In the meantime, any moratoriums put in place to defer a decision actually become the decision.  The balance is shifted permanently, in this case from a regulatory structure that fosters at least some competition to one that stifles it altogether.  Such an abdication of responsibility in reaching such an important decision is totally unacceptable.

    Let us make two final points.  There is still another way, even more vivid, that these 'temporary' moratriums may become permanent. That is by amendment on the Senate floor or in conference with the House of Representatives.  It is no secret that the interest groups protected by the moratoriums would like to do just that, with the moratoriums being nothing more than a smoke-screen to move the legislation through this Committee.  We hope this is inaccurate, and we will vigorously oppose any efforts to that end.

    Finally, we do not believe that the legislation will 'bring all the interest groups to the table' for comprehensive reform because it 'holds their feet to the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19    Page 88
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

fire.' It does no such thing. This bill penalizes banks more than anyone else,
yet banks need the least incentive to promote new legislation because they are
clearly so anxious for it. At the same time the bill represents an unprecedented
victory for the securities, insurance, and real estate interests, who will from
now on expend all their legislative efforts to preserve the moratorium status quo
rather than tackle any legislative changes. And while the bill undoubtedly pun-
ishes the diversified financial firms with nonbank banks, these companies already
have a tremendous incentive to resolve their precarious legal situation by fully
participating in any package of true comprehensive reform.

**\*\*577 \*88** In short, the bill's restrictions are not temporary, and they create
distinctive, not incentives, for comprehensive reform of the financial services
industry.

### III.--TITLES I AND II ARE REGRESSIVE

The non-emergency provisions of the bill--principally Titles I and II--are
clearly backward steps from comprehensive reform for two reasons: they directly
undermine FSLIC Recap; and they protect special interests by moving back towards a
coddled, segmented financial services industry.

### A. THE ERODED THRIFT FRANCHISE UNDERMINES FSLIC RECAP

Title III's FSLIC Recapitalization provisions are clearly the most urgently
needed provisions in the bill. Yet what the bill provides to thrifts there is
taken away by the thrift restrictions in Title I.

While thrifts obviously need the resources provided by FSLIC Recap, they will
almost certainly need even more resources to completely resolve their problems.
One means to do this is to attract new capital to the thrift industry by attract-
ing new buyers of both healthy and unhealthy thrifts. Title I does exactly the
opposite: it diminishes the thrift franchise so dramatically that whole classes
of potential buyers are either barred or severely deterred from purchasing
thrifts.

This is no small matter, particularly, in the case of troubled or failing
thrifts. It costs FSLIC far more to liquidate a troubled thrift and pay off its
insured deposits than it does to assist its acquisition by another institution.
The problem, of course, is finding willing buyers to purchase these sick thrifts
even when FSLIC is standing by with its pocketbook open. Title I of the bill makes
that problem much worse in at least four ways.

First, it deters any diversified financial firm from buying a filing thrift be-
cause of the cross-marketing restrictions imposed on all diversified thrift hold-
ing companies. How important are these restrictions? We can only point to the
language in the Committee Report, with which we wholeheartedly agree: 'The key to
success in today's highly competitive financial services business is cross-
selling.' Having acknowledged this, the Committee would nevertheless take this
'key' away from the thrift franchise.

Second, it prohibits, any grandfathered nonbank bank from acquiring a failing
thrift without losing its granfather rights.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

Third, it prohibits any grandfathered unitary thrift from acquiring a failing thrift without losing its granfather rights.

Finally, it prohibits any diversified financial firm or commercial firm affiliated with either a granfathered nonbank bank or unitary thrift from acquiring a failing thrift without divesting the grandfathered institution.

It is obviously impossible to quantify exactly how many thrift purchases would be deterred by these restrictions on the thrift franchise. But rough estimates are possible, and recent statistics provided by the Federal Home Loan Bank Board are illuminating. If current cost patterns continue FSLIC will incur 38.4 percent higher costs in liquidating a failing thrift rather than arranging an assisted merger. At the same time the Bank Board estimates that **578 *89 there are 221 thrifts with $56 billion in assets that are already insolvent under Regulatory Accounting Principles or RAP. Using simple arithmetic, if only 10 percent of these institutions were liquidated rather than sold because potential buyers were deterred by restrictions in the bill, the extra cost to FSLIC would be $2.13 billion. If 40 percent were deterred the extra cost would be $8.6 billion.

In the meantime, the FSLIC Recap section of the bill raises only $7.5 billion.

Whether the bill forces away 10 or 40 percent of potential buyers is impossible to determine with certainty. But that is the magnitude we may be facing, and the attendant costs to FSLIC are staggering. What we give with FSLIC Recap we may be taking away with the erosion of the thrift franchise.

The Committee Report's only response to this problem is that closing the nonbank bank loophole will create more potential buyers for failing thrifts, citing assertions in testimony from the Federal Home Loan Bank and the Federal Reserve Board. But is there any evidence to support this? The firms most interested in owning nonbank banks are diversified companies that seek to cross-sell products and services--'the key to success,' as the Committee Report puts it, 'in today's highly competitive financial services business.' Yet the bill specifically bars these firms from cross-selling through any thrifts they may acquire. At the same time the major diversified financial firms that already own nonbank banks--which is most of them--may continue to cross-sell products through these entities, but if they buy failing thrifts they would have to divest their nonbank banks. In other words, a diversified financial firm is permitted to buy a failing thrift through which it cannot cross-sell products in exchange for selling the nonbank through which it can cross-sell. That is hardly an incentive for purchasing a failing thrift.

Finally, the bill imposes an additional restriction that substantially diminishes the thrift franchise: it extends the Glass-Steagall Act to the entire thrift industry. This means that securities firms cannot purchase thrifts, and neither can firms affiliated with securities firms like insurance and major diversified financial companies--the very firms most likely to be interested in such purchases. With today's troubled thrift environment this makes absolutely no sense. Why chase capital away from an industry that so desperately needs it?

In short, if Congress enacts Title I into law, who will buy a thrift?

B. THE BILL PROTECTS SPECIAL INTERESTS FROM COMPETITION

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

It is a ruse to pretend that this bill 'preserves the status quo' until Congress
enacts comprehensive, progressive legislation. The bill is regressive.  It coddles
the securities, insurance, and real estate industries by moving backwards toward
protected, segmented markets and easy profits.

**\*\*579 \*90** 1. Securities industry protection

The protected market of the securities industry is production profits that can
only be described as estronomical--if not illegal. The top partners in investment
banking firms routinely earn tens of millions of dollars annually, sometimes as
much as $100 million, while entry-level MBAs struggle on salaries in the six fig-
ures.  The insider trading, market manipulation, and conflicts of interest now
coming to light have only increased these amounts.

The rational Congressional response, of course, would be to clean up that in-
dustry and let in some healthy competition to drive down these oligopoly profits.
But Congress is not always rational, as this bill poignantly demonstrates.  Far
from providing more competition, this bill moves in exactly the opposite direc-
tion. Responding to whining cries for protection, the bill prohibits banks and
thrifts from even very limited access to the securities industry, despite the fact
that this access is or may be permitted by current law.  Preserving the status quo
would be to preserve that access, but the bill takes it away in three specific in-
stances:  it prohibits banks from engaging in certain securities activities under
section 20 of the Glass-Stegall Act; it prohibits state-chartered banks that are
not members of the Federal Reserve from engaging in securities activities; and it
applies the Glass-Steagall prohibitions to thrift institutions.

Section 20 moratorium.--Under section 20 of the Glass-Steagall Act, banks are
permitted to affiliate with firms that are not 'engaged principally' in certain
securities activities. This part of Section 20 was enacted into law in 1933 and
has not been changed since.

Two years ago several bank holding companies applied to the Federal Reserve
Board for permission under this section to establish subsidiaries that would en-
gage to a limited extent (not 'principally') in the underwriting and dealing of
municipal revenue bonds, commercial paper, mortgage-related securities, and secur-
ities backed by consumer receivables.  The Federal Reserve Board has since delayed
ruling on these applications, presumably to give Congress enough time to enact le-
gislation that would make the issue moot.

But Congress has not so acted.  The Senate passed S. 2851 in 1984 that would
have explicitly permitted similar activities, but the House of Representatives
failed to take up that bill before the end of the 98th Congress, and no legislat-
ive action has been taken since.

Now this bill, rather than resolving the issue, would simply place a one-year
moratorium on the Federal Reserve granting any such application.  As we said
above, this is a copout, an inexcusable abdication of Congressional responsibility
to legislate.  Let Congress change the law if it so desires, or let the Federal
Reserve Board interpret existing law.  But Congress should not put the matter in
limbo because it has no stomach to legislate.  That weakness may never change, and
in the meantime we will have taken away a legitimate competitive option for banks.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19                                                                              Page 91
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

We firmly believe that banks should be allowed to compete, but even more than that we believe that the Federal Reserve Board **580 *91 should be permitted to interpret existing law, regardless of the outcome.  Indeed, the Congress would benefit from a thorough analysis of this issue from both the Federal Reserve Board and the courts, which is undoubtedly where the matter will proceed after the Board reaches its conclusions.

The only positive aspect of this moratorium is that--notwithstanding statements to the contrary--it is a clear statement of Congressional intent that the Federal Reserve Board has the legal authority to approve the section 20 applications should the moratorium ever expire.

Applying Glass-Steagall to State-chartered, nonmember banks.--The restrictions of the Glass-Steagall Act do not currently apply to state-chartered banks that are not members of the Federal Reserve System.  This bill would change the status quo to apply these restrictions for the one-year moratorium period.  Even though a permanent version of this provision was included in S. 2851 in 1984, for which some of us voted, the situation has since changed. Given the competitive realities of toady's marketplace, both at home and abroad, we need to contract the scope of Glass-Steagall, not expand it.  Any step to expand it is a step backwards, even if it is 'just' a moratorium--because we know what can happen to them. Furthermore, we believe that it is up to the states to decide what their banks should do if they are not members of the Federal Reserve System.  We note that the State of New York in particular has taken some very progressive steps under its own 'little Glass-Steagall Act.'

Applying Glass-Steagall to thrifts.--The bill imposes the Glass-Steagall restrictions on thrifts permanently, not as part of a moratorium.  We have already expressed our views on the inappropriateness of this given the current state of the thrift industry and its need to attract new capital.  But we also oppose the provision for the same reason that we oppose the application of Glass-Steagall to state-chartered nonmember banks:  we should be contracting, not expanding, the scope of that statute.  The bill's provisions send the wrong signals to both thrifts and securities firms about whom they must compete against and how hard they must compete.  And again, those of us who voted for this provision in 1984 have since changed our view:  what was necessary to the legislation then is a clear step backwards in 1987.

2.  Insurance industry protection

Title II of the bill uses a moratorium to impose a number of new restrictions on the insurance activities of banks, particularly state-chartered banks.  These restrictions are similar to, but even more than, those included in the so-called 'Dodd Amendment' that passed the Senate in 1984 as part of S. 2851.  Among other things, they preclude federal regulators from taking any action that would increase the insurance powers of any bank entity beyond those set forth in Section 4(c)(8) of the Bank Holding Company Act.  The scope of this grant of federal veto power appears not to extend to the insurance powers of state-chartered banks and their affiliates, but the federal regulators will undoubtedly attempt to use it as a pretext for doing just that.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)

**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

**\*\*581 \*92** The moratorium is more specific about precluding a bank holding company from acquiring any new state-chartered bank or savings bank unless the holding company promises to limit the activities of the new bank to the federal restrictions of Section 4(c)(8)--even if the state in which the bank is chartered would permit broader insurance activities. Moreover, the bill goes even further by prohibiting even a simple reorganization of a state bank into a bank holding company without limiting the new institution's insurance activities to the federal standard.

We strongly oppose this provision, just as we did the Dodd Amendment in 1984. Not only does it protect insurance agents from much-needed competition, but it tramples on each state's right to determine the scope of both the charter issued to local banks and the statutory framework of that state's insurance business. On this point we can think of no better words than those expressed in the additional views of Senators Proxmire and Garn in the 1984 Committee Report accompanying S. 2851:

Under the dual banking system, the state and the federal government both charter and supervise banks. This has been a source of strength and diversity for our financial system. To subject state banks to the nonbanking activities restrictions of the insurance provisions of section 4(c)(8) removes some of the chartering authority from states. The message is clear-- Congress knows best what state banks should do in their home states, regardless of what state legislatures say or do. . . .

The insurance business has historically been regulated on the state level. The McCarran-Ferguson Act sets the federal standard that it is the states, not the federal government, which regulate this business. It is more than ironic that Congress, at the urging of various insurance groups, is now proposing to preclude state legislative actions or the potential for such actions affecting the insurance activities of state banks. Perhaps Congress should consider changes to McCarran-Ferguson, if it is going to preclude actions by states to authorize in-state insurance activities of state chartered institutions.

The application of Title VI to state-chartered bank subsidiaries of bank holding companies undermines the principle of states rights, and in so doing, weakens the ability of the states to serve as laboratories for change.

Let us emphasize one final point: the involvement of state-chartered banks in the insurance business has produced demonstrable competitive benefits to consumers in those states; yet the bill's moratorium moves squarely in the direction of ending that for the benefit of a protected insurance industry.

A recent study by the nationally prominent Consumer Federation of America confirms this point. This study, 'The Potential Costs and Benefits of Allowing Banks to Sell Insurance,' found among other things that:

--'the excess annual costs to consumers in the present life insurance system alone totaled $5-$10 billion';

**\*\*582 \*93** --'the savings banks and brokers based in banks sent policies that were lower in cost [than those sent by independent insurance agents]. The econometric study of life insurance costs . . . indicates that competition from banks could lower costs industry-wide';

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

    --'To summarize the responses to the survey, every one of the comparisons show
that bank sellers of life insurance were more forthcoming with information than
agents . . . the policies sent by bank-based sellers were much lower in cost'; and
    --'Bank entry could not only capture the unique benefits associated with dir-
ect bank sale of insurance, it might also drive the industry to perform better as
a whole. . . . There is no reason to prohibit states from carefully expanding
bank sale of insurance. . . .'
  The insurance moratorium in this bill is a giant step in exactly the wrong dir-
ection.

3. Protection of the real estate industry

  The final moratorium in this bill breaks new ground for protectionism: for the
first time the real estate industry would be statutorily shielded from bank com-
petition. The provision prohibits federal regulators from expanding the real es-
tate powers of banks--presumably real estate equity investments and real estate
brokerage. This appears aimed at a proposed interpretation under Section 4(c)(8)
of the Bank Holding Company Act that such activities may be 'closely related to
banking' for bank holding companies. (As with the insurance moratorium, federal
regulators may very well attempt to extend this veto power to the activities of
state-chartered bank subsidiaries, notwithstanding state law--they would certainly
have no authority to do so, but a similar lack of authority has not prevented
their recent effort to define the limits of real estate powers for state-chartered
banks.)
  Once again, why should Congress take such great pains to protect an industry
from competition at the expense of the consumer? Nineteen states currently permit
the banks they charter to invest in real estate, whether directly or through Sub-
sidiaries. If the Federal Reserve finds that such activities are 'closely related
to banking,' why not permit bank holding companies the same authority under appro-
priate regulation? Congress has no business preventing the natural evolution of
this activity, particularly when we have had no hearings or discussion about the
issues involved. Indeed, allowing the Federal Reserve Board to go forward and do
its job would help flesh out the issues for everyone concerned. It is simply pre-
mature and unwarranted for Congress to involve itself in a matter that is still
fundamentally regulatory.
  In this case a moratorium only confirms that Congress has no substantive ideas
about this issue but is willing to freeze the world until it finds some. That is
a sorry way to legislate.

    IV.--THE BILL IS INCONSISTENT WITH INTERNATIONAL COMPETITIVE TRENDS

  In February of 1986, the Senate Banking Committee had hearings on the interna-
tionalization of capital markets. In those hearings **\*94 \*\*583** we heard from major
financial institutions, stock exchanges, and corporate borrowers. The committee
received surprising testimony from chief financial officers of American based com-
panies. We learned that increasingly U.S. companies need bank financing less and
less frequently and more frequently turn to the Eurobond market in London for

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19    Page 94

**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

their debt financing.  Many were startled to learn that new U.S. corporate debt
issuances in 1985 were larger in London than in the United States.

The importance of these hearings is not that they revealed a trend that should
be reversed.  Indeed, none of the witnesses suggested such a course.  To the con-
trary, most agreed that the changes which were occurring in the financial services
markets were beneficial to U.S. companies.  Nevertheless it is clear that the pro-
cess of securitization is changing the operation of finance worldwide and that
capital markets are becoming global.

As the Committee continues the process of reexamining the kind of financial
structure which is well-suited for the 1990s, we must remain cognizant of these
trends.  In his testimony before the Committee in January of 1987, Chairman Volck-
er of the Federal Reserve Board acknowledged both the trend toward securitization
and the globalization of capital markets:

World financial markets, taking advantage of developments in communications
technology and computers, are not much more closely integrated with worldwide
trading in some financial instruments on a 24-hour a day basis.  The volume of in-
ternational transactions is enormous, amounting to well in excess of 4 1/2 tril-
lion per day, on average.  Major borrowers and lenders have access to a much wider
range of markets.  Credit flows, especially those involving large, prime borrow-
ers, increasingly are being 'securitized', that is, they take the form of direct
claims of lenders on ultimate borrowers, rather than using banks as intermediar-
ies.

We acknowledge that in 1933, the United States in enacting Glass-Steagall separ-
ated commercial and investment banking. However, we must recognize that U.S. banks
have been engaged in securities activities overseas for some time. Three of the
top 25 Eurobond underwriters in the Eurobond market in 1986 were American commer-
cial banks.  Likewise 7 of the top 25 dealers in the new Euro-commercial paper
market are American banks.  For over a decade American banks have been demonstrat-
ing their ability to engage in a broader range of business activities overseas.
The Chairman of the Federal Reserve Board, and the FDIC as well as the Comptroller
of the Currency all acknowledge these trends and can point to no safety and sound-
ness problem arising out of them.  All suggest that Congress seriously consider
updating our financial structure.

While we have been debating these issues, foreign banks and financial firms have
been overtaking our domestic financial institutions.  In 1970, six of the largest
ten banks in the world were American, while in 1985 only one U.S. bank was in the
top ten.  In contrast, in 1970 none of the largest ten banks in the world were Ja-
panese, while in 1985 six Japanese banks were in the top ten.  As competition **95
**584 in the Eurobond market has intensified since 'big bang' in London last Octo-
ber, the Japanese, the Swiss and the German firms have been increasing their posi-
tions while American firms have been slipping.

In our own market here in the United States, fifteen foreign banks were allowed
to continue to operate banks and securities firms through a grandfather clause in
the International Banking Act of 1978.  Those firms have continued to perform well
in our markets and have not caused or triggered any significant regulatory or
safety and soundness problems.  We are not suggesting that this grandfather status

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

be removed, but we believe the time has long come to provide American firms the same competitive freedom in the United States.

Likewise foreign-owned banks are permitted to engage and expand in other nonfinancial activities in the United States. The list of activities in which foreign banks and their subsidiaries are engaged in the United States through ownership of activities not permitted to U.S. banks is unbelievable--ranging from insurance . . . to real estate . . . to electronics . . . to shipbuilding. Again we are not suggesting that these firms be required to divest their activities. We recognize they bring capital and employment to the U.S. economy--but again we must point out the anomaly of freezing our own domestic institutions from evolution and innovation at a crucial time while we continue to grant freedom on our shares to foreign institutions. Indeed this bill even exempts foreign banks with U.S. branches from its new definition of banks and its moratorium. We must ask why our U.S. banks are second-class citizens under U.S. banking laws.

Under the shallow guise of moratoriums, this bill seeks to put U.S. based financial firms in a deep freeze. It ignores strong economic trends both domestically and internationally. It mistakenly steps in the trap that Secretary Baker recently warned us about:

If Congress applies the 'protectionist' model by trying to repair the crumbling walls of financial oligopolies, the marketplace, technology, and consumer tastes will move beyond. The victim would be one more U.S. industry that would not--or in this case could not--evolve to meet the competition.

In a recent article, entitled 'Changing Patterns of International Competition,' Michael Porter of the Harvard Business School wrote: 'International success today is a dynamic process resulting from continued development of products and services.' By placing a freeze on domestic institutions' ability to innovate in the United States, aren't we denying them the right to be dynamic in our own market? Rather than avoiding confronting these issues head on and resolving them, shouldn't we demonstrate our willingness to resolve the competitive and public policy issues in the near term by facing them? If we believe the Congress should act on these issues and not the agencies or the courts--let's act this year.

What we need is not delay. What we need is to modernize our laws in such a way that American firms can evolve prudently and in a safe and sound manner to be effective global competitors in these quickly changing markets. Peter Drucker, in a recent article, **\*\*585 \*96** gave us some advice which we should use as a standard to evaluate financial legislation:

From now on any country--but also any business, especially a large one-- that wants to prosper will have to accept that it is the world economy that leads and that domestic economic policies will succeed only if they strengthen, or at least do not impair, the country's international competitive position. This may be the most important--it surely is the most striking--feature of the changed world economy. (P. Drucker, 'A Changed World Economy,' Foreign Affairs April 1986)
This bill in our opinion not only does not meet this test, it flunks it miserably. Indeed, it goes in the opposite direction. America became a great country because of its willingness to face tough problems and its philosophy of individual freedom. If America is to remain a great country we must not sacrifice those prin-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19    Page 96
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

ciples now.  We must redouble our efforts.  Let's get on with it.

CONCLUSION

Accordingly, we dissent from the views expressed by the reporting of this bill
in its current form.  These dissenting views do not contain discussion of each
point or problem with the bill with which we disagree.  There are other areas of
strong disagreement not mentioned.  What we have done is simply state that the
FSLIC recapitalization and the safety and soundness package are urgent.  They
should be done quickly in a separate bill.

The issues of nonbank banks and overall structural reform are complicated and
controversial.  We should neither delay nor complicate their consideration by im-
posing moratoriums.  Rather, we should proceed immediately to address them in a
more careful and deliberate manner.  We should not rush into freezing out new cap-
ital to the savings and loan industry, nor should we rush to freeze the domestic
financial services industry in places during a period of intensifying internation-
al competition.

JAKE GARN.

CHIC HECHT (except III B).

PHIL GRAMM (Title I only).

CHRISTOPHER S. BOND (Title I only).

JOHN CHAFEE (Except III B).

**586 *97 ADDITIONAL VIEWS OF WILLIAM L. ARMSTRONG

This legislation is at the same time too much and too little. It's too little in
the way of true financial institution reform, and too much in that it unnecessar-
ily burdens the FSLIC recapitalization provisions.

The legislation contains an add mix of elements that rescue, freeze, define and
condition various segments of the financial services industry without any overall
policy direction.  That is why this legislation is 'too little.'

The most important feature of this measure, in fact the top priority before us,
is Title III--the Federal Savings and Loan Insurance Corporation (FSLIC) Recapit-
alization provisions. FSLIC--which insures deposits at most thrift institutions-
-is near insolvency.  To assure the safety of deposits in these thrift institu-
tions, Congress should quickly enact those provisions in this bill which provide
FSLIC with $7.5 billion in needed capital.  This FSLIC bill should have been en-
acted in 1986.  Though the bill passed the Senate, it died in the House.

But the FSLIC provisions are encumbered by a host of other issues which threaten
to delay enactment of the FSLIC rescue package.  Events since the committee acted
on March 10, 1987 have made the situation even more difficult for FSLIC and under
the present circumstances a matter of days could make a difference.

I note with some irony that much has changed in this legislation as compared to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19                                                                Page 97
S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)
**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

that originally conceived by Chairman Proxmire.  His intention to have the commit-
tee make some long overdue policy decisions and combine it with the FSLIC provi-
sions was a worthy one.  It was an intellectually honest, head-on approach that
began to try to make some sense out of our neglected statutory and regulatory fin-
ancial institution guidelines.  The final committee result is less decisive and
appears to be the more typical Congressional side step around the issues.

   The financial marketplace, both domestic and international, is leaps and bounds
ahead of the Congress.  What the United States has now is a patchwork, crazy quilt
set of financial organizations that has evolved in the absence of Congressional
leadership.

   John Heimann, currently Vice Chairman of Merrill Lynch Capital Markets and a
former state and federal bank regulator in an appearance before the Federal Re-
serve Board last October made the following points:

   '* * * this [legal] framework is increasingly unresponsive to, and incompat-
ible with, the global financial services marketplace. As this case and the pending
bank securities affiliate applications reflect, the structure of the U.S. finan-
cial system is being shaped piecemeal by a series of administrative and judicial
decisions.  The result is a spiral of **587 *98 inconsistency.' 'American law thus
gives us all incentives to expand abroad at the expense of our own financial mar-
ketplace.'

   'Businessmen are forced to choose second- and third-best strategies to achieve
their goals and then live under the sword of Damocles in fear of an unfavorable
development in the courts or Congress.'

   At the height of its frustration with a Congress unable to write banking laws,
the Federal Reserve had this to say in December 1986 about a decision it didn't
disagree with on policy grounds but which had to be granted in a very roundabout,
cumbersome manner:

   'The Board believes that the public interest in promoting competition, meeting
consumer needs, and safeguarding the safety and soundness of the banking system
will not . . . be optimally served by attempting to fit today's markedly different
financial markets into the fifty-year old Glass-Steagall Procrustean bed.  The
Board again wishes to take this opportunity to express its strong recommendation
that the Congress act on these and other banking issues as early as possible in
the next Congress.'

   I have come to the conclusion that this nation needs bold, even, unprecedented
financial reform legislation.  Others agree.  Two Months ago, Mr. E. Gerald Cor-
rigan, President of the Federal Reserve Bank of New York received wide attention
for his proposal for sweeping restructuring of the financial services industry.
Mr. Corrigan proposed a restructuring meant to preserve the distinctions between
financial and commercial firms, improve the safety and soundness of the financial
system and set up a structure that is based on functions performed by financial
firms, rather than their legal forms.

   This makes sense.  Federal laws should be less concerned about who is offering
what services and more concerned about how they are offering them. Congress ought
to ease the distinctions between various kinds of business firms that comprise the
financial services industry and, at the same time, reduce regulatory duplication.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 100-19, S. Rep. No. 19, 100TH Cong., 1ST Sess. 1987, 1987 U.S.C.C.A.N. 489, 1987 WL 61462
(Leg.Hist.)

**(Cite as: S. REP. 100-19, 1987 U.S.C.C.A.N. 489)**

The pending bill does little to address these overall questions. Not only does this bill fail to set national policy in many areas it compounds existing problems by preventing the evolution of the industry. In so doing the bill grandfathers some organizations into activities that may or may not be acceptable when Congress does finally act.

It is said that the moratorium of Title II will give Congress time to consider what it should do. But will Congress act at the end of the year? Experience leads me to be doubtful. And if Congress does not act the grandfathering provisions of this legislation favors some of the largest insurance, securities and commercial organizations in the country and allows them to continue to own banks, other depository and financial service institutions. These 166 grandfathered companies become a set of privileged organizations that are given significant time and market advantages that are denied to other organizations that seek competitive equity.

**\*\*588 \*99** This legislation treats the symptoms and not the problems. Yet Congress ignores the need for comprehensive answers and furthermore freezes the hodge-podge set of laws, legal decisions, regulatory actions and market innovations into place. Instead of providing reassurance to markets we provide indecision.

Congressional neglect of the financial services law leaves the result completely up to the marketplace and loophole lawyers.

So my long-term objective is a complete overhaul of the laws affecting the financial services industry. In the meantime let's respond to the emergency FSLIC situation.

WILLIAM L. ARMSTRONG.

FN1. 98 S.Ct. 3069, 57 L.Ed.2d 1121.

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.