**Westlaw Delivery Summary Report for BURNS,IAN M 6026348**

| | |
|---|---|
| Date/Time of Request: | Monday, July 14, 2008 18:41 Central |
| Client Identifier: | 126/01 |
| Database: | DCT |
| Citation Text: | Not Reported in F.Supp.2d |
| Lines: | 1042 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

Westlaw.

Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.))**

Hamilton v. O'Connor Chevrolet, Inc.
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
Deborah and Kwanza HAMILTON, Plaintiffs,
v.
O'CONNOR CHEVROLET, INC., Defendant.
No. 02 C 1897.

June 12, 2006.

*MEMORANDUM OPINION AND ORDER*

FILIP , J.

*1 Plaintiffs, Deborah and Kwanza Hamilton ("Plaintiffs or "the Hamiltons"), purchased an automobile from Defendant, O'Connor Chevrolet, Inc. ("Defendant" or "O'Connor"), and brought suit regarding that transaction under various federal and state statutes. (D.E. 26 (the operative complaint, also "Second Amended Complaint").) Defendant subsequently moved for summary judgment on various claims (D.E.50), which motions were granted in part and denied in part (D.E.82); the summary judgment rulings included a denial of a defense motion concerning Count VII of the Second Amended Complaint, a claim under the Illinois Consumer Fraud Act ("ICFA"), because of disputed material factual questions. (*Id.*) Plaintiffs have now moved to certify Count VII of the Second Amended Complaint for class treatment. (D.E.85.) For the multiple, independent reasons stated below, Plaintiffs' motion for class certification is respectfully denied.

FACTUAL BACKGROUND

As reflected by the fact that this Court denied the Defendant's summary judgment motion concerning Count VII, the parties have material factual disputes concerning the ICFA Section 2C claim and related damages issues that require resolution by the jury at trial. The parties disagree-sometimes diametrically-about what happened in this case. A brief summary concerning the facts surrounding Count VII is provided below.

On March 15, 2001, the Hamiltons went to O'Connor to purchase a car. (D.E. 82 at 2.) They contend that they were told by an O'Connor salesperson that the 1996 Chrysler LHS they were considering purchasing was a "certified pre-owned vehicle that had passed a 'rigid 120-point' certified inspection and had been 'reconditioned to the highest standards.'" (Id. at 2-3.)O'Connor disputes that any such representations were made-but it does contend that the Chrysler had been the subject of an extensive inspection that would have revealed the existence of various defects which the Hamiltons claim were plaguing the car and which O'Connor denies existed at the time the car was sold. (See D.E. 58 at 7, 13.) These disputes about the putative problems with the car (concerning, for example, brakes, a tie rod, and some valves) are related to further heated and material factual disputes concerning the Hamiltons' driving of the car after they took possession of it. (See, e.g., D.E. 64 at 3-5.) In this regard, Plaintiffs contend that the car was plagued by performance problems, including certain problems that scared them and caused them to cease using the car at all. (See, e.g., id. at 4-5.)Prior to the point in time that the Hamiltons' allegedly ceased using the car, the Hamiltons also contend that they used the car only for limited purposes. (See, e.g., id. at 4.) O'Connor offers multiple odometer readings that, if credited, reflect that the Hamiltons drove the vehicle some 10,500 miles in the approximately six months between when the Hamiltons took possession and the car was ultimately repossessed, including some 4,700 miles after the Hamiltons allegedly ceased driving the vehicle. (D.E. 58 at 6-7.) The Hamiltons assert that there is no proof that the odometer readings are accurate; they also deny driving the vehicle to the extent reflected in the odometer readings. (D.E. 82 at 7.)

*2 In any event, on March 15, 2001, the Hamiltons decided to purchase the 1996 Chrysler LHS and took possession of it. (Id. at 4-5.)As reported in the retail contract, the Hamiltons gave $2,000 as a down-payment and as consideration with respect to delivery of the Chrysler. (Id.) Ms. Deborah Hamilton has testified that when she left O'Connor on March 15, 2001, taking possession of the 1996 Chrysler LHS, she was "under the understanding that this retail installment contract, the percentage rate [of financing], and everything else was locked in."(Id. at 5.1 Relying on the affidavit of spot delivery signed on March 15, 2001, by both Ms. Hamilton and her son and co-Plaintiff, Mr. Kwanza Hamilton, O'Connor disputes this position, and O'Connor asserts that the Hamiltons understood that financing for the Chrysler was not locked in and was subject to subsequent review and approvals. (Id.)

On March 26, 2001. GMAC sent O'Connor a fax stating, "Please send a check or new contract for the rate difference. B tier is 14.75%. Contract is 12.75. To buy down it is $845.00."(Id.) Sometime shortly after March 26, 2001 (roughly two weeks after March 15, 2001, and at least March 26, 2001). the Hamiltons returned to O'Connor and signed a new retail contract with a revised financing rate of 15.75%. (Id.) The Hamiltons claim that an employee at O'Connor verbally told them that 15.75% was the best interest rate available to them. (Id.) O'Connor denies that such a representation was made. (D.E. 64 at 7.) It also appears that the Hamiltons did not seek financing from any other source than O'Connor, and thus were not approved or denied credit elsewhere on other terms.

The Hamiltons assert that they wanted to return the 1996 Chrysler when they returned to O'Connor and signed new documents completing the purchase at a higher interest rate. (D.E. 62 at 11.) O'Connor disputes this contention, and claims that the Hamiltons never returned the vehicle after the initial financing the Hamiltons claim was "locked in" fell through, nor did they tell anyone at O'Connor that they wanted to return the car. (D.E. 64 at 8.) O'Connor also suggests that the Hamiltons "elect[ed] to apply the down payment to another retail installment contract" after the initial hoped-for financing

fell through. (D.E. 58 at 11; *see also* D.E. 65 at 10 (O'Connor contending that "Plaintiffs ... knowingly chose to obligate themselves to a contract with a higher rate....").)

As mentioned, the Hamiltons contend that the 1996 Chrysler subsequently suffered from various problems, and further assert, at least taking the Hamiltons' stated positions and reasonable inferences from those positions most favorably to Plaintiffs, that the problems existed with the car at the time Plaintiffs took possession. (*See, e.g.,* D.E. 2 at 7.) The Hamiltons assert that they did not receive any reasonable servicing on the car, and were told that it would be months before the vehicle could be serviced. (*Id.*) O'Connor disputes all of these assertions and denies any such representations or statements were made. (*See, e.g.,* D.E. 64 at 4.) If the aforementioned odometer readings are credited by the jury, it would cast substantial doubt on the veracity of some, and perhaps many, of the damage allegations concerning the Chrysler's performance. (*See* D.E. 82 at 21.) However, there are at least some damages questions (e.g., concerning the allegedly rotted tie rod in the steering assembly) that seemingly might be colorable for the Plaintiffs even if the Defendant's odometer readings were credited. (*See id.*)(Put differently, even if someone were extensively driving a car for six months, it might be reasonable to conclude that the tie rod must have suffered from material and visible rusting at the time the car was sold: it might not be reasonable, however, to accept the contention that the brakes were hazardously defective if the driver were driving the car at an approximate rate of 20,000 miles year.)

*3 In connection with Count VII. the ICFA Section 2C claim, the Hamiltons claim damages and relief in the form of, *inter alia,* "actual damages in an amount to be proven at trial," plus attorneys' fees and costs, as are provided for under ICFA. (*See* D.E. 26 at 24.) Plaintiffs have asserted that actual damages for them will include, at a minimum, damages associated with: "(1) two months of mechanical difficulties with the vehicle; (2) rental charges during the time the vehicle was being serviced; (3) delinquent credit reporting after revoking acceptance of the vehicle; (4) the continued stress, concern, and anxiety over having a car that could not reliably transport them between two points and yet asked to make monthly payments for it; and (5) the resulting three years of litigation."(D.E. 62 at 12-13.) Plaintiffs also demand punitive damages. (D.E. 26 at 24.) Defendant denies that any damages are warranted, and offers, for example, what it suggests are vehicle servicing records from when the Plaintiffs brought in the car which establish that claimed problems were non-existent or mistaken. (*See, e.g.,* D.E. 59 at 3.)

## LEGAL STANDARDS

"[T]he party seeking class certification assumes the burden of demonstrating that certification is appropriate."*Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993) (citation omitted). The Seventh Circuit has taught that "a district court has broad discretion to determine whether certification of a class is appropriate."*Id.* (citation omitted); *accord, e.g., Szabo v. Bridgeport Mach., Inc.,* 249 F.3d 672, 677 (7th Cir.2001) (certification assessment left to informed discretion of district court); *Andrews v. AT & T,* 95 F.3d 1014, 1022 (11th Cir.1996) ("Determining whether a class action is ... a superior method of fair and efficient adjudication, is committed to the discretion of the district court 'because that court "generally has a greater familiarity and expertise" ' ' with the practical problems involved in administering a piece of litigation) (quoting *Cent. Wesleyan Coll. v. W.R. Grace & Co.,* 6 F.3d 177, 185 (4th Cir.1993) (in turn quoting *Windham v. Am. Brands, Inc.,* 565 F.2d 59, 65 (4th Cir.1977) (*en banc* )); *Boughton v. Cotter Corp.,* 65 F.3d 823, 828 (10th Cir.1995) (similar, when discussing assessment of predominance, superiority, and manageability considerations under Rule 23(b)(3)).

As the Seventh Circuit has also taught, the district court does not and should not talismanically accept the plaintiff's factual allegations as true when determining whether to certify a class. *Szabo,* 249 F.3d at 676 ("The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it."). A district court does not probe behind a plaintiff's allegations or factual assertions to attempt to determine whether the plaintiff or defendant ultimately will win on the merits: either party can win or lose in a

case more properly handled as an individual suit or more properly handled as a class action. Instead, a district court often probes behind a plaintiff's allegations or assertions because it is necessary to determine whether, if the class were certified, the issues presented could fairly and confidently be resolved with respect to all the absent class members based on the proof offered on behalf of only the named plaintiff(s).*See, e.g., Hudson v. Delta Air Lines, Inc.,* 90 F.3d 451, 457 (11th Cir.1996) (affirming denial of class certification because "the claims ... were not susceptible to class-wide proof" offered through only the name plaintiffs); accord *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613 (1997) (teaching that "Rule 23's requirements must be interpreted in keeping with ... the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right,' 28 U.S.C. § 2072(b) "); *Szabo,* 249 F.3d at 677 (explaining that a district court often must probe beneath the pleadings "to conduct the inquiries identified" in Rule 23 and to "exercise the discretion it confers").FN1

> FN1. Plaintiffs assert that should accept as true the allegations made in support of certification. (D.E. 86 at 5 (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156 (1974) .) Plaintiffs misread *Eisen* in advancing this argument, as the precedent cited above repeatedly explains and establishes. *Accord, e.g., Szabo v. Bridgeport Mach., Inc.,* 249 F.3d 672, 677 (7th Cir.2001) ; *Cooper v. Southern Co.,* 390 F.3d 695, 712 (11th Cir.2004) (collecting Supreme Court and appellate authorities); *Rockey v. Courtesy Motors, Inc.,* 199 F.R.D. 578, 588 (W.D.Mich.2001) (rejecting reading of *Eisen* similar to Plaintiffs as a "gross over-reading" of the case, and collecting Supreme Court and federal appellate authority consistent with principles identified above).

*4 "The class action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." ' *McFadden v. Bd. of Educ. for Ill. Sch. Dist. U-46,* No. 05 C 0760, 2006 WL 681054, at *5 (N.D.Ill. Mar. 13, 2006) (Gettleman, J.) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700-01 (1979) ). A class action "may only be certified if the trial court is satisfied, after rigorous analysis, that the prerequisites of the rule governing class actions have been satisfied." *Gen. Tel. Co. of the S.W. v. Falcon,* 457 U.S. 147, 161 (1982) ; *accord, e.g., Clark v. Experian Info. Inc.,* 223 F.R.D. 508, 510 (N.D.Ill.2005) (quoting *Falcon,* 457 U.S. at 161).

## ANALYSIS

For an action to be maintained as a class action, all of the prerequisites of Rule 23(a) must be satisfied. If the Rule 23(a) requirements are met, the Court then must assess whether a class action is appropriate and prudent under the provisions of Rule 23(b). For the reasons set forth below, the Court concludes (or at least assumes) that Plaintiffs have satisfied the requirements of Rule 23(a), but Plaintiffs have not persuaded the Court that certification is appropriate under Rule 23(b)(3).FN2

> FN2. Plaintiffs do not suggest that certification would be warranted under Fed.R.Civ.P. 23(b)(2) , and such certification appears clearly inappropriate in any event, as this is not a case where injunctive relief would predominate over the monetary relief claimed. *Accord, e.g., Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 415 (5th Cir.1998) ( "[M]onetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief") (citing *Williams v. Owens-Illinois, Inc.,* 665 F.2d 918, 928-29 (9th Cir.1982) ); *id.,* 151 F.3d at 415 ("Liability for incidental damages should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations."). Plaintiffs also do not suggest that certification would be warranted under Fed.R.Civ.P. 23(b)(1) , which is also inapposite on the facts presented. *See, e.g., Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 834-35 (1999) (discussing limitations and prerequisites needed for proper Rule 23(b)(1) class).

I. Rule 23(a) requirements

Rule 23(a) contains four express requirements: (1) the class must be so numerous that joinder of all members is impracticable ("numerosity"), (2) there must be at least one question of law or fact common to the class ("commonality"), (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class ("typicality"), and (4) the representative parties and their counsel must be able to fairly and adequately protect the interests of the class ("adequacy").*See* Fed.R.Civ.P. 23(a) .

A. Numerosity

While Rule 23 does not identify a magic threshold number required to establish numerosity, "permissive joinder is usually deemed impracticable where the class members number 40 or more."*Chandler v. S.W. Jeep-Eagle, Inc.,* 162 F.R.D. 302, 307 (N.D.Ill.1995) . Defendant has stipulated as to the numerosity of the proposed class. (D.E. 90 at 5.) Based on present information, and O'Connor's stipulation, it appears that the putative class is sufficiently numerous that joinder is impracticable.

B. Commonality

For purposes of the commonality requirement, there must be at least one question "of law or fact common to the class" proposed. Fed.R.Civ.P. 23(a)(2) . Defendant maintains that there is no common nucleus of operative facts to unite the Hamiltons with any other putative class member because "the resolution of [the Hamiltons'] common legal issue is dependent upon factual determinations that will be different for each purported class member. (D.E. 90 at 5 (citations omitted).) At a minimum, the claims share a common allegation that O'Connor's alleged practice of not immediately returning down payments violated Section 2C, and thus there is sufficient basis for the Court to assume, at least *arguendo*, that the commonality requirement is satisfied. *Accord, e.g., Fisher v. Bristol-Myers Squibb Co.,* 181 F.R.D. 365, 368 (N.D.Ill.1998) .

C. Typicality

*5 The commonality and typicality requirements of Rule 23(a) are often interrelated. *See Rosario v. Lividatis,* 963 F.2d 1013, 1018 (7th Cir.1992) ."The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members."*De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983) . Defendant acknowledges the relationship between commonality and typicality, and its arguments with respect to each reveal no material differences. (*See* D.E. 90 at 5-6 (advancing virtually identical arguments with respect to commonality and typicality).) As with the commonality requirement, the Court will assume, at least *arguendo,* that the typicality requirement is satisfied. *Accord, e.g., Fisher,* 181 F.R.D. at 368 .

D. Adequacy of Representation

"[A]dequacy of representation is composed of two parts: 'the adequacy of the named plaintiffs counsel, and the adequacy of representation provided [by the putative name plaintiff(s) ] in protecting the different, separate, and distinct interest[s]' of the class members."*Retired Chicago Police Ass'n,* 7 F.3d at 598 (quoting *Sec'y of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir.1986) (*en banc* )). The adequacy of representation prong is often concerned with avoiding conflicts of

interest between the class representative(s) and the rest of the putative class. *See, e .g., Amchem,* 521 U.S. at 625-26 .

O'Connor does not challenge the adequacy of Plaintiffs' counsel. The Court also finds no basis to question the competency or earnestness of Plaintiffs' counsel. Defendant also fails to identify any conflict of interest between the Hamiltons and the putative class. The Court will thus assume, for the purposes of this motion, that the Rule 23(a)(4) adequacy requirements are satisfied.<sup>FN3</sup>

> FN3. O'Connor argues that the Hamiltons are inadequate representatives because O'Connor may have some defenses unique to the Hamiltons, meaning that their claims are not representative of the class as a whole or that the class is not definable. (D.E. 90 at 7.) This objection is better understood as an argument that certification is not warranted under Rule 23(b)(3) , and will be addressed when the Court considers that issue.

II. Certification Is Not Warranted Under Rule 23(b)(3) For Multiple Independent Reasons

Rule 23(b)(3) allows for certification where the requirements of Rule 23(a) have been met, and where the Court finds that "questions of law or fact common to members of the class predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for resolving the controversy."Fed.R.Civ.P. 23(b)(3) . In looking at these factors, the Court must analyze, among other things, "the difficulties likely to be encountered in the management of a class action"(*id.* )-or what is typically referred to as the "manageability" analysis. For the reasons discussed below, the Court determines that the proposed common questions of law or fact do not predominate and, independently, that a class action is not superior to other methods of adjudication. In addition, and again independently, the Court concludes that the manageability problems that would ensue by attempting to resolve Count VII of this case via the proposed class action dictate that class treatment is imprudent and unwarranted.

A. Plaintiffs Have Failed to Establish That Classwide Issues Predominate

\*6 "Determining whether [issues] common to the class predominate over individual issues requires that the court inquire how the case will be tried. This entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class."*O'Sullivan v. Countrywide Home Loans,* 319 F.3d 732, 738 (5th Cir.2003) (citing *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996) ). At its essence, predominance is concerned with whether the putative named plaintiffs can, through their individualized cases, offer proof on a class-wide basis. *See Hewitt v. Joyce Beverages of Wisc., Inc.,* 721 F.2d 625, 628-629 (7th Cir.1983) ; *accord, e.g., Hudson,* 90 F.3d at 457 .

Plaintiffs' assert, in support of class certification, that "the commonality requirement of Rule 23(a)(2) and the predominance requirement of Rule 23(b)(3) are closely related and a finding of one will generally satisfy the other."(D.E. 86 at 11 (internal quotation marks omitted; offered district court authority).) With all respect, this assertion is a substantial error. As Justice Ginsburg explained in writing for the Supreme Court, "[e]ven if Rule 23(a) 's commonality requirement may be satisfied ... the predominance criterion [of Rule 23(b)(3) ] is *far more demanding." Amchem,* 521 U.S. at 623-24 (emphasis added). Justice Ginsburg's teaching on this point has since been underscored by the Supreme Court and numerous other courts. *See, e.g., Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 831 n. 12, (1999) (citing *Amchem* and discussing the "demanding predominance requirements of Rule 23(b)(3) "); *O'Sullivan,* 319 F.3d at 738 ("The predominance and superiority requirements [of Rule 23(b)(3) ] are 'far more demanding' than is rule 23(a)(2) 's commonality requirement.") (quoting *Amchem,* 521 U.S. at 624); *Newton v. Merrill, Lynch, Pierce, Fenner & Smith,* 259 F.3d 154, 186 n. 32 (3d Cir.2001) ; *Clark,* 233 F.R.D. at 511 .

Consistent with this Supreme Court teaching-*i.e.,* that predominance requires much more than the identification of a single common issue-precedent instructs that a class action movant cannot gerrymander predominance by suggesting that only a single issue be certified for class treatment (in which, by definition, it will "predominate") when other individualized issues will dominate or be meaningfully material to the resolution of the absent class members' claims. *See Castano,* 84 F.3d at 745 n. 21 ("Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action. A district court cannot manufacture predominance through the nimble use of subdivision (c)(4)."); FN4 *accord, e.g., Allison,* 151 F.3d at 422 . As *Castano* explained, "[r]eading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3) ; the result would be automatic certification in every case in which there is a common issue, a result that could have not been intended."*Id.,* 84 F.3d at 745 n.21 .

> FN4. Rule 23(c)(4) states, in relevant part, that: "When appropriate (A) an action may be brought or maintained as a class action to respect to particular issues...."

*7 Resolving a class certification motion does not require a trial court to determine whether the putative name plaintiff ultimately will prevail, but the Court is required to determine whether the case as framed is likely to proceed most sensibly as a class action. *See, e.g., Szabo,* 249 F.3d at 677 . In this regard, the Court notes, without definitively passing on the underlying issue of Illinois law, that Plaintiffs are seeking class treatment to present a novel issue of Illinois law-although, as explained further below, this issue seems largely to be a product of the class certification effort, as the Hamiltons' actual merits positions do not depend on prevailing on the more aggressive interpretations proposed by their counsel concerning the Illinois statute that underlie the class certification proposal. With respect to this novel issue concerning the application of Section 2C of the ICFA, to be sure, there are a few reported decisions generally concerning the section. *See, e.g., Jones v. William Buick, Inc.,* 785 N.E.2d 910, 911 (Ill.App.Ct.2003) ; *see also Roche v. Fireside Chrysler-Plymouth, Mazda,* 600 N.E.2d 1218 (Ill.App.Ct.1992) . However, the Hamiltons' do not cite any case meaningfully addressing: (1) the degree to which (if any) a seller may propose an alternative financing arrangement to a buyer in lieu of immediately returning a down payment check; (2) whether any putative obligation to return a downpayment is obviated or affected by a buyer's desire to simply complete the transaction at an adjusted rate of financing; or (3) whether any putative obligation to return a downpayment is affected by a putative buyer's refusal to return the purchase item, such as an automobile-all potential issues in this case or in the proposed class scenario.FN5 Section 2C is silent on these issues-for example, it says nothing about the time-frame during which a down payment must be returned, *see, e.g., Jones,* 785 N.E.2d at 911, nor does it address whether a buyer must return the purchased item to be able to demand return of a down payment of part of the purchase price.FN6 In light of such ambiguities, and as explained further below, it is at best unestablished by Plaintiffs that their class proposal, in which a threshold and subsidiary statutory interpretation question is proposed, will resolve a meaningful chunk of the case.

> FN5. Plaintiffs cite *Najieb v. William Chrysler-Plymouth,* 2002 WL 31906466 (N.D.Ill.Dec. 30, 2002) . (See D.E. 92 at 2 n.3.) However, in that case, the plaintiff returned the car to the dealership three days after receiving notice that her application for credit had been rejected, and after returning the car, the dealership did not refund the down payment.*Najieb,* 2002 WL 31906466, at *3, *10 . *Roche v. Fireside Chrysler-Plymouth, Mazda,* 600 N.E.2d 1218 (Ill.App.Ct.1992) is also of no assistance to the Hamiltons, because, in that case, the plaintiff demanded that the dealership return her down payment and she did not remain in possession of the vehicle she had attempted to purchase. *Id.* at 1220-21. As a subsequent Illinois appellate court recognized, "[Section 2C] does not dictate a period within which this refund [of the down payment] must occur."*Jones v. William Buick, Inc.,* 785 N.E.2d 910, 911 (Ill.App.Ct.2003) .

> FN6. Plaintiffs suggest that the text of Section 2C commands that a purchaser can demand return of the down payment, even if the purchaser refuses to return the item such as a car when financing falls through. Although the

Court need not resolve this issue to adjudicate the Hamiltons' case (again, they claim they wanted to return the car and get their down-payment back), the Court notes that the language of Section 2C does not appear at least to unambigiously command the result the Plaintiffs suggest; Plaintiffs also offer no caselaw in their class certification papers in support of their proposed statutory reading on this point.

> Section 2C states, in relevant part, that: "The retention by the seller of part or all of the down payment ... under those circumstances [*i.e.,* where the seller rejects the putative purchaser's credit application] as a fee for investigating the credit of the consumer or as liquidated damages to cover depreciation of the merchandise which was the subject of the purchase order or contract or for any other purpose is an unlawful practice within the meaning of this Act, whether that fee or those charges are claimed from the down payment...." This language at least arguably only prohibits the seller from retaining or taking any credit investigation fee, or depreciation fee, or any other sort of service fee, when the credit application is rejected and the chattel is returned. Perhaps the language could be read as Plaintiffs' attorneys suggest-such that a seller would presumably left to only whatever other civil and or criminal remedies the law affords if the buyer demanded receipt of the downpayment but nonetheless refused to return the unfinanced automobile-but the Court need not resolve this open question of Illinois statutory interpretation to adjudicate the Hamiltons' case.

In this regard, a review of the basic elements of the ICFA, of which Section 2C is a part, is required to properly assess the appropriateness of any class treatment in this case. The Illinois Supreme Court has repeatedly instructed, in relevant part, that "[t]o succeed in a private cause of action under the [ICFA], a plaintiff must prove (1) a deceptive act or practice by the defendant ... and (4) actual damage to the plaintiff (5) proximately caused by the deception."*Avery v. State Farm Mut. Auto. Ins. Co.,* 835 N.E.2d 801, 856 (Ill.2005) (internal quotation marks and citation omitted); *accord, e.g., id.* at 858-59 ("In order to sustain a private cause of action under the [ICFA], a plaintiff must prove that he or she suffered actual damage as a result of a violation of the Act.") (internal punctuation and citation omitted); *Oliveira v. Amoco Oil Co.,* 776 N.E.2d 151, 160 (Ill.2002) ("[A] private cause of action ... requires proof that the damage occurred 'as a result of the deceptive act or practice.") (internal citations omitted); *id.* (holding that a private plaintiff (as opposed to the Illinois Attorney General) must show "actual damage to the plaintiff" that was "proximately caused" by the putative deceptive practice) (collecting cases).

**\*8** These elements of the private cause of action under the ICFA are, as one would expect, of substantial consequence. Thus, for example, in *Avery,* the Illinois Supreme Court's most recent teaching on the ICFA private cause of action, the Illinois Supreme Court reversed class certification of an ICFA claim and also reversed verdicts in favor of the plaintiff and entered judgment in favor of the defendant-insurers because, *inter alia,* the plaintiff failed to prove that he suffered actual damages and, independently, because he failed to show proximate cause. *Id.,* 835 N.E.2d at 820 . As for actual damages, the Illinois Supreme Court found that the plaintiff failed to establish that he suffered any actual "damage as a result of State Farm's specification or use of" non-original equipment manufacture parts for his car repairs-a failing that the Illinois Supreme Court described as a "striking deficiency" in the plaintiff's claim. *Id.* at 858; *see also id.* at 859 (holding that plaintiff "suffered no 'actual damage' as a result of State Farm's specification or use of non-OEM parts and, therefore, he cannot recover under the Act").*Avery* also independently held that the plaintiff failed to establish any ICFA violation because he was not deceived or affected by the defendant's alleged deceptive practice. *See id.* at 861.Similarly, in *Oliveira,* the Illinois Supreme Court rejected the plaintiff's proposed class-wide liability theory concerning allegedly deceptive advertising of the defendant-which allegedly falsely implied that certain higher-priced gasoline would improve engine performance and benefit the environment-because such a theory would improperly allow recovery by absent class members who "never saw the ads and, thus, were 'not deceived," ' or "who saw the ads but never believed them." *Id.,* 776 N.E.2d at 164 . The Illinois Supreme Court held that such results would be "plainly at odds" with Illinois precedent concerning the ICFA private cause of action. *Id.* (citation omitted).

This precedent is relevant with respect to the instant class certification motion. As previously explained, the certification

proposal is centrally concerned with proposing the litigation of a novel issue of state law-whether Section 2C of the ICFA requires a lender to physically return a down payment to a putative purchaser if his or her credit application concerning a financed sale falls through (*see, e.g.,* D.E. 86 at 1), seemingly irrespective of whether that purchaser instead wants to complete the transaction at an adjusted rate, or whether the customer is willing or unwilling to return the subject of the financed sale (*e.g.,* a car). (*See, e.g., id.* (seemingly suggesting that a violation is *per se* shown whenever a defendant maintains "dominion, custody, and control over consumer funds after rejecting their original credit applications"): D.E. 92 at 3 (similar).) Even if one assumes *arguendo* that this unequivocal outcome is mandated by the language of Section 2C, as Plaintiffs propose would be established in the class proceeding, that result would do little, if anything, towards establishing liability for any putative class member. As explained, substantial Illinois Supreme Court precedent teaches that actual damages and proximate cause must be shown to establish liability. So, for example, if a putative customer returns to the car dealer, is told that his or her original financing application has been rejected, and is asked whether he or she would like to finance at a marginally higher rate, there is no violation of the ICFA if the customer elects to complete the transaction and would have done so irrespective of whether the car dealer went through the formality of actually handing the customer a check representing the proceeds of the down payment that the customer then would resign over to the dealer or need to redeposit in the customer's own account after writing a duplicate check back to the dealer. Likewise, even if the customer was not told of his or her option to get back the downpayment, and the customer refinanced the transaction at a marginally higher rate, the customer still would need to show both proximate cause and actual damages in a plaintiff-specific manner-for example, by analyzing whether the customer would have elected to unwind the transaction and/or would have shopped for and actually been able to obtain more advantageous financing in the market than the rate actually financed. Similar examples are readily imagined concerning proximate cause and actual damages issues for a plaintiff who would not even return the now-unfinanced automobile but would, seemingly under Plaintiffs' theory, be able to demand return of their downpayment and leave with both it and the unfinanced car. All of these plaintiff-specific inquiries would need to be undertaken-many, if not all of which, likely would involve a review of what various oral representations were made by each of the respective salespersons and putative classmembers in the relevant individual transactions-simply to assess liability *vel non* under Illinois precedent. *See, e.g., Oliveira,* 776 N.E.2d at 160 (holding that a private ICFA cause of action "requires proof that the damage occurred "as a result of" the deceptive act or practice.... [T]his language imposes a proximate causation requirement") (internal citation omitted). Moreover, these plaintiff- and episode-specific inquiries would need to be taken simply to assess whether any liability eventuated, even before one would move to the question of the amount of actual damages that might be recoverable-a subject that, as explained further below, further undermines any predominance assessment for the proposed resolution of the claim(s).[FN7]

> FN7. To the extent that the Plaintiffs' papers can be read to support a more qualified statutory interpretation-under which, for example, a car dealer would act lawfully if it informed the putative purchaser of their right to the return of the downpayment, but did not actually tender a check to the purchaser (such as might readily occur if a purchaser did not want to incur the time and costs associated with waiting for such a check before discussing how to complete the sale)-that more qualified statutory interpretation would not assist the certification effort. Under such a more qualified interpretation, the Court would still need to make the same sort of plaintiff- and episode-specific inquiries to determine, for example, what representations (including oral representations) were made by the affected parties, and what the putative class member actually wanted to do with the sale at issue. Little, if anything, is gained in terms of conservation of judicial resources by a "class proceeding" in which the Court would need to hold hundreds or thousands of hearings-one concerning each relevant car purchaser who ultimately financed a purchase at a higher rate than the rate that may have been initially quoted when that respective class member left with the vehicle at issue.

\*9 In this regard, the Court notes that the Hamiltons themselves do not need to prevail on the unyielding statutory interpretation proposed by their counsel as the basis for class treatment in order to prevail on their own claims. For example, Ms. Hamilton does not suggest that she intended to retain both the unfinanced car and the downpayment, as she has specifically testified to "not only a willingness, but a desire to return the vehicle" at issue in the instant case. (D.E. 62

at 11.) Similarly, Ms. Hamilton's claim that she would have returned the vehicle-as opposed to completing the financing at a different rate, as several of the putative class members apparently did (*see, e.g.,* D.E. 86 (first example presented by Plaintiffs of putative class member, who refinanced transaction for $555 more than original transaction))-obviated the need to see if a putative buyer who wished to retain possession of the car and actually pay for it could have obtained a better financing rate elsewhere or would have wanted to incur the time and search costs required to look elsewhere in the first place as opposed to accepting the alternative financing proposed and completed.

These fact-specific inquiries concerning simply the liability assessment for each putative class member defeat any predominance finding in this case. The proposed statutory interpretation issue-in which this Court would wade in relatively unguided fashion into a novel threshold issue of state law-would settle little, if anything, both for the Hamiltons and for each putative class member. Instead, assessing liability would require individualized assessments along various factual axes-including the consideration of various putative oral representations and time-specific financing markets for any given buyer. The Court is unpersuaded that this proposal satisfies the "demanding predominance requirements of Rule 23(b)(3) ."*Ortiz,* 527 U.S. at 831 n. 12 (citing *Amchem,* 521 U.S. at 623-24) ); accord, e.g., *Oshana v. The Coca-Cola Co.,* 225 F.R.D. 575 . 585-86 (N.D.Ill.2005) (denying class certification motion for ICFA claim for lack of predominance based on individualized issues concerning causation and actual damages); *see id.* at 586 ("Consideration of the substance of Oshana's claims, as well as the form that resolution of these issues would take, mandate a finding that the highly individualized nature of the inquiries predominates over issues common to the class.") (collecting cases).[FN8]

> FN8. In their briefs, the Hamiltons at times argue that certification is warranted because they have demonstrated that O'Connor engaged in a "pattern or practice" of Section 2C violations. (*See, e.g.,* D.E. 86 at 3-4; D.E. 92 at 6-8.) This statement appears to be hinged to the proposed absolutist reading of Section 2C, by which it would be violated, even if a borrower were fully informed of the right to return of a downpayment; that given borrower wanted to refinance so as to complete the transaction; and the borrower did not want to go through the formality (and concomitant expenditure of time and resources, which presumably would also tend to inflate the ultimate purchase price) of physically receiving a check representing his downpayment, which he would immediately resign back to the dealer or deposit into his own account after reissuing a duplicate check to the dealer for the final transaction. Moreover, even if O'Connor has engaged in the putative "pattern," precedent teaches that a "pattern" claim is not by itself a signal that class certification is appropriate. *See, e.g., O'Sullivan v. Countrywide Home Loans, Inc.,* 319 F.3d 732 . 742 (5th Cir.2003) ("In both proposed class actions, there is a question whether an overall practice or policy violates a statute. But Rule 23(b)(3) predominance requires a court to ask, in light of how liability is established under the relevant statute, whether common questions predominate over individual ones."); *Rutstein v. Avis Rent-A-Car Sys.,* 211 F.3d 1228, 1234 (11th Cir.2000) ("Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action.") (citing *Amchem,* 521 U.S. at 623). In some instances, of course, a "pattern or practice" case may be suitable or even ideal for class treatment. *See, e.g., Fields v. Maram,* 04 C 0174, 2004 WL 1979997, at *2 (N.D.Ill. Aug. 17, 2004) . However, as explained above, in this case, the existence of the posited "pattern," does not even satisfy the proximate cause and actual damages elements required to show liability, much less resolve any putative class members' actual case.

Over and above these individualized issues concerning liability, resolution of the class members' actual claims would implicate various other fact- and plaintiff-specific issues as well. As previously stated, precedent instructs that a trial court may-indeed, perhaps must-look at whether the proposed class issue(s) predominate with respect to the resolution of the putative class members' *claims,* not simply look at the tautological question of whether "the proposed class issues" predominate merely with respect to "the proposed class issues." *See, e.g., Allison,* 151 F.3d at 422; *Castano,* 84 F.3d at 745 n. 21 . In the instant setting, a review of the Hamiltons' demanded damages and other requested relief reveals that assessing the amount of any putative damages would substantially complicate any classwide resolution of the putative class

members' claims. In this litigation, the Hamiltons have stated that resolution of simply their own damages claims will require a look at, among other things: "the stress, concern, and anxiety" associated with the disputed transaction and subsequent events (D.E. 62 at 13); alleged damages associated with undisclosed mechanical difficulties concerning the car FN9 that manifested in subsequent months; and alleged problems concerning subsequent credit reporting and collection efforts. (See, e.g., D.E. 62 at 12-13.)

> FN9. Defendant disputes that the alleged defects were present when the car was sold. Resolution of these car part repair claims will involve questions beyond the personal experience of many jurors (e .g., concerning the expected performance and life expectancies of tie-rods and automobile valves), and will likely require expert or quasi-expert testimony about expected performance of the particular used car involved in the transaction at issue (a five year old Chrysler LHS). In addition, resolution of this component of the Hamiltons' damages claim will require resolving the parties' conflicting contentions about how far the Plaintiffs drove the car after taking possession. (O'Connor points to odometer readings that suggest that the Plaintiffs drove the car extensively, such that substantial wear and tear was put on the car that might reasonably been seen as causing some or all of the allegedly hidden problems, while the Plaintiffs dispute the odometer readings and claim that they drove the car in limited fashion.) Such issues, even for this single component of the Hamiltons' damages case, will be specific as to them, the defects they allege, and the used car they bought and its subsequent driving and performance record.

*10 Resolving these sorts of damages issues alone would be a highly plaintiff- and episode-specific endeavor, further cutting against any predominance finding. Thus, for example, in Aiello v. Providian Fin. Corp., 239 F.3d 876 (7th Cir.2001), the Seventh Circuit affirmed the denial of class certification involving a claim that a finance company was using unlawful collection practices to collect debts in violation of federal bankruptcy laws. Id. at 881. In affirming the denial of class certification, Aiello noted the individualized nature of damages claims for emotional distress (as are claimed here, among further individualized types of damages), and the need for extensive individualized damages hearings to resolve the class members' claims. Id. Aiello concluded that "the case is not suitable for class action treatment because of the variance of injury among the members of the class and the costs of individualized hearings [in terms of judicial resources] that would in consequence be required for assessing damages." Id. This holding of Aiello is consonant with many other federal cases denying certification where resolution of the putative "class" issue would settle a relatively limited portion of the dispute and substantial individualized hearings would remain to resolve the claims of the class members. See e.g., O'Sullivan, 319 F.3d at 744-45; Allison, 151 F.3d at 419 ("The plaintiffs' claims for compensatory and punitive damages ... focus almost entirely on facts and issues specific to individuals rather than the class as a whole.... Under such circumstances, an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.") (internal quotation marks and citation omitted); Clark, 233 F.R.D. at 512 ("Individual questions also predominate as to damages for each potential class member."); Oshana, 225 F.R.D. at 586; Zapata v. IBP. Inc., 167 F.R.D. 147, 163 (D.Kan.1996) ( "Courts have held that claims for compensatory damages unique to each individual greatly complicate management of a class") (citing Williams v. Owens-Illinois, Inc., 665 F.2d 918, 928-29 (9th Cir.1982) ); Dahlgren's Nursery, Inc. v. E.I. Du Pont De Nemours & Co., No. 91-8709-CIV, 1994 WL 1251231, at *12 (S.D.Fla. Oct. 30, 1994) (citing Windham, 565 F .2d at 68). Although fact-specific questions concerning damages are not a per se bar against certification (each class proposal must be evaluated on its own facts), precedent teaches that such issues must be considered; when they are considered in this case, they confirm the impropriety of the certification proposed.

In sum, in this case, the proposed class issues have not been shown to predominate over those individualized issues that likely would need to be resolved. Because the Court concludes that the Plaintiffs have failed to establish predominance, certification is inappropriate.

B. Plaintiffs Have Not Shown That Class Treatment is Superior Method of Adjudication

*11 The Court also respectfully denies the Hamiltons' motion for class certification under Rule 23(b)(3) for the independent reason that class treatment has not been shown to be a superior method of resolving the putative class members' claims. When assessing superiority, a district court must "consider what other procedures, if any, exist for disposing of the dispute before it. It then must compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court."Wright & Miller, *Federal Practice and Procedure,* Vol. 7AA, Civil 3d § 1779; see also *O'Sullivan,* 319 F.3d at 738 ("The predominance and superiority requirements [of Rule 23(b)(3) ] are 'far more demanding' than is rule 23(a)(2) 's commonality requirement.") (quoting *Amchem,* 521 U.S. at 624).

Plaintiffs' superiority claim is two-fold: (1) class certification is necessary because this is a putative consumer class action and individual claims may be too small to support a suit; and (2) a one-time adjudication of the legality of O'Connor's alleged policy is more efficient than repeated litigation over a policy that class members would challenge in individual suits. (*See* D.E. 86 at 12.)

With respect to the first claim-what is often referred to in jurisprudence as a potential "negative value suit"-if there really were no incentive for a litigant to bring a meritorious individual claim, then that obviously would be a substantial concern. However, this putative problem was not lost on the Illinois General Assembly, which provided for attorneys fees and costs for prevailing parties in actions under Section 2C (and other provisions in the ICFA).*See* 815 ILCS 505/10a(c) ; *Allen v. Woodfield Chevrolet, Inc.,* 802 N.E.2d 752, 756 (Ill.2003) . Precedent discussing the "negative value suit" problem in the context of other statutes teaches that the ability to recover attorneys fees and costs provides substantial incentives to bring meritorious individual suits. *See, e.g., Glover v. Standard Fed. Bank,* 283 F.3d 953, 965-66 (8th Cir.2002) ; *Castano,* 84 F.3d at 748; *Andrews,* 95 F.3d at 1025 .

To be sure, the availability of attorneys fees and costs is not a *per se* bar against class certification. Nonetheless, as reflected in the federal appellate caselaw cited above, the fact that a case potentially involves small recoveries for an individual litigant is equally not dispositive. The Illinois General Assembly was obviously attuned to the potential for negative value suits, it took meaningful steps to provide incentives for plaintiffs to pursue winning claims, and those incentives are material when assessing whether class treatment is superior and appropriate.

The Court is also unpersuaded by Plaintiffs' contention that the certification proposed (*i.e.,* concerning a novel state law issue or issues) produces sufficient efficiency benefits, as compared to available alternatives, to warrant class treatment. Plaintiffs maintain that proving O'Connor's alleged policy (of not automatically returning down-payments in the form of checks) is not a fact-intensive endeavor-at least according to Plaintiffs, a review of the loan jackets is sufficient to demonstrate that O'Connor does not immediately return down payments after the denial of financing. (D.E. 86 at 2.) As a result, to the extent Plaintiffs are correct, the existence *vel non* of O'Connor's "practice" will not even be a material factual issue in this trial, much less in any other. (And to the extent it is an issue and Plaintiffs are correct about the existence of O'Connor's "practice," offensive non-mutual collateral estoppel will potentially be available to subsequent individual suitors.)

*12 Thus, the only possible efficiency gains will come from having a single class-wide decision on Plaintiffs' proposed and novel reading of ICFA Section 2C. The Court envisions extremely limited gains from consolidating in one proceeding what is essentially a question of statutory interpretation-*i.e.,* whether Section 2C prohibits any further negotiations or transactions before physical return of a downpayment check and/or allows a purchaser to retain possession of the unfinanced vehicle while simultaneously demanding return of the partial payment in the form of the downpayment. Resolving such question(s) will take up a limited portion of the putative class proceedings-and the resolution(s) of such

subsidiary issue(s) will not even touch upon essential, plaintiff-specific, inquiries concerning proximate cause and actual damages that are wrapped up in determining liability *vel non* for each putative class member under Illinois law. (Further individualized questions would attend to any damages assessments.)

Moreover, while the answers to statutory questions are not always driven by the facts of a given case, it is equally true that the factual context of a given plaintiff or defendant's case can be helpful in analyzing a legal question, including a statutory one. That is one of the reasons why courts often issue narrower rulings as opposed to broader ones, and why respect for judicial restraint counsels against certification here. In this instance, little would be gained, and much potentially lost, by trying to interpret Section 2C as it should apply to an unknown universe of plaintiffs' cases, the facts relating to whom will be entirely divorced from the interpretive endeavor. This is especially true when the issue is one of state rather than federal law, and where the Illinois courts have not received a meaningful opportunity to construe the provision that this Court would putatively reach out to sweepingly interpret. *See, e.g., Shaw v. Republic Drill Corp.,* 810 F.2d 149, 150 (7th Cir.1987) (per curiam) ("In the context of pendent state law claims, we have already indicated our unwillingness to speculate on any trends in state law.").

These potential drawbacks, combined with the plaintiff-specific inquiries likely required in a class scenario and the concomitant administrability and manageability problems identified elsewhere in this opinion, lead to the conclusion that there is too little benefit in Plaintiffs' proposal to adjudge a class action superior to the alternatives. The Court determines that, independent of the question of whether classwide issues predominate (which they do not), the availability of an effective alternative to the class action device and the problems inherent in conducting hundreds or thousands of follow-on procedures means that the class action is not superior in this case. *Accord, e.g., Clark,* 233 F.R.D. at 511 ("If individual issues predominate, then class certification is usually not a superior method for resolving the controversy, since management of such issues will not be efficient.") (citing, *inter alia, Szabo,* 249 F.3d at 675 (internal quotation marks omitted)).

C. Plaintiffs Have Not Satisfied the Manageability Requirement of Rule 23(b)(3)

*13 Relatedly, the proposed 23(b)(3) class also fails on manageability grounds. Determining whether a class action satisfies manageability concerns involves a practical, on-the-ground assessment of whether the proposed efficiencies from a class action will outweigh the administrative problems and inefficiencies likely to ensue. *See, e.g., Andrews,* 95 F.3d at 1022 (collecting cases). This type of balancing analysis is appropriate because the district court must balance whether any administrative and management problems (which will also negatively impact other litigants) are outweighed by efficiencies to the absent class members (who either will proceed in this courtroom or otherwise be free to file their own suits if and as they see fit).

In the instant case, Plaintiffs have not meaningfully identified how the individual issues will be resolved; instead, they speak casually and in passing of "separate proceedings, mini trials, relaxed reliance standards, and subclasses."(D.E. 92 at 5.) Precedent teaches that this sort of cursory proposal and analysis is inadequate to discharge Plaintiff's burden of showing that class certification is appropriate. *See, e.g., Allison,* 151 F.3d at 420 (citation omitted); *see also Andrews,* 95 F.3d at 1023 (reversing class certification on grounds of manageability and predominance, and stating that if there are apparent problems with a proposed class action, the district court should not certify the class based on the speculation that a solution will be found or a problem will not eventuate).

In this regard, the Court notes that its own research reveals that the Seventh Circuit has, in limited instances, authorized "follow-on" procedures for individual issues of damages, following the resolution of liability on a class-wide basis. *See, e.g., In re Allstate Ins. Co.,* 400 F.3d 505 (7th Cir.2005) ; *see also Mejdrech v. Met-Coil Sys. Corp.,* 319 F.3d 910 (7th Cir.2003) . However, these cases are inapposite because, in both instances, the efficiency gains from consolidation were

far greater than in the case *sub judice* and the proposed follow-on procedures were equivalent to a bifurcated trial. Moreover, in both cases, the class-wide proceedings would definitively settle the liability question, and all that would be left for the follow-on proceedings was the extent of that liability.

The best-case scenario envisioned by Plaintiffs is that the statutory interpretation question will be resolved, at which time the Court potentially may need to conduct several hundreds or thousands of plaintiff-specific hearings at which proof of, *inter alia,* proximate cause, actual damages, and the amount of each class member's putative damages (including any claimed emotional damages) will need to be resolved. (*Id.*) In this scenario, there is a substantial chance (indeed, it is a virtual certainty) that the Court will be enmeshed in lengthy individualized proceedings, in which the expenditure of judicial resources will be geometrically greater than the resources needed to litigate the threshold legal question underlying Plaintiffs' class proposal-which is essentially a limited, subsidiary part of the liability case that each plaintiff individually will need to make irrespective of how the "class" issue is resolved. *See, e.g., Avery,* 835 N.E.2d at 858-59 (requiring proof of proximate cause and actual damages in private right of action case; citation omitted); *Oliveira,* 776 N.E.2d at 160 (same; collecting cases). There also will be attendant manageability problems presented by the individualized damages questions discussed herein. *Accord, e.g., Aiello,* 239 F.3d at 881 (affirming denial of class certification where putative plaintiff class sought to recover, *inter alia,* damages for emotional distress against creditor employing unlawful collection practices). On the other hand, if Plaintiffs are incorrect in their proposed statutory interpretation, the class action will not only involve all of the individualized damages assessments mentioned immediately above, but it will also entail a plaintiff-by-plaintiff assessment of whether O'Connor has done anything culpable, even under Section 2C, with regard to that particular plaintiff-which outcome would negate *any* gains from class certification.[FN10] All of the related individualized issues concerning liability (*i.e.,* proximate cause and a showing of actual damages) would endure, of course, as would the individualized issues (and concomitant manageability problems) concerning the extent of any damages, including damages for emotional wrongs.

> FN10. Although the Court will not belabor the point, given the myriad other problems with the class proposal, to the extent the Plaintiffs' express suggestion that "relaxed reliance standards" could make certification easier can be understood as an invitation to apply a "relaxed" version of of the elements or showings required to prevail on an ICFA claim, fealty to precedent requires the Court to note that Rule 23 cannot be used to relax or modify the standards and rules that would otherwise apply to an individual litigant's case when the case would proceed as a putative class action. Specifically, the Supreme Court has specifically and repeatedly instructed that federal courts may not use Rule 23 to " 'abridge, enlarge, or modify any substantive right" ' of a litigant's (whether plaintiff or defendant) that would adhere in a non-class proceeding. *Amchem Prods, Inc v. Windsor,* 521 U.S. 591, 613 (1997) (quoting the Rules Enabling Act, 28 U.S.C. § 2072(b) ); *accord Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 845 (1999) ("As we said in *Amchem,* no reading of the Rule [*i.e.,* Fed.R.Civ.P. 23 ] can ignore the Act's mandate that rules of procedure "shall not abridge, enlarge or modify any substantive right") (quoting the Rules Enabling Act, 28 U.S.C. § 2072(b) : further citation to *Amchem* and related quotation marks omitted); *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 345 (4th Cir.1998) (reversing class judgment and certification order and holding, "courts considering class certification must rigorously apply the requirements of Rule 23 to avoid the real risk, realized here, of a composite case being much stronger than any plaintiff's individual action would be. Because the class action device permitted plaintiffs to strike Meineke with selective allegations, which may or may not have been available to individual named plaintiffs or franchisees, the judgment below cannot stand."). In this regard, the Plaintiffs' citation of *In re Visa Check Master Money Antitrust Litig.,* 280 F.3d 124 (2d Cir.2001) -*see* D.E. 92 at 8 n.18-is inapposite. In *In re Visa Check,* the record included testimony supporting a liability theory that "did not require analysis of any of the individualized questions" suggested by the defendants in that case. In this case, Plaintiffs do not meaningfully address, much less resolve, how their limited class proposal would resolve the numerous, individualized, and episode-specific issues needed to assess liability as well as damages for a given putative class member. As explained elsewhere, these extensive

fact-specific issues, and the attendant manageability and superiority issues they would present, render class certification imprudent in this case.

**\*14** For these reasons, the Hamiltons' proposal also independently fails on manageability grounds. The likely administrability problems involved in their proposed class action are extensive and real, and the putative efficiency gains are limited at best. Class certification is not prudent under such circumstances. *Accord, e.g., Clark,* 233 F.R.D. at 511 ("If individual issues predominate, then class certification is usually not a superior method for resolving the controversy, since management of such issues will not be efficient.") (citing, *inter alia, Szabo,* 249 F.3d at 675).

## CONCLUSION

For all of the aforementioned reasons, the Court respectfully denies the Plaintiffs' class certification motion (D.E.85). The Court is unpersuaded that the proposed class treatment is sensible, as it fails independently on predominance, superiority, and manageability grounds under well settled law. Under the circumstances presented, certification under Fed.R.Civ.P. 23(b)(3) is inappropriate.

So ordered.

N.D.Ill.,2006.
Hamilton v. O'Connor Chevrolet, Inc.
Not Reported in F.Supp.2d, 2006 WL 1697171 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.