**Westlaw Delivery Summary Report for BURNS,IAN M 6026348**

| | |
|---|---|
| Date/Time of Request: | Monday, July 14, 2008 18:47 Central |
| Client Identifier: | 126/01 |
| Database: | FRDFIND |
| Citation Text: | 214 F.R.D. 614 |
| Lines: | 661 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.



214 F.R.D. 614                                                                                                                         Page 1

214 F.R.D. 614

**(Cite as: 214 F.R.D. 614)**

▷

In re Phenylpropanolamine (PPA) Products Liability Litigation
W.D.Wash.,2003.

United States District Court,W.D. Washington,
at Seattle.
In re PHENYLPROPANOLAMINE (PPA) PRODUCTS LIABILITY LITIGATION.
**No. MDL 1407.**

Feb. 7, 2003.

Purchasers of medication containing phenylpropanolamine (PPA) brought products liability suit against entities responsible for manufacturing and marketing PPA products. On plaintiffs' renewed motion for class certification of economic injury claims, the District Court, Rothstein , J., held that superiority requirement for class certification was not satisfied with respect to economic injury claims of proposed class of consumers who purchased and still possessed unused portions of PPA products on date of voluntary product withdrawal.

Motion denied.

West Headnotes

**Federal Civil Procedure 170A** ⟐182.5

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak182.5 k. Consumers, Purchasers, Borrowers, and Debtors. Most Cited Cases

Superiority requirement for class certification was not satisfied in products liability suit against manufacturers and marketers of products containing phenylpropanolamine (PPA) with respect to economic injury claims of proposed class of consumers who purchased and still possessed unused portions of PPA products on date of voluntary product withdrawal; considerations of manageability, the minuscule individual recoveries in comparison to the significant manageability problems, the extent and nature of litigation already commenced, and the existence of alternative remedies of refund or replacement argued strongly and persuasively against certification. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A .

*614 Richard S. Lewis , Cohen, Milstein, Hausfeld & Toll, Washington, DC, Arthur Sherman , Sherman, Salkow, Petoyan & Weber, Los Angeles, CA, for plaintiffs.

Randolph S. Sherman , Kaye Scholer LLP, New York City, Terry O. Tottenham , Fulbright & Jaworski, Austin, TX, for defendants.

Lance Eugene Palmer , Levinson Friedman, Seattle, WA, for plaintiffs' liaison.

Douglas A. Hofmann, Williams, Kastner & Gibbs, D. Joseph Hurson , Lane, Powell, Spears, Lubersky, Seattle, WA, for defendants' liaison.

ORDER DENYING PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION PURSUANT TO RULE 23(B)(3) FOR ECONOMIC INJURY CLAIMS

ROTHSTEIN , District Judge.

I. BACKGROUND

Plaintiffs' claims stem from their purchase of medication containing phenylpropanolamine ("PPA"). The court outlined the essential history involved in plaintiffs' cases and the PPA multi-district litigation ("MDL") generally in previous orders, including one denying certification in these cases. See Order Denying Certif. at 2 (Sept. 4, 2002). It is enough to repeat here that defendants, along with other entities responsible for manufacturing and marketing PPA products, withdrew those products from the market following a November 6, 2000 Food and Drug Administration ("FDA") health advisory and concomitant request for the voluntary removal of PPA-containing products from the market. See, e.g., Decl. of Michael W. Hogue ("Hogue Decl."), Ex. B (FDA public health advisory pointing to a recent study reporting an association between PPA and hemorrhagic stroke , recommending that consumers not *615 use any products containing PPA, and noting request for voluntary removal). As described in more detail below, plaintiffs primarily seek economic relief based on their continued possession of PPA-containing products as of November 6, 2000.

The court previously denied certification upon finding plaintiffs' failure to demonstrate satisfaction of Federal Rule of Civil Procedure 23(b)(3) . The court concluded that the laws of each state of purchase would apply to the proposed nationwide class and found that plaintiffs neither adequately demonstrated the predominance of common issues of law, nor provided the court with a trial plan suitable at the class certification stage. See Order Denying Certif. at 14-17. The court later found that plaintiffs only belatedly provided, in their motion for reconsideration, some of the arguments and information the court found lacking in the class certification briefing. See Order Denying Recons. at 3-4 (Sept. 26, 2002).

In the renewed motion for class certification currently before the court, plaintiffs further address the court's concerns relating to state law variations and submit a trial plan. They also address superiority-related issues the court raised in granting plaintiffs leave to file the renewed motion for class certification, along with the remaining requirements of Rule

23.

## II. CLASS ALLEGATIONS

Plaintiffs seek class certification in six different PPA cases, each brought against a different defendant. They propose the following class:

Consumers (excluding those who assert personal injury claims and excluding residents of California) who purchased and still possessed unused portions of non-expired PPA products as of November 6, 2000, the date of defendants' voluntary PPA product withdrawal (or thereafter, in the event PPA products were sold after the November 6, 2000 withdrawal).[FN1]

> FN1. Plaintiffs exclude California residents because of similar litigation brought in California state court. *See Webster v. Whitehall-Robins, et al.*, No. JCCP-4166.

They seek refunds for class members under theories of unjust enrichment and breach of implied warranty. Each class would break down into at least three subclasses, including an unjust enrichment subclass, an implied warranty/privity subclass, and an implied warranty/non-privity subclass.

Class members claim they purchased an unmerchantable product and suffered economic injury in the amount of the price of the unused portion of the product possessed as of November 6, 2000. They seek a refund or disgorgement of defendants' profits through restitution, the establishment of a fund supporting a medical research, education, and notification program, and injunctive relief in the form of notice to consumers still in possession of PPA-containing products.

The approximate size of the proposed class is unknown. However, from a PPA over-the-counter ("OTC") cough, cold, and flu product market totaling some $440 million, plaintiffs proffer a value of unused PPA-containing product possessed by consumers on November 6, 2000 numbering in the tens of millions of dollars. From that total, putative class members seek refunds averaging in the range of $3.00 per product.[FN2]

> FN2. Defendants reach this refund amount by interpreting the estimates in the declaration of Dr. Sivaramakrishnan Siddarth, plaintiffs' expert in the New Jersey PPA litigation, offered by plaintiffs here in support of class certification. *See* Decl. of Keelyn M. Friesen ("Friesen Decl."), Ex. 21. Plaintiffs note that this amount assumes a $5.00 average price of product, but do not otherwise object to defendants' conclusion with respect to the estimated average refund amount.

## III. DISCUSSION

Federal Rule of Civil Procedure 23 governs class actions. Plaintiffs, as the party seeking class certification, bear the burden of demonstrating that they meet each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). *Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1186, amended by 273 F.3d 1266 (9th Cir.2001). A trial court must conduct a " 'rigorous analysis' " in order to determine whether the party seeking class certification satisfies the prerequisites of Rule 23. *616Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1233 (9th Cir.1996) (quoting *In re American Med. Sys., Inc.,* 75 F.3d 1069, 1078-79 (6th Cir.1996)). The trial court possesses broad discretion on the question of class certification, but must exercise that discretion within the framework of Rule 23. *Zinser,* 253 F.3d at 1186.

Plaintiffs seek certification pursuant to Rule 23(b)(3). Rule 23(b)(3) allows for class certification where "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Valentino,* 97 F.3d at 1234. "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation." *Id.*

Plaintiffs assert that, outside of privity-which they account for through the above-described subclassing plan, no material variations in state unjust enrichment and breach of implied warranty laws exist as applied to the facts of the proposed class. They assert the predominance of common facts given that their claims relate to one product, and their evidence commonly lies in the November 6, 2000 FDA advisory and defendants' product withdrawal. However, even assuming relative uniformity in state laws and the ability to avoid individualized factual inquiries in establishing breach of warranty and unjust enrichment, the court finds the proposed class unsuitable for certification under Rule 23(b)(3).

A. *Factors Relevant to Rule 23(b)(3) Predominance and Superiority Analysis:*

Rule 23(b)(3) identifies a list of factors pertinent to the class certification analysis:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). These factors are not exhaustive. *Kamm v. California City Dev. Co.,* 509 F.2d 205, 212 (9th Cir.1975). Ultimately, consideration of relevant factors " 'requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis.' " *Zinser,* 253 F.3d at 1190 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1780 at 562 (2d ed.1986)).

Considering the minimal recovery available to individual class members in isolation, the first Rule 23(b)(3) factor may be said to weigh in favor of certification. *See id.* ("Where damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action.") [FN3] Plaintiffs also arguably selected the most desirable forum for a nationwide class action given that this court also serves as the MDL court for all federal PPA cases. However, the court finds that considerations of manageability, the minuscule individual recoveries in comparison to the significant manageability problems, the extent and nature of litigation already commenced, and the existence of alternative remedies argue strongly and persuasively against certification.

> FN3. *But see infra* part A.2.

1. *Manageability:*

The manageability determination "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 164, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Here, the court finds that individualized factual inquiries required for identification of the proposed class would render this case unmanageable. *See, e.g., Zinser,* 253 F.3d at 1189, 1192 ("If each class member has to litigate

numerous and substantial separate issues to establish his or her right to recovery individually*617 a class action is not 'superior'."); *O'Connor v. Boeing N. Am., Inc.,* 197 F.R.D. 404, 415 (C.D.Cal.2000) (" '[A] class action is improper where an individual class member would be compelled to try numerous and substantial issues to establish his or her right to recover individually, after liability to the class is established.' ") (quoting earlier opinion at 184 F.R.D. 311, 340 (C.D.Cal.1998) ). The court also finds that plaintiffs' proposal for the adoption of a fluid recovery procedure would not rectify this manageability problem.

a. *Class Identification:*

It is axiomatic that a "class" must exist in order for a class action to be certified. *Simer v. Rios,* 661 F.2d 655, 669 (7th Cir.1981) . As stated by the Seventh Circuit:

Identification of the class serves at least two obvious purposes in the context of certification. First, it alerts the court and parties to the burdens that such a process might entail. In this way the court can decide whether the class device simply would be an inefficient way of trying the lawsuit for the parties as well as for its own congested docket. Second, identifying the class insures that those actually harmed by defendants' wrongful conduct will be the recipients of the relief eventually provided.

*Id.* at 670. "If the members of the class are not identifiable, managing of the action may pose insurmountable problems." 5 James Wm. Moore et al., Moore's Federal Practice § 23.49[5][b] (3d ed.1997).

Here, individuals would be required to show some proof of injury-in this case purchase and possession of a non-expired PPA-containing product as of November 6, 2000-in order to qualify for membership in the proposed class. *See Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1305 (9th Cir.1990) ( Rule 23 does not permit "dispensing with individual proof of damages.") (citing *In re Hotel Tel. Charges,* 500 F.2d 86, 89-92 (9th Cir.1974) ("[E]ach member of the class seeking recovery would then be required to prove that he patronized the hotel while the surcharge was in effect and that he absorbed the cost of the surcharge.")); *Sikes v. Teleline, Inc.,* 281 F.3d 1350, 1365 (11th Cir.2002) ("[C]lass treatment may not serve to lesson the plaintiffs' burden of proof."), *cert. denied* 537 U.S. 884, 123 S.Ct. 117, 154 L.Ed.2d 143 (2002) . Plaintiffs propose a proof of claim process in which class members supply either physical proof of purchase and possession, such as the actual product, product packaging, or a receipt, or submit a certified oath or verification attesting to purchase and possession as of November 6, 2000.

Plaintiffs posit that the only relevant question concerning their proposal would be whether or not adequate checks for fraud exist at the claims processing stage. However, the court finds itself equally, if not more, concerned with the vagaries of memory. Six out of the eight total putative subclass representatives do not possess any physical proof that they purchased and possessed a PPA-containing product as of November 6, 2000.FN4 Therefore, using the named plaintiffs as a marker, only a quarter of the class, at most, would likely possess any physical proof of purchase. A determination as to the remainder of the class would rely on the memories of those individuals as to the types, amounts, and expiration dates of medication they possessed over two years ago. *See, e.g., Webster v. Whitehall-Robins, et al.,* No. JCCP-4166, slip op. at 8 (Cal.Sup.Ct. Aug. 23, 2002) (finding identical class proposed in California "not ascertainable": "The court would have to conduct an individualized inquiry into several factors. Common to all of these questions is the need to depend on human memory. The court doubts that many individuals will still have records of minor purchases such as these products dating back to the fall of 2000. People will have to recall when they bought a *618 product, when they used it, and how much if any was left over on November 6, 2000. It will be a rare person who has such a precise memory or who is so well organized. Most likely, identifying this class will be a hit or miss proposition.") (internal footnote omitted).FN5

> FN4. *See* Pls.' Renewed Mot. at n. 8-9 (only Loretta Anderson and Traci McKee have physical proof of purchase, through a product and receipts respectively). Plaintiffs do not mention the continued participation of three other previously named plaintiffs, none of whom possess proof of purchase. *See* Decl. of D. Joseph Hurson ("Hurson Decl."), Ex. J (the only product possessed by Kristin Wurz consists of a bottle with a 1999 expiration date); Bristol-Myers Squibb Opp'n Class Certif. at 3-4 (Apr. 12, 2002) (packaging produced by Nancy French in deposition indicated that the product did not contain PPA); and Defs.' Joint Mem. Opp'n Class Certif. at 9 (Apr. 12, 2002) (Amanda Turner lacks any proof she possessed a PPA product as of November 6, 2000).

> FN5. *See also* <u>Sias v. Edge Communs. Inc.</u>, 8 P.3d 182, 185-189 (Okla.Civ.App.2000) (upholding finding that identification of class of prepaid calling card purchasers would be very difficult and class adjudication unduly burdensome where class size would be very substantial, defendant produced several different designs of calling cards, and purchasers generally discarded cards after use); <u>Hayna v. Arby's, Inc.,</u> 99 Ill.App.3d 700, 55 Ill.Dec. 1, 425 N.E.2d 1174, 1183-84 (Ill.App.Ct.1981) (finding "insubstantial recoveries by class members, high administrative costs in relation to aggregate recovery and difficulty in corroborating claims[ ] valid considerations in determining whether a class action is manageable[,]" in reviewing trial court's denial of certification of class of Illinois purchasers of Arby's roast beef sandwiches). A number of federal courts have denied class certification upon finding the class not identifiable or ascertainable. These decisions typically rest on the fact that identification of class members would require inquiry into an individual's state of mind. *See, e.g.,* <u>Simer, 661 F.2d at 671, 673-74</u>; <u>Schwartz v. Upper Deck Co.,</u> 183 F.R.D. 672, 679 (S.D.Cal.1999). Although the proposed class entails identification problems of a different nature, it shares with these cases the very real problem posed by a class requiring the individualized adjudication of each potential class member's claim.

The ability to recollect these facts is complicated by not only the ubiquitous nature of consumer OTC medication purchases, but also by the fact that not all of the OTC products manufactured and marketed by defendants contained PPA. Even within various well-known brand names, such as "<u>Contac</u>," "<u>Dimetapp</u>," and "<u>Triaminic</u>," only certain formulations actually contained PPA. *See* Defs.' Joint Opp'n at 29-30 n. 20 (also noting that two-thirds of "<u>Coricidin</u>" brand medications did not contain PPA). Putative class members would be asked to distinguish, now over two years after the fact, between defendants' various products and the various formulations of those products, many of which differed only slightly in name and packaging.[FN6] Making matters more difficult, some retailers apparently mimicked defendants' packaging for their "house brands" of defendants' products, the possession of which would presumably not qualify an individual for class membership.

> FN6. For example, four Triaminic products contained PPA prior to November 2000, including Triaminic Cough (formerly known as (f/k/a) Triaminic DM), Triaminic Cold & Allergy (f/k/a Triaminic Syrup), Triaminic Cold & Cough (formerly known as Triaminicol), and Triaminic Chest Congestion (f/k/a Triaminic Expectorant), while a number of Triaminic products never contained PPA, including Triaminic A.M. (now called Triaminic Allergy Congestion), Triaminic Cold Cough & Fever, Triaminic Cough & Congestion, Triaminic Cold & Night Time Cough, and Triaminic Cough & Sore Throat. Decl. of Henry Weidmuller, ¶ 7 (Apr. 12, 2002).

As such, the proposed class relates not to a single OTC "product," as plaintiffs suggest, but to a single ingredient contained in some OTC products. Except perhaps for those individuals who could attest to having reviewed the list of ingredients on a product of defendants in their possession in November 2000, the identification process would be fraught with uncertainty. In fact, the risk of confusion would remain even for those individuals who did read the small print, given that many of defendants' products and formulations contained an alternative ingredient, denominated "pseudoephedrine," which could be reasonably confused with PPA. *See* Hogue Decl., Ex. C, tab 88 (Los Angeles Times article reporting that reading labels to make sure PPA is not an ingredient "may be harder than it sounds" and quoting a local pharmacist: "Many people get [PPA] confused with pseudoephedrine, the alternative compound[.] 'They are both long words[ ]and 99% of the people don't know how to pronounce either one.' ")

Moreover, class identification and damages distribution would not end with a determination as to the ingredient possessed. As noted, class members would also have to recall how much, if any, of the product remained as of November 6, 2000, as well as the product's expiration date. As with product identification, given the passage of two years time, these details would sorely tax putative class members' memories.

The court does not believe the use of sworn oaths or affidavits would avoid individualized inquiry into class membership. For example, one of the named plaintiffs, Terry *619 Asbert, could not recall in her deposition the formulations of the various brand name medications she possessed in November 2000, nor the amount remaining in her possession as of that date. Hurson Decl., Ex. B (when asked how she could determine which products did and did not contain PPA, Asbert replied: "Oh, I don't know. That would be hard.") Another named plaintiff, Traci McKee, admitted confusion in identifying the types of Triaminic she purchased over the years stemming from the various "alpha letters" that appeared on the different formulations. Id., Ex. G. FN7 At one point in her deposition, named plaintiff Deborah Kamla conceded she did not know whether the Contac medication she purchased contained PPA. Id., Ex. E. Additionally, a recent survey respondent claimed to have purchased a "Chlor-Trimeton" product containing PPA within the past two or three years, despite the fact that those products have not contained PPA since 1997. See Defs.' Jt. Opp'n at 30 n. 20.

> FN7. Given the many different formulations of this brand, see supra n. 6, McKee's confusion is understandable.

It is unrealistic to suppose that defendants will accept sworn oaths or affidavits under these circumstances. Indeed, the court would not expect them to do so. See, e.g., O'Connor, 197 F.R.D. at 415 (utilizing questionnaires at the claims stage eviscerated the role of the statute of limitations defense, which was not based on "easily verifiable 'objective' criteria."; noting the "futility of reliance on questionnaires [given the] complex individualized inquiry" at issue); Thompson v. American Tobacco Co., 189 F.R.D. 544, 554 (D.Minn.1999) ("Plaintiffs assume that the affidavits would constitute conclusive proof of injury. In reality, even if a questionnaire could be used to establish prima facie evidence of injury, Defendants would be permitted to cross-examine each class members [sic] regarding that alleged injury.")

Even individuals in possession of receipts would not be immune from extensive inquiry. It is highly unlikely that, for the rare person holding onto records of minor purchases made more than two years prior, the receipts would contain enough detail to allow a conclusion as to the precise product formulation purchased and/or the date of expiration. Further, even if such informative receipts existed, they would shed no light on the amount of product, if any, remaining as of November 6, 2000.

Unlike cases involving substantial purchases for which proof of purchase would be readily available or prescription medication verifiable by medical and pharmacy records, the process of simply identifying who rightfully belongs within the proposed class would entail a host of mini-trials. The bulk of cases proffered by plaintiffs involved class settlements in which defendants agreed to class identification and damages distribution procedures, and the courts were not faced with the reality of managing trials. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, [ ] for the proposal is that there be no trial.") (internal citation omitted). Moreover, the majority of non-settlement cases did not entail the identification problems the court foresees here. See, e.g., Long v. Trans World Airlines, Inc., 761 F.Supp. 1320, 1322 (N.D.Ill.1991) (class of former employees); Avery v. State Farm Mut. Auto. Ins. Co., 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242, 1255 (2001) (defendant maintained central database from which class members could be identified); Naef v. Masonite Corp., No. CV-94-4033 (Ala.Cir.Ct. Nov. 15, 1995) (class members had brand of hardboard siding installed on their homes) (attached as Ex. H to Pls.' Compendium of Non-Reported Cases); Folbaum v. Rexall Sundown, Inc., No. L-8625-98 (N.J.Super.Ct. Aug. 5, 2002) (involving two specific vitamins produced and marketed by a single company, and with a

class limited to New Jersey residents) (attached as Ex. E to Pls.' Compendium of Non-Reported Cases). Because the vast majority of putative class members are unlikely to possess proof of purchase, and given the purportedly immense size of this class, the individualized inquiries surrounding class identification would be prodigious and would *620 defy the court's ability to effectively and efficiently manage the litigation.[FN8]

> FN8. Although the court finds the class identification problem significant enough, in and of itself, to prohibit the manageability of this litigation, additional complications are worthy of mention. For instance, the court would also be faced with computing individual damages. *See, e.g., Schwartz,* 183 F.R.D. at 680 (although differences in damage calculations for individual class members would not alone prevent class certification, court's decision was reinforced where "damages questions [were] layered onto the other issues of fact and law[.]"); *see also* 5 Moore's Federal Practice § 23.49[5][b] ("[T]he presence of individual issues increases the difficulty of assessing injury and calculating damages.") Moreover, along with the potential for additional material state law variations, the breach of warranty and unjust enrichment claims could require individualized factual inquiries into issues such as causation, materiality, notice, and/or breach. *Cf. In re Rezulin Prods. Liab. Litig.,* 210 F.R.D. 61, 68-69 (S.D.N.Y.2002) (finding individual issues would predominate on a restitution of purchase price claim even in the absence of compensatory damages claims).

b. *Fluid Recovery:*

As noted, plaintiffs propose that the court adopt a fluid recovery, or *cy pres,* procedure in this case. As explained by the Ninth Circuit:

When a class action involves a large number of class members but only a small individual recovery, the cost of separately proving and distributing each class member's damages may so outweigh the potential recovery that the class action becomes unfeasible. Fluid recovery or "cy pres" distribution avoids these difficulties by permitting aggregate calculation of damages, the use of summary claim procedures, and distribution of unclaimed funds to indirectly benefit the entire class.

*Six Mexican Workers,* 904 F.2d at 1305.

However, courts "have rejected fluid recovery as a 'solution of the manageability problems of class actions.' " *Id.* (quoting *Eisen v. Carlisle & Jacquelin,* 479 F.2d 1005, 1018 (2d Cir.1973), *vacated on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). For example, *In re Hotel Tel. Charges* involved antitrust allegations based on a surcharge for telephone services imposed at a number of different hotels nationwide. 500 F.2d at 88. The Ninth Circuit rejected the use of fluid recovery as a means of dispensing with proof of individual injury under Rule 23. *Id.* at 89-90. *See also Six Mexican Workers,* 904 F.2d at 1305 (stating that the court in *Eisen,* 479 F.2d at 1017-18, rejected a fluid recovery procedure in an antitrust case where it "avoided constitutionally required notice to each class member, dispensed with individual calculation of damages, and distributed the damages to future traders who were not necessarily members of the class.")

Plaintiffs distinguish their fluid recovery proposal from these cases, asserting that it would be used only for the purpose of distributing unclaimed, rather than unproven, damages. In support, they point to the Ninth Circuit's holding in *Six Mexican Workers,* allowing a *cy pres* distribution "for the limited purpose of distributing unclaimed funds." *Id.* at 1305-06. Yet, plaintiffs ignore the fact that the individuals in *Six Mexican Workers* sought damages under a statute which allowed damages not dependent on proof of actual injury. *Id.* (plaintiffs sought statutory damages under the Farm Labor Contractor Registration Act). In other words, the only question at issue in that case was how to distribute the damages awarded. *Id.* at 1307-09 (rejecting distribution plan adopted because it did not adequately target the class and failed to provide adequate supervision over the distribution).

Here, the court's concerns lie in more than simply how to distribute unclaimed damages. Instead, the court faces the daunting task of determining who could claim those damages in the first place. Given plaintiffs' supposition that tens of millions of dollars are at stake, and the incredibly difficult and time consuming process of distributing portions of that amount on an individual basis, at approximately three dollars per product, the adoption of a fluid recovery procedure would not serve to lessen the manageability problems plaguing the proposed class.

2. *Minimal Damages in Comparison to Manageability Problems:*

The court recognizes that, because of the small amount of individual damages at issue, *621 alternative methods to adjudication by a class may be realistically lacking for individuals without any proof of purchase. However, "the desirability of allowing small claimants a forum to recover for largescale [ ] violations does not eclipse the problem of unmanageability." In re Hotel Tel. Charges, 500 F.2d at 90, 92 ("When, as here, there is no realistic possibility that the class members will in fact receive compensation, then monolithic class actions raising mind-boggling manageability problems should be rejected.") Accord Thompson, 189 F.R.D. at 556 ("Although it is difficult to ignore th[e] reality [that a class action is the only viable remedy for the plaintiffs given the enormous burden of pursuing independent litigation,] it is not a sufficient reason to 'headlong plunge into an unmanageable and interminable litigation process.' ") (quoting Barreras Ruiz v. American Tobacco Co., 180 F.R.D. 194, 199 (D.P.R.1998) ).

As noted, class members here seek damages amounting to approximately $3.00 per product. Like the Ninth Circuit in *In re Hotel Tel. Charges,* wherein putative class members stood to gain refunds averaging $2.20, the court finds this minimal recovery-when considered in relation to the enormous costs in time, effort, and burdens on the court-argues against the superiority of class certification. See 500 F.2d at 88, 92 (reversing class certification based on, inter alia, "the unmanageability of the litigation in terms of time, administrative costs, and complexity[, and] the minimal recovery it promises the potential individual class members.")

3. *Other Litigation Already Commenced:*

As of the date of this order, almost 900 PPA-related personal injury actions have been transferred into this MDL. This number does not account for the many state court cases, nor the cases awaiting transfer into the MDL, nor even those not yet filed in federal courts around the country. As such, to the extent plaintiffs pursue a class vehicle as a means of punishing defendants, preventing their retention of "ill gotten gains," or deterring future behavior, the existing individual personal injury lawsuits may well serve those purposes. See, e.g., In re Rezulin Prods. Liab. Litig., 210 F.R.D. 61, 75 (S.D.N.Y.2002) ("If Rezulin and its marketing was as bad as plaintiffs claim, defendants doubtless will get their comeuppance in the hundreds or thousands of personal injury cases already pending against them."); *Webster,* slip op. at 5 (rejecting deterrence as justification for class certification given the multitude of state and federal personal injury actions pending nationwide and the fact that PPA-containing products are no longer being sold).

In contrast to the many personal injury actions filed, the number of federal cases seeking economic damages is limited to these plaintiffs.[FN9] The court finds the lack of parallel, individual suits significant. Clearly, denial of class certification will not inundate the judicial system with individual claims. See In re Hotel Tel. Charges, 500 F.2d at 91; Castano v. American Tobacco Co., 84 F.3d 734, 747-48 (5th Cir.1996) . For these reasons, the "litigation already commenced" factor argues against the superiority of class certification in these cases.

> FN9. Defendants draw the court's attention to one additional case, and proposed class, purportedly limited to economic recovery, which was transferred to this court in May 2002. See *Horne v. American Home Products*

*Corp.,* No. C02-894R. They submit that the court's order on plaintiffs' renewed motion for class certification should also apply to *Horne,* despite the fact that no motion for certification has been filed in that case. The court only recently received plaintiffs' objections to this request. Given the lack of complete briefing on this issue, the court declines to extend this order to *Horne.*

4. *Alternative Remedies:*

Of course, the court retains the authority to limit and/or redefine the proposed class to individuals possessing proof of purchase and possession. Plaintiffs previously noted their continued interest in pursuing such a class in the event the court denied the broader class proposed here. This limitation would drastically reduce the number of individualized *622 inquiries associated with class identification, claims, and damages. However, the court finds an already existing remedy presents an additional barrier to this more limited class.

To this day, defendants maintain refund and product replacement programs for individuals still in possession of PPA-containing products. It makes little sense to certify a class where a class mechanism is unnecessary to afford the class members redress. *See, e.g., Chin v. Chrysler Corp.,* 182 F.R.D. 448, 462-65 (D.N.J.1998) (finding lack of superiority where reimbursement available through recall program and through administrative remedy); *Berley v. Dreyfus Co.,* 43 F.R.D. 397, 398-99 (S.D.N.Y.1967) (rejecting plaintiffs' proposal to "needlessly replace a simple, amicable settlement procedure with complicated, protracted litigation" where the defendant offered a purchase price refund to its customers); *Webster,* slip op. at 3 (finding the fact that a class seeking refunds for PPA products "would not produce any substantial benefit[,]" given the defendants' refund programs, to be the "most important reason" for denial of certification).

Plaintiffs point to the limitations of these refund programs. For instance, several defendants require physical proof of purchase such as bottle caps, packaging, and unused product in order to qualify for a refund, while another does not specify the type of proof required, while still another requires a "lot code." Plaintiffs also make much of the fact that only one defendant could identify a dollar amount refunded directly to consumers, while many millions of dollars in refunds were provided to retailers. Additionally, plaintiffs describe the programs as "silent," meaning that an individual must either actively seek out a refund by directly contacting a defendant or happen to run across a website on which the refund program might be advertised.

However, the court finds proof of purchase requirements for refund programs an extraordinarily commonplace practice amongst retailers and, as evidenced by this opinion, a necessary requirement for class identification purposes. The fact that consumers have not sought refunds in large numbers may well demonstrate that certification of the proposed class would merely serve to create lawsuits where none previously existed. *See In re Hotel Tel. Charges,* 500 F.2d at 91 . Moreover, the distinction between the amount of refunds given to retailers, rather than consumers, is likely due to the fact that the retailers had readily available proof of purchase in the form of the products themselves and that retailers may be called upon by their customers to make refunds.

Finally, although plaintiffs criticize the amount of publicity directly relating to defendants' refund and product replacement programs, a significant number of people somehow heard about these programs. In addition to the $119,808 in refunds distributed to 14,000 consumers of Novartis products, American Home Products and Bayer indicate receiving requests for refunds from 16,159 and 16,935 consumers respectively. *See also* Hurson Decl., Ex. EE (Fort Worth Star-Telegram article noting SmithKline Beecham refund program). Also, a number of individuals may have sought and received refunds from retailers of defendants' products. *Id.* (attaching newspaper articles indicating that retailers, including Eckerd, Walgreens, and Wegmans stores, were providing refunds to consumers). Moreover, the possible availability of refunds likely occurred to a number of people following the widely publicized FDA advisory and product withdrawal. *See, e.g.,* Hogue Decl., Ex. B (FDA public health advisory); Friesen Decl., Ex. 5 (FDA "Questions and Answers" web page: "[W]e suggest you stop taking the drug [PPA] immediately and use an alternative product."); Hogue Decl., Ex. C (attaching numerous articles

publicizing FDA advisory and product withdrawal, including front page articles in major regional and national newspapers); and *id.,* Ex. G (attaching full-page advertisements run by plaintiffs' lawyers in People and Time magazines).

While not all affected individuals sought refunds or replacement products, a substantial number of individuals and many retailers *623 clearly did, while hundreds, if not thousands, of PPA-related personal injury cases have been filed in federal and state courts. Plaintiffs do not persuade the court that a nationwide class action would be superior to the remedy already existing through these refund and product replacement programs.

## IV. CONCLUSION

For the reasons described above, the court finds that plaintiffs fail to demonstrate satisfaction of Rule 23(b)(3). In denying certification on this basis, the court does not find consideration of the remaining Rule 23 requirements necessary. Plaintiffs' renewed motion for class certification is hereby DENIED.

W.D.Wash.,2003.
In re Phenylpropanolamine (PPA) Products Liability Litigation
214 F.R.D. 614

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.