# EXHIBIT 5

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                   EASTERN DIVISION
 4   CARMEN FLORES,           )
 5   individually and on      )
 6   behalf of all others     ) No. 07 C 6403
 7   similarly situated,      ) Judge Hibbler
 8             Plaintiff,     ) Magistrate
 9        vs.                 ) Judge Valdez
10   DIAMOND BANK,            )
11             Defendant.     )
12
13        The discovery deposition of CARMEN FLORES,
14   taken in the above-entitled cause, before
15   KIMBERLEY M. TITSWORTH, a notary public of Cook
16   County, Illinois, on Tuesday, June 24, 2008, at
17   2:20 p.m., at 53 West Jackson Boulevard,
18   Suite 315, Chicago, Illinois, pursuant to
19   notice.
20
21
22
23   Reported by: Kimberley M. Titsworth, CSR
24   License No.: 084-004670
```

2

```
 1   APPEARANCES:
 2        CONSUMER ADVOCACY CENTER, P.C.
 3        BY: MR. LANCE A. RAPHAEL
 4        180 West Washington Street
 5        Suite 700
 6        Chicago, Illinois  60602
 7        (312) 782-5808
 8             Representing the Plaintiff;
 9
10        BELONGIA & SHAPIRO, LLP
11        BY: MR. MARK D. BELONGIA
12        53 West Jackson Boulevard
13        Suite 315
14        Chicago, Illinois  60604
15        (312) 662-1030
16             Representing the Defendant.
```

3

```
 1              I N D E X
 2   WITNESS                    EXAMINATION
 3   CARMEN FLORES
 4      By Mr. Belongia              6
 5
 6
 7
 8
 9
10             E X H I B I T S
11   NUMBER                     MARKED FOR ID
12   Flores Deposition Exhibit
13      A                            17
14      B                            27
```

4

```
 1             (WHEREUPON, the witness was duly
 2             sworn.)
 3        MR. BELONGIA: Could you please state and
 4   then spell your name for the record.
 5        THE WITNESS: Carmen Flores. You want the
 6   full name spelled?
 7        MR. BELONGIA: Correct.
 8        THE WITNESS: C-a-r-m-e-n, F-l-o-r-e-s.
 9        MR. BELONGIA: Let the record reflect that
10   this deposition will be taken in accord with all
11   applicable rules and statutes, taken today
12   pursuant to notice and agreement of the parties.
13        Ms. Flores, have you ever given a
14   deposition before?
15        THE WITNESS: No.
16        MR. BELONGIA: I'm sure counsel has met with
17   you and gone over the ground rules for a
18   deposition, but just in case, I'm going to go
19   over some of the general guidelines for a
20   deposition in order to make this process move as
21   smooth as possible; okay?
22        THE WITNESS: Okay.
23        MR. BELONGIA: It's very important that in
24   this room with high ceilings that you speak
```

5

1 loudly so everybody can hear you. There's a
2 slight echo in the room, so it's important,
3 again, that you speak slowly and clearly so that
4 the court reporter can take everything down. Is
5 that fair?
6    THE WITNESS: Yes.
7    MR. BELONGIA: If you don't understand any
8 one of my questions, which has been known to
9 happen from time to time, you can please let me
10 know that, in fact, you don't understand the
11 question, and I'll be happy to rephrase it;
12 okay?
13    THE WITNESS: Okay.
14    MR. BELONGIA: It's important that you
15 respond to all of my questions with verbal
16 responses. The court reporter, who's taking
17 everything down here on a machine, can't take
18 down shrugs, nods, uh-huhs, so everything has to
19 be a verbal response. Fair?
20    THE WITNESS: Okay. Yes.
21    MR. BELONGIA: If at any point you need a
22 break for whatever reason, as long as there is
23 not a pending question, we will break to use the
24 washroom, get you something to drink or for just

6

1 a break to have a break; okay?
2    THE WITNESS: Okay.
3    MR. BELONGIA: Given that I don't know you,
4 let me just take a brief second to explain the
5 deposition. It's an opportunity for me, as the
6 attorney for the defendant bank, Diamond Bank,
7 FSB, and the case that you brought against it to
8 ask you questions on the record; okay?
9    THE WITNESS: Yes.
10    MR. BELONGIA: And as I don't know you, I'm
11 going to ask some general background questions,
12 and I'm sure Mr. Raphael will let you know that
13 I'll be doing that. And don't be offended by
14 any means by the questions. It's just that I
15 don't know you, and this is my only opportunity
16 to speak to you on the record; okay?
17    THE WITNESS: All right.
18        CARMEN FLORES,
19 having been first duly sworn, was examined and
20 testified as follows:
21        EXAMINATION
22 BY MR. BELONGIA:
23    Q. What is your current home address?
24    A. 2707 North McVicker. That's in

7

1 Chicago.
2    Q. How do you spell the street name,
3 please.
4    A. M-c-V-i-c-k-e-r.
5    Q. Is that a capital V?
6    A. Capital V.
7    Q. And that's in Chicago?
8    A. Yes.
9    Q. What's the ZIP code?
10    A. 60639.
11    Q. And what is your current age, please.
12    A. God, I'm trying to calculate that. 55.
13    Q. And what's the last four digits of your
14 Social Security number?
15    A. 9516.
16    Q. And your marital status?
17    A. I'm divorced.
18    Q. Do you have any children?
19    A. Yes.
20    Q. How many?
21    A. Two.
22    Q. And how old are they?
23    A. 31 and 34.
24    Q. Do either of them work in the legal

8

1 field?
2    A. No.
3    Q. They don't work for a law firm or any
4 law school?
5    A. No.
6    Q. What's your highest level of education?
7    A. About second year of college.
8    Q. Did you receive any type of certificate
9 or degree?
10    A. No.
11    Q. And where did you attend?
12    A. I attended -- well, I've attended
13 Harold Washington.
14    Q. Were you seeking any specific type of
15 coursework, business or marketing or anything?
16    A. Yes, accounting.
17    Q. Accounting?
18    A. Yes.
19    Q. Are you currently employed?
20    A. Yes.
21    Q. Where are you employed?
22    A. I work for World Book.
23    Q. What is World Book?
24    A. An encyclopedia company.

9

1  Q. Where are they located?
2  A. On Michigan Avenue.
3  Q. In Chicago?
4  A. Yes.
5  Q. How long have you worked there?
6  A. Let's see. 15 years.
7  Q. What is your job title there?
8  A. I am a fulfillment supervisor.
9  Q. And describe for me generally what is
10 meant by the title fulfillment manager?
11 A. I monitor all the warehouses and make
12 sure that the orders are fulfilled. And I also
13 take care of the database that handles all the
14 prices and things like that for order
15 processing.
16 Q. Do you work a 40-hour work week?
17 A. It's 37 and a half.
18 Q. And is it a standard work week, it's
19 the same hours each week?
20 A. Yes.
21 Q. During the course of the written
22 discovery phase, I believe it was listed,
23 identified that you had previously filed a
24 bankruptcy; is that right?

10

1  A. Correct.
2  Q. And what year did you file bankruptcy?
3  A. Oh, bankruptcy?
4  Q. Yeah.
5  A. No.
6  Q. Never filed a bankruptcy?
7  A. No.
8  MR. RAPHAEL: Did I say she filed a
9  bankruptcy?
10 MR. BELONGIA: No. There was a question
11 about that. I sent you a letter inquiring as to
12 whether or not there was a Carmen Flores.
13 BY MR. BELONGIA:
14 Q. There was actually two that filed
15 bankruptcy here in the Northern District, and we
16 didn't know if that was you or not.
17 A. No, not me.
18 MR. RAPHAEL: Good. I thought I had said she
19 filed a bankruptcy when she didn't.
20 BY MR. BELONGIA:
21 Q. Besides this lawsuit, are you a
22 plaintiff in any other litigation?
23 A. The Credit Union 1.
24 Q. So there is another pending lawsuit

11

1  involving you as a plaintiff, is that right?
2  A. Yes.
3  Q. And is that the case Smith versus
4  Credit Union 1?
5  A. That's correct.
6  Q. Who is Smith?
7  A. I don't know.
8  Q. Are you a plaintiff in that case?
9  A. Yes.
10 Q. Do you know how many other plaintiffs,
11 besides you and Smith, there are in the Credit
12 Union 1 case?
13 A. No.
14 Q. Can you tell me generally what are your
15 claims in that lawsuit?
16 A. What do you mean claims? I'm sorry.
17 Q. That's okay. I know you're not an
18 attorney. I don't expect you to give me legal
19 responses.
20 But you are a plaintiff, and when
21 you're a plaintiff, you filed a lawsuit against
22 somebody. And when you filed a lawsuit, you
23 were making claims. They did something wrong.
24 A. Right.

12

1  Q. What did Credit Union 1 do wrong?
2  MR. RAPHAEL: Objection. Calls for work
3  product, attorney-client privilege information.
4  And if you go off the record for a second, I'll
5  explain something to you.
6  MR. BELONGIA: Off.
7  (WHEREUPON, a discussion was had
8  off the record.)
9  MR. BELONGIA: For the record, we're going to
10 stipulate between the parties that the Smith
11 versus Credit Union 1 case involving Ms. Flores
12 is the same claim as -- similar claims as
13 brought in the Diamond Bank case.
14 MR. RAPHAEL: Correct. And it's the subject
15 of a preliminary approved settlement and class
16 basis where the first-named plaintiff is Smith,
17 not Ms. Flores.
18 BY MR. BELONGIA:
19 Q. Ms. Flores, besides the Smith case and
20 this case you're here today about, are there any
21 other lawsuits that you ever filed?
22 A. Not that I can recall at this time.
23 Q. So is it fair to say you never filed
24 any actions for workers' comp or for personal

13

1   injury?
2       A.   No, not that I can recall.
3       Q.   So is it fair to say that you've,
4   besides the Smith case, never been a class
5   plaintiff, other than these two cases?
6       A.   Correct.
7       Q.   Do you currently have a bank account?
8       A.   Yes.
9       Q.   How many bank accounts do you have?
10      A.   How many bank accounts?
11      Q.   Yes.
12      A.   Maybe three.
13      Q.   Are they all at the same financial
14  institution?
15      A.   Yes.
16      Q.   And what institution is that?
17      A.   TCF.
18      Q.   And at the time of the alleged
19  occurrence in this lawsuit of August 2nd, 2007,
20  were your accounts at TCF Bank?
21      A.   Yes.
22      Q.   How long have you maintained bank
23  accounts at TCF Bank?
24      A.   Several years.  I don't remember how

14

1   many.
2       Q.   And do you have an ATM card for the
3   bank accounts at TCF Bank?
4       A.   Yes.
5       Q.   And how many ATM cards do you have?
6       A.   I carry only one with me.  So I think I
7   have three.
8       Q.   So you have three total cards?
9       A.   ATM, yes.
10      Q.   The one that you carry currently, is
11  that linked to all three accounts?
12      A.   Yes.
13      Q.   And that card, do you have it with you
14  today?
15      A.   Yes.
16      MR. RAPHAEL:  Are we going to do the same
17  thing we did?
18      MR. BELONGIA:  Yes.
19      MR. RAPHAEL:  Fine.
20          In the other depositions of the bank
21  president and the bank vice president, they
22  produced to me their ATM cards for their
23  accounts, their bank accounts, so that we could
24  write down the number for their bank account on

15

1   a piece of paper that I said I would keep
2   strictly confidential, only my eyes, no one else
3   sees it.
4           It's just for the evidence to establish
5   that -- I guess for you he's going to be using
6   it for the evidence to establish that you
7   actually took out money from this ATM.  For me
8   it was to establish that the bank president had
9   used his own ATM.  No one will see it, except
10  for him; correct?
11      MR. BELONGIA:  It'll be maintained and we do
12  what is called a little stipulation to
13  confidentiality.  And what I'm going to do is
14  inspect your card, I'm going to write the number
15  down, he's going to verify that the number is
16  correct, he's going to sign this piece of paper
17  and your number will be kept in our office in a
18  locked drawer so that it can't be revealed to
19  anyone.
20          And we understand the identity theft
21  issues, and we did the same thing when we
22  produced our clients', employees, bank ATM
23  cards, okay?  But we need to, as did
24  Mr. Raphael, verify that transactions did incur

16

1   so that we can cross-reference with the
2   discovery produced in the case; okay?
3       MR. RAPHAEL:  So if you have your ATM card,
4   toss it to him.
5   BY MR. BELONGIA:
6       Q.   Do you have any questions?
7       A.   No.
8       MR. RAPHAEL:  I stipulate that this is her
9   ATM stuff.  I'd just staple this closed so that
10  no one else but you or I saw it.
11      MR. BELONGIA:  Yeah.
12      MR. RAPHAEL:  And we should mark it as a
13  confidential exhibit.
14      MR. BELONGIA:  Exhibit A.  For the record,
15  Ms. Flores's numbers for her ATM account
16  number --
17      MR. RAPHAEL:  I didn't give any in the
18  others.
19      MR. BELONGIA:  Right.  I'm not going to.
20          Has been written on a piece of paper.
21  Counsel and I have signed the stipulation of
22  confidentiality.  It has been folded up.  It
23  will be maintained in a safe place within our
24  law firm, not revealed outside of this

17

1  litigation, and destroyed at the conclusion of
2  the litigation, so as to ensure the safety of
3  the information.
4          It will be marked as Confidential
5  Exhibit A, and the number not read on the
6  record.
7             (WHEREUPON, Flores Deposition
8                     Confidential Exhibit A was
9                     marked for identification by
10                    the attorney.)
11 MR. RAPHAEL: Off the record for a second.
12            (WHEREUPON, a discussion was had
13                    off the record.)
14 BY MR. BELONGIA:
15    Q. Was this the ATM card that was used at
16 the time of the alleged occurrence on --
17    A. Yes.
18    Q. -- August 2nd, 2007?
19    A. Yes.
20    Q. It's important to add one more ground
21 rule at this point. It's important for the
22 transcript purposes that you wait until I ask
23 the entire question. It's human nature; once I
24 start talking, you know what I'm going to say,

18

1  to answer but we need to get it all on the
2  record clean; okay?
3     A. Okay.
4     Q. What bank branch of TCF Bank do you
5  usually use for your financial transactions?
6     A. I usually go to the one that's close to
7  my house. That's on -- what do you want, the
8  address?
9     Q. Yes.
10    A. I don't have the address. I can tell
11 you --
12    Q. Give me the nearest intersection.
13    A. It's on Narragansett, close to
14 Diversey. It's a Jewel's.
15    Q. And your employer is located on
16 Michigan Avenue, correct?
17    A. Correct.
18    Q. Whereabouts on Michigan Avenue?
19    A. South Water.
20    Q. So can we agree that neither one of
21 those locations is close to Diamond Bank?
22    A. Yes.
23    Q. To the best of your recollection, where
24 is Diamond Bank located?

19

1     A. It's right on Clark and North Avenue.
2     Q. And prior to using the ATM on
3  August 2nd, 2007, had you ever used the ATM at
4  that bank before?
5     A. No.
6     Q. This was the first time you ever used
7  this bank ATM?
8     A. Yes.
9     Q. What was the reason you were in the
10 vicinity of Clark and North Avenue on
11 August 2nd, 2007?
12    A. I was by my chiropractor.
13    Q. And where is your chiropractor located?
14    A. My chiropractor is on Wells by North
15 Avenue.
16    Q. And what's your chiropractor's name?
17    A. Peak Performance.
18 MR. RAPHAEL: Peak or Pete?
19 THE WITNESS: Peak, P-e-a-k.
20 BY MR. BELONGIA:
21    Q. And do you have a specific physician
22 that you see at Peak Performance?
23    A. They changed, so I got a new one now.
24 It's not the same. But it's the same office.

20

1  MR. RAPHAEL: At the time. He's asking you
2  at the time.
3  BY MR. BELONGIA:
4     Q. Yeah, at the time who was your
5  chiropractor?
6     A. Dr. Crevy.
7     Q. How do you spell that?
8     A. I think it's C-r-e-v-y.
9     Q. And prior to August 2nd, 2007, for how
10 long a period of time had you been treating with
11 Dr. Crevy at Peak Performance at Wells and North
12 Avenue?
13    A. About two years.
14    Q. And is it your testimony that in that
15 two-year period you had never gone to the corner
16 of Clark and North Avenue to utilize the ATM
17 machine at Diamond Bank or any of its
18 predecessors?
19    A. No, I have not. Not that I can recall.
20    Q. When you would treat with Dr. Crevy,
21 did you pay by cash, credit card or check?
22    A. I don't remember.
23    Q. Was it covered, do you know, by medical
24 insurance?

21

```
 1    A.   Part of it is.  So sometimes if I have
 2  the cash, I'll pay cash.  Sometimes credit card.
 3  So I don't remember on that day.
 4    Q.   On August 2nd, 2007, do you recall the
 5  specific reason why you needed to use an ATM
 6  machine?
 7    A.   I can't remember.
 8    Q.   Do you recall specifically how much
 9  money that you took out of the ATM machine at
10  Diamond Bank on August 2nd, 2007?
11    A.   I don't remember.
12    Q.   Do you remember what time of day that
13  you went to the machine to use the machine for
14  whatever purpose?
15    A.   I think it was late afternoon.
16    Q.   Was it before or after your doctor's
17  appointment?
18    A.   I don't remember if it was before or
19  after.
20    Q.   Do you recall typically during that
21  two-year period on and prior to August 2nd,
22  2007, whether your appointments with Dr. Crevy
23  were after work?
24    A.   They're usually after work.
```

22

```
 1    Q.   And do you have a standing appointment
 2  time with Dr. Crevy?
 3    A.   The majority of the time was around --
 4  it's after 4:00, 5:00 o'clock.
 5    Q.   What's your dismissal time from work?
 6  In other words, what time do you leave?
 7    A.   Well, I work -- it's usually
 8  4:00 o'clock, 4:15.  But many times I stay over.
 9    Q.   At the time you used the ATM at Diamond
10  Bank on August 2nd, 2007, was anyone with you?
11    A.   No.
12    Q.   At the time you used the ATM, were you
13  talking on a cell phone?
14    A.   Not that I can remember.
15    Q.   Prior to using the Diamond Bank ATM on
16  August 2nd, 2007, had you ever used an ATM
17  machine before?
18    A.   Yes.
19    Q.   Can you give me an approximate number
20  of times that you used an ATM machine prior to
21  August 2nd, 2007?
22    A.   No.
23    MR. RAPHAEL:  Objection.
24         Wait, pause.
```

23

```
 1         Form of the question.  You can answer.
 2    THE WITNESS:  No.
 3  BY MR. BELONGIA:
 4    Q.   Would it be fair to say it was more
 5  than 100 times?
 6    MR. RAPHAEL:  Same objection, form of the
 7  question.  You can answer.
 8    THE WITNESS:  I don't know how many times.
 9  BY MR. BELONGIA:
10    Q.   You testified earlier that you have
11  three ATM cards, is that correct?
12    A.   Correct.
13    Q.   And had you ever used any of the other
14  two ATM cards, besides the one that you've
15  produced today?
16    A.   Very rarely.
17    Q.   What is the purpose of having these two
18  other ATM cards?
19    A.   I have them joint with my kids.
20    Q.   And that's the next question.  Who else
21  is on these three bank accounts at TCF Bank,
22  besides yourself?
23    MR. RAPHAEL:  Objection.  Form.  You can
24  answer.  Always answer, unless I say don't
```

24

```
 1  answer.  And if you can answer, always answer.
 2  BY MR. BELONGIA:
 3    Q.   The reason I asked is that you just
 4  testified that your children were on the
 5  accounts.  And so now I'm asking --
 6    A.   They're on the other two accounts.  On
 7  this one I'm the only one.
 8    Q.   So let me ask this question.  You have
 9  three total accounts at TCF Bank, correct?
10    A.   Correct.
11    Q.   You're on all three accounts, correct?
12    A.   Correct.
13    Q.   On any one of these three accounts, is
14  there somebody else that's a signatory on those
15  accounts?
16    A.   Like I said, my kids.  Each one of my
17  kids has one account with me.
18    Q.   Again, that's why we ask these
19  questions.  And they may seem redundant or
20  repetitive, but we have to get to the minutia of
21  the details.  That's what lawyers do.
22         So is it fair to say one of the
23  accounts, the account that you accessed on
24  August 2nd, 2007, you're the sole signatory on
```

25

1   that account?
2   A.  That's correct.
3   Q.  You have another account where you have
4   one child as also a signatory, is that right?
5   A.  That's correct.
6   Q.  And that has its own ATM card, is that
7   right?
8   A.  That's correct.
9   Q.  And you have a third account with the
10  other child as the other signatory, correct?
11  A.  That's correct.
12  Q.  And that has, also, another ATM card;
13  correct?
14  A.  That's correct.
15  Q.  But the only thing we care about today
16  that we're talking about is the account that you
17  have with the ATM card that you produced because
18  you're the only signatory on that account,
19  right?
20  A.  That's correct.
21  MR. RAPHAEL:  If there's anything you want me
22  to stipulate to, let me know.
23  MR. BELONGIA:  Okay.
24  MR. RAPHAEL:  Because we'll do it the same

26

1   way we did it at the other deps.  We'll try to
2   stipulate.
3       Stipulate means agree to it.
4   THE WITNESS:  Okay.
5   BY MR. BELONGIA:
6   Q.  And so I'm correct you testified a
7   little bit earlier that you don't recall the
8   specific purpose for why you were accessing or
9   using the ATM at Diamond Bank on August 2nd,
10  correct?
11  A.  Correct.  I can't remember.
12  Q.  And is it fair to say you don't
13  remember how much money -- strike that.
14      Going to the actual transaction at the
15  ATM, do you remember whether you withdrew money
16  or made a deposit?
17  A.  At Diamond Bank?
18  Q.  Correct.
19  A.  It would be to withdraw money.
20  Q.  And is it fair to say you did not make
21  a deposit at that time, correct?
22  A.  Correct.
23  Q.  And am I correct that you do not recall
24  how much money that you took out from the ATM,

27

1   from the Diamond Bank ATM, on August 2nd?
2   A.  Correct, I don't remember.
3   MR. RAPHAEL:  Objection.  Asked and answered
4   twice.
5   MR. BELONGIA:  And we'll mark this as
6   Exhibit B.
7       (WHEREUPON, Flores Deposition
8           Exhibit B was marked for
9           identification.)
10  BY MR. BELONGIA:
11  Q.  Looking at Exhibit B, do you recognize
12  what is represented to be Exhibit B?
13  MR. RAPHAEL:  Can we stipulate that it's the
14  same?  It's Flores 1.
15  MR. BELONGIA:  Yes.
16  THE WITNESS:  I'm sorry?
17  MR. RAPHAEL:  Do you recognize that?
18  THE WITNESS:  Yes.
19  BY MR. BELONGIA:
20  Q.  What is it?
21  A.  It's the receipt that I got after I
22  withdrew the money.
23  Q.  Does this refresh your recollection as
24  to the amount of money you withdrew from the

28

1   Diamond Bank ATM?
2   A.  Yeah, it stated $50.
3   Q.  Now that you can recall that it was
4   $50, do you remember what you used that $50 for?
5   A.  No.
6   MR. RAPHAEL:  Say it louder so she can --
7   you're going to drive her crazy.  You're so
8   soft.
9   THE WITNESS:  I'm sorry.
10  BY MR. BELONGIA:
11  Q.  So it would be fair to say that after
12  you withdrew the money you completed your
13  transactions at the ATM at Diamond Bank?
14  A.  Yes.
15  Q.  You didn't deposit any of the money
16  back into your account, correct?
17  A.  No.
18  MR. RAPHAEL:  Do you want me to stipulate
19  there was no deposit made?
20  MR. BELONGIA:  Yes.
21  MR. RAPHAEL:  We're stipulating no deposit
22  was made by my client into the Diamond Bank
23  account.
24      We withdrew Count 2 of the Complaint, I

29

1  think; right?
2      MR. BELONGIA: Yeah.
3      MR. RAPHAEL: Was it Count 2 or Count 1?
4      MR. BELONGIA: Count 2.
5      MR. RAPHAEL: So if you want to reopen it for
6  being subject to, you know, admissible to --
7      MR. BELONGIA: No.
8      MR. RAPHAEL: -- discovery, you can keep
9  asking the questions and then I'll start asking
10 your client those questions. But I've steered
11 away from them.
12 BY MR. BELONGIA:
13     Q.  When you first -- strike that.
14         Not having ever used this ATM before at
15 Diamond Bank, what made you decide to use the
16 ATM at Diamond Bank versus some other location?
17     MR. RAPHAEL: Objection. Form and
18 foundation. You can answer.
19     THE WITNESS: Well, it was the bank I
20 remembered seeing when I go to the chiropractor,
21 so I stopped there when I needed the cash.
22 BY MR. BELONGIA:
23     Q.  How do you get from -- strike that.
24         Did you on August 2nd, 2007, go

30

1  directly from your employer to Dr. Crevy's
2  office?
3      A.  Yes.
4      Q.  What route did you take from
5  Dr. Crevy's -- from work to Dr. Crevy's office?
6      A.  I have a couple of routes, so I don't
7  remember that day which route I took.
8      Q.  Well, describe for me the routes and
9  the alternative routes that you take.
10     A.  I take the Clark bus down to -- I think
11 it's Armitage. And then I walk the half block
12 or block there.
13     Q.  Whereabouts on Wells Street is
14 Dr. Crevy's office?
15     A.  It's right on Wells between North
16 Avenue and that other street. Is it Armitage?
17     MR. RAPHAEL: You're looking at the wrong guy
18 because I actually told him I've never been to
19 Diamond Bank.
20         You've been there, so you know what
21 she's talking about. I don't.
22     THE WITNESS: The next big street after North
23 Avenue. I think it's Armitage.
24     MR. RAPHAEL: And by the way, you can't ask

31

1  him or me questions. So even though you're
2  saying it in a questioning type of fashion, it's
3  coming out as if you are saying this as an
4  emphatic statement. So if you don't know
5  exactly, tell him. Otherwise --
6  BY MR. BELONGIA:
7      Q.  What other routes do you take, besides
8  the route you just described?
9      A.  I take the Brown Line to Sedgwick, and
10 then I walk down.
11     Q.  Where do you pick up the Brown Line?
12     A.  On State and Lake.
13     Q.  Besides the Brown Line and the Clark
14 bus, is there any other way you get from your
15 work to Dr. Crevy's office?
16     A.  No.
17     Q.  Do you know if there are any other
18 ATM's within a one-block radius of Dr. Crevy's
19 office, besides Diamond Bank?
20     MR. RAPHAEL: Objection. Form of the
21 question.
22     THE WITNESS: No, not that I can remember
23 seeing any.
24

32

1  BY MR. BELONGIA:
2      Q.  On August 2nd, 2007, when you used the
3  ATM machine at Diamond Bank, did you look at the
4  machine to see whether or not there was a fee
5  notice placed on the machine?
6      A.  Yes.
7      Q.  Why did you look on the machine --
8      A.  I always do.
9      Q.  -- to see whether or not there was a
10 fee notice?
11     A.  I always do.
12     Q.  Why do you always look?
13     A.  To see if I'm going to get charged a
14 fee.
15     Q.  Prior to August 2nd, 2007, had you ever
16 been charged a fee for using a bank that was not
17 a TCF Bank?
18     A.  I don't remember if it was before or
19 after. I don't remember.
20     Q.  When did you open up your account?
21 When I say account, we're just talking about
22 this specific one account you identified that
23 you're the sole signatory at TCF Bank.
24     A.  Several years ago. I don't remember

33

1  how long.
2     Q.  When you opened up that account at TCF
3  Bank, do you recall getting any type of
4  disclosures from the bank concerning your
5  account?
6     A.  I don't remember.
7     Q.  Do you recall getting a disclosure from
8  TCF Bank that anytime you performed an ATM cash
9  withdrawal from a non-TCF Bank that you may be
10 charged a fee by that other bank?
11    MR. RAPHAEL: Objection. Form and
12 foundation.
13    THE WITNESS: I don't remember getting -- if
14 they did, I don't remember.
15 BY MR. BELONGIA:
16    Q.  The ATM at Diamond Bank, where was that
17 located? Was it in the inside or the outside of
18 the building?
19    A.  It's on the outside of the building.
20    Q.  And you testified that the bank is at
21 Clark and North Avenue, is that right?
22    A.  No. I'm sorry. I'm wrong on that
23 one -- yeah, it is Clark and North Avenue.
24    Q.  On what side of the building was the

34

1  ATM, Clark or North Avenue?
2     A.  It's on --
3     MR. RAPHAEL: You can't use your hands to
4  gesture.
5     THE WITNESS: I'm thinking. I'm sorry. It's
6  on Clark.
7  BY MR. BELONGIA:
8     Q.  And was it closer to the North Avenue
9  side of the building, or was it closer to the
10 other side of the building farthest away from
11 North Avenue?
12    A.  It's closer to North Avenue.
13    Q.  As you're looking at the building and
14 standing on Clark, is the ATM on the right --
15 strike that.
16    Do you recall where the entrance to the
17 bank is located?
18    A.  No.
19    Q.  Is it on the North Avenue side or the
20 Clark side?
21    A.  I don't remember.
22    MR. RAPHAEL: Objection. Form. Go ahead.
23 BY MR. BELONGIA:
24    Q.  Do you remember when you want to use

35

1  the ATM whether or not you had to wait for
2  anyone in front of you to finish a transaction
3  at the machine?
4     A.  There was no one there.
5     Q.  While you were performing your
6  transaction at the machine, was anyone waiting
7  in line behind you for you to finish your
8  transaction?
9     A.  No.
10    Q.  You testified that you always look at
11 the machine to see if there's a fee notice
12 posted on the machine before you do a
13 transaction, correct?
14    A.  Correct.
15    Q.  If you see a fee notice on a non-TCF
16 Bank, do you -- strike that.
17    On and prior to August 2nd, 2007, when
18 you would look at an ATM machine that was a
19 non-TCF Bank machine and you did not see a fee
20 notice, would you continue with the transaction?
21    MR. RAPHAEL: Objection. Form. You can
22 answer.
23    THE WITNESS: If I did not see a fee notice?
24 Yes.

36

1  BY MR. BELONGIA:
2     Q.  If you saw a fee notice on a non-TCF
3  Bank, would you continue to consummate the
4  transaction at the machine?
5     MR. RAPHAEL: Same objection, form.
6     THE WITNESS: If I see a fee notice, I try
7  and go to another bank that doesn't have one.
8  If it's -- thinking it's free.
9  BY MR. BELONGIA:
10    Q.  On August 2nd, 2007, when you used the
11 ATM at Diamond Bank, was it your understanding,
12 based on your testimony of a moment ago, that
13 the transaction would be free?
14    THE WITNESS: Yes.
15    MR. RAPHAEL: Objection. Form. But go
16 ahead.
17 BY MR. BELONGIA:
18    Q.  When you were consummating your
19 transaction at the ATM machine at Diamond Bank,
20 do you recall seeing an on-screen notice on that
21 ATM alerting you to the fact that you were going
22 to be charged a fee because you were a
23 non-Diamond Bank customer?
24    MR. RAPHAEL: Objection to form. Go ahead.

Page 37

```
 1    THE WITNESS: I saw a fee, yes, after I
 2  started the transaction.
 3  BY MR. BELONGIA:
 4    Q.  And did you continue with the
 5  transaction after seeing the notice that you
 6  were going to be charged a fee?
 7    A.  Yes.
 8    Q.  Let me ask you, the next question is,
 9  why did you continue to consummate the
10  transaction after you were alerted that you were
11  going to be charged a fee?
12    MR. RAPHAEL: Objection to form. Go ahead.
13    THE WITNESS: I was already in the
14  transaction, so I just finished it off and --
15  BY MR. BELONGIA:
16    Q.  Would you agree with me that if you
17  would have chosen not to be charged a fee
18  pursuant to the on-screen notice that the
19  transaction would have stopped and you would not
20  have been charged a fee?
21    MR. RAPHAEL: Objection. Foundation. Go
22  ahead.
23    THE WITNESS: I'm sorry, repeat that again.
24
```

Page 38

```
 1  BY MR. BELONGIA:
 2    Q.  Do you agree with me that upon seeing
 3  this on-screen notice that you were about to be
 4  charged a fee that if you chose no, not to
 5  continue with the transaction, that you, in
 6  fact, would have not been charged for any
 7  transaction?
 8    MR. RAPHAEL: Same objection.
 9    THE WITNESS: Okay. Yes.
10  BY MR. BELONGIA:
11    Q.  But you chose to continue with the
12  transaction after seeing the on-screen notice of
13  the fee, correct?
14    A.  Yes.
15    MR. RAPHAEL: Off the record.
16       (WHEREUPON, a discussion was had
17        off the record.)
18  BY MR. BELONGIA:
19    Q.  After you completed the transaction,
20  you were issued a receipt; is that correct?
21    A.  Yes.
22    Q.  And after getting the receipt from the
23  ATM, would you agree with me that the ATM
24  identified a charge on that receipt?
```

Page 39

```
 1    A.  Yes.
 2    Q.  Is it fair to say Exhibit B, which is
 3  in front of you, Flores Bates Stamp 1,
 4  identifies that you were charged a $2 fee; is
 5  that right?
 6    A.  Yes.
 7    Q.  After receiving that receipt, did you
 8  ever contact anyone at Diamond Bank to object to
 9  the fee being charged for the transaction?
10    MR. RAPHAEL: Objection. Form.
11    THE WITNESS: No.
12  BY MR. BELONGIA:
13    Q.  Would it be fair to say you did not
14  contact anyone at Diamond Bank to object to the
15  fee because you had chosen to proceed with the
16  transaction after reading the on-screen notice
17  that you were going to be charged a fee?
18    A.  Can you repeat that?
19    MR. BELONGIA: Can you read that back?
20       (WHEREUPON, the record was read
21        by the reporter as requested.)
22    THE WITNESS: Yes.
23  BY MR. BELONGIA:
24    Q.  Do you recall on August 2nd, 2007,
```

Page 40

```
 1  observing any signage on the ATM at Diamond
 2  Bank?
 3    MR. RAPHAEL: Objection. Form.
 4    THE WITNESS: I don't remember seeing
 5  anything else.
 6  BY MR. BELONGIA:
 7    Q.  And when you say anything else, what
 8  did you see?
 9    MR. RAPHAEL: Same objection, form.
10    THE WITNESS: I didn't see any notice on
11  there. And I don't remember seeing anything on
12  the ATM.
13  BY MR. BELONGIA:
14    Q.  Is it your testimony that if you had
15  seen a fee notice on the ATM machine you
16  wouldn't -- you would have not used that ATM and
17  chosen an alternative ATM?
18    MR. RAPHAEL: Objection. Form of the
19  question, foundation, calls for speculation.
20  You can answer.
21    THE WITNESS: I probably would have. I don't
22  know.
23  BY MR. BELONGIA:
24    Q.  Well, you gave two answers there so
```

41

1  let's explore that a little further.
2     A.   Sorry.
3     Q.   You said, I probably would have but
4  maybe -- I didn't quite understand the response.
5         This is very simple. If you had seen a
6  fee notice on any ATM on August 2nd, 2007, would
7  you have chosen to use a different ATM instead
8  of the ATM at Diamond Bank? Go.
9     MR. RAPHAEL: Objection. Foundation, form of
10 the question, calls for speculation, incomplete
11 hypothetical. Subject to that, you can answer.
12    THE WITNESS: I'm not sure.
13 BY MR. BELONGIA:
14    Q.   Why are you not sure?
15    MR. RAPHAEL: Same objection.
16    THE WITNESS: Like I said before, I would try
17 and find a bank that didn't have the sticker,
18 and I'm not sure if I would have.
19 BY MR. BELONGIA:
20    Q.   Have you ever used an ATM at Diamond
21 Bank since August 2nd, 2007?
22    A.   No.
23    Q.   Have you yourself ever taken
24 photographs of the ATM at Diamond Bank?

42

1     A.   No.
2     Q.   Do you have any friends or family who
3  are plaintiffs in any pending class action
4  cases?
5     MR. RAPHAEL: Objection. Foundation. Let me
6  think about this for a second because I don't
7  know if it's work product or attorney-client
8  privilege.
9         Can I ask you a question?
10    MR. BELONGIA: Yeah.
11    MR. RAPHAEL: I don't know the answer to the
12 question you just asked her. But I'm concerned
13 that if any of them are and they're not on file
14 and she doesn't know about it and it's not a
15 public record. And it would be attorney-client
16 or work product information --
17    MR. BELONGIA: It's regarding pending class
18 actions. So if it's not filed, then
19 obviously --
20    MR. RAPHAEL: So if you know if anything is
21 on file.
22        For any friends, family or relatives;
23 did you say?
24    MR. BELONGIA: Correct.

43

1     THE WITNESS: I don't know.
2  BY MR. BELONGIA:
3     Q.   Prior to the Smith case and the current
4  case against Diamond Bank, have you ever engaged
5  the office of Mr. Raphael before for any legal
6  purpose?
7     A.   No.
8     Q.   After you left the ATM on August 2nd,
9  2007, where did you go?
10    A.   I don't remember.
11    Q.   Prior to August 2nd, 2007, had you ever
12 walked up to an ATM machine that did not have a
13 fee notice, perform a transaction and not get
14 charged an ATM fee?
15    MR. RAPHAEL: Objection. Form.
16    THE WITNESS: I don't remember. I don't
17 remember.
18 BY MR. BELONGIA:
19    Q.   As you sit here today, do you know of
20 any non-TCF Bank ATM machines that you can use
21 to perform a withdrawal of cash that will not
22 charge you a fee?
23    MR. RAPHAEL: Objection. Form. You can
24 answer.

44

1     THE WITNESS: I think it's WaMu.
2  BY MR. BELONGIA:
3     Q.   So it's your understanding that even
4  though you're not a WaMu customer you can use
5  their machines to withdraw money and not pay a
6  fee?
7     A.   Right.
8     Q.   Do you have any knowledge as to who
9  removed the ATM fee notice from the Diamond Bank
10 ATM?
11    MR. RAPHAEL: Objection. Form of the
12 question, foundation, assumes facts not in
13 evidence.
14    THE WITNESS: No.
15    MR. BELONGIA: It was worth asking. You
16 never know.
17    MR. RAPHAEL: We don't even know that it was
18 removed.
19 BY MR. BELONGIA:
20    Q.   Prior to August 2nd, 2007, were you,
21 Carmen Flores, aware of the legal requirement
22 that a bank post an ATM fee notice on an ATM
23 machine?
24    A.   Yes.

45

Q. And how did you know that?
A. My daughter told me.
Q. When did your daughter tell you?
A. I don't remember that.
Q. How soon before August 2nd, 2007, did she tell you that?
A. I don't remember.
Q. Do you know how she knew that?
A. Through her friend.
MR. RAPHAEL: Objection. Foundation, form.
BY MR. BELONGIA:
Q. And do you know who her friend is? A name?
MR. RAPHAEL: Tell him, if you know. If you don't know, then you don't know. This isn't a memory test. Don't feel bad if you don't know questions or answers that he's asking. If you don't remember, say I don't remember and that's okay.
THE WITNESS: I don't know who told her. She said it was a friend.
BY MR. BELONGIA:
Q. Did you ever talk to that friend, or is it just solely a friend?

46

A. She's just a friend. I don't know who told her.
Q. Do you know if that friend was a plaintiff in any pending litigation regarding ATM fee notices?
A. When she told me it was a friend, she didn't tell me who the friend was at the time. So I don't know who the friend was.
Q. Can you tell me about the conversation you had with your daughter about the legal requirement that fee notices be posted on an ATM machine? In other words, how did this conversation first start?
A. I don't remember how it started but she just -- I remember her telling me about it. But I don't remember how it started.
Q. Was this a conversation she just out of the blue said, hey, by the way, did you know the fabulous fact that ATM's need to have fee notices posted, or was this in response to something you said to her?
A. I don't remember. I don't remember how it started. We sometimes talk about things, and it must have come up.

47

Q. What did you do after this conversation with your daughter where you learned that, according to your daughter, an ATM has to have a fee set and posted on its face?
A. Nothing.
Q. Obviously, at some point you did do something, because we're sitting here today with counsel here, who has filed a lawsuit on your behalf and behalf of others regarding the alleged failure of the ATM at Diamond Bank to have a fee sign posted.
    So would it be fair to say at some point you engaged counsel, is that right?
A. Yes.
Q. And as a ground rule, we're going to state right now, and your lawyer is going to agree with me, that any of my questions from here forth when I ask you something I'm not asking you anything that you talked about with counsel, anything that you shared with counsel, any documents you gave him.
    Those are all attorney-client, attorney-work product, and those are all privileged; okay? So I'm not asking about any

48

of those things.
MR. RAPHAEL: I'm in agreement with him.
THE WITNESS: Okay.
MR. RAPHAEL: He said I was going to agree with him, and he was right.
BY MR. BELONGIA:
Q. So I'm not inquiring into any of those things, and I don't want to know any of your conversations.
MR. RAPHAEL: So when he asks you a question, if you can answer it without referencing anything I may have told you or any of the people working at my office may have told you, cool. If not, you can't answer it.
THE WITNESS: Okay.
BY MR. BELONGIA:
Q. The alleged transaction at the alleged deficient ATM occurred on August 2nd, 2007, and the lawsuit was filed on November 21st, 2007.
    Do you recall approximately when you first contacted Mr. Raphael to discuss a potential lawsuit?
A. No.
Q. Would it be fair to say that you did

49

1  not participate in the drafting of the lawsuit?
2       MR. RAPHAEL: Objection. Form.
3       THE WITNESS: What do you mean in the
4  drafting of the lawsuit?
5  BY MR. BELONGIA:
6     Q. You didn't sit at a computer and work
7  on a draft lawsuit with Mr. Raphael? You left
8  that to the attorneys to prepare the pleadings,
9  is that right?
10    A. The attorney does everything for me.
11    Q. And I believe you testified -- and if I
12 already asked this and you answered, I
13 apologize. I'm getting old and senile.
14       But you did not ever take any
15 photographs of the ATM at issue, correct?
16    A. That's correct.
17    Q. Prior to coming to this deposition
18 today, did you review any documents to prepare
19 for this deposition?
20      MR. RAPHAEL: I'm going to object to work
21 product, attorney-client privilege but I'll let
22 her -- without waiving that objection and
23 subject to that objection, answer the question.
24      THE WITNESS: I just looked --

50

1       MR. RAPHAEL: He asked a yes or no question.
2       THE WITNESS: Oh, I'm sorry. Yes.
3  BY MR. BELONGIA:
4     Q. What documents did you review?
5       MR. RAPHAEL: Now I'm going to object based
6  on the work product and attorney-client
7  privilege and instruct my client not to answer
8  that question.
9       If you ask a different question, it'll
10 be okay.
11 BY MR. BELONGIA:
12    Q. Did you review photographs?
13      MR. RAPHAEL: I'm not objecting.
14      THE WITNESS: Yes.
15      MR. BELONGIA: And can we stipulate those are
16 the photographs that you have not yet produced
17 in this case?
18      MR. RAPHAEL: No, I wouldn't stipulate to
19 that. That would be problematic.
20 BY MR. BELONGIA:
21    Q. What photographs did you review?
22      MR. RAPHAEL: If you can tell him, you can
23 answer.
24      THE WITNESS: It was of the ATM at the

51

1  Diamond Bank.
2  BY MR. BELONGIA:
3     Q. Were these photographs taken after the
4  time that you used the machine?
5       MR. RAPHAEL: Objection. Foundation.
6       THE WITNESS: I wouldn't know.
7       MR. RAPHAEL: You want me to make this
8  easier?
9       MR. BELONGIA: Yeah.
10      MR. RAPHAEL: I showed her the website photo,
11 and the two photos you guys took. If you would
12 ask her about those photos, she would have some
13 familiarity with them.
14      MR. BELONGIA: Okay.
15      MR. RAPHAEL: And as far as I know, I didn't
16 show her any other photos, other than those.
17 BY MR. BELONGIA:
18    Q. After you completed your transaction at
19 the ATM at Diamond Bank on August 2nd, 2007, did
20 you ever notify anyone at the bank to alert them
21 to the fact that the ATM did not have a fee sign
22 posted on its face?
23      MR. RAPHAEL: Objection. Asked and answered.
24 You can answer.

52

1       THE WITNESS: No.
2  BY MR. BELONGIA:
3     Q. And earlier you testified that you
4  never notified them that you were charged a fee,
5  but this was about whether or not you notified
6  them about the fee sign being posted.
7       And why did you not choose to notify
8  them of the fee notice not being on the ATM
9  machine?
10      MR. RAPHAEL: Objection. Form of the
11 question. You can answer.
12      THE WITNESS: I didn't think about it at the
13 time.
14 BY MR. BELONGIA:
15    Q. I guess I'll ask a follow-up question
16 here. Why didn't you think about it at the
17 time?
18      MR. RAPHAEL: Objection. Form, foundation,
19 calls for speculation.
20      THE WITNESS: I don't know.
21 BY MR. BELONGIA:
22    Q. Prior to today, besides this incident
23 at Diamond Bank, besides the incident at Credit
24 Union 1, has there been any other instance where

53

```
 1   you used an ATM machine that did not have a fee
 2   sign posted and you were charged for the
 3   transaction?
 4        A.   I can't remember right now.
 5        MR. BELONGIA:  Just give me a minute here.
 6        MR. RAPHAEL:  You're almost done?
 7        MR. BELONGIA:  Yeah.
 8   BY MR. BELONGIA:
 9        Q.   Do you recall while performing the
10   transaction at the ATM at Diamond Bank what
11   specifically the fee notice said on the screen?
12        A.   On the screen?
13        Q.   Correct.
14        A.   It said $2.
15        Q.   And it said you would be charged $2 if
16   you continued with the transaction, is that
17   right?
18        A.   Yes.
19        Q.   And we agree that you continued with
20   the transaction?
21        A.   Yes.
22        Q.   After you leave the doctor's office, do
23   you typically go home from there?
24        A.   Most of the time.
```

54

```
 1        Q.   How do you get home from the doctor's
 2   office?  Do you take the El or take a cab?
 3        A.   I take the El.
 4        Q.   And that's the Brown Line that you use?
 5        A.   Yes.
 6        Q.   Do you recall after using the ATM at
 7   Diamond Bank whether you proceeded to take the
 8   El home, or did you take a cab?
 9        A.   I know I don't take cabs, so I don't
10   remember if I took the El home.
11        Q.   If you don't use the El, what other way
12   do you use to get home?
13        A.   I take a walk down Clark by the lake
14   going north.
15        Q.   And how long does it take you to walk
16   home?
17        A.   Well, I don't walk all the way home.  I
18   just walk up one of the big streets, maybe
19   Diversey, and then take the bus.
20        MR. BELONGIA:  Nothing further.  I'll order.
21   Signature?
22        MR. RAPHAEL:  Reserved.  I might have a
23   question.  Off the record for a second.
24
```

55

```
 1             (WHEREUPON, a discussion was had
 2              off the record.)
 3        MR. BELONGIA:  We're done.
 4        (FURTHER DEPONENT SAITH NAUGHT.)
```

56

```
 1          IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                    EASTERN DIVISION
 4   CARMEN FLORES,           )
 5   individually and on      )
 6   behalf of all others     )  No. 07 C 6403
 7   similarly situated,      )  Judge Hibbler
 8              Plaintiff,    )  Magistrate
 9        vs.                 )  Judge Valdez
10   DIAMOND BANK,            )
11              Defendant.    )
12        I, CARMEN FLORES, being first duly sworn,
13   on oath say that I am the deponent in the
14   aforesaid deposition taken on June 24, 2008;
15   that I have read the foregoing transcript of my
16   deposition, and affix my signature to same.
17                    _____
                              CARMEN FLORES
18
19   Subscribed and sworn to
     before me this        day
20   of               , 2008
21
22   Notary Public
23
24
```

57

```
 1   STATE OF ILLINOIS    )
 2                        ) SS:
 3   COUNTY OF C O O K    )
 4          I, KIMBERLEY M. TITSWORTH, a notary
 5   public within and for the County of Cook County
 6   and State of Illinois, do hereby certify that
 7   heretofore, to-wit, on June 24, 2008, personally
 8   appeared before me, at 53 West Jackson
 9   Boulevard, Suite 315, Chicago, Illinois,
10   CARMEN FLORES, in a cause now pending and
11   undetermined in the United States District
12   Court, Northern District, wherein CARMEN FLORES,
13   individually and on behalf of all others
14   similarly situated, is the Plaintiff, and
15   DIAMOND BANK is the Defendant.
16          I further certify that the said
17   CARMEN FLORES was first duly sworn to testify
18   the truth, the whole truth and nothing but the
19   truth in the cause aforesaid; that the testimony
20   then given by said witness was reported
21   stenographically by me in the presence of the
22   said witness, and afterwards reduced to
23   typewriting by Computer-Aided Transcription, and
24   the foregoing is a true and correct transcript
```

58

```
 1   of the testimony so given by said witness as
 2   aforesaid.
 3          I further certify that the signature to
 4   the foregoing deposition was reserved by counsel
 5   for the respective parties and that there were
 6   present at the deposition the attorneys
 7   hereinbefore mentioned.
 8          I further certify that I am not counsel
 9   for nor in any way related to the parties to
10   this suit, nor am I in any way interested in the
11   outcome thereof.
12          IN TESTIMONY WHEREOF:  I have hereunto
13   set my hand and affixed my notarial seal this
14         day of              , 2008.



                    _____
20                  NOTARY PUBLIC, COOK COUNTY, ILLINOIS
```

59

```
 1              McCorkle Court Reporters, Inc.
                200 N. LaSalle Street, Suite 300
 2                Chicago, Illinois 60601-1014
 3
 4   DATE:  June 27, 2008
      Consumer Advocacy Center, P.C.
 5   ATTN:  Mr. Lance A. Raphael
      180 West Washington Street, Suite 700
 6   Chicago, Illinois 60602
 7   IN RE:  Flores vs. Diamond Bank
      COURT NUMBER:  07 C 6403
 8   DATE TAKEN:  June 24, 2008
      DEPONENT:  Carmen Flores
 9
     Dear Mr. Raphael:
10
     Enclosed is the deposition transcript for the
11   aforementioned deponent in the above-entitled
     cause.  Also enclosed are additional signature
12   pages, if applicable, and errata sheets.
13   Per your agreement to secure signature, please
     submit the transcript to the deponent for review
14   and signature.  All changes or corrections must
     be made on the errata sheets, not on the
15   transcript itself.  All errata sheets should be
     signed and all signature pages need to be signed
16   and notarized.
17   After the deponent has completed the above,
     please return all signature pages and errata
18   sheets to me at the above address, and I will
     handle distribution to the respective parties.
19
     If you have any questions, please call me at the
20   phone number below.
21   Sincerely,
22   Margaret Setina          Court Reporter:
     Signature Department     Kimberley H. Titsworth
23
        cc:  Mr. Belongia
24
```