# **APPENDIX 15**

**Westlaw Delivery Summary Report for SINN,NATE R 6026349**

| | |
|---|---|
| Date/Time of Request: | Wednesday, July 30, 2008 16:19 Central |
| Client Identifier: | 0126/01 |
| Database: | FRDFIND |
| Citation Text: | 148 F.R.D. 25 |
| Lines: | 1884 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

Westlaw.

148 F.R.D. 25                                                                                    Page 1
148 F.R.D. 25, 26 Fed.R.Serv.3d 46
**148 F.R.D. 25**

☞
Nault's Auto. Sales, Inc. v. American Honda Motor Co., Inc., Acura Auto. Div.
D.N.H.,1993.

United States District Court,D. New Hampshire.
NAULT'S AUTOMOBILE SALES, INC. d/b/a Nault's Acura, Richard M. Nault
v.
AMERICAN HONDA MOTOR COMPANY, INC., ACURA AUTOMOBILE DIVISION.
**Civ. No. 89-384**

March 31, 1993.

Automobile dealer brought action against automobile distributor following termination of franchise. On pretrial motions, the District Court, McAuliffe , J., held that: (1) allegations of perjury, subornation of perjury, and discovery abuse were impertinent or scandalous and would be stricken; (2) Rule 11 sanctions were warranted; (3) actions of opposing counsel in connection with motion to hold witness in contempt served to vexatiously multiply proceedings; (4) protective order was unwarranted; and (5) dealer could maintain actions under both Consumer Protection Act and Automobile Dealers Act.

Ordered accordingly.

West Headnotes

[1] Federal Civil Procedure 170A ☞1127

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(N) Striking Pleading or Matter Therein

170Ak1127 k. Impertinent or Scandalous Matter. Most Cited Cases

Court possesses considerable discretion in ruling on motion to strike impertinent or scandalous matter. Fed.Rules Civ.Proc.Rule 12(f), 28 U.S.C.A .

**[2] Federal Civil Procedure 170A ⇐⇒1127**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(N) Striking Pleading or Matter Therein
         170Ak1127 k. Impertinent or Scandalous Matter. Most Cited Cases

Allegations that opposing attorney deliberately and contemptuously withheld requested information, which was based upon suspicion supported only by rather strained theory of informational flow, would be stricken from pleadings impertinent or scandalous. Fed.Rules Civ.Proc.Rule 12(f), 28 U.S.C.A .

**[3] Federal Civil Procedure 170A ⇐⇒1127**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(N) Striking Pleading or Matter Therein
         170Ak1127 k. Impertinent or Scandalous Matter. Most Cited Cases

Allegation that opposing counsel suborned perjury, which was not supported by evidence that counsel presented witnes with affidavit which counsel knew contained false information or by pressuring him to execute it, would be stricl scandalous. Fed.Rules Civ.Proc.Rule 12(f), 28 U.S.C.A .

**[4] Federal Civil Procedure 170A ⇐⇒1129.1**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(N) Striking Pleading or Matter Therein
         170Ak1129 Insufficient Allegations in General
           170Ak1129.1 k. In General. Most Cited Cases

Unsupported allegations of perjury by opposing counsel would be stricken from pleadings. Fed.Rules Civ.Proc.Rule 12(f), 28 U.S.C.A .

**[5] Attorney and Client 45 ⇐⇒32(8)**

45 Attorney and Client
   45I The Office of Attorney
      45I(B) Privileges, Disabilities, and Liabilities
         45k32 Regulation of Professional Conduct, in General
           45k32(8) k. Dignity, Decorum, and Courtesy; Criticism of Courts. Most Cited Cases

When presented with evidence which is consistent with two possible and equally plausible, but inconsistent, interpretations of how opposing counsel conducted themselves, professional courtesy and dignity militate in favor adopting that which is consistent with ethical and professional conduct, at least until the contrary is demonstrated beyo mere suspicion.

**[6] Attorney and Client 45 ⇐⇒32(8)**

45 Attorney and Client
   45I The Office of Attorney
      45I(B) Privileges, Disabilities, and Liabilities

45k32 Regulation of Professional Conduct, in General
   45k32(8) k. Dignity, Decorum, and Courtesy; Criticism of Courts. Most Cited Cases
When publishing allegations of misconduct by opposing counsel in pleadings filed with court, circumspection is expec
from attorney as matter of professionalism.

**[7] Federal Civil Procedure 170A ⟨⟩⟩2783(2.1)**

170A Federal Civil Procedure
   170AXX Sanctions
      170AXX(B) Grounds for Imposition
         170Ak2767 Unwarranted, Groundless or Frivolous Papers or Claims
            170Ak2783 Duty of Reasonable Inquiry
               170Ak2783(2) As to Facts
                  170Ak2783(2.1) k. In General. Most Cited Cases
Rule 11 imposes upon attorney affirmative duty to investigate facts alleged in any pleading, motion, or paper prior to subscribing to it. Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A .

**[8] Federal Civil Procedure 170A ⟨⟩⟩2769**

170A Federal Civil Procedure
   170AXX Sanctions
      170AXX(B) Grounds for Imposition
         170Ak2767 Unwarranted, Groundless or Frivolous Papers or Claims
            170Ak2769 k. Reasonableness or Bad Faith in General; Objective or Subjective Standard. Most Cited Cases
Counsel's subjective belief in veracity of accusation which they have leveled against opposing counsel is entirely irrelevant to Rule 11 inquiry; while attorneys are free to believe whatever they choose to believe, they are not free to indiscriminately professional reputation of opposing counsel out of frustration or in angry overreaction or on mere suspicion alone. Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A .

**[9] Federal Civil Procedure 170A ⟨⟩⟩2758**

170A Federal Civil Procedure
   170AXX Sanctions
      170AXX(A) In General
         170Ak2758 k. Mandatory Duty or Discretion. Most Cited Cases
Finding that party has violated Rule 11 requires imposition of sanctions, but sanctions are entirely discretionary and may include striking of offensive pleadings. Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A .

**[10] Federal Civil Procedure 170A ⟨⟩⟩2812**

170A Federal Civil Procedure
   170AXX Sanctions
      170AXX(D) Type and Amount
         170Ak2811 Monetary Sanctions
            170Ak2812 k. In General. Most Cited Cases

**Federal Civil Procedure 170A ⟨⟩⟩2820**

170A Federal Civil Procedure

170AXX Sanctions
170AXX(D) Type and Amount
170Ak2820 k. Non-Monetary Sanctions. <u>Most Cited Cases</u>

Attorneys found to have made allegations of perjury, suborning perjury, and discovery abuses against opposing couns would be required, as <u>Rule 11</u> sanctions, to write letters of apology to attorneys, to have all future pleadings reviewed by "Rule                                                                                                                                                                      11 committee" of not fewer than two litigation partners at the firm and certified by those partners, and to pay opposing counsel $1,000 as attorney fees. <u>Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A</u>.

**[11] Federal Civil Procedure 170A** ⟜1278

<u>170A</u> Federal Civil Procedure
<u>170AX</u> Depositions and Discovery
<u>170AX(A)</u> In General
<u>170Ak1278</u> k. Failure to Respond; Sanctions. <u>Most Cited Cases</u>

Court's comments and questions aimed at determining whether defendant and counsel had complied with discovery request or were continued in a pattern of foot dragging did not amount to a discovery order which could provide the basi for discovery sanction. <u>Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A</u>.

**[12] Federal Civil Procedure 170A** ⟜2766

<u>170A</u> Federal Civil Procedure
<u>170AXX</u> Sanctions
<u>170AXX(B)</u> Grounds for Imposition
<u>170Ak2766</u> k. Multiplication of Proceedings in General. <u>Most Cited Cases</u>

Attorneys' conduct in seeking to have witness held in contempt for failing to respond to subpoena in district where h resided even though presiding judge in the forum district had directed that any problems regarding the witnesses' deposition be brought to his attention resulted in unreasonable and vexatious multiplication of the proceedings, warranting order for payment of witness's attorney fees. <u>28 U.S.C.A § 1927</u> ; <u>Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A</u>.

**[13] Attorney and Client 45** ⟜10

<u>45</u> Attorney and Client
<u>45I</u> The Office of Attorney
<u>45I(A)</u> Admission to Practice
<u>45k10</u> k. Admission of Practitioners in Different Jurisdiction. <u>Most Cited Cases</u>

Counsel's pro hoc vice status can not be revoked solely on finding that attorneys are not conducting themselves in a manner consistent with traditions expected of the local bar.

**[14] Records 326** ⟜32

<u>326</u> Records
<u>326II</u> Public Access
<u>326II(A)</u> In General
<u>326k32</u> k. Court Records. <u>Most Cited Cases</u>

Decision to seal pleadings and documents filed with the court is not one properly left to the litigants themselves, nor should sealing orders be issued automatically or cavalierly or by mere operation of local rules governing motions routinely granted by agreement of the parties in the absence of objections. U.S.Dist.Ct.Rules D.N.H., Rule 11.

**[15] Records 326** ⟜32

326 Records
   326II Public Access
      326II(A) In General
         326k32 k. Court Records. <u>Most Cited Cases</u>
Where court has already issued protective order covering discovery materials and parties subsequently seek to seal materials when entered into the record, court should make additional inquiry before expanding scope of the protective order. <u>Fed.Rules Civ.Proc.Rule 26(c), 28 U.S.C.A</u> .

**[16] Records 326 ⟲32**

326 Records
   326II Public Access
      326II(A) In General
         326k32 k. Court Records. <u>Most Cited Cases</u>
There was no basis for sealing routine litigation motions and memoranda or caustic and emotional charges between counsel, or allegations of commercial bribery or other misconduct on the part of certain employees of one of the parties. <u>Fed.Rules Civ.Proc.Rule 26(c), 28 U.S.C.A</u> .

**[17] Federal Civil Procedure 170A ⟲2557**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2557 k. Partial Summary Judgment. <u>Most Cited Cases</u>
Where claim is barred as matter of law, partial summary judgment is appropriate to eliminate invalid claim from suit.

**[18] Federal Civil Procedure 170A ⟲2481**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2481 k. In General. <u>Most Cited Cases</u>
Statutory interpretation is question of law and is properly decided on motion for summary judgment.

**[19] Antitrust and Trade Regulation 29T ⟲ 282**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(E) Enforcement and Remedies
         29TIII(E)1 In General
            29Tk281 Exclusive and Concurrent Remedies or Laws
            29Tk282 k. In General. <u>Most Cited Cases</u>
   (Formerly 92Hk32 Consumer Protection)
Where conduct in which automobile distributor was alleged to have engaged would violate both New Hampshire Automobile Dealers Act and New Hampshire Consumers Protection Act, dealer could pursue action under Consu Protection Act. <u>N.H.RSA 357-C:1</u> et seq., <u>358-A:1</u> et seq.

**[20] Election of Remedies 143 ⟲2**

143 Election of Remedies
  143k2 k. Causes of Action and Remedies Subject to Election. Most Cited Cases
Mere existence of two statutes with overlapping civil remedies does not necessarily render one inapplicable to civil action
in which plaintiff seeks redress under both remedial provisions.

**[21] Antitrust and Trade Regulation 29T ⟸⟹ 290**

29T Antitrust and Trade Regulation
  29TIII Statutory Unfair Trade Practices and Consumer Protection
    29TIII(E) Enforcement and Remedies
      29TIII(E)1 In General
        29Tk287 Persons Entitled to Sue or Seek Remedy
          29Tk290 k. Private Entities or Individuals. Most Cited Cases
  (Formerly 92Hk32 Consumer Protection)
Both individual, as natural person, and automobile dealer, as corporation, could avail themselves of protections and
remedies afforded by New Hampshire Consumer Protection Act. N.H.RSA 358-A:1 et seq.

**[22] Statutes 361 ⟸⟹230**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k230 k. Amendatory and Amended Acts. Most Cited Cases
When        statute        is        clarified        by        subsequent        amendment,
amendment is indicative of legislative intent surrounding the original enactment.

**[23] Federal Civil Procedure 170A ⟸⟹675.1**

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(B) Complaint
      170AVII(B)1 In General
        170Ak675 Alternate, Hypothetical and Inconsistent Claims
          170Ak675.1 k. In General. Most Cited Cases
Although plaintiff could plead case in the alternative, it would eventually be required to elect theory that was inter
consistent and could not argue both that automobile franchise was terminated in good faith and with good cause and that it
was wrongfully terminated. Fed.Rules Civ.Proc.Rule 8(e)(2), 28 U.S.C.A .

**\*27** Richard B. McNamara, Manchester, NH, for plaintiffs.
J. Donald McCarthy , Los Angeles, CA, John B. Garvey , Concord, NH, Keith A. Graham , Orlando, FL, Edward A.
Jordan , Nashua, NH, for defendant.

## MEMORANDUM ORDER

McAULIFFE , District Judge.

I. *Introduction.*

This case has evolved into two distinct and nearly unrelated parts. One concerns the merits. The other, a continuing
between the parties' counsel, each side claiming to be "more sinned against than sinning." [FN1] The Court will first direct

its attention to the battle and its reciprocal charges of professional misconduct, then focus upon those issues related to merits. Plainly, there is sufficient evidence of sharp practice, unjustifiable overreaction, and lack of professional courtesy the chronology of which is detailed in several thousand pages of motions, memoranda, affidavits and exhibits, to warn ample criticism of both camps.

FN1. *King Lear*, Act 3, Scene 2.

## II. *Relevant Facts.*

Plaintiffs, Nault's Automobile Sales, Inc. and Richard M. Nault (collectively "Nault"), initiated this litigation aga defendant, Acura Automobile Division, American Honda Motor Company, Inc. ("Honda"), alleging bad faith by Honda in awarding, supplying, and terminating Nault's Acura franchise. Nault alleges that Honda terminated its franchise f "dualling" the Acura dealership with Nault's adjacent Lincoln-Mercury dealership. The word "dualling" is a term of a within the automobile industry, referring to the combining of two or more linemakes of automobile within the same s and/or service facility. Dualling lowers overhead costs, making it an attractive practice to dealers. However, manufacturers, like Honda, prefer to avoid it as an impediment to sales of their particular cars.

After experiencing substantial losses in its first months of operation, Nault requested permission from Honda to relocate the Acura dealership to, and dual with, Nault's nearby Lincoln-Mercury dealership. Honda refused to authorize th relocation and dualling. Nevertheless, allegedly forced by continued substantial losses, Nault went ahead and relocated the Acura dealership. Subsequently, Honda terminated Nault's franchise, asserting that Nault had violated a contractual *28 provision prohibiting it from relocating the Acura facility. Nault counters that the franchise was in fact terminated because Nault began dualling the Acura and Lincoln-Mercury dealerships, a distinction of possible importance in light of H apparent acceptance of other dualled Acura dealerships and other facts developed during discovery. Following i termination by Honda, Nault began this suit for damages.

In late 1989, Nault propounded its First Set of Interrogatories upon Honda. One of these interrogatories asked:

Have you ever permitted other franchises to operate multiple dealerships in one facility? If so:

(a) State the name and address of such dealerships;

(b) The date the dealerships were opened; and

(c) The reasons for allowing this operation of two dealerships in one facility.

Honda responded by disclosing the name of a single Acura dealer who was permitted to operate multiple dealerships in one facility. Nault alleges that, in reliance upon Honda's presumptively candid and complete response to this interrogatory, it did not vigorously pursue the question of whether, in actual practice, Honda substantially deviated from its stated rule of not allowing dualling; Nault reasonably assumed that of all the Acura franchises, only one was dualled.

Subsequently, however, Nault discovered that, despite Honda's earlier representation to the contrary, at least several Acura dealerships were being dualled with other automobile linemakes. Honda dismissed Nault's apparent shock at this discovery by asserting that Nault's use of the word "permitted" in its first set of interrogatories substantively affected nature of Honda's response. Honda said it "permitted" (as in "gave prior authorization to") only one Acura dealer t However, Honda admits it "tolerated" (as in, "did not authorize, but did not complain") many other franchise owners dualled without Honda's express permission. Honda defends its answer by pointing to a subtle distinction between denotation of the words employed in Nault's various discovery requests. Honda says that when Nault phrased the questi with precision, as it did in subsequent sets of interrogatories, Honda readily disclosed the desired information, and, in cases, answered in a truthfully precise fashion.

Thus, the first shot in the warfare between counsel was fired. The litigants, whether actively directing the actions c attorneys, or passively in tow, were also hurled into the trenches. Disputes over discovery continued, costs undoubtedly escalated geometrically, a relations between opposing counsel deteriorated proportionally.

Eventually, Nault filed a motion seeking the revocation of Lyon & Lyon's (Honda's California counsel) *pro hac vice* status. On April 29, 1991, the Court (Stahl, J.) held a hearing on that issue, at which charges of withholding rec discoverable materials again surfaced. Although the Court determined that it was not then appropriate to revoke Lyon Lyon's *pro hac vice* status, it cautioned that counsel had better modify their conduct in this matter.

Believing that Honda and its counsel failed or refused to heed the Court's warning, Nault filed its first Motion for Judgment on July 18, 1991, citing as Honda's most egregious violation its having withheld requested information about the dualled Acura dealerships. Later, again during the course of discovery, Nault requested that Honda turn over deposition transcripts from a prior unrelated suit in which Honda was involved. Honda responded that, although its counsel had conducted a thorough search of all pertinent files, they were simply unable to locate the requested transcript By letter dated April 19, 1991, Attorney Ritchie of Lyon & Lyon, on behalf of Honda, notified Nault that because the case in which the depositions were taken had settled, it understood that the requested depositions were never transcribed Attorney Ritchie suggested that Nault's counsel try to obtain transcripts from the stenographic reporter and, if successful, he requested that Lyon & Lyon also be provided with a copy. Nault subsequently discovered that not only had the depositions been transcribed, but they had been delivered by messenger to Honda's counsel, Lyon & Lyon.

**\*29**
Honda, through its counsel, explained that embarrassment by repeating that it had diligently searched for the transcripts and reasonably assumed that they were never transcribed. The Lyon & Lyon paralegal charged with conducting the search verified these facts in court testimony. Lyon & Lyon steadfastly denied that it had purposefully withheld any disco materials.

Nault's counsel assumed the worst of Honda and its counsel, citing what it considered to be a pattern of conduct by v Honda, "produces documents and responds to interrogatory answers only after a protracted process of quibbling semantics, and ... interpreting requests in such a manner so as to avoid responding." Nault also alleges other instances which discoverable evidence was purposefully withheld by Honda and its counsel. One example involves the text o so-called "Legend Introduction Speech." Nault claims that it requested production of, and identified the speech wi sufficient specificity to enable Honda and its counsel to know precisely what it was seeking. In a letter to Nault's coun dated November 1, 1991, Honda's counsel represented, however, that "we have made every effort that we can think of t find such a document and we are unaware that such a document exists." Subsequently, at the deposition of Honda employee Edward Taylor, Nault questioned Mr. Taylor about the missing speech. Taylor stated: "I'm surprised. Who helped you with all this knows-you know, that's where these other things came from. The same drawer." Apparently, the text of the requested speech was then produced by Lyon & Lyon within the hour. Again, Nault assumed the worst o Honda's counsel, and realleged that documents had knowingly and purposefully been withheld until Honda or its coun could no longer deny their existence. Once again, Honda's counsel professed innocence of any intentional wrongdoing.

On November 27, 1991, Nault filed its Second Motion for Default Judgment, listing the foregoing events, as well as others, as evidence that Honda had "intentionally withheld transcripts of damaging deposition testimony," engaged in pattern of feigning misunderstanding production requests in order to avoid producing documents," and "shown an interest in trying to derail discovery in this case, increase the cost of litigation and to hide damaging evidence." Plaintiffs' Memorandum in Support of Second Motion Default Judgment, at 1, 14 and 25.

With each passing week the pleadings assumed a more hostile and accusatory tone. Terms such as "perjury," "contem "liar," and "suborning of perjury" became almost routine in Nault's pleadings. Ultimately, in response to what it considered outrageous and unjustifiable accusations by Nault and its counsel, Honda filed a Motion to Strike Scan

Pleadings and for Sanctions.

No longer is this simply a case involving a commercial dispute between the litigants. Counsel for Honda and Nault 1 become deeply and personally involved in a personal battle of their own making. No longer are the attorneys mere zealous advocates of their clients' interests. Rather, they are active combatants with a personal stake in the outcome. Ego professional reputations are now involved. Sadly, the ongoing personal battle between attorneys appears to be a impediment to meaningful communication between the actual litigants, communication which might have resulted amicable, reasonable, and responsible settlement.

Additional facts will be discussed as they relate to specific issues.

III. *Honda's Motion to Strike Scandalous Pleadings.*

The Court now turns to Honda's Motion to Strike Scandalous Pleadings and For Sanctions (document no. 155). In it Honda asserts that several of Nault's pleadings contain reckless and baseless accusations of perjury, subornation of perjury, discovery abuses and criminal conduct. Honda asks the Court to strike those pleadings and to impose sanctions on Nault's counsel under Rule 11 and Rule 12(f) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927 . The pleadings at issue are the following: (a) Plaintiffs' Supplemental Memorandum in Support of Plaintiffs' Second Motion for Default (document no. 111 "Supplemental Memo"); (b) Plaintiffs' Objection to Defendant's Motion**30 for Protective Order (document no. 133) (the "Objection to Protective Order"); (c) Plaintiffs' Memorandum of Law on Discovery of Defense Counsel's File (documen no. 152) (the "Discovery Memo"); and (d) Plaintiffs' Memorandum of Law Opposing Motion to Strike Bohlander Affidavit (document no. 178) (the "Affidavit Memo").

A. Standard of Review.

Rule 12(f) of the Federal Rules of Civil Procedure provides:

**Motion** **to** **Strike.**
Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleadings upon the party or upon the court's ov initiative at any time, *the court may order stricken* from any pleading any insufficient defense or any redundant, immaterial, *impertinent,* or *scandalous matter.* (emphasis added)

12(f) Fed.R.Civ.P.

"Scandalous material is that which 'casts an adverse light on the character of an individual or party.' " *Alvarado Morales v. Digital Equipment Corp.,* 669 F.Supp. 1173, 1186 (D.Puerto Rico 1987) *aff'd* 843 F.2d 613 (1st Cir.1988) (quoting *OKC Corp. v. Williams,* 461 F.Supp. 540, 550 (N.D.Tex.1978) ). Scandalous pleadings for the purpose of Rule 12(f) are those which, " 'reflect cruelly' upon the defendant's moral character, use 'repulsive language' or 'detract from the dignity of the court'... to be scandalous such 'degrading charges must be irrelevant, or, if relevant, must be gone into in unnecessary detail.' " *Skadegaard v. Farrell,* 578 F.Supp. 1209, 1221 (D.N.J.1984) (quoting 2A Moore's Federal Practice ¶ 12.21 at 2429 (1983)).

[1]
However, " 'motions to strike alleged redundant, immaterial, impertinent or scandalous matter are not favored. Matter will not be stricken from a pleading unless it is clear that it can have no possible bearing upon the subject matter of th litigation.' " *Id.* at 1221.
The Court possesses considerable discretion in ruling upon a motion to strike impertinent or scandalous matter. *Alvarado*

_Morales v. Digital Equipment Corp.,_ 843 F.2d 613, 618 (1st Cir.1988) .

B. The Allegations.

1. _Discovery Abuses._

[2]
Nault's counsel assert that Honda's lawyers "deliberately and contemptuously withheld" requested information about alleged bribes within American Honda. In the Supplemental Memo, they allege that Honda's attorneys knowingl purposefully failed to turn over information which was the subject of a May 2, 1991, interrogatory and a discovery or issued by Magistrate Judge Barry. Nault alleges that:

The only reasonable conclusion is that the [requested bribe] information was available to American Honda's attorneys c May 2, 1991, but was intentionally and contemptuously withheld in violation of the court order.

American Honda's attorneys' conduct not only is contemptuously in violation of the magistrate's order, but it is exact conduct that the plaintiffs have been complaining about in the various motions that currently are pending before this Court. However, the magnitude of their conduct strains belief.

Supplemental Memo at 9.

Similarly, Nault's Discovery Memo also charges that Honda's attorneys' purposefully and contemptuously withhe information which was the subject of the May 2, 1991, interrogatory:

Nault filed a Supplement to its Second Motion for Default Judgment, reasoning that if Damien Budnick, at one tin American Honda's "factual consultant," knew of these payoffs, American Honda must have had the same information, and must have intentionally withheld it from Nault.

Discovery Memo at p. 2-3. These charges are again reiterated in Nault's Affidavit Memo:
There is probable cause to believe Lyon & Lyon's file in this case reflects that Attorney Donald J. McCarthy intenti withheld evidence from Nault which he was under Court order to produce. Moreover, based on the testimony of Damien
*31
Budnick, there is probable cause to believe that the file documents demonstrate that Mr. McCarthy filed a false affidavi with this Court, and attempted to have a key witness likewise file a false affidavit, in an effort to prevent the Court plaintiffs from learning the truth about the intentional withholding.

Discovery Memo at p. 5-6. Other examples of Nault's charges of contempt and purposeful discovery abuses are numerous. The Court will not list them in detail.

These serious allegations are based not on hard evidence of wrongdoing, but upon suspicion supported only by a rat strained theory of information flow. Nault asserts that if Budnick, Honda's factual consultant, knew of the alleged p (because he was involved in them, to some degree) then Honda and its attorneys also _necessarily_ possessed this information. Nault asserts that, at a minimum, it is sufficiently "probable" that Honda and its counsel possessed information to justify Nault's personal assault on opposing counsels' integrity.

Nault's theory runs counter to human nature and common experience. If an employee, like Budnick, is involved in arguably criminal conduct, it is unlikely that he will readily disclose that information to his superiors or to his comp lawyers, absent some compelling reason to do so. Despite the existence of circumstantial evidence which might have supported a mere suspicion that Honda and/or its counsel withheld discoverable material, the Court concludes that plaintiffs' counsel has failed to demonstrate that they could have had a reasonable belief, well grounded in fact, that

Honda's counsel "intentionally and contemptuously withheld" bribe information which American Honda was requir disclose. The charges leveled against counsel for American Honda are not only unsubstantiated, but there was at the time the charges were leveled, and there is now, no reasonable basis upon which such charges could be responsibly made. Those charges are ordered stricken.


## 2. Alleged Subornation of Perjury.

As discovery progressed in this case, Nault learned of allegations of commercial bribery within American Honda. On May 30, 1990, Nault propounded a second set of interrogatories to Honda, specifically requesting, among other thing information about gratuities flowing from Honda franchisees to distributors, managers and other representatives of Honda. Honda answered these interrogatories on July 27, 1990, objecting generally to every question, but particularly objecting to nineteen questions. Nault responded with a motion to compel answers, which was heard by Magistrate Judge Barry.

On April 5, 1991, Magistrate Judge Barry issued an order providing, *inter alia:*

[T]he Court grants the plaintiffs' motion to compel Interrogatories 20-23. The court orders, however, that Interrogatory 2: be limited to allegations of acceptance of gratuities by the distributors, zone managers or other representatives of 1 defendant *who handled the Nault's account.* (emphasis added)

On May 21, 1991, Honda supplemented its answers to interrogatories and in response to interrogatory 22 (concer allegations of commercial bribery), Honda stated, in pertinent part:
The scope of this Interrogatory has been limited by Order of the Court and this Supplemental Response comports with scope of that order.

Beyond the ordinary and customary "gratuities" permitted under the policies set forth in the documents identified above, *American Honda is unaware of any such instances or allegation.* (emphasis added).

Honda did, however, disclose that a Florida dealer made comments "which could be construed as an unsubstantia1 allegation that they gave Mr. Budnick a gratuity." Supplemental Response to Interrogatory No. 22.

Subsequently, at the December 12, 1991, deposition of Damien Budnick, Mr. Budnick testified that *he* was aware that Mr. Pedersen was said to have taken a bribe from Mr. Bohlander, Nault's competitor in Nashua, New Hampshire. Budni testified in his deposition that he first told counsel to Honda, Attorney McCarthy, of the Bohlander-to-Pedersen bi allegation on September 24, 1991. As noted above, Nault apparently reasoned that if Budnick, a former employee *32 of Honda and litigation "factual consultant" for this case, knew of the alleged Bohlander-to-Pedersen gratuity and info Honda's counsel of that fact in September 1991, then Honda and/or its counsel *must* have somehow known of it even earlier, particularly when Honda denied any such knowledge in May, 1991, in response to interrogatory 22.

Nault's theory brings into question the precise date on which Honda's counsel learned of the allegations of bribery American Honda. In response to Budnick's deposition testimony, Attorney McCarthy of Lyon & Lyon submitted ar affidavit which states that he first learned of the Bohlander-to-Pedersen bribery allegation from Damien Budnick December, 1991 (i.e., after the September meeting in Boston and well after the supplemental interrogatory answe furnished).

On the evening of January 6, 1992, after the McCarthy affidavit was filed, Honda's counsel placed a joint telephone call to Budnick at his Florida home to discuss the precise date on which Budnick first disclosed commercial bribe informatior Lyon & Lyon attorneys. The conversation was lead by Attorney Weiss of Lyon & Lyon. Mr. Weiss was on a speaker phone while questioning Mr. Budnick and, unknown to Budnick, the conversation was being transcribed by a Lyon & Lyon secretary. Also present with Attorney Weiss were Attorneys McCarthy and Ritchie.

Budnick testified that he felt that the attorneys were "throwing things at me from every direction," but the talk was m related to the September 24, 1991 meeting in Boston between Budnick and McCarthy. The transcript reveals that questions were obviously leading in nature. As Budnick was asked to confirm McCarthy's affidavit (i.e. that the firs Budnick revealed information to McCarthy about the Bohlander-to-Pedersen gratuities had been in December, 1991 rather than September, 1991), Budnick was interrupted by an incoming call on his line. Budnick said "Yes," then paused to answer the other call. That "yes" answer appears to have been transitory in nature and does not appear to have been a clear or direct or informed response to the critical question being asked. Rather, it appears to have been more in the nature of an acknowledgement of both the question itself and that the attorneys would remain on the line while Budnick diverted attention to answering the incoming call.

It is significant to the Court that when Budnick returned to the line, no attorney followed up on the critical inquiry; Budnick was not questioned further about the date on which he disclosed to McCarthy allegations of bribery within Honda. His transitory "yes" prior to the interruption was not further clarified or defined or explored or confirmed t attorneys. It was recorded, of course. The phone conversation ended with Weiss telling Budnick that they would be sending along some papers for him to look over and sign. The silence on the very issue prompting the call (i.e., the variance between McCarthy's and Budnick's sworn testimony) is significant. The entire call appears to the Court to hav been a calculated exercise designed by advocates primarily to create evidence supporting McCarthy's position undermining Budnick's credibility, rather than an inquiry into the pertinent facts as Budnick believed them to be.

[3]

Although the call orchestrated by Lyon & Lyon appears to have been designed to cajole Budnick into consistenc McCarthy's affidavit and/or trap him in a misstatement for later use in assailing his credibility, there is *no* evidence that Honda's                                  counsel                                  *ever* requested Budnick to execute a false affidavit, as Nault charges. Attorney Weiss undoubtedly was satisfied that Bi transitory (and recorded) "yes" had achieved his goal, and he set out to have Budnick himself confirm the "contradiction" in writing. Honda's counsel faxed a proposed affidavit to Budnick which supported McCarthy's and Ritchie's assertions that they had not withheld evidence of alleged bribes. Budnick refused to execute the affidavit, telling Lyon & Lyon "you'll have to find another way." It remains unclear to the Court exactly what Budnick meant by his somewhat cr statement (his testimony on the point was vague), but he did testify that he would not sign it because it wasn't true.

**\*33**

Nevertheless, Nault failed to elicit or proffer any reliable evidence to support its assertion that Honda's counsel attempted to suborn perjury by presenting Budnick with an affidavit which it *knew* contained false information, and by "pressuring" him to execute the same. It does not appear that Budnick was pressured in any way to sign the affidavit he declined to sign. To the contrary, the evidence demonstrates just the opposite. Upon learning that Mr. Budnick would not exect affidavit, counsel at Lyon & Lyon dropped the matter, with the exception of one call which Mr. Ritchie placed to Budnick to ask why he would not sign.

The evidence presented during the hearing does not support Nault's charge; Budnick's own testimony does not support such a charge; and Nault's counsel had no reasonable basis for making such a serious charge either at the time it was mad or now. References to Honda and its counsel allegedly having suborned perjury shall be stricken from the record.

3. *Allegations of Perjury.*

The first charges that Honda's counsel committed perjury surfaced in Nault's Objection to Protective Order, where Na wrote, *inter alia:*

1. The affidavit filed by J. Donald McCarthy with this Court on January 13, 1992, ... was a lie.

\* \* \* \* \* \*

4. The Statement in Mr. McCarthy's January 13, 1992 affidavit, that Mr. Budnick made only a passing reference to bribes on September 24, 1991 and did not discuss anything in detail was a lie.

5. The statement in Mr. McCarthy's affidavit that he did not learn about the other of these bribes until December 12, 199 was a lie.

\* \* \* \* \*

In light of this perjury and attempt to suborn perjury by defense counsel, Nault believes that it is absolutely essential forward with the deposition of Damien Budnick in order to get to the truth of this matter. Unless the false affidavi withdrawn and the truth acknowledged by defense counsel, Nault requests that the Court order that Mr. Budnick': deposition go forward without California counsel.

Objection to Protective Order, pp. 1-2.

Nault's counsel leaves little room for mistaking exactly what they are asserting. The terms "lie," "perjury," and "attempt to suborn perjury" are quite clear. Nault's choice of words is unjustified by the facts as proven and was unjustified by the facts known to counsel when the choice was made. Budnick's testimony at the February 22-24, 1993, hearing was direct and credible. He affirmatively stated that he did not inform Honda's counsel of the alleged instances of bribery at any before September 24, 1991 and certainly not in May, 1991, when interrogatory answers related to bribery were prepared and served. That testimony was entirely consistent with his earlier deposition testimony on that subject.

[4]
Furthermore, the evidence does not establish any reason why Attorney McCarthy should deliberately lie about wheth learned of bribe allegations in September rather than December of 1991. Neither date supports Nault's assertion th McCarthy knew of such allegations in May, 1991. Nault has demonstrated no benefit that Attorney McCarthy or his c might hope to obtain as a result of this alleged lie, nor can the Court envision one for which an attorney in McCarth position would be willing to risk his integrity and his professional career.[FN2]

> FN2.
> Nault has suggested that, although he knew of the bribery allegations earlier, McCarthy delayed revealir information until: (1) it had been revealed by another source, thereby making it necessary; and (2) the disc deadline had nearly passed, thereby making it more difficult for Nault to follow-up on this information. The Court is unpersuaded by these assertions. First, as noted previously, Nault has failed to demonstrate that McCarth actually knew about the Bohlander-to-Pedersen bribe prior to December, 1991, when McCarthy reveale information to Nault. Furthermore, even if the discovery deadline had passed before this information surfaced, the Court would not likely have prevented Nault from engaging in further discovery on this issue. Nevertheless, Nault would have the Court believe that, had it not discovered this information prior to the close of discovery would have been terribly prejudiced. Because this is simply not the case, Nault's assertions to the contrary are less than compelling.

\*34
Finally, with respect to the September 24, 1991 conversation between Mr. Budnick and Mr. McCarthy, it is unclear whether McCarthy was paying close attention to Budnick when Budnick says he told McCarthy of alleged instances bribery; it is equally unclear how direct Budnick was. Budnick was sure McCarthy heard and understood what he wa saying; McCarthy is sure he did not pay close attention and was distracted. The Court is inclined to accept McCart statement that,

"Mr. Budnick made an out-of-context comment that I took as indicating a desire to continue the discussion that we had had earlier about the Holtham-Budnick [bribe] assertion [and Budnick's own innocence]. The subject was dropped

because of the necessity to prepare for the Boston evidentiary hearing in a short period of time."

Attorney McCarthy's Supplemental Declaration re Plaintiffs' Second Motion for Default.

The Court is not persuaded that the contradiction between Budnick's and McCarthy's sworn statements regarding September meeting in Boston, alone, justifies Nault's immediate and extreme characterization of McCarthy's statement as a "lie." Nault's counsel is sufficiently skilled and experienced to know better, and reasonable inquiry, as is required, would likely have revealed the alternative explanation.

[5]                                                                                                    [6]

When presented with evidence which is consistent with two possible and equally plausible, but inconsistent, interpretations of how opposing counsel have conducted themselves, professional courtesy and dignity militate in favor of adopting that which is consistent with ethical and professional conduct, at least until the contrary is demonstrated beyo mere suspicion. When publishing allegations relating to misconduct by opposing counsel in pleadings filed with a cour even more circumspection is expected from an attorney as a matter of professionalism. In this instance, the Court finds there was and is no reasonable basis well grounded in fact to have warranted Nault's allegations of perjury and subornation of perjury in the first place, and certainly no basis for refusing to strike those allegations now. Those allegations are stricken.

4. *Allegations of Criminal Conduct.*

Finally, Nault's pleadings contain allegations that Honda's lawyers are guilty of "fraudulent and criminal conduct." N alleges that Attorney McCarthy:

intentionally withheld evidence from Nault which he was under Court order to produce [and that he] filed an affidavit with this Court, and attempted to have a key witness likewise file a false affidavit, in an effort to prevent the Court and t plaintiffs from learning the truth about the intentional withholding.

Discovery memo at 5-6. Because, as the Court has already held, Nault lacked an objectively reasonable basis for allegations of perjury, suborning of perjury, and contemptuous withholding of discoverable material, Nault also lacked and lacks sufficient evidence to support its allegations of criminal conduct, since they too rely upon the same events for justification.

C. Striking Scandalous Pleadings.

That Nault's counsel are convinced in their own minds that the "facts" point exclusively to one reasonable conclusion (i.e., that Honda's counsel "contemptuously withheld discovery materials," "suborned perjury," "committed perjury," and engaged in "criminal conduct") hardly establishes either the truth of those charges or even that those charges wei objectively reasonable when made. Nault's counsel apparently cannot, or will not, accept any other explanation for any o the supposed sins of defense counsel, thereby demonstrating an unfortunate and uncharacteristic loss of profess detachment. It is also indicative of the nearly complete breakdown of the professional relationship normally expected t exist among attorneys.

To be sure, the record before the Court reflects a disturbingly polished skill on the part of Lyon & Lyon for h interpretations of discovery requirements, for strained employment of the common speech of common people wh answering interrogatories and defending depositions in this and **35 other litigation, for unsettlingly facile explanations when caught in what ought to be exceedingly embarrassing failures to comply with straightforward production obligations, and for a curiously dull unfamiliarity with most incriminating facts about Honda and its employees impressively detailed grasp of all other facts. It is a provocative and suspicious history without doubt.

Nevertheless,                                                                                    *none*
of that justifies the unsubstantiated and extreme attacks on the personal integrity, ethics and character of defense c
exhibited in the challenged pleadings. The tone, the language used, and the accusations themselves are unwarranted by the
facts, either as they are presently known or as they were known to plaintiffs' counsel when the challenged pleadings w
filed.

Accordingly, Plaintiffs' Supplemental Memorandum in Support of Plaintiffs' Second Motion for Default (document no.
111), Plaintiffs' Objection to Defendant's Motion for Protective Order (document no. 133), Plaintiffs' Memorandum of
Law on Discovery of Defense Counsel's File (document no. 152) and Plaintiffs' Memorandum of Law Opposing Motion
to Strike Bohlander Affidavit (document no. 178) are found to be scandalous and are ordered stricken in their entirety
from the record. Fed.R.Civ.P. 12(f) .

D. Sanctions.

[7] Rule 11 of the Federal Rules of Civil Procedure provides, in pertinent part, that:

Every pleading, motion and other paper ... shall be signed by at least one attorney of record in the attorney's individual
name ... The signature of an attorney or a party constitutes a certificate by the signer that the signer has read the plea
motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it
is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, o
reversal of existing law, and that it is not interposed for any improper purpose ... If a pleading, motion, or other paper
signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed
it, a represented party, or both, an appropriate sanction....

Fed.R.Civ.P. 11 . The scope and object of Rule 11 has been discussed in prior decisions of this Court:
The purpose of the rule is to discourage baseless claims and defenses and other abusive tactics that needlessly increase t
cost and duration of litigation. That purpose is effectuated by emphasizing the obligations assumed by participants in
process and by mandating sanctions when those obligations are violated.

*Kenna v. U.S. Department of Justice,* 128 F.R.D. 172, 176 (D.N.H.1989) . The rule imposes upon an attorney the
affirmative duty to investigate the facts alleged in any pleading, motion or paper prior to subscribing to it. *Alvarado
Morales v. Digital Equipment Corp.,* 669 F.Supp. 1173, 1187 (D.Puerto Rico 1987) , *aff'd.,* 843 F.2d 613 (1st Cir.1983) .
And, as noted by the *Alvarado Morales* court:
The                    1983                    amendments                    to                    Rule                    11
abandoned the rules' "subjective test," which had required that sanctions be imposed only if the signer of the documen
acted in bad faith: "If it appears to the court upon hearing that the pleading is *not* well grounded in fact or law and that
there was no reasonable inquiry made before filing, the court is *required* to impose a sanction *without regard to whether
the failure was willful or inadvertent.* "

*Id.* at 1187-88 (citations omitted) (emphasis in original). This interpretation of Rule 11 is entirely consistent with the
Federal Rules of Civil Procedure Advisory Committee Notes, which state that:
The                    new                    language                    [of                    Rule                    11]
stresses the need for some prefiling inquiry into both the facts and the law to satisfy the affirmative duty imposed by the
rule. The standard is one of reasonableness under the circumstances. This standard is more stringent than the orig
good-faith formula and thus it is expected that a greater range of circumstances will trigger its violation.

Fed.R.Civ.P. 11 Advisory Committee Notes (1983).

*36                                                                                                    [8]

As plaintiffs' counsel have repeatedly and correctly argued, their subjective good faith belief in the veracity of the accusations which they have leveled against opposing counsel is entirely irrelevant to the inquiry at hand. They are of course free to believe whatever they choose to believe. They are not free to indiscriminately bludgeon the profess reputations of opposing counsel out of frustration, or in angry overreaction, or on mere suspicion alone.

The question for the Court is not whether plaintiffs' counsel subjectively believe the allegations they have hurled, but whether those allegations are based in fact. More precisely, the Court must determine whether a reasonable person, arm with the facts and knowledge of plaintiffs' counsel when they filed the challenged pleadings, could have reasonably concluded that the charges being made were "well grounded in fact." Fed.R.Civ.P. 11 .

The Court is not entirely unsympathetic to Nault's obvious feelings of frustration in this matter. As noted, when responding to interrogatories and requests for documents, counsel for American Honda have employed strai hyper-technical interpretations of common English words and phrases, in an apparent effort to slow or thwart the discovery process.[FN3]

Whenever a term or phrase was susceptible to more than one interpretation, Lyon & Lyon seems to have leaned c backwards to adopt that which resulted in the least relevant disclosure by their client, regardless of how extreme c seemingly indefensible their interpretation might have been. This calculated behavior is made all the more frustrating when the attorneys engaging in it freely and unashamedly profess to have had memory lapses, or to have misunderstood, or on occasion angelically confess to having "screwed up,"[FN4] when caught.

FN3.
Other examples of Lyon & Lyon's uniquely literal application of English centers on Lyon & Lyon's apparent view that the phrase "dealer litigation" does not include within its scope any litigation which involved individuals w held letters of intent from American Honda regarding the awarding of an Acura franchise, regardless of wheth such a letter of intent holder was ultimately awarded a franchise and became a "dealer." *See* Transcript of February 23, 1993 hearing at 182-83. Another example includes Attorney Ritchie's apparent belief that a deposition question about contacts between the witness and Honda's "legal staff" referred exclusively to *in-house* attorneys employed by American Honda and specifically excluded from its scope counsel such as himself and other attorneys at Lyon & Lyon who were representing Honda. The Court questioned Mr. Ritchie on this point at the February, 1993 hearing, as follows:

THE COURT: When you were representing Mr. Crowe at his deposition in California ... I beg your pardon. I was the Pedersen deposition. You suggested that you were not legal staff of American Honda. And is th seriously what your position was?

THE WITNESS: This is what I thought at the time, your Honor.... And when he said legal staff as opposed Lyon & Lyon, who we were, I thought he was specifically referring to, you know, inside counsel....

FN4.
At the February, 1993 hearing, AttorneyNighswander, local counsel for Honda, asked Mr. Ritchie, "Now, how did it come about that you did not identify the Roulette case ... in response to the interrogatories that had propounded earlier on in this case requesting such information." Mr. Ritchie responded by acknowledging, "I think I screwed up. I don't think I asked the right questions when I interviewed the [Honda] witnesses at depositions that they'd given." Transcript of February 23, 1993 hearing at 181-82.

If counsel at Lyon & Lyon were not so studied in their interpretations of discovery requests, or so attentive to detail, o might not be suspicious of their ready confessions of oversight or mistake. Mistakes and discovery oversights are common in complex commercial cases, and usually are corrected by those making them, without prompting. However, r protestations of convenient oversight by a group of bright, sophisticated, and experienced litigation attorneys, usually after exposure and never self-initiated, soon take on an appearance of insincerity.

But, again, the appropriate response to such Simpsonesque behavior is hardly Nault's deluge of *ad hominem* assaults and insupportable accusations of contempt, perjury and criminal activity. If Nault is, as it claims, "more sinned against sinning," it has yet to be established. Given the absence of facts demonstrating the objective reasonableness of the s[ ] charges which they have leveled against Honda and Lyon & Lyon, Nault's counsel would have been well *37 advised to exercise a modicum of restraint, make a reasonable inquiry, or raise the matter with the Court in language more consist[ ] with the facts and the presumption of integrity to which every member of the bar and every litigant is entitled.

During the February 22-24 hearing Nault failed to prove even one of its charges against counsel for Honda.[FN5] While there is little chance that counsel at Lyon & Lyon will ever be commended for their cooperative and professional handlin[ ] of this case, insufficient evidence has been presented to justify a finding that Nault's counsel's conduct was objec[ ] reasonable in repeatedly asserting that Lyon & Lyon attorneys engaged in contempt, perjury, subornation of perjury criminal activity.

> FN5.
> At the February 22-24, 1993 hearing Nault's counsel, Attorney McNamara, steadfastly asserted that Nault wo[ ] prove the veracity of each of the charges it leveled against Honda and its counsel. For example, Attorne[ ] McNamara stated that, "the Supplemental Memorandum in Support of the Plaintiffs' Motion for ... Defau[ ] Judgment, was presented to the Court as a pleading setting forth propositions which we intended to prove an[ ] which we do intend to prove in the next day or two." Transcript of February 22, 1993 hearing, at 165 Subsequently, Attorney McNamara responded as follows to a series of questions posed by Attorney Nighswander:
>
> > QUESTION: And you still allege that those attorneys knew that they had deliberately defied a court order at that time?
> >
> > ANSWER: I believe it today. I believe the evidence shows that it's true.
> >
> > QUESTION: Do you have facts to support that?
> >
> > ANSWER: I believe that we're about to prove it in our motion for default judgment.
>
> Transcript of February 22, 1993 hearing, at 186.

When making serious charges of unprofessional and criminal conduct against an individual in pleadings filed with th[ ] Court, the certitude of suspicion alone is not enough. Exasperation and frustration may serve as explanations, but acceptable                        excuses.                         Rule                         11 demands objectively reasonable conduct, including a reasonable inquiry into the facts. In the present case, counsel for Nault have failed to demonstrate that their conduct met these threshold requirements.

Accordingly, the Court finds that Plaintiffs' Supplemental Memorandum in Support of Plaintiffs' Second Motion for Default (document no. 111), Plaintiffs' Objection to Defendant's Motion for Protective Order (document no. 133), Plaintiffs' Memorandum of Law on Discovery of Defense Counsel's File (document no. 152) and Plaintiffs' Memorandum of Law Opposing Motion to Strike Bohlander Affidavit (document no. 178) were filed in violation of Rule 11 of the Federal Rules of Civil Procedure .

[9] [10] As noted above, a finding that a party has violated Rule 11 *requires* the imposition of sanctions. Such sanctions, however, are entirely discretionary and may include, among other things, the striking of the offensive pleadings. *United States v. Excellair, Inc.* 637 F.Supp. 1377, 1398 (D.Colo.1986) . This, the Court has already ordered. In addition, not later than April 15, 1993, Attorney McNamara, on behalf of himself, his co-counsel, and the law firm of Wiggin & Nourie shall write formal letters of apology to Lyon & Lyon counsel, that is, one to Attorney McCarthy, one to Attorney Weiss, and one to Attorney Ritchie, for his and his firm's unacceptable written outbursts in this matter.FN6 The letters of apology will

be courteous in tone, specific in retracting the unfounded charges stricken by the Court, and acceptable to the Court. A copy shall be filed in and made a permanent part of the record of this case. Offended counsel are entitled to no less.[FN7]

> FN6.
> While co-counsel also signed some offending pleadings, and Attorney McNamara did not actually sign all offending pleadings, he forthrightly testified that responsibility for them was properly his as partner and lead counsel. The relief ordered is sufficiently broad, and proportional, to make individual sanctions unnecessary, sufficient that the firm is sanctioned.

> FN7.
> No apology to Sulloway & Hollis or its counsel is required because the Court is satisfied by the evidence presented and a review of the pleadings themselves, that the stricken charges were not directed at local counsel, not intended to be so directed, and do not reflect adversely on local counsel.

Additionally, *all* future pleadings submitted by or on behalf of Nault shall be reviewed by a "Rule 11 committee" of not fewer than two experienced litigation partners at the firm of Wiggin & Nourie not directly involved in the conduct of the case. **\*38** Every future pleading by Nault shall contain a certification of the fact of that review. Finally, not later than April 15, 1993, the firm of Wiggin & Nourie will pay $1,000.00 to Lyon & Lyon in payment of a portion of the attorneys' fees in addressing these issues.

*IV. Nault's Motions For Default Judgment.*

Nault has filed two separate motions for default judgment. These motions point to the conduct of Honda and Lyon & Lyon discussed above as warranting entry of default judgment against Honda. In support of these motions, Nault relies on provisions of Fed.R.Civ.P. 37(b)(2)(C) , which provides, in pertinent part:

If a party ... fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, or if a party fails to obey an order entered under Rule 26(f) , the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

. . . . .

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or *rendering a judgment by default against the disobedient party.* (emphasis added)

As is apparent from the Rule's language, in order to grant a party the remedies outlined in subsection C, a court must first find: (1) that there is a valid discovery order in effect; and (2) that the opposing party has failed to obey that order. The First Circuit has made this unmistakable:
The rule's language clearly requires two things as conditions precedent to engaging the gears of the rule's sanction machinery: a court order must be in effect, and then must be violated, before the enumerated sanctions can be imposed. The decided cases, and the commentators, are consistent in the view that Rule 37(b)(2) 's plain language means exactly what it says.

*R.W. International Corp. v. Welch Foods, Inc.,* 937 F.2d 11, 15 (1st Cir.1991) .

[11]
Nault first asserts that a series of statements and observations made and questions posed by Judge Stahl during an April 29, 1991, motions hearing amount to a "discovery order" for the purposes of Rule 37 .[FN8]

FN8. In response to comments made by Attorney McCarthy, the Court made the following observation:

> JUDGE STAHL: The point of interrogatories is to aid, to move cases along, and when you have interrogatories, and I get this on occasion, where it's obvious that everybody's danced on the head of a pin to decide how little it is you can say and skate through the minimum requirements. And frankly I think that's a mistake. I think in t long run it doesn't help, and it does lend itself to the accusation in a case like this where the economic realities are very disparate. You [defense counsel] represent a very deep pocket client who has a lot of money and ca grind a plaintiff, with smaller resources, fine. So that I think you have to take a hard look at the practices that are being conducted to see whether you aren't stepping over that line of what is permissible in a forthri aggressive defense and to what is impermissible.

Hearing transcript at 38-39. Nault also relies upon the following question from the Court:

> JUDGE STAHL: Have you in fact produced everything which you should have produced and which has requested by the plaintiff in this case at this point in time?

> MR. MCCARTHY: Yes sir. As far as we in our good faith can get it....

Hearing transcript at 31. Finally, Nault relies upon this question from the Court:

> JUDGE STAHL: Well, the main thing I want to know is have you in fact at this point produced everything th you should produce and that you've made a really good faith effort to search American Honda to make sure that everything that should be here is now in fact in Mr. McNamara's hands, or the ability for him to review it.

Hearing transcript at 48.

Although Judge Stahl's comments and questions were aimed at determining whether Honda and its counsel had compli with discovery requests or were continuing a pattern of foot dragging, they did not amount to a "discovery order" under Rule 37 . Here, as in *R.W. International Corp., supra,* there is no clear, specific, freestanding discovery order. *39*R.W. *International      Corp.,*                937        F.2d        at        16 . The First Circuit has held that in such a situation, a party must seek a more specific discovery order before invoki sanctions under Rule 37(b) .

[W]hen a court issues a broad-form discovery order, and the party to whom it is addressed complies with it somewhat le than fully, withholding documents arguably outside the order's scope, the district court cannot dismiss without first entering an order commanding production of the specific materials.

*R.W. International Corp.,* 937 F.2d at 17 .

Thus, even if the Court were to accept Nault's argument and construe Judge Stahl's questions and comments as a "discovery order," the Court still could not reasonably find that it amounted to anything more than a broad-form discovery order of the type described in *R.W. International Corp.* In such a circumstance, the Court of Appeals has made it clear that a motion for sanctions is not ripe until the party alleging discovery abuses has returned to the Court and sought a mo specific order.

In support of its motions for default Nault also relies upon the April 5, 1991, order of Magistrate Judge Barry grantin Nault's motion to compel responses to interrogatories concerning bribery. As noted above, Magistrate Judge Barry *limited* the scope of Interrogatory 22 to "allegations of acceptance of gratuities by the distributors, zone managers or representatives of the defendant who handled the Nault's account." A month later, on May 2, 1991, Honda ans Interrogatory 22 by stating that, with regard to gratuities paid by franchisees to employees of Honda, "American Ho

unaware of any such instance or allegation." Honda was, however, carefully precise in noting that the answer t Interrogatory 22 was limited in accordance with Magistrate Judge Barry's order. Subsequently, after Damien Budni revealed information about alleged gratuities within Honda during his December 12, 1991, deposition, Honda amended the answer to Interrogatory 22 and disclosed allegations of the Holtham-to-Pedersen gratuity.

Nault asserts that Honda knew of the Holtham-to-Pedersen allegations when the response to Interrogatory 22 was prepared, and provided accurate information only *after* it was already revealed in Budnick's deposition and could no longer be denied. Nault claims that:

The defendant does not deny in its answer that this information was available to it on May 2, 1991, when it provided the first portion of the answer. In fact, the last sentence indicates that the same person who had knowledge abou "unsubstantiated allegation" about Mr. Budnick, Frank Holtham, was the one who also gave the gratuity to Pedersen and that these activities took place at the same time. *The only reasonable conclusion is that the information was available to American Honda's attorneys on May 2, 1991, but was intentionally and contemptuously withheld in violation of the court order.* (emphasis added)

Plaintiffs' Supplemental Memorandum in Support of Plaintiffs' Second Motion for Default Judgment at 9.

Nault has failed to produce *any* evidence which demonstrates that Honda's attorneys knew about the Holtham-to-Pedersen allegations prior to May 2, 1991. In the absence of such evidence, the Court cannot and will not find that Honda violated the discovery order issued by Magistrate Judge Barry on April 5, 1991. Accordingly, Nault's Motion for default Judgment (document no. 62) ar Nault's Second Motion for Default Judgment (document no. 92) are denied.


*V. Honda's Motion to Hold Damien Budnick in Contempt.*

Also pending is Honda's Motion for an Order Holding Damien Budnick in Contempt and Compelling Him to Comply with Subpoena (document no. 176). Budnick is a resident of Orlando, Florida and is a non-party witness to facts relatin underlying action initiated by Nault against Honda. Budnick was deposed in New Hampshire on April 10 and 11, 1991, and again on December 12, 1991. On or about February 6, 1992, counsel for Honda served a subpoena *duces tecum* on Budnick. That subpoena directed Budnick to appear for a third round of depositions in Orlando, Florida on February 1 1992, and to produce numerous personal documents.

**\*40**
At a February 12, 1992, hearing in this Court, Judge Stahl ordered that the deposition of Budnick proceed in Nev Hampshire rather than Florida (Budnick had previously represented to the Court that he would voluntarily make hi available in New Hampshire). Then, Judge Stahl appointed a commissioner to preside at Budnick's deposition and directed the parties to return to the Court if any disputes or problems arose during Budnick's deposition. *See* Transcript of February 12, 1992, hearing, pp. 38-40. No subsequent subpoena was issued compelling Budnick to appear at the New Har deposition. Rather, the Court confirmed its oral order by entering a written order directing that Budnick's deposition be taken in New Hampshire and appointing the commissioner to oversee that deposition.

At the New Hampshire deposition, Budnick testified that he had produced all requested documents which were in hi custody or under his control, with the exception of certain telephone and travel records which were in the possession of his accountant. Subsequently, Budnick provided Honda with all or most of the remaining requested documents to which Budnick had access.[FN9]

FN9.
Apparently it is the practice of Mr. Budnick to reconcile his bank accounts periodically and thereafter to discard his bank statements. Accordingly, these records were not available to Honda and Mr. Budnick refused to execute

a release which would have permitted Honda to have access to his permanent bank records.

On March 31, 1992, Honda filed a Motion for Contempt against Budnick in the United States District Court for the Middle District of Florida. In initiating its efforts to have the Middle District of Florida hold Budnick in contempt, Honda ignored the unambiguous direction of Judge Stahl, who had instructed the parties to depose Budnick in New Hampshire on February 14, 1992, and to inform him if there were any problems or issues to be resolved. Judge Stahl affirmed his point at a March 31, 1992, hearing. Directing his comments to Honda's counsel, Judge Stahl said:

I am perplexed by you gentlemen. I made it very clear that ... if Budnick did not do what he should have done at deposition, the place to have come was here. I made it very evident to everybody that if there was a problem, I'd be here.

Transcript of March 31, 1992, hearing at 79.

Following Honda's filing of the contempt motion in the Middle District of Florida, Budnick readily agreed to provide travel and telephone records which Honda sought (and which were previously in the possession of Budnick's accountant), *provided* Honda agree to withdraw its motion for contempt. Budnick turned the requested records over to Honda. But, Honda refused to withdraw its motion for contempt.

Honda's motion for contempt in the Middle District of Florida was denied based on that Court's finding that this Court asserted jurisdiction over Budnick's deposition and, pursuant to Fed.R.Civ.P. 45 , only this Court could enforce the subpoena. Undaunted, Honda refiled its motion for contempt before this Court. At the February 22-24, 1993 hearing, this Court denied Honda's motion from the bench. Honda has responded by filing a Motion for Reconsideration of Order Denying American Honda's Motion for an Order Holding Damien Budnick in Contempt (document no. 204).

In support of its motion for reconsideration, Honda asserts that, "[t]he opportunity to gain access to these records [FN10] has become more critical than ever as a result of the ... testimony presented at the motions hearing, indicating that Budnick contrary to his sworn denials, knowingly received $100,000.00 cash from Frank Holtham [a Florida Acura dealer]." Honda's argument not only misses the mark, but lends credence to the view that its motives were a bit suspect from the outset.

FN10.
Honda still seeks the following documents, which it alleges Budnick has refused to provide: "(1) income tax returns from 1985 to 1990, (2) W-2 and 1099 forms and other records of income from 1991, and (3) bank records of Mr. Budnick covering any portion of the period from January 1, 1987 through the present." Honda's Motion for Reconsideration at 2.

Whether Budnick received gratuities from Holtham or from any other Acura dealer(s) is not directly related to this case This case *does* involve *Pedersen's* (a regional manager *41 for Acura) receipt of gratuities from *Bohlander* (a New Hampshire Acura dealer and competitor of Nault) as well as whether Bohlander benefitted at Nault's expense or to detriment from Honda decisions precipitated by bribery. Allegations of a Holtham-to-Pedersen gratuity ( Holtham-to-Budnick gratuity) are relevant only insofar as they may tend to establish a pattern of conduct or an expectation of commercial bribery within Honda related to Acura dealer administration. To that end, it is not especially critical to whom Holtham paid the alleged gratuity. It is perhaps relevant that Holtham paid the gratuity with the understanding that he would receive a commercial benefit from Honda in return.[FN11] And, even Honda concedes that Budnick had no authority worthy of a $100,000 bribe. Furthermore, Holtham apparently said the money was intended for others higher u the executive ladder. Testimony of Christine Fitzgerald, February 23, 1993 Hearing Transcript at 96 and 121-22.

FN11.
When questioned about the existence of bribery within the Honda corporate structure, Budnick testified th exchange for making a $100,000.00 payment (or "passing the football") to superiors, a dealer could exp

preferential treatment and a "direct line to top management":

> QUESTION: So, in your position as a district sales manager you were aware of the concept of passing the football for a hundred thousand dollars would be paid by dealers to the top management of the American Honda, correct?
>
> ANSWER: Correct.
>
> QUESTION: And when you learned that, did your position or your role as a district sales manager differ with the dealer who passed the football as opposed to a dealer who didn't pass the football?
>
> ANSWER: Yes, it did.
>
> QUESTION: In what way?
>
> ANSWER: I knew that the dealer had a direct line to top management, and that anything that was either said done with that dealer would, you know, get directly to top management.

Honda's unwarranted pursuit of a contempt order against Budnick in the Middle District of Florida has not only caused him to unnecessarily incur substantial attorneys' fees, but it has wasted a significant amount of this Court's time and resources. Before initiating contempt proceedings in the Middle District of Florida, Honda should have complied with Judge Stahl's order and brought its concerns to his attention. If, as it claims, Honda had doubts about the jurisd requirements of applicable law, Judge Stahl was available and prepared to resolve those doubts. Had Honda complied with Judge Stahl's order, this matter would have been resolved long ago, at minimal expense and inconvenience to the parties and Court.

[12]
Honda's relentless pursuit of Budnick's personal records and repeated efforts to have him held in contempt suggest t Honda's actions might be motivated, at least in part, by less than appropriate objectives. Its pursuit of a contempt ord against Budnick does not appear to have been focused entirely on obtaining relevant records from a non-party witne Rather, Honda's conduct hints of an effort to punish and harass a former Honda employee and one-time "factual consultant" to Honda's attorneys, whose testimony tends to support Honda's opponent.

The Court finds that Honda's conduct in this regard not only was contrary to the procedure directed and expected by Judge Stahl, but it unnecessarily, unreasonably and vexatiously multiplied the proceedings in this matter. *See* 28 U.S.C. § 1927 ; Fed.R.Civ.P. 11 . *See also, Ordower v. Feldman,* 826 F.2d 1569, 1573-74 (7th Cir.1987) ; *Perkins v. General Motors Corp.,*                               129                   F.R.D.                   655                   (W.D.Mo.1990) . The Court denied Honda's Motion for an Order Holding Damien Budnick in Contempt and Compelling Him to Compl with Subpoena (document no. 176) at the February 22-24, 1993, hearing. Honda's Motion for Reconsideration (documer no. 204) is likewise denied.

Mr. Budnick shall, within 30 days hereof, file with the Court and serve upon counsel for Honda an affidavit which itemizes the expenses, including attorneys' fees, reasonably expended in responding to Honda's motion for contempt filed in the Middle District of Florida. Unless within ten days of receipt of such affidavit Honda shall file a written objection those expense itemizations, identifying with particularity those expenses which Honda has a *good faith and articulable belief*              are              unreasonable,              Honda              shall              pay              **\*42** Budnick a sum equal to the expenses stated. If Honda objects to any items set forth in the affidavit, the Court will rule upon the objection. However, such objection shall not delay payment with respect to those items to which Honda doe object.

7/30/2008 4:17 PM

VI. *Pro Hac Vice Status of Honda's California Counsel.*

As noted above, in April, 1991, this Court (Stahl, J.) addressed the question of whether the *pro hac vice* status of Honda's California counsel, Lyon & Lyon, should be revoked. Although Judge Stahl determined that it was not then appropria revoke the *pro hac vice* status of Lyon & Lyon, he cautioned counsel about future conduct.

Following reassignment of the case, this judge adopted the New Hampshire Bar Association Litigation Guidelines a standing pretrial order, in an effort to refocus the attention of respective counsel upon the merits of their clients' case: Copies of the Litigation Guidelines were provided to all counsel and all were cautioned that any violations of thos guidelines would be promptly sanctioned. Additionally, the Court ordered that, at the February 22-24, 1993 hearing, counsel should be prepared to show cause why counsel admitted *pro hac vice* for defendant ought not to be relieved and local counsel substituted in their place. Order, January 27, 1993.

[13]
Both Honda and Nault presented a substantial amount of testimony at the February 22-24, 1993, hearing. There i: persuasive evidence that, Lyon & Lyon have not conducted themselves in a manner consistent with the traditions expected of the bar of this Court. Nevertheless, before revoking the *pro hac vice* status of counsel from Lyon & Lyon, the Court must be persuaded of more. As the Tenth Circuit Court of Appeals has held:

Attorneys                    admitted                    *pro                    hac                    vice*
are held to the same professional responsibilities and ethical standards as regular counsel. Once admitted, *pro hac vice* counsel cannot be disqualified under standards and procedures any different or more stringent than those imposed up regular members of the district court bar.

*United States v. Collins,* 920 F.2d 619, 626 (10th Cir.1990) , *cert. denied,* 500 U.S. 920, 111 S.Ct. 2022, 114 L.Ed.2d 108 (1991) .

In the present case, there is simply insufficient concrete evidence of serious wrongdoing by counsel at Lyon & Lyon support         the         Court's         revocation         of         *pro         hac         vice* status. If, however, the applicable standard were lower, if removal turned upon the Court's level of confidence and unfettered discretion, the Court would be inclined to remove Lyon & Lyon.

That Lyon & Lyon will remain as counsel should not be misconstrued as a vote of confidence. Sharp practice hyper-technical interpretations of discovery requests, followed by occasional confessions of oversight and error, all o: which conveniently work to the benefit of Honda, will not be tolerated in what future is left for this case. Any simil: conduct during the remainder of this case shall be considered violative of the New Hampshire Bar Association Litigation Guidelines and, therefore, violative of the standing Order of the Court. It will be sanctioned severely, to include removal.

The Court is concerned that neither it nor the litigants be again burdened by the necessity of inquiring into m professionalism on the part of counsel at Lyon & Lyon. The parties' interests remain in obtaining the most speedy, just and economical determination of the merits of this case as is possible, without such diversions. *See* Fed.R.Civ.P. 1 . Local counsel for Honda, the firm of Sulloway & Hollis, shall assume heightened responsibility for pleadings and for the practice         of         *pro         hac         vice* counsel. Specifically, Sulloway & Hollis shall independently verify, to its satisfaction, the accuracy and veraci representations made whether in pleadings, during trial, or to Nault's counsel. *See* District Court Rule 5. The Court trusts and         expects         that         local         counsel         will         direct         *pro         hac         vice* counsel along a safer path, one more consistent with local practice expectations and more consistent with this Bar': traditions of genuine candor, civility and professionalism.

VII. *Nault's Motion for Relief From Protective Order.*

Damien Budnick, a former employee of Honda, testified in deposition and during motions *43 hearings that gratuities were paid by at least two Honda automobile dealers to a Honda Zone manager, and that he personally (and unknowingly) delivered one payment of $100,000. Budnick's information was classified "confidential" by Honda, thereby restricting Nault's use of it under a previously entered protective order. Nault wished to reveal the information in the course of further investigation of both the accusations of bribery and the extent to which such occurrences might have affected decision made by American Honda which were adverse to Nault's interests. So, Nault sought relief from the protective order.

American Honda objected on essentially three grounds: (1) that the "unsubstantiated charges of gratuity taking have largely from a single witness, Damien Budnick" (whose third and final deposition had yet to be taken); (2) th unsubstantiated charges, if made public, would harm the reputations of American Honda and its present and for employees"; and (3) that "[n]o showing has been made by Nault which would justify the release to the public at large of the allegations of gratuity taking." Defendant's Objection to Nault's Motion for Relief from Protective Order at 2.

For the reasons explained below, the Court expanded the scope of inquiry by directing the parties to show cause w protective order itself should not be rescinded and the Court's records, including all previously sealed documents, should not be open to the public. From the bench the Court granted Nault's motion for relief relative to the Budnick info (document no. 128). The Court's records were also ordered unsealed, and the parties granted leave within thirty days from the date of the order (i.e. until March 24, 1993) to request return of any exhibits previously filed under seal, and to amen any pleadings filed under an expectation of confidentiality. Although the Court has already issued its order, furth discussion is warranted.


A. The Protective Order.

The genesis of the protective order in this case is instructive. The parties negotiated a "stipulated protective order" under Fed.R.Civ.P.                                                                                                       26(c)
. That pleading was filed with the Court, as a stipulation, and, in the absence of objection was entered as a court orde District Court Rule 11. It was signed not by a judicial officer, but by the Clerk of Court. The Clerk added a notatic stipulation                                                                                                                   qua
"order" requiring pleadings filed under it to set forth the basis upon which a claim of seal rested. As a practical matter, most of the pleadings filed "under seal" were filed by agreement of both parties. As a result, few if any pleadings were actually reviewed by a judicial officer to determine whether sealing was either required or appropriate. Sealed pleadi simply found their way into the Court's normally public records, unreviewed by a judicial officer and cloaked in secrecy by mere agreement of the litigants.

Judge Stahl, to whom this case was assigned prior to his elevation to the Court of Appeals, expressed concern abo seemingly unchecked sealing of pleadings. This Court shares that concern and is satisfied that no legitimate, and certainly no compelling, reason exists to justify shielding the Court's records in this case from public access.


B. Open Access to the Judicial Process.

There appears to be a growing tendency throughout both federal and state courts, especially in commercial cases, fo litigants to agree to seal documents produced during the discovery process as well as pleadings and exhibits filed with court. Scholars have been commenting on the subject with increasing frequency.[FN12] Even Professor Miller, who argues at length for expansive flexibility in protecting litigation privacy through sealing, cautions against unchecked secrecy:

FN12. *See, e.g.,* Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts,* 105 Harv.L.Rev. 427 (1991) [hereinafter Miller, *Public Access to the Courts* ]; B.T. Fitzgerald, Note, *Sealed v. Sealed: A Public Court System Going Secretly Private,* 6 J.L. & Pol. 381 (1990) [hereinafter Note, *Sealed v.*

*Sealed* ]; R.D. May, Recent Development, *Public Access to Civil Court Records: A Common Law Approach,* 39 Vand.L.Rev. 1465 (1986) .

Judges must guard against any notion that the issuance of protective orders is routine, **44** let alone automatic, even when the application is supported by all parties. Thus, they must look carefully at each case and tailor appropriate responses which should take account of a kaleidoscope of factors, including the likely outcome on the merits, the value or importance of commercial or personal data, the identity of the parties and any apparent outside interests, the existence of any threat to health and safety, and the presence of a governmental agency with primary responsibility for the subject matter of the data.

Miller, *Public Access to the Courts, supra* note 12, at 492. And, in a footnote to that text, Professor Miller cautions:

When all the parties support the protective order or seal, as often is the case when the defendant seeks confidentiality and the plaintiff wants to facilitate its own access to discovery materials, the court is faced with an essentially non-adve situation and must assume the duty of making an independent inquiry. A useful analogue is the fiduciary burden assumed by federal judges in evaluating a proposed class action settlement under Federal Rule 23(e).

*Id.* at 492, n. 322.

[14]

Plainly, there are legitimate reasons for protecting the confidentiality of certain types of information obtained through discovery or litigation processes. Courts should remain sensitive to the need to protect litigants from discovery abuses in all their invasive and oppressive forms. However, the decision to seal pleadings and documents filed with the Court is no one properly left to the litigants themselves. Nor should sealing orders be issued automatically or cavalierly, nor by operation of this Court's Local Rule 11 (motions routinely granted by agreement of parties, or in the absence of objection). Due regard to important common law and Constitutional interests in public access to judicial records must be brought to bear by a judicial officer before any court documents are placed beyond public review. *See Public Citizen v. Liggett Group, Inc.,* 858 F.2d 775 (1st Cir.1988) , *cert. denied,* 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989) (discussing in detail the grounds for issuance and modification of a Rule 26 protective order).

In *Public Citizen v. Liggett Group, Inc.,* the Court of Appeals for this Circuit noted that:

A       plain       reading       of       the       language       of       Rule       26(c) demonstrates that the party seeking a protective order has the burden of showing that good cause exists for issuance of that order. It is equally apparent that the obverse also is true, i.e., *if good cause is not shown, the discovery materials in question              should              not              receive              judicial              protection* and therefore would be open to the public for inspection.... Any other conclusion effectively would negate the go requirement of Rule 26(c) .

*Public Citizen v. Liggett Group, Inc.,* 858 F.2d 775 (1st Cir.1988) (emphasis added) (quoting *In re Agent Orange Product Liability Litigation,* 821 F.2d 139, 145-46 (2d Cir.1987) , *cert. denied,* 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987) ).

Pretrial depositions, interrogatory answers, and document production are generally not considered part of the civil trial itself. Because those proceedings by tradition are not open to the public, and were not open at common law, dissen restraints on those materials do not necessarily amount to restrictions on traditionally public sources of information. *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 33, 104 S.Ct. 2199, 2208, 81 L.Ed.2d 17 (1984) (citing *Gannett Co. v. De Pasquale,* 443 U.S. 368, 389, 99 S.Ct. 2898, 2910, 61 L.Ed.2d 608 (1979) ). "Certainly the public has no right to demand access to discovery materials which are solely in the hands of private party litigants." *Public Citizen v. Liggett Group, Inc.,* 858 F.2d at 790 .

[15]

On the other hand, discovery material shielded by a pretrial confidentiality order typically becomes public when it is entered into the record, since a contemporaneous right of access attaches to exhibits submitted in open court proceedings. *Re Continental Illinois Securities Litigation,* 732 F.2d 1302, 1310 (7th Cir.1984) ; *Brown & Williamson Tobacco Corp. v. Federal Trade Commission,* 710 F.2d 1165 (6th Cir.1983) , *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 127 (1984) . It is a "well established principle of **\*45** American jurisprudence that the release of information in open trial is a publication of that information and, if no effort made to limit its disclosure, operates as a waiver of any rights a party had to restrict its further use." *National Polymer Products, Inc. v. Borg-Warner Corp.,* 641 F.2d 418, 421-22 (6th Cir.1981) . Where a court has already issued a Rule 26(c)

protective order covering discovery materials and the parties subsequently seek to seal those materials when entered into the record, the court should make an additional inquiry before expanding the scope of the protective order. *United States v. Kentucky Utilities Co.,* 124 F.R.D. 146 (E.D.Ky.1989) ; *see Poliquin v. Garden Way, Inc.,* 989 F.2d 527, 533 (1st Cir. March 24, 1993) ("the ordinary showing of good cause which is adequate to protect *discovery material* from disclosure cannot alone justify protecting such material after it has been introduced at trial. This dividing line may in some measure be an arbitrary one, but it accords with long-settled practice in this country separating the presumptively private phase litigation from the presumptively public.").

Commentaries                                                                                              FN13

and case authorities identify a number of reasons militating against extensive sealing of judicial records. Sealing t undermine public understanding of and confidence in the overall fairness of the judicial system. Note, *Sealed v. Sealed, supra* note 12, at 398. "When judicial decisions are known to be just and when the legal system is moving to vindicate soc wrongs, members of the community are less likely to act as self-appointed law enforcers or vigilantes." *Brown & Williamson Tobacco Corp,* 710 F.2d at 1178 . The sealing of pleadings also undermines the public's ability to monitor and observe the judiciary. Public access to judicial proceedings properly imposes upon judges and the judicial system an element of accountability. Note, *Sealed v. Sealed, supra* note 12, at 401. Sealing can even undermine public health and safety if, for example, the public is denied access information concerning consumer product design defects or harmful or fatal drug side-effects, which, if known, mig avoided. *Id.* at 401-04. *But see* Miller, *Public Access to the Courts, supra* note 12, at 470-71 (discussing the risks that businesses face if unsubstantiated detrimental information about a product is released to the public and the correspon damage to the company's reputation, profitability and viability; also discussing the possibility that a party might ini litigation for the sole purpose of gaining access to a competitor's trade secrets.)

FN13. *See* note 12, *supra.*

Access to judicial records and proceedings also encourages greater integrity among litigators and litigants alike. Fo example, if documents are public in one case, an attorney or a party is less likely to deny either their existence o accessibility in other litigation, as has been alleged to have occurred here. L. Doggett & M. Mucchetti, *Public Access to Public Courts: Discouraging Secrecy in the Public Interest,* 69 Tex.L.Rev. 643, 650 (1991) [hereinafter, Doggett & Mucchetti, *Discouraging Secrecy* ]. Public access to judicial proceedings also tends to encourage truthful and accurate witness testimony by creating a critical audience and by inducing fear of exposure of inaccurate testimony. *Brown & Williamson Tobacco Corp.,* 710 F.2d at 1178 . As articulated by Justice Brandeis, "sunlight is said to be the best of disinfectants; electric light the most effici policeman." Doggett & Mucchetti, *Discouraging Secrecy,* at 644 (quoting L. Brandeis, *Other People's Money and How the Bankers Use It,* 92 (1st ed. 1914)).

[16]
This Court is hard pressed to find a single factor weighing in favor of sealing any of the documents filed in this c confidential

designations under the stipulated protective order do not apply to trade secrets, secret manufacturing formulas, sens financial or other competitive data, patents, or even matters of peculiar personal privacy. On the contrary, virtually all of the sealed material consists of either routine litigation motions and memoranda, or caustic and emotional charges be counsel, or allegations of commercial bribery and other misconduct on the part of certain employees of the defenda Material of this character in this context does not present a legitimate *46 basis upon which to invoke the Court's discretionary authority to seal information from public view.

Simply stated, the parties have failed to demonstrate that good cause ever existed or currently exists for the issu continuation of a protective order under Rule 26(c) . Unless and until such a showing is made, no pleadings, exhibits thereto, or other materials filed with the Court can rightly be withheld from public view or scrutiny. Reiterating the Court's ruling from the bench, Nault's Motion for Relief from Protective Order is granted. Additionally, the stipulation *qua* "protective order" is rescinded and all previously sealed records shall be unsealed, counsel having elected not to request the return of previously filed exhibits or to amend previously filed pleadings within the time allotted.

In the future, if any party believes that good cause exists to issue a protective order pursuant to Federal Rule 26(c) with respect to *specific pleadings, information, material or evidence,* an appropriately tailored motion should be submitted to the Court.

VIII. *Motions For Partial Summary Judgment.*

Also pending before the Court are Nault's Motion for Partial Summary Judgment (Count IV) (document no. 77) and Honda's Motion for Partial Summary Judgment on Count I of the Complaint (document no. 109).

A. Standard of Review.

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) . In ruling upon a party's motion for summary judgment, the Court must, "view the entire record in the light most hospitable to the party opposing summary judg including all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990) .

The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) , *motion denied,* 480 U.S. 903, 107 S.Ct. 1343, 94 L.Ed.2d 515 (1987) . If the moving party carries its burden, the party opposing the motion must set forth specific facts showing that ther remains a genuine issue for trial, demonstrating "some factual disagreement sufficient to deflect *brevis* disposition." *Mesnick v. General Electric Co.,* 950 F.2d 816, 822 (1st Cir.1991) , *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992) . *See also* Fed.R.Civ.P. 56(e) . This burden is discharged only if the cited disagreement relates to a genuine issue of material fact. *Wynne v. Tufts University School of Medicine,* 976 F.2d 791, 794 (1st Cir.1992) . "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party [and] 'material' means that the fact is one that might affect the outcome of the suit under the governing law." *United States v. One Parcel of Real Property, Etc.,* 960 F.2d 200, 204 (1st Cir.1992) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ).

[17]                                                                                                                    [18]
Where a claim is barred as a matter of law, partial summary judgment is appropriate to eliminate the invalid claim from the suit. *Raymond v. Eli Lilly & Co.,* 412 F.Supp. 1392, 1394 (D.N.H.1976) , *aff'd* 556 F.2d 628 (1st Cir.1977) ; *Collier v. Red Bones Tavern & Restaurant, Inc.,* 601 F.Supp. 927, 929 (D.N.H.1985) . Statutory interpretation is a question of law and is properly decided on a motion for summary judgment. *Mason v. Montgomery Data, Inc.,* 741 F.Supp. 1282, 1285

(S.D.Tex.1990) ; *Saroyan v. William Saroyan Foundation,* 675 F.Supp. 843, 844 (S.D.N.Y.1987) *aff'd without op.* 862 F.2d 304 (2d Cir.1988) ; *French v. Wilson,* 446 F.Supp. 216, 218 (D.R.I.1978) .

B. Honda's Motion for Partial Summary Judgment.

Count I of Nault's complaint alleges that Honda's actions toward Nault constituted fraud, bad faith and unreasonable conduct under N.H.REV.STAT.ANN. ch. 357-C (the "Auto Dealers Act"), and unfair competition and unfair trade practices                  under                  N.H.REV.STAT.ANN.**47** ch. 358-A (the "Consumer Protection Act"). Honda's Motion for Partial Summary Judgment on Count I of the Complai rests largely on three assertions:

(1) that existing case law within this jurisdiction holds that the provisions of the Auto Dealers Act preempt those c Consumer Protection Act in the instant proceeding;

(2) that the express provisions of the Consumer Protection Statute render it inapplicable to this case; and

(3) that Nault's Automobile Sales, Inc., as a commercial entity, is not a "consumer" within the meaning of the Cor Protection Act and, therefore, is not entitled to its protections.

For the reasons set forth below, the Court is unpersuaded by defendant's arguments and its Motion for Partial Sum Judgment on Count I of the Complaint is hereby denied.

1. *Existing Case Law.*

Honda relies heavily upon *New Hampshire Automobile Dealers Association, Inc. v. General Motors Corporation,* 620 F.Supp. 1150 (D.N.H.1985) , *modified,* 801 F.2d 528 (1st Cir.1986) , in support of its argument that the Consumer Protection Act is not applicable to this action. In that case, Chief Judge Devine noted that, "New Hampshire courts hav long followed the well-established rule that where conflicts exist as between a general and a specific statute, the provisions of the specific statute are to be applied." *Id.,* at 1159. Then, finding a conflict between the provisions of the Consumer Protection Act and the Auto Dealers Act as applied to the facts of the case then before him, Judge Devine he that, "under the circumstances of this case the plaintiffs are not entitled to seek relief pursuant to the provisions of RS 358-A [the Consumer Protection Statute], but they are confined to the provisions of RSA 357-C [the Auto Dealers Act]." *Id.,* at 1160.

[19] [20] Here, unlike the *Automobile Dealers Association* case, the conduct in which Honda is alleged to have engaged, if proved, is violative of both statutes. In the absence of a conflict between these two statutes, as applied to this proceeding, the holding in *Automobile Dealers Association* is not on point. The mere existence of two statutes with overlapping civil remedies does not necessarily render one inapplicable to a civil action in which the plaintiff seeks redress under both remedial provisions. The Court's interpretation of the scope and application of the Consumer Protection Act is consistent with that of the New Hampshire Supreme Court:

The Consumer Protection Act "is a comprehensive statute designed to regulate business practices for consumer protection by making it unlawful for persons engaged in trade or commerce to use various methods of unfair competition and deceptive business practices." The very words contained in the statute indicate that the act's proscriptions are to be broadly applied. "It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." Given this language, neither the legislature nor the *Rousseau* court could have intended to exclude from the protection of the act the large number of industries which are subje regulation in this State simply because the legislature has provided for regulation of that industry within a statu

framework.... The mere existence of a regulatory board to oversee certain standards of an industry does not remove all acts and practices of that industry from the provisions of the Consumer Protection Act.

*Gilmore v. Bradgate Associates, Inc.,* 135 N.H. 234, 238, 604 A.2d 555, 557 (1992) (citations omitted). *See also, WVG v. Pacific Insurance Co.,* 707 F.Supp. 70 (D.N.H.1986) (provisions of New Hampshire Unfair Insurance Practices statute do not preclude an action under the Consumer Protection Statute against an insurance company); *Therrien v. Resource Financial Group, Inc.,* 704 F.Supp. 322 (D.N.H.1989) (provisions of federal Truth in Lending Act do not preclude an action under the Consumer Protection Statute again corporation providing consumer loans). Accordingly, Nault is not precluded, as a matter of law, from availing itself of the **\*48** remedies set forth in the New Hampshire Consumer Protection Act under the facts pled.


### 2. *Express Provisions of the Consumer Protection Act.*

Honda next asserts that, "The regulatory framework of 358-A contains within it an express exemption of situations such as that presented here, where another regulatory system applies." Honda refers to N.H.REV.STAT.ANN. ch. 358-A:3, which provides, in part, that:

The following transactions shall be exempt from the provisions of this chapter: I. Trade or commerce otherwise permi under laws as administered by any regulatory board or officer acting under statutory authority of this state or of the United States.

Defendant also relies upon the 1986 New Hampshire Supreme Court decision in *Rousseau v. Eshleman,* 128 N.H. 564, 519 A.2d 243 (1986) .

As noted above, however, the New Hampshire Supreme Court has addressed and rejected defendant's position. *Gilmore v. Bradgate Associates, Inc.,* 604 A.2d at 557 . The mere existence of legislation aimed at regulating a particular industry does not necessarily preclude an action under the Consumer Protection Act against individuals operating within that industry. The exemption upon which Honda r applies only "where a party attempts to label as fraud, deceit or misrepresentation conduct which is 'otherwise permitt under laws administered by regulatory boards or officers acting under the statutory authority of this State or the Unit States." *Gilmore v. Bradgate Associates, Inc.,* 604 A.2d at 557 . Such was the case in *New Hampshire Automobile Dealers Association, Inc. v. General Motors Corporation, supra,* where the court rejected plaintiff's attempt to recover under the Consumer Protection Act for conduct which was "otherwise permitted" under the laws of New Hampshire and the United States (i.e., General Motors' sale of fleet vehicles at reduced prices).

And, with regard to the *Rousseau* decision, upon which Honda also relies, the New Hampshire Supreme Court held that, "the reasoning behind the *Rousseau* decision, if relevant at all, is applicable only within the context of attorneys, whose individual conduct and practice i subject to a comprehensive regulatory and disciplinary framework under the jurisdiction of this court." *Gilmore v. Bradgate Associates, Inc.,* 604 A.2d at 557 .


### 3. *The Meaning of "Consumer" Under the Act.*

[21] The language of the Consumer Protection Act is clear and unambiguous. Section 1 defines "person" to include "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity." Section 10 provides that, "Any person injured by another's use of any method, act or practice declared unlawf under this chapter may bring an action for damages and for such equitable relief, including an injunction, as the court deems necessary and proper." This language contemplates that both Richard Nault, as a "natural person," and N

Automobile Sales, Inc., as a "corporation," may avail themselves of the protections and remedies afforded by the Consumer Protection Act.

Given the plain language of the Consumer Protection Act and the decisional law construing the Act's scope, Honda's Motion for Partial Summary Judgment on Count I is denied.

C. Nault's Motion for Partial Summary Judgment on Count IV.

Count IV of Nault's complaint alleges that the Auto Dealers Act mandates that Honda compensate Nault for the Acura facility constructed at 158 Manchester Street, Concord, New Hampshire. Nault claims that its Acura facility was "required to be ... constructed as a precondition to obtaining the [Acura] franchise," within the meaning of the statute. Nault's Motion for Partial Summary Judgment (Count IV), at 8, citing N.H.REV.STAT.ANN. ch. 357-C:7 VI(a)(3).

The version of the statute in effect in 1986, when Honda issued Nault's "Letter of Intent," and in 1989, when Honda notified **49** Nault that its franchise had been terminated, provided in pertinent part, as follows:

Within 90 days of the valid termination or nonrenewal with notice, in good faith, and for good cause of any franchise, the new motor vehicle dealer shall be allowed fair and reasonable compensation by the manufacturer for:

* * * * * *

(3) The dealership facilities if the facilities were required to be purchased or constructed as a precondition to obtain franchise or to its renewal; ....

N.H.REV.STAT.ANN. ch. 357-C:7 VI(a)(3). The text literally provides that where a manufacturer terminates an automobile dealer's franchise with notice, *in good faith,* and *for good cause,* the manufacturer is nevertheless required to pay the terminated dealer "fair and reasonable compensation" for the dealer's facility. This odd statutory language creates the following anomalous situation. When automobile sales are poor and a dealer is not succeeding financially, the statute creates an incentive for that dealer to deliberately induce termination of his or her franchise *for cause.* That is to say, the failing dealer has an incentive to engage in contractually proscribed, commercially unreasonable and damaging conduct sufficient to force the manufacturer to terminate the dealer for cause. If the dealer is in fact terminated for *good cause,* the dealer is then entitled to the specified compensation. Curiously, however, no statutory remedy was provided for the dealer who is unfortunate enough to have suffered a *wrongful* termination of his or her franchise by the manufacturer.

The New Hampshire legislature apparently recognized the oddity of the situation created by the original language. Effective January 1, 1991, the statute was amended to read as follows:

Within 90 days of a termination or nonrenewal *without good cause or good faith* by the manufacturer or distributor of any franchise, and notwithstanding any terms therein to the contrary, the manufacturer or distributor shall pay to the new motor vehicle dealer the fair market value of the dealership facilities if such facilities were required to be purchased or constructed as a precondition to obtaining the franchise or to its renewal; ....

N.H.REV.STAT.ANN. ch. 357-C:7 VII (1991 Supp.) (emphasis added).

[22] Being a diversity case, the Court is bound to apply New Hampshire law, *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), in interpreting the language of the Auto Dealers Act. When interpreting the language of a state statute, a New Hampshire court will construe that language according to its common and approved usage. *Concord Steam Corp. v. The City of Concord,* 128 N.H. 724, 519 A.2d 266 (N.H.1986). However, the court should not interpret a statute so as to produce an unjust or illogical result. *General Electric Co. v.*

| _Dole_ | _Co._, | 105 | N.H. | 477, | 479, | 202 | A.2d | 486 | (N.H.1964) |

. For, as the New Hampshire Supreme Court has held, "It is not to be presumed that the legislature would pass an act leading to an absurd result and nullifying to an appreciable extent the purpose of the statute." _State v. Kay,_ 115 N.H. 696,

| 698, | | 350 | | A.2d | | 336, | | 338 | (N.H.1975) |

. And, when a statute is clarified by a subsequent amendment, the amendment is indicative of the legislative inte surrounding the original enactment. _Supervisory Union 29 v. New Hampshire Department of Education,_ 125 N.H. 117, 122, 480 A.2d 46, 48 (N.H.1984) ; _Roy v. Transairco,_ 112 N.H. 171, 174, 291 A.2d 605, 607 (N.H.1972) ; _Blue Mountain Forest Association v. Town of Croydon,_ 119 N.H. 202, 205, 400 A.2d 55, 57 (N.H.1979) .

In _Supervisory Union 29, supra,_ the New Hampshire Supreme Court held:

Where the original law was subject to very serious doubt, by permitting subsequent amendments to control the form meaning a great deal of uncertainty in the law is removed. And the legislature is probably in the best position to ascertai the most desirable construction.

_Id._

at 122 (quoting 2A J. Sutherland, Statutes and Statutory Construction § 49.11 (C. Sands 4th ed. 1973)). In opposition Nault's motion, Honda argues that much uncertainty may be removed and an illogical result avoided if the Court permits the "subsequent amendments [of the Auto Dealers *50 Act] to control the former meaning." _Supervisory Union 29, supra,_ at 122.

It is certainly arguable that the New Hampshire Legislature did not intend to provide a statutory remedy of the son magnitude contemplated in the former Auto Dealers Act to an automobile dealer _only_ if the dealer were terminated for _good cause,_ while leaving the wrongfully terminated dealer without any recourse at all.[FN14] Honda asserts that a New Hampshire court reviewing this issue would find that in order to benefit from the protections and remedies provided in Auto Dealers Act, even prior to its amendment in 1991, the dealer must first demonstrate that he or she was terminated _without_

good cause. In that scenario, the question of whether Nault was terminated for cause or without cause is a genuine issue of material fact and summary judgment would be inappropriate.

> FN14.
> However, Honda has cited, and the Court has discovered, no legislative history which demonstrates conclusivel that the 1991 amendments to the Auto Dealers Act were intended to correct unintended or illogical provisions ir the        original      Act.        _See,_        _e.g.,_
> N.H. Senate Journal, March 27, 1990, at 822 (comments of Senator DuPont regarding House Bill 1276).

Conversely, Nault argues that the Court should interpret the pre-amendment words of the Auto Dealer Act according to their plain and customary meaning. Accordingly, Nault would be entitled to judgment if it has been terminated for go cause. Nault has, however, alleged just the opposite: that Honda's termination of its franchise was _wrongful,_ thereby raising a genuine issue of material fact and precluding summary judgment.

[23]

The Court anticipates that, for the purposes of this Count, Nault would concede that Honda terminated its franchise w proper notice, in good faith and with good cause. However, the Court will not permit Nault to concede that its terminatio was proper, merely for the purpose of obtaining summary judgment on one count of its complaint, while simultaneously challenging the termination as having been wrongful and claiming substantial damages for that wrongful termination. Nault is certainly at liberty to plead its case in the alternative, as it has. _See_ Fed.R.Civ.P. 8(e)(2) . Eventually, however, it must elect a theory of its case that is internally consistent. In the absence of such an election, the question of whethe Honda's termination of the Nault Acura franchise was wrongful remains a genuine issue of material fact and, there summary judgment is inappropriate.

If Nault should elect to concede for all purposes of this litigation that, as a matter of fact and law, Honda acted in good faith and in accordance with the pre-1991 requirements of the Auto Dealers Act, summary judgment might then appropriate on this count, depending upon the proper interpretation of the statute then in force. However, until such election is made, the Court will not unnecessarily speculate on the New Hampshire Legislature's intent when passing th 1991 amendments to the Act, the meaning of "fair and reasonable compensation" as that phrase is used in the Act, or what, if any, compensation might be appropriate under a proper construction.[FN15] Because there remains a genuine issue of material fact, summary judgment is not appropriate and Nault's Motion for Partial Summary Judgment (Count (document no. 77) is denied at this juncture.

> FN15.
> As noted above, the Auto Dealers Act provides that, "Within 90 days of the valid termination ... with notice, in good faith, and for good cause of any franchise, the new motor vehicle dealer shall be allowed fair and reasonable compensation by the manufacturer for ... the dealership facilities." However, it is unclear precisely what Hampshire Legislature intended by the phrase "fair and reasonable." It is also unclear whether the Legislat intended that, in exchange for such compensation, the manufacturer would obtain title to the dealership facilities. It is entirely possible, especially in light of subsequent language in the statute relating to the compensation to b paid to a dealer who leased, rather than owned, the dealership facilities, that the Legislature intended somethin other than requiring the manufacturer to purchase the dealership facilities in fee.

IX. *Summary.*

As discussed above, the Court rules or reaffirms its prior rulings on the pending motions as follows:

**\*51** 1. Honda's Motion to Strike Scandalous Pleadings and for Sanctions (document no. 155) is granted in part;

2. Nault's Motion for Default Judgment (document no. 62) is denied;

3. Nault's Second Motion for Default Judgment (document no. 92) is denied;

4. Honda's Motion to Hold Damien Budnick in Contempt (document no. 176) is denied, Honda's Motion to Reconsid denied, and fees are assessed against American Honda;

5. Nault's Motion for Relief From Protective Order (document no. 128) is granted;

6. Nault's Motion for Partial Summary Judgment (Count I) (document no. 77) is denied;

7. Honda's Motion for Partial Summary Judgment (Count IV) (document no. 109) is denied.

SO ORDERED.

D.N.H.,1993.
Nault's Auto. Sales, Inc. v. American Honda Motor Co., Inc., Acura Auto. Div.
148 F.R.D. 25, 26 Fed.R.Serv.3d 46

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.