1
2
3
4

           UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
              EASTERN DIVISION

5  CARMEN FLORES, individually        )
    and on behalf of all others     )
6  similarly situated,             )
                        )
7        Plaintiff,         )
                        )
8    vs.                 )No. 07 CV 6403
                        )Judge Hibbler
9  DIAMOND BANK, FSB,        )Magistrate
                        )Judge Valdez
10       Defendants.       )

11        The following corrections were made:

12  PAGE_____ LINE_____

13  CHANGE_____

14  TO_____

15  REASON_____

16

17  PAGE_____ LINE_____

18  CHANGE_____

19  TO_____

20  REASON_____

21                      _____

22                      JAMES A. HUBBARD

23

24

```
 1   PAGE_____ LINE_____

 2   CHANGE_____

 3   TO_____

 4   REASON_____

 5

 6   PAGE_____ LINE_____

 7   CHANGE_____

 8   TO_____

 9   REASON_____

10

11   PAGE_____ LINE_____

12   CHANGE_____

13   TO_____

14   REASON_____

15

16   PAGE_____ LINE_____

17   CHANGE_____

18   TO_____

19   REASON_____

20

21

22                    _____

23                    JAMES A. HUBBARD

24
```

1  PAGE_____ LINE_____

2  CHANGE_____

3  TO_____

4  REASON_____

5

6  PAGE_____ LINE_____

7  CHANGE_____

8  TO_____

9  REASON_____

10

11  PAGE_____ LINE_____

12  CHANGE_____

13  TO_____

14  REASON_____

15

16  PAGE_____ LINE_____

17  CHANGE_____

18  TO_____

19  REASON_____

20

21

22                    _____

23                    JAMES A. HUBBARD

24

1   PAGE_____ LINE_____

2   CHANGE_____

3   TO_____

4   REASON_____

5

6   PAGE_____ LINE_____

7   CHANGE_____

8   TO_____

9   REASON_____

10

11  PAGE_____ LINE_____

12  CHANGE_____

13  TO_____

14  REASON_____

15

16  PAGE_____ LINE_____

17  CHANGE_____

18  TO_____

19  REASON_____

20

21

22                    _____

23                    JAMES A. HUBBARD

24

1   PAGE_____ LINE_____

2   CHANGE_____

3   TO_____

4   REASON_____

5

6   PAGE_____ LINE_____

7   CHANGE_____

8   TO_____

9   REASON_____

10

11  PAGE_____ LINE_____

12  CHANGE_____

13  TO_____

14  REASON_____

15

16  PAGE_____ LINE_____

17  CHANGE_____

18  TO_____

19  REASON_____

20

21

22                  _____

23                  JAMES A. HUBBARD

24

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   CARMEN FLORES, individually      )
     and on behalf of all others      )
 4   similarly situated,              )
                                      )
 5              Plaintiff,            )    No. 07 C 6403
                                      )
 6      vs.                           )    Judge Hibbler
                                      )
 7   DIAMOND BANK, FSB,               )    Magistrate
                                      )    Judge Valdez
 8              Defendant.            )

 9

10              I, KIMBERLY COLE hereby certify that I have

11   read the foregoing transcript of my deposition taken on

12   Wednesday, June 18, 2008, and that to the best of my

13   knowledge it is a true and correct transcript of said

14   deposition, except as I have changed it on the attached

15   sheets in accordance with the rules provided by the

16   said Court.

17              _____   Corrections were made.

18              _____   No corrections were made.

19

20                      _____
                                  KIMBERLY COLE
21
     SUBSCRIBED AND SWORN TO
22   before me this     day
     of          , 2008.
23
     _____
24   Notary Public
```

1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4    CARMEN FLORES, individually        )
     and on behalf of all others        )
5    similarly situated,                )
                                        )
6          Plaintiff,                   )
                                        )
7       vs.                             )No. 07 CV 6403
                                        )Judge Hibbler
8    DIAMOND BANK, FSB,                 )Magistrate
                                        )Judge Valdez
9          Defendants.                  )

10              The following corrections were made:

11   PAGE_____ LINE_____

12   CHANGE_____

13   TO_____

14   REASON_____

15

16   PAGE_____ LINE_____

17   CHANGE_____

18   TO_____

19   REASON_____

20                         _____

21                              KIMBERLY COLE

22

23

24

1  PAGE_____ LINE_____

2  CHANGE_____

3  TO_____

4  REASON_____

5

6  PAGE_____ LINE_____

7  CHANGE_____

8  TO_____

9  REASON_____

10

11 PAGE_____ LINE_____

12 CHANGE_____

13 TO_____

14 REASON_____

15

16 PAGE_____ LINE_____

17 CHANGE_____

18 TO_____

19 REASON_____

20

21

22             _____

23                     KIMBERLY COLE

24

1  PAGE_____ LINE_____

2  CHANGE_____

3  TO_____

4  REASON_____

5

6  PAGE_____ LINE_____

7  CHANGE_____

8  TO_____

9  REASON_____

10

11  PAGE_____ LINE_____

12  CHANGE_____

13  TO_____

14  REASON_____

15

16  PAGE_____ LINE_____

17  CHANGE_____

18  TO_____

19  REASON_____

20

21

22                    _____

23                          KIMBERLY COLE

24

```
1   PAGE_____ LINE_____

2   CHANGE_____

3   TO_____

4   REASON_____

5

6   PAGE_____ LINE_____

7   CHANGE_____

8   TO_____

9   REASON_____

10

11  PAGE_____ LINE_____

12  CHANGE_____

13  TO_____

14  REASON_____

15

16  PAGE_____ LINE_____

17  CHANGE_____

18  TO_____

19  REASON_____

20

21

22                      _____

23                      KIMBERLY COLE

24
```

1  PAGE_____  LINE_____

2  CHANGE_____

3  TO_____

4  REASON_____

5

6  PAGE_____  LINE_____

7  CHANGE_____

8  TO_____

9  REASON_____

10

11  PAGE_____  LINE_____

12  CHANGE_____

13  TO_____

14  REASON_____

15

16  PAGE_____  LINE_____

17  CHANGE_____

18  TO_____

19  REASON_____

20

21

22                  _____

23                  KIMBERLY COLE

24

1   PAGE_____ LINE_____

2   CHANGE_____

3   TO_____

4   REASON_____

5

6   PAGE_____ LINE_____

7   CHANGE_____

8   TO_____

9   REASON_____

10

11  PAGE_____ LINE_____

12  CHANGE_____

13  TO_____

14  REASON_____

15

16  PAGE_____ LINE_____

17  CHANGE_____

18  TO_____

19  REASON_____

20

21

22                  _____

23                  KIMBERLY COLE

24

```
 1   PAGE_____ LINE_____

 2   CHANGE_____

 3   TO_____

 4   REASON_____

 5

 6   PAGE_____ LINE_____

 7   CHANGE_____

 8   TO_____

 9   REASON_____

10

11   PAGE_____ LINE_____

12   CHANGE_____

13   TO_____

14   REASON_____

15

16   PAGE_____ LINE_____

17   CHANGE_____

18   TO_____

19   REASON_____

20

21

22                    _____

23                    KIMBERLY COLE

24
```

**Page 1**

1          UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF ILLINOIS
3               EASTERN DIVISION
4
5   CARMEN FLORES, individually        )
    and on behalf of all others        )
6   similarly situated,                )
                                       )
7          Plaintiff,                  )
                                       )
8      vs.                             )No. 07 CV 6403
                                       )Judge Hibbler
9   DIAMOND BANK, FSB,                 )Magistrate
                                       )Judge Valdez
10         Defendants.                 )
11
12          The deposition of JAMES A. HUBBARD,
13   called by the Plaintiff taken in accordance with
14   the applicable provisions of the Federal Rules of
15   Civil Procedure of the United States District
16   Courts pertaining to the taking of depositions,
17   taken before Barbara Anthony, CSR, RPR, CSR License
18   No. 084-003185, a notary public within and for the
19   County of DuPage and State of Illinois, taken at
20   180 West Washington, Suite 700, Chicago, Illinois
21   on June 19, 2008, commencing at the hour of
22   10:11 a.m.
23
24

COPY

ACR REPORTING, LLP (312) 422-0515

**Page 2**

1  APPEARANCES:
2
3          Mr. Lance A. Raphael
           Consumer Advocacy Center, P.C.
4          180 West Washington Street
           Suite 700
5          Chicago, Illinois  60602
           (312) 782-5808
6            on behalf of the Plaintiff,
7          Mr. Mark D. Belongia
           Belongia & Shapiro, LLP
8          The Monadnock Building
           53 West Jackson Boulevard
9          Suite 315
           Chicago, Illinois  60604
10         (312) 662-1030
                and
11         Mr. Andrew Bronfeld
           Diamond Bank, FSB
12         100 West North Avenue
           Chicago, Illinois  60645
13         (312) 664-4320
             on behalf of the Defendant.
14
15
16
17
18
19
20
21
22
23
24

ACR REPORTING, LLP (312) 422-0515

**Page 3**

1                  I N D E X
2   WITNESS                              PAGE
3   JAMES A. HUBBARD
4   Examination
5   By: Mr. Raphael                        4
6
7                  EXHIBITS
8
9                             MARKED FOR
10                            IDENTIFICATION
11  D                              13
12  E                              63
13  F - CONFIDENTIAL               88
14
15
16
17
18
19
20
21
22
23
24

ACR REPORTING, LLP (312) 422-0515

**Page 4**

1              (Witness duly sworn.)
2              JAMES A. HUBBARD
3   called as a witness herein, having been duly sworn
4   was examined and testified as follows:
5                  EXAMINATION
6   By Mr. Raphael:
7      Q    Mr. Hubbard, will you give your full name
8   for the court reporter for the record.
9      A    James A. Hubbard.
10     Q    Where do you work?
11     A    Diamond Bank, FSB.  100 West North
12  Avenue.
13     Q    Have you had your deposition taken ever
14  before?
15     A    Yes.
16     Q    How many times?
17     A    Two.
18     Q    Two.
19          What were those cases relating to?
20     A    General bank litigation.
21     Q    So none of them were private
22  litigation --
23     A    No.
24     Q    -- car accident or a slip and fall?

ACR REPORTING, LLP (312) 422-0515

---

5

```
 1     A     No.
 2     Q     What kind of litigation with regard to
 3  the bank?
 4     A     Loan litigation.
 5     Q     Give me the -- I don't want to ask you
 6  20 different ways to get to the same answer.  Just
 7  give me a basic description so I can move on to the
 8  next topic.  It is just background.
 9     A     Generic loan collection issues.
10     Q     The bank was suing someone to collect on
11  a loan --
12     A     Yes.
13     Q     -- or someone was suing the bank?
14     A     Yes, the bank was.
15     Q     Suing to collect on a loan?
16     A     Correct.
17     Q     Two cases before?
18     A     I believe so.  Some amount like that.
19     Q     Nothing related to banking regulations,
20  but more collection action from the bank?
21     A     That's correct.
22     Q     And nothing related obviously to the
23  Electronic Funds Transfer Act?
24     A     No.
```

---

6

```
 1     Q     How long ago did you have those
 2  depositions?
 3     A     Years.
 4     Q     Years, okay.
 5           Do you know if they were in State or
 6  Federal Court?
 7     A     Don't know.  I don't --
 8     Q     The reason I am asking you is I have to
 9  have an understanding if you know the basic
10  procedures for depositions.  It is important I go
11  over them.
12           Since I don't know, let me just give you
13  a quick one, two primer.
14     A     Thanks.
15     Q     I think we have -- they took it out of
16  here.
17           MR. BELONGIA:  Just go ahead.
18           By Mr. Raphael:
19     Q     Basically if you don't understand a
20  question that I ask, tell me.  I'll explain it.
21  Otherwise, I will assume you understand the
22  question.
23           I don't want you to guess.  I'd rather
24  you tell me what you do know and what you don't
```

---

7

```
 1  know.  If we ask for something where it might
 2  involve a range of dates, as opposed to a specific
 3  date we can ask a couple of questions to get the
 4  outer range of things, so it is an estimate as
 5  opposed to a guess.
 6           You're going to hear your lawyer
 7  possibly object to some of the questions that I
 8  ask.  Unless he tells you don't answer the
 9  question, try to stay focused on the question so
10  that we don't have to reread it back.  Because he
11  and I might have a particular legal point, but it
12  really doesn't affect whether you should answer the
13  question or not.
14           Let me think what else.  That's all I
15  can think of at the moment.
16           Let me go back and finish up doing a
17  little bit of your background.
18           Oh, that's the other thing.  I will ask
19  questions that are for lack of a better term really
20  stupid.  They are not meant to talk down to you.
21  They are meant to drag things out.  Unfortunately
22  you seen the statute of justice of how it is blind.
23  The court system is blind until you show them
24  something.
```

---

8

```
 1           So if, for example, if I were to ask you
 2  certain questions about the operations of the bank
 3  without first getting some really really
 4  rudimentary background on you there might be an
 5  objection properly that oh, that question and
 6  answer lacks foundation.
 7           So please don't take offense if I ask
 8  you what seems to be really rudimentary and
 9  simplistic questions, okay.
10           MR. BELONGIA:  One last ground rule that you
11  didn't mention.
12           MR. RAPHAEL:  Yes.
13           MR. BELONGIA:  Is always keep your responses
14  verbal.  Avoid shrugs of the head, et cetera.  The
15  court reporter can't take that down.
16           By Mr. Raphael:
17     Q     Right.  Since she is the most important
18  person in the room, not you anymore and not me.
19  Keep your hands away from your mouth so she can
20  hear you and speak as loud as necessary so she
21  hears everything and writes it down accurately.
22           Are we on the same page with all of the
23  ground rules?
24     A     Yes.
```

9

```
 1    Q      Okay.  So when did you start with
 2  Diamond Bank?
 3    A      We acquired Diamond Bank August 31st or
 4  September 1st of 2004.
 5    Q      Okay.  Were you with Diamond Bank when
 6  it formed or when it acquired -- I guess it was
 7  North Federal Savings?  Was it North Federal
 8  Savings that was acquired?
 9    A      Yes.  It was North Federal Savings that
10  was acquired.
11    Q      Were you with Diamond Bank at that --
12    A      Diamond Bank --
13    Q      -- formation?
14    A      -- was not in formation.
15    Q      Were you with North Federal Savings
16  before --
17    A      No.
18    Q      Okay.  That's another ground rule.  We
19  all really smart people here presumably, so we know
20  what the other person is going to say.  But if we
21  don't let the other finish the sentence, she will
22  get mad at us, okay.
23           So you weren't with North Federal
24  Savings prior to the acquisition of that entity by
```

ACR REPORTING, LLP (312) 422-0515

10

```
 1  Diamond Bank?
 2    A      No.
 3    Q      Before you worked for Diamond Bank where
 4  did you work?
 5    A      I worked for an entity called DH2, which
 6  was the entity that or part of the entity that
 7  formed a partnership or Group 2 by North Federal
 8  Savings.
 9    Q      Okay.  All right.  What was the other
10  part of the entity that bought -- give me, if you
11  can, the structure of what bought North Federal
12  Savings so I get an idea of how this all
13  happened?
14    A      There were three individuals who
15  acquired the stock interest in North Federal
16  Savings.  And there was a series of mergers that
17  related to do it to take control of the entity with
18  which was a publicly held company at the time.
19    Q      So --
20    A      And it was taken private.
21    Q      So North Federal was publicly owned.
22  All right.
23           There were three individuals who owned?
24    A      Who owned.  Who had entities that owned
```

ACR REPORTING, LLP (312) 422-0515

11

```
 1  some of the shares and they acquired the balance of
 2  the shares of the company.
 3    Q      Were you one of the entities?
 4    A      No.
 5    Q      Do you own stock in --
 6    A      No.
 7    Q      -- Diamond Bank?
 8           We are doing it.  Sorry.  I talk slow
 9  sometimes because I am thinking as I am talking.
10  So I apologize.  Let me try it again.
11           You don't own any stock in Diamond Bank?
12    A      No.
13    Q      Okay.  You weren't one of the three
14  entities that acquired Diamond Bank or North
15  Federal that turned into Diamond Bank?
16    A      No.
17    Q      So can you -- did you take part in how
18  the -- in how North Federal became Diamond Bank?
19    A      Yes.
20    Q      Describe for me how you -- how North
21  Federal became Diamond Bank?
22    A      We changed --
23    MR. BELONGIA:  Asked and answered.
24
```

ACR REPORTING, LLP (312) 422-0515

12

```
 1    By Mr. Raphael:
 2    Q      You can still answer.  He is just
 3  saying that --
 4    A      We changed the name.  We acquired North
 5  Federal Savings.  Subsequently simply had a name
 6  change.
 7    Q      All right.  And the acquisition of it
 8  occurred around August 31, 2004 by these 3
 9  entities?
10    A      Yes.
11    Q      So when you started with Diamond Bank
12  August or early September of '04, your position was
13  president at that time?
14    A      Yes.
15    Q      You maintained the same position the
16  whole time you have been there?
17    A      I have been president the entire time.
18    Q      Aside from doing presidential like
19  things, give me an idea of what it is you do as
20  president for Diamond Bank?
21    A      Responsible for the organization,
22  approving loans.  You know, just responsible for
23  the general management of the organization.
24    Q      Now, more specifically as it relates to
```

ACR REPORTING, LLP (312) 422-0515

13

1  the running of the ATM Network that Diamond Bank
2  has.  What would be your responsibilities vis-a-vis
3  that?
4      A      Simply general management.
5      Q      More of an oversight.  You don't do any
6  of the day-to-day activities related to running the
7  ATM's --
8      A      No.
9      Q      -- that Diamond Bank has?
10     A      No.
11  MR. RAPHAEL:  Off the record.
12          (A discussion was had off the record.)
13          (Deposition Exhibit D was marked for
14          identification.)
15  By Mr. Raphael:
16     Q      Let's go to Exhibit D.  Have you ever
17  seen this document before?  Take your time.
18     A      (Examining document.)
19          (A discussion was had off the record.)
20  By Mr. Raphael:
21     Q      All right.  You've had time to look at
22  Exhibit D?
23     A      I believe, yes, I have.
24     Q      Okay.  Have you seen that before?

ACR REPORTING, LLP (312) 422-0515

14

1      A      I believe that was the letter that I did
2  read.
3      Q      What was your reaction to it?
4  MR. BELONGIA:  Objection, relevance.
5  THE WITNESS:  Didn't think much of it.
6  By Mr. Raphael:
7      Q      You didn't have any thoughts about it at
8  all?
9      A      Rejected it.
10     Q      Okay.  Besides rejecting it, what did
11  you think of it?
12  MR. BELONGIA:  Objection; relevance, asked and
13  answered.
14  THE WITNESS:  Rejected it.  Didn't think that
15  the merits were right.
16  By Mr. Raphael:
17     Q      I'm sorry, you didn't --
18     A      Without merit.
19     Q      I'm sorry, without merit.  Okay.
20          Did you determine that a sign had been
21  in place when this lawsuit was filed.  By "sign,"
22  let me give you some ground rules we did yesterday.
23          When I say a sign, I mean the fee notice
24  required by EFTA.  The notice by EFTA, the sticker,

ACR REPORTING, LLP (312) 422-0515

15

1  the plaque, whatever term we are talking about for
2  the purpose of this deposition.
3          What I mean is the statutorily required
4  notice of a surcharge fee being assessed against a
5  user of the ATM.  So are we on the same page as to
6  that --
7      A      Yes.
8      Q      -- terminology?  Great.  Okay.
9          Now, given our understanding of that
10  terminology, was there a sticker or fee notice or
11  sign?
12     A      At the time of the lawsuit being filed.
13     Q      Yes.
14     A      I determined -- I asked one of the
15  individuals at the bank to inspect the ATM.
16     Q      Who?
17     A      Brett Sand.
18     Q      Yes.
19     A      He responded that no, there was not a
20  sign on there at that time.
21     Q      Okay.  So is it your understanding that
22  a sign needs to be on the ATM?
23     A      Yes.
24     Q      Okay.  So then when you looked at this

ACR REPORTING, LLP (312) 422-0515

16

1  Exhibit D, and you just told me now your reaction
2  was without merit, what did you mean by that?
3  MR. BELONGIA:  I am going to object.  Now you
4  are delving into what I believe is attorney-client
5  privilege, attorney work product.  And if you can
6  answer outside of any of those parameters --
7  MR. RAPHAEL:  Yes.
8  MR. BELONGIA:  -- okay, but by any means if
9  it's delving into attorney-client privilege,
10  attorney-client work product, I'd ask you not to
11  answer.
12  By Mr. Raphael:
13     Q      Let me further what your lawyer said.  I
14  am not trying to trick you or anything like that.
15  Let me rephrase the question so it is absolutely
16  clear.
17          I don't want to know what your lawyer
18  told you.  If your lawyer said to you, gee, Jim,
19  this is without merit because of this legal
20  argument and this legal argument and this legal
21  argument or anything remotely similar to that kind
22  of conversation, I don't want to know.  Because
23  that is your lawyer's job to put in front of the
24  Court.  They have a motion to dismiss for your

ACR REPORTING, LLP (312) 422-0515

17

1  bank, I'm sure you're aware of.  We will be
2  fighting about that and see what the Judge says.
3      What I am actually more concerned with
4  is what you thought irrespective of what your
5  client -- of what your lawyer said.
6      MR. BELONGIA:  If you can separate the two.
7      MR. RAPHAEL:  Yes.
8      MR. BELONGIA:  Answer the best to your
9  ability.
10     By Mr. Raphael:
11     Q    I presume you have -- you're the
12  president of a very large bank.  You have got --
13  It's clear you're a very intelligent man.  I want
14  to get an idea of what your thoughts are because
15  sometimes what is lost in translation is what
16  lawyers think.
17     MR. BELONGIA:  I object to the term large
18  bank.
19     By Mr. Raphael:
20     Q    Small bank, medium bank, good bank.
21     MR. BELONGIA:  Very small community bank for
22  the record.
23     By Mr. Raphael:
24     Q    Yes.  A very small community bank, but

ACR REPORTING, LLP (312) 422-0515

18

1  looks very professional.
2      A    I have had subsequent discussions with
3  counsel regarding this.  I think it would be
4  difficult to split out anything that would not have
5  been discussed within that context of that
6  discussion.
7      Q    Fair enough.
8      Do you remember -- if you can think back
9  in your mind what you thought about when you were
10  reading it.  Back at that time.  Not now looking at
11  it fresh.
12     A    Not really.
13     Q    Okay.  So today when you're saying it
14  was without merit, was that based upon discussions
15  with your lawyer or do you think -- in what aspect
16  do you think it is without merit, if your
17  investigation showed that there was a missing
18  notice on the ATM?
19     MR. BELONGIA:  Same objection.
20     THE WITNESS:  Again I have gone through -- we
21  have had extensive discussions with Counsel --
22     By Mr. Raphael:
23     Q    Sure.
24     A    -- Regarding this issue.

ACR REPORTING, LLP (312) 422-0515

19

1      Q    Yes.
2      A    And it's hard for me to pull apart
3  anything that would be outside of that,
4  discussions.
5      Q    Let's approach it a different way.  Are
6  you familiar with EFTA?
7      A    Yes.
8      Q    Were you familiar with EFTA before this
9  lawsuit came on the horizon?
10     A    Yes.
11     Q    And you were familiar with the
12  requirement that the ATM's that charge a surcharge
13  or a fee need a fee notice on it?
14     A    Yes.
15     Q    So before this lawsuit was filed, before
16  you were aware of this lawsuit being filed, you
17  believed it was an obligation of the bank to have
18  the fee notice on the ATM?
19     MR. BELONGIA:  Objection to the term
20  obligation.
21     By Mr. Raphael:
22     Q    Legal obligation, whatever.  Your
23  vice president testified that you guys are supposed
24  to comply with the law and all of that.  So I don't

ACR REPORTING, LLP (312) 422-0515

20

1  know.
2      Do you understand the word obligation?
3      A    Yes.
4      Q    Okay.
5      A    Yes.  We have an obligation or
6  responsibility to comply with the law.
7      Q    Okay.
8      A    The law states that we should have a
9  sign on the machine.
10     Q    Okay.  I didn't want to interrupt you.
11  That is why I was waiting for the period.
12     A    Okay.
13     Q    All right.  So then if there was no
14  notice on the machine at the time you became aware
15  of the lawsuit, what makes you feel that the bank
16  was compliant with the law?
17     MR. BELONGIA:  Objection, standing objection.
18  Attorney-client privilege, attorney-work product.
19     By Mr. Raphael:
20     Q    Yes.  I will have a standing objection.
21  Go ahead.
22     A    The bank had a sign on the machine and
23  thus my belief is we were compliant.
24     Q    Well, okay.  So is it your belief that

ACR REPORTING, LLP (312) 422-0515

21

1  if there was a sign put on the machine at some
2  point, doesn't matter when, that if that sign is no
3  longer on the machine, doesn't matter how long that
4  that sign isn't on the machine, that the bank is
5  still compliant?
6        A     It is my belief that the bank complied
7  with the laws and affixed a sign to that machine.
8  When notified about the sign not being there, the
9  bank immediately affixed a sign to the machine.
10       Q     Okay.  That isn't exactly what I asked.
11  So maybe I will try to say it in a different way so
12  we are on the same page.
13       A     Yes, okay.
14       Q     I'm trying to get an idea of what your
15  understanding is of your obligation after affixing
16  a sign to the ATM. Let's for the sake of argument
17  so we are not bantering about, oh, it was on.  It
18  was not on.  Okay.
19             Let's assume that the bank put on a sign
20  to this machine back in 2005 or 2006 and
21  immediately the day after vanished from the ATM for
22  the sake of argument.  What is the bank's
23  obligation in terms of putting on a new sign?
24       MR. BELONGIA:  Objection, calls for

ACR REPORTING, LLP (312) 422-0515

22

1  speculation and object to the facts set forth in
2  the hypothetical as not relating to the case that
3  is pending.
4        THE WITNESS:  The law states that the bank
5  should have a sign on the machine.  We affixed a
6  sign on the machine.
7              When notified that there was no sign on
8  the machine, we immediately inspected the machine
9  and reaffixed the sign.   Because we believe that
10  there should be a sign on the machine.
11  By Mr. Raphael:
12       Q     Okay.  So your understanding then of the
13  law is not that you can affix the sign once and
14  then no matter what happens later on, you don't
15  have to reaffix a sign if the sign comes off,
16  right?
17       A     My understanding of the law is there
18  should be a sign on the machine.
19       Q     Right.
20       A     We comply with all laws.  We have a
21  compliance program.  We adhere to our regulations
22  to do that.
23             If in fact anything comes to our
24  attention that is not in compliance, we immediately

ACR REPORTING, LLP (312) 422-0515

23

1  correct the situation.
2        Q     What I am asking again, and I'll ask it
3  a different way so we can still get to the -- I
4  don't understand why there wasn't a yes to what I
5  just said.
6              But if you put a sign on the machine,
7  and it comes off, and you notice that the sign is
8  not there, it's your belief that you got to put a
9  new sign on, right?
10       MR. BELONGIA:  Asked and answered.
11       THE WITNESS:  We've already -- I've already
12  answered that question.
13  By Mr. Raphael:
14       Q     Okay.  Is it yes or no?
15       A     I stated the law says there should be a
16  sign on the machine.  We comply with the laws.  If
17  it's not there, we put one on.
18       Q     Okay.  I am not asking for you --
19       A     So yes.
20       MR. BELONGIA:  He just said yes.
21  By Mr. Raphael:
22       Q     Oh, okay.  You just said yes?
23       A     If there is not a sign on the machine --
24       Q     Right.

ACR REPORTING, LLP (312) 422-0515

24

1        A     -- yes, I have instructed our people to
2  put a sign on the machine.
3        Q     That's all I was trying to get at.
4        A     Yes.
5        Q     You know, for whatever reason if the
6  sign isn't there and you know the sign isn't there,
7  just because you put a sign up ten centuries ago
8  doesn't mean you now don't put up a sign,
9  correct?
10       MR. BELONGIA:  Asked and answered.
11  By Mr. Raphael:
12       Q     That was a different way of asking.
13       MR. BELONGIA:  The same question.  So you will
14  get the same answer.
15  By Mr. Raphael:
16       Q     Yes, right?
17       A     If the sign is not on the machine, I
18  have instructed our people to put a sign on the
19  machine.  Simple.
20       Q     Okay.  And that's because that's your
21  understanding of what you need to do to comply with
22  the law?
23       A     Yes.
24       Q     Okay.  Sorry about that.  All right.

ACR REPORTING, LLP (312) 422-0515

25

```
 1            All right. Let's go back to the sign on
 2  the ATM and rather than again bantering back and
 3  forth. It's my position there was never a sign up
 4  there, just so you know up front. It was your
 5  position that there was a sign up there at one
 6  point in time. We will explore. I will call that
 7  the old sign versus the new sign which is the
 8  current sign that is on there now. Are we on the
 9  same page?
10      A    Yes.
11      Q    But we are not conceding to each other
12  any legal issues or issues of fact. We are just
13  for the sake of not having to go and do a long
14  explanatory preface to each question, for the sake
15  of making the question simple, we are just calling
16  it old and new sign. Same page?
17      A    Yes.
18      Q    Tell me about the old sign on the ATM.
19  What did it look like?
20      A    To the best of my recollection it was
21  some sort of silvery black sign.
22      Q    Okay.
23      A    That had the disclosure information on
24  it.
```

27

```
 1  that location.
 2      A    Fine.
 3      Q    Unless we specify otherwise. That ATM
 4  unless we specify otherwise, and the fee notice
 5  unless we specify otherwise.
 6      A    Fine.
 7      Q    Cool. When did the renovation take
 8  place at that location?
 9      MR. BELONGIA: Asking when it started? Either
10  because otherwise you could have time frame.
11      MR. RAPHAEL: I know. He can explain.
12      THE WITNESS: Subsequent to the purchase we
13  started doing small renovation, things almost
14  immediately thereafter, cleaning, painting.
15  By Mr. Raphael:
16      Q    Cosmetic stuff?
17      A    Yes.
18      Q    Okay.
19      A    And then we had a -- I'm not sure
20  whenever we had a building permit issue is when we
21  began the process.
22      Q    The real heavy duty stuff?
23      A    My guess is that it was in '05.
24      Q    Do you know summer, winter, fall?
```

26

```
 1      Q    So you, yourself, have seen the old
 2  sign?
 3      A    Yes.
 4      Q    Okay. When was the first time you saw
 5  the old sign?
 6      A    Best of my recollection, August of or
 7  June or somewhere of 2004.
 8      Q    I got to ask you some more background
 9  questions. I'm sorry. August of '04 that's when
10  Diamond took over North Federal Savings.
11           When did the renovation take place of
12  the bank location that we are talking about which
13  is at 100 North --
14      MR. BELONGIA: West North Avenue.
15      MR. RAPHAEL: West North Avenue.
16      MR. BELONGIA: Let's just call it for the
17  record so we are clear and you don't have to keep
18  repeating that, just call it the bank location.
19      MR. RAPHAEL: The bank location.
20      MR. BELONGIA: I'll stip to that.
21  By Mr. Raphael:
22      Q    Are we okay, fine.
23           Just for the sake of everything we are
24  talking about, sir, we will be talking about just
```

28

```
 1      A    I would assume --
 2      MR. BELONGIA: Don't assume. Don't guess.
 3      THE WITNESS: I don't know.
 4  By Mr. Raphael:
 5      Q    Okay.
 6      A    Some time in '05.
 7      Q    Some time in '05, okay.
 8           That's when you guys hired Ligas or did
 9  you hire him before?
10      A    We engaged Ligas to do some of the
11  construction in the bank that he did.
12      Q    There were others who did construction
13  as well besides him or I thought he was the
14  general?
15      A    He was.
16      Q    He was the general?
17      A    Yes.
18      Q    Did he start with all of the minor
19  cosmetic stuff or did he start after you guys got
20  the construction permit?
21      A    After the construction permit.
22      Q    Who did the painting and the other type
23  of minor cosmetic cleaning and painting and other
24  stuff, if it wasn't Ligas? Who did you guys hire
```

29

1 before that?
2    A    I believe we hired a couple of handymen
3 to sweep and clean, as well as the handyman that
4 was an employee of the bank.
5    Q    Is he still an employee of the bank?
6    A    No.
7    Q    Has nothing to do with the case. I like
8 to see when transitions occur, employees continue
9 to operate.
10          These couple of handymen and the man who
11 was a handyman for the bank prior to that, they did
12 painting -- what other type of cosmetic upgrades
13 for the bank did the real earnest heavy duty
14 construction start?
15    A    Really just kind of painting and
16 cleaning.
17    Q    They didn't do -- they didn't install --
18 you guys didn't have that new logo at that point
19 yet?
20    A    No.
21    Q    Did these guys install new carpet or
22 anything?
23    A    I don't recall.
24    Q    Okay. They would have worked from

30

1 almost immediately in August of '04 until some time
2 in '05 when you got the building permit?
3    A    I believe so.
4    Q    All right. So Ligas started as the
5 general contractor for the bank some time in '05
6 maybe a little before or after the building
7 permit?
8    A    Yes.
9    Q    How many people did he have working with
10 him?
11    A    A crew of individuals. I don't know how
12 many. Could be three, could be six.
13    Q    I am trying --
14    A    Whoever --
15    Q    -- to get a picture because I understood
16 that this was a major, this is a big deal the
17 rebraining of the bank. I thought it, I mean --
18 off the record.
19    MR. BELONGIA:  Yes.
20          (A brief interruption was had.)
21    By Mr. Raphael:
22    Q    What was done in terms of cosmetically
23 to rehab the bank when Ligas started?
24    A    His initial contract to do the work was

31

1 to rebuild the teller line, the downstairs front
2 area or where our bankers sit and upstairs to
3 convert the lunchroom into a Board room and an
4 office for me.
5    Q    Okay.
6    A    That was the basis of his contract.
7    Q    Did he do any -- I know -- I think I
8 remember there is a big pillar out there that says
9 Diamond Bank now; is that correct?
10    A    There's a sign in front of the building
11 which is a vertical sign, yes.
12    Q    Yes. Did he put that up?
13    A    Yes.
14    Q    All right.
15    A    Well, he worked with the sign company.
16    Q    Okay.
17    A    The sign company put that up.
18    Q    I mean, this was not like a minor, you
19 know, paint and freshening up of the bank. This
20 was a -- I mean, you guys revamped the entire bank
21 to make it look more modern and --
22    A    Yes.
23    Q    -- sleek, right?
24    A    Yes.

32

1    Q    I am just trying to get a picture of
2 what happened and how long it took to do all of
3 this. Because if it took a year and a half to do a
4 paint and, you know, recarpet, I'm going to say,
5 well, okay, how did that happen?
6    MR. BELONGIA:  I am just going to at this
7 point object to relevance of where we are going
8 with this.
9    THE WITNESS:  It took a protracted period of
10 time. He had an initial contract to do the work
11 electrical, ceilings.
12    By Mr. Raphael:
13    Q    Yes.
14    A    Build teller lines. The whole --
15    Q    They recarpeted?
16    A    Recarpeting, all of those things.
17    Q    How about the exterior of the building.
18 Was he the one who built the ATM machine on the
19 outside?
20    MR. BELONGIA:  Object.
21    By Mr. Raphael:
22    Q    The structure where the ATM machine was
23 to be housed?
24    A    After completing much of the interior

33

1  work we shifted to doing the front outside of his
2  contract.
3      Q     Yes.
4      A     Time and material to rebuild the front.
5  And yes, he was involved in doing that.
6      Q     No one else?
7      A     Whoever the manufacturer of the ATM
8  machine built the ATM machine. Whoever that
9  machine it was.
10     Q     Obviously Ligas is not in the business
11 of manufacturing ATM machines.
12     A     No.
13     Q     No, okay.
14     A     There was also -- he ordered a surround,
15 you know, that goes around an ATM machine from a
16 company that makes surrounds.
17     Q     Okay. So he didn't fabricate that and
18 put the surround in that was premade?
19     A     Yes.
20     Q     All right. Was it the same ATM machine
21 that had previously been in the -- Strike that
22 because I didn't ask you the foundation question
23 and he'll object.
24           The ATM machine at North Federal Savings

ACR REPORTING, LLP (312) 422-0515

34

1  was in the lobby initially, right?
2      A     It was an interior machine in the lobby.
3      Q     Okay. That would be yes?
4      A     Yes.
5      Q     When you guys changed the ATM from being
6  an interior machine from an exterior machine, did
7  you move the interior machine to the exterior or
8  did you buy a fresh new machine to put in the
9  exterior?
10     A     We acquired a new machine for the
11 exterior.
12     Q     Where was that acquired from?
13     A     EFMARK, I believe.
14     Q     And they are now known as?
15     MR. BELONGIA: Pendum.
16     By Mr. Raphael:
17     Q     Pendum, yes. They changed names. You
18 don't even deal with them, right?
19     A     No.
20     MR. RAPHAEL: She is going to be a much better
21 30 (B)(6) witness.
22     By Mr. Raphael:
23     Q     So you required a new machine from
24 EFMARK at the time he acquired -- did he acquire it

ACR REPORTING, LLP (312) 422-0515

35

1  or did you guys acquire it?
2      A     We acquired the machine.
3      Q     And what happened with the old machine,
4  the one that was in the lobby?
5      A     I believe we traded it in.
6      Q     To EFMARK?
7      A     I believe so.
8      Q     Who came and picked up the old machine
9  them or did you have to have it delivered to them?
10 How did that work?
11     A     EFMARK delivers the machine and takes
12 the old machine.
13     Q     Where did they deliver the new machine
14 to? Was it -- did you install it or did they just
15 drop ship it so that he had to install it? Do you
16 remember?
17     A     I believe they would have installed it.
18 Had to put it in. It's a heavy safe.
19     Q     Yes.
20     A     That's their expertise.
21     Q     Right. Right.
22     A     I'm sure that, you know, Ligas also has
23 guys assisted, whatever, but that's the way they
24 put it.

ACR REPORTING, LLP (312) 422-0515

36

1      Q     Probably helped with the electrical or
2  whatever?
3      A     I don't know.
4      Q     After it was shipped and installed did
5  they make it active or did you have to hire another
6  third-party servicer to activate the machine and
7  program it and put all of the guts of the workings
8  into it?
9      A     I believe that EFMARK took care of that.
10     Q     Are you sure? Was it possible it was
11 Fifth/Third Bank or would that refresh or change
12 your mind?
13     A     Fifth/Third is our ATM switch.
14     Q     Okay.
15     A     The machine itself, getting it up and
16 running EFMARK would have done.
17     Q     Okay. Including programing it and all
18 of that?
19     A     I don't know.
20     Q     Okay. I was just curious because I know
21 yesterday when I talked to your vice president she
22 was talking about Fifth/Third being this entity
23 that was involved in some aspect I can't remember,
24 programing.

ACR REPORTING, LLP (312) 422-0515

37

1    A    Fifth/Third handles the switch and how
2    it works in hooking it up and whatever to do it.
3    Q    Right.
4    A    I don't believe they come on site. I
5    believe whatever you plug into them and whatever I
6    assume they do their programing work --
7    Q    Sure.
8    A    -- they're there to do it. But in the
9    installation, if anything is done on the machine, I
10    thought that was EFMARK. But I could be --
11    Q    You're probably right. I don't know. I
12    may be mistaken from yesterday.
13         In terms of the time frame so far, the
14    Bank takes over in '04. August, September
15    somewhere there. Then we are on to somewhere in
16    2005 where the earnest heavy duty rehab of the bank
17    starts.
18    A    Uh-huh.
19    Q    When did that rehab -- the heavy part of
20    it finish?
21         I'm not talking about a little punch
22    list where he has to fix or do some minor things.
23    A    It seemed it went on forever.
24    Q    I know. I just lived under construction

ACR REPORTING, LLP (312) 422-0515

38

1    myself so.
2    A    I don't really recall. I really
3    don't --
4    MR. BELONGIA:    Don't guess.
5    THE WITNESS:    -- recall.
6    By Mr. Raphael:
7    Q    Okay, let's not guess. It wasn't just
8    this year, was it?
9    A    No.
10    Q    Okay. So it had to have happened before
11    the beginning of 2008?
12    A    Yes.
13    Q    2007, 2006, let's go back. I mean, was
14    it a year and a half roughly the main aspects of
15    the rehab process?
16    A    Seemed like a lifetime, but perhaps a
17    year, year and a half is reasonable --
18    Q    Okay.
19    A    -- that the construction period went on
20    for.
21    Q    So some time in '06 the main aspects of
22    the construction and rehab were finished?
23    A    Yes.
24    Q    Oh, I know would it -- do you remember

ACR REPORTING, LLP (312) 422-0515

39

1    Barry -- off the record.
2         (A discussion was had off the record.)
3    By Mr. Raphael:
4    Q    You remember the photographer named
5    Barry Rustin?
6    A    Yes.
7    Q    When did he come out to take the
8    pictures of the exterior of the building? And I
9    know he took a picture of you for some portrait
10    purposes.
11    A    November maybe. It was cold, cool
12    out.
13    Q    Of '06?
14    A    Sounds right.
15    Q    All right. Is it safe to say that the
16    main aspects of the construction were done prior to
17    you guys hiring Barry to take --
18    A    Yes.
19    Q    -- pictures?
20         Whenever in fact he took the picture
21    that would be about the time most of the
22    construction was done?
23    A    That's probably correct.
24    Q    Did you hire Barry Rustin or did someone

ACR REPORTING, LLP (312) 422-0515

40

1    else from the bank hire him?
2    A    We hired him. He came referred by Larry
3    Ligas as a good photographer to take the picture.
4    Q    Yes.
5    A    He came out and set up his cameras in
6    the corner and took a nice picture. We liked the
7    result.
8    Q    Did you hire him -- by the way when I
9    say "you," I don't mean you personally. I'm not
10    trying to --
11    A    No.
12    Q    -- be funny. It was a bad question.
13         Who at the bank decided to hire for the
14    bank obviously Barry Rustin? Who was his main
15    contact? Was that you or was that someone else
16    that decided?
17    A    I did.
18    Q    Were you pleased with the results of the
19    photography?
20    MR. BELONGIA:    Asked and answered.
21    THE WITNESS:    As I said before, yes.
22    By Mr. Raphael:
23    Q    Okay. Did you hire him meaning, you for
24    the bank, hire him a second time for the picture of

ACR REPORTING, LLP (312) 422-0515

41

1 you or was it all done at the same time?
2     A    I believe it was done within a short
3 period of time to do it. I think. Best that I can
4 recall.
5     Q    When he took the pictures of you in the
6 bank, I presume there were only two pictures that
7 he took?
8     I don't know. He didn't provide us with any
9 other pictures, I believe, so I believe those are
10 the only two. There were a couple of different
11 versions of my portrait, which I didn't really --
12    Q    Let me be clear. He probably took
13 multiple exposures of the same shot of the outside
14 of the building, correct? I mean, he was out there
15 for more than two seconds?
16    A    I don't know.
17    Q    When he took the picture of you, he took
18 multiple shots of the same you?
19    A    Yes. There were a couple of different
20 shots he took of me three, four, two. I don't
21 know.
22    Q    But he was commissioned to take two
23 photographs for the purpose of you guys. Not how
24 many exposures he took to give you the

42

1 photographs?
2     A    Correct.
3     Q    My understanding is that he delivered
4 the photographs on the DVD or a CD rom to the bank.
5 Is that your understanding?
6     A    Don't recall.
7     Q    Did you look?
8     A    We would need those pictures.
9     Q    Right.
10    A    So he would have to give us some format
11 to get them to us.
12    Q    Okay.
13    A    So my assumption is -- I don't want to
14 assume.
15    Q    Okay.
16    A    I don't recall but.
17    Q    You didn't get the pictures personally.
18 Someone at the bank took them for the bank? Did
19 you ever see the pictures?
20    A    Yes, I saw the pictures.
21    Q    Not the outputted pictures, but the
22 media in which they came on?
23    A    Yes, I would have. I believe I would
24 have seen the media that they came on.

43

1     Q    Would that be something that you would
2 have had, kept possession of for the bank, the CD
3 rom or the DVD that they came with?
4     The reason I'm asking is we haven't
5 gotten them produced in discovery yet, and I am
6 sort of looking for those pictures. Actually I am
7 looking for those pictures, not sort of.
8     A    I believe we would have downloaded or
9 off loaded whatever the information was. And then
10 we don't keep CD's or DVD's around. So I don't.
11    Q    Are those pictures still located on the
12 hard drive of the bank somewhere?
13    A    There on -- it's on our web site.
14    Q    No, but I mean the original file format
15 for the pictures?
16    A    I don't know.
17    Q    Do you know who would be the person to
18 ask at the bank to see if they could locate those
19 pictures?
20    Better yet who would you go to if you
21 wanted to go find the original? You know, what I
22 am talking about, the electronic file of those
23 pictures?
24    A    I would ask the lady who runs marketing

44

1 for the bank to look to find the file.
2     Q    Who is that? Who is that woman that
3 runs marketing?
4     A    Her name is Andria Shibe. She has been
5 running marketing for a short period of time, you
6 know, for six months.
7     Q    Familiar name.
8     I asked you what you thought about the
9 quality of Rustin's pictures, but I didn't ask you
10 the most -- what did you feel about the renovations
11 of the bank? Were they satisfactory? Were they
12 good?
13    A    Yes.
14    Q    Okay. Did you take people on tours of
15 the bank to show them the renovation?
16    A    Yes.
17    Q    So this was a good job? There was
18 nothing?
19    A    Yes.
20    Q    Okay. Did you take pictures yourself of
21 the renovation process that was going on?
22    A    No.
23    Q    Did anyone working for the bank take
24 pictures of the renovation process as it was going

---

45

1  on?
2      A    I don't know.  There was no one tasked
3  with taking pictures.
4      Q    I understand.
5      A    If somebody took a picture, I do not
6  know.
7      Q    All right.  So during the renovation
8  process you're unaware of whether anyone may have
9  taken pictures of the renovation process as it was
10  going on?
11     A    I am unaware of people taking pictures
12  during the process, but people have cameras on
13  their phones or whatever and I have no way of
14  knowing if somebody took a picture.
15     Q    Have you asked all of the employees at
16  the bank whether any of them have taken pictures of
17  their renovation process during or after?
18     A    Have I asked all employees?
19     Q    Or even any?
20     A    Yes, I have asked some employees if
21  there were any -- if anybody had pictures.
22     Q    Who did you ask?
23     A    I can't recall other than I know I
24  talked to a couple of employees, but no one

ACR REPORTING, LLP (312) 422-0515

---

46

1  organized.
2      Q    Which employees do you remember having
3  asked whether there are any pictures of the bank?
4      A    I believe I asked Kim Cole if we had any
5  pictures that were taken at all at the bank.
6      Q    Yes.
7      A    Other people.
8      Q    No one else that you can remember?
9      A    No.  No.
10     Q    Does the bank have any pictures of what
11  the bank looked like prior to the renovation?
12     MR. BELONGIA:  Objection, relevance.
13     THE WITNESS:  Yes.
14  By Mr. Raphael:
15     Q    Where are those pictures?
16     A    Right now they are with -- I think legal
17  counsel for preparation of a landmark case for us.
18  They were pictures that were taken in 1960.
19     Q    What I am looking for is more recent
20  pictures which might depict the ATM when it was
21  currently in the lobby of Northern Federal --
22  North Federal Savings?
23     A    Not to my knowledge.
24     Q    All right.  So when you --

ACR REPORTING, LLP (312) 422-0515

---

47

1  previously when I asked you, I'm circling back,
2  when the first time was that you saw the old fee
3  notice that we had been talking about, you said it
4  was some time in August or June of 2004, right?
5      A    Yes.
6      Q    Okay.  That would have been inside the
7  lobby of the ATM at the time?
8      A    To correct the statement I would have
9  seen the sign on the old ATM, which was located in
10  the interior vestibule of the bank, yes.
11     Q    And I wasn't trying to trick you.  Yes,
12  it was an old ATM.  It is not the current ATM.
13     A    Yes.
14     Q    We were clear on that on the record it
15  is one ATM and it has been replaced with a new
16  ATM?
17     A    Yes.
18     Q    All right.  So the first time that you
19  saw the sign, the old sign, it was on the old ATM
20  interior vestibule of the bank before the rehab?
21     A    Yes.
22     Q    What did it say, the fee notice?
23     A    A standard fee notice that's on --
24  standard fee notice that says if you're not a

ACR REPORTING, LLP (312) 422-0515

---

48

1  customer of the bank you may be charged a $2 fee
2  and availability of deposits.  There's two
3  different signs on there for that.
4      Q    There's two different signs for the
5  availability of deposits?
6      A    Well, there is one that addresses
7  availability.  A paragraph that addresses
8  availability and a paragraph that addresses the
9  fee charge.
10     Q    Let's skip the availability of deposits
11  sign or any other sign for the moment.  I am still
12  focused just on the fee notice sign under EFTA.
13     When I say, "EFTA" I mean the Electronic
14  Funds Transfer Act.  You know that I mean by that,
15  right?
16     A    Yes.
17     MR. RAPHAEL:  And for you, ma'am, it's capital
18  E-F-T-A when I say EFTA.
19     You should see what I say when I say
20  Fair Credit Reporting Act.  Horrible Statute.
21  Horrible.
22     By Mr. Raphael:
23     Q    So the fee notice when you first saw it
24  before the renovation, what do you remember the

ACR REPORTING, LLP (312) 422-0515

---

**ACR REPORTING, LLP  (312) 422-0515**

49

1  language to actually have said?
2       MR. BELONGIA:  Asked and answered.
3       THE WITNESS:  The standard notice for charging
4  the fee to noncard members, noncustomers.
5       By Mr. Raphael:
6       Q    When you say "the standard notice," I'm
7  confused as to what you mean.  Because I've seen
8  more different types of language on every bank than
9  you can shake a stick at.
10           Have you seen different notices on
11  different ATM's run by different banks than your
12  own?
13      A    I have not.  I have seen notices on
14  other machines.
15      Q    Fee notices?
16      A    Fee notices.
17      Q    All right.
18      A    And outside of seeing the fee notice
19  there, I can't tell you what they said or did not
20  say.
21      Q    Okay.  Do you know if they all say the
22  exact same thing or if they say things
23  differently?
24      A    I don't know.

ACR REPORTING, LLP (312) 422-0515

50

1       Q    Do you know if the fee notice, the old
2  fee notice on the old ATM says the same thing as
3  what the new fee notice on the new ATM says?
4       A    I believe it does, but I don't know.  I
5  can't --
6       Q    You don't know?
7       A    I can't recall.  More than that the fee
8  notice was there.
9       Q    Okay.  You don't know what it says
10  exactly?
11      A    No.
12      Q    The old notice -- Strike that.  That was
13  a really bad question.  I apologize to both of you.
14           The old fee notice you don't know what
15  the actual wording of that notice was?
16      MR. BELONGIA:  Asked and answered.
17      THE WITNESS:  No, I can't recall.
18      By Mr. Raphael:
19      Q    Do you remember what color the old fee
20  notice was?
21      MR. BELONGIA:  Asked and answered.
22      THE WITNESS:  As I said earlier, it was some
23  sort of silverish black sign.  Whether it was
24  silver with black letters, but some sort of sign of

ACR REPORTING, LLP (312) 422-0515

51

1  that ilk.
2       By Mr. Raphael:
3       Q    Do you know how big the sign was?
4       A    It was small, but I can't recall.  I
5  can't give you specific dimensions other than it
6  was a small sign that was affixed to it.
7       Q    Do you know if it was larger or smaller
8  than four inches?
9       A    I assume smaller than four --
10      MR. BELONGIA:  I don't want you to assume or
11  guess.
12      THE WITNESS:  No.  No.
13      By Mr. Raphael:
14      Q    Definitely smaller than a foot?
15      A    Yes.
16      Q    Definitely smaller than six inches?
17      A    Yes.
18      Q    Could have been a little bit bigger
19  maybe smaller than four inches, but you're just not
20  sure?
21      A    I'm not sure.
22      Q    What was the sign made out of?
23      A    To the best of my recollection I believe
24  it was some sort of either metal or plastic that

ACR REPORTING, LLP (312) 422-0515

52

1  looked like metal or something that had a metallic
2  type of a finish.
3       Q    The whole surface of the sign or a frame
4  of the sign?
5       A    Don't recall.
6       Q    How was the old sign affixed to the old
7  ATM?
8       A    I don't know.
9       Q    Do you know how did it appear to be
10  affixed?  Did it appear to be glued on, hung with a
11  little rope, stapled on, bolted?  How was it?
12      A    To the best of my knowledge it would
13  have been glued in some format.
14      Q    All right.  Was it a raised sign or was
15  it smooth, you know and flat?
16      A    I really don't recall that much about it
17  other than it was a sign.
18      Q    I apologize.  I know this is really -- I
19  hate to say this on the record that it is really
20  retarded to ask these questions over and over in
21  different ways, but it is the only way you can
22  flesh out a person's memory and that is why it is
23  done.
24      A    Okay.

ACR REPORTING, LLP (312) 422-0515

53

1    Q    Please bear with me.
2         You'd be amazed at sometimes when you
3    ask the question in this very broad fashion someone
4    says, I don't remember.
5         You ask all of these different things
6    and it starts to prompt their memory.
7         Where on the ATM, the old ATM were the
8    old signs placed?
9    A    Other than in the field of vision for
10   the person I don't have a specific --
11   Q    Recollection?
12   A    -- recollection of it.
13   Q    You don't remember whether they were to
14   the right or to the left of the key pad or the
15   screen or --
16   A    No.
17   Q    -- anything like that?
18   A    No.
19   Q    All right.  I asked you when the first
20   time you recall seeing those signs were.
21        When was the last time you recall seeing
22   the old signs at all?
23   A    Some period of time after the
24   installation of the new machine I recall seeing the

ACR REPORTING, LLP (312) 422-0515

54

1    sign.  That's -- I don't have a specific date that
2    I can tell you that.
3    Q    When was the old -- when was the new
4    machine, ATM machine, purchased?  What was the
5    date?
6    A    Whatever the contract would say.
7    Q    Do you have Exhibit A there?  Is it in
8    there; do you know?
9    MR. BELONGIA:  I have no idea.
10   By Mr. Raphael:
11   Q    Give him Exhibit A.  Why don't you look
12   at page 1.
13   MR. BELONGIA:  Page numbers are on the bottom
14   right.
15   By Mr. Raphael:
16   Q    Why don't you look at page numbers like
17   100 or so and afterwards.  I believe that's where
18   the EFMARK stuff starts.  Actually it's looking
19   like it's after page --
20   MR. BELONGIA:  107.
21   By Mr. Raphael:
22   Q    I'm sorry, page 107.
23   A    (Examining document.)
24   Q    Is page 107 of Exhibit A the contract

ACR REPORTING, LLP (312) 422-0515

55

1    between EFMARK and North Federal Savings & Loan
2    which is now Diamond?
3    A    It looks like it was a purchase adding
4    an ATM in Wilmette.
5    Q    Does the bank still have an ATM in
6    Wilmette?
7    A    No.
8    Q    Flip through those and see if you can
9    locate for me the one that shows the purchase of
10   the ATM at issue in this case?
11        I'll do the same and see if I can
12   reference it to you.
13   MR. BELONGIA:  112.
14   THE WITNESS:  You are doing better than I
15   am.
16   By Mr. Raphael:
17   Q    Are you looking at Page 112?
18   A    I am.
19   Q    At the bottom line is that for a service
20   contract for a year on the machine or is that for
21   the purchase of the contract -- the purchase of the
22   machine?
23   A    That would not be the purchase of the
24   machine.

ACR REPORTING, LLP (312) 422-0515

56

1    Q    Yes.  It looks like it is a coverage
2    period from '06 to '07?
3    A    Yes, it appears to be so.
4         The machine would have been around, I
5    don't know, whatever the trade-in discount.  It
6    would have been in the 20,000?
7    Q    How much?
8    A    Maybe twenty some thousand dollars or
9    whatever.
10   Q    Yes.  What do you get on -- do you
11   know what you would get on the old ones for trade
12   in?
13   A    Depends on whether the machine's
14   condition, model, date.
15   Q    Has the bank made any claims with EFMARK
16   for indemnification in this case?
17   A    I'm not sure I understand your question.
18   Q    If they installed the machine and didn't
19   install it with all of the signage appropriately,
20   has the bank sought any claim against EFMARK?
21   A    The bank has not sought any claim
22   against EFMARK.
23   Q    Okay.
24   MR. BELONGIA:  Looks like 127 would be the

ACR REPORTING, LLP (312) 422-0515

57

1 original purchase.
2      THE WITNESS:  Is that what it is.  I went
3 through that.
4      MR. BELONGIA:  It says '99, but it doesn't
5 show -- I don't think we have the new one.  Because
6 '99 shows --
7      THE WITNESS:  I don't know.
8      MR. BELONGIA:  Yes.
9      THE WITNESS:  It would have been in '06, but I
10 don't have the --
11      By Mr. Raphael:
12      Q    And looking at 127 --
13      A    It would have been in '06, but I don't
14 have the date.
15      Q    So this document on page 127 of
16 Exhibit A is a purchase agreement of a machine in
17 '99 it looks like?
18      A    First time I've seen the document and I
19 would assume that was -- that your comment looked
20 like it was correct.  Like 1900.  It looks like a
21 surround and an ATM, yes.  Refurbished ATM.
22      Q    It looks like there was a trade in of an
23 ATM as well?
24      A    Yes.  Less the trade for the reduced

ACR REPORTING, LLP (312) 422-0515

58

1 7015.
2      Q    And below that it looks like there is a
3 network logo sign pack for $150?
4      A    Yes, it looks like it.
5      Q    It's your understanding that would have
6 been signage for the machine, right?
7      A    I'm not sure what was included in that.
8 I don't know.
9      Q    All right.  In looking through
10 Exhibit A, which is the only documents that have
11 been produced to me so far in the case relative to
12 the purchase of the machine.  Obviously, there were
13 other documents that were the transaction logs.
14      You don't see any purchase agreement for
15 the machine, the new machine that is in the
16 exterior of the bank?
17      A    I have not seen it yet.  It maybe here.
18 I haven't.  This is the first time I seen the
19 document package.
20      Q    Take your time and look and see if you
21 see one.  When you are confident that you don't see
22 one, let me know?
23      A    All right.  (Examining document.)
24      MR. BELONGIA:  What I want to do now is take a

ACR REPORTING, LLP (312) 422-0515

59

1 short break.
2      MR. RAPHAEL:  Although because there is a
3 question pending --
4      MR. BELONGIA:  I am just going to the
5 bathroom.
6           (A brief recess was had.)
7      MR. RAPHAEL:  Was the question pending
8 already?
9      MR. BELONGIA:  Read the question back, please.
10      MR. RAPHAEL:  Read the question, please.
11           (The record was read.)
12      By Mr. Raphael:
13      Q    That was such a horribly convoluted
14 question.  Let me ask it again.
15      Looking through Exhibit A, which you
16 have had the chance to look through, is there a
17 copy of any contract showing the purchase of the
18 new ATM machine?
19      A    I did not see a copy.
20      Q    You have looked through the complete
21 Exhibit A?
22      A    I did.
23      MR. RAPHAEL:  Counsel, just so I don't waste
24 your client's time.  That's so far everything that

ACR REPORTING, LLP (312) 422-0515

60

1 has been produced --
2      MR. BELONGIA:  Correct.
3      MR. RAPHAEL:  -- except the transaction log?
4      MR. BELONGIA:  Correct.  The client has done
5 their due diligence to try to locate that.  I would
6 suggest that a subpoena be issued to EFMARK to get
7 a copy.  See if they have one.
8      By Mr. Raphael:
9      Q    The bank doesn't have one.  If it is not
10 there, the bank doesn't have it.  We should go to
11 EFMARK for it?
12      A    I do not -- I believe that all documents
13 were produced.
14      Q    Right.
15      A    I did not see it in that package.
16           (A brief interruption was had.)
17      By Mr. Raphael:
18      Q    So last time you saw -- last time you
19 saw the old sign on the new ATM was -- I asked you
20 this before.  I am asking it again because I can't
21 remember what you said.
22      When was the last time?
23      A    I said to the best of my recollection it
24 was after the installation of the new machine.  And

ACR REPORTING, LLP (312) 422-0515

61

1  beyond that I can't recall.
2      Q   Okay. Was the new machine installed
3  before the finish of the renovation process, the
4  major part that we had talked about?
5      A   It was installed subsequent to the core
6  renovation. It was installed during the canopy,
7  canopy whatever you want to call it.
8      Q   Exterior renovation.
9      A   During that exterior portion it was
10 installed.
11     Q   Okay. So the new ATM was installed
12 after the interior version of the renovation was
13 done, but during obviously the exterior part of the
14 Bank's renovation?
15     A   Yes.
16     Q   And was there any time period where that
17 ATM was like inactive or did it become active as
18 soon as it got installed?
19     A   To the best of my recollection there was
20 some period that the ATM was not available.
21     Q   What's was the greatest extent of that
22 period that you could imagine?
23     A   I don't know.
24     Q   A year?

ACR REPORTING, LLP (312) 422-0515

62

1      A   No.
2      Q   A month?
3      A   Perhaps.
4      Q   Two months?
5      A   Don't recall. Don't recall. But
6  probably. Don't think so.
7      Q   Would it be safe to say that the period
8  of inactivity of that ATM from the time it was
9  actually physically installed until it became
10 active would be no greater than three months?
11     A   I do not know the period of time in
12 which it was inactive.
13         However, the period of time would have
14 been a reasonably short period.
15     Q   And a reasonably short period you would
16 define as what?
17     A   Yes, I would agree that it's less than
18 three months.
19     Q   Okay. All right.
20         When it became active, had the surround
21 to the machine -- you know what I mean by the
22 "surround"?
23     A   Yes.
24     Q   Had the surround to the machine been

ACR REPORTING, LLP (312) 422-0515

63

1  already installed?
2      A   Yes, I know what the surround is and.
3      MR. RAPHAEL:  Thanks for not objecting.
4      THE WITNESS:  And I do not know -- I really
5  don't recall well the timing of that
6  reconstruction.
7  By Mr. Raphael:
8      Q   Now, I got something that might help
9  your recollection.
10     A   Okay.
11     Q   Take a look at what we marked as
12 Exhibit, Hubbard E.
13         (Deposition Exhibit Hubbard E was
14         marked for identification.)
15 By Mr. Raphael:
16     Q   See the picture or recognize the
17 picture?
18     A   Yes.
19     Q   What is it?
20     A   It's a picture of the bank. Front of
21 the bank taken by Mr. Rustin.
22     Q   Okay. All right. And that's the same
23 picture we had talked about earlier in this
24 deposition where Barry Rustin had come out and

ACR REPORTING, LLP (312) 422-0515

64

1  taken the picture?
2      A   Yes.
3      Q   Were you present when that picture was
4  taken? Not the whole time, but you were around
5  when he took that picture?
6      A   I believe I was.
7      Q   Okay. I mean, do you recall seeing him
8  taking the picture or setting up to take the
9  picture personally?
10     A   Yes. I think because I had to come take
11 my picture in that time frame. Had to come out.
12     Q   Right. Would it be safe to say that
13 this was -- take a look at the picture, so you know
14 I am not giving you anything that isn't capable of
15 being ascertained by yourself. Strike that
16 question. New question.
17         Is it safe to say that that picture was
18 taken some time in the fall, possibly early onset
19 of winter in '06?
20     MR. BELONGIA:  Objection, calls for
21 speculation.
22     THE WITNESS:  I believe that that picture was
23 taken in cold weather. And it would have been, you
24 know, I have to go find a date but.

ACR REPORTING, LLP (312) 422-0515

ACR REPORTING, LLP  (312) 422-0515

65

1       By Mr. Raphael:
2       Q       Would you be surprised if I said it was
3   in September or October of '06? Late September
4   early October?
5       A       I would be surprised on September.
6   October I would believe. October or November I
7   could believe.
8       Q       Okay. All right.
9       A       Because it was cold.
10      Q       Yes. All right.
11              When you had your picture taken it was
12  around the same time that he took this picture?
13      A       I believe so.
14      Q       Okay.
15      A       Because I don't think he came out
16  multiple times. I believe he -- I assume it was
17  one time.
18      Q       Okay. Where was your picture taken?
19  Was it in front of the bank where that tall
20  vertical sign is?
21      A       I believe it was.
22      Q       I apologize. I only have one copy. So
23  that I get it on the record.
24              So in Exhibit E, this sign in the

66

1   forefront of the picture that says Diamond Bank,
2   which has got your logo, you would have been
3   standing somewhere in front of that sign when you
4   had your picture taken?
5       A       I believe so.
6       Q       As you can see in the background, is the
7   ATM at issue in this case, right?
8       A       Yes.
9       Q       And that is right next to the -- in the
10  picture it appears right to the right of the main
11  entrance to the bank, right?
12      A       Yes.
13      Q       Forgive me, I say this to you. I said
14  this to your vice president. I've never actually
15  been to your bank. This is my only image of the
16  physical layout of the bank.
17              Is there a parking lot to the front of
18  this picture, if the picture had continued outward?
19      A       No.
20      Q       Where is the parking lot for the bank?
21  Is there one?
22      A       To the north of the building.
23      Q       Where would the north of the building
24  be?

67

1       A       To the right.
2       Q       To the right. So the parking lot would
3   be to the right of this picture?
4       A       Yes.
5       Q       All right. And is the main entrance the
6   entrance that you go in and come from every day
7   that you go to work?
8       A       Not always.
9       Q       What is there a different entrance?
10      A       There is a rear entrance, which I used
11  often.
12      Q       But you also used the front
13  entrance often, right?
14      A       Occasionally.
15      Q       Occasionally.
16              Now, give me an idea, a rough estimate.
17  Once, twice a week?
18      A       Occasionally.
19      Q       What's occasionally. I just don't know
20  what that means.
21      A       As I need to use that entrance.
22      Q       We have to use estimates so that we can
23  talk the same language.
24              Frequency. How frequent would you go

68

1   in and out of that door since you've been there?
2       MR. BELONGIA: Asked and answered.
3       THE WITNESS: Occasionally.
4       By Mr. Raphael:
5       Q       Can you give me a range in terms of
6   numbers per week, per month?
7       MR. BELONGIA: Asked and answered.
8       THE WITNESS: Occasionally.
9       By Mr. Raphael:
10      Q       More than once a month?
11      A       Occasionally.
12      Q       More than once a year?
13      A       Occasionally.
14      Q       So does occasionally mean only once a
15  year?
16      A       I said occasionally.
17      MR. BELONGIA: Asked and answered.
18      By Mr. Raphael:
19      Q       I am not asking you now anything other
20  than --
21      A       I go in and out of the bank
22  occasionally. Out of the front door. I use
23  primarily the rear door.
24      Q       Okay. What about other employees of the

69

1 bank, do they use primarily the rear door or the
2 front door?
3        A    Front door.
4        Q    Well, here.  Since this photograph has
5 been taken, have you gone in and out of the front
6 door?
7        A    Yes.
8        Q    Since this photograph was taken, but
9 before you knew about this lawsuit, had you gone in
10 and out of the front door?
11       A    Yes.
12       Q    So at some time between the time this
13 photograph was taken and you learning of the filing
14 of this lawsuit, you had been in and out of this
15 front door?
16       MR. BELONGIA:  Asked and answered.
17       THE WITNESS:  Yes.
18 By Mr. Raphael:
19       Q    When this photograph was taken had -- I
20 think we had talked about this, so I apologize if
21 it is asked and answered.
22            When this photograph was taken, the
23 majority of the renovation process, both in and out
24 had been complete with the exception of some minor

ACR REPORTING, LLP (312) 422-0515

70

1 punch list things.
2        A    That's what I said before, yes.
3        Q    At the time this photograph was taken,
4 is it your recollection that the surround to the
5 machine had been installed?
6        A    Yes.
7        Q    Okay.  Where on the ATM or around the
8 ATM -- Strike that.  Because we have talked about
9 you and the old ATM.
10            Where on the new ATM do you recall
11 seeing the old sign?
12       A    Somewhere in my field of vision using
13 the machine.  Beyond that I don't -- I can't really
14 recollect if it was more on the leftish or
15 whatever, but on that machine.
16       Q    Okay.
17       A    I just recall looking at the machine and
18 seeing the sign.
19       Q    At the time this photograph was taken,
20 the machine had already been activated, right?
21       A    I believe so.
22       Q    Yes.  All right.
23            At the time this photograph was taken
24 you had already had people come in and take tours

ACR REPORTING, LLP (312) 422-0515

71

1 of the bank to see that it was fresh, new, and
2 updated?
3        A    I believe so.
4        Q    All right.  On the new ATM how was the
5 old sign affixed?
6        A    I do not know.
7        Q    How did it appear to be affixed?  Was it
8 bolted on?  Was it glued on?  Was it stapled on?
9        A    I believe it was glued.
10       Q    So the new -- the old sign was a sign
11 that could be detached and reattached.  It wasn't
12 something like a sticker sign?
13       A    I don't recall that much about the
14 physical description of the sign other than it was
15 metallic in nature or appeared to look metallic in
16 nature.  It was moved from the old machine at my
17 request to the new machine.
18       Q    Did you actually see it be moved from
19 the old machine to the new machine?
20       A    I did not.
21       Q    Before this picture was taken though you
22 certainly recall having seen the sign on the
23 machine?
24       A    Yes.  On the surround.

ACR REPORTING, LLP (312) 422-0515

72

1        Q    On the surround of the machine, I
2 apologize.
3            When I say, "this machine," the machine
4 that's in the picture of Exhibit D, right?
5        MR. BELONGIA:  E.
6 By Mr. Raphael:
7        Q    E, right?
8        A    Yes.
9        Q    No.  Keep it.
10            So looking at Exhibit E, right?
11       A    Yes.  (Examining document.)
12       Q    At that point in time the machine was
13 active, the old sign had been attached to the new
14 sign, and the machine was operational, correct?
15       A    Can you rephrase that?
16       Q    I asked for three things at once, but I
17 am trying to get to the next point.
18            At the time of this picture --
19       A    Say November of --
20       Q    Yes, November.
21       A    November of '06 or whatever.
22       Q    Right.  As of November of '06, the
23 machine was operational, the surround was up.  The
24 old sign was attached to the new machine,

ACR REPORTING, LLP (312) 422-0515

**ACR REPORTING, LLP  (312) 422-0515**

73

1  correct?
2      A    At the time this thing, which I believe
3  is November of '06, I believe the machine was
4  installed and operational.
5      Q    Yes.
6      A    I believe the surround was there.  And I
7  believe that the sign had been affixed post
8  installation of the ATM surround and machine.
9      Q    Before this picture was taken, whenever
10 this picture happened to be --
11     A    Before that picture was taken, yes.
12     Q    Because we are fussy on actual perfect
13 dates so we are using this --
14     A    Best --
15     Q    -- this as the basis of tracking the
16 time.
17          We are using this Exhibit E as the basis
18 of tracking time.
19          So we are absolutely clear that prior to
20 the taking of the picture in Exhibit E, whatever
21 date that happens to be in Exhibit E, prior to
22 that, the ATM -- the new ATM had been installed,
23 the surround had been installed, the old sign had
24 been affixed to the new ATM, correct?

ACR REPORTING, LLP (312) 422-0515

74

1      A    I believe that's correct.
2      Q    You base that belief based on your own
3  personal firsthand looking at the machine before
4  this --
5      A    Yes.
6      Q    -- picture was taken?
7      A    Yes.
8      Q    After this picture had been taken, okay,
9  but before you were notified of this lawsuit, at
10 any point in between those two points did you
11 become aware of the fact that the new ATM did not
12 have a sign on it?  And "sign," I mean the fee
13 notice?
14     A    No.
15     Q    Again between those same two points
16 though, you had walked in and out of the front door
17 and would have seen the ATM in order to have
18 noticed whether a sign had been present or not
19 present?
20     A    I would have walked in and out of the
21 front door of the building.
22     Q    Would you have noticed if -- here, let
23 me back up.
24          F is not a statute about, you know,

ACR REPORTING, LLP (312) 422-0515

75

1  killing people or something else.  But it is
2  something you guys take seriously at the bank to
3  comply with EFTA, right?
4      A    We comply with all laws.  EFTA is a very
5  important law and we comply with it.
6      Q    So if the sign, the EFTA sign on the ATM
7  had been absent and you had walked passed it, you
8  would have noticed something like that?
9      MR. BELONGIA:  Objection, calls for
10 speculation.
11     THE WITNESS:  I can't tell you whether or not
12 I would have noticed it or not noticed it then in
13 that case to do it.
14          I can tell you that post the lawsuit
15 every time I look at an ATM machine of ours or any
16 other ones, I look for that issue to see that it's
17 there.
18     By Mr. Raphael:
19     Q    Sure.  Probably do it on your
20 competitor's machines too?
21     A    It's in the forefront of my mind.
22     Q    Yes.  You can't really tell me though
23 between the time after that picture was taken to
24 the time you were on notice of this lawsuit,

ACR REPORTING, LLP (312) 422-0515

76

1  whether there was a fee notice present on that
2  ATM?
3      A    I can't tell you that.
4      Q    Because I am confused from this
5  perspective.  Because earlier I thought -- I
6  thought that the last time that you saw the old
7  notice on the new machine was more recently then
8  back in 2004.
9      MR. BELONGIA:  Mischaracterizes his testimony.
10 This picture is taken in 2006.  You just said
11 2004.
12     By Mr. Raphael:
13     Q    Okay.  Oh, I'm sorry.  Here.  Let me.  I
14 know what happened.
15          When you went through this renovation
16 process, I presume you were checking things off so
17 to speak as to every process that needed to be
18 done, right?
19     A    I would review it, look at it, and make
20 sure the work was done obviously before we paid.
21     Q    You're not -- you're not Bank One
22 or Chase.  You're more of a hands-on, just a little
23 community bank, right?
24     A    That's correct.

ACR REPORTING, LLP (312) 422-0515

77

```
1      Q      So you are more involved as a president
2  than say Charter One's, whoever president that
3  person is; right?
4      A      That's correct.
5      Q      During the renovation process you took
6  an active role in making sure everything that was
7  supposed to be done, got done?
8      A      That's correct.
9      Q      Is that why you know that the fee
10 notice, the old fee notice on the new machine was
11 installed on the new machine.
12            Did you check to make sure that it was
13 installed on the new machine prior to this picture
14 being taken and after the renovation took place?
15     A      My recollection is that as in all of it,
16 I would review the work being performed.  I had
17 asked to make sure that signage was transferred.  I
18 recall looking at the machine and I recall seeing
19 signage.
20     Q      So you recall checking to make sure the
21 signage had been transferred from the old machine
22 to the new machine?
23     A      Yes.
24     Q      Okay.  And you recall doing that before
```

ACR REPORTING, LLP (312) 422-0515

79

```
1      A      I don't know.  I didn't see it.
2      MR. BELONGIA:  Whatever records exist were
3  produced.
4      THE WITNESS:  So we would have paid him.  But
5  I would have inspected it at that point.
6      MR. BELONGIA:  Off the record.
7      MR. RAPHAEL:  Yes.
8            (A discussion was had off the record.)
9      By Mr. Raphael:
10     Q      Do you recall whether you would have,
11 whether you inspected it before paying him or not.
12 You do recall looking at the exterior of the bank
13 and the ATM before having commissioned this
14 photographer to take these pictures, right?
15     A      That's correct.
16     Q      At that time if you had noticed anything
17 missing, you would recall it, right?
18     A      I believe so.
19     Q      And certainly since the fee notice is an
20 important aspect of complying with the Electronic
21 Funds Transfer Act, you would have noticed that was
22 missing, if it had been missing at the time you
23 inspected the machine, right?
24     MR. BELONGIA:  Objection, use of the word
```

ACR REPORTING, LLP (312) 422-0515

78

```
1  the completion of the renovation process and before
2  this picture was taken?
3      A      I believe that's correct.
4      Q      If during the renovation process you had
5  checked the new ATM installation and the surround
6  installation being put in, you would have noticed
7  if the fee sign from the old machine had not in
8  fact been transferred?
9      A      Say that again, please.
10     MR. RAPHAEL:  Off the record.
11            (A discussion was had off the
12            record.)
13            (The record was read.)
14     THE WITNESS:  Prior to payment for the work
15 completion on that.
16     By Mr. Raphael:
17     Q      Yes.
18     A      When I inspected the machine, I
19 inspected it to make sure that he had done his
20 work.
21     Q      Do we have in the Exhibit A the payment
22 for the work done on the machine by Ligas?  Did
23 you notice it when you went through all of
24 Exhibit A?
```

ACR REPORTING, LLP (312) 422-0515

80

```
1  important.  The law is the law.
2      By Mr. Raphael:
3      Q      Okay.  Subject to that objection, yes.
4      A      I inspected the machine to make sure
5  that the sign -- one component, that he had
6  performed his work and that signage had been moved.
7      Q      Right.  Why didn't you submit an
8  affidavit in support of the -- subject to I know
9  what you are going to say.
10            Without waiving any of your
11 attorney-client privilege or anything else, why
12 didn't you submit an affidavit in support of the
13 motion to dismiss as opposed to Kim Cole?
14     MR. BELONGIA:  And same instruction.  If you
15 can't separate it out from the attorney-client
16 privilege, attorney work-product, then you can't
17 answer the question.
18     THE WITNESS:  Other than being out of town and
19 the other, that's why.
20     By Mr. Raphael:
21     Q      Otherwise you would have submitted the
22 affidavit yourself, yes?
23     A      Kim Cole is our chief operating officer.
24 She would deal with these issues.
```

ACR REPORTING, LLP (312) 422-0515

81

1        MR. RAPHAEL:  Yes.  Off the record.
2             (A discussion was had off the record.)
3     By Mr. Raphael:
4        Q    Do you know when the bank first started
5   to charge ATM fees?
6        A    I don't recall.
7        Q    Was it before you took over on the bank
8   or was it afterwards?
9        A    The bank charge for ATM fees before we
10  took over, it was a line item in their financial
11  statements.  The numbers.  Yes, we charge for fees.
12       Q    So North Federal Savings charged ATM
13  fees prior to the takeover of North Federal Savings
14  in August or September of '04?
15       A    It did charge -- it is my belief that it
16  did charge ATM fees.
17       Q    Okay.  Is there any documentation that
18  would establish that?
19       A    I don't know the answer to that.  Goes
20  back a while.  So I don't know.
21       Q    Did the bank ever change the amount of
22  the ATM fees that it was charging?
23       MR. BELONGIA:  Objection.  When you say the
24  "bank," you previously were referring to North

ACR REPORTING, LLP (312) 422-0515

82

1   Federal Savings.  Are you asking Diamond Bank, what
2   entity?
3        MR. RAPHAEL:  Yes, I agree with your objection.
4   Let me ask it a different way, an easier way.
5     By Mr. Raphael:
6        Q    Since the name change from North Federal
7   Savings to Diamond Bank, has Diamond Bank changed
8   the amount of its ATM fees that it charges?
9        A    I'd have to go back and look.  I don't
10  recall if it's -- when or if exactly it did.  I'd
11  have to go back and look at it.
12       Q    What is your belief do you think, yes or
13  no?
14       MR. BELONGIA:  Asked and answered.
15       THE WITNESS:  I really don't recall.  I'd have
16  to go back and actually look and see what
17  happened.
18     By Mr. Raphael:
19       Q    Yes.
20       A    It is not a material -- whatever it is,
21  it is not a material item for us.
22       Q    Have they always charged -- Strike that.
23  It's a bad question.
24            Prior to the takeover of North Federal

ACR REPORTING, LLP (312) 422-0515

83

1   Savings, did North Federal Savings charge ATM fees
2   for the North Avenue branch?
3        A    I don't recall.
4        Q    There would be documentation though from
5   the takeover that would establish whether that was
6   true or false?
7        A    I would have to review documentation to
8   see what was available to determine if there was
9   any information on that.  It's historical.  So I'd
10  have to go back and try to look at that.
11       Q    Who at the bank would be the person you
12  would, if you were interested in finding out the
13  answer to that question, who would you go to?
14       A    I'd probably go to Kim Cole and ask her
15  to try and determine that.  Digging through
16  whatever she could find, financial statements or
17  billings or whatever.
18       Q    Do you know who she would go to down the
19  line if Kim Cole wasn't available?  Actually --
20  Strike that.
21            Do you know who you would go to if Kim
22  Cole wasn't available to ask that same question?
23       A    It is a research project, so I'd have
24  to -- I'd have to find somebody who would be

ACR REPORTING, LLP (312) 422-0515

84

1   competent to be able to handle it.  She would
2   normally do it.
3        MR. RAPHAEL:  If you don't mind, I will just
4   hit you with an additional interrogatory.  I don't
5   want to take her back here.
6        MR. BELONGIA:  For what?
7        MR. RAPHAEL:  To find out if the ATM at the
8   North Avenue location charged a fee before the
9   takeover by Diamond Bank?
10       MR. BELONGIA:  I guess I will save you a trip.
11  Object to relevance.  Outside of the Statute of
12  Limitations.  Has no bearing on this case.  I don't
13  see how it's relevant to even ask.
14       MR. RAPHAEL:  Okay.  You can make the
15  objection.  We can talk about it.
16       MR. BELONGIA:  Think about my objection before
17  you make the request for the interrogatory.
18       MR. RAPHAEL:  I will.  I know it's relevant
19  and I'll explain it to you.  I don't want to waste
20  his time with it.
21       MR. BELONGIA:  Fine.
22       MR. RAPHAEL:  The question is to you, would
23  you prefer if I have any clean up stuff to shoot
24  you interrogatories on it?  You can make your

ACR REPORTING, LLP (312) 422-0515

85

1  objections to those, but I'm saying, we are past
2  the number of interrogatories.  I am asking you to
3  waive that aspect.
4       MR. BELONGIA:  Put it in a letter.
5       MR. RAPHAEL:  Okay.  Fine.
6       By Mr. Raphael:
7       Q    By the way just so you know, you're
8  almost done.
9            Have you ever in fact used the ATM at
10 issue in this case?
11      A    Yes.
12      Q    Taken money out?
13      A    Yes.
14      Q    All right.
15           What card would you have used to take
16 out money from this ATM, card or cards?
17      A    Most likely --
18      Q    Yes.
19      A    -- I would have used either my own
20 Diamond Bank card --
21      Q    Yes.
22      A    -- or I may have used one of, you know,
23 my other, infrequently, but maybe used another ATM
24 card.

            ACR REPORTING, LLP (312) 422-0515

86

1       Q    From who?
2       A    Chase.
3       Q    Do you have those ATM cards with you
4  today?
5       A    I don't think I do.  I think my daughter
6  has them or I don't know where they are at.  I have
7  one of my Diamond Bank cards with me here.
8       Q    Would that have been one of those you
9  would have used at the ATM?
10      A    Yes, but I don't use it often.
11      MR. RAPHAEL:  Did you tell him what I did
12 yesterday?
13      Mr. BELONGIA:  We already talked about it.
14      MR. RAPHAEL:  So we will do the same thing
15 that we did yesterday.  Fine.  Can I borrow a
16 piece.  Oh, I have a yellow pad here.
17           If you want to write it down and do it,
18 then we will take care of it.
19      THE WITNESS:  Want to give the last six
20 numbers or whatever.
21      By Mr. Raphael:
22      Q    We take the whole number, but we won't
23 read any of the number in there.  We are holding it
24 super confidential.

            ACR REPORTING, LLP (312) 422-0515

87

1            In fact, I've done the extra ordinary
2  efforts because I am paranoid of putting these
3  things in my safe.  And I will destroy them at the
4  end of the --
5       MR. BELONGIA:  And there is a protective order
6  in this case entered by the Federal Judge over all
7  of this information.
8       By Mr. Raphael:
9       Q    So if these things get misplaced, it
10 would be like getting shot by lightening five times
11 in a row.
12      A    Okay.  My other cards are not on me.
13      Q    All right.  If you can produce to him
14 the numbers for those cards, that would be
15 sufficient to me.
16           And he will do the same thing that we
17 are doing right now.
18      MR. BELONGIA:  Is that Master Card?
19      MR. RAPHAEL:  No, he said it is a Chase card,
20 a debit card.
21      MR. BELONGIA:  It is Diamond Bank.
22      By Mr. Raphael:
23      Q    Diamond Bank and Chase card, right?
24      A    That's correct.

            ACR REPORTING, LLP (312) 422-0515

88

1       Q    Do you have a different Diamond Bank ATM
2  card than this one?
3       A    I have one other Diamond Bank card.
4       Q    All right.  So that card number produced
5  to him as well as the chase card number produced to
6  your lawyer.  And then that will be fine.
7            If you give me a couple of minutes.  I
8  don't think I have anymore questions.
9       MR. BELONGIA:  Okay.
10           (A brief interruption was had.)
11      MR. RAPHAEL:  All done.
12      MR. BELONGIA:  Nothing.  Reserve.
13      MR. RAPHAEL:  Mark this confidential Exhibit
14 F.  But you're not seeing it.  I am just marking it
15 because we signed it.  Just stick a sticker on it.
16 And I'll keep that.
17           (Deposition Exhibit F was marked for
18           identification and retained with
19           Mr. Raphael.)
20           DEPOSITION CONCLUDED
21
22
23
24

            ACR REPORTING, LLP (312) 422-0515

89

```
 1                UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3
 4   CARMEN FLORES, individually      )
     and on behalf of all others      )
 5   similarly situated,              )
                                      )
 6        Plaintiff,                  )
                                      )
 7        vs.                         )No. 07 CV 6403
                                      )Judge Hibbler
 8   DIAMOND BANK, FSB,               )Magistrate
                                      )Judge Valdez
 9        Defendants.                 )

10
          I, JAMES A. HUBBARD, being first duly
11   sworn, on oath, say that I am the deponent in the
     aforesaid and that I have read the foregoing
12   transcript of my deposition, consisting of pages 1
     through 91, inclusive, taken on June 19, 2008, at
13   the aforesaid place and that the foregoing is a
     true and correct transcript of my testimony so
14   given.

15             _____ corrections were made

16             _____ no corrections were made

17        _____

18             JAMES A. HUBBARD

19
     Subscribed AND SWORN TO
20   before me this _____ day
     of _____ A.D., 2008.
21
22   _____
     Notary Public
23
24
```

ACR REPORTING, LLP (312) 422-0515

91

```
 1   at the taking of the deposition the aforementioned

 2   counsel.

 3        I further certify that I am not counsel

 4   for nor in any way related to any of the parties to

 5   this suit, nor am I in any way interested in the

 6   outcome thereof.

 7        In testimony whereof, I have hereunto set

 8   my hand and seal this 1st day of July, A.D., 2008.

 9

10

11             Notary Public

12             DuPage County, Illinois

13             CSR No. 084-003185

14

15

16

17

18

19         ┌─────────────────────────┐
           │      OFFICIAL SEAL       │
20         │      PEGGY CURRAN        │
           │ NOTARY PUBLIC - STATE OF ILLINOIS │
21         │ MY COMMISSION EXPIRES:03/03/09 │
           └─────────────────────────┘
22

23

24
```

ACR REPORTING, LLP (312) 422-0515

90

```
 1   STATE OF ILLINOIS  )
                        )SS:
 2   COUNTY OF DU PAGE  )

 3
 4        I, BARBARA ANTHONY, CSR, RPR, CSR License

 5   No. 084-003185, notary public within and for the

 6   County of DuPage and State of Illinois, do hereby

 7   certify that heretofore, to wit, on the 19th day of

 8   June A.D., 2008, JAMES A. HUBBARD, appeared before

 9   me as a witness in a cause now pending in the

10   United States District Court, Northern District of

11   Illinois, Eastern Division wherein, Carmen Flores,

12   individually and on behalf of all others similarly

13   situated is the Plaintiff and DIAMOND BANK, FSB, is

14   the Defendants in Case No. 07 C 6403.

15        I further certify that the said witness,

16   JAMES A. HUBBARD was by me first duly sworn to

17   testify the truth, the whole truth and nothing but

18   the truth in the cause aforesaid before the taking

19   of his deposition; that the testimony given was

20   stenographically recorded in the presence of said

21   witness by me, and afterwards transcribed upon a

22   computer, and that the foregoing is a true and

23   correct transcript of said testimony.

24        I further certify that there were present
```

ACR REPORTING, LLP (312) 422-0515

92

```
 1                UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3
 4   CARMEN FLORES, individually      )
     and on behalf of all others      )
 5   similarly situated,              )
                                      )
 6        Plaintiff,                  )
                                      )
 7        vs.                         )No. 07 CV 6403
                                      )Judge Hibbler
 8   DIAMOND BANK, FSB,               )Magistrate
                                      )Judge Valdez
 9        Defendants.                 )

10        The following corrections were made:

11   PAGE_____ LINE_____

12   CHANGE_____

13   TO_____

14   REASON_____

15

16   PAGE_____ LINE_____

17   CHANGE_____

18   TO_____

19   REASON_____

20

21             JAMES A. HUBBARD

22

23

24
```

ACR REPORTING, LLP (312) 422-0515

93

```
 1    PAGE_____ LINE_____
 2    CHANGE_____
 3    TO_____
 4    REASON_____
 5
 6    PAGE_____ LINE_____
 7    CHANGE_____
 8    TO_____
 9    REASON_____
10
11    PAGE_____ LINE_____
12    CHANGE_____
13    TO_____
14    REASON_____
15
16    PAGE_____ LINE_____
17    CHANGE_____
18    TO_____
19    REASON_____
20
21
22            _____
23                    JAMES A. HUBBARD
24


         ACR REPORTING, LLP (312) 422-0515
```

**CONSUMER ADVOCACY CENTER, P.C.**
A PRIVATE LAW FIRM PROTECTING CONSUMERS' RIGHTS



April 30, 2008

**Via Facsimile and U.S. Mail**

**312-662-1040**                                    For settlement under Rule 408

                                                     Request for 37.2 Conference
Mark Belongia
Belongia & Shapiro, LLP
53 W. Jackson Blvd, Suite 315
Chicago,, IL 60604

     Re:    Flores v. Diamond Bank ATM CASE
            Case No.:

Dear Mr. Belongia:

Now that your client, Diamond Bank, has partially answered some discovery requests issued by Plaintiff, and assuming the accuracy of the data, this letter is an attempt to resolve this matter by settlement. The Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq.* ("EFTA") allows for actual damages, statutory damages (up to $1000 for an individual case and up to the lesser of $500,000 or 1% of net worth for a class), attorneys' fees and costs.

**Actual Damages**

With 5,308 transactions at issue, at $2.00 per transaction, actual damages are $10,616.00.

**Statutory Damages**

The EFTA provides that the following factors, among others, shall be considered in determining the amount of liability in a class action case such as this: the frequency and persistence of noncompliance, the nature of such noncompliance, the resources of the defendant, the number of persons adversely affected and the extent to which the noncompliance was intentional. Assuming that your client is worth $27,714,000; statutory damages would be capped at $277,140 (1% of net worth).

Frequency and Persistence

All indications are that the ATM at issue was noncompliant with the EFTA for at least a year, or at least Defendant has no idea how long the ATM was noncompliant because it had no procedure in place to verify compliance. Nonetheless, more than 5,300 incidences of noncompliance is frequent, and a period of noncompliance covering at least the entire statute of limitations period (1 year) constitutes persistence. I believe that assessment of this factor would be weighted at or near the statutory cap of $277,140.

Nature of Noncompliance

While the failure to post a fee notice on an ATM may be considered a technical violation, it was a significant enough issue that Congress enacted a law to require it. More importantly, the action needed to be compliant (posting a single sticker) is so simple that a failure to do so is all the more egregious. This is further bolstered by the fact that the ATM at issue is located at your client's

180 W. WASHINGTON
SUITE 700
CHICAGO, IL 60602-2318

312.782.5808
FAX 312.377.9930

WWW.CACLAWYERS.COM



**CONSUMER ADVOCACY CENTER, P.C.**
A PRIVATE LAW FIRM PROTECTING CONSUMERS' RIGHTS

headquarters, with employees and officers (let alone servicers of the machine) having ready access to the ATM. Not only did your client have no procedures in place monitor EFTA compliance and acknowledges that it never inspected the ATM for EFTA compliance, but it is quite surprising that one of your client's employees and/or officers did not pick up on the noncompliance. Because compliance is quite simple but your client apparently just chose not to put compliance procedures in place, I believe that assessment of this factor also would be weighted toward the statutory cap of $277,140.

### Resources of Defendant

Given your client's net worth of $27,714,000, it is clear that your client has the wherewithal to absorb payment of the statutory cap of $277,140 relatively easily. Undoubtedly, this factor would also be weighted toward the statutory cap of $277,140.

### Number of Persons Adversely Affected

The number of persons adversely affected is relatively high at 5,308. It is not the highest transaction number I have seen in an ATM case, but it is far from the lowest in a one year period. Additionally, because we do not know right now how long your client's noncompliance persisted, the number of persons adversely affected could be significantly higher than 5,308. While those persons that were affected more than a year prior to the filing of this lawsuit may not be able to recover, this does not preclude consideration of them when assessing this factor. Because we do not have all of the information necessary to asses this factor fully, I would place this in the middle ground of the available statutory damages, at $138,570.

### Intentional Noncompliance

Again, because we do not have all relevant information to assess this factor, I will, for now, give your client the benefit of the doubt on this factor. I doubt a financial institution would purposely fail to comply, especially in light of the potential exposure. This is tempered a bit by your client's approach thus far in this litigation. That said, as set forth above, while not intentional, your client's lack of compliance likely rises to the level of reckless disregard by its failure to post a simple sticker, its failure to have any procedure in place to ensure compliance and its allowance of noncompliance for at least a year. For our purposes at this point in the litigation, I believe this factor would be weighted toward the middle ground of available statutory damages, at $138,570.

### Other Factors

Because the EFTA requires consideration of other relevant, but not specifically enumerated, factors, I think a couple others should be considered to the extent not considered previously. First, it is astounding that your client had no compliance procedures in place and has, in fact, never surveyed the ATM for compliance (not only for compliance with the EFTA but also, apparently, for compliance with the EFAA). Second, to the extent not evaluated in other factors above, your client's actions should be viewed negatively because the noncompliance occurred at its headquarters. Of course, each of your client's ATMs are required to be compliant, but it is astounding that the one at issue is the one most likely subject to scrutiny by people that should know the applicable law, i.e., the officers.

180 W. WASHINGTON
SUITE 700
CHICAGO, IL 60602-2318

312.782.5808
FAX 312.377.9930

WWW.CACLAWYERS.COM

\*     \*     \*     \*     \*

**CONSUMER ADVOCACY CENTER, P.C.**
A PRIVATE LAW FIRM PROTECTING CONSUMERS' RIGHTS

Taking each of the 5 required factors into consideration, I value them at an average of $221,712. Though I have not yet identified a credible defense to this case, I am not so naïve to think that it is a slam dunk, especially with your client's motion to dismiss pending. Therefore, I think a 20% uncertainty discount should be considered in an effort to resolve this matter, thus bringing the number to $177,370.

In addition to actual and statutory damages, we demand $2,000 for my client as class representative, plus attorneys' fees and costs, to which we can agree or we can petition the court. In sum, our total demand is as follows:

| | |
|---|---|
| Plaintiff: | $2,000.00 |
| Actual Damages (Class): | $10,616.00 |
| Statutory Damages (Class): | $177,370.00 |
| Total: | $189,986.00 plus attorneys' fees and costs |

I look forward to your response.

### Discovery and Deposition Schedules under Rule 37.2

We have received your written responses to discovery and need to have a 37.2 conference on the matters not responded to. I would like to schedule such a conference on May 6, 2008, May 7, 2008, May 8, 2008 or May 9, 2008.

For the depositions previously scheduled and cancelled, (Lawrence Ligas, Brett Sand, Barry Rustin, James Hubbard, Kim Cole), I would like to get them rescheduled for the week of May 26, 2008, or June 2, 2008. I generally schedule deposition for 10:00 a.m. and only one per day. Please let me know in the next week whether any of the days are preferable over others and if any of the witnesses are unavailable on any of the days.

Unless I hear to the contrary on May 5, 2008, I will notice them as follows:

Brett Sand, May 27, 2008- 10:00 a.m.
Lawrence Ligas, May 28, 2008- 10:00 a.m.
Barry Rustin, May 29, 2008- 10:00 a.m.
James Hubbard, May 30, 2008- 10:00 a.m.
Kim Cole, June 2, 2008- 10:00 a.m.

Yours very truly,

Lance Raphael

180 W. WASHINGTON
SUITE 700
CHICAGO, IL 60602-2318

312.782.5808
FAX 312.377.9930

WWW.CACLAWYERS.COM

| Transaction Report | | | | | |
| Send | | | | | |
| Transaction(s) completed | | | | | |
| TX Date/Time | Destination | | Duration P. # | Result | Mode |
| 906 APR-30   08:34 | 3126621040 | | 0°00'46"  003 | OK | N  ECM |



**CONSUMER ADVOCACY CENTER, P.C.**
A PRIVATE LAW FIRM PROTECTING CONSUMERS' RIGHTS

April 30, 2008

**Via Facsimile and U.S. Mail**

312-662-1040                                    For settlement under Rule 408

Mark Belongia                                   Request for 37.2 Conference
Belongia & Shapiro, LLP
53 W. Jackson Blvd, Suite 315
Chicago,, IL 60604

Re:     Flores v. Diamond Bank ATM CASE
        Case No.:

Dear Mr. Belongia:

Now that your client, Diamond Bank, has partially answered some discovery requests issued by Plaintiff, and assuming the accuracy of the data, this letter is an attempt to resolve this matter by settlement. The Electronic Funds Transfer Act, 15 U.S.C. § 1693, et seq. ("EFTA") allows for actual damages, statutory damages (up to $1000 for an individual case and up to the lesser of $500,000 or 1% of net worth for a class), attorneys' fees and costs.

**Actual Damages**

With 5,308 transactions at issue, at $2.00 per transaction, actual damages are $10,616.00.

**Statutory Damages**

The EFTA provides that the following factors, among others, shall be considered in determining the amount of liability in a class action case such as this: the frequency and persistence of noncompliance, the nature of such noncompliance, the resources of the defendant, the number of persons adversely affected and the extent to which the noncompliance was intentional. Assuming that your client is worth $27,714,000; statutory damages would be capped at $277,140 (1% of net worth).

<u>Frequency and Persistence</u>

All indications are that the ATM at issue was noncompliant with the EFTA for at least a year, or at least Defendant has no idea how long the ATM was noncompliant because it had no procedure in place to verify compliance. Nonetheless, more than 5,300 incidences of noncompliance is frequent, and a period of noncompliance covering at least the entire statute of limitations period (1 year) constitutes persistence. I believe that assessment of this factor would be weighted at or near the statutory cap of $277,140.

Nature of Noncompliance





Online Banking

Diamond Click!
Business Internet
Banking

President's Letter

History & Community

Bank Locations and
New Lobby Hours

Current Rates

Lending Products

Home Equity

Deposit Products

Commercial Banking

Newcomer Information

Calculators

Interesting Links

Privacy & Security

Disclosures

Contact Us

Home Page

Special Events

# Welcome to Diamond Bank.
# A Real Gem.



Thank you for visiting our site and welcome to a whole new bank that is actually one of the most established financial institutions in Chicago.

From the outside we are a rare beauty found in the heart of Chicago and Skokie. Step inside and find polished banking professionals eager to listen and be of service. Look closer and notice state-of-the-art technology and great products combined with over 120 years experience. Stay awhile and gain a financial partner dedicated to meeting your personal and business banking needs.

We invite you to explore our products and come in to see the newest bank in town!

Diamond Bank.

Excellence.. since 1886.

**ON-LINE BANKING CENTER**

To find a *Surcharge Free* ATM near you, enter your zip code below.

FIND A SURCHARGE-FREE ATM!

  

## Diamond Bank Now Offers Its Customers
## Access To 34,000 Surcharge Free ATMs

- Get your secure Credit Report in seconds.
- Use over 25 Calculators. Go Figure!
- Test Yourself for a Loan or Investment Product.



EXHIBIT

Hubbard E
6-19-08 RR

- **Use our secure Check Reorder Form.**
- **Use EDIE to answer your deposit insurance questions.**

Please take a moment to sign our **Guest Register** then browse our website. It represents our commitment to progress and "staying connected" with the communities we serve. Also be sure to add our website to your favorites, because we'll be updating it often to make it more interactive and responsive to your needs.



Powered By BankSITE®