1      Q.    Right.

2      A.    That sign is part of the surround.

3      Q.    Would that have come from --

4      A.    Some company that makes fiberglass

5   surrounds.

6      Q.    Well, did LaSalle Glass --

7      A.    LaSalle Glass had nothing to do with the

8   fiberglass surround.

9      Q.    Okay.  Where did you obtain it from

10   then?

11      A.    I -- The bank obtained it directly.  I

12   assisted them with what size we need to fit the

13   physical sizing that LaSalle Glass has given me

14   from post-to-post.

15      Q.    Okay.  So LaSalle Bank personnel ordered

16   it directly.  You didn't have --

17      A.    LaSalle Glass.

18      Q.    I'm sorry, Diamond Bank personnel

19   ordered the Diamond Bank sign directly without

20   using you as a conduit.

21         MR. BELONGIA:  Objection to the term

22   Diamond Bank sign.  Are we referring to the

23   surround or the sign or what are we talking about?

24   BY MR. RAPHAEL:

1    Q.    Here.   Is that Diamond Bank --

2    A.    Well, there's -- there's three signs--

3         MR. LOWREY:   Please.

4         THE WITNESS:   -- I'm looking at.

5    Diamond Bank, Diamond Bank, Diamond Bank.

6         MR. LOWREY:   Please, just answer the

7    question.

8         THE WITNESS:   Okay.

9    BY MR. RAPHAEL:

10    Q.    You got to wait for me to ask it because

11    you don't know what I'm going to ask.   I don't

12    care about that big post sign that's near the

13    tree.   You see that sign?

14    A.    Yes.

15    Q.    Okay.   I don't care about that.   I don't

16    even care about the big sign that says Diamond

17    Bank on the -- on the branch.

18    A.    Okay.

19    Q.    Okay?   All we're talking about are the

20    signs and the surrounds of the ATM at this point.

21    Are we absolutely on the same page?

22    A.    Yes.

23    Q.    Okay.   So did Diamond Bank order that

24    Diamond Bank sign on the ATM, the one that says

1    Diamond Bank with its logo?

2        A.    It's part of the fiberglass surround.

3        Q.    Okay.  Did they order this fiberglass

4    surround themselves?

5        A.    They ordered it.  Yes.

6        Q.    You got to let me finish the question

7    because I got to ask it again because we were

8    talking over each other and it will show up screwy

9    on the transcript.  Diamond Bank directly ordered

10   the fiberglass surround, which includes that

11   Diamond Bank sign.

12        A.    After I gave them the size that will

13   fit.

14        Q.    Okay.  And so they ordered --

15        A.    So I gave them the -- the parameters.

16   They have to order it, wrote it down, and the bank

17   placed the order.

18        Q.    That's all I'm getting at.  I don't care

19   what you measured.  I'm concerned with who made

20   the order, who actually got billed for the

21   surround -- the fiberglass surround.

22        A.    Well, then if you want to -- if you want

23   to -- if that's the question --

24        Q.    Yeah.

1       A.    -- the answer is Diamond Bank.

2       Q.    Okay.  So they all direct contact with

3  the company that --

4       A.    I had -- I had contact with the company.

5       Q.    You got to -- You got to stop.  You got

6  to wait until I'm finished with the question.

7  Okay?  Please take just a breath before you start

8  to answer, pause, let me -- let me ask the

9  question.  Diamond Bank had all direct contact

10  with the company that the fiberglass surround was

11  ordered from.

12       A.    No.

13       Q.    What contact did other people have?

14       A.    I had contact with them of finding out

15  sizes that would fit our tight widths because of

16  our corner post.

17       Q.    Okay.  And what contact was it, over the

18  phone or in per -- Let me finish the question,

19  please.  Was it over the phone, in person, E-mail,

20  what?

21       A.    It was verbal, over the phone.

22       Q.    What was the name of the company?

23       A.    I stated it.  I don't recall.  It was a

24  company that furnishes fiberglass surrounds.

1       Q.   Where did you locate them from?

2       A.   From doing some networking and it may

3 have come from the people that delivered the

4 machine.  I don't know how we -- I don't recall

5 how we ended up getting this company.

6       Q.   Did they send you -- This company, did

7 they send you the invoice for the fiberglass

8 surround?

9       A.   I don't recall.

10      Q.   Well, did you pay them for the

11 fiberglass --

12      A.   The bank.  The bank paid them.

13      Q.   You installed the fiberglass surround

14 after it had been delivered.  Right?

15      A.   That's true.

16      Q.   So this company just drop shipped the

17 fiberglass surround?

18      A.   To the bank.

19      Q.   And you personally installed it?

20      A.   I and Matt.

21      Q.   Other than installing the fiberglass

22 surround and then powering up the light in the

23 surround and the machine, what other things were

24 done by you to make the machine ready for usage?

1      A.   We -- Around the machine, around the

2    floor we made sure that there was no hazardous on

3    the ground so no one would trip because the

4    finished concrete was not finished.  So we had

5    some temporary plywood down so that there was no

6    high spots, no one tripped.  We also made sure

7    that before it was working Mr. Hubbard asked me to

8    scrape off a couple of old signs and move them to

9    the new surround.

10       Q.   What do you mean scrape off a couple of

11    old signs, from where?  What -- What are you

12    talking about?

13       A.   This was -- The old -- It was a masonite

14    surround that they had around the old machine.

15       Q.   You mean an old machine that was inside

16    of the bank?

17       A.   Right.  The existing ATM.

18       Q.   Okay.  So he had you scrape off some

19    signs from a masonite --

20       A.   From a masonite flat surround.  It was

21    just a flat surround, masonite surround.  It

22    wasn't a fiberglass.

23       Q.   Okay.  And what were these -- what --

24    scrape them off, what, were they, stickers?

1      A.   No.  Stickers I wouldn't be able to get

2  off.

3      Q.   Well, what were they?

4      A.   It was a raised like, metallic letters

5  on a flat surface adhered -- adhered behind a flat

6  surface.

7      Q.   What do you mean?  These were raised

8  letters, like embossed letters on a flat surface?

9      A.   I don't recall exactly what it was.  It

10  looked metallic to me.  It looked pretty cool.  It

11  was like, you know, raised letters, but it was on

12  a flat surface that we were able to scrape from

13  the back, remove it, and we were able to adhere it

14  onto the fiberglass surround.

15      Q.   Well, what was it adhering -- It was --

16  It adhered to some masonite?

17      A.   Yes.

18      Q.   And what was the metal?  You say it was

19  a metal sign?

20      A.   On a -- It was on a plaque that was wrap

21  with looked like metal --

22      Q.   Mm-hmm.

23      A.   -- and it was glued from the back.

24      Q.   Okay.  Using what kind of --

1   A.   So we were able to basically -- I just

2   was able to get a scraper and I was able to remove

3   the adhesion, detach it.

4       Q.   You did that yourself?

5       A.   Yes.

6       Q.   Alright.  So what did you use, some sort

7   of a chisel to pull it off?

8       A.   No, I just I used a scraper --

9       Q.   What's --

10      A.   Flat -- A flat scraper, stiff scraper,

11  and I just took the scraper between the masonite

12  and the back of this signage.

13      Q.   When you're talking about this scraper,

14  you're talking about one of these flat edge with a

15  knife edge where it's used for drywalling?

16      A.   Yes, sir.

17      Q.   You shook your head and then said yes,

18  so were you thinking I was going to ask a

19  different question?  It was a scraper that you

20  would use for drywalling with a flat --

21          MR. BELONGIA:  Asked and answered.

22          THE WITNESS:  It was a stiff scraper.

23  BY MR. RAPHAEL:

24      Q.   Okay.  How many signs were there?

1          A.    There was one on the left and one on the

2    right.

3          Q.    And what were the dimensions?

4          A.    I don't recall.

5          Q.    Well, were they 2 x 2 inches, 4 x6

6    inches?

7          A.    It was about like that, 5 x 4.

8          Q.    5 x 4.

9          A.    I don't recall, but approximately.

10         Q.    Okay.   Approximately 5 inches x 4

11   inches.  Right?

12         A.    Something like that.

13         Q.    I mean you're a contractor.

14         A.    Yes.

15         Q.    You're in the building business.

16         A.    Yes.

17         Q.    And we know how to measure.   Right?

18         A.    Right.

19         Q.    Okay.   So it could've been 4-1/2, it

20   could've been 5-1/2, but it's roughly 4 x 5

21   inches.

22         A.    Approximate.  Yes.

23         Q.    Okay.

24         A.    It's not 8 x 10.

1    Q.   And it wasn't 2 x 2 either.

2    A.   That's a fact.

3    Q.   Okay.  And when did you scrape those

4  signs off?

5    A.   The afternoon when we ready to liven up

6  that new machine.

7    Q.   Okay.  So after the -- after the

8  fiberglass surround was installed and after the

9  lights on the fiberglass surround were powered up,

10  that's when you scraped off the sign.

11    A.   Yes.  Yes.

12    Q.   And that would've been in March like you

13  said?

14    A.   Yes.

15    Q.   Okay.  And what did you adhere the signs

16  to?

17    A.   I needed to -- the fiberglass.

18    Q.   To the fiberglass.  And what did you use

19  to adhere it?

20    A.   We had to -- We had some weather proof

21  adhesion, tape.

22    Q.   You used tape?

23    A.   Two-sided tape.  Yes.

24    Q.   So you used two-sided tape?

1    A. Yes. It's called -- It's stronger than

2 glue adhesive.

3    Q. How strong is it?

4    A. Extremely.

5    Q. Is it like super glue?

6    A. It's very strong. It's two-sided

7 weather resistant tape.

8    Q. And would it be more difficult to scrape

9 off than the adhesive that was used in the first

10 instance?

11    A. It would not crack. The first adhesion

12 when it got below zero, the thing would've fallen

13 off. This has expansion-contraction.

14    Q. But it's tape. Right?

15    A. It's the same stuff that glazers use.

16    Q. What's it called?

17    A. It's called two-sided tape.

18    Q. Well, there's a bunch of two-sided tape.

19 There's two sided Scotch tape, there's

20 two-sided –

21    A. It's 3M. It's 3M two-sided glazing

22 tape.

23    Q. So it's called 3M two-sided glazing

24 tape. Okay.

1          A.     The best that I recall.

2          Q.     Where'd you get it from?

3          A.     A supplier on Ogden Avenue.   I don't

4     recall their name.   Smock and something.

5          Q.     Smock and something?

6          A.     Yeah.

7          Q.     What kind of supplier are they?

8          A.     For window glazing, exterior glazing

9     materials.

10         Q.     Have you used them before?

11         A.     Yes.

12         Q.     Do you use them still?

13         A.     Periodically.

14         Q.     What's the address on Ogden?

15         A.     It's like Ogden and Cicero.

16         Q.     And the first name is Smock, S-M-O-C-K?

17         A.     Yeah, something like that.

18         Q.     Definitely with an S though.   Right?

19         A.     Definite.

20         Q.     And where on Ogden and Cicero is it, on

21    which corner?

22         A.     It's not on a corner.   It's on the south

23    side of the street.

24         Q.     The south side of which, Ogden?

1      A.    Yes.

2      Q.    And it's between Cicero and what?

3      A.    It's -- I would -- If I recall, I think

4    it's like between Cicero and Central.

5      Q.    So it's between Cicero and Central on

6    Ogden Avenue.

7      A.    Correct.

8      Q.    And they have this 3M two-sided glazing

9    tape?

10     A.    I'm not sure if it's actually 3M, but 3M

11   makes a lot of it.

12     Q.    But it's the glazing tape that's used

13   for windows.

14     A.    Yes.  Mirrors.

15     Q.    Mirrors.

16     A.    Stainless steel.  And that's why I used

17   it because it's -- it was made for stainless

18   steel.

19     Q.    Well, was the stainless steel up at this

20   point or was this --

21     A.    It's the fiberglass.

22     Q.    So you used it for adhering a metallic

23   type sign to a fiberglass surround.

24     A.    Correct.  And the spec said it's -- it's

1  good for fiberglass, steel --

2      Q.   Where on --

3      A.   And that's the same tape that we use

4  when we glue stainless steel to other substrates.

5      Q.   Where on the fiberglass surround was the

6  sign adhered?

7      A.   I think there were two signs.  I know

8  that there were two signs.

9      Q.   Okay.  Where on the fiberglass surround

10  were the two signs adhered when you adhered them?

11      A.   One went on the left bottom and one went

12  on the right bottom.

13      Q.   Left bottom and right bottom.

14  Underneath the machines?

15      A.   There's like a ledge or there was a

16  protrusion that I recall.

17      Q.   So it was below the ledge or above the

18  ledge?

19      A.   It was below the ledge where there was a

20  wide area.

21      Q.   And how strong is this adhesive?

22      A.   I just want to make it clear what

23  it's -- It's strong enough that it's made to hold

24  stainless steel.

1          Q.    Alright.  Would you have to pry this

2     sign off in order to --

3          A.    You have to.  Yeah.  You have to pry it

4     to get it off.

5          Q.    Well, you would have to use a tool like

6     the one you used?

7          A.    If you don't want to damage the sign,

8     but if -- You know, if you're not worrying about

9     damaging, you probably could --

10         Q.    You mean you could pull it off with your

11    hand?

12         A.    If you're a -- I would say with your

13    hand you probably would damage your hand.

14         Q.    Okay.  I mean this wasn't like tape.

15         A.    No.  It's -- It's trade --

16         Q.    It's meant to be permanent.

17         A.    I try my best to get the best and latest

18    -- Why Mr. Hubbard hired me is because I try to

19    get the latest and best, you know, products out

20    for the situation, and knowing how important these

21    signs were to Mr. Hubbard, these sign -- this tape

22    would've been better than using spray because when

23    it got so cold outside the spray adhesion would

24    not have worked.

1      Q.    Okay.

2      A.    This tape, the specs stated it's for

3  holding to fiberglass, to wood, to stainless

4  steel.  I had both.  I had fiberglass and I had

5  some type of wood and metal backing, and if it --

6  if it holds stainless steel, it definitely was

7  strong enough to hold these little signs.

8      Q.    Alright.  This type of stuff you're

9  talking about is for a layman like me the

10 equivalent of -- You ever see that commercial with

11 the guy with Super Glue on the hard hat and he's

12 attached to the steel girder?  You ever see that

13 commercial?

14     A.    No, but it's not a -- It's not a liquid

15 glue.

16     Q.    I understand that.

17     A.    These are strips.

18     Q.    Okay.  But it's that kind of strength.

19 It's something --

20     A.    Yes.  It's --

21     Q.    -- that would take --

22     A.    It's made to hold stainless steel.

23     Q.    Okay.

24     A.    That's how they advertise it.  Two-sided

1    before.

2         A.    Yes.    Definite.

3         Q.    Okay.    And so if you had to have taken

4    the sign off yourself after you had used this more

5    technologically advanced adhesive than what was

6    previously on there --

7         A.    Right.    I would have to work a little

8    harder to remove it, to separate it.

9         Q.    You'd have to have used some sort of a

10   chisel or force?

11        A.    No, I would've probably used the same

12   type of apparatus, same type of tool, but I

13   would've probably had to have worked a little

14   harder to separate it.

15        Q.    Okay.    How many strips of this adhesive

16   tape did you use to adhere it to the fiberglass

17   surround?

18        A.    I followed the exterior perimeter.

19        Q.    Oh, so, in other words you used -- you

20   covered completely every -- every square inch of

21   the back of the sign and adhered it to the --

22        A.    I did a frame around the perimeter of

23   the sign and then I adhered it.

24        Q.    So it was covering all of the --

1    A.    The perimeter.

2    Q.    -- exposed perimeter of the sign.

3    A.    Yes.  Yes.

4    Q.    Okay.  And putting up the sign, you said

5    this was very important to Mr. Hubbard?

6    A.    Yeah, he wanted to make sure that before

7    I left that day that we had these signs up.

8    Q.    Okay.  And do you recall him making

9    special mention of these signs need to be up there

10    or something like that or what?

11    A.    He said these -- these -- the signage or

12    signs need to be put on the machine.

13    Q.    Okay.  And when you were done putting

14    the signs on the machine, did he look at it?

15    A.    He -- He came by and looked at the

16    machine, and he was playing with the buttons.  He

17    may have been using the machine.

18    Q.    Okay.  And this was some time in March?

19    A.    Yes.

20    Q.    Okay.  And when -- when was the last

21    time you saw those signs up on the machine?

22    A.    I don't recall.

23    Q.    Well, do you ever recall seeing them

24    after that point?

1      A.    They were -- They were all -- When we

2   did the punch list in July, they were on there.

3      Q.    You know that why?

4      A.    I remember putting up the signs with the

5   tape and everything and I looked at it.

6      Q.    Okay.  So in July when the punch list

7   was being done you remember seeing for sure those

8   signs were up.

9      A.    Yes.  Yes.

10     Q.    Was there any point in time after July

11  that you remember seeing that those signs were

12  actually up, and we're talking July of '06

13     A.    Yeah.  There's no other time that I -- I

14  had no other reason to be looking at it.

15     Q.    Okay.  Well did you ever see the signs

16  up there at any point in time after having this

17  picture taken of the bank?

18     A.    I don't recall even -- even thinking of

19  looking for those signs.

20     Q.    Okay.  So you don't know then if those

21  signs were up after this picture was taken?

22     A.    I do not know.  All I know is that July

23  2006 they were up.

24     Q.    Prior to coming here today, have you

1  seen this picture of Diamond Bank, Exhibit E or

2  the one that's Exhibit D on the website?

3       A.   I don't recall seeing the actual

4  picture.  I mean this may be the first time.

5       Q.   Do you recall ever seeing a picture of

6  the exterior of Diamond Bank of any sort by any

7  one?

8       A.   You know, now -- There may have been a

9  brochure that was laying on the -- one of the

10  tables in the upper floor.  I remember walking by,

11  you know, breezing through.  I remember some

12  brochure may have had this picture on the front in

13  the bank, but did I stop and really look at it,

14  no.

15       Q.   Okay.  Other than that picture you're

16  describing, have you ever seen another picture of

17  the Diamond Bank exterior?

18       A.   Before renovation?

19       Q.   No.

20       A.   Yes.

21       Q.   After the renovation.

22       A.   No.

23       Q.   And these signs that you've put up on

24  the exterior of the fiberglass surround, they were

1  raised metallic signs.  They were not stickers.

2  Correct?

3          A.    They were not stickers.

4          Q.    But they were raised metallic signs.

5          A.    They were on -- They were on like, a

6  backboard and they looked like they were metal,

7  but they were not a flat -- adhesion flat -- They

8  were on a backer board.

9          Q.    Since being involved in this case, have

10  you had an opportunity to be -- to look at the ATM

11  at issue?

12          A.    To look at it?

13          Q.    Mm-hmm.

14          A.    I mean when I -- when we did the punch

15  list and everything, I made sure everything was

16  within tolerance of a 32nd of an inch.

17          Q.    No, no.  Since the time you became

18  involved in this piece of litigation -- After

19  you –

20          A.    Oh, this litigation?

21          Q.    Yes.  Since that time --

22          A.    No.

23          Q.    -- have you looked at the ATM at all?

24          A.    No.

1       Q.   You haven't even bothered to go look at

2   it since being subpoenaed or anything else?

3       A.   Believe me, this -- this litigation here

4   is not on my priority of putting any brain muscle

5   into it.  I did not go look at the ATM.  I mean I

6   got a visual picture of it.

7       Q.   Mm-hmm.  What time is it?

8       MR. LOWREY:  12:20.

9       MR. RAPHAEL:  Why don't we take a break

10  for lunch and let me collect my notes.  You may

11  get it as short or as long as you want?

12      MR. LOWREY:  I'd rather make it non --

13  Why don't you just take a few minutes.  Why don't

14  you take a few minutes and look through your notes

15  so we can be done because we've all got other

16  things to do, I think.

17      THE REPORTER:  This is the end of tape

18  number two.  The time is 12:22 p.m., and the

19  running time of this tape is 58 minutes and 37

20  seconds.  This is the start of tape number three.

21  The time is 12:39 p.m.

22  BY MR. RAPHAEL:

23      Q.   Alright.  So we're in March of 2006 when

24  you said you had put in the two signs and affixed

1    them with this adhesive tape and lit up the

2    surround and powered up the machine.  What

3    happened after that with regard to making the

4    machine finished?

5        A.    We put a slip resistant pad -- the

6    answer to your -- to make the machine finished?

7        Q.    To finish the ATM project in its

8    entirety.

9        A.    We ended up -- I suggested to Mr.

10   Hubbard that there's these slip resistant pads

11   that raise up off the ground, so when there's a

12   little snow on the ground, if it melts then no

13   ones's standing in slush and it's slip resistant

14   and plus it's handicap for wheelchairs so no one

15   is slipping.  So we put this type of pad in in

16   front of the machine and then in June when --

17   approximately June -- approximate when the

18   stainless steel finally showed up, the right size,

19   we then had to maneuver the machine in the

20   surround to let LaSalle Glass slip their stainless

21   steel in, and then we finished the final cement

22   work around the slip resistant pad.

23       Q.    Okay.  When -- When did that happen?

24       A.    It's probably June.

1    A. No.

2    Q. What would that have been?

3    A. Actually, in this picture it shows up

4 very clear where it says ATM.

5    Q. Oh, I see.  It's the ATM above the --

6    A. Correct.

7    Q. It is the ATM sign above the revolving

8 door.

9    A. It's -- Yeah, attached to the bottom of

10 the canopy, the bottom side of the canopy.

11    Q. Okay.  It's not next to the actual

12 machine itself.

13    A. No.  It's facing southbound.

14    Q. Okay.  So invoice 112 refers to that.

15 Correct?

16    A. Yes.

17    Q. Invoice 06-284 relates to LaSalle Glass

18 coming in in June and finishing the installation

19 of the surround for the ATM.

20    A. No.  They put the substrate where the

21 surround butts up to.

22    Q. What work does invoice 06-284 refer to

23 in terms of when was this work done?

24    A. Like between March and June.

1    Q.    Invoice 06-178, does that have anything

2    to do with the ATM at all?

3    A.    This is part of the base contract.  We

4    just upgraded it from -- He wanted to get some

5    nice cherry panel doors.

6    Q.    Is that yes or no?

7    A.    It has nothing to do with your ATM

8    surround.

9    Q.    Okay.  That's what I was asking.

10   Invoice 06-290, it says furnished and installed

11   vandal resistant mirrored camera window on front

12   panel of ATM surround.  You see that?

13   A.    Well, say that again.  Which one was

14   that?  Oh, yeah, vandal resistant -- Yeah,

15   mirrored camera window.

16   Q.    So you installed that.

17   A.    Yes.

18   Q.    When was this done?

19   A.    Probably June of 2006.

20   Q.    Well, could it have been done after June

21   of 2006?

22   A.    No.  It was done prior to July, you

23   know, completion.

24   Q.    Where did this camera come from?

1        A.    It wasn't a camera.  It was a glass.

2        Q.    Where did this glass come from?

3        A.    I don't recall the supplier.

4        Q.    Well, do you think you got it from the

5   same supplier that --

6        A.    No.

7        Q.    What was I going to ask?

8        A.    From the same supplier as the surround.

9        MR. BELONGIA:  Don't badger the witness.

10  Just ask the question, please.

11  BY MR. RAPHAEL:

12        Q.    Well, actually I was going to ask --

13        A.    I would imagine.

14        Q.    -- did it come from the same -- same

15  supplier as supplied the ATM itself?

16        A.    No.

17        Q.    Do you know where the ATM itself was

18  supplied from?

19        A.    I recall some tag, but I don't know the

20  actual supplier's name.  No.

21        Q.    If I said Diebold, would that refresh

22  your recollection?

23        A.    Yeah.  It said Diebold 5th/3rd Bank on

24  it.

1    Q.    Okay.  Do you know if the vandal

2    resistant mirrored camera window came from that

3    same supplier?

4        A.    I'm almost sure it didn't.

5        Q.    Okay.  Where did it come from then?

6        A.    Some other -- Some other supply source.

7    I'm almost sure it wasn't Diebold, but I'm not

8    saying that Diebold may carry it.  I don't know,

9    but based on my recollection, I don't remember

10   talking to Diebold about it.

11       Q.    Okay.  Did you pay this invoice?

12       A.    The best of my recollection that I -- I

13   paid it.

14       Q.    Okay.  And then you invoiced the bank --

15       A.    Yes.

16       Q.    -- to be reimbursed?

17       A.    Yes.

18       Q.    Okay.  You have to really try very hard

19   to not speak until I'm actually done with the

20   sentence.  Okay?  So invoice 06-290 is you seeking

21   reimbursement for an invoice that you paid for the

22   ATM camera window.

23       A.    Yes.

24       Q.    And did you pay the invoice for the ATM

1    camera window out of your bank account for Alligas

2    Enterprises, Inc.?

3         A.    The best that I recall.

4         Q.    Why did you wait from June of 2006 to

5    December of -- December 26 of 2006 to invoice the

6    bank for something you had paid out?

7         A.    Regarding low overhead, I just sat down

8    and gathered some invoices and that month is when

9    I got around to billing for the -- for that part

10   of the project.

11        Q.    Well, according to these invoices for

12   the work you said was done in June of 2006, you

13   were owed approximately $5,000.  Right?

14        A.    If that's what it adds up to.

15        Q.    Well, if you think it's some different

16   amount, please check.

17        A.    I mean -- If that's what it adds up to,

18   that's -- that's what they owed.

19        Q.    Well, let's look.  Invoice 07-112,

20   invoice 06-284, and invoice 06-290.  Are those --

21   All those invoices were for work that was done in

22   June of 2006.  Correct?

23        A.    Yes.

24        Q.    Okay.  And you waited until six months

1   later to invoice for those?

2          MR. BELONGIA:  Asked and answered.

3          THE WITNESS:  Yes.

4   BY MR. RAPHAEL:

5      Q.   Why were you sitting on $5,000 worth of

6   invoices for that time period?

7          MR. BELONGIA:  Asked and answered.

8          THE WITNESS:  The -- The relationship

9   that I had with Mr. Hubbard is monthly.  I billed

10  him a certain percentage of invoices and that part

11  of the project came in at that time of the year.

12  BY MR. RAPHAEL:

13     Q.   How much had you previously billed Mr.

14  Hubbard or the bank for work previously done?

15     A.   I don't recall.

16     Q.   Is it fair to say that you've billed

17  them more than a half-a-million dollars for the

18  work done on the bank?

19     A.   It's probably fair to say.

20     Q.   And you've billed that half-a-million

21  dollars over the time frame between October of

22  2005 through to December of 2006?

23         MR. BELONGIA:  Object to relevance.

24         THE WITNESS:  You object?

1          MR. BELONGIA:   Answer if you can.

2          THE WITNESS:   Oh.   Yes.

3      BY MR. RAPHAEL:

4          Q.    You were clear that if they object that

5      you still answer the question.   Right?

6          A.    Yes.

7          Q.    Okay.

8          A.    But thanks for clarifying.

9          Q.    Have you been fully paid for all the

10     work done under your May 4, 2005, proposal here?

11         A.    Yes.

12         Q.    Okay.   When was the last time you

13     received payment from the bank?

14         A.    About 30 days ago.

15         Q.    How much was it?

16         A.    I don't recall.

17         Q.    Roughly.

18         A.    Several thousand dollars.

19         Q.    What's several thousand?   One, two,

20     five, ten, twenty?

21         A.    It may have been $5,000.

22         Q.    And what was that for?

23         A.    Electrical work.

24         Q.    Where's the invoice for that electrical

1       work?

2           A.    That one I -- It was not part of this --

3       It was additional work.

4           Q.    I didn't ask whether it was additional.

5       I asked where's the invoice for that work.

6           A.    It may be -- I may -- Yeah, I may be

7       able to get a copy of that one.   It's a newer

8       invoice.

9           Q.    Okay.  Well, were you unclear as to the

10      meaning of the request for documents saying all

11      documents relating to any contracts and/or work

12      orders between Diamond and you?

13          A.    It wasn't clear of any additional work

14      beyond the finish of the entire project.

15          Q.    What do you mean beyond the finish of

16      the entire project?

17          A.    That was not clear that any additional

18      work beyond the completion of the whole scope of

19      the work with the ATM.  You made it very clear

20      that everything that we're talking about is just

21      ATM, ATM, so --

22          Q.    I made it clear that during this

23      deposition -- at a certain point in time during

24      this deposition I was going to focus in on the

1    ATM.   That's not what I said to you -- I haven't

2    spoke to you prior to this with regard to the

3    document production provider, did I?

4        A.    That's false.  You called me on my cell

5    phone in the middle of a meeting and you said I

6    don't care if you're in the middle of a meeting,

7    if you don't come to the deposition you're going

8    to get the U.S. Marshals to escort me in, and I

9    will have to pay all the legal bills, and I stated

10   that I'm in the middle of a meeting, and you went

11   on again and stated that per rule so and so and so

12   and so you will be brought in and you will file

13   papers against me.

14       Q.    Did, during that conversation, I ever

15   discuss limiting the documents you were supposed

16   to bring with for today?

17       A.    You mentioned that -- The way I

18   understand all the documents regarding the project

19   with the ATM.

20       Q.    You mean I said I'm limiting the

21   documents that were produced that were being

22   sought for in this subpoena?  I told you it was

23   going to be limited?

24       A.    You did not.

1         MR. LOWREY:  I object to this entire

2   line of questions, unless you're going to offer

3   yourself as a witness at this trial.  You're

4   harassing the client.  If you want to talk to him

5   about the ATM situation and ask him more

6   questions, go ahead.

7   BY MR. RAPHAEL:

8         Q.   I'm looking for the invoices that you

9   submitted to the bank for work done with the bank,

10  and --

11        A.   And my --

12        MR. LOWREY:  Excuse me.  I'm objecting.

13  It's beyond the scope of relevancy or materiality.

14  The case is about an ATM machine with some notices

15  and signs on it.  That's all you're entitled to

16  get.

17        MR. RAPHAEL:  You can object.

18        MR. LOWREY:  And I'm instructing him not

19  to answer anymore of these questions.

20        MR. RAPHAEL:  You can do that, but it's

21  subject to him being recalled to testify about

22  these things.

23        MR. LOWREY:  I will deal with the judge

24  under the rules.  I practiced there for 40 years.

1    I know how things are done over there.  I know

2    what the rules are and I know when you're out of

3    bounds.  I'm instructing him not to answer this

4    line of questions.

5    BY MR. RAPHAEL:

6        Q.   What was the electrical work that you

7    did on the bank that you invoiced them for

8    previously?

9            MR. BELONGIA:  Objection.  Relevancy.

10           MR. LOWREY:  He's already answered.

11   It's beyond the scope of relevancy, materiality

12   and will not be -- that everything that we produce

13   we'll limit to this trial.

14           THE REPORTER:  Pardon me, Mr. Lowrey,

15   would you mind clipping on your microphone,

16   please?  Thank you very much.

17           MR. LOWREY:  Did you get what you

18   needed?

19           MR. BELONGIA:  I did.  Yes, I did.  It's

20   just not as vibrant.

21           MR. LOWREY:  I'm always vibrant.

22           MR. RAPHAEL:  Mr. Lowrey, with respect

23   to your having practiced for as long as you've

24   stated, Rule 30(d) with regard to depositions:

1    Any objection during the deposition must be stated

2    concisely and in a nonargumentative and

3    nonsuggestive manner.  That's not the part I'm

4    referencing.  A person may instruct a deponent not

5    to answer only when necessary to preserve a

6    privilege or to enforce a limitation directed by

7    the court or to present a motion under Rule

8    30(d(4).  So I would ask you to follow the Rule of

9    Civil Procedure and restrain yourself from

10   instructing the client not to answer unless it's

11   for one of those purposes.  If you have some case

12   authority or some other rule upon which you're

13   basing your instruction for him not to answer, I'd

14   be interested in hearing it.

15           MR. LOWREY:  Do you have another

16   question to ask?

17           MR. RAPHAEL:  I want the question I did

18   ask answered.

19           MR. LOWREY:  I stated my objection.  I'm

20   standing by it.

21           MR. RAPHAEL:  Okay.  I'm going to

22   continue to ask these questions, and if you

23   continue to instruct your witness not to answer,

24   I'm going to tell you that I'm going to move to

1    have him brought back here to answer these

2    questions and any other questions that are related

3    to those questions.

4                MR. LOWREY:  Do you have an additional

5    question?  Please ask it.

6                MR. RAPHAEL:  I do.

7                MR. LOWREY:  Please ask it.

8    BY MR. RAPHAEL:

9        Q.    Besides the electrical work that you say

10   you recently invoiced and were paid for by the

11   bank, what other work have you done in the last

12   six to eight months for the bank?

13               MR. BELONGIA:  Objection to relevance.

14               MR. LOWREY:  It's also asked and

15   answered.

16   BY MR. RAPHAEL:

17       Q.    You were not instructed to not answer.

18   So please answer.

19               MR. LOWREY:  I'm instructing him not to

20   answer it.

21               MR. RAPHAEL:  Oh, you're instructing him

22   not to answer?

23               MR. LOWREY:  Yes.

24               MR. RAPHAEL:  Okay.  Payments to your

1      client by the bank evidence bias, and it is a

2      certain -- it's certainly a relevant topic for me

3      to explore when he is testifying in a fashion

4      consistent with the bank's position, so are you

5      sure you want to maintain that objection and

6      instruction not to answer?

7              MR. LOWREY:  Yes.

8              MR. RAPHAEL:  Yes.

9      BY MR. RAPHAEL:

10             Q.   Do you have an E-mail address?

11             A.   Yes.

12             Q.   What is it?

13             A.   Larryligas@larryligas.com

14             Q.   How long have you had that E-mail

15     address?

16             A.   I don't recall.

17             Q.   More than three years?

18             A.   I don't -- I don't -- I don't recall.

19             Q.   Well, larryligas.com, that's a URL that

20     you own?

21             A.   Yes.

22             Q.   Okay.  And when did you register that

23     domain name?

24             A.   I don't recall.

1      Q.    Have you had E-mail at that domain name

2   the entire time that you've registered it?

3           MR. BELONGIA:  Objection to relevance.

4           THE WITNESS:  I don't recall.

5   BY MR. RAPHAEL:

6      Q.    Well, when did you get E-mail at

7   Larryligas.com?

8           MR. BELONGIA:  Continuing objection.

9           MR. LOWREY:  I object to this line of

10  questions.  If you want to limit your questions to

11  something that's relevant and material based upon

12  the second amended complaint, ask the questions.

13  Otherwise, it's over.

14          MR. RAPHAEL:  Are you instructing the

15  witness not to answer this question as well?

16          MR. LOWREY:  Yes.

17          MR. RAPHAEL:  Are you instructing the

18  witness not to answer any questions with regard to

19  his E-mail addresses?

20          MR. LOWREY:  You ask the questions and

21  I'll make the objections.

22          MR. RAPHAEL:  Okay.

23  BY MR. RAPHAEL:

24     Q.    Did you have E-mail correspondence with

1    anyone from the bank through

2    Larryligas@larryligas.com?

3            MR. LOWREY:  I'll instruct him to not

4    answer.  It's been asked and answered.  You asked

5    about E-mails and he answered the questions at the

6    beginning of the deposition.

7    BY MR. RAPHAEL:

8        Q.   Do you have any E-mail that -- I'm

9    sorry, did you E-mail anyone at the bank through

10   the use of larryligas@larryligas.com?

11           MR. LOWREY:  Asked and answered.  I'll

12   instruct him not to answer it.

13           MR. BELONGIA:  Objection.  Relevance.

14   BY MR. RAPHAEL:

15       Q.   Did you have anymore E-mail

16   correspondence with the bank at all?

17           MR. LOWREY:  Asked and answered.

18   Instruct him not to answer it.

19           MR. RAPHAEL:  I'm going to have to tell

20   you again you're not entitled to instruct him not

21   to answer and the first question that I asked him

22   at the beginning of the deposition is did he have

23   any of those E-mails present with him here today

24   as were requested in the document production

1      rider.  I did not ask him whether he had any

2      correspondence with the bank prior to the question

3      you just instructed him not to answer.  Are you

4      going to maintain your instruction not to answer?

5              MR. LOWREY:  Yes.

6      BY MR. RAPHAEL:

7          Q.   Are you going to follow your lawyer's

8      instructions?

9              MR. LOWREY:  Yes, he is.

10             MR. RAPHAEL:  I'm asking the witness.

11     BY MR. RAPHAEL:

12         Q.   Are you going to follow your lawyer's

13     instructions?

14         A.   Yes.

15             MR. BELONGIA:  I think it's an improper

16     question.

17             MR. RAPHAEL:  No, it's actually not an

18     improper question.  It's --

19             MR. BELONGIA:  I don't need a lecture.

20     Just move on.

21             MR. RAPHAEL:  -- setting up the motion

22     here.

23     BY MR. RAPHAEL:

24         Q.   How did you send invoices to the bank?

1      A.    As I did with all of them, messengered

2    them by myself.

3      Q.    Besides the bank president, who else did

4    you have contact with over at the bank?

5      A.    No one else.

6      Q.    Let's show you what I'll mark as Exhibit

7    F.  Here's Exhibit E so you can reference it.

8          MR. BELONGIA:  Do you have other copies

9    for counsel or I just got to peer over?

10          MR. RAPHAEL:  I'll supply copies.

11   BY MR. RAPHAEL:

12     Q.    Okay.  On that picture -- Well, first

13   off, do you recognize what is in that picture?

14     A.    Yes.

15     Q.    What?

16     A.    Well, we've been talking about the

17   stainless steel substrate, the fiberglass

18   surround, the stainless steel columns.

19     Q.    Okay.  Let me see the picture for a

20   second.  Before I ask you these questions I'll

21   make a couple of copies for the lawyer who just

22   requested it.

23          THE REPORTER:  You want to go off the

24   record for a moment?

1          MR. RAPHAEL:  Stay on the record.

2          THE WITNESS:  And I just -- You know, we

3      dress up for respect, and we got the attorney

4      that's representing the lawsuit that can't dress

5      for respect.  I wish the jury were to see this

6      guy's actions and the way he dresses.

7      BY MR. RAPHAEL:

8          Q.    Alright.  Describe for me in this

9      drawing or, I'm sorry, in this picture, which part

10     is the fiberglass portion of the surround?

11         A.    You see on the side where it says ATM

12     where it protrudes out?

13         Q.    Mm-hmm.

14         A.    That's part of the fiberglass surround.

15         Q.    Mm-hmm.

16         A.    Going all the way down the straight

17     line –

18         Q.    Mm-hmm.

19         A.    -- that's all the fiberglass surround

20     protruding away from the stainless steel

21     substrate.  It's protruding out about 10 inches.

22         Q.    Okay.  And what about the face of the

23     ATM?

24         A.    The face of the ATM --

1        Q.    This part here.  This grayish part right

2    here.

3        A.    That is -- That is part of the whole

4    fiberglass surround.  That's the internal --

5        Q.    Okay.

6        A.    -- indented portion.

7        Q.    Alright.  So if we can hold that up for

8    the camera and point to the fiberglass surround in

9    the picture, that way we will have it preserved.

10    Hang on.  Just wait a second.  He's got to get it

11    close up.  Hold that still.  Alright.  Point with

12    your pinky to the fiberglass surround.  You got to

13    have your fingers like this.  That's even better.

14    Alright.  Alright.  And the face of the ATM, what

15    part is the fiberglass surround?  The bottom there

16    and the top there.  That whole part.

17        A.    This whole part here.

18        Q.    Alright.  And that was all installed by

19    you personally.

20        A.    Yes.

21        Q.    Okay.  And where on the face of that

22    fiberglass surround did you place these two signs?

23        A.    Right there and right there.

24        Q.    Right where?

1      A.    Right here.

2      Q.    Okay.

3      A.    And I think right there.

4      Q.    You mean on -- on the machine face

5  itself.

6      A.    That's -- That's the -- That's the

7  machine.  Yes.

8      Q.    So you didn't place it on the fiberglass

9  surround --

10     A.    No.

11     Q.    -- but on the machine itself.

12     A.    That's part of the machine.

13     Q.    Okay.  And that's where you placed it.

14  It was on the steel portion of the machine.

15     A.    Yes.

16     Q.    Okay.  So you're taking back your

17  testimony of having put it on the --

18     A.    So it was the steel part.

19     Q.    Let me finish the question.

20     A.    Yes.

21     Q.    You're taking back your testimony that

22  you previously made, which was that you put it on

23  the fiberglass.

24     A.    On the fiberglass.  Yes.

1    Q.    Excuse me.  Please let me finish the

2    question.  Are we clear about that I have to

3    finish the question before you answer?  So you are

4    taking back your prior testimony that where you

5    swore that the signage that you placed on this

6    machine was placed on the fiberglass portion of

7    the ATM and you are now saying that it was placed

8    upon the steel portion of the ATM machine itself.

9    Is that correct?

10    A.    This picture, it refreshes my memory

11    from a year and-a-half ago that it was this

12    portion, not the fiberglass.

13    Q.    So the ATM signage that you're saying

14    you placed on this machine was placed on the

15    actual steel structure and not the fiberglass

16    surround structure.  Is that correct?

17    A.    And that's if you're saying that this is

18    not fiberglass.

19    Q.    Well, is the machine made out of

20    fiberglass, the actual machine itself, or is it a

21    -- is it a steel machine?

22    A.    The actual -- There are parts of it that

23    is made out of plastic fiberglass.

24    Q.    Maybe it'll help if I give you an even

1    better closeup.  You are -- First off, looking on

2    that picture, Exhibit F, you are pointing to

3    the -- to where exactly did you place the -- the

4    signage?

5        A.    Originally we were going -- We were

6    going to put it down here.

7        Q.    Whoa, whoa, whoa, whoa.  Put the -- Put

8    the -- Put the picture so that the camera can see

9    it and point to where -- I don't care where you

10    were originally going to do it.  I want to know

11    where you actually placed it.

12        A.    Yes.

13        Q.    Point to it, please.

14        A.    Right -- Right in this area here.

15        Q.    On that lower shelf area.

16        A.    Yes.

17        Q.    Okay.  Let me make a blow up picture of

18    another picture.

19        A.    I'm pretty sure that area is --

20        Q.    Let's mark this as exhibit whatever is

21    the next one.  Okay.  So put that picture up so

22    that the video camera can see it and point to

23    where you placed the signage on that picture.

24        A.    We originally were going to place it

1      down here, in this area here, but Mr. Hubbard

2      thought it would be out of view for the users, so

3      we ended up putting it up here.

4          Q.   On the metal portion of the ATM machine

5      itself.

6          A.   Correct.

7          Q.   That portion that you --

8          A.   And the two-sided tape is for metal,

9      fiberglass.

10          Q.   So that portion that you've pointed to

11      as to where the two signs were located is actually

12      made out of metal.  Am I correct?  The thing where

13      you just pointed?  You pointed to where you put

14      the signs.  That piece there --

15          A.   That is some -- some type of metal.

16          Q.   That's metal.  It's not fiberglass.

17      Right?

18              MR. BELONGIA:  Asked and answered

19      BY MR. RAPHAEL:

20          Q.   I want to be clear.  That part that you

21      just pointed to, that part is metal, not

22      fiberglass.  Correct?

23              MR. BELONGIA:  Asked and answered.

24              THE WITNESS:  It is some type of metal,

1    but the original location down here was not in

2    view.

3            MR. LOWREY:  Larry, please, please.

4    There's no question pending.

5    BY MR. RAPHAEL:

6        Q.    Do you know what those signs actually

7    said?

8        A.    I remember, not -- not word for word,

9    you know, sentence for sentence, but one was that

10   you are going to get some type of charge and the

11   other was that your deposit may not show up or

12   something on that idea.

13       Q.    Okay.  Did it mention the name Diamond

14   Bank on it?

15       A.    I don't recall.

16       Q.    Do you know if it mentioned any other

17   bank's name on it?

18       A.    I don't recall.

19       Q.    Well, do you know -- You know how

20   Diamond Bank has that nifty logo there, that DB

21   there, did it have Diamond Bank's logo on it?

22       A.    No, not that I recall.

23       Q.    And was there any other sign --

24       A.    But it may have had Diamond Bank on it.

1      Q.    You think it had Diamond Bank on it?

2      A.    It may have had Diamond Bank on it.

3      Q.    Is that what you recall?

4      A.    That's may what I recall, but I don't

5  remember specifically what it said.

6      Q.    Do you know if it said a dollar amount

7  as to the charge that was going to be charged?

8      A.    There was a dollar amount.

9      Q.    Do you know what the dollar amount said?

10     A.    I do not recall.

11     Q.    Okay.  So it actually had a physical

12 dollar amount that was going to be charged.

13     A.    Yes.

14     Q.    Like one dollar or two dollars.

15     A.    I don't recall.

16     Q.    Let me ask you about the signs that you

17 originally took off from the machine located on

18 the inside of the bank.  When you scraped the

19 signs off the original machine, what was left on

20 the machine when you scraped it off?

21     A.    There was a little of the glue and we

22 needed to sand the back of this board, the plaque,

23 whatever you want to call it.  We had to sand it

24 before we adhered it to the machine.

1    Q.    Okay.  So some of the adhesive was stuck

2    to the back of the board as well as --

3    A.    Yes.

4    Q.    -- to the machine?  Yes?

5    A.    Yes.

6    Q.    Is that your experience as to what

7    would've happened if you had tried to yank the --

8    or pry or scrape the sign off of the machine that

9    you put on -- on that --

10    A.    It cleans up much easier.

11    MR. BELONGIA: And I'm going to object.

12    You're asking glue versus tape.  I mean it's

13    totally irrelevant.

14    BY MR. RAPHAEL:

15    Q.    Which cleans up much easier?

16    A.    The tape.

17    Q.    Okay.  So the tape would not adhere to

18    the machine if you were able to pry the notice

19    off?

20    MR. BELONGIA:  Objection to foundation.

21    Form.  Knowledge as to ever having pried off a

22    sign with tape on it.

23    BY MR. RAPHAEL:

24    Q.    Have you used this glazer's tape before?

1      A.   Once or twice personally.

2      Q.   Have you ever had to take anything off

3   that you've affixed with the glazer's tape?

4      A.   No.

5      Q.   Okay.  So you have no idea whether it

6   would have a residue or leave anything on the

7   surface of the material that you tried --

8      A.   Well, this here, this tape has a

9   30-minute working time.  So within 30 minutes if

10  you take it off, it'll come off as easy as it was

11  applied.  There's a 30-minute window.

12     Q.   Mm-hmm.

13     A.   So I keep looking at this.  I remember

14  clearer now when you sit here looking at this

15  picture when I asked Matt that we originally --

16  When I said we're putting this on, he originally

17  put it at the bottom of the -- of the black frame

18  of the ATM.  That's where it looked very nice

19  proportionally.  It was down here.

20     Q.   Please point on the bigger photo so that

21  the --

22     A.   Proportionally --

23     Q.   Your hand is in front of the picture.

24  You got to use something or use your finger.

1    A.    Proportionally, it looked, you know,

2    very artistically right here and right here.

3    Q.    So that's where you originally placed

4    the --

5    A.    Originally did.  And then --

6    Q.    Hang on.  You got to let me finish the

7    question.

8    MR. BELONGIA:  You got to let him finish

9    the answer.

10    MR. LOWREY:  Let him finish his answer,

11    please.

12    BY MR. RAPHAEL:

13    Q.    Oh, finish your answer.

14    A.    And then Mr. Hubbard, for customer view,

15    he wanted it up here, even though aesthetically it

16    was not, you know, pleasing.  So that's where we

17    were able to just take it off and then we adhered

18    it over here.

19    Q.    Okay.  So originally you had adhered the

20    sign to the fiberglass.

21    A.    Yes.

22    Q.    Okay.  And you did that on what day?

23    A.    On the date in 2006, the March date.

24    Q.    You had done this on -- in March.

```
 1        A.    Yes.

 2        Q.    Okay.  And --

 3        A.    It was a -- It was a fairly day of like,

 4   it was above -- It was like 50 degrees, 55, 60.

 5        Q.    It was 55 to 60 degrees in March of

 6   2006.  Right?

 7        A.    It was a warmer day.  It wasn't a cold

 8   day.

 9        Q.    Uh-huh.

10        A.    So I don't know what exact temperature

11   it was, but it was not near freezing.  It was a

12   respectable day.

13        Q.    Okay.

14        A.    It may have been 40.  I don't know, but

15   it was not near freezing, I remember.

16        Q.    Well, what's freezing?

17        A.    Thirty-two.

18        Q.    So 40 is not near freezing?

19              MR. BELONGIA:  Is that a question?

20   BY MR. RAPHAEL:

21        Q.    In your mind 40 is not near -- not near

22   freezing?

23        A.    Forty is not near freezing.  It may have

24   been, you know, 40.
```

1      Q.    Okay.  Okay.

2      A.    Because there's --

3            MR. LOWREY:   Please.

4   BY MR. RAPHAEL:

5      Q.    Because there's a what?  Please finish

6   what you were going to say.

7      A.    Because there's a concern that if

8   it's -- if the fiberglass is very cold, the tape

9   may not adhere correctly.

10     Q.    Okay.  And you adhered the sign to the

11  fiberglass and then what happened?

12     A.    Mr. Hubbard wanted it more closer to the

13  machine itself so people see it.

14     Q.    So he came out when?

15     A.    Within minutes of us putting the sign

16  on.

17     Q.    Okay.  So after you put the sign on, Mr.

18  Hubbard walked out the door, within minutes of you

19  putting it on --

20     A.    He was hovering.

21     Q.    He was hovering over you.

22     A.    Please.  I didn't say he was hovering

23  over.  He was hovering around.

24     Q.    Okay.  He was hovering, and then what

did you do?

    A.    We took his advice and put it up onto the -- to that angle ledge.

    Q.    Okay.  And did you do it straight away, or did you do anything in anticipation of it?

    A.    Mr. Hubbard is the president, and he thought it would be better up there.

    Q.    Okay.  So how did you take it off of the fiberglass?

    A.    It came off very easy.

    Q.    So with his hand.  Did you do it or did your friend do it?

    A.    No, Matt.

    Q.    Matt did it.  Okay.  You were watching, though.

    A.    Yes.

    Q.    Okay.  And he took it off with his hand.

    A.    Yes.

    Q.    And then what did he do exactly?

    A.    He put new strips on and then reapplied it onto the ledge.

    Q.    Okay.  So he took it off, pulled off the strips on the back --

    A.    Yes.

1    Q.    -- with his hand.

2    A.    Yes.

3    Q.    And then put on new strips --

4    A.    Yes.

5    Q.    -- and then just put it right on to the

6    metal part that you pointed to?

7    A.    Yes.

8    Q.    Nothing else?

9    A.    Nothing else.

10    Q.    Okay.  And this was all done in plain

11    sight of Mr. Hubbard?

12    A.    I'm not sure of in plain sight, but he

13    was somewhere around.

14    Q.    Well, he was out when he said take it

15    off of there and put it onto --

16    A.    Yes.

17    Q.    -- the new location.

18    A.    Yes.  That he may have walked in for a

19    few minutes or something and came out.  Like I

20    said, the best of my recollection it was a little

21    warmer day than a normal March day.

22    Q.    But it was definitely in March.

23         MR. BELONGIA:  Asked and answered.

24    BY MR. RAPHAEL:

1      Q.    Right?

2      A.    Yeah, it was -- It was definitely some

3 time in March.

4      Q.    And after that 30-minute setting time,

5 is it possible to pull off the sign with your bare

6 hand?

7           MR. BELONGIA:   Asked and answered.   We

8 went through this already several times.

9 BY MR. RAPHAEL:

10      Q.    Well, we didn't hear about the 30-minute

11 setting time before, so please answer.

12      A.    The best that I -- I understand the

13 product, after 30 minutes it should be -- it

14 should be adhered to the point that it's

15 structurally sound.

16      Q.    Okay.   Did you wait around for 30

17 minutes?

18      A.    Yes.

19      Q.    Okay.

20      A.    We were there for -- for several hours.

21      Q.    Okay.   And did you see it within that

22 30-minute time period after the 30-minute time

23 period had expired?

24      A.    Yes.

1       Q.   Did you ever try to take the sign off

2    after adhering it this second time to the metal

3    portion of the ATM?

4       A.   No.

5       Q.   So you never tested to see whether it

6    was firmly affixed or not?

7       A.   No.

8       Q.   So you don't know if it --

9       A.   After the 30 minutes, we removed the

10   blue tape and it was solid.

11      Q.   What blue tape are you talking about

12   now?

13      A.   We put temporarily -- temporary tape on

14   it.  Actually that type of tape that's holding the

15   prints, just to hold the product secure.

16      Q.   What type of tape are you referring to?

17      A.   The tape that's on the blueprints.

18      Q.   You show me the -- The blue tape you're

19   referring to, is that the type of tape you use to

20   mask for painting?

21      A.   Yes.

22      Q.   Okay.  So painter's tape.

23      A.   Yes, if you want to call it that.

24      Q.   Okay.  So you used painter's tape to