1    hold the sign up while the adhesive double-sided

2    tape was curing.

3        A.    Curing.

4        Q.    Correct?

5        A.    Correct.

6        Q.    And after taking off the painter's tape,

7    no one tested it to see that it was adhered to

8    firmly.

9        A.    I did.

10        Q.    Oh, you did.  Oh, okay.  I thought you

11    said you didn't.  What did you do to test that it

12    was adhered to firmly?

13        A.    I just tried to yank it.

14        Q.    You tried to yank it?

15        A.    Yes.

16        Q.    How hard?

17        A.    Aggressive enough to grab.

18        Q.    And when did you do that?

19        A.    Like if I was grabbing a football.

20        Q.    And when did you do that?

21        A.    Probably an hour after we adhered it.

22        Q.    When was the first time you heard about

23    this case?

24        A.    I think when I got served.

1        Q.    Okay.  When you got served with this

2   subpoena for today?

3        A.    Yes.

4        Q.    Okay.  Prior to that you had never heard

5   about this case?

6        A.    No.

7        Q.    Had you ever spoken to --

8        A.    Yeah.  I mean I may have -- Yeah, the

9   best of my knowledge there may have been one

10   conversation that I may be -- They called for

11   Barry -- Barry's number or name or something and

12   they mentioned that there's a case.  So that's

13   when the first time I actually heard about it.

14        Q.    Mm-hmm.

15        A.    They called and asking for Barry's

16   number if I had it.  That was prior to me getting

17   served.

18        Q.    Okay.  So prior to you getting a call

19   for the number for Barry Ligas, you had never

20   heard of this lawsuit.

21        A.    Correct.

22        Q.    Okay.  Had you ever spoken to anyone

23   with regard to this lawsuit before getting served

24   with this subpoena?

1          A.    Not that I recall.

2          Q.    Okay.   Sorry.   I just pulled my

3    hamstring here.

4               MR. LOWREY:   It's an Achilles.

5               MR. RAPHAEL:   Pardon?

6               MR. LOWREY:   It's your Achilles.   The

7    hamstrings are --

8               MR. RAPHAEL:   Oh, yes.

9               MR. RAPHAEL:   Whatever it was, it hurt.

10              THE WITNESS:   We have a good trial

11   attorney at the table here.

12              MR. RAPHAEL:   It would be covered by

13   worker's comp, unfortunately and I'm the owner,

14   so --

15   BY MR. RAPHAEL:

16         Q.    When did you -- When were you served

17   with the summons on this subpoena?

18         A.    I don't recall.

19         Q.    Well, was it more than a month ago?

20         A.    I don't recall.

21         Q.    Well, was it more than six months ago?

22         A.    No.

23         Q.    So the first time that you'd heard of

24   this case was within the last six months?

1          A.    I think the first time I heard of this

2     case is when somebody from the bank was calling to

3     get Barry Rustin's number.

4          Q.    Okay.  And who called you from the bank?

5          A.    I don't recall.

6          Q.    And was it a man or a woman?

7          A.    I don't recall.

8          Q.    Where were you when they called?

9          A.    I don't recall.

10         Q.    What number did they call you on?

11         A.    My cell number.

12         Q.    What number is that?

13         A.    The same number that you called and was

14    harassing me.

15         Q.    Okay.  I'm not saying okay to me

16    harassing you but that number is the one you're

17    referring to.

18         A.    Yes.

19         Q.    Before that, had you ever spoke to

20    anyone else regarding your putting this sign up on

21    the ATM that's pictured in Exhibit E, F, and

22    whatever that one is?

23         A.    I primarily -- I took all my direction

24    from Jim Hubbard.  I spoke to people in the bank,

1   respected them, took their suggestions, but prior

2   to me acting on anything, I shared it with Mr.

3   Hubbard.  There were several people, you know,

4   with, you know, seniority in the bank.  I

5   respected them but I shared everything with Mr.

6   Hubbard.

7       Q.   Did you ever speak to anyone outside of

8   the bank with regard to this case?

9       A.   Regarding this case?

10      Q.   Yeah.

11      A.   My attorney.

12      Q.   You're pointing -- You're pointing to

13  your attorney.  What's your attorney's name?

14      A.   Yes.  John Lowrey.

15      Q.   Okay.  When did you hire him?

16      A.   About three weeks ago.

17      Q.   Okay.  Who's paying the bill for him?

18      A.   Alligas --

19           MR. LOWREY:  Objection.  It's attorney-

20  client privilege.

21           MR. RAPHAEL:  Who's paying the bill is

22  not attorney-client privilege.

23           MR. LOWREY:  I'm instructing him not to

24  answer it.  He's paying me.  That's all you need

1          to know.

2          BY MR. RAPHAEL:

3                 Q.    Are you paying him?

4                 A.    Or Alligas Enterprises.

5                 Q.    Okay.  So Alligas Enterprises is paying

6          the attorney?

7                 A.    Yes.

8                 Q.    Are you seeking reimbursement for those

9          fees from the bank?

10                       MR. LOWREY:  Objection.

11                       THE WITNESS:  I --

12                       MR. RAPHAEL:  There's nothing -- There's

13         nothing privileged about that.

14         BY MR. RAPHAEL:

15                Q.    Are you seeking reimbursement for those

16         fees from the bank?

17                A.    I have not crossed that yet.

18                Q.    Well, are have you talked to the bank

19         about --

20                A.    I have not.

21                Q.    Okay.  Has the bank offered you any

22         reimbursement for the fees for your attorney?

23                A.    I spoken to them yet.

24                Q.    How did you locate your attorney?

1        A.    Through --

2            MR. LOWREY:  Objection.

3    BY MR. RAPHAEL:

4        Q.    Pardon?

5            MR. BELONGIA:  Attorney-client

6    privilege.  It's totally improper.

7            MR. RAPHAEL:  I'm sorry, that's not

8    privileged.

9    BY MR. RAPHAEL:

10      Q.    How did you locate your attorney?

11      A.    Through a very good referral.

12           MR. LOWREY:  Objection.

13    BY MR. RAPHAEL:

14      Q.    Who was -- Who was the source of the

15    referral?

16      A.    Another qualified attorney.

17      Q.    Who was that?

18           MR. LOWREY:  Same objection.

19           MR. BELONGIA:  That's attorney-client

20    privilege.

21           MR. RAPHAEL:  Naming the person whom you

22    talked to is not attorney-client privilege.

23    BY MR. RAPHAEL:

24      Q.    Who was the attorney that referred you

1     to your present attorney?

2          A.   If it's one of my attorneys.

3          Q.   Look, I'm not going to argue with you.

4     Who was the --

5          A.   It was one of my other attorneys.

6          MR. LOWREY:   I'm instructing him not to

7     answer it.  It's privileged.  It's -- He's got --

8     BY MR. RAPHAEL:

9          Q.   And what was his name?

10         MR. LOWREY:   It's none of your business.

11    It's the attorney-client privilege with that

12    individual and he's got other matters pending and

13    it's not relevant or material.  It's not related

14    to your second amended complaint.  I'm instructing

15    him not to answer it.

16    BY MR. RAPHAEL:

17         Q.   Did you ever speak to the attorneys for

18    the bank to get the name of your current attorney?

19         A.   Never.

20         Q.   Have you ever spoke to the attorneys for

21    the bank?

22         A.   Never.

23         Q.   Do you know who the attorneys for the

24    bank are?

1     A.   I just -- The first -- The first time I

2    met the attorney for the bank is when I signed the

3    affidavit.

4     Q.   And when was that?

5     A.   I don't recall.  So that was probably

6    the first time now, refreshing my memory, is when

7    we talked about the case.

8     Q.   So you talked about the case with the

9    attorneys for the bank?

10     A.   Not -- We didn't talk about the case.

11    It was just an affidavit that they, you know,

12    asked what I remember and I shared what I

13    remembered, basically what I shared with you

14    today.

15     Q.   Well, when did this take place?

16     A.   I don't recall.

17     Q.   Where was it?

18     A.   It was over the phone.

19     Q.   So you had a phone conversation with the

20    attorneys for the bank?

21     A.   It wasn't a -- It was just a question,

22    what do I remember about the ATM.

23     Q.   Well, who asked the question?

24     A.   I think it was Mark.

1    Q.    Mark Belongia?

2    A.    Yes.

3    Q.    Alright.  And this was over the phone

4    you had this conversation?

5    A.    Yes.

6    Q.    Okay.  And what did he ask you?

7    A.    What do I recall about the ATM, what

8    went through -- what did we do with the ATM, and

9    what -- what do I recall about the -- any type of

10    work that Mr. Hubbard wanted me to do after the

11    ATM was on.  Then he asked me what do I recall

12    about the signs and I said all I remember is

13    something about Diamond Bank, some charge, and

14    something about the deposit is not going to show

15    up.  I mean I never memorized the darn things.

16    Q.    Okay.  So is that what you told him?

17    A.    It's pretty much what I told him and

18    then he asked if I would sign a affidavit, and

19    then he asked if I'd come down to his office.

20    Q.    Did you go down to his office?

21    A.    I said actually I'll be by the Monadnock

22    building in a couple of days, and I said I'll come

23    up and sign it.

24    Q.    So you went over to his office to sign

VIDEO INSTANTER, INC.  (312) 641-3605

1          this affidavit?

2                    A.    Yes.

3                    Q.    And was he present?

4                    A.    Yes, because I think he notarized it.

5                    Q.    Okay.  And what time of year was this?

6                          MR. BELONGIA:  Objection.  The document

7          speaks for itself.

8          BY MR. RAPHAEL:

9                    Q.    Documents don't speak.  I'm asking the

10         witness what time of year did you go over to Mr.

11         Belongia's office?

12                   A.    This was probably -- It was probably

13         late -- late winter, early spring.  I don't -- I

14         don't recall.

15                   Q.    Did you have any conversation with him

16         at the time you signed the affidavit?

17                   A.    Not really.

18                   Q.    Okay.  So he handed you the affidavit

19         and you signed it?

20                   A.    I -- I read through it.

21                   Q.    You read through it?

22                   A.    Yeah, and I signed it.

23                   Q.    Did you make any changes to it?

24                   A.    No.

1   Q. Okay.  So you signed it exactly the way

2 he drafted it.

3   A. I signed it pretty much what I told him

4 on the phone.

5   Q. You didn't make any changes to his draft

6 of what you had told him.

7   A. No, it --

8   MR. BELONGIA:  Asked and answered.

9 BY MR. RAPHAEL:

10   Q. Pardon?

11   A. Word-to-word it was pretty accurate.

12   MR. LOWREY:  Excuse me.

13 BY MR. RAPHAEL:

14   Q. Why don't we mark this as the next

15 exhibit?  Yeah, give it to the witness.

16   A. Thank you.

17   Q. H.  Okay.  Is this your affidavit?

18   A. Yes.

19   Q. That's your signature on the back?

20   A. Yes.

21   Q. Okay.  Looking at paragraph six of your

22 affidavit, I have no knowledge as to how the two

23 metal signs that my company affixed to the ATM

24 surround were removed.  That's true?

1      A.    After they were -- After they were put

2  on after we installed them.  Right?  Not removed

3  after we put them underneath and Mr. Hubbard

4  wanted them on the top.

5      Q.   Well, there's nothing in this affidavit

6  that says you installed them, then removed them.

7      A.    Well, remove because you and I spoke in

8  length about removing it from this point to that

9  point.

10     Q.   If you -- If you interrupt my -- If you

11  interrupt my question, you'll never know what it

12  is I was actually going to ask, so I'm going to

13  ask you the question again.  There's nothing in

14  this affidavit that indicates that you -- you

15  affixed the signage to the ATM surround, removed

16  them, and then re-affixed them, is there?

17     A.    That's correct.

18     Q.   Okay.  So I am only reading from your

19  affidavit.  It says I have no knowledge as to how

20  these -- the two metal signs that my company

21  affixed to the ATM surround were removed.

22       MR. BELONGIA:  Asked and answered.  He's

23  already testified in length about this issue.

24  BY MR. RAPHAEL:

1    Q.    Is that a correct --

2    A.    I have not knowledge.  That's correct.

3    Q.    Yeah.  Okay.  So after you re-affixed

4    the signs to the metal portion of the ATM, you

5    don't know what happened to them.

6    A.    My affidavit states that.

7    Q.    What is the fact for your belief that

8    the ATM signs might've been removed by some

9    vandals?

10    A.    I've been a victim of -- of some of my

11    equipment was stolen.  We've been vandalized

12    there, not once, not twice, several times.  So

13    when it comes to stuff like that, I thought

14    immediately that it had to be these, you know,

15    homeless guys, these vagrants that hover around

16    the property.

17    Q.    So vandals or vagrants or homeless guys

18    that hover around that area vandalized you?

19    A.    My equipment has been vandalized.  My

20    car was vandalized.  I was -- We lost small,

21    little, you know, equipment, you know, trying to

22    unload or loading disappeared.

23    Q.    Okay.

24    A.    So there's been numerous issues.

1   Q. Okay.  Did you ever file any police

2 reports regarding any of these things?

3   A. There have been numerous 911 calls.

4   Q. Did you ever file any police reports

5 regarding any vandalism that took place for you

6 within the area of this bank?

7   A. The best -- best of my knowledge -- 100

8 West North Avenue, the best of my knowledge, we

9 may have filed a police report on one of the

10 incidents.

11   Q. You may have.

12   A. Yes.

13   Q. And what was that police report for?

14   A. I just recall because when the police

15 show up they're like what are you wasting our time

16 for for little things like this, and I told

17 them -- I said part of stopping crime is you got

18 to document everything, and the Chicago Police

19 Department -- the police officers that have shown

20 up to there, they go we got more important things

21 than to worry about these little, you know,

22 problems.  So we made numerous 911 calls.  I made

23 them from my cell regarding problems around the

24 property.

1      Q.    So you made 911 phone calls from your

2    cell phone at what point in time while you were

3    working at 100 West North Avenue?

4      A.    Between the starting and -- Between the

5    May 2005 and July 2006, probably half-a-dozen 911

6    calls for police assistance.

7      THE REPORTER:  Sorry, I need to switch

8    the video.  This is the end of tape three.  The

9    time is 1:40 p.m., and the running time of this

10    tape is 1 hour, 1 minute, and 13 seconds.  This is

11    the start of tape four.  The time is 1:41 p.m.

12    BY MR. RAPHAEL:

13      Q.    Who's your cell phone provider?

14      A.    I think we may be using U.S. Cellular.

15      Q.    You say we.  Is this a account that

16    Alligas Enterprises, Inc. holds?

17      A.    I think it's a family plan, my wife and

18    I.

19      Q.    Okay.  So you use U.S. Cellular for your

20    cell phone?  Are you sure?

21      A.    Pretty sure.

22      Q.    Okay.  And who pays the bills?

23      MR. LOWREY:  Objection.  It's not

24    relevant or material.  It has nothing to do with

1        the allegations in the second amended complaint.

2                MR. BELONGIA:  Join.

3                MR. RAPHAEL:  It has to do with this

4        affidavit which talks about vandalism and he's

5        just testified he's made cell phone 911 calls, so

6        I want to find out about those cell phone 911

7        calls.

8                MR. BELONGIA:  That's fine, but the

9        payment of the bill is totally irrelevant to the

10       calls being made on the phone.

11               MR. RAPHAEL:  No, it isn't.  It'll get

12       there.

13       BY MR. RAPHAEL:

14           Q.   So who makes the phone -- Who makes

15       the –

16           A.   I made the phone calls.

17               MR. LOWREY:  Don't answer.

18       BY MR. RAPHAEL:

19           Q.   Okay.  Who made the payments on the cell

20       phone?

21               MR. LOWREY:  Don't answer the question.

22       It's not relevant material.  It's not related to

23       the issues in the second amended complaint.

24       BY MR. RAPHAEL:

1      Q.    Where are the bills for your cell phone?

2            MR. LOWREY:  Don't answer the question.

3      Object.  It's not relevant material and it's not

4      related to the allegations in the second amended

5      complaint.

6            MR. RAPHAEL:  Counsel, I'm going to tell

7      you again, you know, it's totally improper to

8      instruct your client not to answer and I've been

9      more than patient in explaining to you the rules.

10     I don't know where you normally practice but you

11     can't do this in Federal Court.  It's a ask and

12     answer session.  If you continue with this, I'm

13     going to move for sanctions against you.

14           MR. LOWREY:  Let me get something real

15     straight.  As a personal, professional courtesy to

16     my client I allowed this deposition to proceed.

17     You are not dressed appropriately, you're not

18     acting like a lawyer, you're not conducting

19     yourself.  So I have tolerated this for hours.

20     You are now wasting his time.  These issues --

21     questions you are raising have nothing to do with

22     the second amended complaint.  I do not need

23     lectures from you.  I do not need ad hominem

24     comments from you.  Ask proper questions; I will

1    to lead to anything that's relevant or material at

2    the trial.

3    BY MR. RAPHAEL:

4        Q.    Your cell phone bills contain a list of

5    all of the phone calls you've made or received on

6    your cell phone.  Correct?

7            MR. LOWREY:  Objection.  It's not

8    relevant material and it's not going to lead to

9    anything relevant at trial.  It's way beyond the

10   issues in the second amended complaint.

11   BY MR. RAPHAEL:

12       Q.    Other than your own personal experience

13   in having some of your equipment stolen or your

14   car vandalized, what other basis do you have for

15   believing that vandals came in and vandalized this

16   ATM machine?

17       A.    Threats.  Verbal threats and physical

18   from --

19       Q.    Verbal threats from who?

20       A.    I would've called him a -- a vagrant.

21       Q.    So a vagrant verbally threatened you.

22   What did he say?

23       A.    I don't like you, mother fucker.

24       Q.    And that was it?

1    A.    And then I said that's fine, that's your

2    opinion.  He goes you better get the fuck out of

3    here.

4    Q.    Okay.  So a vagrant said this to you in

5    front of the bank?

6    A.    On the bank property.

7    Q.    On the bank property.  And you called --

8    A.    In the parking lot.

9    Q.    And why do you believe that that vagrant

10   would have some sort of design on the ATM machine

11   at the bank?

12   A.    That -- That personal vagrant?

13   Q.    Yeah.

14   A.    I just feel that these guys, they would

15   do anything for a couple of bucks and they thought

16   that maybe that plaque was a big heavy hunk of

17   metal.

18   Q.    You mean the plaques that you've

19   described as being approximately 3 x 5 inches, you

20   felt these were valuable to vagrants?

21        MR. BELONGIA:  Objection.

22   Mischaracterizes his testimony.  He testified that

23   the vagrants thought they were valuable.  He

24   didn't say they were valuable.

1    BY MR. RAPHAEL:

2        Q.    Did you think that they thought they

3    were valuable to these vagrants?

4        A.    Some of these vagrants -- I've seen a

5    lot of -- lot of odd things where these guys would

6    put their self in jeopardy with the law for a

7    50-cent piece of scrap.

8        Q.    Did you ever see any vagrant take the

9    metal signs down off of the machine?

10       A.    No, I have not.

11       Q.    Okay.  Did you see anyone take the metal

12   signs off of the machine?

13            MR. BELONGIA:  Asked and answered.

14            THE WITNESS:  I have not.

15   BY MR. RAPHAEL:

16       Q.    Did anyone ever say to you in any way

17   shape or form I want to take those metal signs off

18   the machine?

19       A.    But in this picture I can see that the

20   light bulb from the heat lamp is stolen.

21       Q.    Are you going to answer my question?

22       A.    What was your question?

23       Q.    Did anyone at any point in time ever say

24   anything to you that I want to take those metal

1    signs off that machine?

2         A.    No, but looking at –

3              MR. LOWREY:  Please, please, Larry --

4              THE WITNESS:   -- deposition Exhibit F --

5    BY MR. RAPHAEL:

6         Q.    Yes, looking at Exhibit F what?

7         A.    There's a heat lamp that's missing from

8    the heat lamp from the heat lamp fixture.

9         Q.    Do you know why it's missing?

10        A.    Someone probably thought they could get

11   some money for it --

12        Q.    Do you know --

13        A.    -- is my personal assumption.

14        Q.    You're assuming that.  Do you know why

15   it's missing?

16        A.    Because it's not there.

17        Q.    Okay.  But do you know why?  Is it

18   something that might've been broken and is being

19   fixed or is it something that has been stolen and

20   needed to be replaced?

21        A.    It could be either/or.

22        Q.    Okay.  So you don't know why it's

23   missing from that picture, do you?

24        A.    But I know what was there when I did my

1    final inspection.  It's not there now.

2         Q.   So that heat lamp in Exhibit F --

3         A.   Yes.  It -- It protrudes below the

4    surface about a half inch to get the full maximum

5    spread of the ultraviolet, the heat from the lamp.

6    It's not protruding below the frame of the

7    fixture.

8         Q.   So that heat lamp in Exhibit F is

9    missing from Exhibit F and it was present at the

10   time you performed your final inspection?

11        A.   Yes, sir.

12        Q.   Did you ever replace the heat lamp?

13        A.   I never had to replace it because it was

14   in -- it was intact.

15        Q.   Okay.  So you've never had to replace

16   the heat lamp that you say is missing from Exhibit

17   F?

18        A.   I was never hired to replace the heat

19   lamp.  It was there.  It was working on our final

20   in July.

21        Q.   Where was the heat lamp obtained from?

22        MR. LOWREY:  Objection.  It's not

23   relevant or material and will lead to anything

24   related to the issues in the second amended

1    complaint.  Don't answer it.

2    BY MR. RAPHAEL:

3        Q.   Was there any other contractors working

4    for the bank besides you at the time this picture

5    in Exhibit F was taken?

6        A.    None.

7        Q.    So no one besides you has done any

8    physical repair work to the bank between the time

9    you were hired in October of '05 and when you were

10   last paid in May of '08.

11       A.    That's what I recall.  That's what I

12   know.

13       Q.    Okay.  And you have never been asked to

14   replace or repair the heat lamp on the ATM at

15   issue in this case.

16       A.    That's true.

17       Q.    And the heat lamp was installed and

18   present as of the time you did your July walk

19   through in 2006.

20       A.    Correct.

21       Q.    Was the heat lamp present when the

22   pictures on the -- on the Internet -- I'm sorry,

23   when the pictures by Barry Rustin were taken?

24       A.    It's hard to tell from -- from this

1    picture, but if this is the same picture, it is

2    not.

3        Q.   Okay.  Is that something you would've

4    noticed?

5        A.   The heat lamp I would not have noticed

6    right at that time because I was looking for

7    illuminated white light and that gives off a red

8    light, so I would not have brought that up because

9    that would've actually distorted his picture.

10           MR. LOWREY:  There's no question.

11           THE WITNESS:  Okay.

12   BY MR. RAPHAEL:

13       Q.   Have you been asked at any point in time

14   since the July 2006 walk through to do any repair

15   work to the ATM or its surround at all?

16       A.   No.

17       Q.   Have you been asked to do any repair

18   work since July of 2006 to the outside of the bank

19   -- Strike that.

20           Have you been asked since July of 2006

21   to do any repair work to the exterior of the bank?

22       A.   Yes.

23       Q.   What?

24       A.   There was a plaque that's in the ground

1    right in front of the revolving door.  Someone

2    tried to remove the plaque, and we had to recaulk.

3         Q.    Was the plaque removed or was it just

4    recaulked?

5         A.    There was damage that someone tried to

6    pry it up.

7         Q.    And what did it damage?

8         A.    The seal around the plaque -- the round

9    plaque.

10        Q.    Is this the one that's in the ground?

11        A.    Yes, sir.

12        Q.    And what's that made out of?

13        A.    Some type of metal.

14        Q.    And when was that repair done?

15        A.    Maybe like August, September.  Maybe a

16   few months after the July -- You know, August,

17   September.  At the same time then there was some

18   graffiti on the windows.

19        Q.    And who did the repair work to the

20   graffiti?

21        A.    I hired a glazing -- We -- We may have

22   repaired it.  I might've hired LaSalle Glass.

23   That's who it was.  Some glass company.

24        Q.    When you went to sign your affidavit

1    over at the lawyer for the bank's office, what

2    made you pick that day to go over there to sign

3    it?

4            A.    There was something that I had going --

5    going on the South Loop.  I was going to lunch, I

6    think, over at SRO.

7            Q.    SRO, Standing Room Only on the South

8    Loop?

9            A.    Yes.

10           Q.    On Dearborn?

11           A.    I don't know which street but I know how

12   to get there.

13           Q.    In Printer's Row.  Right?

14           A.    Yes.

15           Q.    And was there anyone from the bank at

16   the lawyer's office at the time you went and

17   signed your affidavit?

18           A.    No.

19           Q.    Okay.  What time did you go to sign your

20   affidavit?

21                 MR. BELONGIA:  Objection.  Relevance.

22                 THE WITNESS:  It was right -- I had a

23   lunch appointment.

24   BY MR. RAPHAEL:

1    Q.    So it was right before lunch?

2    A.    Yes.   Could I mention about this -- this

3   pen being stolen?

4    Q.    What is it you want to mention?

5    A.    For one of the questions you asked what

6   else do you recall looking at these pictures, and

7   the more I look at them, the more it refreshes my

8   memory.   The pen that's shown in this picture,

9   that's the blown up picture of Exhibit F, the pen,

10  it was stolen at least three times in a matter of

11  between June and July 2006.   Literally ripped

12  right off the base.   It's the pen and the pen

13  holder.

14   Q.    And where did you get replacements for

15  the pen and the pen holder?

16   A.    The --

17        MR. LOWREY:   Objection.   It's not

18  relevant material and it's not related to the

19  issues in the second amended complaint.

20        MR. RAPHAEL:   Your client just talked

21  about it, so I'm going to ask him about it.

22        MR. LOWREY:   I'm instructing him not to

23  say anymore about it.   It's not relevant or

24  material.

1          MR. RAPHAEL:  You can't instruct someone

2     not to answer questions about a topic he just

3     brought up, so --

4          MR. LOWREY:  I've instructed him not to

5     answer it.  Ask your next question.

6     BY MR. RAPHAEL:

7          Q.   Where did you get the replacement pen

8     and base that you installed?

9          MR. LOWREY:  It's neither relevant nor

10    material nor is it going to lead to anything

11    related to the second amended complaint.  I'm

12    instructing him not to answer it.

13    BY MR. RAPHAEL:

14         Q.   Okay.  Why did you bring up the issue of

15    the pen?

16         MR. LOWREY:  I'm instructing him not to

17    answer it.

18    BY MR. RAPHAEL:

19         Q.   Why did you bring up the pen?

20         MR. LOWREY:  I'm instructing him not to

21    answer it.

22         MR. RAPHAEL:  Alright.  Well, I'm going

23    to take a couple minute break and I'm going to

24    give a call over to the Court and see if we can

1    get a ruling on your instructions not to answer

2    questions.

3         MR. LOWREY:   Well, I'm not here for that

4    conference.  If you're not asking anymore

5    questions, I'm leaving.

6         MR. RAPHAEL:   You do so at your own

7    peril.  I'm going to try to obtain the audience

8    with the judge right now.

9         MR. LOWREY:   I'm not agreeing to that

10   conference.

11        MR. RAPHAEL:   I can't help it.  We're

12   still on the record.  If you leave, it's your own

13   problem.

14        THE REPORTER:   Counselor, do you want

15   this to stay on the record?

16        MR. RAPHAEL:   Stay on the record.   If

17   they leave, that's their problem.

18        MR. LOWREY:   Counselor, I'm leaving due

19   to the fact that you're walking out.

20             (WHEREUPON, the Witness and Mr.

21             Lowrey exited the deposition.)

22        MR. RAPHAEL:   They've left already?

23        MR. BELONGIA:   They left.

24        MR. RAPHAEL:   Well, this puts me in an

1  awkward situation.  Typically I move to compel

2  answers to questions with the judge present,

3  otherwise, I've -- I've never had anyone walk out

4  of a deposition before.  So, for the record, this

5  deposition has not been terminated.  I took a

6  couple of minutes to get Judge Hibbler's phone

7  number and I had intended on calling him.  It

8  seems somewhat moot now, so I'll bring a motion

9  with regard to this in my Rule to Show Cause.

10  Where's the court reporter?

11          MR. BELONGIA:  He's in the washroom.

12          MR. RAPHAEL:  Yeah.  I just -- I just

13  finished making my record that --

14          THE REPORTER:  Was it clear into the

15  mic?

16          MR. RAPHAEL:  Just to make a record that

17  the witness and his lawyer walked out within a

18  couple of minutes of me going to get Judge

19  Hibbler's phone number to get a ruling on these

20  instructions not to answer.  So the deposition is

21  not terminated but I can't do anything now.

22          THE REPORTER:  Would you like to go off

23  the record?

24          MR. RAPHAEL:  Yes.

1        THE REPORTER:  Would you like to

2   conclude for the day or just go off the record

3   temporarily?

4        MR. RAPHAEL:  Yeah, there's nothing --

5        MR. BELONGIA:  They're gone.

6        MR. RAPHAEL:  They're gone.  There's

7   nothing to do.

8        THE REPORTER:  This is the end of

9   today's portion of the deposition.  The time is

10  2:06 p.m., and the running time of this fourth

11  tape is 25 minutes and 37 seconds.

169

```
STATE OF ILLINOIS     )
                      )   SS:
COUNTY OF C O O K      )
```

I, PAUL DAVID GILLERAN, a Notary Public within and

for the County of Cook and State of Illinois, do hereby certify

that LAWRENCE J. LIGAS, the deponent, was by me first duly sworn to

testify the truth, the whole truth and nothing but the truth in the

cause aforesaid; that the deposition of the said LAWRENCE J. LIGAS

was taken before me at 180 West Washington Street, Chicago,

Illinois, commencing at the hour of 10:11 a.m. on the 12th day of

August, A.D. 2008, and was concluded at the hour of 2:07 p.m. on

that date.

I further certify that the testimony given at said

deposition by said witness was recorded by an audio/visual

recording device, by me in the presence of said witness and

thereafter transcribed into typewriting under my direction and

control.

I further certify that the foregoing transcript of

said deposition is a true, complete and correct report of the

entire testimony so given by said witness, together with such other

matters and things as counsel for the parties present at the taking

of said deposition desire to have appear of record.

170

I further certify that I am not counsel for, nor attorney for any of the parties to the aforesaid cause, nor am I related to any of the parties to the aforesaid cause, nor am I interested in any manner in the said cause or in its outcome.

I further certify that the deponent has reserved the right to review and certify this transcript.

IN WITNESS WHEREOF, I have hereunto set my hand and affix my seal of office, at Chicago, Illinois this 22nd day of August, A.D. 2008.

OFFICIAL SEAL
PAUL DAVID GILLERAN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES

_____
NOTARY PUBLIC

My commission expires:
September 15, 2009.

# DEPOSITION OF LAWRENCE J. LIGAS 08/12/08

MINDEX by Kenson

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word .... Page |
|---|---|---|---|---|
| $5,000 ... 105-107 | a.m. ... 4, 54 | 166 | bare ... 134 | **C** |
| 049E4 ... 33 | ability ... 8 | apologize ... 4 | Barry ... 41, 46, 47, 137, | |
| 05 ... 53, 55 | able ... 57, 64, 65, 81, 82, | apparatus ... 93 | 139, 160 | call ... 5, 15, 16, 126, 135, |
| 06 ... 19, 29, 58, 62, 63, 66, | 92, 108, 127, 129 | appearance ... 71 | base ... 53, 102, 164, 165 | 137, 139, 165 |
| 101, 102, 104, 105, | above ... 51, 88, 101, 130 | applicable ... 4 | based ... 104, 115 | called ... 18, 33, 47, 85, 109, |
| 168 | access ... 61 | applied ... 128 | basement ... 20 | 137, 139, 155, 156 |
| 06240 ... 62 | according ... 105 | appointment ... 163 | basic ... 63 | calling ... 139, 167 |
| 06284 ... 53 | account ... 26, 27, 105, 151 | appropriately ... 153 | basics ... 5 | calls ... 150-152, 154, 155 |
| 06420 ... 62 | accurate ... 54, 147 | approximate ... 68, 83, 99 | basing ... 112 | camera ... 17, 62, 102-105, |
| 07 ... 4, 63, 66, 100, 105 | accurately ... 71 | approximately ... 40, 68, 70, | basis ... 155 | 120, 123 |
| 1 ... 54, 83, 151 | Achilles ... 138 | 83, 99, 105, 156 | became ... 97 | can ... 5, 18, 27, 29, 31, 98, |
| 1:40 ... 151 | acknowledges ... 19 | April ... 73, 74 | become ... 70 | 107, 110, 118, 120, |
| 1:41 ... 151 | across ... 45 | Architect ... 54 | behind ... 81 | 123, 157, 165 |
| 10 ... 4, 7, 83, 119 | act ... 13 | architectural ... 47, 49, 54 | belief ... 9 | cancelled ... 27, 57 |
| 10:11 ... 4 | acted ... 13-15 | area ... 46, 88, 123, 124, | believing ... 155 | candid ... 6 |
| 100 ... 10, 11, 15, 33, 34, 36, | acting ... 45, 140, 153 | 149, 150 | BELONGIA ... 8, 9, 25, 37, | canopy ... 101 |
| 39, 40, 150, 151 | actions ... 119 | argue ... 143 | 39, 43, 48, 51, 64, 72, | car ... 149, 155 |
| 11:17 ... 54 | activated ... 10, 74 | arrived ... 52 | 75, 82, 92, 103, 106, | care ... 76, 77, 109, 123 |
| 11:24 ... 54 | active ... 69, 70, 73, 74 | artistically ... 129 | 107, 111, 113, | Carmen ... 4 |
| 112 ... 63, 66, 100, 101, 105 | actual ... 16, 42, 60, 64, 96, | aspect ... 32, 58 | 115-118, 124, ... 127, | carpenter ... 18, 29 |
| 12 ... 4, 98 | 101, 103, 122 | aspects ... 15, 51, 60 | 129, 130, 133, 134, | carpentry ... 28 |
| 12:20 ... 98 | ad ... 153 | assessment ... 14 | 142, 145-148, 152, | carried ... 23 |
| 12:22 ... 98 | ADA ... 71, 72 | assignment ... 51 | 154, 156, 157, 163, | carrier ... 154 |
| 12:39 ... 98 | add ... 54 | assistance ... 151 | 166-168 | carry ... 23, 164 |
| 13 ... 151 | address ... 4, 15, 28, 30, 86, | assistant ... 43 | below ... 85, 88, 159 | case ... 4, 7, 20, 30, 31, 97, |
| 15 ... 15, 53-55 | 134, 154 | assisted ... 75 | bias ... 114 | 110, 112, 136-140, |
| 178 ... 102 | addressed ... 5 | assumption ... 158 | big ... 71, 76, 156 | 144, 154, 160 |
| 180 ... 4 | addresses ... 115 | assumptions ... 14 | bill ... 57, 140, 152 | cases ... 13 |
| 19 ... 19, 29 | adds ... 105 | ATM ... 9-11, 20, 29, 31-41, | billed ... 57, 77, 106 | casually ... 92 |
| 2 ... 53-55, 83, 84, 168 | adhere ... 81, 84, 93, 127, | 44, 51-55, 57-63, 67, | billing ... 16, 105 | categories ... 8 |
| 2:06 ... 168 | 131 | 73, 76, 80, 97-104, | billings ... 11 | caught ... 67 |
| 2005 ... 55, 58, 59, 68, 106, | adhered ... 81, 88, 93, 126, | 108-110, 119, 120, | bills ... 12, 109, 151, | Cause ... 167 |
| 107, 151 | 129, 131, 134, 136 | 122, 124, ... 128, 135, | 153-155 | cell ... 109, 139, 150-155 |
| 2006 ... 40, 58-60, 66-68, | adhering ... 81, 87, 135 | 139, 144, 145, | bit ... 15, 40, 62 | Cellular ... 151 |
| 70, 72-74, 95, 98, 100, | adhesion ... 82, 84, 85, 89, | 147-149, 155, 156, | black ... 128 | cement ... 99 |
| 102, 105, 106, 129, | 97 | 160, 161 | blow ... 123 | cent ... 157 |
| 130, 151, 160, 161, | adhesive ... 85, 88, 93, 99, | attached ... 8, 53, 55, 90, 101 | blown ... 36, 164 | centers ... 71 |
| 164 | 127, 136 | attorney ... 5, 30, 119, 138, | blowup ... 36 | Central ... 87 |
| 2007 ... 63 | adjustment ... 40, 41 | 140-144 | blue ... 135 | certain ... 29, 106, 108, 114 |
| 2008 ... 4, 21, 22, 25 | advanced ... 93 | attorneys ... 143, 144 | blueprints ... 135 | certainly ... 114 |
| 206 ... 4 | advertise ... 90 | audience ... 166 | board ... 21, 97, 126, 127 | certificate ... 18, 29 |
| 24 ... 24, 54 | advice ... 132 | August ... 4, 19, 20, 162 | body ... 71 | chance ... 8, 24 |
| 240 ... 62, 63 | aesthetically ... 129 | authority ... 112 | both ... 14, 90 | changes ... 146, 147 |
| 2424 ... 4, 30 | affidavit ... 144-149, 152, | Avenue ... 10, 11, 15, 33, 34, | bothered ... 98 | charge ... 125, 126, 145 |
| 25 ... 168 | 154, 162, 163 | 36, 39, 40, 86, 87, 150, | bottom ... 88, 101, 120, 128 | charged ... 126 |
| 26 ... 65, 105 | affixed ... 98, 128, 135, | 151 | bought ... 32 | check ... 25, 50, 105 |
| 284 ... 58, 101, 105 | 147-149 | aware ... 10-12 | bounds ... 111 | checking ... 26 |
| 290 ... 66, 102, 104, 105 | afternoon ... 84 | awkward ... 167 | brain ... 98 | checks ... 25-27 |
| 3 ... 156 | against ... 109, 153 | **B** | branch ... 27, 76 | cherry ... 102 |
| 30 ... 107, 111, 112, 128, | Aggressive ... 136 | back ... 9, 22, 31, 33, 40, 44, | break ... 98, 165 | Chicago ... 4, 11, 33, 45, 150 |
| 134, 135 | agreeing ... 46, 166 | 52, 81, 82, 93, 113, | breath ... 78 | chisel ... 82, 91-93 |
| 32nd ... 97 | ahead ... 110 | 121, 122, 126, 127, | breezing ... 96 | Cicero ... 86, 87 |
| 37 ... 98, 168 | allegations ... 152, 153 | 132, 147 | brochure ... 96 | Civil ... 4, 112 |
| 3M ... 85, 87 | Alligas ... 12, 15, 26, 32, | backboard ... 97 | broken ... 158 | clarify ... 36, 38, 66, 69 |
| 3rd ... 103 | 105, 140, 141, 151 | backer ... 97 | brought ... 10-12, 16, 32, 54, | clarifying ... 46, 107 |
| 4 ... 19, 29, 83, 107, 112 | allowed ... 153 | backing ... 40, 58, 90 | 59, 109, 113, 161, 165 | clean ... 43 |
| 40 ... 110, 130, 151 | Alright ... 5-7, 9, 13-15, 19, | badger ... 103 | bucks ... 156 | cleans ... 127 |
| 5 ... 83, 105-107, 156 | 21, 31, 33-36, 38, 46, | balance ... 23, 71 | build ... 13 | clearer ... 36, 128 |
| 50 ... 130, 157 | 54, 55, 67, 69, 82, | Bank ... 4, 9-17, 19-22, | builder ... 50 | clients ... 22 |
| 55 ... 130 | 89-91, 98, 100, 119, | 25-29, 31, 33, 34, | building ... 18, 43, 68, 83, | clipping ... 111 |
| 58 ... 98 | 120, 145, ... 154, 165 | 37-39, 42, 44-49, 51, | 145 | close ... 51, 120 |
| 5th ... 103 | amended ... 115, 143, 152, | 55, 57, 59-62, 65, 66, | bulb ... 157 | closer ... 131 |
| 60 ... 130 | 153, 155, 159, 164, | 73-80, 95, 96, ... | bunch ... 85 | closeup ... 123 |
| 6403 ... 4 | 165 | 103-107, 110, 111, | burning ... 50, 51 | clue ... 64 |
| 8 ... 83 | amount ... 22, 105, 126 | 113, 114, 116-118, | business ... 4, 15, 19, 23, 83, | cold ... 89, 130, 131 |
| 90 ... 25 | angle ... 132 | 125, 126, 139-141, | 143 | collect ... 98 |
| 911 ... 150-152, 154 | anticipation ... 132 | 143-145, 150, 156, | buttoned ... 67 | columns ... 118 |
| **A** | anyhow ... 14 | 160, 161, ... 163 | buttons ... 71, 94 | come ... 63, 75, 79, 102-104, |
| | anymore ... 110, 116, 164, | banks ... 28 | butts ... 60, 101 | 109, 128, 145 |
| | | | | comes ... 149 |

**DEPOSITION OF LAWRENCE J. LIGAS 08/12/08**    MINDEX by Kenson

| Word ...... Page | Word ..... Page | Word ...... Page | Word ...... Page | Word .... Page |
|---|---|---|---|---|
| 167, 168 | hunk ... 156 | **J** | liquid ... 90 | maneuver ... 40, 62, 99 |
| going ... 6, 14, 15, 33, 35, 39, 43, 44, 49, 50, 68, 76, 82, 103, 108-110, 112, 116, 117, 119, 123, 125-127, ... 131, 143, 145, 148, 153-155, 157, 163-167 | hurt ... 138 | January ... 69, 70, 72 | Lisa ... 29 | many ... 7, 12, 14, 16, 56, 82, 93 |
| | husband ... 30, 31 | jeopardy ... 157 | list ... 67, 95, 97, 100, 155 | March ... 72-74, 84, 94, 98, 101, 129, 130, 133, 134 |
| | | Jim ... 42, 139 | lit ... 72, 73, 99 | |
| | **I** | job ... 18, 54, 59 | Literally ... 164 | |
| | identified ... 10 | John ... 140 | litigation ... 30, 97, 98 | mark ... 9, 17, 29, 34-36, 118, 123, 144, 145, 147 |
| | Illinois ... 4 | Join ... 152 | litigator ... 30 | |
| gone ... 25, 168 | illuminated ... 161 | judge ... 110, 166, 167 | liven ... 84 | marking ... 8 |
| good ... 16, 47, 88, 100, 138, 142 | imagine ... 103 | juggle ... 40 | loading ... 149 | Marshals ... 109 |
| | immediately ... 149 | July ... 19, 20, 22, 67, 68, 95, 100, 102, 151, 159-162, 164 | lobby ... 21, 53, 54, 67, 68 | mask ... 135 |
| goofy ... 32 | impair ... 8 | | Local ... 4 | masonite ... 80-82 |
| grab ... 136 | important ... 89, 94, 150 | | locate ... 17, 60, 79, 141, 142 | material ... 115, 128, 143; 151-155, 159, 164, 165 |
| grabbing ... 136 | improper ... 117, 142, 153 | June ... 40, 57-60, 67, 99-102, 105, 164 | located ... 11, 27, 30, 33, 39, 40, 124, 126 | |
| graffiti ... 162 | Inc ... 12, 26, 105, 151 | | | materiality ... 110, 111 |
| grayish ... 120 | Inc. ... 12, 26, 105, 151 | jury ... 119 | location ... 34-36, 52, 55, 57, 125, 133 | materials ... 59, 86 |
| ground ... 6, 11, 80, 99, 161, 162 | inch ... 93, 97, 159 | **K** | logo ... 73, 77, 125 | Matt ... 18, 19, 29, 31-33, 79, 128, 132 |
| | inches ... 83, 119, 156 | Kedzie ... 30 | long ... 7, 14, 15, 19, 20, 23, 56, 98, 111, 114 | matters ... 143 |
| guards ... 50 | incidents ... 150 | kitty ... 45 | longer ... 15, 24, 25, 64 | Matviekas ... 18 |
| guess ... 48, 52, 67 | Incorporated ... 26 | knife ... 82 | longest ... 24, 25 | maximum ... 159 |
| gunshot ... 7 | indented ... 120 | knowing ... 89 | look ... 9, 16, 35, 51, 53, 58, 61, 66, 94, 96-98, 105, 143, 164 | means ... 4 |
| guys ... 13, 149, 156, 157 | initiate ... 55 | knowledge ... 27, 44, 46, 63, 67, 74, 127, 137, 147-150 | | meant ... 89 |
| **H** | initiated ... 55 | | | measure ... 83 |
| half ... 106, 122, 151, 159 | inside ... 52, 55, 57, 67, 68, 80, 126 | | looked ... 8, 51, 81, 94, 95, 97, 128, 129 | measured ... 59, 68, 77 |
| hamstring ... 138 | inspect ... 50 | **L** | | measurement ... 69 |
| hamstrings ... 138 | inspected ... 49 | lamp ... 157-161 | looking ... 6, 10, 18, 38, 39, 76, 95, 110, 123, 128, 147, 158, 161, 164 | measurements ... 60, 71 |
| hand ... 5, 89, 91, 92, 128, 132-134 | inspection ... 49, 159 | lamps ... 50, 51 | | measuring ... 71 |
| | install ... 37, 38 | laptop ... 65 | Loop ... 163 | medication ... 8 |
| handed ... 146 | installation ... 9, 10, 29, 31, 52, 57, 63, 100, 101 | large ... 59 | lost ... 63, 149 | meet ... 46, 71 |
| handicap ... 99 | | Larry ... 5, 125, 158 | lot ... 20, 45, 63, 67, 71, 72, 87, 156, 157 | meeting ... 109 |
| Hang ... 120, 129 | installed ... 10, 36-38, 44, 54, 58, 71, 74, 79, 84, 102, 120, 148, 160, 165 | Larryligas ... 114-116 | | melts ... 99 |
| harassing ... 110, 139 | | larryligas.com ... 114-116 | loud ... 17 | memorized ... 145 |
| hard ... 31, 90, 104, 136, 160 | | LaSalle ... 4, 16-18, 32, 40, 57-61, 68, 69, 75, 99, 101, 162 | low ... 105 | memory ... 122, 144, 164 |
| harder ... 93 | installing ... 70, 71, 74, 79 | | lower ... 35, 123 | messenger ... 66 |
| hat ... 90 | Instanter ... 4 | late ... 20, 63, 72, 146 | LOWREY ... 30, 31, 37, 76, 98, 110-117, 125, 129, 131, 138, 140-143, 147, 151-155, 158, 159, 161, ... 164-166 | messengered ... 118 |
| hazardous ... 80 | instruct ... 112, 116, 153, 165 | later ... 24, 70, 74, 106 | | met ... 46, 71, 72, 144 |
| head ... 82 | | latest ... 89 | | metal ... 81, 90, 97, 124, 133, 135, 147-149, 156, 157, 162 |
| hear ... 6, 134 | instructed ... 113, 117, 165 | Latin ... 45 | | |
| heard ... 136-139 | instructing ... 110-113, 115, 140, 143, 154, 164, 165 | Lawrence ... 4, 5 | | metallic ... 81, 87, 97 |
| hearing ... 112 | | lawsuit ... 119, 137 | | mic ... 167 |
| heat ... 157-161 | instruction ... 112, 114, 117 | lawyer ... 5, 6, 8, 9, 118, 153, 163, 167 | lunch ... 98, 163, 164 | microphone ... 111 |
| heavy ... 156 | instructions ... 117, 166, 167 | | **M** | Microsoft ... 63 |
| height ... 71 | | lawyers ... 9 | machine ... 32, 33, 36, 37, 40, 44, 56, 69-74, 79, 80, 84, 94, 99, 101, 110, 121, 122, 124, 126, 127, ... 131, 155-158 | Midwest ... 26, 27 |
| help ... 122, 166 | intact ... 159 | laying ... 96 | | million ... 106 |
| high ... 80 | intended ... 167 | layman ... 90 | | Mina ... 47 |
| hire ... 41, 46, 48, 49, 140 | interior ... 53, 54 | lead ... 18, 59, 155, 159, 165 | | mirrored ... 102, 104 |
| hired ... 19, 28, 44, 45, 89, 159, 160, 162 | internal ... 120 | leave ... 128, 166 | | Mirrors ... 87 |
| | Internet ... 160 | leaving ... 166 | machinery ... 71 | Mischaracterizes ... 72, 92, 156 |
| hold ... 88, 90, 91, 120, 135, 136 | interrupt ... 148 | lecture ... 117 | machines ... 38 | |
| | intrusion ... 61, 62 | lectures ... 153 | mail ... 10, 78, 114-116 | missing ... 56, 158, 159 |
| holder ... 164 | invoice ... 17, 22-25, 47, 53, 56-58, 60-63, 66, 79, 100-102, 104-108 | led ... 48, 63, 100 | mails ... 9-11, 116 | mistaked ... 6 |
| holding ... 90, 135 | | ledge ... 88, 132 | main ... 20-22, 62, 64 | mistakes ... 6 |
| holds ... 90, 151 | | Left ... 83, 88, 94, 126, 166 | mainframe ... 12 | misunderstood ... 10 |
| home ... 30, 154 | invoiced ... 17, 22, 25, 47, 55, 56, 104, 111, 113 | legal ... 109 | maintain ... 114, 117 | Mm ... 21, 32, 47, 59, 63, 69, 81, 97, 98, 119, 128, 137 |
| homeless ... 45, 46, 149 | | length ... 148 | maintains ... 14 | |
| hominem ... 153 | invoices ... 11, 12, 17, 22, 24, 25, 52-55, 57, 63-66, 105, 106, 110, 117 | letters ... 81 | make ... 5, 7, 14, 28, 43, 49-51, 57, 60, 67, 70, 74, 79, 88, 94, 98, 99, 115, 118, 123, 146, 147, 154, ... 167 | Monadnock ... 145 |
| honest ... 6 | | licensed ... 30 | | money ... 158 |
| hour ... 54, 136, 151 | | Ligas ... 4, 29, 137 | | month ... 20, 23, 56, 105, 138 |
| hours ... 24, 28, 134, 153 | invoicing ... 60, 63 | light ... 51, 73, 74, 79, 157, 161 | | monthly ... 26, 27, 106 |
| housing ... 52 | involve ... 54 | | | months ... 21, 23, 24, 49, 59, 105, 113, 138, 162 |
| hover ... 149 | irrelevant ... 127, 152 | lighting ... 43, 50, 63, 100 | making ... 6, 94, 99, 154, 167 | |
| hovering ... 131 | issue ... 20, 24, 27, 63, 97, 148, 160, 165 | lights ... 43, 74, 84 | man ... 139 | Montrose ... 27 |
| Hubbard ... 24, 42, 55, 66, 67, 80, 89, 94, 99, 100, 106, 124, 129, 131-133, 139, 140, 145, 148 | | limit ... 111, 115 | manage ... 13 | moot ... 167 |
| | issues ... 67, 149, 152, 153, 155, 159, 164 | limitation ... 112 | managed ... 41, 60 | Morgan ... 30 |
| | item ... 24 | limited ... 5, 62, 109 | management ... 13 | |
| huge ... 71 | | limiting ... 109 | manager ... 13-15, 45, 60 | |
| human ... 6 | | line ... 24, 62, 110, 111, 115, 119 | | |

DEPOSITION OF LAWRENCE J. LIGAS 08/12/08    MINDEX by Kenson

Word . . . . . . Page

162
removed ... 135, 147-149, 162
removing ... 148
renovated ... 36
renovating ... 34
renovation ... 11, 41, 44, 49, 50, 53, 54, 96
repair ... 22, 23, 160-162
repaired ... 52, 162
replace ... 159, 160
replaced ... 158
replacement ... 165
replacements ... 164
report ... 150
REPORTER ... 4, 33, 35, 44, 54, 98, 111, 118, 151, 166-168
reports ... 150
request ... 108
requested ... 8, 116, 118
require ... 71, 91
requirements ... 71, 72
residence ... 65
residue ... 128
resistant ... 85, 99, 102, 104
respect ... 91, 111, 119
respectable ... 130
respected ... 140
response ... 8
responsibility ... 52
responsible ... 51
restrain ... 112
retrieve ... 64
returned ... 27
reveal ... 71
revolving ... 59, 101, 162
reworked ... 61
rider ... 8, 10, 117
ripped ... 164
Room ... 57, 163
round ... 162
Row ... 163
rule ... 4, 6, 11, 109, 111, 112, 167
Rules ... 4, 5, 110, 111, 153
ruling ... 166, 167
run ... 5
running ... 54, 98, 151, 168
runs ... 62
Rustin ... 41, 46, 47, 160

S

safe ... 15, 74
safety ... 28, 45
sake ... 33
sanctions ... 153
sand ... 126
sat ... 105
saved ... 63, 65
saw ... 38, 39, 47, 94
schedule ... 28
schedules ... 25
School ... 45
scope ... 53, 108, 110, 111
Scotch ... 85
scrap ... 157
scrape ... 80, 81, 84, 85, 127
scraped ... 84, 126
scraper ... 82

Word . . . . . Page

scratch ... 67
screwdriver ... 91
screwy ... 77
seal ... 162
second ... 57, 58, 115, 118, 120, 135, 143, 152, 153, 155, 159, 164, 165
seconds ... 54, 98, 151, 168
secure ... 135
security ... 49, 50, 61, 62
see ... 20, 34, 35, 52-54, 66, 76, 90, 95, 101, 102, 118, 119, 123, 131, 134-136, 157, 165
seeing ... 39, 40, 62, 94-96, 100
seeking ... 104, 141
seen ... 8, 48, 96, 157
seldom ... 21
self ... 157
seniority ... 140
sent ... 8, 27, 66
separate ... 93
September ... 68, 162
served ... 54, 136-138
services ... 16
session ... 5, 153
set ... 28, 40
setting ... 117, 134
several ... 23, 61, 62, 66, 107, 134, 140, 149
shape ... 157
shared ... 140, 144
shelf ... 123
shelter ... 45, 46
Shhh ... 39
shiny ... 43
shipped ... 79
shook ... 82
shot ... 7
show ... 9, 34, 52, 77, 118, 125, 135, 145, 150, 154, 167
showed ... 53, 69, 99
showing ... 26
shown ... 52, 55, 150, 164
shows ... 52, 101
sick ... 8
side ... 20, 21, 86, 101, 119
sided ... 84, 85, 87, 90, 124, 136
sight ... 133
sign ... 37, 38, 63, 74-77, 81, 84, 87-89, 91-94, 100, 101, 125, 127, 129, 131, 134-136, 139, 145, 154, ... 162, 163
signage ... 37, 38, 50, 82, 94, 100, 122, 123, 148
signature ... 147
signed ... 30, 59, 60, 144, 146, 147, 161
signs ... 76, 80, 82, 84, 88-90, 94-98, 100, 110, 120, 124-126, 145, 147-149, 157,

Word . . . . . . Page

158
silly ... 6
simple ... 28, 92
single ... 11
sit ... 24, 128
site ... 32, 50
sitting ... 106
situation ... 89, 110, 167
six ... 105, 113, 138, 147
size ... 58, 75, 77, 99
sizes ... 78
sizing ... 75
skills ... 45
slash ... 16
slightly ... 57
slip ... 99
slipping ... 99
slow ... 7
slush ... 99
small ... 20, 22, 149
smaller ... 19
smear ... 35
Smock ... 86
snow ... 99
solid ... 135
somewhat ... 167
sought ... 109
sound ... 134
sounding ... 14
sounds ... 6, 32, 41
source ... 104, 142
south ... 86, 163
southbound ... 101
speaks ... 146
spec ... 87
special ... 94
specialty ... 59
specific ... 31, 56
specification ... 54
specs ... 90
spoken ... 137, 141
spots ... 80
spray ... 89
spread ... 159
spring ... 146
square ... 93
SRO ... 163
stainless ... 32, 40, 57-59, 68, 69, 71, 87, 88, 90, 91, 99, 118, 119
standing ... 59, 99, 112, 163
Stanley ... 30
start ... 54, 78, 98, 151
started ... 19, 46, 58, 59, 67, 68
starting ... 59, 151
State ... 4
statement ... 26, 27
statements ... 26, 53
Stay ... 119, 166
staying ... 53
steel ... 32, 40, 57-59, 71, 87, 88, 90, 91, 99, 118, 119, 121, 122
steps ... 67
stickers ... 80, 81, 97
stiff ... 82
stolen ... 149, 155, 157, 158, 164

Word . . . . . . Page

stop ... 78, 96
stopped ... 20, 47
stopping ... 150
store ... 59
stored ... 64
straight ... 119, 132, 153
street ... 4, 45, 86, 163
strength ... 90
strike ... 25, 55, 161
strips ... 90, 93, 132, 133
strong ... 85, 88, 90, 91
stronger ... 85, 92
structurally ... 134
structure ... 21, 32, 58, 68, 69, 122
stuck ... 127
stupid ... 59
subcontractor ... 16, 59
subcontractors ... 13, 14, 16, 19, 27-29
submitted ... 110
subpoena ... 10, 109, 137, 138, 154
subpoenaed ... 8, 98
substrate ... 58, 60, 101, 118, 119
substrates ... 88
suggested ... 99
suggestions ... 140
suing ... 7
Suite ... 4
sum ... 9
summons ... 138
Super ... 85, 90
supplied ... 73, 74, 103
supplier ... 73, 74, 86, 103, 104
supplies ... 13
supply ... 104, 118
supposed ... 32, 109
Supreme ... 4
surface ... 81, 128, 159
surround ... 29, 32, 33, 35-38, 40, 41, 44, 51, 52, 57, 59, 60, 69-75, 77-81, 84, 87, 88, 93, 96, 99-103, ... 118-122, 147, 148, 161
surroundings ... 69
surrounds ... 75, 76, 78
switch ... 151
swore ... 122
sworn ... 5, 154
system ... 61

T

table ... 138
tables ... 96
tag ... 103
taking ... 8, 41, 43, 49, 121, 122, 136
talented ... 28
tape ... 54, 84, 85, 87-93, 95, 98, 99, 124, 127, 128, 131, 135, 136, 151, 168
tax ... 29
team ... 33
technologically ... 93
telephone ... 28

Word . . . . Page

temperature ... 130
temporarily ... 135, 168
temporary ... 69, 80, 135
ten ... 107
term ... 13, 37, 43, 75
terminated ... 167
terms ... 38, 50, 51, 101
test ... 136
tested ... 135, 136
testimony ... 72, 92, 121, 122, 154, 156
Thanks ... 46, 107
theoretically ... 66
these ... 8, 11, 12, 22, 25, 26, 29, 53-55, 63-66, 80-82, 89, 90, 94, 96, 99, 105, 110, 112, 113, 118, ... 120, 148-150, 153, 154, 156, 157, 164, 167
thief ... 92
Thirty ... 130
thousand ... 107
threatened ... 155
Threats ... 155
three ... 18, 19, 23, 28, 29, 52, 56, 76, 98, 114, 140, 151, 164
tidy ... 43
tight ... 67, 78
time ... 4, 5, 7, 11, 14-16, 19-23, 25, 31, 33, 38-40, 42-44, 47, 49, 54, 56-59, 65, 68-73, 92, 94-98, ... 106-108, 115, 128, 134-139, 144, 146, 150, 151, 153, 157, 159-163, 168
times ... 14, 29, 56, 134, 149, 164
today ... 8, 9, 95, 109, 116, 137, 144
tolerance ... 97
tolerated ... 153
took ... 41, 42, 46, 58, 69, 82, 126, 132, 139, 140, 150, 167
tool ... 89, 91-93
tools ... 20
top ... 100, 120, 148
topic ... 114, 165
Torchia ... 52, 54
total ... 9
trade ... 89
tradesman ... 32
transcribed ... 4
transcript ... 77
transferred ... 65
trap ... 45
tree ... 76
trial ... 110, 111, 138, 155
trip ... 80
tripped ... 80
truth ... 6
turn ... 17
twenty ... 107
twice ... 56, 128, 149
twist ... 40
Two ... 5, 19, 20, 23, 34, 54,

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CARMEN FLORES, | ) | |
| | ) | Case No. 07 C 6403 |
| Plaintiff, | ) | |
| | ) | Judge Hibbler |
| v. | ) | |
| | ) | Magistrate Judge Valdez |
| DIAMOND BANK, | ) | |
| | ) | |
| Defendant. | ) | |

### NOTICE OF SUBPOENAED VIDEO DEPOSITION

To:    See Certificate of Service

PLEASE TAKE NOTICE that we shall take the subpoenaed deposition of Lawrence J.

Ligas by video graphic means on **August 12, 2008 at 10:00 a.m.**

Respectfully submitted,

By: _____
One of Plaintiff's Attorneys

Lance A. Raphael
Stacy M. Bardo
Allison A. Krumhorn
The Consumer Advocacy Center, P.C.
180 W Washington, Suite 700
Chicago, IL 60602
(312) 782-5808

DEPOSITION
EXHIBIT
A
for identification

## CERTIFICATE OF SERVICE

I, Sherry Joseph, paralegal, hereby certify under penalties of perjury according to 28 U.S.C. § 1746 that I served the attached *Notice of Subpoenaed Video Deposition*, by faxing and e-mailing a copy, on August 8, 2008, to the following counsel of record:

Mark D. Belongia
Nathaniel R. Sinn
Belongia & Shapiro, LLP
53 W. Jackson Blvd., Ste. 315
Chicago, IL 60604
mbelongia@mdb-law.com

Lawrence Ligas
c/o John Lowrey
338 S. Sixth Ave.
LaGrange, IL 60525
jjl@jjltriallaw.com

Sherry Joseph, paralegal

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CARMEN FLORES,                               )
                                             )   Case No. 07 C 6403
                         Plaintiff,          )
                                             )   Judge Hibbler
        v.                                   )
                                             )   Magistrate Judge Valdez
DIAMOND BANK,                                )
                                             )
                         Defendant.          )

## DOCUMENT PRODUCTION RIDER

To:    Lawrence J. Ligas c/o John Lowrey

The deponent is instructed to bring with him to the deposition, each and every time he is produced:

1. All documents, memos, notes, e-mails, or correspondence you or anyone in your control possesses relating to automated teller machine number 049E4, located at Diamond Bank, 100 W. North Avenue, Chicago, Illinois 60610 ("the ATM").

2. All photographs and videos of the ATM and its surroundings.

3. All photographs and videos of the renovation of Diamond Bank's main entrance at 100 W. North Avenue, Chicago, Illinois 60610.

4. All documents relating to any contracts and/or work orders between Diamond Bank and you and/or Alligas Enterprises, Inc.

5. All documents identifying, by name, address and telephone number, all employees, contractors and/or agents of you and/or Alligas Enterprises, Inc. that worked on the renovation of Diamond Bank's main entrance.

6. All documents supporting the statements in your Affidavit of Knowledge signed by you on February 5, 2008 and submitted in Flores v. Diamond Bank, case no. 06 C 6403.

7. All documents relating to any correspondence between you and/or Alligas Enterprises, Inc. and Diamond Bank or any of its attorneys, employees, officers, agents and/or representatives.

Respectfully submitted,

By_____
One of Plaintiff's Attorneys

Lance A. Raphael
Stacy M. Bardo
Allison A. Krumhorn
The Consumer Advocacy Center, P.C.
180 West Washington, Suite 700
Chicago, IL 60602
(312) 782-5808

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

DISTRICT OF

CARMEN FLORES

V.

DIAMOND BANK

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 07 C 6403

TO:  Lawrence J. Ligas
2424 N. Kedzie Blvd.
Chicago, IL 60647

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   The Consumer Advocacy Center, P.C., 180 W. Washington St., Ste. 700, Chicago, IL 60602 | DATE AND TIME 7/16/2008 10:00 am |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
See attached Document Rider

| PLACE   The Consumer Advocacy Center, P.C., 180 W. Washington St., Ste 700, Chicago, IL 60602 | DATE AND TIME 7/14/2008 5:00 pm |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)  Attorney for Plaintiff | DATE 6/23/2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Lance Raphael, The Consumer Advocacy Center, P.C., 180 W. Washington St., Ste. 700, Chicago, IL 60602
312-782-5808

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

**Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:**

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises— or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

```
Transaction Report

Send
Transaction(s) completed

No. TX Date/Time   Destination                 Duration P.#    Result   Mode

115 AUG-08   11:51 3126621040                  0'00'44" 006    OK       N  ECM
```

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CARMEN FLORES,                              )
                                            )        Case No. 07 C 6403
                        Plaintiff,          )
                                            )        Judge Hibbler
            v.                              )
                                            )        Magistrate Judge Valdez
DIAMOND BANK,                               )
                                            )
                        Defendant.          )
                                            )

### NOTICE OF SUBPOENAED VIDEO DEPOSITION

To:    See Certificate of Service

        PLEASE TAKE NOTICE that we shall take the subpoenaed deposition of Lawrence J.

Ligas by video graphic means on **August 12, 2008 at 10:00 a.m.**

                        Respectfully submitted,


                        By: _____
                        One of Plaintiff's Attorneys

Lance A. Raphael
Stacy M. Bardo
Allison A. Krumhorn
The Consumer Advocacy Center, P.C.
180 W Washington, Suite 700
Chicago, IL 60602
(312) 782-5808

```
Transaction Report
Broadcast

No. TX Date/Time    Destination          Duration P.#   Result   Mode
113 AUG-08   11:43 17083540327           0'00'46" 006   OK       N  ECM
             11:45 3126621040                     000   Stopped
```

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CARMEN FLORES,                          )
                                        )       Case No. 07 C 6403
                        Plaintiff,      )
                                        )       Judge Hibbler
        v.                              )
                                        )       Magistrate Judge Valdez
DIAMOND BANK,                           )
                                        )
                        Defendant.      )

### NOTICE OF SUBPOENAED VIDEO DEPOSITION

To:     See Certificate of Service

        PLEASE TAKE NOTICE that we shall take the subpoenaed deposition of Lawrence J.

Ligas by video graphic means on **August 12, 2008 at 10:00 a.m.**

                        Respectfully submitted,

                        By: _____
                        One of Plaintiff's Attorneys

Lance A. Raphael
Stacy M. Bardo
Allison A. Krumhorn
The Consumer Advocacy Center, P.C.
180 W Washington, Suite 700
Chicago, IL 60602
(312) 782-5808





## ALLIGAS
### ENTERPRISES, INC.

Date:   May 4, 2005

To:     North Federal Savings Bank
Attn:   Mr. James Hubbard, President
Project: 100 W. North Avenue
         (Interior Renovations)
         Chicago, Illinois

### PROPOSAL

ALLIGAS ENTERPRISES, INC., hereby proposes to furnish materials and skilled labor required to perform the following, per architectural plans and specifications prepared by Torchia Associates, dated 2/15/05, interior renovation only, as well as numerous site meetings with North Federal President/CEO. Materials specified may be substituted with equivalents.

Alligas Enterprises, Inc., will provide construction management and general contracting services limited to the interior renovation of the existing ground floor per plans and specifications, second floor new offices (west end), and teller stations.

Additional items included in contract: constructing temporary entrance (security system and cabeling by others), handicapped accessible ramp (interior/exterior), temporary (movable) partition wall (erected and moved to accommodate 3-phases of construction), and teller location.

Also included in contract above and beyond the scope of work defined on the architect's drawings and specifications, as we understand after numerous meetings with North Federal President/CEO:
  ➢ Refinishing of wood casing and trim around interior glass frames at north wall, behind teller line and adjoining hallways;
  ➢ Installation of temporary door during construction;
  ➢ Custom built teller line with "furniture look" rather than "pre-fab" look, with brushed metal inserts (to compliment vault), premium stain and catalyzed varnish finish;
  ➢ Additional labor and material required to install substrait required for mosaic tile installation;
  ➢ Installation of brushed chrome (or equivalent) tile at teller line;
  ➢ Upgrade for stone and 2" edging on customer side of teller line (to conceal light rail);
  ➢ C2 paint products in lieu of Benjamin Moore;

  ➢ 

2424 North Kedzie Boulevard
Chicago, IL  60647
(312) 850-0300  phone
(773) 862-1716 fax

DEPOSITION
EXHIBIT
B
for identification

North Federal Savings Bank
Proposal Date: May 4, 2005
Page 2 of 3

> Building of 3-person conference room on second floor (not on architect's plans);
> Upgrade to hardwood on teller line;
> Modification and relamping of north and south walls' interior lighting fixtures (in construction area) to achieve a wall-washing effect on perimeter walls rather than current downlighting;
> Construction design-build meetings and on-site investigation with North Federal President/CEO to minimize construction delays and cost overruns;
> Install metal cross channel in soffited areas to improve acoustics and avoid ceiling bowing.

<u>Items not included and outside of contract:</u>
Exterior work
Window treatments (materials and labor)
Removal of existing fabric wall treatments
Fabric wall treatments (materials and labor)
Carpet (materials and labor)
Building permit fees
Elevator treatment
Security/surveillance system/cabeling
Ventilation
Plumbing

WE PROPOSE TO PERFORM THE ABOVE FOR THE SUM OF ......$416,313.00
(Four-hundred sixteen thousand, three-hundred thirteen dollars and 00/100)

Any additional work not included in above scope to be performed at additional cost and pursuant to executed Change Order/Additional Work Authorization.

<u>Payments shall be made as follows:</u>
1. Preliminary site preparation, demolition, and layout:  $15,000.00
2. Upon commencement of framing and layout of teller line:  $125,000.00
3. Upon completion of drywall, patching, and priming:  $100,000.00
4. Upon installation of electrical fixtures:  $100,000.00
5. Upon completion of teller line:  $60,000.00
6. Upon completion of punch list:  $16,313.00

North Federal Savings Bank
Proposal Date: May 4, 2005
Page 3 of 3


Respectfully submitted,
ALLIGAS ENTERPRISES, INC.


By:  Lawrence J. Ligas, President


Accepted:
NORTH FEDERAL SAVINGS BANK


By:_____

Title: _____

Dated as of: _____



Invoice # 06-178

# ALLIGAS
ENTERPRISES, INC.

INVOICE



May 24, 2006

Customer:   Diamond Bank
Attn:          Mr. James Hubbard, President
                 100 W. North Avenue
                 Chicago, Illinois

## ATM Doors & Hardware - Upgrade

- Upgraded cherry panel doors with stainless steel accent stripes; upgraded commercial hardware with concealed hinges and latches  (base contract drawings showed slab doors).

Material only.
Upgrade from base contract.

TOTAL DUE, THIS INVOICE.............................................................$ 1,575.00

THANK YOU!

2424 North Kedzie Boulevard
Chicago, IL  60647
(312) 850-0300  phone
(773) 862-4301  fax



Invoice # 07-112

# INVOICE

## ALLIGAS
ENTERPRISES, INC.



December 26, 2006

Customer:  Diamond Bank
Attn:      Mr. James Hubbard, President
           100 W. North Avenue
           Chicago, Illinois

Project:   ATM signage –LED lighting installation

- Installation  of ATM sign with LED lighting(not included w/invoice #06-240)
- Brought power to elevator closet for automatic switching, including necessary coring.

BALANCE NOW DUE, THIS INVOICE………………...…………………$ 970.00

Work not included in scope of base contract.

THANK YOU!

2424 North Kedzie Boulevard
Chicago, IL  60647
(312) 850-0300  phone
(773) 862-4301  fax



Invoice # 06-290

**INVOICE**

# ALLIGAS
ENTERPRISES, INC.

December 26, 2006

Customer:   Diamond Bank
Attn:           Mr. James Hubbard, President
                  100 W. North Avenue
                  Chicago, Illinois

Project:       ATM Camera Window

- Furnished and installed vandal-resistant mirrored camera window on front panel of ATM surround.

Note: Existing ATM camera requires relocation and adjustment, as camera records skyline view rather than facial images, due to the factory selected location.

BALANCE NOW DUE, THIS INVOICE……………….………..…………$ 389.00

Work not included in scope of base contract.

THANK YOU!

2424 North Kedzie Boulevard
Chicago, IL  60647
(312) 850-0300  phone
(773) 862-4301  fax



Invoice # 06-284

**INVOICE**

# ALLIGAS

ENTERPRISES, INC.

December 26, 2006

Customer:   Diamond Bank
Attn:       Mr. James Hubbard, President
            100 W. North Avenue
            Chicago, Illinois

## ATM

- Relocation and setting of ATM machine into permanent ATM surround.  NOTE: LaSalle Glas cancelled two dates to relocate: required joint effort of moving company (6 men). (Alligas backcharged for cancellation by moving company and absorbed the backcharged cost at no charge to Diamond Bank)
- Custom fitting and installation of surround around ATM.
- Required working around the trench and temporary shelter around new storefront.
- Reworked intrusion detection network wires and line voltage power to ATM, without losing business time, downtime of ATM or intrusion detection system.

Not included in scope of base contract.

TOTAL DUE, THIS INVOICE..................................................................$3,600.00

THANK YOU!

2424 North Kedzie Boulevard
Chicago, IL  60647
(312) 850-0300  phone
(773) 862-4301  fax

XPAYER'S NAME(S) _MINDANGAS MATVIEKAS_ IDENTIFICATION NUMER(S) _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_

(as shown on the front)

ECTION 1. LEVY ACKNOWLEDGEMENT

Signature of person responding

Printed name of person responding _LISA M. LIGAS, ATTORNEY_

Your telephone number _(773) 862 4301_

Date and time this levy received _3-12-07    9AM_

ECTION 2. LEVY RESULTS (Check all applicable boxes.)

☐ Check attached in the amount of $_____

☐ Taxpayer no longer employed here as of _____

☐ Remarks: _____

☐ Additional checks will be sent :

_____ approximate amount of each payment

$ _____ (weekly, bi-weekly, monthly, etc.)

SECTION 3. ADDITIONAL INFORMATION - Additional Information

(Please complete this section if this levy does not attach any funds).

Taxpayer's latest address, if different from the one on this levy: _TAXPAYER, MINDANGAS MATVIEKAS, IS DECEASED AS OF 4-19-06._

Taxpayer's telephone number: _(    )    N/A_

Name and Address of taxpayer's employer: _N/A_
(if different from addressee).

Other information you believe may help us: _NO FURTHER INFORMATION._

SECTION 4. Levy Processing Information (Please complete this section if this form was not sent to the proper address.)

Please provide us with the proper address and contact phone numbers for processing levies:

Department: _____

Address: _____

Contact Person: _____

Phone: _(    )_ _____

DEPOSITION
EXHIBIT
C





# Welcome to Diamond Bank.
# A Real Gem.



Thank you for visiting our site and welcome to a whole new bank that is actually one of the m established financial institutions in Chicago

From the outside we are a rare beauty found in the heart of Chicago and Skokie. Step inside and find polished banking professionals eager to listen and be of service Look closer and notice state-of-the-art technology and great products combined with over 120 y experience Stay awhile and gain a financial partner dedicated to meeting your personal an business banking needs.

We invite you to explore our products and come in to see the newest bank in town!

Diamond Bank.

Excellence, since 1886.

**ON-LINE BANKING CENTER**

To find a *Surcharge Free* ATM near you, enter your zip code below.

Zip Code    Go      **STAR**

## Diamond Bank Now Offers Its Customers



DEPOSITION
EXHIBIT
_D_
for identification

http:/www.dbdiamond.com.

2/5/2008









**IN THE UNITED STATES DISTRIC COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CARMEN FLORES, individually and on behalf       (
of all others similarly situated,               (
                                                (
                   Plaintiff,                   (   Case No. 07 C 6403
                                                (
v.                                              (   Judge Hibbler
                                                (
DIAMOND BANK, FSB,                              (   Magistrate Judge Valdez
                                                (
                   Defendant.                   (

## AFFIDAVIT OF KNOWLEDGE

I, Lawrence J. Ligas, first being sworn on oath, deposes and says that if sworn as a witness I could competently testify to the matters set forth herein from my own personal knowledge:

1.      I am the President of Alligas Enterprises, Inc.,

2.      That on or about October 15, 2005, my company was hired by Defendant Diamond Bank, FSB ("Bank") to install an ATM surround at its bank building located at 100 West North Avenue, Chicago, Illinois 60610.

3.      That my company did perform the installation of the ATM surround for the ATM # 049E4 located on the Clark Street side of the exterior of the bank building. At that time, there was only one ATM machine located on the exterior of the Diamond Bank building.

4.      Upon the completion of the ATM surround installation, my company placed two metal signs ("signs") on the ATM surround. These signs were affixed by adhesive. Upon my best personal recollection and knowledge, one of these signs concerned the amount of the bank charge that would be assessed to non-bank customers and the other sign concerned the notice that funds deposited at that ATM machine might not be available for immediate withdrawal.

5.      Our company had removed the signs that had been previously affixed to the ATM surround that was around the ATM machine when it was located in the lobby of the bank building.

DEPOSITION
EXHIBIT
**H**
for identification

6.     I have no knowledge as to how the two metal signs that my company affixed to the ATM surround were removed; when these signs were removed; or who removed the signs.

7.     It is my personal belief that the ATM signs were removed by vandals who were seeking to sell the metal signs for scrap along with other metal objects.

FURTHER, AFFIANT SAYETH NOT.

Lawrence J. Ligas

Subscribed and Sworn to before
me this 5th day of February, 2008.

Notary Public

Official Seal
Mark D Belongia
Notary Public State of Illinois
My Commission Expires 03/16/2010