such failure within such time, and such failure has or will have a materially adverse effect upon Customer, Customer shall have a right to terminate this Agreement effective upon not less than 60 days prior notice to Vendor.

Upon such termination, Vendor will reimburse Customer the actual monetary damages Customer incurred as a result of Vendor's nonperformance; provided, however, in no event shall such damages exceed the limit of liability set forth in Section 9. The obligations of Vendor under this Section 7 are conditioned upon: (i) Vendor receiving a notice of nonperformance from Customer as required in this Section 7, and (ii) Vendor being reasonably satisfied upon investigation that the nonperformance was not a result of any negligent, improper or prohibited act or omission of Customer, or their employees or agents, or any other factor not directly within the reasonable control of Vendor. Customer shall promptly reimburse Vendor for any expenses incurred by Vendor in investigating or correcting any problem experienced by Customer which is not the responsibility of or solely caused by Vendor under this Agreement.

(c) Excused or Delayed Performance. Vendor shall not be deemed to be in default under this Agreement nor liable for any delay or loss in the performance, failure to perform, or interruption of any Services resulting, directly or indirectly, from: errors in data provided by Customer or others, labor disputes, fire or other casualty, criminal activity, governmental orders or regulations, or any other cause, whether similar or dissimilar to the foregoing, beyond Vendor's reasonable control. Upon such an occurrence, performance by Vendor shall be excused until the cause for the delay has been removed and Vendor has had a reasonable time to again provide the Services.

8. TERMINATION BY VENDOR

(a) Default by Customer. Customer shall be in default under this Agreement upon the occurrence of any of the following events ("Events of Default"):
  (i) In the event that Customer becomes subject to any voluntary or involuntary bankruptcy, insolvency, reorganization or liquidation proceeding, a receiver is appointed for Customer, or Customer makes an assignment for benefit of creditors, or admits its inability to pay its debts as they come due; or
  (ii) In the event Customer fails to pay the fees, expenses or charges referenced in Section 4 when they become due; or
  (iii) In the event 50% or more of Customer's assets related to the Services are sold, divested, transferred or otherwise disposed of while this Agreement is in full force and effect; or
  (iv) In the event that Customer is in default of any terms or conditions of this Agreement (other than Section 4) or any Addendum whether by reason of its own action or inaction or that of another, and such default continues for 30 days after receipt of a notice from Vendor describing such default or violation, unless within such 30-day period Customer either corrects the default or, in the opinion of Vendor, initiates appropriate action to correct such default and thereafter diligently pursues to cure such default.

(b) Termination. Upon the occurrence of an Event of Default, Vendor may at any time thereafter terminate this Agreement effective 60 days after notice of such termination is given by Vendor to Customer. Termination of this Agreement for any reason shall not relieve Customer from any liability or obligation to Vendor arising prior to such termination. In the event of Event of Default, Customer shall be liable to Vendor for liquidated damages in an amount equal to the average amount of the monthly revenue payable to Vendor (excluding any credits applied to and/or fees waived for Customer by Vendor) as a result of this Agreement for the 3 calendar months in which Customer's billings were the highest during the preceding 12 calendar months (or such shorter period if this Agreement has not been in effect for 12 months), multiplied by the number of months remaining during the then current term of this Agreement. Customer and Vendor recognize and agree that the liquidated damages are fair and reasonable because it is not possible to establish the actual increase in volume and activity by Customer during the term of this Agreement. Customer shall also reimburse Vendor for any damage, loss or expense incurred by Vendor as a result of a breach by Customer, including any damages set forth in any Addendum. All such amounts shall be due and payable by Customer on the effective date of termination. In addition to, and not in limitation of the foregoing, Vendor may refuse to provide the Services in the event it has not been paid for the Services as provided in Section 4.

(c) Notwithstanding any other provision in this Agreement, in the event that Customer fails to comply with any term or provision of any Addendum or this Agreement, which failure has or may adversely affect Vendor, Vendor reserves the right to refuse to perform the Services for Customer unless and until Customer has corrected its failure to comply.

9. LIMITS ON LIABILITY

EXCEPT THOSE EXPRESS WARRANTIES MADE IN THIS AGREEMENT, VENDOR DISCLAIMS ALL WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Without limiting the foregoing, Vendor shall not be liable for lost profits, lost business or any incidental, special, consequential or punitive damages (whether or not arising out of circumstances known or foreseeable by Vendor) suffered by Customer, its customers or any third party in connection with the Services provided by Vendor hereunder. Vendor's liability hereunder shall in no event exceed an amount equal to the lesser of

(i) actual monetary damages incurred by Customer or (ii) fees paid for the particular Services in question for the calendar month immediately preceding the date on which Vendor received Customer's notice of nonperformance as set forth in Section 7. In no event shall Vendor be liable for any matter beyond its reasonable control, or for damages or losses wholly or partially caused by the Customer, or its employees or agents, or for any damages or losses which could have been avoided or limited by Customer giving notice to Vendor as provided in Section 7. No cause of action, regardless of form, shall be brought by either party more than 1 year after the cause of action arose, other than one for the nonpayment of fees and other amounts, including any damages, due Vendor under this Agreement.

10. CUSTOMER'S REPRESENTATIONS AND COVENANTS

Customer represents and warrants to Vendor:

(a) That it will comply, and will cause its employees and agents to comply with, all the terms of this Agreement and any Addendum, including any amendments thereto.

(b) That it is a state and/or federally chartered financial institution licensed to do business in all applicable jurisdictions in which it conducts business and that it will comply with all applicable federal, state and local laws and regulations applicable to its business operations and will acquire all the rights and licenses deemed necessary by Vendor for Vendor to interface with Customer, or vice versa, as contemplated under this Agreement. Customer shall notify Vendor within thirty (30) days of any change in Customer's name, principal location or state and/or federal charter.

(c) That it will solely be responsible for the quality, accuracy, and adequacy of all information supplied to Vendor to be input into Vendor's computer system or otherwise provided to Vendor hereunder, and that it will establish and maintain adequate audit controls to monitor the quality and delivery of such data. Customer acknowledges that Vendor may intercept and settle Customer transactions directly with other entities processed by Vendor.

(d) That it will review all reports prepared by Vendor and its agents and submitted to Customer. Customer's failure to reject any report in writing within three business days of its receipt shall constitute acceptance of the report.

(e) That it shall comply with all time deadlines, equipment and software maintenance and upgrading requirements which Vendor may reasonably impose on Customer from time to time.

(f) That it shall solely be responsible for all record-keeping as may be required of it under any federal, state or local laws and regulations. Vendor shall not be obligated to retain any records of Services performed hereunder for a period beyond 7 calendar days after delivery of the records to Customer.

(g) That it will indemnify, defend and hold Vendor, and its directors, officers, employees, affiliates and agents, harmless from all proceedings, claims, liabilities and expenses whatsoever (including attorneys fees) arising out of the Services, the business of Customer or its customers, or by reason of any breach or nonperformance of any provision of this Agreement or any Addendum on the part of the Customer, or its employees, agents or customers, except, however, where such is due to the sole negligence of Vendor.

(h) That it will not solicit or hire Vendor's or its affiliates' employees for employment during the period that this Agreement is in force and effect and for one (1) year after the termination or expiration of this Agreement.

(i) That it shall take all necessary steps to, and shall, promptly convert to Vendor's system for all of the Services in each executed Addendum to this Agreement.

11. AUDIT PROCEDURES

Vendor shall allow Customer's auditors to review the files held and the procedures followed by Vendor. Vendor will assist such auditors as may be necessary for them to complete their audit; provided, however, that Vendor reserves the right to charge Customer for Vendor's out-of-pocket expenses and its standard fees for the time spent by Vendor's personnel in providing such assistance to Customer's auditors, or to any governmental examiners because of those services Vendor is providing to Customer.

12. MISCELLANEOUS

(a) Other Agreements. Vendor reserves the right to enter into other agreements pertaining to the Services with others including without limitation other banks, savings and loan associations, credit unions and other financial institutions.

(b) Taxes. Any sales, use, excise or other taxes (other than Vendor's income taxes) payable in connection with or attributable to the Services shall be paid by Customer. In the event Customer is not subject to such taxes, Customer must provide Vendor with written evidence of such tax exempt status on an annual basis or upon Vendor's request. Vendor may, but shall not have the obligation to pay such taxes if Customer fails to do so. In the event Vendor pays such taxes, Customer shall immediately reimburse Vendor upon demand and at the interest rate applicable for

delinquent amounts as set forth in Section 4 hereof.

(c) Violation of Applicable Laws and Regulations. Vendor may cease providing any Service if such Service, in Vendor's opinion, violates any federal, state or local statute or ordinance or any regulation, order or directive of any governmental agency or court.

(d) Entire Agreement. This Agreement (including all exhibits and Addenda hereto and all documents and materials referenced herein) supersedes any and all other agreements, oral or written, between the parties hereto with respect to the subject matter hereof, and contains the entire agreement between such parties with respect to the transactions contemplated hereunder. If there is a conflict between this Master Data Processing Agreement and the Addenda, the Addenda shall control. In the event of an inconsistency between the pricing contained in the Definitions and General Services Addendum and the pricing contained in the Master Data Processing Agreement, or any Addenda (other than the Definitions and General Services Addendum) or Fee Schedule to the Core Services Addendum, for the same specific Service, the pricing contained in the specific Addenda or Fee Schedule shall control.

(e) Amendments. This Agreement and any Addendum shall only be modified or amended by an instrument in writing signed by each party hereto. Provided, however, Vendor may amend or otherwise modify this Agreement and any Addendum provided such modification does not create any new obligation on the part of Customer and does not materially diminish any Service being provided by Vendor hereunder. Vendor shall give Customer notice of such changes by ordinary mail.

(f) Successors; Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors, transferees and assignees. Neither this Agreement nor any interest herein may directly or indirectly be transferred or assigned by Customer, in whole or in part, without the prior written consent of Vendor.

(g) Notices. Except as provided in Section 4 and Section 12(e) all notices, requests, demands and other communications to be delivered hereunder shall be in writing and shall be delivered by hand or mailed, by registered or certified mail, postage prepaid, at or to the following addresses:

(i) If to Vendor:

Fifth Third Bank
c/o Fifth Third Processing Solutions
38 Fountain Square Plaza
MD 10907E
Cincinnati, Ohio 45263

Attn: Fifth Third Processing Solutions
Executive Vice President

With a copy to: General
Counsel of Vendor at the
same address

(ii) If to Customer:

DIAMOND BANK, FSB
100 W. NORTH AVE
CHICAGO, IL
60610

Attention: VICTOR E. CAPUTO
EXECUTIVE V.P.

or to such other address or to such other person as either party shall have last designated by written notice to the other party. Notices, etc., so delivered shall be deemed given upon receipt.

(h) Waiver. If either party waives in writing an unsatisfied condition, representation, warranty, undertaking or agreement (or portion thereof) set forth herein, the waiving party shall thereafter be barred from recovering, and thereafter shall not seek to recover, any damages, claims, losses, liabilities or expenses, including, without limitation, legal and other expenses, from the other party in respect of the matter or matters so waived. Except as otherwise specifically provided for in this Agreement or any Addendum, the failure of any party to promptly enforce its rights herein shall not be construed to be a waiver of such rights unless agreed to in writing. Any rights and remedies specifically provided for in any Addendum are in addition to those rights and remedies set forth in this Agreement.

(i) Headings. The headings in this Agreement are for convenience of reference only and shall not be deemed to alter or affect any provision of this Agreement.

(j) Severability. If any term or provision of this Agreement or any application thereof shall be invalid or unenforceable, the remainder of this Agreement and any other application of such term or provision shall not be affected thereby.

(k) No Third Party Beneficiary. This Agreement is for the benefit of, and may be enforced only by, Vendor and Customer and their respective successors and permitted transferees and assignees, and is not for the benefit of, and may not be enforced by, any third party.

(l) Applicable Law. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Ohio. The parties hereby consent to service of process, personal jurisdiction, and venue in the state and federal courts in Cincinnati, Ohio or Hamilton County, Ohio, and select such courts as the exclusive forum with respect to any action or proceeding brought to enforce any liability or obligation under this Agreement.

(m) Authorization. Each of the parties hereto represents and warrants on behalf of itself that it has full power and authority to enter into this Agreement; that the execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate or partnership or other appropriate authorizing actions; that the execution, delivery and performance of this Agreement will not contravene any applicable by-law, corporate charter, partnership or joint venture agreement, law, regulation, order or judgment; that execution, delivery and performance of this Agreement will not constitute a default under any other agreement, license or contract which such party is bound; and, that this Agreement is valid and enforceable in accordance with its terms.

(n) Counterparts. This Agreement may be executed and delivered in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

(o) Drafting. This Agreement has been drafted by Vendor as a matter of convenience only and shall not be construed in favor of either party on that account.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their authorized officers as of the dates set forth below.

FIFTH THIRD BANK
By: [signature]
Name: JOHN C. HUBER
Title: VICE PRESIDENT
Date: 9/27/05

CUSTOMER: DIAMOND BANK, FSB
By: [signature]
Name: VICTOR E. CAPUTO
Title: EXECUTIVE V.P.
Date: 9/1/05

MDPA/Diamond Bank 6-22-05.doc

## CORE SERVICES ADDENDUM
## TO MASTER DATA PROCESSING AGREEMENT

7/04

This Agreement shall be an Addendum to the Master Data Processing Agreement between DIAMOND BANK, FSB ("Customer"), and FIFTH THIRD PROCESSING SOLUTIONS, a division of FIFTH THIRD BANK, an Ohio banking corporation (collectively "Vendor") dated July 1, 2005 (the "Agreement").

WHEREAS, Customer desires to receive the Core Services in this Addendum from Vendor and pursuant to the Agreement and the Fee Schedule, and Vendor agrees to provide such Services on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing recitals and of mutual promises hereinafter set forth, the parties agree as follows:

### A. DEFINITIONS

For the purposes of this Agreement, the following terms shall mean:

Card Production Services shall mean the embossing/encoding of cards by means of instant issue services or custom issue services including the inventory of plastics, card inserting and mailing using Vendor's standard forms and envelopes. Physical plastic cards will either be provided by Customer or by Vendor at Customer's expense.

Debit Card Services shall mean the facilitation of Customer's cardholder transactions in VISA's or MC's off-line debit program (and any other successor or competing off-line debit card programs supported by Vendor). Authorization will occur in accordance with Network Documentation and Vendor's standards.

Gateway Services shall mean the facilitation of Customer's cardholder and Terminal transactions in each Network in which Customer participates and/or is a member.

Terminal Services shall mean the facilitation of transactions at Customer's Terminals.

MC means MasterCard International, Inc.

VISA means VISA USA, Inc.

Network Participant shall mean any financial institution such as a bank, thrift, credit union, or other entity, such as a merchant, which is a member of and/or is otherwise participating in a Network.

Network shall mean the networks specified in Section D below and any successor or assigns. In addition, in the event that Customer begins receiving any Services in connection with any other Network(s) supported by Vendor, such additional Network(s) shall automatically be included in the definition of "Network" for purposes of this Addendum and the Agreement, effective the date Customer begins receiving such Services, and all of Customer's obligations in this Addendum and the Agreement shall apply with respect to the Networks originally listed in Section D, and any successor or assign, and any such additional Network(s).

Network Documentation shall mean the Network by-laws, operating rules, identification standards manual, and such other rules, regulations, manuals, policies and procedures (including Vendor's standards), as may be amended from time to time.

Card Services shall mean the facilitation of Customer's cardholder transactions regardless of method (e.g., on-line to Customer's applications processor, using a cardholder database on Vendor's system, using defined limits, etc.).

Terminal means an ATM, POS, or other device which is or which will be supported directly or indirectly by Vendor in accordance with its Standards.

Except for the terms defined herein, the capitalized terms herein shall have the same meanings as ascribed to them in the Agreement or the Definitions and General Services Addendum as may be published by Vendor from time to time. In the event of a conflict between the Agreement and this Addendum, this Addendum shall control.

### B. TERM

The term of this Addendum shall commence _____ 20 _____, and shall continue for a term of _____ years from the 1st day of the calendar month following the above date or the date of Customer's completed conversion to Vendor for all of the Core Services ("Initial Term") whichever date shall later occur. Except as hereafter provided, unless either party gives written notice to the other party at least 180 days prior to the expiration of any term, the Agreement and this Addendum shall be automatically extended for additional periods equal to the Initial Term.

### C. SERVICES AND FEES

Customer agrees that it shall receive Terminal Services, Card Services, Debit Card Services, Card Production Services and Gateway Services (collectively "Core Services") from Vendor pursuant to this Addendum and the Agreement. Customer agrees that all of the Services will be provided in accordance with Vendor's standards, and Customer agrees to pay all applicable fees in the attached Fee Schedule which is hereby incorporated into this Addendum by reference. Customer further agrees that if Customer receives a service not described in this Addendum and/or not listed in the attached Fee Schedule, Customer shall be subject to Vendor's then standard terms and assessed the then current fees for any such service.

### D. NETWORK MEMBERSHIP

Customer shall indicate below the Network(s) in which Customer is a Network Participant. In the event for any reason Customer participates in a Network which Customer has not indicated below, Customer agrees that all of Customer's obligations in the Agreement and this Addendum shall apply with respect to such Network as if Customer had indicated such Network effective the date Customer begins participating in such Network. Customer, on behalf of itself and its Customer Agents as defined hereinafter, agrees to abide by and fully comply with the Network Documentation including but not be limited to compliance with VISA's Cardholder Information Security Program ("CISP"), MasterCard's Site Data Protection program ("SDP")as may be in effect from time to time and to perform and fulfill any and all obligations and responsibilities related thereto, including, if requested by the Network, execution of additional documentation or agreements, and that such compliance shall be solely Customer's obligation and at Customer's expense. Customer, or its agents or nominees (but not Vendor), will provide all necessary Network, federal, state and/or local regulatory sponsorship, membership or other applicable approvals in order to receive the Services, unless otherwise specifically agreed to in writing in the form of an Amendment to the Agreement or in another written contract signed by an authorized officer of Vendor. Notwithstanding the fact that a specific Network is listed below, Customer acknowledges and agrees that Vendor shall only be obligated to provide access to the Networks actually supported by Vendor and for only so long as such Networks are supported by Vendor.

Gateway Services/Networks:

| | |
|---|---|
| ☒ | Cirrus Corresponding Member (Issuer and Acquirer) |
| ☐ | Cirrus Terminal Only Corresponding Member (Acquirer Only) |
| ☐ | Plus Sponsored Member (Issuer and Acquirer) |
| ☒ | Plus ATM Category B Member (Acquirer Only) |
| ☒ | Visa ATM Acquirer Member |
| ☒ | American Express ATM Acquirer Member |
| ☒ | Discover Card Sponsored ATM Acquirer Member |
| ☐ | Alaska Option Network |
| ☒ | Allpoint Network |
| ☐ | Armed Forces Financial (AFFN) |
| ☐ | Cartel |
| ☐ | Co-Op Network |
| ☐ | Credit Union 24 (CU24) |
| ☐ | Interlink |
| ☒ | Maestro |
| ☐ | Member Access |
| ☐ | MoneyPass |
| ☐ | NETS Network |
| ☐ | NYCE |
| ☐ | Online Resources |
| ☐ | Presto |
| ☐ | Pulse |
| ☐ | Shazam |
| ☒ | STAR |
| ☐ | TransAlliance |

Debit Card Services/Networks

| | |
|---|---|
| ☒ | MC Debit Card |
| ☐ | VISA Checkcard |

Customer shall pay all fees, fines, assessments, penalties and other amounts in effect or assessed by each Network, which may change from time to time. Vendor may allocate any such fees, fines, assessments and penalties in such manner as it deems advisable in its sole discretion. Customer assumes all responsibility for collecting any amounts arising in connection with the use of Customer's cardholders' cards and/or Terminals, including but not limited to transaction amounts, fraud or other losses. Customer is solely responsible for all costs directly or indirectly associated with any system upgrades required by Customer or Vendor as a result of changes in the Network Documentation and/or any Network standards or requirements. In the event of any changes or modifications to the Network Documentation which affect the responsibilities of a Network Participant or any processor in such Network, Vendor may amend this Agreement and/or change the applicable Service upon 30 days prior written notice to Customer.

Customer elects to be a participating member in Vendor's proprietary Jeanie Network for the term of this Agreement and in accordance with the Jeanie Operating Standards and Rules. Vendor, or the Jeanie Network, in its sole discretion, may acknowledge Customer's participation agreement in a separate agreement which shall be effective upon delivery to Customer.

E. **THIRD PARTY FEES**

Customer shall pay all third party fees, costs, expenses and assessments in connection with the Services, which may change from time to time, whether incurred directly or indirectly by Customer, Vendor and/or its affiliates. Third party fees include, but shall not be limited to, all communications expenses (e.g. equipment, lines, drop charges, access charges, long distance, etc.); all hardware costs (e.g. the cost of individual Terminals, modems, upgrades, modem sharing devices, etc. and any expenses associated therewith (e.g. setups, maintenance, etc.)); all Network fees per Section D. above; all miscellaneous fees associated with the Services (e.g. mailing expenses, overnight courier expenses, plastics, etc.); and all costs associated with maintaining and implementing all software and hardware necessary for any interface affecting the Services. Customer acknowledges and agrees that Customer shall continue to be responsible for all fees, costs and expenses associated with telecommunications for so long as third party provides such services and/or Vendor is charged for such fees, costs and expenses by such third party.

F. **GENERAL PROVISIONS**

1. Customer hereby agrees to take all steps as may reasonably be necessary to settle with Vendor for all fees, amounts and transactions involving its cardholders and its Terminals. As part of this settlement, Customer agrees to maintain at Fifth Third Bank a non-interest bearing account. Customer also agrees to maintain adequate collected funds in this account to cover all amounts due under this Agreement.

2. All reports and record and file formats used in connection with the Services shall be designated by Vendor and may change from time to time. Vendor will make available to Customer transaction activity files in a Vendor format. Vendor will not provide: (i) routing of activity files received from Network to Customer; (ii) implementation of any of Customer's BINs at Network; (iii) paper based adjustments; or (iv) any other files or reports not specifically described above.

3. Customer agrees to allow the auditors of Vendor or any Network to review the files held and procedures followed by Customer in connection with the Services.

4. Customer agrees to be responsible for all direct and indirect costs (including but not limited to those incurred by Vendor), Vendor's standard fees for conversion, reasonable out of pocket expenses (including but not limited to travel, meals, telephone, etc..), and time and materials, based upon Vendor's standard rates, for any personnel, as applicable in connection with and/or related to any conversion by Customer or in connection with any other processor or vendor conversion after Customer's initial conversion to Vendor and/or Customer's conversion from Vendor at the termination of this Addendum.

5. Customer shall be responsible for the establishment, maintenance and written notification to Vendor of cardholder authorization limits, and other terms and conditions applicable to transactions effected in accordance with Customer's cardholder agreements.

6. Customer, and not Vendor, shall be solely responsible for securing the cooperation and/or agreement of any of Customer's vendors, or agents including but not limited to Customer's applications processor, core processor, card production agents, or other services providers, hereinafter ("Customer Agents") to facilitate the exchange of data between such vendor, Customer and/or Vendor, or as otherwise necessary to facilitate Customer's receipt of the Services. Customer, in connection with receipt of the Services, hereby authorizes Vendor to send data, including Customer Confidential Information to Customer Agents.

7. Upon the expiration or termination of this addendum for any reason, Customer acknowledges and agrees that it shall be responsible for requiring its successor service provider to coordinate all aspects of Customer's conversion to such new service provider and for requiring such new service provider to accept transfer of any and/or all of Customer's debit/check card bank identification number(s) ("BINs") maintained on Vendor's system. Customer further agrees to accept full responsibility for all applicable fees, trailing activity (e.g.: cardholder chargebacks, adjustment items, transactions by cardholders etc.), or third party costs or fees arising out of the addendum, including but in no way limited to telecommunications fees, network fees, fines or penalties, and any fees imposed by any Network, arising out of Customer's debit/check cards and any BINs on Vendor's system until such time as all BINs are completely removed from Vendor's system or Vendor is otherwise released from all liability related to such BINs by the applicable Network(s).

G. **INDEMNIFICATION**

Customer agrees to indemnify and hold harmless, Vendor, its officers, employees, affiliates and agents, from and against any losses, damages, fees, fines, penalties and expenses, including reasonable legal and accounting fees and expenses, that Vendor, its officers, employees, affiliates and agents may incur as a result of Customer's failure to comply with any provision of the Network Documentation, the Agreement or this Addendum or for any other reason in connection with any of the Services provided hereunder, whether incurred by or as a result of the action or failure to act of Customer or Customer Agents. This indemnification shall survive the termination of the Agreement and/or this Addendum.

THE PARTIES ACKNOWLEDGE THAT THE MASTER DATA PROCESSING AGREEMENT BETWEEN THEM, AS SUPPLEMENTED BY THIS AND OTHER ADDENDA, SET FORTH THE COMPLETE AND EXCLUSIVE AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SERVICES PROVIDED AND UNLESS SPECIFICALLY PROVIDED FOR IN THIS ADDENDUM, THE SERVICES DESCRIBED HEREIN SHALL NOT INCLUDE ANY OF THE SERVICES OUTLINED IN THE DEFINITIONS AND GENERAL SERVICES ADDENDUM OR OTHER ADDENDA WHICH MAY BE A PREREQUISITE FOR THE SERVICES DESCRIBED HEREIN.

FIFTH THIRD BANK

By: *[signature]*

Name: JOHN C. HUBER

Title: VICE PRESIDENT

Date: 9-27-05

CUSTOMER: DIAMOND BANK, FSB

By: *[signature]*

Name: VICTOR E. CAPUTO

Title: EXECUTIVE V.P.

Date: 9/1/05

Core Services Addendum 1-1-05.doc

Cole Dep DPR000121

**EFMARK**

ESC SERVICE AGREEMENT

CUSTOMER: North Federal Savings Bank

STREET ADDRESS: 100 West North Avenue

CITY: Chicago          STATE: IL   ZIP: 60610

DATE: February 17, 1995   CONTRACT EFFECTIVE DATE: 90 Days from installation

This SERVICE AGREEMENT (hereinafter "Agreement") is entered into by and between Customer and EFMARK SERVICE COMPANY, an Illinois corporation with an office at 1111 Executive Court, Suite 200, Westmont, Illinois 60559, (hereinafter ESC).

Subject to the terms and conditions hereinafter set forth, the parties agree as follows:

1. TERMS: This Agreement shall become effective on the date shown above (hereinafter "Effective Date"), and, unless sooner terminated as hereinafter provided, shall remain in full force and effect for an initial term of one year (hereinafter "Initial Term").

2. AUTOMATIC RENEWAL: Upon expiration of the Initial Term, this Agreement shall be automatically extended on an annual basis unless (30) days prior to the expiration date of the Initial Term, or any extended terms, a party hereto gives written notice to the other party of its termination of this Agreement as of such expiration date.

3. MAINTENANCE PERIOD: The term Maintenance Period as used herein means the time from the Effective Date to the expiration of the billing period and each successive like period of time as specified in Exhibit A.

4. MAINTENANCE SERVICE: The term Maintenance Service as used herein means Covered Maintenance and Billable Call Maintenance as hereafter defined, performed by ESC in respect to the equipment identified in Exhibit A (hereinafter "Equipment").

5. COVERED MAINTENANCE: The term Covered Maintenance as used herein means the periodic maintenance required to keep Customer's Equipment operating and all on-call remedial maintenance performed by ESC hereunder with respect to the Equipment during ESC's contract hours on all non-holiday days as specified in Exhibit A. For the purposes of the Agreement, "holiday" shall mean any of the eight (8) days that ESC shall designate as holidays on Exhibit A.

6. BILLABLE CALL MAINTENANCE: The term Billable Call Maintenance as used herein means any maintenance, other than Covered Maintenance, performed by ESC and includes, but is not limited to, the following types of maintenance:
   (a) Work requested by Customer for rearrangement, such as additional wiring, moving other equipment or cables, relocating Equipment or repairing a previously prepared site or station to make it operational;
   (b) Electrical work external to the equipment; Refinishing of Equipment; adding accessories, attachments or other devices;
   (c) Work on Equipment caused by maintenance or repair performed by any other than authorized ESC personnel or resulting from improper operation by Customer personnel;
   (d) Specific request by Customer for maintenance in addition to Covered Maintenance requirements;

Cole Dep DPR000122