## POINT OF SALE TRANSACTIONS

You may use your ATM card or Debit MasterCard to purchase goods and services from merchants that have arranged to accept your ATM card or Debit MasterCard as a means of payment (these merchants are referred to as "Participating Merchants"). Some Participating Merchants may permit you to receive cash back as part of your purchase. Purchases made with your ATM card or Debit MasterCard, including any purchase where you receive cash, are referred to as "Point of Sale" transactions and will cause your "designated account" to be debited for the amount of the purchase. The designated account for ATM card transactions is your checking account. The designated account for Debit MasterCard transactions is your checking account.

In addition, your Debit MasterCard may be used at any merchant that accepts MasterCard™ debit cards for the purchase of goods and services. Your card may also be used to obtain cash from your designated account at participating financial institutions.

Each time you use your ATM card or Debit MasterCard, the amount of the transaction will be debited from your designated account. We have the right to return any check or other item drawn against your account to ensure there are funds available to pay for the ATM card or Debit MasterCard transactions. We may, but do not have to, allow transactions which exceed your available account balance or available overdraft protection. If we do, you agree to pay the overdraft. You also agree to pay overdraft charges in effect from time to time for each transaction which causes your available account balance or available overdraft protection to be exceeded.

CURRENCY CONVERSION. If you effect transactions with your Debit MasterCard in a currency other than US dollars, MasterCard International Inc., will convert the charge into a US dollar amount. At MasterCard International they use a currency conversion procedure, which is disclosed to institutions that issue MasterCard. Currently the currency conversions rate used by MasterCard International to determine the transaction amount in US dollars for such transactions is generally either a government mandated rate or wholesale rate, determined by MasterCard International for the processing cycle in which the transaction is processed, increased by an adjustment factor established from time to time by MasterCard International. The currency conversion rate used by MasterCard International on the processing date may differ from the rate that would have been used on the purchase date or the cardholder statement posting date.

## SERVICES PROVIDED THROUGH USE OF EASY RETRIEVE

You may perform the following functions through use of Easy Retrieve.

You may initiate transfers of funds between your checking and savings accounts, checking and money market accounts, checking and NOW accounts, savings and money market accounts, savings and NOW accounts, and NOW accounts and money market accounts.

You may make balance inquiries on your checking account(s), savings account(s), money market account(s), and NOW account(s).

You may make payments on consumer loans, home mortgage loans, and home equity loans that you have with us. You may change your PIN via the telephone.

## PREAUTHORIZED TRANSFER SERVICES

You may arrange for the preauthorized automatic deposit of funds to your checking account(s), savings account(s), money market account(s), and NOW account(s).

You may arrange for the preauthorized automatic payment of bills from your checking account(s), savings account(s), money market account(s), and NOW account(s).

## SERVICES PROVIDED THROUGH USE OF INTERNET BANKING

This Bank offers its customers an Internet Banking (Home Banking) service. This service permits you to perform the following transactions using your home computer.

Internet banking allows the customer to do all of their normal banking activities from the convenience and privacy of their own home. All customer information is kept strictly confidential and all transactions are guaranteed secure.

## LIMITATIONS ON TRANSACTIONS

## TRANSACTION LIMITATIONS - ATM CARD
CASH WITHDRAWAL LIMITATIONS - You may withdraw up to $200.00 through use of ATMs in any one day.

POINT OF SALE LIMITATIONS - You may buy up to $200.00 worth of goods or services each day through use of our Point of Sale service.

TOTAL DAILY LIMITS - In addition to the ATM limit or Point of Sale limits disclosed above, a total daily limit is imposed on these transactions. The maximum amount of cash withdrawals and Point of Sale transactions is limited to $400.00 in any one day.

## TRANSACTION LIMITATIONS - DEBIT MASTERCARD
CASH WITHDRAWAL LIMITATIONS - You may withdraw up to $200.00 through use of ATMs in any one day.

POINT OF SALE LIMITATIONS - You may buy up to $200.00 worth of goods or services each day through use of our Point of Sale service.

TOTAL DAILY LIMITS - In addition to the ATM limit or Point of Sale limits disclosed above, a total daily limit is imposed on these transactions. The maximum amount of cash withdrawals and point of sale transactions is limited to $400.00 in any one day.

[C](C)1995-2002, Compliance Systems Inc. Thu Aug 04 17:24:52 2005 Page 2

Cole Dep DPR000162

**OTHER LIMITATIONS**
The terms of your account(s) may limit the number of withdrawals you may make each month. Restrictions disclosed at the time you opened your account(s), or sent to you subsequently will also apply to your electronic withdrawals and electronic payments unless specified otherwise.

Listed below are access devices that may be used to access a line of credit account, and the line of credit accounts that may be accessed. The amount of any cash advance available through use of your access device is subject to your separate agreement with the Bank, if any. Please refer to your Line of Credit Agreement for disclosures related to such limitations.
    ATM card: overdraft line of credit
    Debit MasterCard: overdraft line of credit

We reserve the right to impose limitations for security purposes at any time.

**LIMITS ON TRANSFERS FROM CERTAIN ACCOUNTS.** Federal regulation limits the number of telephonic transfers and preauthorized electronic transfers to third parties (including Point of Sale transactions) from money market and savings type accounts. You are limited to six such transfers from each money market and/or savings type account(s) you have each statement period for purposes of making a payment to a third party or by use of a telephone. No more than three of the six transfers may be made by check, draft, debit card, or similar order.

## NOTICE OF RIGHTS AND RESPONSIBILITIES

The use of any electronic fund transfer services described in this document creates certain rights and responsibilities regarding these services as described below.

**RIGHT TO RECEIVE DOCUMENTATION OF YOUR TRANSFERS**
**PERIODIC STATEMENTS.** If your account is subject to receiving a monthly Statement, all EFT transactions will be reported on it. If your account is subject to receiving a statement less frequently than monthly, then you will continue to receive your statement on that cycle, unless there are EFT transactions, in which case you will receive a monthly statement.

**PREAUTHORIZED DEPOSITS.** If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company:
    - you can call us at 312-664-4320 to find out whether or not the deposit has been made.

**PASSBOOK ACCOUNTS.** If the only type of electronic fund transactions are preauthorized deposits you will not receive a statement for your PassBook account. If you bring your PassBook to us, we will record any electronic deposits that were made to your account since the last time you brought in your PassBook. You will not receive a periodic statement noting these transactions on your PassBook account.

**TERMINAL TRANSFERS.** You will get a receipt at the time you make an EFT transaction to or from your account at an ATM terminal or at a Participating Merchant. The receipt shall clearly set forth to the extent applicable:
    (1) the amount involved and date the transfer is initiated;
    (2) the type of transfer;
    (3) the identity of your account with the financial institution from which or to which funds are transferred;
    (4) the identity of any third party to whom or from whom funds are transferred; and
    (5) the location or identification of the electronic terminal involved.

**DOCUMENTATION AS EVIDENCE OF TRANSFER.** Any documentation that is provided to you which indicates that an electronic fund transfer was made shall be admissible as evidence of such transfer and shall constitute prima facie proof that such transfer was made.

**RIGHTS REGARDING PREAUTHORIZED TRANSFERS**
**RIGHTS AND PROCEDURES TO STOP PAYMENTS.** If you have instructed us to make regular preauthorized transfers out of your account, you may stop any of the payments. To stop a payment,
    - call us at:
    - 312-664-4320
    - or write to:
    - 100 West North Ave.
    - Chicago, IL 60610-1303
We must receive your call or written request at least three (3) business days prior to the scheduled payment. If you call, please have the following information ready: your account number, the date the transfer is to take place, to whom the transfer is being made and the amount of the scheduled transfer. If you call, we will require you to put your request in writing and deliver it to us within fourteen (14) days after you call.

**NOTICE OF VARYING AMOUNTS.** If you have arranged for automatic periodic payments to be deducted from your checking or savings account and these payments vary in amount, you will be notified by the person or company you are going to pay ten days prior to the payment date of the amount to be deducted. You may choose instead to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.

**OUR LIABILITY FOR FAILURE TO STOP PREAUTHORIZED TRANSFER PAYMENTS.** If you order us to stop one of the payments and have provided us with the information we need within three (3) business days prior to the scheduled transfer, and we do not stop the transfer, we will be liable for your losses or damages.

**YOUR RESPONSIBILITY TO NOTIFY US OF LOSS OR THEFT**
If you believe your ATM card or Debit MasterCard or PIN or internet banking access code has been lost or stolen or that someone has transferred or may transfer money from your account without your permission,
    - call us at:

(C)1995-2002, Compliance Systems Inc. Tue Aug 04 17:24:02 2005 Page 3

1-312-664-4320 (9:00 a.m. to 8:00 p.m.)
or write to:
Diamond Bank, FSB
100 West North Ave.
Chicago, IL 60610-1303

**CONSUMER LIABILITY**
You will tell us at once if you believe your ATM card or Debit MasterCard or PIN or internet banking access code has been lost or stolen. Telephoning is the best way of keeping your possible losses down. If you tell us within two (2) business days, you can lose no more than fifty dollars ($50) if someone uses your ATM card or Debit MasterCard or PIN without your permission. If you do not tell us within two (2) business days after you learn of the loss or theft of your ATM card or Debit MasterCard or PIN and we can prove we could have stopped someone from using your ATM card or Debit MasterCard or PIN without your permission if you had given us notice, you can lose as much as five hundred dollars ($500).

Also, if your statement shows transfers you did not make, tell us at once. If you do not tell us within sixty (60) days after the statement was mailed to you, you may not receive back any money you lost after the sixty (60) days, and therefore, you could lose all the money in your account (plus your maximum overdraft line of credit, if applicable), if we can prove that we could have stopped someone from taking the money had you given us notice in time. If a good reason (such as a long trip or hospital stay) keeps you from giving the notice, we will extend the time periods.

**CONSUMER LIABILITY FOR UNAUTHORIZED TRANSACTIONS INVOLVING DEBIT MASTERCARD**
The limitations on your liability for unauthorized transactions described above generally apply to all electronic fund transfers. However, different limitations apply to certain transactions involving your Debit MasterCard with the MasterCard™ logo. These limits apply to unauthorized transactions processed on the MasterCard™ Network.

If you notify us about an unauthorized transaction involving your Debit MasterCard, and the unauthorized transaction took place on the MasterCard ™ Network, zero liability will be imposed on you for the unauthorized transaction. In order to qualify for the zero liability protection, you must have exercised reasonable care in safeguarding your card from the risk of loss or theft, you must not have reported two or more incidents of unauthorized use within the preceding twelve (12) months, and your account must be in good standing.

Your liability for unauthorized transactions with your Debit MasterCard that involve PIN-based transactions not processed by the MasterCard ™ Network, including ATM transactions, are described under "Consumer Liability" above.

**ILLEGAL USE OF DEBIT MASTERCARD.** You agree not to use your Debit MasterCard for any illegal transactions, including Internet gambling and similar activities.

**TRUTH IN LENDING DISCLOSURE**
You may be liable for the unauthorized use of your ATM card or Debit MasterCard to access a line of credit. Please refer to your Line of Credit Agreement for disclosures related to your liability for unauthorized use.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR TRANSACTIONS**
In case of errors or questions about your electronic fund transfers;
        call us at:
        312-664-4320
        or write to:
        Diamond Bank, FSB
        ATTN: Customer Services
        100 West North Ave.
        Chicago, IL 60610-1303
or use the current information on your most recent account statement.

Notification should be made as soon as possible if you think your statement or receipt is wrong or if you need more information about a transaction listed on the statement or receipt. You must contact the Bank no later than 60 days after it sent you the first statement on which the problem or error appears. You must be prepared to provide the following information:
        - Your name and account number.
        - A description of the error or transaction you are unsure about along with an explanation as to why you believe it is an error or why you need more information.
        - The dollar amount of the suspected error.

If you provide oral notice, you may be required to send in your complaint or question in writing within ten (10) business days.

We will determine whether an error occurred within ten (10) business days (twenty (20) business days for new accounts) after we hear from you and will correct any error promptly. If we need more time, however, we may take up to forty-five (45) days (ninety (90) days for new accounts and foreign initiated or point of sale transfers) to investigate your complaint or question. If we decide to do this, we will credit your account within ten (10) business days (twenty business days (20) days for new accounts) for the amount which you think is in error, so that you will have the use of the money during the time it takes to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within ten (10) business days, we may not credit your account. The extended time periods for new accounts apply to all electronic fund transfers that occur within the first thirty (30) calendar days after the first deposit to the account is made, including those for foreign initiated or point of sale transactions.

We will tell you the results within three (3) business days after completing our investigation. If we decide that there was no error, we will send

(C)1993-2002, Compliance Systems Inc. Thu Aug 04 17:24:52 2005 Page 4

Cole Dep DPR000164

you a written explanation.

You may ask for copies of the documents that we used in our investigation.

**LIABILITY FOR FAILURE TO COMPLETE TRANSACTION**

If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages as provided by law. However, there are some exceptions. We will NOT be liable, for instance:

- If through no fault of ours, you do not have enough money in your account to make the transfer.
- If the transfer would result in your exceeding the credit limit on your line of credit, if you have one.
- If the electronic terminal was not working properly and you knew about the breakdown before you started the transfer.
- If circumstances beyond our control (such as fire or flood, computer or machine breakdown, or failure or interruption of communications facilities) prevent the transfer, despite reasonable precautions we have taken.
- If we have terminated our Agreement with you;
- When your ATM card or Debit MasterCard has been reported lost or stolen or we have reason to believe that something is wrong with a transaction.
- If we receive inaccurate or incomplete information needed to complete a transaction.
- In the case of preauthorized transfers, we will not be liable where there is a breakdown of the system which would normally handle the transfer.
- If the funds in the account are subject to legal action preventing a transfer to or from your account.
- If the electronic terminal does not have enough cash to complete the transaction.

There may be other exceptions provided by applicable law.

**DISCLOSURE OF ACCOUNT INFORMATION**

You agree that merchant authorization messages transmitted in connection with point of sale transactions are permissible disclosures of account information, and you further agree to release the Bank and hold it harmless from any liability arising out of the transmission of those messages.

We will disclose information to third parties about your account or electronic fund transfers made to your account:
1. When necessary to complete a transfer or to investigate and resolve errors involving the transfer(s); or
2. In order to verify the existence and condition of your account for a third party such as a credit bureau or merchant; or
3. In order to comply with government agency or court orders; or
4. With your consent.

**DEFINITION OF BUSINESS DAY**

Business days are Monday through Saturday excluding holidays.

**AMENDING OR TERMINATING THIS AGREEMENT**

We may change this agreement from time to time. You will be notified at least 30 days before a change will take effect if it will cause you an increase in costs or liability or it will limit your ability to make electronic fund transfers. No notice will be given if the change is necessary for security reasons. We also have the right to terminate this agreement at any time.

**NOTICE OF ATM SAFETY PRECAUTIONS**

SAFETY PRECAUTIONS FOR ATM TERMINAL USAGE. Please keep in mind the following basic safety tips whenever you use an ATM:

- Have your ATM card or Debit MasterCard ready to use when you reach the ATM. Have all of your forms ready before you get to the machine. Keep some extra forms at home for this purpose.
- If you are new to ATM usage, use machines close to or inside a financial institution until you become comfortable and can conduct your usage quickly.
- If using an ATM in an isolated area, take someone else with you if possible. Have them watch from the car as you conduct your transaction.
- Do not use ATMs at night unless the area and machine are well-lighted. If the lights are out, go to a different location.
- If someone else is using the machine you want to use, stand back or stay in your car until the machine is free. Watch out for suspicious people lurking around ATMs, especially during the times that few people are around.
- When using the machine, stand so you block anyone else's view from behind.
- If anything suspicious occurs when you are using a machine, cancel what you are doing and leave immediately. If going to your car, lock your doors.
- Do not stand at the ATM counting cash. Check that you received the right amount later in a secure place, and reconcile it to your receipt then.
- Keep your receipts and verify transactions on your account statement. Report errors immediately. Do not leave receipts at an ATM location.
- Report all crimes to the operator of the ATM and to local law enforcement officials immediately.

**ADDITIONAL PROVISIONS**

Your account is also governed by the terms and conditions of other applicable agreements between you and the Bank.

You agree not to reveal your PIN to any person not authorized by you to access your account.

A lost or stolen Debit MasterCard can also be reported 24 hours a day 7 days a week to 1-800-528-2273.

Cole Dep DPR000165

**ACKNOWLEDGMENT**

The undersigned acknowledge(s) receipt of a copy of this Electronic Fund Transfer Disclosure and Agreement and agrees to abide by the terms of the Agreement.

X_____    Date_____

X_____    Date_____

X_____    Date_____

X_____    Date_____

(C)1995-2002, Compliance Systems Inc. Thu Aug 04 17:24:53 2005 Page 6

Cole Dep DPR000166

**DIAMOND BANK, FSB**
100 W. North Avenue
Chicago, IL 60610-1303

tel 312.664.4320
fax 312.664.4289
www.dbdiamond.com

January 1, 2008

Dear Diamond Bank Customer,

As you may be aware, the Bank is required, by various regulations, to inform you of our policies with respect to aspects of your relationship with us. We have decided that we will send these notices to you in an easy to read form and while some parts may not be applicable to your particular use of our products and services, we hope that over time they will.

## REGULATION E DISCLOSURE

**DIRECT DEPOSIT DISCLOSURE** - Our Pre-Authorized credit service is called Direct Deposit. This service allows you to designate that certain recurring payments, such as social security or payroll deposits, be deposited directly to your account. This service is provided to you at no charge.

If you have arranged to have direct deposits made to your account at least every 60 days from the same person or company, you can call us at (312) 664-4320 or (847) 256-6010 or use Easy Retrieve (312) 649-5048 to find out whether or not the deposit has been made.

**DIRECT DEBIT DISCLOSURES** - Our preauthorized debit service is called Direct Debit and allows you to authorize companies or others whom you designate, to automatically collect payments owed to them by you from your account in the amounts and on the days that you request. This service is provided to you at no charge.

Should your statements indicate transfers that you did not make, please notify us at once. We must hear from you within 60 days after the statement was mailed to you. If we do not receive notice from you within 60 days and can prove that such notice would have prevented additional withdrawals, you may not get back any of the funds that were taken after the 60 days. If good cause for non-notification exists (e.g. hospital stay or long trip) we will extend the notification period.

If you believe someone has transferred or may transfer money from your account without permission, call or write us at the telephone number or address shown in this notice.

If you have told us in advance to make regular payments out of your account, you can stop any of these direct debit payments. Simply call or write us at the telephone or address shown in this notice in time for us to receive your request 3 business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and to get it to us within 14 days after you call.

If you order us to stop one of these payments 3 business days or more before the transfer is scheduled and we do not do so, we will be liable for your losses and damages.

If these regular direct debit payments vary in amount, the person who is going to pay must notify you at least 10 days before each payment. This notification should include the payment date and amount. You may, however, allow the person you are going to pay to notify you only in these circumstances:

1. when the payment would differ by more than a certain amount;
2. when the amount would fall outside certain limits that you set.

You have the right to receive a copy of your authorization to debit your account from the party to whom you give the authorization. WE WILL NOT ACCEPT ANY SUCH DEBIT UNTIL A COPY OF YOUR AUTHORIZATION IS ON FILE WITH US.

**TELEPHONE TRANSFER DISCLOSURES** - The following disclosures set forth your and our rights and responsibilities concerning electronic funds transfers in accordance with federal law regulating electronic funds transfer (EFT) services at the bank. In this Agreement, the word "you" and "yours" means those who sign as applicants or any authorized user(s). The word "we" and "ours" means the bank. If there is conflict between this Agreement and something said by one of our employees, we'll follow the Agreement. You agree to this method of settling differences.

**NON-AUTOMATED TRANSFERS** - With our non automated Telephone Transfer Service, you may call and request that we transfer funds between your Money Market Account and your Checking Account at our Bank as long as the ownership of the two accounts is exactly the same.

Cole Dep DPR000167

**DIAMOND BANK, FSB**
100 W. North Avenue
Chicago, IL 60610-1303

tel 312.664.4320
fax 312.664.4289
www.dbdiamond.com

The minimum transfer amount is $500.00. Each telephone transfer is subject to a service charge as stated in our schedule of service fees and charges. Subject to availability of funds the transfer will be processed before the end of the business day you call. A telephone transfer authorization card must be on filed before a transfer can be performed.

If you believe that someone has transferred or may transfer money from your account without your permission, call or write us at the telephone number or address in this notice. The Bank assumes full liability for unauthorized telephone transfers.

**AUTOMATED-EASY RETRIEVE (312-649-5048) -** Each Easy Retrieve transfer of funds is considered an electronic funds transfer, and you agree to the rules and regulations outlined in this Disclosure.

Use of Easy Retrieve. You may access your deposit accounts by using a Security Access code (created by you) with your account number, and then follow the easy to understand automated voice instructions.

Transfers Between Your Deposit Accounts. You may transfer freely between your deposit accounts with this exception: transfers from a money market deposit account or a savings account to any other account by a preauthorized, automatic or telephone transfer are limited by law to six (6) per statement cycle with no more than three (3) third-party checks or point-of-sale withdrawals (which are considered to be preauthorized transfers). Telephone transfers are considered to be automatic transfers.
Easy Retrieve is available 24 hours a day, seven days each week, with a brief interruption for routine maintenance.

The Security Access Code ("Code"). This secret number together with the account number is needed to use Easy Retrieve. You authorize us to carry out any instructions given by a holder of the Code who also uses the account number. Because it is very important not to allow other people to know what this number is, you agree never to tell the Code to anyone else.

This disclosure describes additional rights and responsibilities you may have when using Easy Retrieve. To understand all of your rights and responsibilities, you must read this disclosure in its entirety, including the "Electronic Funds Transfer (EFT) Disclosures" section in it.

**GENERAL DISCLOSURES -** Third Party Disclosures. We will disclose information to third parties about your account of the transfers that you make in these situations.
1. Where it is necessary for completing such transfers.
2. In order to comply with government agency or court orders.
3. If you give us written permission.
4. In order to verify the existence and condition of your account for a third party such as a credit bureau or a merchant.
5. In order to advise third parties of accounts which were closed for misuse.

**STATEMENT FREQUENCY -** For passbook accounts where the only possible electronic funds transfers are preauthorized credits: If you bring your passbook to us, we will record in it any direct deposits or other transactions that were made to your account since the last time you brought in your book.

For Statement Savings, Checking and Money Market Accounts you will receive a statement each month.

Business Days: Our business days are Monday, Tuesday, Wednesday, Thursday, and Friday. Holidays are not considered to be business days.

**GENERAL LIABILITY DISCLOSURES -** If we do not complete an Electronic transfer to or from your account on time, or in the correct amount, according to our agreement with you, we will be liable for your losses and damages. We will not be liable, however:
1. If circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions that we have taken.
2. In the case of debit transactions; if through no fault of your own, you do not have available funds n your account to make the transfer.
3. If the system was not working properly and you know about the breakdown when you started the transfer.

Other exceptions will be stated in specific account terms and conditions.

**IN CASE OF ERRORS OR QUESTIONS ABOUT TRANSFERS TO OR FROM YOUR ACCOUNT**
Call us at (312) 664-4320 or write to our Customer Services department at the address above.

Cole Dep DPR000168

**DIAMOND BANK, FSB**
100 W. North Avenue
Chicago, IL 60610-1303

tel 312.664.4320
fax 312.664.4289
www.dbdiamond.com

Contact us immediately, if you believe there is an error in your statement or passbook, or if you need more information about a transfer listed on the statement or in your book. We must hear from you no later than 60 days after we record the entry in your book or send you the statement on which the problem or error appeared.  When you contact us:

1. Tell us your name and account number.
2. Describe the error or the transfer in question, and explain as clearly as you can why you believe it is in error or why you need more information.
3. Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question by mail within 10 business days.

We will tell you the results of our investigation within 10 business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. Should we decide to do this, we will re-credit your account within 10 business days for the amount you think is in error so that you will have the use of the money during the time it takes to complete our investigation. If we ask you to put your complaint or question in writing and do not receive it within 10 business days, we may not re-credit your account.

If we decide that there was no error, we will send you a written explanation within 3 business days after we finish our investigation. You may ask for copies of the documents that we used in our investigation.

## REGULATION P DISCLOSURE

**PERSONAL INFORMATION PRIVACY PROTECTION POLICY - At** Diamond Bank, FSB, protecting the privacy and confidentiality of your personal information is important to our employees and us.  We value your business and the trust you put in Diamond Bank, FSB.  In order to offer you the financial products and services you seek to obtain, we collect, maintain, and use information about you on a routine basis.  To help you better understand how your personal information is protected here at Diamond Bank, FSB, we are providing you with the following statement describing our practices and policies with respect to the privacy of customer information.  At Diamond Bank, FSB:

❖ We do not disclose any nonpublic personal information about you to anyone except as permitted by law.  We may, for example, disclose nonpublic personal information about you to others for purposes of servicing your account with us, processing transactions which you request or authorize, or running credit or other verification checks.

❖ We may collect information volunteered by you during the application process, gathered from your transactions and experiences with us, and obtained from other authorized sources, such as credit bureaus.  All information collected and stored by Diamond Bank, FSB is used for specific business purposes, such as administering your account, complying with state and federal banking regulations, protecting against fraud, and developing a better understanding of your financial needs to provide you with improved products and services.

❖ We understand that the protection of your nonpublic personal information is of the utmost importance.  Guarding your privacy is our obligation.  Diamond Bank, FSB maintains strict procedures and policies to safeguard your privacy.  We restrict employee access to customer information to only those who have a business reason to know such information, and we educate our employees about the importance of confidentiality and customer privacy.

**MORTGAGE INSURANCE REQUIREMENTS -** Banking regulations require that Diamond Bank inform you annually of your responsibility to carry hazard insurance on the property we have mortgaged.

Please be advised that your mortgage documents require that you carry Fire and Extended Coverage, and Vandalism and Malicious Mischief insurance on your property in amounts at least equal to your loan balance.  You may also be required to maintain flood insurance if your property is located in a Special Flood Hazard Area.  Please contact the Bank if you have any questions.
**Call us at (312) 664-4320 or write to our Loan Operations department at the address above.**

For purposes of this disclosure and agreement the terms "we", "us" and 'our' refer to the Bank named above. The terms "you" and "your" refer to the recipient of this disclosure and agreement.

The Electronic Fund Transfer Act and Regulation E require Banks to provide certain information to customers regarding electronic fund transfers (EFTs). This disclosure applies to any EFT service you receive from us related to an account established primarily for personal, family or household purposes. Examples of EFT services include direct deposits to your account and automatic regular payments made from your account to a third party. This disclosure also applies to the use of your ATM card or Debit MasterCard at our automated teller machines (ATMs) and any networks described below.

**TERMS AND CONDITIONS.** The following provisions govern the use of electronic fund transfer (EFT) services through accounts held by the Bank which are established primarily for personal, family or household purposes. If you use any EFT

Cole Dep DPR000169

**DIAMOND BANK, FSB**
100 W. North Avenue
Chicago, IL 60610-1303

tel 312.664.4320
fax 312.664.4289
www.dbdiamond.com

services provided, you agree to be bound by the applicable terms and conditions listed below. Please read this document carefully and retain it for future reference.

## ELECTRONIC FUND TRANSFER SERVICES PROVIDED

SERVICES PROVIDED THROUGH USE OF ATM CARD OR DEBIT MASTERCARD
If you have received an electronic fund transfer card ("ATM card" or "Debit Mastercard") from us you may use it for the type(s) of services noted below, and the following provisions are applicable:

USING YOUR CARD AND PERSONAL IDENTIFICATION NUMBER ("PIN"). In order to assist us in maintaining the security of your account and the terminals, the ATM card or Debit MasterCard remains our property and may be revoked or canceled at any time without giving you prior notice. You agree not to use your ATM card or Debit MasterCard for a transaction that would cause your account balance to go below zero, or to access an account that is no longer available or lacks sufficient funds to complete the transaction. You agree not to use your ATM card or Debit MasterCard for a transaction that would exceed your account balance plus the available credit on any credit line attached to your account. We will not be required to complete any such transaction, but if we do, we may, at our sole discretion, charge or credit the transaction to another account, and you agree to pay us the amount of the improper withdrawal or transfer upon request.

Your ATM card may only be used with your PIN. Certain transactions involving your Debit MasterCard require the use of your PIN. Your PIN is used to identify you as an authorized user. Because the PIN is used for identification purposes, you agree to notify the Bank immediately if not authorized by you to use your ATM card or Debit MasterCard or to write your PIN on your ATM card or Debit MasterCard or on any other item kept with your ATM card or Debit MasterCard. We have the right to refuse a transaction on your account when your ATM card or Debit MasterCard or PIN has been reported lost or stolen or when we reasonably believe there is unusual activity on your account.

The security of your account depends upon your maintaining possession of your ATM card Debit MasterCard and the secrecy of your PIN. You may change your PIN if you feel that the secrecy of your PIN has been compromised. You may only change your PIN by at any of our convenient locations.

## ATM SERVICES

The following services are available through use of your ATM card and Debit MasterCard.

You may withdraw cash from your checking account(s), savings account(s), money market account(s), and NOW account(s).

You may make deposits into your checking account(s), savings account(s), money market account(s), and NOW account(s).

You may transfer funds between your checking and savings accounts, checking and money market accounts, savings and money market accounts, and NOW accounts and money market accounts.

You may make balance inquiries on your checking account(s), savings account(s), money Markey account(s), and NOW account(s).

You may use your ATM card to obtain cash advances from your overdraft line of credit at an ATM.

NETWORK. Your ability to perform the transactions or access the accounts set forth above depends on the location and type of ATM you are using and the network through which the transaction is being performed. A specific ATM or network may not perform or permit all of the above transactions. For example, you may not be able to make deposits or transfer funds at ATMs located out of state.

Besides being able to use your ATM card or Debit MasterCard at our ATM terminals, you may access your accounts through the following networks: STAR, MASTERCARD, ALLPOINT AND JEANIE.

ATM FEES. When you use an ATM not owned by us, you may be charged a fee by the ATM operator or any network used, and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer.

POINT OF SALE TRANSACTIONS
You may use your ATM card or Debit MasterCard to purchase goods and services from merchants that have arranged to accept your ATM card or debit Mastercard™ as a means of payment (these merchants are referred to as "Participating Merchants"). Some Participating Merchants may permit you to receive cash back as part of your purchase. Purchases made

4

Cole Dep DPR000170

**DIAMOND BANK, FSB**
100 W. North Avenue
Chicago, IL  60610-1303

tel 312.664.4320
fax 312.664.4289
www.dbdiamond.com

with your ATM card or debit Mastercard™, including any purchase you receive cash, are referred to as "Point of Sale" transactions and will cause your "designated account" to be debited for the amount of the purchase. The designated account for ATM transactions is your checking account. The designated account for debit Mastercard transactions is your checking account.

In addition, your debit Mastercard ™ may be used at any merchant that accepts Mastercard ™ debit cards for the purchase of goods and services. Your card may also be used to obtain cash from your designated account at participating financial institutions.

Each time you use your ATM card or debit Mastercard ™, the amount of the transaction will be debited from your designated account. We have the right to return any check or other item drawn off your account to ensure there are funds available to pay for the ATM card or debit Mastercard ™ transactions. We may, but do not have to, allow transactions which exceed your available account balance or available overdraft protection. If we do, you agree to pay the overdraft. You also agree to pay overdraft charges in effect from time to time for each transaction which causes your available account balance or available overdraft protection to be exceeded.

CURRENCY CONVERSION. If you affect transactions with your debit Mastercard™ in a currency other then UD dollars, Mastercard™ International, Inc, will convert the charge into US dollar amount. At Mastercard™ International, Inc. they use a currency conversion procedure, which is disclosed to institutions that issue Mastercard™. Currently the currency conversion s rate used by Mastercard ™ International to determine the transaction amount in US dollars for such transactions is generally either a government mandated rate or wholesale rate, determined by Mastercard™ International for the processing cycle in which the transaction is processed, increased by an adjustment factor established from time to time by Mastercard™ International. The currency conversion rate used by Mastercard™ International on the processing date may differ from the rate that would have been used on the purchase date or the cardholder statement posting date.

### Limitations on transactions
**Transaction limitations- ATM card** (default limits; may be changed upon request)

CASH WITHDRAWAL LIMITATIONS- you may withdraw up to $200.00 through use of ATMs in any one day.

POINT OF SALE LIMITATIONS- You may buy up to $500.00 worth of goods or services each day through use of out Point of sale service.

TOTAL DAILY LIMITS- In addition to the ATM limit or Point of Sale limits disclosed above, a total daily limit is imposed on these transactions. The maximum amount of cash withdrawals and Point of Sale transactions is limited to $700.00 in any one day.

**TRANSACTION LIMITATIONS- DEBIT MASTERCARD™** (default limits; may be changed upon request)

CASH WITHDRAWAL LIMITATIONS-You may withdraw up to $200.00 through use of ATMs in any one day.

POINT OF SALE LIMITATIONS- You may buy up to $500.00 worth of goods and services each day through use of our Point of Sale service.

TOTAL DAILY LIMITS- In addition to the ATM limit or Point of Sale limits disclosed above, a total daily limit is imposed on these transactions. The maximum amount of cash withdrawals and point of sale transactions is limited to $700.00 in any one day.

### OTHER LIMITATIONS
The terms of your account(s) may limit the number of withdrawals you may make each month. Restrictions disclosed at the time you opened your account(s), or sent to you subsequently will also apply to your electronic withdrawals and electronic payments unless specified otherwise.

Listed below are access devices that may be used to access a line of credit account and the line of credit accounts that may be accessed. The amount of cash advance available through use of your access device is subject to your separate agreement with the Bank, if any. Please refer to your Line of Credit Agreement for disclosures related to such limitations.
ATM card: overdraft line of credit
Debit Mastercard™: overdraft line of credit.

We reserve the right to impose limitations for security purposes at any time.

Cole Dep DPR000171

## DIAMOND BANK, FSB
## COMPLIANCE POLICY

This Compliance Policy describes how Diamond Bank (the bank) will comply with federal, state and local consumer laws and regulations. The bank believes it is prudent to maintain and administer an effective regulatory Compliance Program to avoid compliance failures that may result in penalties, costly civil and criminal litigation, customer restitution and adverse public relations or loss of customer goodwill.

The Compliance Program provides an overall strategic approach that specifies how we will manage our compliance responsibility. It defines the role of the Board of Directors and Executive Management, identifies the general duties and responsibilities of the Chief Risk and Compliance Officer, Compliance Coordinator and Compliance Committee, outlines the reporting structure and provides a blueprint for conducting a comprehensive review and testing of internal policies and procedures to facilitate compliance with federal, state and local consumer laws and regulations.

The Compliance Program covers the following consumer laws and regulations:

- Regulation B - Equal Credit Opportunity Act
- Regulation C - Home Mortgage Disclosure Act
- Regulation D – Federal Reserve Act; Reserve Requirements
- Regulation F – Limitations on Interbank Liabilities
- Regulation E - Electronic Funds Transfer Act
- Regulation P – Non-Public Information Privacy Act
- Regulation Z - Truth in Lending Act
- Regulation X - Real Estate Settlement Procedures Act
- Regulation BB - Community Reinvestment Act
- Regulation CC - Expedited Funds Availability Act
- Regulation DD - Truth In Savings Act
- Regulation AA – Credit Practices Rules (Unfair or Deceptive Acts or Practices)
- Real Estate Lending Policy
- Flood Disaster Protection Act
- Advertising Regulations
- Economic Sanctions Act (OFAC)
- Equal Employment Opportunity Act
- Fair Debt Collection Practices Act
- Bank Secrecy Act
- Bank Protection Act
- Fair Credit Reporting Act
- Right to Financial Privacy Act
- Branch Closing Policy
- Record Retention Schedule
- Regulation O – Loans to Insiders

Reviewed by Chief Operating Officer
Approved by Board of Directors 3.25.08

1

Cole Dep DPR000172

## BOARD AND MANAGEMENT RESPONSIBILITY

A cohesive Compliance Program is the responsibility of every person in the bank to ensure that the rights of individual consumers are preserved. Total bank support is required but the board and executive management acknowledge that their influence, direction and guidance are critical to implementing an effective Compliance Program.

The Board of Directors recognizes that management and officers must demonstrate unequivocal support of the Compliance Program so that all members of the bank understand and perceive the importance of the program. Management's involvement is critical to administering an effective Compliance Program.

The Chief Executive Officer will periodically reinforce the need to maintain an effective Compliance Program. This sign of support communicates a commitment to others and serves to strengthen the internal compliance effort throughout the bank. The Board empowers management to implement an effective Compliance Program.

## ORGANIZATION

Asset size and resource limitations dictate that our bank establishes a compliance committee. The compliance committee will be chaired by the bank's Chief Risk and Compliance Officer (or as designated by the board) and will be responsible for providing regulatory guidance, designing compliance procedures and assisting the Compliance Coordinator and third party compliance advisory and education firm(s). The compliance committee will consist of staff members selected by management. Compliance committee members will have lending, banking, operations, finance and human resource experience. The compliance committee will assist the Compliance Coordinator during the periodic reviews and help implement corrective procedures if deficiencies exist.

It is the responsibility of the Compliance Committee to ensure that the regulations are implemented in a timely manner. The Compliance Committee will meet at least six (6) times per calendar year and meeting minutes will be presented to the Board by a member of the Compliance Committee. The Board will acknowledge reviewing the compliance committee's minutes in the Board's minutes.

## CHIEF RISK AND COMPLIANCE OFFICER

The Board of Directors will designate a Chief Risk and Compliance Officer and a Compliance Coordinator who will be given appropriate responsibility and authority for compliance assurance. The Chief Risk and Compliance Officer, in conjunction with our compliance advisory and education firm(s), Plante Moran will be responsible for developing and overseeing a Compliance Program that includes a system of internal operating procedures to ensure compliance and minimize violations. Plante Moran will additionally assess the performance of the bank's Compliance Program. Compliance examinations will be conducted using our primary regulator's *Compliance Activities Regulatory Handbooks* as a guide. Thomas Compliance Associates, Inc. will be

Cole Dep DPR000173

responsible for designing and delivering Compliance Education for the board and the staff in accordance with our primary regulator's guidelines.

The examination should seek to discover strengths and weaknesses of the bank's compliance effort, operational flaws and assess the degree to which internal systems need to be improved. A discussion of violations should include:

- A description of the problem including the exact citation of statutory or regulatory provisions violated;
- The extent of any problem including a projection of the violations anticipated and the frequency of occurrence based on the examination sample;
- An estimate of financial risk created by the problem including projected cost of restitution;
- The underlying cause of the problem if it can be determined; and,
- Any specific steps to correct the problem or recommended procedures to alleviate the uncovered deficiencies.

All compliance reviews, whether performed internally or by a third-party are reported to management. A response is required to all compliance review findings and recommendations. Responses must generally be completed within one month from the date the report is provided and corrective action implemented within the first calendar quarter, if feasible, following the exception.

## REPORTING

The Chief Risk and Compliance Officer (a.k.a. as the Compliance Officer) will report directly to the Board of Directors. At appropriate board meetings, the Chief Risk and Compliance Officer shall provide a report covering changes, revisions or modifications to current compliance rules or regulations and will report on each regulation or rule identified in the Compliance Program.

During the Officer's presentation(s), the Board of Directors shall look or listen for signs or warnings that indicate ineffective maintenance or administration of the Compliance Program.

In addition, the Board shall:

1) Determine if the bank's compliance policies, practices and reporting systems are effective;
2) Review compliance findings and, if necessary, authorize corrective action to resolve compliance policy deficiencies, practices or reporting systems described in the report.
3) Assess the adequacy of the information and reporting systems described by the Chief Risk and Compliance Officer and Compliance Committee.

A summary of the report will be included in the Board minutes.

Reviewed by Chief Operating Officer
Approved by Board of Directors 3.25.08

3

Cole Dep DPR000174

## TESTING

Periodically, Plante Moran will test for compliance deficiencies. In addition, policies and procedures will be revised and tested to determine if they effectively describe the actual practice used by bank personnel when complying with the consumer laws and regulations issued by federal, state or local authorities. After each periodic test, a list of recommendations to improve the level of compliance, such as modifications to internal reporting systems or changing policies and procedures will be discussed with the Board of Directors at the appropriate meeting. To assess performance of the bank's policies and procedures, testing procedures will follow the procedures in our regulator's *Self-Assessment Compliance Guides*. These guides provide a checklist of the rules audited during the compliance exam. An analysis of the findings will provide a good indication of how well our bank has complied with its mandates. The independent compliance audit will probe for violations with the consumer laws and regulations prior to the bank's examination by its primary banking regulator. Findings will be reported to the Board of Directors via the Compliance Committee's report.

## CONTROLS

Our approach to compliance management emphasizes the importance of a compliance management strategy predicated on systems and procedures, monitoring, periodic self-assessment, organizational accountability, responsiveness to findings and effective training.

### 1. Systems and Procedures

The compliance officer is responsible for ensuring that the bank's compliance program is effective, and takes into consideration the bank's size and complexity of its operations. The compliance officer provides oversight of the bank's compliance function and acts as a resource to all other departments regarding compliance matters. Our compliance officer is assisted by our independent compliance advisory firm.

The compliance officer periodically reviews the compliance elements of bank policies and procedures to ensure that they reflect current regulatory requirements and works with applicable department managers to implement revisions or enhancements to policies and procedures as necessary. When new or revised laws or regulations require major revisions to bank processes the compliance officer works with affected departments on the changes that must be made in policies and/or procedures.

The compliance officer has responsibility for coordinating all compliance matters such as monitoring training, compliance reviews, coordination with our outside audit firm, and representatives from our primary supervisory regulators. The compliance officer acts as liaison between the bank and our regulator on all compliance examinations as well as any other compliance issues that arise. Our compliance officer ensures that required regulatory reports are completed and filed in a timely manner.

Reviewed by Chief Operating Officer
Approved by Board of Directors 3.25.08

4

Cole Dep DPR000175

The compliance officer consults with board, management and our legal firm when issues arise needing such guidance.

## 2. Monitoring

The compliance coordinator is responsible for maintaining an awareness of current compliance issues, and in turn keeps other staff updated by:

- Reviewing various regulatory and industry issuances addressing compliance matters on an ongoing basis.
- Notifying other bank areas when external factors, such as new or revised laws or regulations affect our banking function(s).
- Reporting to management on current compliance issues as well as dissemination of articles, checklists, and other information applicable to particular bank departments.

Our compliance coordinator is responsible for verifying that department managers are overseeing day to day operational performances and conducts the diligence to identify related exceptions.

As part of our interactive process between the compliance function and operating departments, the compliance coordinator maintains a general awareness of system changes that are put into place. This includes regularly schedule updates to existing deposit and loan systems as well as new systems that the bank purchases. Testing of the compliance components of systems is routinely required.

## 3. Assessment

The compliance officer and coordinator establishes a compliance monitoring schedule based on an assessment of risk. Risk is evaluated using the following criteria:

- Violations of regulations during past and present compliance examinations or exceptions identified in internal reviews,
- Those areas where violations of law could result in financial impact to the bank through fines or reimbursement to customers,
- Those violations of regulations that have the greatest risk of negative impact due to public perception and regulation of the bank
- In response to current regulatory concerns
- Those violations of regulations that could result in litigation exposure
- Those violations of regulations which are primarily technical in nature

The compliance monitoring schedule, which is broken down into periodic audits is risk-based and designed to cover high-risk regulations more frequently. Over time, all regulatory compliance areas are reviewed. This schedule is not rigid in nature but rather provides a guideline that is subject to revision by the ever-changing regulatory

Reviewed by Chief Operating Officer                                      5
Approved by Board of Directors 3.25.08

Cole Dep DPR000176

environment. Our internal compliance reviews are enhanced by engaging our independent compliance advisory firm to perform periodic reviews. Our third-party review is conducted by an organization with recognized compliance expertise.

### 4. Accountability

#### a. Executive Management and Compliance Committee

The Compliance Committee provides compliance and audit oversight at the management level and its membership consists of department officers and staff with related expertise. The committee reports to the Audit Committee of the board. The compliance officer is required to present compliance updates to this committee regarding:

- Current activities of the Compliance Department
- Compliance Reviews performed during the month
- Information on new/changing regulatory requirements

#### b. Board of Directors

The Board of Directors of our bank has the responsibility for ultimate oversight of the bank's compliance function. The activities of the Compliance Committee are reported to the Board on a periodic basis.

### 5. Responsiveness

All compliance reviews, whether performed internally or by a third-party are reported to management. A response is required to all compliance review findings and recommendations. Responses must generally be completed within one month from the date the report is provided and corrective action implemented within the first calendar quarter, if feasible, following the exception.

Once finalized, all compliance review reports and management responses are submitted and discussed at the next Compliance Committee meeting and to the audit committee of the board.

### 6. Training

The Compliance Officer in conjunction with the Compliance Committee will be instrumental in ensuring that bank personnel are provided adequate training of the consumer issues, laws and regulations. The compliance officer will work closely with other departments that conduct the training. In addition, the compliance officer and appropriate compliance committee members will maintain documents showing who was trained, what rules and regulations were covered and when the training took place. The training program will include all appropriate personnel.

Reviewed by Chief Operating Officer
Approved by Board of Directors 3.25.08

6

Cole Dep DPR000177

The compliance officer is responsible for working closely with our banking department to provide and track compliance training to bank employees as necessary to ensure staff is knowledgeable. Our bank along with our compliance education firm, Thomas Compliance & Associates, Inc., will provide regulatory training and includes:

- Providing basic compliance training to the board, all department managers and new hires
- Providing current training resources, internally and externally, to bank personnel
- Updating bank personnel on regulatory changes and emerging issues
- The maintenance of internal and external compliance training records

## CONCLUSION

Our bank recognizes that the compliance officer is not singularly responsible for compliance controls and for the entire bank; it must be a company-wide program. Training of new staff to develop an immediate awareness of regulatory compliance requirements contributes to the success of our program. Our staff understands they are responsible for performing self-assessments to ensure compliance control on a daily basis.

## CONSUMER COMPLAINTS

Consumer complaints can play an important role in the supervision of a financial bank's activities as well as establishing sound, effective policy. Consumer comments are a tool for identifying problems, for modifying operations and for protecting both the financial bank and users of the financial services. Since no two consumer complaints or comments are exactly alike, the following procedure should be used as a guideline and the scope may vary based on the specific facts.

### 1. Preliminary Actions

Generally, consumer complaints or comments involve the following:

- An alleged violation of existing federal laws or regulations
- An apparent misunderstanding of banking procedures or law
- An allegation of a bank error (includes disputes)
- Objections to or comments regarding existing polices or laws

### 2. Interviewing Bank Personnel

Bank personnel should be individually interviewed by either the compliance officer or the compliance coordinator if they are involved in the complaint or consumer's comment. Explanations of the occurrence should be requested during the interview process and copies of any written instructions furnished to employees regarding the allegation should be reviewed and discussed during the interview process.

Cole Dep DPR000178

### 3. Investigative Report

Either the Compliance Officer or Compliance Coordinator will write a report presenting the facts and information in a clear, objective manner. The report should:

- Summarize the facts in chronological order
- Detail the precise claims of the complainant
- Express the resolution desired by the complainant
- Indicate bank management's response to the claims of the complainant
- Recommend a course of action or corrective procedures
- Comment on the whether the complaint represents an isolated case or a pattern or practice that needs to be corrected

### 4. Complaint Processing Guidelines

Unless otherwise specified by any regulation or law, the following time limits should be followed in responding to complaints:

- Complaints should be acknowledged within fifteen (15) days after receipt of the correspondence
- Inquiries, comments or objections should be answered or the information provided within fifteen (15) business days after receipt
- Complaints not involving an on-site investigation should be fully processed and responded to within thirty (30) days after receipt
- Complaints involving an on-site investigation should be resolved within forty-five (45) days after receipt.

Exceptions may occur due to time limitations caused by staff and scheduling or other problems. If such a delay should occur, a memorandum should be placed in the file to indicate why the complaint processing guideline was not followed.

All written consumer complaints and inquiries, including those directed elsewhere with a blind copy, should be answered in writing in order to acknowledge receipt of the complaint. In addition, a separate file should be maintained on each complaint containing all information pertaining to the complaint.

### Complaint Alleging Credit Discrimination

Our Bank is committed to serving the credit needs of our lending community and responding to all credit applicants without prejudice. The Bank does not condone illegal credit discrimination. All credit applicants are treated equally regardless of race, color, religion, national origin, marital status, age, income derived from any public assistance program, or the good faith exercise of any right under the Equal Credit Opportunity Act or the Fair Housing Act which covers handicapped and familial status.

Reviewed by Chief Operating Officer                                                           8
Approved by Board of Directors 3.25.08

Cole Dep DPR000179

The area of discriminatory practices is broad and varied. The following four general classifications of discriminatory conduct are useful guides in assessing discriminatory lending practices:

- Purposeful discrimination against a protected group
- Overt discrimination when a prohibited basis is openly considered
- Pre-textual discrimination, when nondiscriminatory reasons are asserted to justify discriminatory acts
- Subjective standards that are vague and undefined that may produce unexplained discriminatory results
- Effects test -- a disproportionate impact on a protected group, but without discriminatory motivation

The Board of Directors will monitor equal credit investment by reviewing findings from periodic tests, annual reports, internal compliance exams and agency examination reports. The Board unequivocally endorses equal treatment for all credit applicants.

Cole Dep DPR000180

APPENDIX A

## COMPLIANCE ORGANIZATIONAL CHART



Diamond Bank, FSB
Board of Directors

Diamond Bank, FSB
Compliance Committee
Chair – Chief Risk and Compliance Officer

Plante Moran
Advisory Firm

Thomas Compliance & Associates, Inc.
Education Firm

Diamond Bank, FSB
Compliance Committee

Chair – Chief Operating Officer, Kimberly Cole
Compliance Coordinator, Cathy Harper

BSA/AML – Simone Gatlin
CRA – Brett Sand/Andrea Shibe
Deposits – Troy Divine
Finance & Accounting – Janis Skujins
HR/IT – Akiba Barberousse

Reviewed by Chief Operating Officer
Approved by Board of Directors 3.25.08

10

Cole Dep DPR000181

## APPENDIX B
## COMPLIANCE PROGRAM RESOLUTION

**WHEREAS**, Diamond Bank is committed to operate the bank in a safe and sound manner, and

**WHEREAS**, Diamond Bank will comply with applicable federal, state and local consumer laws and regulations, and

**WHEREAS**, failure to comply with federal, state and local consumer laws and regulations may result in certain penalties, civil or criminal liability litigation, customer restitution and adverse public relations, and

**WHEREAS**, Diamond Bank believes it is prudent to adopt and maintain and administer a formal Compliance Program to ensure adherence with current federal, state and local consumer laws and regulations, and

**WHEREAS**, Diamond Bank's Board of Directors directs management to design a formal Compliance Program, and

**WHEREAS**, Diamond Bank's Board of Directors has reviewed management's Compliance Program to effectively monitor, maintain and administer compliance activities, therefore,

**BE IT RESOLVED**, that the Board of Directors of Diamond Bank endorses the Compliance Program submitted on this 25th day of March, 2008 and approves Cathy Harper, Vice President and Retail Services Manager as the Bank's Compliance Coordinator, who will coordinate the Bank's overall compliance activities, audits, and exams and will report to the Bank's Chief Risk and Compliance Officer, and

**BE IT FUTHER RESOLVED,** that the Board of Directors of Diamond Bank designates Kimberly Cole, the Chief Operating Officer to act in the capacity of Chief Risk and Compliance Officer in accordance with the Bank's Risk and Compliance Policies, who shall report directly to the Board of Directors on said matters.

Cole Dep DPR000182

# APPENDIX C

## TRAINING SCHEDULE

**Semi-Annually**
- Bank Secrecy Act
- Regulation H – Bank Protection Act
- Flood Disaster Protection Act
- Economic Sanctions (OFAC)

**Annually**
- Regulation AA – Credit Practice Rules (Unfair or Deceptive Acts or Practices)
- Regulation B – Equal Credit Opportunity Act
- Regulation BB – Community Reinvestment Act
- Regulation C – Home Mortgage Disclosure Act
- Regulation DD – Truth In Savings Act
- Regulation E – Electronic Funds Transfer Act
- Regulation O – Loans to Insiders
- Regulation P – Non-Public Information Privacy Act
- Right to Financial Privacy Act
- Regulation X – Real Estate Settlement Procedures Act
- Regulation Z – Truth in Lending Act

**Periodically**
- Advertising
- Fair Credit Reporting Act
- Fair Debt Collection Practices Act
- Regulation D – Federal Reserve Act; Reserve Requirements
- Regulation F – Limitations on Interbank Liabilities
- Regulation Q – Prohibition Against Payment of Interest on Deposits
- Regulation CC – Expedited Funds Availability Act
- Record Retention

Cole Dep DPR000183

**APPENDIX D**

**AUDIT SCHEDULE**

1st **Quarter**
- Regulation C - Home Mortgage Disclosure Act
- Regulation P – Non-Public Information Privacy Act
- Right to Financial Privacy Act
- Regulation BB - Community Reinvestment Act
- Regulation H - Bank Protection Act
- Regulation O – Loans to Insiders

2nd **Quarter**
- Bank Secrecy Act
- Flood Disaster Protection Act
- Regulation B - Equal Credit Opportunity Act
- Regulation E - Electronic Funds Transfer Act
- Regulation Z - Truth in Lending Act
- Regulation CC - Expedited Funds Availability Act
- Regulation DD - Truth In Savings Act
- Regulation AA – Credit Practices Rules (Unfair or Deceptive Acts or Practices)

3rd **Quarter**
- Regulation D – Federal Reserve Act; Reserve Requirements
- Regulation Q – Prohibition Against Payment of Interest on Deposits
- Regulation X - Real Estate Settlement Procedures Act
- Economic Sanctions Act (OFAC)
- Equal Employment Opportunity Act
- Record Retention Schedule

4th **Quarter**
- Regulation F – Limitations on Interbank Liabilities
- Credit & Real Estate Lending Policy
- Advertising Regulations
- Fair Debt Collection Practices Act
- Fair Credit Reporting Act
- Branch Closing Policy

Cole Dep DPR000184

# DPR

# 10

Cole Dep DPR000185

| NAME | | |
|---|---|---|
| Rodriguez, Susan | | |
| Harper, Cathy | | |
| Warsi, Shabnam | | |
| Harris, Beaunica K. | | |
| Farlinger, Diana | | |
| Williams, Karen | | |
| Rubio, Sonia | | |
| Desai, Minal | | |
| Gatlin, Simone Y. | | |
| Hubbard, James A. | | |
| Sebastian, Christopher | | |
| Jameson, Jacqueline | | |
| Shibe, Andrea | | |
| Inonu, Ismet | | |
| Jukovich, Dean | | |
| Gipson, Terrona | | |
| Crumlish, Jon | | |
| Gottstein, Dan | | |
| Lignelli, Brian | | |
| Mitchell, Gregory W. | | |
| Roberts, Megan | | |
| Towne, Daniel | | |
| Urkov, Jodi | | |
| Urkov, Stuart | | |
| Patel, Jagruti | | |
| Wojtasik, Lukasz S. | | |
| Koehler, Jaclyn T. | | |
| Harvey, Denna | | |
| Collier, Dana | | |
| Skujins, Janis | | |
| Sand, Brett | | |
| Boldt, Barbara I. | | |
| Fitzsimmons, Nicole | | |
| Craychee, Michael | | |
| Cole, Kimberly | | |
| Dolan, Robert J | | |
| Russ, Adriana | | |
| Gilles, Kevin | | |
| Gallagher, Michael | | |
| Radford, Ursula | | |
| Evans, Sheena | | |
| Cole, Thomas | | |
| Parilla, Michael | | |
| King, Vanessa | | |
| Linneman, Nathan | | |
| Bronfeld, Andrew | | |
| Caivano, David | | |
| Sarkisian-Kalis, Renee F. | | |
| Hart, Tom | | |
| Barberousse, Akiba M. | | |
| Coleman, Laurence | | |

Cole Dep DPR000186

| |
|---|
| Elianow, Stan |
| Greco, Joseph |
| Kaufman, Michael |
| Klein, Michael |
| Tuel, Robert |
| Wolf, Sari |
| Erimann, Lori E. |
| Kahn, Darryl |
| Larson, Julie |
| Stoner, Joshua |
| Veritas, Christopher A. |
| Fritzmeier, David |
| Kosberg, Richard |
| McGrail, Constance J. |
| Setti, Frederico |
| Cascio, Theresa "Tracy" |
| Divine, Troy |
| Mandalke, Linda |
| Pozo, Mary |
| Muni, Premal J. |
| Tapia, Jesus "Jesse" |
| Pearce, R. Lynette |
| Ellington, Monique |
| Turner, Tamiko |
| Hubbard, Lauren F. |
| Perri, Joseph M. |
| Trent, Jennifer A. |
| Rosiles, Veronica P. |
| Hoffman, Brandt |
| Kraszewska, Anita |
| Rizos, Eva M. |
| Quiroz, Juana |
| Russ III, Charles F. |
| Jensen, Jens A. |

Cole Dep DPR000187

# DPR

# 13

Cole Dep DPR000188



# A & R Security Services, Inc.

4415 W. Harrison St., Suite 531
Hillside, Illinois 60102

# SPECIAL OCCURRENCE REPORT

| Type of Occurrence: | | | Time: | Date: |
|---|---|---|---|---|
| *HARASSMENT* | | | *1610 Hours* | *03/01/07* |

| Account Name: *Diamond Bank* | | Specific Location of Occurrence: |
|---|---|---|
| Address: *160 SOUTH AVE.* | | *N.E. lot, ENTRANCE* |
| | | *AREA.* |

| Suspect ☑ | Name: *Male-Bank. MR. Phillips* | Origin of Report | |
|---|---|---|---|
| Reporter ☐ | Address: _____ | Found | ☑ |
| Victim ☐ | _____ | Reported to Security Officer | ☐ |
| Other ☐ | _____ | Telephone | ☐ |
| | Phone No: _____ | Alarm | ☐ |
| | | Other | ☐ |

| A&R Security Officer: | A&R Field Supervisor Notified: | Yes ☐ | No ☑ |
|---|---|---|---|
| Name: *Siedler Jra* | Name: _____ | | |
| | Time Notified _____ am pm | Time of Arrival _____ am pm | |

## DETAILS

*ON THE ABOVE DATE TIME AND locATION. THE WRITER
CONTINUES TO GET DIRTY looks AND USES THE FINGER
INDICATING F--k YOU TO THE WRITER. SHOWN ON
CAMERA OF N.E lot. ENTRANCE. CUSTOMER CAUSE A
INCIDENT IN THE PAST WITH LARRY - PARTNER AND
THE WRITER BY DRIVING FAST AND WRONG WAY IN
PARKING LOT AND WAS GIVEN A WARNING. THAT NEXT
TIME WILL BE BARD FROM PREMISES. DEAN WAS INFORMED
ON OCCURRENCE TODAY AT 410 PM.*

Cole Dep DPR000189



# A & R Security Services, Inc.

4415 W. Harrison St., Suite 531
Hillside, Illinois 60102

# SPECIAL OCCURRENCE REPORT

| Type of Occurrence: | | Time: | Date: |
|---|---|---|---|
| ACCIDENT. CUSTOMER FELL DOWN | | 1018 hours | 02/15/07 |

| Account Name: Dirman Park | Specific Location of Occurrence: |
|---|---|
| Address: 100 ARY AR, INT 810 IL 60610 | LOBBY AREA BY SECURITY DESK. |

| | Name: WINTER SPEARS | Origin of Report | |
|---|---|---|---|
| Suspect ☐ | | Found | ☐ |
| Reporter ☐ | Address: 901 W ARGYLE #2K | Reported to Security Officer | ☑ |
| Victim ☑ | CHICAGO IL 60640 | Telephone | ☐ |
| Other ☐ | | Alarm | ☐ |
| | Phone No: 773-936-7128 | Other | ☐ |

| A&R Security Officer: | A&R Field Supervisor Notified:     Yes ☐     No ☑ |
|---|---|
| Name: STEVE SI---EK | Name: _____ |
| | Time Notified ___ am pm     Time of Arrival ___ am pm |

## DETAILS

ON THE ABOVE DATE ITEMS AND LOCATION. THE WRITER
WAS INFORMED BY DIANE RUTH. PK MEMBER THAT A LADY
FELL BY ABOVE STATED LOCATION. THE WRITER SPOKE TO
MRS SPEARS AND ASK IF SHE NEEDED MEDICAL TREATMENT.
SHE REFUSED TREATMENT SAYS SHE FELL ON HER LEFT KNEE
AND SHE WAS FINE. THE WRITER TOOK DOWN HER INFORMATION.
REPORT NOT WRITTEN WITNESS ACCIDENT. STATED SAME.
CUSTOMER FELL BY OF TRIPE AREA AND DEPARTED ON HER OWN.
THE AREA WAS DRY AS IT WAS DRY. VENTOUS WAS FINE
STEVE IS NEXT TO AREA ALSO. INCIDENT OVER. RP



# A & R Security Services, Inc.

4415 W. Harrison St., Suite 531
Hillside, Illinois 60102

# SPECIAL OCCURRENCE REPORT

| Type of Occurrence: *CAMERA DOWN BROKEN BRACKET* | Time: *1505 HOURS* | Date: *03/02/07* |
|---|---|---|

| Account Name: *Diamond Bank* | Specific Location of Occurrence: |
|---|---|
| Address: *100 North Ave* *Chicago IL* | *North / West Lot* *Camera.* |

| Suspect ☐ | Name: _____ | Origin of Report | |
|---|---|---|---|
| Reporter ☐ | Address: *N/A* | Found | ☑ |
| Victim ☐ *N/A* | | Reported to Security Officer | ☐ |
| Other ☐ | | Telephone | ☐ |
| | | Alarm | ☐ |
| | Phone No: _____ | Other | ☐ |

| A&R Security Officer: Name: *Jennifer Sims* | A&R Field Supervisor Notified:     Yes ☐     No ☑ |
|---|---|
| | Name: *N/A* |
| | Time Notified _____ am pm    Time of Arrival _____ am pm |

## DETAILS

*On the above date, time and location. This writer found camera at stated location hanging off pole. Appears wind broke off bracket due to very strong winds. Larry informed. Brownie came back out. Camera tied to pole so it will not fell. Larry said it will be fixed on Monday. Mr. Hubbard advised on all above.*

Cole Dep DPR000191



# A & R Security Services, Inc.
4415 W. Harrison St., Suite 531
Hillside, Illinois 60102

# SPECIAL OCCURRENCE REPORT

| Type of Occurrence: | Time: | Date: |
|---|---|---|
| *ILLEGALLY PARKED VEHICAL* | 1020 HOURS | 04/05/07 |

| Account Name: *Diamond Bank* | Specific Location of Occurrence: |
|---|---|
| Address: *100 North Ave.* *CHICAGO IL* | *NORTH PARKING LOT 2* *STALL FROM STILLS.* |

| Suspect ☑ | Name: *UNKNOWN ON A RED* | Origin of Report | |
|---|---|---|---|
| Reporter ☐ | Address: *DODGE CARAVAN.* | Found | ☑ |
| Victim ☐ | *ILL. 305 7375* | Reported to Security Officer | ☐ |
| Other ☐ | | Telephone | ☐ |
| | Phone No: *N/A* | Alarm | ☐ |
| | | Other | ☐ |

| A&R Security Officer: Name: *SETTLER STAN.* | A&R Field Supervisor Notified:   Yes ☐   No ☑ |
|---|---|
| | Name: |
| | Time Notified _____ am  pm   Time of Arrival _____ am  pm |

## DETAILS

*ON THE ABOVE DATE TIME AND LOCATION. THE WRITER*
*FOUND STATED DODGE CARAVAN. ILL 305 7375 IN*
*OUR LOT. THE WRITER REVIEWED CCTV. SAW OWNER*
*LEAN OFF PROPERTY TOWARDS SHELL GAS STATION. THE*
*WRITER STICKER VEHICAL AND MANAGMENT ADVISE-*
*T. TOW AFTER ONE HOUR BUT CHECK AT SHELL FIRST.*
*POSSIBLE EMPLOYE THERE. AT 1125 HOURS SAW OWNER*
*RETURN TO VEHICAL. THE WRITER ADVISED OWNER HE*
*WILL NOT PARK HERE AND HE SAID HE KNOWS AND LEFT.*

Cole Dep DPR000192



# A & R Security Services, Inc.

4415 W. Harrison St., Suite 531
Hillside, Illinois 60102

# SPECIAL OCCURRENCE REPORT

| Type of Occurrence: | | Time: | Date: |
|---|---|---|---|
| *Accident* | | 11:30 a.m. | 7/03/07 |

| Account Name: | Diamond Bank | Specific Location of Occurrence: |
|---|---|---|
| Address: | 110 W. North Avenue | Tellers Line Register |
| | Chicago, Illinois 6060 | two |

| Suspect ☐ | Name: | A & R Security Services | Origin of Report | |
|---|---|---|---|---|
| Reporter ☑ | Address: | 700 E. Butterfield Rd. | Found | ☐ |
| Victim ☐ | | Lombard, IL 60148 | Reported to Security Officer | ☑ |
| Other ☐ | | | Telephone | ☐ |
| | Phone No: (630) 366-4111 | | Alarm | ☐ |
| | | | Other | ☐ |

| A&R Security Officer: | A&R Field Supervisor Notified: | Yes ☐ | No ☑ |
|---|---|---|---|
| Name: Jeffrey Johnson | Name: | | |
| | Time Notified_____ am pm | Time of Arrival_____ am pm | |

## DETAILS

At approximately 11:30 a.m. I was seating at my desk monitoring the activities in the bank on the monitor when the receptionist notified me that a customer on Register two had fainted. Me and the receptionist tried to call the paramedic at the same time; she got through before me. The paramedics advised us on what to do until they arrived. Before they arrived her son picked her up and attempted to leave the bank. We advised him that the paramedics was on the way and gave his mother a chair to sit in. He and his mother advised us that she was o.k. but we encouraged her to wait for the ambulance. Once the paramedic arrived and examined her they advised us that she was alright and there was nothing seriously wrong with her. We then notified Kim Cole (The Senior Vice President at the bank) that the customer was o.k. She congratulated us on a job well done.

Cole Dep DPR000193



# A & R Security Services, Inc.

4415 W. Harrison St., Suite 531
Hillside, Illinois 60102

# SPECIAL OCCURRENCE REPORT

| Type of Occurrence: Power Outage | Time: 21:00 | Date: 7/9/07 |
|---|---|---|

| Account Name: Diamond Bank<br>Address: 100 W. North Avenue Chicago, IL. | Specific Location of Occurrence: All over the whole building. |
|---|---|

| Suspect ☐ | Name: A & R Security Services | Origin of Report |
|---|---|---|
| Reporter ☒ | Address: 100 E. Butterfield Rd. | Found ☐ |
| Victim ☐ | Lombard, IL. 60148 | Reported to Security Officer ☐ |
| Other ☐ | Phone No: 630-316-4111 | Telephone ☐ |
| | | Alarm ☐ |
| | | Other ☒ |

| A&R Security Officer:<br>Name: s/o Jeffrey Johnson | A&R Field Supervisor Notified:     Yes ☐   No ☒ |
|---|---|
| | Name: _____ |
| | Time Notified _____ am pm   Time of Arrival _____ am pm |

## DETAILS

At approximately 1610 hundred hours. I s/o Johnson was at my desk monitoring the activities of the bank on the monitor when I heard a loud sound, then the power went out. The President and Senior Vice-President of the bank told me to lock the doors and to let no one leave the bank; keep an eye on the vault by the tellers department. While I was monitoring the door and vault Kimberly Cole and Kevin Jurkovich was making calls to try and got the services restored. After Ms. Cole made the calls she interviewed all the employees in the bank to see what they was doing before the power failure to make sure it was not the bank fault. No one was allowed to leave before everyone was interviewed and before I could bring back up the cameras and make sure they was working properly when the power was restored at approximately 5:40 p.m.

Cole Dep DPR000194

# A & R Security Services, Inc.



### DAILY ACTIVITY REPORT

ACCOUNT: _Diamond Bank 100 W North Ave_

OFFICER: _Stan Seidler_          DATE: _07/24/07_  SHIFT: _0600/1830_

*Please print:* **Document all shift activity, including all facts, names, addresses and descriptions.**

| TIME | INFORMATION/ACTION TAKEN |
|------|--------------------------|
| 0600 | On Duty. Alarm off. Lights on. Tom present. Call A&R. |
| 0605 | Interior flx fl patrol. All clear. Secured. In order. |
| 0635 | Exterior patrol of premises. No unlawful activity. |
| 0705 | Monitor CCTV. Lobby area. Made coffee. All in order. |
| 0800 | Pick up mail/tan box. Put on Diana's desk. A.I.O. |
| 0830 | Unlock main lobby/handy cap doors. Now open. |
| 0840 | ATM duties with Diane/Simone. Escort to vault. Secure. |
| 0855 | Exterior patrol. Clear mail shoot. Moved car. All secure. |
| 0918 | Monitor CCTV. Lobby area. All in order. Secure. |
| 1000 | Interior flx fl patrol. All in order. Secure. |
| 1030 | Monitor CCTV. Lobby area. Normal activity. Secure. |
| 1130 | Dun Bear armored stopped. Escort to/from vault. Secure. |
| 1200 | Monitor CCTV. Lobby area. All in order. Secure. |
| 1232 | Exterior patrol of premises. All in order. |
| 1375 | Lunch break. CCTV monitor all areas. AIO/OE |
| " | Mike Newberry and new comander stopped. Meeting A.I. |

**OFFICER'S SIGNATURE:** _Stan S_

_1 of 2_

**RELIEVED BY:** _N/A_

305 A          **REVIEWED BY:** _____          Cole Dep DPR000195



# A & R Security Services, Inc.

## DAILY ACTIVITY REPORT

ACCOUNT: _Diamond Bank_

OFFICER: _Seidler_          DATE: _7/24_     SHIFT: _dd18?0_

**Please print: Document all shift activity, including all facts, names, addresses and descriptions.**

| TIME | INFORMATION/ACTION TAKEN |
|------|--------------------------|
| 1420 | MONITOR CCTV LOBBY AREA. ALL IN ORDER. SECURE. |
| 1500 | INTERIOR FLX FL PATROL. NORMAL ACTIVITY. |
| 1525 | MONITOR CCTV LOBBY AREA. ALL AREA'S IN ORDER. |
| 1620 | PICKED UP TAN BOX FROM DANA. PUT TO NIGHT BOX. |
| 1635 | EXTERIOR PATROL OF PERIMETER. INCIDENT OF #2 MALES. ADVISED DRIVER. DROVE TO WRONG WAY. |
| 1643 | INCIDENT W/ MONIQUE F. TELLER #2. 2 BL. MALE OF DRIVE SHORT CHANGE MONIQUE $200.00. ASKING FOR CHANGE. CALLED POLICE. TOOK DOWN PLATE NUMBER. RADIO |
| 1651 | CPD ARRIVED. BEAT # 1811 1STAR #4352 O/ROOKS. INFORMED. |
| " | FOR FURTHER DETAILS SEE SPECIAL OCCURRENCE REPORT. (ATTACHED) |
| 1715 | CALLED A&R LT. WHATLING. ADVISED ON INCIDENT. |
| 1744 | INTERIOR FLX FL PATROL. NIGHT CLOSED SAFETY DEP VAULT. |
| 1800 | CLOSED - LOCKED MAIN LOBBY/THRUDY VIA DOORS. SECURE. |
| 1820 | BRIEFING WITH MRS COLK / HR HUSBAND ON INCIDENT. WITH MONIQUE, DIANE, SIMARK. ALL IN ORDER. |
| 1850 | END OF SHIFT. AFTER MS COLE, SIMARK CLOSED OUT. |

OFFICER'S SIGNATURE: _____

RELIEVED BY: _____

REVIEWED BY: _____

Cole Dep DPR000196



# A & R Security Services, Inc.

700 E. Butterfield Rd.
Suite 320
Lombard, IL 60148

## SPECIAL OCCURRENCE REPORT

| Type of Occurrence: *THEFT MONEY XCHANGE* | Time: *1643 HOURS* | Date: *TUESDAY 07/24/07* |
|---|---|---|

Account Name: *Diamond bank*
Address: *100 W 100TH AVE & CLARK*
*CHICAGO IL 60606-1303*

Specific Location of Occurrence: *TELLER #2 AREA*
*MONIQUE PANKIGGET*

| | Name: *MONIQUE ELLINGTON* | Origin of Report | |
|---|---|---|---|
| Suspect ☐ | Address: *100 W 100TH AVE & CLARK* | Found | ☐ |
| Reporter ☑ | *TELLER #2* | Reported to Security Officer | ☑ |
| Victim ☐ | | Telephone | ☐ |
| Other ☐ | Phone No: *312) 649-4320* | Alarm | ☐ |
| | | Other | ☐ |

A&R Security Officer:
Name: *STAN SEIDLER*

A&R Field Supervisor Notified:    Yes ☑    No ☐
Name: *LT. WILKING.*
Time Notified *1752* am pm    Time of Arrival *N/A* am pm

## DETAILS

*ON ABOVE STATED TIME, DATE, LOCATION. THIS WRITER WAS ON PATROL OF LOT NOTICE A DRIVER COMING IN WRONG WAY. AND 1ST DRIVER OF HONDA AND HE LEFT #2 MALE PASSENGER IN BACK. 5 MIN LATER #2 BLK MALE LEFT AS DRIVER #1ST BLK MALE PULLED BACK IN LOT. AS PASSENGER WAS GETTING IN CAR MONIQUE R. CAME OUT IN LOT SAID PASSENGER. STOLED OVER $400.00 DOLERS. AS I APROUCHED BOTH MALES. THAY TOOK OFF IN VEHICLE. EAST BOUND ON 100TH AVE. THIS WRITER TOOK PLATE # NUMBER DOWN, CALLED 911 POLICE AND MRS COLE / MR HUBARD. AT 1648 HRS. AT 1651 HRS. POLICE OFFICER BUNKER STR 9352 / 1STBEAT 2842 SHOWED. REPORT COMPLETED WTH MONIQUE / MRS COLE. INFOMATION / PHOTOS GIVEN. AT 1727 HRS. POLICE DEPARTED. BRIEFING WITH MRS COLE / MR HUBARD $400.00 CONFIRM STOLEN. 1800 HRS. SECURE BANK. 1851 HRS LEFT BNK. A&R OFFICE ADVISED. END OF REPORT. CPD REPORT*

CoK Dep/A&R 00197



# A & R Security Services, Inc.

700 E. Butterfield Rd.
Suite 320
Lombard, IL 60148

# SPECIAL OCCURRENCE REPORT

| Type of Occurrence: PROPERTY DAMAGE (SCRAP) ON POLE | Time: 0900 HOURS | Date: 8/20/07 |
|---|---|---|

| Account Name: Diamond Park | Specific Location of Occurrence: |
|---|---|
| Address: 100 W NORTH AVE CHICAGO IC 60608 | POST UNDER CAMERA C/4 N/W INT. PARKING LOT |

| Suspect ☐ Reporter ☑ Victim ☐ Other ☐ | Name: TOM - ENGINEER Address: 100 W NORTH AVE CHI IL 60605 Phone No: PARK # | Origin of Report |  |
|---|---|---|---|
|  |  | Found | ☑ |
|  |  | Reported to Security Officer | ☑ |
|  |  | Telephone | ☐ |
|  |  | Alarm | ☐ |
|  |  | Other | ☐ |

| A&R Security Officer: Name: Stan Seidler | A&R Field Supervisor Notified: Yes ☐　No ☑ |
|---|---|
|  | Name: N/A |
|  | Time Notified N/A am pm　Time of Arrival N/A am pm |

**DETAILS**

ON THE ABOVE DATE, TIME, AND LOCATION. THIS WRITER
WHILE ON EXTERIOR PATROL. WAS INFORMED I SHOULD
SMALL SCRAPE DAMAGE TO BARRIER AT STATED LOCATION.
APPEARS A TRUCK (MAY RUBBED) AGAINST IT. NO DENTS.
POSSIBLY HAPPEND OVER THE WEEKEND. NOTHING FURTHER.

Cole Dep DPR000198



# A & R Security Services, Inc.

700 E. Butterfield Rd.
Suite 320
Lombard, IL 60148

# SPECIAL OCCURRENCE REPORT

| Type of Occurrence: Urinated on bank Property | Time: 14:30 | Date: Sept. 10, 2007 |
|---|---|---|

| Account Name: Diamond Bank | Specific Location of Occurrence: |
|---|---|
| Address: 100 N. North Avenue Chicago, IL. 60610-1303 | North west end of Parking lot Near last parking lot Space/corner |

| Suspect ☐ Reporter ☑ Victim ☐ Other ☐ | Name: A-N-R Security Services Address: 700 E. Butterfield Rd Lombard, IL 60148 Phone No: (630) 316-4111 | Origin of Report |
|---|---|---|
| | | Found ☐ Reported to Security Officer ☐ Telephone ☐ Alarm ☐ Other ☑ |

| A&R Security Officer: Name: Jeffrey Johnson | A&R Field Supervisor Notified:    Yes ☐    No ☑ Name: _____ Time Notified _____ am  pm    Time of Arrival _____ am  pm |
|---|---|

**DETAILS**

At approximately 14:22 hundred hour I observed a male hispanic on the monitor in parking lot near exit getting ready to urinate. So I quickly exited through the rear door of the building to try and capture the subject. The subject heard the door close ran and jumped in a silver four door chevy truck.

Cole Dep DPR000199



# A & R Security Services, Inc.

700 E. Butterfield Rd.
Suite 320
Lombard, IL 60148

## SPECIAL OCCURRENCE REPORT

| Type of Occurrence: Urinating ON Bank Property | Time: 20:30 | Date: 10/17/07 |
|---|---|---|

| Account Name: Diamond Bank | Specific Location of Occurrence: |
|---|---|
| Address: 100 W. North Avenue Chicago, Illinois 60610 | Rear end of Parking lot near Drive Car |

| Suspect ☐ Reporter ☑ Victim ☐ Other ☐ | Name: A-N-R Security Services | Origin of Report |
|---|---|---|
| | Address: 700 E. Butterfield Rd. Lombard, IL 60148 | Found ☐ <br> Reported to Security Officer ☑ <br> Telephone ☐ |
| | Phone No: 1-(630)-316-4111 | Alarm ☐ <br> Other ☐ |

| &R Security Officer: Name: O/- Jeffrey Johnson | A&R Field Supervisor Notified:    Yes ☑    No ☐ Name: LT. — LOBAL |
|---|---|
| | Time Notified 07:30 am pm    Time of Arrival _____ am pm |

DETAILS

Between the hours of 3 and 4 p.m. while I was monitoring the monitor Dean called and alerted one of a suspicious male and female in the rear of lot. I then proceeded to the rear of the lot and eased up on subject who looked like a single hispanic in his late 20's or early 30's urinating in the lot. I then apprehended the subject and escorted him to the inside of the lower area of bank to the holding room. It was at that time I notified management and asked them if they wanted to press charges or let him go. They asked me if I ever seen subject before, I answered No. They then advised me to give him a warning not to come back on property doing that again and then let him go. I informed him that if he is caught doing it again he would be arrested. I then escorted him off the bank premises.

Cole Dep DPR000200

# DPR

# 14

Cole Dep DPR000201

Prepared for:  Carmen Flores vs. Diamond Bank, FSB Document Production Rider
Prepared by:  Kimberly Cole
Senior Vice President, Chief Operating Officer & Secretary
Date:  June 16, 2008

## Board Meeting January 11, 2008 – Excerpt from Approved Minutes

*[Legal Issues]*
*[ATM Litigation]*
Mr. Hubbard presented the ATM Litigation (see Board Package January 11, 2008).  A
discussion ensued regarding costs and liability risks. Mr. Hokin asked how the attorney
expenses were being covered.  Mr. Hubbard responded through the bank's E&O Policy
"after our deductible of $25,000.00 "and informed the board that he engaged Belongia &
Shapiro, LLP.

## Board Meeting February 26, 2008 – Excerpt from Approved Minutes

*[Legal Issues]*
Mr. Hubbard began a brief update on the bank's legal issues.
*[ATM Litigation]*
No new updates.

## Board Meeting March 25, 2008 – Excerpt from Approved Minutes

*[Legal Issues]*
*[ATM Litigation]*
Richard Marks asked Kimberly Cole about the lawsuit on the ATM machine. She stated
that the second count of the lawsuit was dismissed, so the whole case will be re-presented
without the second count; she stated she was going to be prepared for deposition on this
matter very soon.

## Board Meeting April 23, 2008 – Legal Report Submitted by Andrew Bronfeld and Presented by Kimberly Cole

**From:** Andrew Bronfeld
**To:** The Board of Directors
**Date:** April 23, 2008
**Re:** Carmen Flores v. Diamond Bank, FSB

This action was brought by Carmen Flores ("Flores") for failure to disclose on the outside
of the ATM, that a fee will be imposed by the ATM. Flores originally brought two causes
of action against the bank, the first for failure to provide a fee notice and the second for
failure to disclose that deposited funds may not be immediately available. Our attorney
immediately made a motion to dismiss both causes of action. Instead of opposing our

Prepared for:  Carmen Flores vs. Diamond Bank, FSB Document Production Rider
Prepared by:  Kimberly Cole
Senior Vice President, Chief Operating Officer & Secretary
Date:  June 16, 2008

motion to dismiss the second cause of action, plaintiff's attorney decided to withdraw his second cause of action.

Our motion to dismiss the first cause of action (and now the only cause of action) is being treated as Motion for Summary Judgment, as such, plaintiff is allowed time to complete discovery in order to oppose our motion. We are currently in the process of completing discovery. We have to respond to plaintiff's discovery requests by April 18, 2007 and plaintiff needs to respond to our discovery requests by May 12, 2008.

Board Meeting April 23, 2008 – Excerpt from Minutes presented in May BOD Review Package on May 27, 2008 (Currently Unapproved)

*[Legal Issues]*
*[ATM Litigation]*
Kimberly Cole discussed the ATM litigation pending pertaining to Carmen Flores lawsuit against the Bank. We are currently in the process of completing discovery; and plaintiff needs to respond to our discovery requests by May 12, 2008.

Cole Dep DPR000203

Diamond Bank, FSB
Bank Operations/Legal
Update Dated: 12/12/07

**To:** Diamond Bank, FSB Board of Directors - David Hokin, Chairman; Rob Rubin; Bob
Hartman; Richard Marks; James A. Hubbard, President & CEO
**From:** Kimberly Cole, SVP & COO
**CC:** Dean Jukovich, SVP & CFO
**Re:** Carmen Flores via The Consumer Advocacy Center, PC* vs. Diamond Bank, FSB –
ATM Class Action Filing November 21, 2007

**Description:** Plaintiff claimed that when she used the ATM located at 100 W. North
Avenue to obtain funds on August 2, 2007, there was not a sign placed on or nearby the
ATM stating that a fee would be charged. She also claims that a notice was not visible
concerning the availability of funds once deposited within the ATM. Both claims are
regulatory requirements under Reg E (EFTA-Electronic Fund Transfer Act) and Reg CC
(EFAA-Expedited Funds Availability Act).

**Actions Taken:** Immediate action was taken to replace the notices on the ATM
mentioned in the case. Bank staff subsequently verified that all other bank owned ATMs
had the proper notices. The President & CEO engaged Belongia & Sharpiro, LLC to
gather data and prepare initial responses.

It has been determined that this kind of error is covered under the bank's GLP and E&O
Policies. Similar cases have been filed in the recent past and settled out of court.

Report Submitted By: Kimberly Cole
Title: Senior Vice President & Chief Operating Officer

1

Cole Dep DPR000204

# DPR

# 15

Cole Dep DPR000205

A & R SECURITY SERVICES, INC.
SECURITY GUARD SERVICE AGREEMENT

AGREEMENT dated October 20, 2005 between A & R SECURITY SERVICES, INC. (herein called "A & R"), and Diamond Bank (herein called "Client"). For the considerations specified below, and on any riders attached, the parties mutually agree:

1.      A & R shall furnish security guard patrol service at 100 West North Ave. Chicago, Illinois 60610 (hereinafter called the "Premises") commencing November 7, 2005. The specific number, principal posts and hours of duty of security guards shall be determined by Client in writing. Client assumes complete responsibility for its selection of the number, principal posts and hours of duty of security guards. Client may alter the specific number, principal posts and hours of duty of security guards at anytime upon one (1) business day prior notice to A& R; however, A & R may elect to deem any alternation reducing the number of guards or total hours per week below the amount prevailing at inception of this Agreement as a termination of the Agreement by Client.

2.      For services hereunder, Client shall pay A & R at a straight billing rate of 23.15; overtime billing rate of 33.57; and a holiday billing rate of 44.56; per person, per hour, payable net payable net on receipt of invoice. Client shall be invoiced weekly. If payment is not made within fifteen (15) days after the date of invoice, a 1 3/4 % charge will be assessed against the amount due for each month said amount remains owing (15 % per annum). A & R may increase the rate charged for services upon giving Client at least thirty (30) days prior written notice. If it is unwilling to pay such increase, Client may terminate the unexpired term of this Agreement by notifying A & R in writing fifteen (15) days prior to the otherwise effective date of the increase. Client shall immediately pay all charges for services rendered through termination date.

3.      The term of this Agreement shall commence on the date stated in paragraph 1 and, except as otherwise provided herein, remain in force and effect for a period of two (2) years after the date the term commences. Either party may elect not to renew the Agreement for subsequent 1 year periods sending written notice of termination, by certified or registered mail or by hand delivery to the other party at least thirty (30) days prior to the end of the initial period of the renewal period then in effect. Client shall immediately pay all charges for services rendered through termination date.

4.      A & R shall furnish uniformed security guards. All equipment installed or placed in, on, or about the Premises by A & R shall remain the property of A & R , and A & R shall, at all times during and after the term of the Agreement, have the sole and exclusive right to install, maintain, replace and remove same.

5.      The security guards will be A & R's employees. A & R will pay all salaries and expenses of its employees, withhold necessary Federal, State, and Social Security Taxes and pay any Federal and State Unemployment Taxes or similar taxes related to its employees.

6.      A & R shall maintain the following types insurance: (a) Worker's Compensation Insurance covering persons employed by A & R engaged in the performance of the work hereunder; (b) General Liability Insurance in the name of A & R, including bodily injury, property damages and personal injury for $1,000,000 single limit liability.

7.      A & R will remove from service any security guard who, in the opinion of Client, has engaged in improper conduct or cannot perform the work assigned upon Client's request.

8.      Overtime charges will only apply under strike and emergency conditions and special requests of Client. If a strike or emergency condition arises at the Premises that requires assignment of guards in excess of the normal guard contingent contemplated hereunder or if Client request a specific security guard to work additional hours or days, then Client shall reimburse A & R for all expenses incurred as a result of said strike or emergency condition and special request over and above the expenses incurred in supplying the normal guard contingent hereunder including, but not limited to, additional expenses incurred as a result of A & R's obligation to pay the security guard's overtime pay. Client agrees to pay **double** the then prevailing hourly charge hereunder per person hour worked on all holidays: New Year's Day, Martin Luther King Jr. Day, Memorial Day, Independence Day, Labor Day, Thanksgiving , Christmas Eve , Christmas and New Year's Eve.

9.      It is agreed that A & R is not an insurer, that insurance shall be obtained by Client, if any is desired, that the sums payable hereunder by Client are based upon the value of services offered and the scope of liability undertaken and that such terms are not related to the value of property belonging to Client or others located on the Premises. Client indemnifies and agrees to protect A & R against any claims for damages or losses caused or arising from, in whole or in part, hazards located on the Premises or from Client's property and operations, or from or to the property of any third party. Client shall comply with OSHA Hazard Communication Standards, make available to A & R all material Safety Data Sheets and advise A & R of any precautionary measures that need to be taken to protect A & R personnel on the premises.